## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Case No. 485899V |
| | * | |
| MONTGOMERY COUNTY, MARYLAND | * | |
| | * | |
| Defendant | * | |

### DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Montgomery County, Maryland, by and through its undersigned counsel, respectfully requests that this Court dismiss the Complaint for lack of standing or, alternatively, enter judgment in its favor as to all three counts of the Complaint (pending before this Court on remand from federal court) and further declare that:

Count I: Bill 4-21 is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

Count II: Bill 4-21 is authorized by, and not preempted by or in conflict with, State law; and

Count III: The restrictions of Bill 4-21 are *per se* not a taking and Bill 4-21 was properly enacted pursuant to the County's police powers.

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## REQUEST FOR HEARING

Pursuant to Rule 2-311(f), Defendant requests a hearing on Plaintiff's Motion for Partial

Summary Judgment and Defendant's Motion to Dismiss or, alternatively, for Summary Judgment.

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of February 2022, a copy of the foregoing was
electronically served through MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,          *

     Plaintiffs          *

    v.          *          Case No.: 485899V

MONTGOMERY COUNTY, MARYLAND          *

     Defendant          *

## MEMORANDUM IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### STATEMENT OF THE CASE

"Ghost guns" are homemade unserialized (and therefore untraceable) firearms, which can be easily assembled from kits or built using 3D printers by individuals without any required background check. When made of plastic, these guns may also be undetectable at security checkpoints that use metal detectors. Police in Montgomery County recovered 73 of these guns in 2020. And their use is increasing, both here and in surrounding jurisdictions.

In response, the County Council enacted, and the County Executive signed, Bill 4-21 ("the Bill"). **Ex. A**. The Bill generally restricts the "possession, use, sale, and transfer" of "ghost guns, undetectable guns, and certain other firearms" "with respect to minors" and "within 100 yards of places of public assembly." The Council's motivation to enact Bill 4-21 is set out in the Council Action Staff Report:[1]

### BACKGROUND

"Ghost guns," or "do-it-yourself guns," are unserialized firearms built by unlicensed individuals. These guns evade many firearms regulations. Kits to build

---

[1] Council staff prepares a report at each stage of the legislative process. Those reports are publicly available at https://apps.montgomerycountymd.gov/ccllims/BillDetailsPage?RecordId=2695. For this Court's convenience, the council staff action packet is attached as **Ex. B**.

ghost guns are readily sold on the internet, without the requirement of federal background checks. Other ghost guns are built at home using blueprints and 3D printers.

When ghost guns are used in crimes, they are untraceable due to lack of serial numbers. During 2020, Montgomery County Police Department (MCPD) officers recovered 73 ghost guns.

*　　　　　*　　　　　*

SPECIFICS OF THE BILL

The purpose of Bill 4-21 is to begin to address the issue of ghost guns at the County level, consistent with limitations placed upon localities by Maryland state preemption of local firearms regulations. Under Maryland law, the County generally is preempted to regulate in the area of firearms. However, state law carves out certain specific areas in which the County may regulate. In particular, the County may regulate the sale, use, or transfer of firearms: (1) with respect to minors; or (2) within 100 yards of a place of public assembly.

In this vein, the bill first would maximize the impact of the County's firearms regulations by expanding the definition of "place of public assembly". The definition of "place of public assembly would be expanded to include any "place where the public may assemble, whether the place is publicly or privately owned, including a [government owned] park [identified by the Maryland-National Capital Park and Planning Commission]; place of worship; [elementary or secondary] school; [public] library; [government-owned or -operated] recreational facility; or multipurpose exhibition facility, such as a fairgrounds or conference center."[2]

With respect to ghost guns or DIY guns, the bill would define ghost guns to include firearms, including unfinished frames or receivers,[3] that are unserialized in accordance with federal regulations. The bill would define undetectable guns to include those that cannot be detected through metal detectors, or that are made with 3D printers. These ghost guns, including unfinished frames or receivers, and undetectable guns would be restricted with regard to minors and places of public assembly.

Specifically, the bill would prohibit a person from transferring a ghost gun

---

[2] Underlined text indicates text added by Bill 4-21 while brackets indicate text deleted by Bill 4-21.

[3] ATF Firearms Technology Branch Technical Bulletin 14-01, "Unfinished '80%' AR-15 Type Receivers," provides a useful explanation and examples of unfinished receivers. https://www.nfatca.org/pubs/FTB_Bulletin_102813.pdf. **Ex. C**. The Court may properly consider this document because Plaintiffs cite it in their Motion for Summary Judgment at p. 44.

2

or undetectable gun to a minor. Further, it would prohibit a person from possessing or manufacturing a gun, including through a 3D printing process, in the presence of a minor. Persons also would be prohibited from storing ghost guns, undetectable guns, or gun components in places that the person should know are accessible to minors.

Concerning places of public assembly, the bill would prohibit the sale, transfer, manufacture, or possession of ghost guns or undetectable guns within 100 yards of a place of public assembly. The bill also would prohibit—within 100 yards of a place of public assembly—the sale, transfer, possession, or use of a computer code to create a firearm through a 3D printing process.

SUMMARY OF PUBLIC HEARING

At the public hearing on February 9, five speakers provided testimony regarding Bill 4-21. Chief Marcus Jones testified that the Montgomery County Police Department (MCPD) and the County Executive "fully support the bill." Chief Jones stated that ghost guns are easy to acquire through 3D printing. Ghost guns also are easy to build from parts that can be bought on the internet. Ghost guns make the investigation of crime more difficult and tracing the origins of the ghost guns is nearly impossible. In 2020, MCPD recovered 73 ghost guns.

The Council enacted the Bill on April 6, 2021, and the County Executive signed it into law on April 16, 2021. It took effect on July 16, 2021. The Bill amended Chapter 57 (Weapons) of the Montgomery Cnty. Code by amending §§ 57-1, 57-7, and 57-11 and adding a new § 57-16.[4]

On May 28, 2021, Plaintiffs filed a four-count Complaint in this Court, seeking the following declarations and an injunction against enforcing the Bill:

- Count I: the Bill is not a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

- Count II: the Bill is preempted by and in conflict with State law;

- Count III: the Bill is an unconstitutional taking under Md. Const. art. III § 40 and Md. Decl. Rights art. 24 (this count also seeks "just compensation" from the County);

- Count IV: the Bill violates due process because it is unconstitutionally vague under Md.

---

[4] A copy of Chapter 57, incorporating the changes made by the Bill, is attached as **Ex. D.**

Decl. Rights art. 24 and U.S. Const. 14th Amendment (the latter claim also seeks damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively).

Plaintiffs filed a Motion for Partial Summary Judgment on June 16, 2021.

On July 12, 2021, the County removed the Complaint to the United States District Court for the District of Maryland. On July 19, the federal court denied Plaintiffs' Motion, without prejudice, because the federal court's case management order precluded filing a motion with first seeking a pre-motion conference with the court.[5] Thereafter, Plaintiffs filed a Motion to Remand the Complaint to state court. The County opposed that Motion.

By Order dated February 7, 2022, the federal court granted, in part, Plaintiffs' Motion to Remand. The federal court remanded Counts I, II, and III to this Court while retaining, but holding in abeyance, Count IV pending resolution of the other claims in this Court.

This Court must dismiss the Complaint because all Plaintiffs lack standing as they have not alleged a credible threat of prosecution under Bill 4-21. In addition, Plaintiff Maryland Shall Issue, Inc. lacks organizational standing because it has not alleged any cognizable harm beyond speculative potential future harm to its members.

Alternatively, the County is entitled to summary judgment and a declaration in its favor on each count in the Complaint. As to Count I, the Bill is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment). As to Count II, the Bill is authorized by, and not preempted by or in conflict with, State law. Finally, with respect to Count III, the restrictions of Bill 4-21 are *per se* not a taking and the Bill was properly enacted pursuant to the County's police powers.

---

[5] Given that Plaintiffs' Motion for Partial Summary Judgment was denied on procedural grounds unique to the federal court and anticipating that Plaintiffs would renew their Motion before this Court, Defendant has styled this response, in part, as an Opposition to their Motion. In any event, Plaintiffs already identified in their Complaint all the allegedly preemptive and conflicting State laws (and some of the cases) they rely upon in their Motion.

## UNDISPUTED MATERIAL FACTS

The Bill makes several amendments to Montgomery Cnty. Code Chapter 57 ("Weapons").

It expands the definition of the terms "gun or firearm" in Montgomery Cnty. Code § 57-1 to include

a "ghost gun" and an "undetectable gun." A "ghost gun" is defined as follows:

> a firearm, including an unfinished frame or receiver, that lacks a unique serial
> number engraved or cased in metal alloy on the frame or receiver by a licensed
> manufacturer, maker or importer under federal law or markings in accordance with
> 27 C.F.R. § 479.102. It does not include a firearm that has been rendered
> permanently inoperable, or a firearm that is not required to have a serial number in
> accordance with the Federal Gun Control Act of 1968."

An "undetectable gun" is defined as follows:

(A)   a firearm that, after the removal of all its parts other than a major
component, is not detectable by walk-through metal detectors commonly
used at airports or other public buildings;

(B)   a major component that, if subjected to inspection by the types of detection
devices commonly used at airports or other public buildings for security
screening, would not generate an image that accurately depicts the shape of
the component; or

(C)   a firearm manufactured wholly of plastic, fiberglass, or through a 3D
printing process.

"3D printing process" is defined as "a process of making a three-dimensional, solid object

using a computer code or program, including any process in which material is joined or solidified

under computer control to create a three-dimensional object."[6]

"Major component means, with respect to a firearm: (1) the slide or cylinder or the frame

or receiver; and (2) in the case of a rifle or shotgun, the barrel."

The Bill amended the definition for a "place of public assembly" as follows:

A 'place of public assembly' is a place where the public may assemble, whether
the place is publicly or privately owned, including a [government owned] park
[identified by the Maryland-National Capital Park and Planning Commission];

---

[6] Additions to existing County law made by the original bill are underlined and deletions
to existing law made by the original bill are [bracketed]. Post-introduction (amendments to the
bill) additions are double underlined and post-introduction deletions are [[double bracketed.]]

place of worship; [elementary or secondary] school; [public] library; [government-owned or -operated] recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

The Bill added new subsections (c), (d), and (e) to § 57-7 ("Access to guns by minors"):

(c)  A person must not give, sell, rent, lend, or otherwise transfer to a minor:
  (1)  a ghost gun or major component of a ghost gun;
  (2)  an undetectable gun or major component of an undetectable gun; or
  (3)  a computer code or program to make a gun through a 3D printing.

(d)  A person must not [[manufacture or assemble]] purchase, sell, transfer, possess, or transfer[7] a ghost gun, including [[making]] a gun created through a 3D printing process, in the presence of a minor.

(e)  A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

The Bill amended § 57-11 ("Firearms in or near places of public assembly"):

(a)  [A] In or within 100 yards of a place of public assembly, a person must not:
  (1)  sell, transfer, [[manufacture, assemble,]] possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms[, in or within 100 yards of a place of public assembly]; or
  (2)  sell, transfer, possess, or transport[, or use a computer code to create,]] a firearm created through a 3D printing process.
(b)  This section does not:
  (1)  prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);
  (2)  apply to a law enforcement officer, or a security guard licensed to carry the firearm;
  (3)  apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;
  (4)  apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm;
  (5)  apply to the possession of a handgun by a person who has received a permit to carry the handgun under State law; or
  (6)  apply to separate ammunition or an unloaded firearm:

---

[7] The second reference to "transfer" is likely a typo, meant to say "transport."

> (A)    transported in an enclosed case or in a locked firearms rack on a motor vehicle<u>, unless the firearm is a ghost gun or an undetectable gun</u>; or
>
> (B)    being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

Finally, the Bill adds § 57-16, which requires the Montgomery County Police Department to annually track and report the availability, use, and recovery of ghost guns and undetectable guns.

The Plaintiffs bringing suit include Maryland Shall Issue, Inc. ("MSI"), a Maryland corporation located in Baltimore, Maryland. Compl. ¶ 24. According to the Complaint, the organization is a Section 501(c)(4), non-profit membership organization with approximately 2,000 members statewide, including ones residing in Montgomery County. *Id*. It is allegedly an "all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland." *Id*.

Plaintiff Engage Armament ("Engage") is a Maryland corporation located in Montgomery County. Compl. ¶ 26. Engage is allegedly a Maryland State licensed arms dealer whose business allegedly includes the stocking and selling of "unserialized items," and may include the "transfer [of] firearms in the presence of a minor who is accompanied by a parent." *Id.* Engage is allegedly a dealer of "machines and computer code for the manufacture of firearms by individuals for personal use." *Id.* Engage is allegedly "within 100 yards of a place of public assembly" as defined by Bill 4-21. *Id.*

Plaintiff Andrew Raymond is allegedly a co-owner of Engage and resident of Montgomery County. Compl. ¶ 27. His residence is allegedly "within 100 yards of a public street." He allegedly assembles firearms in the presence of his minor children. He further allegedly possesses computer code used to manufacture firearms and he possesses ghost guns. *Id.* "As co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms

within the business confines of Engage for their self-protection and for the protection of the business." *Id.*

Plaintiff Carlos Rabanales is allegedly a co-owner of Engage and resident of Frederick County. Compl. ¶ 28. He allegedly "has authorized more than one supervisory employee at Engage to carry firearms within the business confines of Engage for their self-protection and for the protection of the business." *Id.* He allegedly "possesses more than one firearm for the protection of himself and his business" and he "may transport unserialized firearm parts and components to and from Engage as part of the business of Engage." *Id.*

Plaintiff Brandon Ferrell is a resident of Montgomery County and a supervisory employee of Engage. Compl. ¶ 29. His residence is allegedly "within 100 yards of a place of public assembly, as defined by Bill 4-21." *Id.* At work, he "wears and carries a fully loaded handgun in the course of his employment at Engage." *Id.* "He possesses one or more 'ghost guns.'" "He possesses computer code of the type regulated by Bill 4-21." *Id.* He allegedly does not possess a wear and carry permit. *Id.*

Plaintiff Deryck Weaver is a resident of Montgomery County and a supervisory employee of Engage. Compl. ¶ 30. He alleges that his residence is "within 100 yards of a 'place of public assembly.'" *Id.* He is the father of one minor child who lives with him. *Id.* "He possesses within his home one or more 'ghost guns.'" *Id.* He allegedly "wears and carries a fully loaded handgun" at his place of employment." *Id.* He is allegedly a qualified handgun instructor. *Id.* He allegedly does not possess a wear and carry permit. *Id.*

Plaintiff Joshua Edgar is a resident of Montgomery County and works as a contractor at Engage. Compl. ¶ 31. He alleges that his residence is "within 100 yards of a place of public assembly." *Id.* He alleges that he possesses within his home one or more "ghost guns." *Id.*

He further alleges that "[f]rom time to time, he assembles a firearm in the presence of a minor child for purposes of instruction." *Id.* He alleges that he does not possess a wear and carry permit. *Id.*

Plaintiff I.C.E. Firearms & Defensive Training, LLC, ("ICE Firearms") is allegedly a Maryland corporation located in Montgomery County. Compl. ¶ 32. ICE Firearms allegedly provides firearm training and safety instruction. *Id.* ICE Firearms allegedly "possesses computer code of the type regulated by Bill 4-21." *Id.* ICE Firearms further allegedly "possesses parts of firearms that are banned by Bill 4-21." *Id.* ICE Firearms allegedly is located "within 100 yards of a place of public assembly as that term is defined in Bill 4-21."

Plaintiff Ronald David is allegedly a resident of Montgomery County and the owner and operator of ICE Firearms. Compl. ¶ 33. He alleges that his home is "within 100 yards of a place of public assembly as that term is defined by Bill 4-21." *Id.*  He allegedly possesses computer code of the type regulated by Bill 4-21. *Id.*  He allegedly "possesses one or more receivers as defined and banned by Bill 4-21 as a 'ghost gun.'" *Id.* He is allegedly a qualified handgun instructor. *Id.*

Plaintiff Nancy David is allegedly a resident of Montgomery County. Compl. ¶ 33. She alleges that her home is "within 100 yards of a place of public assembly as that term is defined by Bill 4-21." *Id.* She allegedly possesses computer code of the type regulated by Bill 4-21. *Id.* She is allegedly a qualified handgun instructor. *Id.* She allegedly does not possess a Maryland carry permit. *Id.*

## STANDARDS OF REVIEW

**Dismissal**

Maryland Rule 2-322 provides that a party may make a motion to dismiss for failure to state a claim upon which relief can be granted. When moving to dismiss, the defendant asserts that,

even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law. *Lubore v. RPM Associates*, 109 Md. App. 312, 322 (1996). In reviewing a motion to dismiss, the Court must assume the truth of all relevant and material facts that are well pleaded and all inferences that can reasonably be drawn from those pleadings. *Bennett Heating and Air Conditioning, Inc. v. NationsBank*, 103 Md. App. 749, 757 (1995), *rev'd in part on other grounds*, 342 Md. 169 (1996). On the other hand, "[a]ny ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317 (2009). Moreover, "the well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Parks v. Alpharma, Inc.*, 421 Md. 59, 72 (2011) (internal quotation and citation omitted).

As to declaratory judgment, dismissal is appropriate only in those cases where the plaintiff is not entitled to a declaration. *Hunt v. Montgomery County*, 248 Md. 403 (1968). For example, a complaint for declaratory judgment is properly dismissed where there is no justiciable controversy between the parties, *120 W. Fayette St., LLLP v. Mayor and City Council of Baltimore City*, 413 Md. 309 (2010), or where the plaintiff has failed to exhaust his administrative remedies, *Abington Ctr. Assoc. Ltd. P'ship v. Baltimore County*, 115 Md. App. 580 (1997). *See also* Md. Code Ann., Cts. & Jud. Proc. § 3-409(b) ("If a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed in lieu of a proceeding under this subtitle").

**Summary Judgment**

Summary judgment should be entered where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 2-501; *Syme v. Marks Rentals, Inc.*, 70 Md. App. 235, 248 (1987); *King v. Bankerd*, 303 Md. 98, 111 (1985). A material

fact is one which will somehow affect the outcome of the case. *Friedman & Fuller, P.C. v. Funkhouser*, 107 Md. App. 91, 99 (1995).

**Declaratory Judgment**

Where a declaratory judgment action is properly brought and considered for summary judgment, the trial court must issue a written declaration of the parties' rights, even if it is not the declaration sought by the plaintiff. *Herlson v. RTS Residential Block 5, LLC*, 191 Md. App. 719, 730 (2010); *Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 524 (2006); *East v. Gilchrist*, 293 Md. 453, 461 n.3 (1982) ("where a plaintiff seeks a declaratory judgment . . ., and the court's conclusion . . . is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment"). Where the court's declaration is in line with the defendant's argument, it is also proper for the court to issue that declaration upon a motion for summary judgment by the defendant. *Griffin v. Anne Arundel County*, 25 Md. App. 115, 137 (1975).

The trial court must issue a separate written declaration. Although the judgment may recite that it is based on reasoning set forth in an accompanying memorandum, it cannot simply incorporate by reference an earlier oral ruling. *Salomon v. Progressive Classic Ins. Co.*, 379 Md. 301, 308 n.7 (2004).

## ARGUMENTS: DISMISSAL

### I.    The Complaint Must Be Dismissed Because the Plaintiffs Lack Standing

Dismissal is proper "when the party seeking such judgment has no standing and there is no justiciable controversy properly before the court." *Roper v. Camuso*, 376 Md. 240, 246-47 n.3, 829 A.2d 589 (2003).

> That the existence of a justiciable controversy is a prerequisite to the maintenance of a declaratory judgment in Maryland is well settled. *Prince George's Co. v. Bd. of*

*Trustees*, 269 Md. 9, 304 A.2d 228 (1973). A controversy is justiciable 'when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded.' *Patuxent Oil Co. v. County Comm'rs of Anne Arundel County*, 212 Md. 543, 548, 129 A.2d 847, 849 (1957). It is thus clear that the declaratory judgment process is not available to decide purely theoretical questions or questions that may never arise, *Prince George's Co. v. Chillum-Adelphi*, 275 Md. 374, 340 A.2d 265 (1975); *Liss v. Goodman*, 224 Md. 173, 167 A.2d 123 (1961), or questions which have become moot, *Eberts v. Congressional Country Club, Inc.*, 197 Md. 461, 79 A.2d 518 (1951), or merely abstract questions, *Davis v. State*, 183 Md. 385, 37 A.2d 880 (1944). That the declaratory judgment process should not be used where a declaration would not serve a useful purpose or terminate a controversy is equally well settled. *Liss v. Goodman, supra*; *Bachman v. Lembach*, 192 Md. 35, 63 A.2d 641 (1949); *Staley v. Safe Deposit & Trust Co.*, 189 Md. 447, 56 A.2d 144 (1947).

*Hamilton v. McAuliffe*, 277 Md. 336, 339-40, 353 A.2d 634 (1976).

The requirement that there be an existing "live" controversy is intended to avoid the issuance of advisory opinions instead of resolving actual disputes. *See Hatt v. Anderson*, 297 Md. 42, 46, 464 A.2d 1076 (1983) ("Indeed, the addressing of non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.") (citing *Maryland-National Capital Park & Planning Comm'n v. Randall*, 209 Md. 18, 120 A.2d 195 (1956); *Tanner v. McKeldin*, 202 Md. 569, 97 A.2d 449 (1953); *Hammond v. Lancaster*, 194 Md. 462, 71 A.2d 474 (1950).

In *Hatt*, a fireman brought suit against the county fire department and other entities, seeking a declaratory judgment that a departmental regulation was unconstitutional. 297 Md. at 43. Both parties moved for summary judgment, and the trial court denied the fireman's motion and granted the county's motion. *Id*. The fireman appealed, and the Court of Appeals vacated the circuit court's judgment, remanding the case and instructing the circuit court to dismiss the fireman's action for lack of a justiciable controversy. *Id.* at 47. The Court observed that nowhere in his complaint did the fireman allege that the regulation had directly impacted him. *Id.* at 45. It concluded that "nothing appears in the pleadings even remotely suggesting that an actual dispute exists between

12

the parties beyond that which might be implied by the mere facial existence of the regulation; and this alone is plainly insufficient to present a justiciable controversy." *Id.* at 46-47 (citing *Hitchcock v. Kloman*, 196 Md. 351, 356, 76 A.2d 582 (1950)). Further, the Court noted that the complaint contained "no allegation that the regulation has been, or is threatened to be interpreted or applied by [defendant] in any particular way" nor were their pleadings alleging that plaintiff's rights were "*actually* being disputed, challenged or contested." *Id.* (Emphasis added). In the absence of an actual direct controversy, plaintiff's claim was "simply too theoretical, too abstract and too speculative to form the basis for an action for declaratory relief." *Id.*

Like in *Hatt*, no individual Plaintiff has plead facts to support that enactment of Bill 4-21 created an actual direct controversy. Under Maryland law, declaratory relief is unavailable to prevent hypothetical and abstract consequences in the future. *Cf. State v. G & C Gulf, Inc.,* 442 Md. 716, 734, 114 A.3d 694, 705 (2015) (A hypothetical threat is not enough).

## II.    Plaintiff Maryland Shall Issue, Inc. Lacks Organizational Standing

In Maryland, an organization has standing to bring a judicial action if it has a "property interest of its own—separate and distinct from that of its individual members." *Med. Waste Assocs. v. Md. Waste Coal.*, 327 Md. 596, 612, 612 A.2d 241, 249 (1992). This is shown if that organization "has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public." *Id.* at 613. *See also Sugarloaf v. Dep't of Environment*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996), and cases there cited.

"The mere fact that an individual or group is opposed to a particular public policy does not confer standing to challenge that policy in court." *Evans v. State*, 396 Md. 256, 329, 914 A.2d 25, 68 (2006). "[E]nsuring that State officials operate legally…is no different than the interest of all Maryland citizens." *Id.*

Here, Plaintiff MSI has not plead facts to support that its interest in the case is separate and distinct from its members. Neither has MSI plead potential damage differing from the general public. MSI's particular public policy priority—the "preservation and advancement of gun owners' rights in Maryland"- is insufficient to establish standing.

## ARGUMENTS: SUMMARY JUDGMENT (DECLARATORY JUDGMENT IN THE COUNTY'S FAVOR)

It is important to note at the outset that the wisdom of the legislative findings supporting the Bill is not on trial. Plaintiffs cannot challenge whether the County Council "was correct" in its legislative findings. *Md. Aggregates Ass'n, Inc. v. State*, 337 Md. 658, 668 (1995) ("the wisdom or expediency of a law adopted by a legislative body is not subject to judicial review"). Rather, the question is whether the Bill violates the specific constitutional and statutory provisions alleged in the Complaint.

## I.   BILL 4-21 IS A VALID LOCAL LAW

Article XI-A[8] of the Maryland Constitution provides counties electing a charter form of government with a certain measure of independence from the State legislature by providing for the transfer, within well-defined limits, of certain legislative powers formerly reserved to the General Assembly. Ratified by the voters of this State in November 1915, Md. Const. Art. XI-A, also known as the "Home Rule Amendment," was intended to secure to Maryland citizens "the fullest measure of local self-government" with respect to their local affairs. *State v. Stewart*, 152 Md. 419, 422, 137 A. 39, 41 (1927). The Home Rule Amendment "freed[]" counties from the General

---

[8] The Complaint alleges that the Bill is not a local law under Md. Const. Art. **XI-E**, § 3. Compl. ¶ 39. Art. XI-E governs the home rule authority of municipal corporations; the County's authority is governed by Art. XI-A. *See, e.g., FOP v. Montgomery Cnty*., 446 Md. 490, 518 (2016); *Save Our Sts. v. Mitchell*, 357 Md. 237, 250 n.8 (2000); *Gordon v. Comm'rs of St. Michaels*, 278 Md. 128, 132 (1976).

Assembly's "interference," *City of Balt. v. Sitnick*, 254 Md. 303, 311 (1969), and bridged the gap between the policy decisions of detached state legislators and the actual preferences of local constituents, *Ritchmount P'ship v. Bd. of Supervisors of Elections*, 283 Md. 48, 56 (1978).

Section 2 of the Home Rule Amendment mandates that the General Assembly expressly enumerate and delegate those powers exercisable by counties electing a charter form of government and, in 1918, the legislature enacted the Express Powers Act, Md. Code Ann., presently codified at Md. Code Ann., Local Gov't. (LG) § 10-101 *et seq*., which endowed charter counties with a wide array of legislative and administrative powers over local affairs. Montgomery County became the first county to adopt a charter form of government by doing so in the November 1948 general election. *McCarthy v. Board of Education*, 280 Md. 634, 638, 374 A.2d 1135, 1137 (1977).

The Express Powers Act is "broadly construed" to enable charter counties such as Montgomery County to "legislate **beyond the powers expressly enumerated**," thereby fostering "peace, good government, health, and welfare of the County." *Snowden v. Ann Arundel Cty.*, 295 Md. 429, 432 (1983) (emphasis added) (citing Express Powers Act). Together, the Home Rule Amendment and the Express Powers Act vest charter counties with significant power on the theory that "the closer those who make and execute the laws are to the citizens they represent, the better … those citizens [are] represented and governed in accordance with democratic ideals." *Ritchmount P'ship v. Bd. of Supervisors of Elections*, 283 Md. 48, 56 (1978).

The broadest authority for local legislation exists in LG § 10-206 of the Express Powers Act, which is often referred to as the "general welfare clause" because it grants charter counties the power to legislate on matters not specifically enumerated elsewhere. *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (referring to the predecessor statute Md. Code

Ann., Art. 25A, § 5(S)). LG § 10-206 empowers charter counties to enact local laws "not preempted by or in conflict with public general law" that "may aid in maintaining the peace, good government, health, and welfare of the county."[9] Thus, in *Greenhalgh*, the Maryland Court of Appeals relied upon § 5(S) to uphold Montgomery County's authority to enact a fair housing law even though the Express Powers Act did not specify that power and explained that "[t]he broadest grant of powers customarily is to home rule Counties . . . and cases holding that a delegation was restricted or narrow are concerned almost always with delegations to municipalities that do not enjoy home rule." *Greenhalgh*, 253 Md. at 162, 252 A.2d at 247.[10]

Under § 3 of the Home Rule Amendment, a charter county has full power to enact "local laws" on any subject covered by the Express Powers Act. A charter County also has the power to appeal or amend public local laws enacted by the General Assembly upon all matters covered by the Express Powers Act.[11] Section 4 of the Home Rule Amendment states that "[a]ny law so drawn

---

[9] Section 3 of the Home Rule Amendment also provides that a public general law controls in case of a conflict with a local law.

[10] Maryland court have sustained a wide variety of local legislation under the Home Rule Amendment and LG § 10-206 of the Express Powers Act. *See FOP v. Montgomery Cty.*, 446 Md. 490, 518-19 (2016) (upholding County spending to support a proposed charter amendment on the ballot); *Tyma v. Montgomery Cnty., Md.*, 369 Md. 497 (2002) (sustaining the County's domestic partnership benefits law); *Cade v. Montgomery Cnty.*, 83 Md. App. 419, *cert. denied*, 320 Md. 350 (1990) (sustaining the County's towing law); *Holiday Universal Club of Rockville, Inc. v. Montgomery Cnty.*, 67 Md. App. 568, *cert. denied*, 307 Md. 260 (1986) (sustaining the County's public accommodation law); *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (sustaining the County's fair housing law).

[11] A companion provision in section 4 of the Home Rule Amendment prohibits **the General Assembly** from enacting a public **local** law on any subject covered by the Express Powers Act, although it may enact a public **general** law inconsistent with the express powers of a chartered county. *State's Attorney of Baltimore City v. City of Baltimore*, 274 Md. 597, 606 (1975). A State law (on a subject covered by the Express Powers Act) is not an impermissible public local law "merely because its operation is confined to Baltimore City or to a single county, if it affects the interests of the people of the whole state." *Gaither v. Jackson*, 147 Md. 655, 667 (1925). *Dasch v. Jackson*, 170 Md. 251, 261 (1936) (state statute concerning the licensing of paper hangers in

so as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law within the meaning of this Act." *See Steimel v. Board of Election Supervisors*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976); *State's Attorney v. City of Baltimore*, 274 Md. 597, 607, 337 A.2d 92, 98-99 (1975). The Home Rule Amendment otherwise "attempts no definition of the distinction between a local law and a general law but leaves that question to be determined by the application of settled legal principles to the facts of particular cases in which the distinction may be involved." *McCrory Corp. v. Fowler*, 319 Md. 12, 17 (1990). Thus, for example, the Maryland Court of Appeals struck down the County's "future service contract" law because of its extra territorial application. *Holiday Universal, Inc. v. Montgomery Cnty.*, 377 Md. 305, 316 (2003) ("the ordinance makes clear that it would apply to a contract signed outside of Montgomery County, by parties residing outside of Montgomery County, where as much as forty-nine percent of the performance of the contract takes place outside of Montgomery County").

Where the application of a county law is limited to the enacting county Maryland courts will invalidate that law only it if clearly intruded on some well-defined state interest. *Tyma v. Montgomery Cnty.*, 369 Md. 497, 513 (2002). For example, in *McCrory Corp. v. Fowler*, the Court of Appeals struck down a Montgomery County law creating a private cause of action for violations of the County's employment discrimination law because it was not a "local law" under the Home Rule Amendment. "In Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *McCrory*, 319 Md. at 20, 570 A.2d at 838.

The Bill is a local law. First, its application is limited to Montgomery County. Unlike the

---

Baltimore City was not an impermissible local law because, in part, it imposed taxes or fees designed to produce a surplus payable into the general funds of the state).

local law in *Holiday Universal*, the Bill does not apply outside of the County.

Second, unlike the other local law struck down in *McCrory*, the Bill is specifically authorized by State law. Md. Code Ann., Crim. Law (CL) § 4-209(b) empowers the County to enact this law (and, as discussed below, the Bill is within the confines of that authorization).

Finally, contrary to Plaintiffs' argument, a local enactment does not cease to be a local law under the Home Rule Amendment merely because it regulates a matter that is also of interest to the State. Compl. ¶ 37; Pls.' Mot. for Summ. J. 31-32. If that were the test, few local regulations would pass muster. For example, although abusive employment practices constitute a statewide problem which have been addressed by the General Assembly, the Court of Appeals recognized that the County could still create administrative remedies to address the matter. *McCrory Corp. v. Fowler*, 319 Md. 12, 20. What the County could not do was create a new **private judicial** cause of action. Likewise, discrimination in housing and places of public accommodation may also be a statewide matter of concern (that has also been addressed by the General Assembly), but the County could create administrative remedies to address those evils as well. *Holiday Universal Club of Rockville, Inc. v. Montgomery County*, 67 Md. App. 568, *cert. denied*, 307 Md. 260 (1986) (sustaining the County's public accommodation law); *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (sustaining the County's fair housing law).

Plaintiffs' remaining objections do not further any local law argument and, instead, are general complaints about the Bill. For example, Plaintiffs' complaint that the County cannot regulate major components of a firearm because certain major components of a ghost gun (e.g., the slide, cylinder, or barrel) are not a firearm and are not required to be serialized under Federal law; only a finished receiver is required to be serialized. Pls.' Mot. for Summ. J. 32.[12] But the

---

[12] Plaintiffs mischaracterize this regulation as a complete ban. It is not. The regulation is

County's authority under State law to regulate firearms with respect to minors (and within 100 yards of a place of public assembly) includes "ammunition for **and components of** a handgun, rifle, or shotgun." CL § 4-209(b)(1) ("A county . . . may regulate the times listed in subsection (a) of this section.") The County's authority to regulate the components of ghost guns does not depend upon whether those components are themselves firearms or required to be serialized under Federal or State law.

Plaintiffs argue that the Bill "bans the mere possession **in the home** of these otherwise non-regulated components," including the slide, cylinder and barrel. Pls.' Mot. for Summ. J. 33 (emphasis in original). However, this argument ignores the home exclusion of proposed County Code 57-11(b)(3) and the plain definitions of a "ghost gun" and "undetectable gun." After enactment of Bill 4-21, the text of County Code 57-11(b)(3) now states the following:

> This section [prohibiting possession of firearms, ghost guns, and undetectable guns within 100 yards of a place of public assembly] does not apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

According to the plain language of County Code 57-11(b)(3), a resident is permitted to possess firearms (except for ghost and undetectable guns) within their own homes, regardless of proximity to a place of public assembly. To the extent a "major component" is part of an ordinary firearm, whether assembled or disassembled, it does not fall within the ambit of Bill 4-21.

With respect to "major components" of a "ghost gun," Plaintiffs argue that Bill requires that each such "major component" be serialized—a requirement not imposed under Maryland or Federal law. Pls.' Mot. for Summ. J. 32-33. This reading is simply not supported by the text of the Bill, and it is not clear how Plaintiffs arrived at this conclusion. Quite to the contrary, the definition

---

limited to regulating firearms in the presence of children and within 100 yards of a place of public assembly. § 57-11(a).

of a "ghost gun" within Bill 4-21 specifically excludes a "firearm … that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968." Furthermore, the definition of a "ghost gun" incorporates by reference the regulations of 27 C.F.R. § 479.102 related to serialization on the frame or receiver—but not other components.

While "major components" of an "undetectable gun" are prohibited in the presence of minors and within 100 yards of a place of public assembly, those components would be easily identified as part of an "undetectable gun" because each "major component" of an "undetectable gun," by definition under Bill 4-21, must "not generate an image that accurately depicts the shape of the component" in a metal detector. In plain words, the "major component" would be made of plastic or some other non-metallic substance. Therefore, there is no genuine possibility that a law enforcement officer would confuse the plainly legal "major components" of an ordinary firearm with the prohibited "major components" of an "undetectable gun" and Plaintiffs' fear of arbitrary enforcement is meritless. Pls.' Mot. for Summ. J. 32-33.[13]

The Bill is a valid local law within the Home Rule Amendment and the County requests that this Court enter a declaratory judgment to that effect.

## II.    BILL 4-21 IS NOT PREEMPTED BY, OR IN CONFLICT WITH, STATE LAW

The Bill is not preempted by, or in conflict with, State law because it is specifically authorized by CL § 4-209(b), which empowers the County to regulate the purchase, sale, transfer, ownership, possession, and transportation of firearms (including their ammunition and

---

[13] In any event, the federal Undetectable Firearms Act prohibits a person from manufacturing, importing, selling, shipping, delivering, possessing, transferring, or receiving any firearm that is not detectable by a walk-through metal detection as a security exemplar containing 3.7 ounces of steel, or any firearm with major components that do not generate an accurate image before standard airport imaging technology. The federal prohibition was first enacted in 1988 and was renewed for 10 years in December 2013. 18 U.S.C. § 922(p).

components) with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. The Bill fits within this authority.

The Home Rule Amendment provides that a State public general law controls over a conflicting charter county's local law. Art. XI-A, § 1. *See also* LG § 10-206 (providing that a charter county may enact local laws to the extent that they are not preempted by or in conflict with public general laws).

A state law may preempt local law in one of three ways: express preemption, implied preemption, and conflict preemption. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 685 (2019). Regardless of the mode of preemption analysis, Maryland courts recognize a presumption against preemption, with ambiguities resolved in favor of local regulation. Thus, when a local law is enacted under competent authority, it "should be upheld by every reasonable intendment, and reasonable doubts as to the validity of an ordinance should be resolved in its favor." *Mayor & Alderman of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 391 (1979). *See also Mayor and Council of Forest Heights v. Frank*, 291 Md. 331, 337 ("We have also recognized that a local government unit may be justified in going further than the policy in effect throughout the broader governmental unit.")

### A.    The Scope of Express Preemption and the Exception / Authority Reserved to Local Governments.

Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 686 (2019). While the State has expressly preempted some local regulation of firearms, it has also expressly created an exception in CL § 4-209(b), authorizing local firearm regulation with respect to minors and near places of public assembly. Although Bill 4-21 is ultimately sustained because it falls within that express authorization, it is important to note at the outset that the scope

of the express preemption in LC § 4-209(a) is quite narrow and specific.

### 1. Scope of the express preemption under CL § 4-209

CL § 4-209 provides:

*§ 4-209. Regulation of weapons and ammunition*

(a)    *State preemption*. -- Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:
    (1)    a handgun, rifle, or shotgun; and
    (2)    ammunition for and components of a handgun, rifle, or shotgun.

(b) *Exceptions*. --
    (1)    A county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:
        (i)    with respect to minors;
        (ii)    with respect to law enforcement officials of the subdivision; and
        (iii)    except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.
    (2)    A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.
    (3)    A county, municipal corporation, or special taxing district may not prohibit the transportation of an item listed in subsection (a) of this section by a person who is carrying a court order requiring the surrender of the item, if:
        (i)    the handgun, rifle, or shotgun is unloaded;
        (ii)    the person has notified the law enforcement unit, barracks, or station that the item is being transported in accordance with the court order; and
        (iii)    the person transports the item directly to the law enforcement unit, barracks, or station.

(c)    *Preexisting local laws*. -- To the extent that a local law does not create an inconsistency with this section or expand existing regulatory control, a county, municipal corporation, or special taxing district may exercise its existing authority to amend any local law that existed on or before December 31, 1984.

(d)    *Discharge of firearms*. --
    (1)    Except as provided in paragraph (2) of this subsection, in accordance with law, a county, municipal corporation, or special taxing district may regulate the discharge of handguns, rifles, and shotguns.
    (2)    A county, municipal corporation, or special taxing district may not prohibit the discharge of firearms at established ranges.

As the Attorney General has noted, "while State preemption of local firearms regulation is undeniably broad, the preemption statutes are also specific—they preempt regulation of specific activities such as the transport of handguns, the sale or manufacture of firearms, or the ownership or possession of firearms." 93 Md. op. Att'y Gen. 126, 134 (2008) (contrasting the relatively limited preemption of firearm regulation with Md. Code Ann., Transp. § 25-101, broadly preempting "**any** local law . . . on **any** subject covered by the Maryland Vehicle Law, subject to specific exceptions) (emphasis in original).

For example, in 2008, the Attorney General opined that a proposed Baltimore City law, which would require a gun owner to report the theft or loss of a firearm within two days of discovery that the weapon had been lost or stolen, did not fall within the express preemption of CL § 4-209(a). 93 Md. Op. Att'y Gen. 126 (2008). Apart from the duty to report the loss of the firearm, the local law did not otherwise restrict, control, or affect the ownership, possession, or use of firearms. "Its effect, if any, on gun ownership is too remote to be deemed a regulation of ownership, such that it would be expressly preempted by State statute." *Id*. at 126.

Similarly, in *State v. Phillips*, 210 Md. App. 239 (2013), the court concluded that State law, including CL § 4-209(a), did not preempt a Baltimore City law requiring persons convicted of certain gun offenses in Baltimore City to register with the Police Commissioner. The court concluded that, although the State has heavily regulated the field of use, ownership, and possession, of firearms, it has not so extensively regulated the field that all local laws relating to firearms are preempted. *State v. Phillips*, 210 Md. App. 239, 280-281 (2013) (citing with approval

93 Md. op. Att'y Gen. 126 (2008)).

### 2. Bill 4-21 Falls Within the Scope of The State Exception / Authority Reserved to Local Government to Regulate Firearms with respect to minors and near places of public assembly

The amendments to the County's weapons law made in the Bill fit within the authority granted to counties by CL § 4-209(b) to regulate firearms with respect to minors and within 100 yards of places of public assembly.

### a. The plain language of CL § 4-209

Local ordinances, such as the Montgomery County Code, are interpreted "under the same canons of construction that apply to the interpretation of [state] statutes." *Kane v. Bd. of Appeals of Prince George's Cnty.*, 390 Md. 145, 161 (2005) (quoting *O'Connor v. Balt. Cnty.*, 382 Md. 102, 113 (2004)). The Court of Special Appeals recently reiterated the by-now familiar principles of statutory construction. *Sullivan v. Caruso Building Belle Oak, LLC*, 251 Md. App. 304, 318 (2021).

The plain language of CL § 2-409 reveals an express grant of authority to counties, municipal corporations, and special taxing districts to regulate firearms with respect to minors and within 100 yards of a place of public assembly, such as a "park, church, school, or public building." The legislative history of CL § 4-209 confirms this interpretation.

### b. The legislative history of CL § 4-209

The legislative history of CL § 4-209 was recounted in detail in 76 Md. Op. Att'y Gen. 240, 243-46 (1991).

In 1982, the State considered legislation that would have allowed local governments to impose additional restrictions on the sale of handgun ammunition. Senate Bill 323 (1982) would have amended Md. Code Ann., Art. 27 §§ 442(a) and 445(a) to permit counties, municipalities,

and special taxing districts to impose restrictions more stringent than those imposed under State law. But the bill died in committee. Despite the failure of the state bill, the County went forward with a local bill (Bill 17-82) to regulate the sale of ammunition. Although both the County Attorney and the Attorney General[14] opined that the bill was preempted, the Council enacted the bill.

The bill was challenged, and the Circuit Court for Montgomery County found that it was preempted by State law. *Atlantic Guns, Inc. v. Montgomery Cnty.*, Equity No. 85854 (Cir. Ct. for Montgomery Cnty., Oct. 27, 1983). The decision was appealed to the Court of Special Appeals, but the Court of Appeals granted a writ of certiorari before the intermediate appellate court took any action on the matter.

While the appeal was pending in the Court of Appeals, legislation was introduced in the 1984 session of the General Assembly that would have removed any local authority to regulate weapons and ammunition (SB 66 and HB 315). The bills expressly preempted local governments from regulating the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of a broad range of firearms, explosives, and ammunition. The only possible remaining local authority would have been over the discharge of firearms.

Both bills passed, but Governor Hughes vetoed them both because they would "invalidate beneficial existing local legislation without any corresponding statewide substitute and, contrary to the sponsor's intent, . . . undermine public safety." 1984 Md. Laws 3866-68. The Governor's veto message gave examples of these **beneficial existing local laws** that would be invalidated by passage of the bill, including laws regulating the **possession of a firearm by a minor** and laws prohibiting the possession of a firearm **within 1,000 feet of a place of public assembly**. *Id.* at 3867. Gov. Hughes concluded, "I am unwilling to sign into law a bill that would invalidate the

---

[14] 67 Md. Op. Att'y Gen. 316 (1982).

judgment of local elected officials when they determine that local legislation of the type described above . . . is required within a particular jurisdiction." *Id*. at 3868. An attempt to override the vetoes at the start of the 1985 session failed by a wide margin.

After the veto, the Governor's Office worked with the sponsors of the vetoed bills on a compromise that would except from preemption local laws with respect to minors and in close proximity to places of public assembly. SB 88 and HB 176 were introduced in the 1985 Session as a result. A bill analysis prepared by the Senate Judicial Proceedings Committee stated that the bill would change current law as follows:

> The General Assembly **partially** preempts the rights of counties, municipalities, and special taxing districts to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, transportation, and discharge of handguns, rifles, shotguns, and their ammunition.
>
> Some exceptions are made in this preemption. **Localities still may regulate some weapons and their ammunition with respect to minors, various places of public assembly**, and law enforcement and security personnel. Also, localities may continue to regulate the discharge of handguns, rifles, and shotguns.

76 Md. Op. Att'y Gen. 240, 246 (1991) (emphasis in original). The Committee report also noted that "[t]he bill's intent is to reserve within the General Assembly the **primary** power to regulate **some forms** of weaponry and ammunition" (*quoted in* 93 Md. op. Att'y Gen 126, 134 n.8 (emphasis in original)). The legislation passed.[15] The Attorney General's May 23, 1985, bill review letter to the Governor noted that the effect of the bill might be in some respects to reduce State preemption of local laws that would otherwise be invalid under older law. *Id*. ("the new authority to regulate in specific ways would control over the older broad preemption"). Governor Hughes signed SB 88 on May 28, 1985, which became 1985 Md. Laws ch. 724 and which added

---

[15] The day after the house of Delegates passed HB 176, the Maryland Court of Appeals concluded that the County's regulation of ammunition sales was preempted by State law. *Montgomery Cnty. v. Atlantic Guns, Inc.*, 302 Md. 540 (1985).

§ 36H to Art. 27.

> The Attorney General concluded that Art. 27, § 36H
>
> is a perfect example of a statute reflecting a political compromise. Its predecessor legislation, Senate Bill 66 and House Bill 315 of 1984, would have preempted virtually all local regulation of firearms, ammunition, and explosives. Governor Hughes' veto prompted several compromises from the legislative sponsors of the 1984 legislation. Among those compromises was the creation of a specific exception to the general preemption rule, to allow local governments to regulate weapons and ammunition with respect to minors [and within 100 yards of or in a park, church, school, public building, and other place of public assembly]. Indeed, that exception can be traced to Governor Hughes' veto message itself, in which he asserted the need for "comprehensive" regulatory authority, either at the State or the local level, and identified examples of local legislation that he believed should not be preempted. The effect of the compromise is that local governments may regulate to whatever extent they consider appropriate for the protection of the public, so long as they do so only in the areas identified in § 36H(b)

76 Md. Op. Att'y Gen. 240, 247 (1991). In 2002, Art. 27, § 36H was recodified to the then-newly created Criminal Law Article as CL § 4-209, without substantive change according to the revisor's note. 2002 Md. Laws ch. 26. Subsection (b)(3) was added in 2010, forbidding a county, municipal corporation, or special taxing district from prohibiting, under certain circumstances, the transportation of a firearm by a person who is carrying a court order requiring the surrender of the item. 2010 Md. laws ch. 712.

### c.    Interpretation of the exceptions in CL § 4-209

The Maryland Attorney General has twice construed the scope of the exceptions to preemption under CL § 4-209(b) and each time found them sufficient to sustain local County firearm regulations. In 1991, after examining both the statutory language and confirmatory legislative history of CL § 4-209, the Attorney General concluded that it did not preempt (and specifically authorized) the County's authority to enact a proposed local law that would prohibit leaving a loaded—or an unloaded firearm near ammunition—in the proximity of a child, with an exception for guns secured in a locked gun cabinet or by a trigger lock. 76 Md. Op. Att'y Gen. 240

(1991).[16] The Attorney General noted that the State law's grant of local authority to regulate firearms "with respect to" minor was quite broad. "Therefore, any regulation that bears a reasonable relation to minors' access to, or use of, firearms is a firearms regulation 'with respect to minors.'" *Id*. at 242. "[The proposed County bill] unquestionably is one 'with respect to minors.' It seeks to protect them against death and injury caused by improperly stored firearms. . . . To be sure, the bill regulates the behavior of adults, not children. But since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id*.

A few years later, the Attorney General similarly concluded that CL § 4-209(b) authorized proposed Montgomery and Prince George's County laws that would (1) prohibit gun dealers from selling, leasing, or otherwise transferring a handgun without also selling or otherwise providing with each handgun a trigger lock or similar device that is designed to prevent the unintentional discharge of the handgun; and (2) require gun dealers to post a conspicuous notice describing the trigger lock sale requirement and the requirement in State law that gun owners keep their guns out of the reach of children. 82 Md. op. Att'y Gen. 84 (1997). The County enacted the proposed bill (County Bill 11-97) shortly thereafter. 1997 Laws Montgomery Cnty. (LMC) ch. 16 (presently codified at MCC § 57-8).

### d.      The Bill falls within the exceptions in CL § 4-209

Comparison of CL § 4-209 and the Bill reveals the following: CL § 4-209(b) expressly **permits** a county, municipal corporation, or special taxing district to do the following:

- "regulate the purchase, sale, transfer, ownership, possession, and transportation of";
- a handgun, rifle, or shotgun, their ammunition and their components;

---

[16] The Attorney General construed CL § 4-209's predecessor—Art. 27, § 36H.

> o "with respect to minors" and
>
> o "within 100 yards of or in a park, church, school, public building, and other place of public assembly."

Bill 4-21 implements this grant of authority by prohibiting a person from committing the following acts:

- selling, renting, lending, or otherwise transferring **to a minor** an untraceable ghost or undetectable gun (or a major component thereof) or a computer code or program to make a gun through a 3D printing process

- purchasing, selling, transferring, or possessing an untraceable ghost gun, including a gun created through a 3D printing process, **in the presence of a minor**;

- storing a leaving an untraceable ghost undetectable gun (or a major component thereof) in a location that the person knows or should know is **accessible to a minor**;

- selling, transferring, possessing, or transporting an untraceable ghost or undetectable gun or a firearm created through a 3D printing process[17] **in or within 100 yards of a place of public assembly**. This prohibition does not apply to:

  > o the possession of a firearm or ammunition, other than an untraceable ghost or undetectable gun, in the person's own home; or
  >
  > o separate ammunition of an unloaded firearm transported in an enclosed case or a locked firearms rack on a motor vehicle, unless the firearm is an untraceable ghost or undetectable gun.

---

[17] Montgomery Cnty. Code § 57-11(a) already prohibited selling, transferring, possession, or transporting a handgun, rifle, or shotgun or their ammunition, in or within 100 yards of a place of public assembly. That provision was enacted in 1997. 1997 Laws Montgomery Cnty. ch. 14 (Bill 4-97). **Ex. E.**

Plaintiffs argue that the Bill exceeds the authority granted under CL § 4-209(b). Compl. ¶ 42(a); Pls.' Mot. for Summ. J. 9-14. They write that the County has "effectively rewritten" CL § 4-209 with amendments to County law that are "breathtaking and leave no doubt that the County has vastly overreached." Pls.' Mot. for Summ. J. 10. But, in fact, the Bill fits comfortably within the authority granted to counties in CL § 4-209(b).

First, in breathless hyperbole, Plaintiffs argue that the new definition of a place of public assembly "literally regulates the totality of Montgomery County, including untold tens of thousands of homes and business throughout the County. Indeed, it is difficult to think of any location within the County that is not within 100 yards of a sidewalk or street, or other or other location where people 'may assemble.'" Pls.' Mot. for Summ. J. 12.

The plain language of the Bill belies Plaintiffs' argument. CL § 4-209(b)(1)(iii) empowers a county to regulate firearms "within 100 yards of or in a park, church, school, public building, and other place of public assembly." Consistent with this authorization, the Bill defines a place of public assembly as follows:

> A 'place of public assembly' is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building.

The Bill's definition of a place of public assembly is co-extensive with the definition in CL § 4-209(b)(1)(iii). As Plaintiffs note, "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned." Pls.' Mot. for Summ. J. 13-14 (quoting *In re Wallace W.*, 333 Md. 186, 190 (1993)). *See also United States v. Andrews*, 441 F3d 220, 224 (4th Cir. 2006). This list of places in the Bill

is consistent with the list in CL § 4-209, if somewhat longer. The Bill's examples of places of public assembly ("park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center") are as much places of public assembly as CL § 4-209's examples (a park, church, school, public building). Plaintiffs' suggestion that the Bill's definition of a place of public assembly "literally encompasses every sidewalk, every street, every restaurant, every coffee shop, and every private business in the entire County" is not supported by the plain language of the Bill.

Plaintiffs' argument that the Bill improperly includes places on private property is similarly refuted by the plain language of CL § 4-209. Both § CL § 4-209 and the Bill include private property as an example of a place of public assembly. CL § 4-209 lists a "church" as a place of public assembly, evidencing the General Assembly's intent not to limit "places of public assembly" to places that are located on public property. The Bill does the same.

Finally, Plaintiffs argue that the County has impermissibly expanded CL § 4-209's definition of "place of public assembly" because the Bill defines it as "a place where the public **may** assemble." (Emphasis added.) Under Plaintiffs reading of CL § 4-209, the County's authority to regulate firearms is limited to "100 yards of specific, existing locations where people typically **already** assemble." Pls.' Mot. for Summ. J. 13 (emphasis in original). In other words, in Plaintiffs' view, a location cannot be a place of public assembly until it is "broken in;" that is, until people have actually assembled there at least once. Aside from being a nonsensical interpretation, which is to be avoided, Plaintiffs' interpretation is, again, not supported by the plain language of CL § 4-209, which empowers the County to regulate firearms within 100 yards of or in a park, church, school, public building, and other place of public assembly." It does not limit the County's

authority to places where the public has **previously** assembled for an established period of time. Nor does it limit the County's authority to places where the public is **currently** assembled. The County's authority is not limited to a church when services are being conducted, or a school when it is in session. Contrary to the cannons of statutory interpretation, Plaintiffs are reading words into the statute that are not there.

### 3. The specific authority granted in CL § 4-209 governs, not the earlier enacted, more general express preemption provisions.

Plaintiffs contend that the General Assembly has repealed, *sub silentio*, the authority granted in CL § 4-209(b) through a series of statutes that were either enacted before CL § 4-209 or are more general than CL § 4-209. This strained argument is contrary to well accepted cannons of statutory construction, which Plaintiffs cite, but fail to apply.

As an initial matter, this Court should construe the various statutory provisions regarding firearms so that they do not conflict with one another.

> When the language of a section of a statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the purpose, aim, or policy of the enacting body, and attempt to harmonize provisions dealing with the same subject so that each may be given effect. In addition to harmonizing the provisions within a single statutory scheme, where statutes relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope.

*Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 714-15 (2010) (internal citations and quotations omitted). Therefore, "when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable." *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 183 (2006).

Two other canons are helpful when seeking to reconcile multiple statutes that related to the same subject matter. First, "[i]t is an often repeated principle that a specific statutory provision

governs over a general one. Thus where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable." *Schreyer v. Chaplain*, 416 Md. 94, 118 n.12 (2010) (internal quotations and citations omitted). Second, when the General Assembly enacts a specific provision subsequent to a general provision, the later-enacted provision controls. *Prince George's Cnty. v. Fitzhugh*, 308 Md. 384, 390 n.4 (1987) (citing earlier authority).

Plaintiffs maintain that the authority granted to counties in CL § 4-209(b) to regulate firearms with respect to minors and near a place of public assembly was constrained by four earlier enacted statutes that more generally preempt the authority of a county to regulate the possession, transfer, and sale of a regulated firearm. Compl. ¶¶ 20 & 42; Pls.' Mot. for Summ. J. 14-18. Specifically, Plaintiffs rely upon PS §§ 5-104 (preempting a local jurisdiction from regulating the sale of a regulated firearm); 5-133(a) (preempting a local jurisdiction from regulating the possession of a regulated firearm); 5-134(a) (preempting a local jurisdiction from regulating the transfer of a regulated firearm) and 1972 Md. Laws ch. 13 § 6 (an uncodified provision preempting a political subdivision from regulating the wearing, carrying, or transporting of handguns).

It is readily apparent that these four provisions, generally preempting local regulation of the sale, possession, transfer, and wearing, carrying, or transporting of a firearm, are broader than CL § 4-209(b)'s narrower grant of authority to local jurisdictions to regulate those same aspects of firearms **with respect to minors and within 100 yards of a place of public assembly**. In other words, CL § 4-209(b) can (and should) be read exactly as intended and written: an exception to the otherwise general preemption in these other statutes and, of course, a specific exception to the preemption in CL § 4-209(a). In this way, these firearm statutes can be read in harmony, avoiding

a strained reading that, contrary to accepted cannons of statutory interpretation, would render nugatory the grant of authority in CL 4-209(b).

In addition, CL § 4-209 was enacted in 1985, after these other statutes were enacted in 1966 and 1972. The Attorney General addressed this very issue—the relationship between the authorization afforded local governments in Art. 27, § 36H (now codified in CL § 4-209) and the four general firearm preemption statutes Plaintiffs rely upon—when reviewing the County's authority to enact a proposed local law regulating a minor's access to firearms. 76 Md. Op. Att'y Gen. 240 (1991).

> Other preemption provisions relating to handguns do not affect the issue, in our opinion. Under Article 27, §§ 442(a) [recodified as **PS § 5-104** in 2003 Md. Laws ch. 5] and 445(a) [recodified as PS §§ **5-133, 5-134** in 2003 Md. Laws ch. 5], the State has preempted local regulation of the sale, possession, and transfer of pistols and revolvers. **These provisions were enacted in Chapter 502 of the Laws of Maryland 1966.** Furthermore, Chapter 13 of the Laws of Maryland **1972** contains an uncodified section preempting local laws regulating the wearing, carrying, or transporting of handguns. *See Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 542, 489 A.2d 1114 (1985).
>
> Customary principles of statutory construction, however, lead us to give effect to the specific and later-enacted authorization for local regulation in § 36H(b), notwithstanding these other preemption provisions. First, where the General Assembly has enacted both a specific and a general statute, and the general statute includes the same subject matter as the more specific, the general statute governs only those cases that do not fall within the provisions of the specific statute. *See Lumberman's Mut. Casualty v. Ins. Comm'r*, 302 Md. 248, 268-69, 487 A.2d 271 (1985) (citing earlier authority). Moreover, when the General Assembly enacts a specific provision subsequent to a general provision, the later-enacted provision controls. *Prince George's County v. Fitzhugh*, 308 Md. 384, 390 n.4, 519 A.2d 1285 (1987) (citing earlier authority).
>
> Under either canon of construction, the specific regulatory authority given local governments under § 36H(b) prevails over more general preemption provisions found elsewhere. Hence, we turn to the task of construing § 36H(b)(1).

76 Md. Op. Att'y Gen. 240, 241 (1991) (emphasis added).[18]

---

[18] Plaintiffs sheepishly acknowledge that the three Public Safety Article statutes were

Plaintiffs' reliance upon PS § 5-207(a) fares no better. Compl. ¶¶ 20 & 42; Pls.' Mot. for Summ. J. 17-18. Finally, PS § 5-207(a)'s general preemption of the right of a local jurisdiction to regulate the transfer of a rifle or shotgun can easily be reconciled with CL § 4-209(b)'s more narrow exception permitting local regulation of a handgun, rifle, or shotgun, their ammunition and component parts, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. It is unreasonable to assume, as Plaintiffs do, that the General Assembly intended to repeal, *sub silentio*, the express authority granted to localities in this back handed manner. The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law. For this reason, another cardinal rule of statutory construction is that courts will not find an implied repeal unless demanded by irreconcilability or repugnancy. *Harden v. Mass Transit Admin.*, 277 Md. 399, 406-07 (1976). PS § 5-207(a) and CL § 4-209(b) are hardly irreconcilable.

In addition, the County has prohibited the transfer of a rifle or shotgun to a minor, except where the transferor is the minor's parent or instructor, since 1966. Montgomery Cnty. Code § 103-6 (1966). **Ex. F**.[19] Because "the General Assembly is presumed to be aware of existing local law when it legislates," the legislature's failure to "address the interaction of its statutes with pre-existing local … laws suggests that it intended no change in the applicability of the local laws."

---

amended and **reenacted** after 1985. Pls.' Mot. for Summ. J. 18. If mere reenactment was determinative, then it should be noted that CL § 4-209 was most recently amended in 2010 (to add subsection (b)(3)), at which time the authority of a county in subsection (b)(1) to regulate firearms with respect to minors and near a place of public assembly was left undisturbed.

[19] The County more generally prohibited the transfer of a gun to a minor, except where the transferor is the minor's parent or instructor, since 1955. Montgomery Cnty. Code § 95-6 (1955). **Ex. G**.

*Ad + Soil, Inc. v. Cty. Comm'rs of Queen Anne's Cty.*, 307 Md. 307, 333 (1986); *see also City of Balt. v. Sitnick*, 254 Md. 303, 322 ("There is a presumption of statutory construction that the Legislature acts with the knowledge of existing laws on the subject matter under consideration."). As in *Sitnick*, the state law "included no repealer of the [local] law[s] nor, as a matter of fact, the standard clause repealing all inconsistent laws." 254 Md. at 322. This failure to grapple with preexisting local law "is an important factor indicating that there was no intent by the General Assembly to preempt the field." *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Cty.*, 292 Md. 75, 79 (1981). *See also Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979). This failure to "mention[] preexisting local … ordinances [is] a clear indication that the General Assembly did not intend to preempt these local laws." *Bd. of Child Care of Balt. Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 698 (1989)

### B.    Implied Preemption

State law does not impliedly preempt Bill 4-21. Pls.' Mot. for Summ. J. 19-20.

Preemption may be implied only if there is "unequivocal conduct of the General Assembly" that "manifest[s] a purpose to occupy exclusively a particular field." *Bd. of Child Care of Balt. Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 697 (1989). The General Assembly must "act[] with such force that an intent by the State to occupy the entire field must be implied." *Talbot Cty. v. Skipper*, 329 Md. 481, 488 (1993) (citation omitted); *see also City of Balt. v. Sitnick*, 254 Md. 303, 323 (1969).

The "primary indicia of a legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated the field." *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 299 (1993) (quoting *Skipper*, 329 Md. at 488). In making this assessment, courts may also consider various "secondary factors" in determining whether a local

law is impliedly preempted. *See id.* at 299-300.[20]

Given that implied preemption is the search for legislative intent to preempt in the absence of express legislative guidance, application of that doctrine is inappropriate where the State law expressly **authorizes** local regulation, as is the case here. In other words, this Court should not seek to divine whether the General Assembly intended to preempt the County from regulating handguns, rifles, or shotguns (or the component parts) with respect to minors and within 100 yards of a place of public assembly when the General Assembly has expressly authorized the County to do just that in CL § 4-209(b).

In *State v. Phillips*, 210 Md. App. 239 (2013), the court concluded that State law did not expressly or impliedly preempt a Baltimore City law requiring persons convicted of certain gun offenses in Baltimore City to register with the Police Commissioner. With regard to implied preemption, the court concluded that, although the State has heavily regulated the field of use, ownership, and possession, of firearms, it has not so extensively regulated the field that all local laws relating to firearms are preempted. *Id.* at 280-281. The court quoted 93 Md. Op. Att'y Gen. 126 (2008) (opining that the Baltimore City law was not preempted), where the Attorney General noted that although the State has broadly preempted much local regulation, it has also "enacted specific exceptions to that preemption," where local regulation is authorized.

The legislature is presumed to know of the Attorney General's interpretation of its statutes,

---

[20] These factors include "whether the state laws provide for pervasive administrative regulation"; "whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances"; "whether a state agency … has recognized local authority to act in the field"; "whether the particular aspect of the field sought to be regulated … has been addressed by the state legislation"; "whether a two-tiered regulatory process … would engender chaos and confusion"; whether "some local control has traditionally been allowed"; and "whether local laws existed prior to the enactment of the state laws." *Allied Vending*, 332 Md. at 299-300.

which can place a gloss on subsequent legislation. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 695 n.29 (2019). As noted above, the Attorney General has twice interpreted the exceptions in CL § 4-209(b) as permitting local regulation of firearms, notwithstanding other broader express preemption provisions in State law. Legislative acquiescence in the Attorney General's interpretation of one of its statutes is a factor in determining legislative will. *Demory Bros. v. Bd. of Public Works of Md.*, 20 Md. Appl. 467, 473 (1974).

This Court cannot conclude that the State has impliedly preempted all local regulation of firearms in light of the express authorization in CL § 4-209(b) and subsequent confirmatory Attorney General opinions.

###    C.    Conflict

Plaintiffs also argue that the Bill conflicts with many of the same State laws cited above. Pls.' Mot. for Summ. J. 21-30.[21]

---

[21] Under the heading "Bill 4-21 is 'inconsistent' with other Maryland statutes," Plaintiffs include a passing reference that the Bill County Code "raises profound Second Amendment questions" under *Heller*. Pls.' Mot. for Summ. J. 22-23. Profundity aside, Plaintiffs have chosen not to include a Second Amendment claim in their Complaint. Even under *Heller*, the Supreme Court made clear that certain restrictions on access to guns were allowed, including laws that involved restrictions over public places. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). The Fourth Circuit has further held that limits to certain types of firearms does not "severely burden…the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (affirmed after summary judgment, the Maryland Firearm Safety Act was valid even though it banned possession of assault weapons). Assuming *arguendo* an impact on the possession of "ghost," "untraceable," and "undetectable" guns, Plaintiffs and County residents are nevertheless afforded the right "to protect themselves with a plethora of other firearms and ammunition" under the Bill; the Bill does "not effectively disarm individuals or substantially affect their ability to defend themselves." *Kolbe*, 849 F.3d at 138-139. Plaintiff's reliance on cases involving stun guns and one of out of Texas involving the manufacture of guns with 3-D printers are of no moment. See *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 699 (W.D. Tex. 2015) ("While Plaintiffs' logic is appealing [relating the historic gunsmithing to modern-day 3-D printing of guns], Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in

"The crux of conflict preemption is that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not **expressly** permitted. Conflict preemption occurs when a local law prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Montgomery Cty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 688 (2019) (emphasis in original) (internal quotations and citations omitted). Maryland courts have thus long followed the concurrent powers doctrine, committed to the principle that "[a]dditional regulation by [a local] ordinance does not render [the local ordinance] void" even though the state may have enacted statutes regulating a field. *Rossberg v. State*, 111 Md. 394 (1909) (citation omitted); *accord E. Tar Prods. Corp. v. State Tax Comm'n of Maryland*, 176 Md. 290, 296-97 (1939) (observing that a local law requiring "more than the [state] statute requires creates no conflict").

The Bill does not conflict with CL § 4-203. Compl. ¶ 42; Pls.' Mot. for Summ. J. 22-24. Subsection (a) of that statute sets out the general prohibition against wearing, carrying, or transporting a handgun (whether open or concealed) on or about the person or in a vehicle. Subsection (b) sets out a variety of exceptions, including § 4-203(b)(6) (on real estate that a person owns or leases), § 4-203(b)(7) (when authorized in the scope of employment), and § 4-203(b)(5) (transporting by a bona fide gun collector).

Plaintiffs' argument here, that the Bill prohibits possessing a handgun in places that fall within one or more of the exceptions in CL § 4-203(b), is again based upon their overbroad reading of the Bill's definition of a "place of public assembly" as encompassing "the totality of

---

the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the International Traffic in Arms Regulations constitute a burden on the core of the Second Amendment").

Montgomery County." Pls.' Mot. for Summ. J. 12. As already discussed above, the Bill's definition of a place of public assembly is coextensive with the definition in CL § 4-209(b). Since 1997, the County has exercised this grant of state authority, prohibiting the selling, transferring, possession, or transporting of a handgun, rifle, or shotgun, their ammunition and component parts, in or within 100 yards of a place of public assembly. 1997 Laws Montgomery Cnty. ch. 14 (Bill 4-97). **Ex. E.**

Second, CL § 4-203, like the other provisions of State law cited by Plaintiffs, was enacted before the authority granted to the County in CL § 4-209. Specifically, the General Assembly enacted CL § 4-203 in 1972, as Art. 27, § 36B. *See* 1972 Md. Laws ch. 13 (which, as noted above, included the uncodified preemption language regarding local regulation of the wearing, carrying, or transporting of handguns). CL § 4-209 was enacted later, in 1985. As the Attorney General noted, that compromise legislation excepted from the scope of preemption local regulation of a handgun, rifle, or shotgun, their ammunition and component parts, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. The Bill cannot conflict with State law when it is enacted pursuant to an explicit exception allowing for local regulation.

Plaintiffs also argue that the Bill exceeds the scope of regulation permitted under CL § 4-209 because, in regulating minors' access to firearms, it impermissibly regulates the conduct of adults. Pls.' Mot. for Summ. J. 27. But the Attorney General has noted that "any regulation that bears a reasonable relation to minors' access to, or use of, firearms is a firearms regulation 'with respect to minors'" permissible under CL § 4-209(b). 76 Md. Op. Att'y Gen. 240, 242 (1991). Thus, the Attorney General found un-preempted a proposed County bill that would (1) prohibit gun dealers from selling, leasing, or otherwise transferring a handgun without also selling or otherwise providing with each handgun a trigger lock or similar device that is designed to prevent

the unintentional discharge of the handgun; and (2) require gun dealers to post a conspicuous notice describing the trigger lock sale requirement and the requirement in State law that gun owners keep their guns out of the reach of children. "To be sure, the bill regulates the behavior of adults, not children. But since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id.* Here, the Bill serves this purpose by prohibiting a person from purchasing, selling, transferring, or possessing a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

The Bill also prohibits a person from giving, selling, renting, lending, or otherwise transferring a ghost gun or its major components to a minor. Plaintiffs assert that this provision is overbroad because certain major components of a ghost gun (e.g., the slide, cylinder, or barrel) are not a firearm and are not required to be serialized under Federal law; only a finished receiver is required to be serialized. Pls.' Mot. for Summ. J. 30. But the County's authority under State law to regulate firearms with respect to minors (and within 100 yards of a place of public assembly) includes "ammunition for **and components of** a handgun, rifle, or shotgun." CL § 4-209(b)(1) ("A county . . .. may regulate the times listed in subsection (a) of this section.") The County's authority to regulate the components of ghost guns does not depend upon whether those components are themselves firearms or required to be serialized under Federal or State law.[22]

---

[22] Plaintiffs allude to a Fourteenth Amendment substantive due process claim within their Express Powers Act argument, concluding that the Bill violates their parent-Plaintiffs' liberty interest in the "care, custody, and control of their children." Pls.' Mot. for Summ. J. 28-29. They cite *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Again, as is true of their Second Amendment argument, the Complaint contains no claim for violation of substantive due process. In any event, the cases they rely on are wholly inapposite, involving the custody of children. The County is unaware of any legal authority for the proposition that parents have a substantive due process right to instruct their children on the use of a specific type of firearm. Moreover, it is long established that "[t]he fundamental right of a parent to control the upbringing of her child…is 'neither absolute nor unqualified.'" *D.B. v. Cardall*, 826 F.3d 721, 740-41 (4th Cir. 2016). It is "subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that

The Bill is not preempted by, or in conflict with, State law. The County asks that this Court issue a declaration to that effect.

## III.     COUNT III: MARYLAND TAKINGS CLAUSE - BILL 4-21 IS A LAWFUL EXERCISE OF MONTGOMERY COUNTY'S POLICE POWERS

In Count III of the Complaint, the Plaintiffs claims that the Bill is a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

### A.     The Restrictions of the Bill Do Not Amount to a Taking

The Bill does not amount to a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

Article III, § 40 of the Maryland Constitution states:

> The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.

Article 24 of the Maryland Declaration of Rights states:

> That no man ought to be … disseized of his freehold, liberties or privileges … or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

The federal analog, contained within the Fifth Amendment,[23] states:

> No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

---

interest." *Id.*

[23] "The decisions of the Supreme Court are practically direct authorities for the Fifth and Fourteenth Amendments to the United States Constitution and Article III, § 40, of the Maryland Constitution . . . ." *Niefert v. Dep't of the Envir.*, 395 Md. 486, 518 (2006) (internal quotations omitted); *see also Dep't of Trans. v. Armacost*, 299 Md. 392, 420 (1984).

Plaintiffs argue that "[u]nder Maryland's Taking Clause and Due Process Clause, "[n]o matter how 'rational' under particular circumstances, the State is constitutionally precluded from abolishing a vested property right or taking one person's property and giving it to someone else." Compl. ¶ 47 (quoting *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 623, 805 A.2d 1061 (2002)). This argument misapprehends the holding of *Dua*[24] and ignores the police powers granted to the State and charter counties like the Defendant.

## B.   Montgomery County May Exercise Its Police Powers to Restrict Possession and Use of Guns and Related Equipment

As noted above, Montgomery County is a charter county and as such enjoys broad authority to legislate. *Tyma v. Montgomery Cnty.*, 369 Md. 497, 511 (2002) (Express Powers Act is broadly construed to permit charter counties to legislate beyond the powers expressly enumerated in the Express Powers Act). This grant of powers provides charter counties with a general police power to enact ordinances for the public good as long as the ordinances are not preempted by and do not conflict with other laws of the State. *Snowden v. Anne Arundel County*, 295 Md. 429, 432-33 (1983); *Prince Geo's Co. v. Chillum-Adelphi,* 275 Md. 374, 382 (1975); *Montgomery League v. Greenhalgh,* 253 Md. 151, 160-61 (1969).

In *Montgomery Citizens League v. Greenhalgh,* the Court of Appeals recognized that the purpose of Article XI-A of the Maryland Constitution was to transfer local lawmaking powers

---

[24] The quoted portion of *Dua* is inapposite because Bill 4-21 does not empower the County to confiscate ghost guns *and give them to someone else* and also because Plaintiffs do not have a vested property interest in the continuous ownership and possession of a highly regulated piece of personal property. Furthermore, Bill 4-21 is not retroactive because the proscribed conduct at issue takes place in the future. Only potential future conduct of possessing ghost guns and untraceable guns in the presence of minors and in certain places of public assembly will amount to a violation of the County code. Plaintiffs' prior purchase and possession of the subject ghost guns and untraceable guns remains legal and beyond the scope of Bill 4-21 as does continued possession of those items outside of the presence of minors and outside of places of public assembly.

from the state legislature to county governments thereby giving the county council full legislative power to enact local laws on all matters covered by the express grant of powers granted by the Express Powers Act pursuant to Art. XI-A, § 2. *Greenhalgh*, 253 Md. 159-60. Thus, where the County's regulations passed pursuant to its police powers do not contravene state or federal law, the County has properly exercised the police powers delegated to it by the State.

### C.   The Bill is *Per Se* Not a Taking because the County is Authorized to Impose a Regulatory Burden on Personal Property

The state's interest in "the protection of its citizenry and the public safety is not only substantial, but compelling." *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (*en banc*). The Supreme Court has routinely upheld property regulations, even those that "destroy[]" a recognized property interest, where a state "reasonably concluded that the health, safety, morals, or general welfare" would be advanced. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 125, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); see also *Mugler v. Kansas*, 123 U.S. 623, 668, 8 S. Ct. 273, 31 L. Ed. 205 (1887) ("A prohibition . . . upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking . . . .").

The Supreme Court's takings cases distinguish between two types of takings: (1) physical appropriation of private property and (2) regulatory burdens on private property. See *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (discussing the distinct types of takings cases). Plaintiffs herein allege a regulatory burden on their property, and not a physical appropriation, because the Bill does not confiscate any variety of firearm. Instead, the Bill merely regulates the possession and use of certain defined ghost guns and untraceable guns in the presence of a minor and within 100 yards of a place of public assembly. While the Bill places a regulatory burden on the use of ghost guns and untraceable guns, it does not ban them outright.

44

Unlike physical takings cases, regulatory takings cases distinguish between real property[25] and personal property when determining whether compensation is owed. With regard to personal property, the Supreme Court has explained that "by reason of the State's traditionally high degree of control over commercial dealings, [the owner of personal property] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027-28 (1992); *see also Horne v. Department of Agric.*, 135 S. Ct. 2419, 2427 (2015) (reiterating the "different treatment of real and personal property in a regulatory case" as articulated in *Lucas*).

The Fourth Circuit has held that even outright bans of personal property, much less the targeted restrictions of the Bill, do not amount to a taking where the state exercises its police power for the benefit of the health, safety, and welfare of its citizens. In *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404 (4th Cir. 2007), the Fourth Circuit held that South Carolina's complete ban on the possession or sale of certain gambling machines, which had previously been legal to possess and sell, was not a taking, even though as a result of the newly-enacted law, the machines "lost all market value" and the owner's "business [selling the machines] became worthless." *Id.* at 406. Relying on *Lucas*, the Fourth Circuit reiterated that "the owner of any form of personal property must anticipate the possibility that new regulation might

---

[25] With regard to real property, "a property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers," but this "'implied limitation'" does not permit the state to "subsequently eliminate all economically valuable use" of land. *Lucas*, 505 U.S. at 1027 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. City of New York*, 438 U.S. at 124. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law . . . ." *Id.*

significantly affect the value of his business," particularly "in the case of a heavily regulated and highly contentious activity . . . ." *Id.* at 411 (citing *Lucas*, 505 U.S. at 1027-28). Critically here, the *Holliday* Court held that regulations for the public good in heavily regulated fields like video gambling and production of alcohol "*per se* do not constitute takings, and thus analysis under existing takings frameworks is unnecessary."[26]

It is incontrovertible that firearms are some of the most highly regulated items of personal property. Much like the owners and sellers of gambling machines in *Holliday*, the owners and sellers of firearms have no reasonable expectation that states or counties will not place restrictions on the possession and other use of those firearms—particularly with respect to minors and places of public assembly. Therefore, according to the holding of *Holliday*, the Bill is *per se* not a taking and no further analysis is required.

Relying extensively on *Holliday*, the Fourth Circuit recently rejected lead Plaintiff Maryland Shall Issue, Inc.'s ("MSI") challenge to Senate Bill 707 (2018), now codified at CL §§ 4-301, 4-305.1, 4-306, prohibiting possession of "rapid fire trigger devices." See *Md. Shall Issue v. Hogan*, 963 F.3d 356 (4th Cir. 2020). MSI argued that SB 707 ran afoul of the Takings Clause because the law was "tantamount to a direct appropriation of . . . personal property." *Id.* at 365. The Fourth Circuit disagreed, finding that although the ban "may make the personal property

---

[26] In the context of regulatory takings, as opposed to physical appropriation, the Court often makes factual inquiries "designed to allow careful examination and weighing of all the relevant circumstances." *Murr*, 137 S. Ct. at 1942 (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)). The Court has articulated "a complex of factors" to guide courts, including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). "A central dynamic of the Court's regulatory takings jurisprudence . . . is its flexibility." *Murr*, 137 S. Ct. at 1943. Because Plaintiffs' allegations here are *per se* not a taking, the analysis described in *Murr* is not necessary.

46

economically worthless," it did not constitute a direct appropriation because it did "not require owners of rapid fire trigger activators to turn them over to the Government or to a third party." *Id*. at 366.

The Bill is even further removed from a taking because it does not ban possession of ghost guns and undetectable guns, much less require them to be turned over to the government or a third party as required by the Fourth Circuit in *Md. Shall Issue v. Hogan*. Instead, the Bill merely restricts possession and transfer of ghost guns and undetectable guns in certain locations and with respect to minors. The Bill does not amount to a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. The County requests that this Court enter a declaration to that effect.

## CONCLUSION

For all of the foregoing reasons, Defendant Montgomery County respectfully requests that this Court dismiss the Complaint because Plaintiffs lack standing. Alternatively, the County requests that grant its Motion for Summary Judgment, enter judgement in its favor, and declare that:

Count I: Bill 4-21 is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

Count II: Bill 4-21 is authorized by, and not preempted by or in conflict with, State law; and

Count III: The restrictions of Bill 4-21 are *per se* not a taking and Bill 4-21 was properly enacted pursuant to the County's police powers.

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of February 2022, a copy of the foregoing was electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

21-003732
County MTD Cross MSJ.docx

48

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,          *

      Plaintiffs          *

      v.          *          Case No.: 485899V

MONTGOMERY COUNTY, MARYLAND          *

      Defendant          *

## ORDER

Upon consideration of the Plaintiffs' Motion for Partial Summary Judgment, Defendant's Opposition filed thereto, Defendant's Motion for Summary Judgment or, Alternatively, for Summary Judgment, any opposition or replies thereto, and any oral argument thereon, it is this _____ day of _____, 2022, by the Circuit Court for Montgomery County, Maryland,

ORDERED that Plaintiffs' Motion for Partial Summary Judgment be and hereby is DENIED; and it is further,

ORDERED that Defendant's Motion for Summary Judgment be and hereby is GRANTED; and it is further,

ORDERED that judgment be and hereby is ENTERED in favor of Defendant Montgomery County, Maryland as to Count I, Count II, and Count III of the Complaint; and it is further,

DECLARED, ADJUDICATED, and DECREED, that:

Count I: Bill 4-21 is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

Count II: Bill 4-21 is authorized by, and not preempted by or in conflict with, State law; and

Count III: The restrictions of Bill 4-21 are *per se* not a taking and Bill 4-21 was properly enacted pursuant to the County's police powers.

_____
Judge, Circuit Court for
Montgomery County, Maryland

cc:    all parties of record

| | |
|---|---|
| Bill No. | 4-21 |
| Concerning: | Weapons - Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns |
| Revised: 04/06/2021 | Draft No. 5 |
| Introduced: | January 19, 2021 |
| Enacted: | April 6, 2021 |
| Executive: | April 16, 2021 |
| Effective: | July 16, 2021 |
| Sunset Date: | None |
| Ch. 7 , Laws of Mont. Co. | 2021 |

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council Vice-President Albornoz
Co-Sponsors: Council President Hucker, Councilmembers Katz, Jawando, Navarro, Friedson, Rice, Riemer and Glass

**AN ACT** to:

(1) define terms related to firearm laws;
(2) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
(3) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
(4) generally amend the law regarding firearms and other weapons.

By amending
Montgomery County Code
Chapter 57, Weapons
Sections 57-1, 57-7, and 57-11

By adding
Montgomery County Code
Chapter 57, Weapons
Section 57-16



DEFENDANT'S EXHIBIT

**A**

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| <u>Double underlining</u> | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

1    **Sec. 1. Sections 57-1, 57-7, and 57-11 are amended, and Section 57-16 is**
2    **added, as follows:**

3    **57-1. Definitions.**

4    In this Chapter, the following words and phrases have the following meanings:

5    *3D printing process*: a process of making a three-dimensional, solid
6    object using a computer code or program, including any process in
7    which material is joined or solidified under computer control to create a
8    three-dimensional object.

9    *    *    *

10    *Gun* or *firearm*: Any rifle, shotgun, revolver, pistol, ghost gun,
11    undetectable gun, air gun, air rifle or any similar mechanism by
12    whatever name known which is designed to expel a projectile through a
13    gun barrel by the action of any explosive, gas, compressed air, spring or
14    elastic.

15    (1)    The term "antique firearm" means (a) any firearm (including any
16        firearm with a matchlock, flintlock, percussion cap, or similar
17        type of ignition system) manufactured in or before 1898; and (b)
18        any replica of any firearm described in subparagraph (a) if such
19        replica (i) is not designed or redesigned or using rimfire or
20        conventional centerfire fixed ammunition, or (ii) uses rimfire or
21        conventional centerfire fixed ammunition which is no longer
22        manufactured in the United States and which is not readily
23        available in the ordinary channels of commercial trade.

24    (2)    "Ghost gun" means a firearm, including an unfinished frame or
25        receiver, that lacks a unique serial number engraved or cased in
26        metal alloy on the frame or receiver by a licensed manufacturer,
27        maker or importer under federal law or markings in accordance

28    with 27 C.F.R. § 479.102. It does not include a firearm that has

29    been rendered permanently inoperable, or a firearm that is not

30    required to have a serial number in accordance with the Federal

31    Gun Control Act of 1968.

32    (3)    "Handgun" means any pistol, revolver or other firearm capable of

33    being concealed on the person, including a short-barreled shotgun

34    and a short-barreled rifle as these terms are defined below.

35    "Handgun" does not include a shotgun, rifle, or antique firearm.

36    [(3)] (4)    "Rifle" means a weapon designed or redesigned, made or

37    remade, and intended to be fired from the shoulder and designed

38    or redesigned and made or remade to use the energy of the

39    explosive in a fixed metallic cartridge to fire only a single

40    projectile through a rifled bore for each single pull of the trigger.

41    [(4)] (5)    The term "short-barreled rifle" means a rifle having one

42    (1) or more barrels less than sixteen (16) inches in length and any

43    weapon made from a rifle (whether by alternation, modification

44    or otherwise) if such weapon, as modified, has an overall length

45    of less than twenty-six (26) inches.

46    [(5)] (6)    The term "short-barreled shotgun" means a shotgun having

47    one (1) or more barrels less than eighteen (18) inches in length

48    and any weapon made from a shotgun (whether by alteration,

49    modification or otherwise) if such weapon as modified has an

50    overall length of less than twenty-six (26) inches.

51    [(6)] (7)    "Shotgun" means a weapon designed or redesigned, made

52    or remade, and intended to be fired from the shoulder and

53    designed or redesigned and made or remade to use the energy of

54    the explosive in a fixed shotgun shell to fire through a smooth

55          bore either a number of ball shot or a single projectile for each
56          single pull of the trigger.

57    (8)   "Undetectable gun" means:

58          (A)   a firearm that, after the removal of all its parts other than a
59                major component, is not detectable by walk-through metal
60                detectors commonly used at airports or other public
61                buildings;

62          (B)   a major component that, if subjected to inspection by the
63                types of detection devices commonly used at airports or
64                other public buildings for security screening, would not
65                generate an image that accurately depicts the shape of the
66                component; or

67          (C)   a firearm manufactured wholly of plastic, fiberglass, or
68                through a 3D printing process.

69                           *       *       *

70    *Major component* means, with respect to a firearm:

71    (1)   the slide or cylinder or the frame or receiver; and

72    (2)   in the case of a rifle or shotgun, the barrel.

73    *Minor*: An individual younger than 18 years old.

74                           *       *       *

75    *Place of public assembly*: A "place of public assembly" is a place where
76    the public may assemble, whether the place is publicly or privately
77    owned, including a [government owned] park [identified by the
78    Maryland-National Capital Park and Planning Commission]; place of
79    worship;   [elementary   or   secondary]   school;   [public]   library;
80    [government-owned   or   -operated]   recreational   facility;   hospital;
81    community health center; long-term facility; or multipurpose exhibition

82      facility, such as fairgrounds or a conference center.  A place of public

83      assembly includes all property associated with the place, such as a

84      parking lot or grounds of a building.

85                                    *          *          *

86  **57-7. Access to guns by minors.**

87  (a)   A person must not give, sell, rent, lend, or otherwise transfer any rifle or

88      shotgun or any ammunition or major component for these guns in the

89      County to a minor.  This subsection does not apply when the transferor

90      is at least 18 years old and is the parent, guardian, or instructor of the

91      minor, or in connection with a regularly conducted or supervised

92      program of marksmanship or marksmanship training.

93  (b)   An owner, employee, or agent of a gun shop must not allow a minor to,

94      and a minor must not, enter the gun shop unless the minor is

95      accompanied by a parent or other legal guardian at all times when the

96      minor is in the gun shop.

97  (c)   A person must not give, sell, rent, lend, or otherwise transfer to a minor:

98      (1)   a ghost gun or major component of a ghost gun;

99      (2)   an undetectable gun or major component of an undetectable gun;

100          or

101     (3)   a computer code or program to make a gun through a 3D printing

102          process.

103 (d)   A person must not [[manufacture or assemble]] purchase, sell, transfer,

104     possess, or transfer a ghost gun, including [[making]] a gun created

105     through a 3D printing process, in the presence of a minor.

106 (e)   A person must not store or leave a ghost gun, an undetectable gun, or a

107     major component of a ghost gun or an undetectable gun, in a location

108     that the person knows or should know is accessible to a minor.

109    [(c)] (f)    This section must be construed as broadly as possible within the
110            limits of State law to protect minors.

111    **57-11.  Firearms in or near places of public assembly.**

112    (a)    [A] In or within 100 yards of a place of public assembly, a person must
113        not:

114        (1)    sell, transfer, [[manufacture, assemble,]] possess, or transport a
115            ghost gun, undetectable gun, handgun, rifle, or shotgun, or
116            ammunition or major component for these firearms[, in or within
117            100 yards of a place of public assembly]; or

118        (2)    sell, transfer, possess, or transport[[, or use a computer code to
119            create,]] a firearm created through a 3D printing process.

120    (b)    This section does not:

121        (1)    prohibit the teaching of firearms safety or other educational or
122            sporting use in the areas described in subsection (a);

123        (2)    apply to a law enforcement officer, or a security guard licensed to
124            carry the firearm;

125        (3)    apply to the possession of a firearm or ammunition, other than a
126            ghost gun or an undetectable gun, in the person's own home;

127        (4)    apply to the possession of one firearm, and ammunition for the
128            firearm, at a business by either the owner who has a permit to
129            carry the firearm, or one authorized employee of the business
130            who has a permit to carry the firearm;

131        (5)    apply to the possession of a handgun by a person who has
132            received a permit to carry the handgun under State law; or

133        ((6)    apply to separate ammunition or an unloaded firearm:

- 6 -

| 134 | | (A) | transported in an enclosed case or in a locked firearms rack |
| 135 | | | on a motor vehicle, unless the firearm is a ghost gun or an |
| 136 | | | undetectable gun; or |
| 137 | | (B) | being surrendered in connection with a gun turn-in or |
| 138 | | | similar program approved by a law enforcement agency. |
| 139 | | | *     *     * |

**57-15. Penalty.**

Any violation of this Chapter or a condition of an approval certificate issued under this Chapter is a Class A violation to which the maximum penalties for a Class A violation apply. Any violation of Section 57-8 is a Class A civil violation.

**57-16. Reporting requirement.**

(a)  The County Police Department must submit a report annually to the County Executive and the County Council regarding the availability and use of ghost guns and undetectable guns in the County.

(b)  The report must include the number of ghost guns and undetectable guns recovered by the Department during the prior year.

(c)  Each report must be available to the public on the Police Department's website.

BILL NO. 4-21

*Approved*:

_____          4/7/2021

Tom Hucker, President, County Council                              Date

*Approved*:

_____          4/16/2021

Marc Elrich, County Executive                                         Date

*This is a correct copy of Council action.*

_____          4/16/2021

Selena Mendy Singleton, Esq., Clerk of the Council             Date



**Committee:** PS
**Committee Review:** Completed
**Staff:** Christine Wellons, Legislative Attorney
**Purpose:** Final action – vote expected
**Keywords:** #NoGhostGunsMoCo, #SafetyMattersInMoCo

AGENDA ITEM #18A
April 6, 2021
**Action**

Montgomery
County Council

---

## SUBJECT

Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns
Lead Sponsor: Council Vice President Albornoz
Co-Sponsors: Council President Hucker, Councilmembers Katz, Jawando, Navarro, Friedson, Rice, Riemer and Glass

## EXPECTED ATTENDEES

Marcus C. Jones, Chief, Montgomery County Police Department

## COUNCIL DECISION POINTS & COMMITTEE RECOMMENDATION

- Council Action; Vote Required
- The Public Safety Committee recommends enactment of Bill 4-21 with amendments.

## DESCRIPTION/ISSUE

Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns, would:
- define terms related to firearm laws;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
- generally amend the law regarding firearms and other weapons.

## SUMMARY OF KEY DISCUSSION POINTS

- The Public Safety Committee recommends enactment of Bill 4-21 with amendments to:
  - consistent with the scope of state preemption, delete from the bill references to gun manufacturing.

**This report contains:**

| | |
|---|---|
| Staff Report | Pages 1 |
| Bill 4-21 | ©1 |
| Legislative Request Report | ©8 |
| RESJ Statement | ©9 |
| Economic Impact Statement | ©13 |

DEFENDANT'S
EXHIBIT

**B**

Fiscal Impact Statement                                              ©16
Testimony                                                            ©18

---

**Alternative format requests for people with disabilities.  If you need assistance accessing this report you may** submit alternative format requests **to the ADA  Compliance  Manager.  The  ADA Compliance Manager  can  also  be  reached  at  240-777-6197  (TTY  240-777-6196)  or  at** adacompliance@montgomerycountymd.gov

---

F:\LAW\BILLS\2104 Ghost Guns\Action Cover Sheet.Docx

Agenda Item 18A
April 6, 2021
**Action**

# MEMORANDUM

April 1, 2021

TO:          County Council

FROM:       Christine Wellons, Legislative Attorney

SUBJECT:    Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns

PURPOSE:    Action – Council vote required

Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns, sponsored by Lead Sponsor Council Vice President Albornoz and Co-Sponsors, Council President Hucker and Councilmembers Katz, Jawando, Navarro, Friedson, Rice, Riemer and Glass, was introduced on January 19, 2021.[1]  A public hearing was held on February 9, 2021 and a Public Safety Committee worksession was held on March 11.

Bill 4-21 would:
- define terms related to firearm laws;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
- generally amend the law regarding firearms and other weapons.

**BACKGROUND**

"Ghost guns," or "do-it-yourself guns," are unserialized firearms built by unlicensed individuals.  These guns evade many firearms regulations.  Kits to build ghost guns are readily sold on the internet, without the requirement of federal background checks.  Other ghost guns are built at home using blueprints and 3D printers.

When ghost guns are used in crimes, they are untraceable due to lack of serial numbers. During 2020, Montgomery County Police Department (MCPD) officers recovered 73 ghost guns.

Several states, including New Jersey, Rhode Island, and Washington State, as well as the District of Columbia, have passed laws to regulate ghost guns.  The Maryland General Assembly

---

[1] #NoGhostGunsMoCo, #SafetyMattersInMoCo

has introduced, but not yet passed, legislation to regulated unfinished frames and receivers.  At the federal level, Congressional bills to regulate ghost guns have not yet been successful.

SPECIFICS OF THE BILL

The purpose of Bill 4-21 is to begin to address the issue of ghost guns at the County level, consistent with limitations placed upon localities by Maryland state preemption of local firearms regulations.  Under Maryland law, the County generally is preempted to regulate in the area of firearms.  However, state law carves out certain specific areas in which the County may regulate.  In particular, the County may regulate the sale, use, or transfer of firearms: (1) with respect to minors; or (2) within 100 yards of a place of public assembly.

In this vein, the bill first would maximize the impact of the County's firearms regulations by expanding the definition of "place of public assembly".  The definition of "place of public assembly would be expanded to include any "place where the public may assemble, whether the place is publicly or privately owned, including a [government owned] park [identified by the Maryland-National Capital Park and Planning Commission]; place of worship; [elementary or secondary] school; [public] library; [government-owned or -operated] recreational facility; or multipurpose exhibition facility, such as a fairgrounds or conference center."

With respect to ghost guns or DIY guns, the bill would define ghost guns to include firearms, including unfinished frames or receivers, that are unserialized in accordance with federal regulations.  The bill would define undetectable guns to include those that cannot be detected through metal detectors, or that are made with 3D printers.  These ghost guns, including unfinished frames or receivers, and undetectable guns would be restricted with regard to minors and places of public assembly.

Specifically, the bill would prohibit a person from transferring a ghost gun or undetectable gun to a minor.  Further, it would prohibit a person from possessing or manufacturing a gun, including through a 3D printing process, in the presence of a minor.  Persons also would be prohibited from storing ghost guns, undetectable guns, or gun components in places that the person should know are accessible to minors.

Concerning places of public assembly, the bill would prohibit the sale, transfer, manufacture, or possession of ghost guns or undetectable guns within 100 yards of a place of public assembly.  The bill also would prohibit – within 100 yards of a place of public assembly – the sale, transfer, possession, or use of a computer code to create a firearm through a 3D printing process.

SUMMARY OF PUBLIC HEARING

At the public hearing on February 9, five speakers provided testimony regarding Bill 4-21.  Chief Marcus Jones testified that the Montgomery County Police Department (MCPD) and the County Executive "fully support the bill."  Chief Jones stated that ghost guns are easy to acquire through 3D printing.  Ghost guns also are easy to build from parts that can be bought on the internet.  Ghost guns make the investigation of crime more difficult and tracing the origins of the ghost guns is nearly impossible.  In 2020, MCPD recovered 73 ghost guns.

Brady United, Marylanders to Prevent Gun Violence, and Critical Issues Forum of Montgomery County also testified in support of the bill.

One individual spoke in opposition to the bill. He explained that he has built ghost guns for personal recreation and sports and he should not be prevented from doing so. He also pointed out that ghost guns are the subject of pending state legislation.

**SUMMARY OF PUBLIC SAFETY COMMITTEE WORKSESSION**

The Public Safety Committee voted (3-0) to recommend the enactment of Bill 4-21 with amendments.

**1.    Amendment Related to State Preemption**

The Committee adopted (3-0) several amendments, described below, to make the bill consistent with the scope of state preemption.

Under the Criminal Law Article of the Maryland Code, § 4-209:

**State preemption**

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and

(2) ammunition for and components of a handgun, rifle, or shotgun.

**Exceptions**

(b)(1) A county, municipal corporation, or special taxing district *may regulate the purchase, sale, transfer, ownership, possession, and transportation* of the items listed in subsection (a) of this section:

(i) with respect to minors;

(ii) with respect to law enforcement officials of the subdivision; and

(iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

(Emphasis added).

3

As originally drafted, the bill would regulate the manufacture, possession, use, sale, and transfer of ghost guns or undetectable guns with respect to minors, and with respect to 100 yards from a place of public assembly. While the preemption provisions of the Criminal Law article allow for local regulation of the possession, use, sale, and transfer of these guns, they do not allow for the regulation of the *manufacture* of guns. To make the bill consistent with state preemption provisions, the PS Committee has recommended the following amendments.

*Delete lines 103-104:*

(d)    A person must not [[manufacture or assemble]] purchase, sell, transfer, possess, or transfer a ghost gun, including [[making]] a gun created through a 3D printing process, in the presence of a minor.

*Amend lines 111-118 as follows.*

(a)    [A] In or within 100 yards of a place of public assembly, a person must not:

(1)    sell, transfer, [[manufacture, assemble,]] possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms[, in or within 100 yards of a place of public assembly]; or

(2)    sell, transfer, possess, or transport[[, or use a computer code to create,]] a firearm created through a 3D printing process.

## 2.    Pending State Legislation

The PS Committee discussed that in the Maryland General Assembly, Delegate Lopez and Senator Lee have sponsored legislation ([Legislation - HB0638 (maryland.gov)](Legislation - HB0638 (maryland.gov)) that would generally require an unfinished frame or receiver to be marked by a federally licensed firearms manufacturer or federally licensed firearms importer before being: (1) sold, offered for sale, or transferred in the State; (2) imported or otherwise brought into the State; or (3) possessed in the State.

In addition, the state bill would prohibit a dealer or any other person from selling, renting, or transferring an unfinished frame or receiver to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person a handgun qualification license (HQL) issued to the purchaser, lessee, or transferee by the Secretary of State Police.

## 3.    Survey of Ghost Gun Legislation in Other Jurisdictions

4

The PS Committee discussed that many jurisdictions – including the District of Columbia, Virginia, California, Connecticut, Hawaii, New Jersey, New York, Rhode Island, and Washington State – have laws regulating the sale or possession of "ghost guns" (*i.e.*, unserialized firearms, including unfinished frames or receivers) and undetectable guns.

According to the Giffords Law Center to Prevent Gun Violence, these state laws vary in their features and their strength, but many include regulations to:

- require frames and receivers, and guns created through 3D printing, to have serial numbers;
- permit the distribution of unfinished frames or receivers only through licensed dealers;
- require that all operable firearms be detectable by standard screening systems;
- require a background check before transferring an unfinished frame or receiver; and
- require a license to manufacture or assemble a firearm using unfinished materials or a 3D printer.

(*See* Ghost Guns | Giffords).

In terms of nearby jurisdictions, the District of Columbia has generally prohibited the possession, sale, or transfer of unfinished frames or receivers and untraceable firearms. (D.C. B. 681, Act No. 23-245; D.C. B. 746, Act No. 23-324; and D.C. Act 23-125). Virginia has banned the manufacture, importation, sale, transfer or possession of certain "plastic guns" that are undetectable by x-rays, but has not addressed the issue of unfinished frames or receivers. (Va. Code Ann. § 18.2-308.5). In New Jersey, it is a crime to knowingly possess, or to transfer, ship, sell or dispose of, a firearm manufactured or otherwise assembled using a firearm frame or firearm that is not imprinted with a serial number registered with a federally licensed manufacturer. (N.J. Stat. Ann. §§ 2C:39-3(n); 2C:39-9(n)).

**NEXT STEP:** Roll call vote on whether to enact Bill 4-21 with amendments, as recommended by the Public Safety Committee.

| This packet contains: | Circle # |
|---|---|
| Bill 4-21 | 1 |
| Legislative Request Report | 8 |
| RESJ Statement | 9 |
| Economic Impact Statement | 13 |
| Fiscal Impact Statement | 16 |
| Testimony | 18 |

F:\LAW\BILLS\2104 Ghost Guns\Action Memo.Docx

| | |
|---|---|
| Bill No. | 4-21 |
| Concerning: | <u>Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns</u> |
| Revised: | <u>1/14/2021</u>   Draft No. <u>4</u> |
| Introduced: | <u>January 19, 2021</u> |
| Expires: | <u>July 19, 2022</u> |
| Enacted: | |
| Executive: | |
| Effective: | |
| Sunset Date: | <u>None</u> |
| Ch. _____, Laws of Mont. Co. | |

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council Vice-President Albornoz
Co-Sponsors: Council President Hucker, Councilmembers Katz, Jawando, Navarro, Friedson, Rice, Riemer and Glass

**AN ACT** to:
(1) define terms related to firearm laws;
(2) restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
(3) restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
(4) generally amend the law regarding firearms and other weapons.

By amending
Montgomery County Code
Chapter 57, Weapons
Sections 57-1, 57-7, and 57-11

By adding
Montgomery County Code
Chapter 57, Weapons
Section 57-16

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| <u>Underlining</u> | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| <u>Double underlining</u> | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

1    **Sec. 1. Sections 57-1, 57-7, and 57-11 are amended, and Section 57-16 is**

2  **added, as follows:**

3  **57-1. Definitions.**

4    In this Chapter, the following words and phrases have the following meanings:

5      *3D printing process*: a process of making a three-dimensional, solid

6      object using a computer code or program, including any process in

7      which material is joined or solidified under computer control to create a

8      three-dimensional object.

9                    *        *        *

10     *Gun* or *firearm*: Any rifle, shotgun, revolver, pistol, ghost gun,

11     undetectable gun, air gun, air rifle or any similar mechanism by

12     whatever name known which is designed to expel a projectile through a

13     gun barrel by the action of any explosive, gas, compressed air, spring or

14     elastic.

15   (1)   The term "antique firearm" means (a) any firearm (including any

16         firearm with a matchlock, flintlock, percussion cap, or similar

17         type of ignition system) manufactured in or before 1898; and (b)

18         any replica of any firearm described in subparagraph (a) if such

19         replica (i) is not designed or redesigned or using rimfire or

20         conventional centerfire fixed ammunition, or (ii) uses rimfire or

21         conventional centerfire fixed ammunition which is no longer

22         manufactured in the United States and which is not readily

23         available in the ordinary channels of commercial trade.

24   (2)   "Ghost gun" means a firearm, including an unfinished frame or

25         receiver, that lacks a unique serial number engraved or cased in

26         metal alloy on the frame or receiver by a licensed manufacturer,

27         maker or importer under federal law or markings in accordance

- 2 -

28      with 27 C.F.R. § 479.102. It does not include a firearm that has

29      been rendered permanently inoperable, or a firearm that is not

30      required to have a serial number in accordance with the Federal

31      Gun Control Act of 1968.

32    (3)      "Handgun" means any pistol, revolver or other firearm capable of

33      being concealed on the person, including a short-barreled shotgun

34      and a short-barreled rifle as these terms are defined below.

35      "Handgun" does not include a shotgun, rifle, or antique firearm.

36    [(3)] (4)      "Rifle" means a weapon designed or redesigned, made or

37      remade, and intended to be fired from the shoulder and designed

38      or redesigned and made or remade to use the energy of the

39      explosive in a fixed metallic cartridge to fire only a single

40      projectile through a rifled bore for each single pull of the trigger.

41    [(4)] (5)      The term "short-barreled rifle" means a rifle having one

42      (1) or more barrels less than sixteen (16) inches in length and any

43      weapon made from a rifle (whether by alternation, modification

44      or otherwise) if such weapon, as modified, has an overall length

45      of less than twenty-six (26) inches.

46    [(5)] (6)      The term "short-barreled shotgun" means a shotgun having

47      one (1) or more barrels less than eighteen (18) inches in length

48      and any weapon made from a shotgun (whether by alteration,

49      modification or otherwise) if such weapon as modified has an

50      overall length of less than twenty-six (26) inches.

51    [(6)] (7)      "Shotgun" means a weapon designed or redesigned, made

52      or remade, and intended to be fired from the shoulder and

53      designed or redesigned and made or remade to use the energy of

54      the explosive in a fixed shotgun shell to fire through a smooth

- 3 -

55      bore either a number of ball shot or a single projectile for each
56      single pull of the trigger.

57  (8)    "Undetectable gun" means:

58      (A)    a firearm that, after the removal of all its parts other than a
59          major component, is not detectable by walk-through metal
60          detectors commonly used at airports or other public
61          buildings;

62      (B)    a major component that, if subjected to inspection by the
63          types of detection devices commonly used at airports or
64          other public buildings for security screening, would not
65          generate an image that accurately depicts the shape of the
66          component; or

67      (C)    a firearm manufactured wholly of plastic, fiberglass, or
68          through a 3D printing process.

69              *    *    *

70  *Major component* means, with respect to a firearm:

71  (1)    the slide or cylinder or the frame or receiver; and

72  (2)    in the case of a rifle or shotgun, the barrel.

73  *Minor*: An individual younger than 18 years old.

74              *    *    *

75  *Place of public assembly*: A "place of public assembly" is a place where
76  the public may assemble, whether the place is publicly or privately
77  owned, including a [government owned] park [identified by the
78  Maryland-National Capital Park and Planning Commission]; place of
79  worship; [elementary or secondary] school; [public] library;
80  [government-owned or -operated] recreational facility; hospital;
81  community health center; long-term facility; or multipurpose exhibition

- 4 -

82       facility, such as a fairgrounds or conference center.  A place of public

83       assembly includes all property associated with the place, such as a

84       parking lot or grounds of a building.

85                  *     *     *

86  **57-7. Access to guns by minors.**

87    (a)    A person must not give, sell, rent, lend, or otherwise transfer any rifle or

88        shotgun or any ammunition or major component for these guns in the

89        County to a minor.  This subsection does not apply when the transferor

90        is at least 18 years old and is the parent, guardian, or instructor of the

91        minor, or in connection with a regularly conducted or supervised

92        program of marksmanship or marksmanship training.

93    (b)    An owner, employee, or agent of a gun shop must not allow a minor to,

94        and a minor must not, enter the gun shop unless the minor is

95        accompanied by a parent or other legal guardian at all times when the

96        minor is in the gun shop.

97    (c)    A person must not give, sell, rent, lend, or otherwise transfer to a minor:

98        (1)    a ghost gun or major component of a ghost gun;

99        (2)    an undetectable gun or major component of an undetectable gun;

100             or

101        (3)    a computer code or program to make a gun through a 3D printing

102             process.

103    (d)    A person must not manufacture or assemble a gun, including making a

104        gun through a 3D printing process, in the presence of a minor.

105    (e)    A person must not store or leave a ghost gun, an undetectable gun, or a

106        major component of a ghost gun or an undetectable gun, in a location

107        that the person knows or should know is accessible to a minor.

- 5 -

| 108 | | [(c)] (f) | This section must be construed as broadly as possible within the |
| 109 | | | limits of State law to protect minors. |
| 110 | **57-11. Firearms in or near places of public assembly.** | | |
| 111 | (a) | | [A] In or within 100 yards of a place of public assembly, a person must |
| 112 | | | not: |
| 113 | | (1) | sell, transfer, manufacture, assemble, possess, or transport a ghost |
| 114 | | | gun, undetectable gun, handgun, rifle, or shotgun, or ammunition |
| 115 | | | or major component for these firearms[, in or within 100 yards of |
| 116 | | | a place of public assembly]; or |
| 117 | | (2) | sell, transfer, possess, transport, or use a computer code to create, |
| 118 | | | a firearm through a 3D printing process. |
| 119 | (b) | | This section does not: |
| 120 | | (1) | prohibit the teaching of firearms safety or other educational or |
| 121 | | | sporting use in the areas described in subsection (a); |
| 122 | | (2) | apply to a law enforcement officer, or a security guard licensed to |
| 123 | | | carry the firearm; |
| 124 | | (3) | apply to the possession of a firearm or ammunition, other than a |
| 125 | | | ghost gun or an undetectable gun, in the person's own home; |
| 126 | | (4) | apply to the possession of one firearm, and ammunition for the |
| 127 | | | firearm, at a business by either the owner who has a permit to |
| 128 | | | carry the firearm, or one authorized employee of the business |
| 129 | | | who has a permit to carry the firearm; |
| 130 | | (5) | apply to the possession of a handgun by a person who has |
| 131 | | | received a permit to carry the handgun under State law; or |
| 132 | | (6) | apply to separate ammunition or an unloaded firearm: |

133            (A)     transported in an enclosed case or in a locked firearms rack

134                      on a motor vehicle, unless the firearm is a ghost gun or an

135                      undetectable gun; or

136            (B)     being surrendered in connection with a gun turn-in or

137                      similar program approved by a law enforcement agency.

138                             \*      \*      \*

139 **57-15. Penalty.**

140        Any violation of this Chapter or a condition of an approval certificate issued

141 under this Chapter is a Class A violation to which the maximum penalties for a Class

142 A violation apply. Any violation of Section 57-8 is a Class A civil violation.

143 **57-16. Reporting requirement.**

144       (a)     The County Police Department must submit a report annually to the

145                County Executive and the County Council regarding the availability and

146                use of ghost guns and undetectable guns in the County.

147       (b)     The report must include the number of ghost guns and undetectable

148                guns recovered by the Department during the prior year.

149       (c)     Each report must be available to the public on the Police Department's

150                website.

**LEGISLATIVE REQUEST REPORT**

Bill 4-21

*Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns
and Undetectable Guns*

**DESCRIPTION:**   Bill 4-21 would:

- define terms related to firearm laws;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
- restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
- generally amend the law regarding firearms and other weapons.

**PROBLEM:**   accessibility and use of ghost guns, including unfinished frames and receivers, and undetectable guns in the County

**GOALS AND
OBJECTIVES:**   prohibit the use and sale of ghost guns to the greatest extent possible consistent with state law

**COORDINATION:**   MCPD

**FISCAL IMPACT:**   OMB

**ECONOMIC
IMPACT:**   OLO

**RACIAL EQUITY
AND SOCIAL
JUSTICE IMPACT:**   OLO

**EVALUATION:**   To be done.

**EXPERIENCE
ELSEWHERE:**   Rhode Island, Washington State, District of Columbia

**SOURCE OF
INFORMATION:**   Christine Wellons, Legislative Attorney

**APPLICATION
WITHIN
MUNICIPALITIES:**   N/A

**PENALTIES:**   Class A Violation: fines of up to $1,000 and up to 6 months in prison

F:\LAW\BILLS\2104 Ghost Guns\LRR.Docx

(8)

# Racial Equity and Social Justice (RESJ) Impact Statement

**Office of Legislative Oversight**

## BILL 4-21: WEAPONS-PROTECTION OF MINORS AND PUBLIC PLACES-RESTRICTIONS AGAINST GHOST GUNS AND UNDETECTABLE GUNS

## SUMMARY

The Office of Legislative Oversight (OLO) expects Bill 4-21 to favorably impact racial equity and social justice by narrowing public health and safety disparities among County residents by race and ethnicity.

## BACKGROUND

On January 19, 2021, the Council introduced Bill 4-21; it aims to reduce crime and violence in the County involving ghost guns and other untraceable firearms, especially involving minors and heavily populated areas. [1]

The phrase "ghost gun" refers to do-it-yourself firearms that are untraceable and/or undetectable.[2] Ghost guns include firearms that:

- Are constructed to avoid detection, lack serial numbers (usually provided by traditional manufacturers);
- Can be built using 3-D printers or similar technology, and/or using kits where 80% of the firearm is preconstructed; and
- Can be fully assembled using readily available tools (instruction can be found online).[3]

What makes ghost guns more dangerous than typical firearms is that they lack serial numbers and a background check requirement for purchase.[4] As such, people who would usually be prohibited from purchasing firearms, like youth and certain convicted felons, can acquire these types of firearms.[5]

Of note, Bill 4-21 responds to the consistently increasing number of undetectable firearms recovered by law enforcement in the Metropolitan Washington region over the past few years. For example:

- In 2020, Washington D.C. police recovered 282 ghost guns compared to three in 2017; nine of these firearms were reportedly involved in homicides.[6]
- In 2020, the Montgomery County Police Department recovered 43 ghost guns in the County; the majority were retrieved from District 3, which serves Silver Spring.[7]

Bill 4-21 aims to reduce firearm violence in the County, focusing on increasing public safety.[8] It seeks to strengthen law regarding firearms and other weapons by broadening key definitions and increasing restrictions related to weapon compliance in the County.[9] If implemented, it would make the following modifications to County law: [10]

- Define terms related to firearm laws;
- Restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
- Restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
- Generally amend the law regarding firearms and other weapons.

# RESJ Impact Statement
## Bill 4-21

## DEMOGRAPHIC DATA

Understanding the impact of Bill 4-21 on racial equity and social justice in the County requires a review and analysis of local data describing incidents of firearm violations and violence.

As noted in Table 1, a review of the Montgomery County Police Department data finds a 31% increase in firearm recoveries over the past five years.[11] A review of data compiled by Healthy Montgomery, the County's community health improvement initiative, further finds that disparities in firearm hospitalization rates by race and ethnicity.[12] Black residents experienced an age-adjusted firearm hospitalization rate of 8.6 per 100,000 persons from 2016-2018 compared to 2.4 for Latinx residents, 1.2 for White residents, and 0.3 for Asian residents.[13] These findings suggests that the increase in firearm recoveries may disparately impact Black and to a lesser extent Latinx residents.

**Table 1:  Montgomery County Firearm Incidents**

| Race and Ethnicity | 2015 | 2016 | 2017 | 2018 | 2019 | Change |
|---|---|---|---|---|---|---|
| Homicides | 30 | 16 | 23 | 20 | 15 | -15 |
| Non-Fatal Shootings | ** | 90 | 79 | 93 | 99 | ** |
| Firearm Recoveries | 767 | 877 | 912 | 941 | 1,047 | +280 |

Sources: Montgomery County Police Department Crime Reports 2015-2019

Disproportionality by race in local firearm hospitalizations is consistent with state and national data describing disproportionality by race in firearm deaths. For example, data compiled by the Center for Disease Control shows that Black residents represented 29% of Maryland's population but represented 57% of the victims killed by firearms in 2018.[14] Nationally, Black people represented 19% of the Country's population but represented 25% (9,959 a total of 39,740 people) of the victims killed by firearms in 2018.[15]

## ANTICIPATED RESJ IMPACTS

Assuming the number of firearms and firearms recoveries drive firearm injuries, reducing the number of firearms in the County should reduce the number of firearm hospitalizations. Given that Black and Latinx residents face the highest rates of firearm hospitalizations, a decline in available firearms should disproportionately benefit Black and Latinx residents. Consequently, OLO anticipates that Bill 4-21 would favorably impact racial equity and social justice in the County by reducing firearm hospitalizations and potentially narrowing the gap in local firearm hospitalization rates by race and ethnicity.

## METHODOLOGIES, ASSUMPTIONS, AND UNCERTAINTIES

This RESJ impact statement and OLO's analysis rely on several information sources, including Census data, MCPD Reports, and unpublished ghost gun data, and County Council packets. OLO also reviewed several sources to understand trends and disparities in firearm incidents by race and ethnicity locally and nationally.  These include:

**Office of Legislative Oversight**              2              **February 8, 2021**

(10)

# RESJ Impact Statement
## Bill 4-21

- Causes of Injury-Related Death, 2018, Center for Disease Control and Prevention[16]
- Racial Equity Profile, Montgomery County, Office of Legislative Oversight[17]
- Healthy Montgomery Core Measures Data Summary

OLO also visited the websites of Marylanders to Prevent Gun Violence,[18] Everytown Research,[19] and the Educational Fund to Stop Gun Violence[20] for information.

## RECOMMENDED AMENDMENTS

The County's Racial Equity and Social Justice Act requires OLO to consider whether recommended amendments to bills aimed at narrowing racial and social inequalities are warranted in developing RESJ impact statements.[21] OLO has determined that the key provisions included in Bill 4-21 align with the best practices for reducing disproportionality in firearm injuries. Consequently, this RESJ impact statement does not offer recommendations.

## CAVEATS

Two caveats to this racial equity and social justice impact statement should be noted.  First, predicting the impact of legislation on racial equity and social justice is a challenging, analytical endeavor due to data limitations, uncertainty, and other factors.  Second, this RESJ statement is intended to inform the legislative process rather than determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## CONTRIBUTIONS

OLO staffer Dr. Theo Holt, RESJ Performance Management and Data Analyst, drafted this RESJ statement with assistance from Dr. Elaine Bonner-Tompkins, OLO Senior Legislative Analyst.

---

[1] Montgomery County Council, Bill 4-21, Weapons-Protection of Minors and Public Places-Restrictions Against Ghost Guns and Undetectable Guns, December/January 2020/21, Montgomery County, Maryland.

[2] Ibid.

[3] Ibid.

[4] Katherine E. Beyer, Busting the Ghost Guns: A Technical, Statutory, and Practical Approach to the 3-D Printed Weapon Problem, Volume 103, Issue 3, 2014, Kentucky Law Journal, University of Kentucky. Busting the Ghost Guns: A Technical, Statutory, and Practical Approach to the 3-D Printed Weapon Problem (uky.edu)

[5] Ibid.

[6] Tom Jackman, Attorneys general in D.C., Md. And Va. Support lawsuit demanding AFT regulate 'ghost guns,' December 24, 2020, The Washington post.

[7] Unpublished Ghost Gun Data compiled and shared with OLO on December 11, 2020 by the County Council.

[8] Ibid

[9] Bill 4-21

[10] Ibid

[11] MCPD policy, Planning & Quality Assurance Division, 2019 Annual Report on Crime & Safety, Montgomery County Department of Police, Montgomery County Maryland. 2019 MCPD Annual Report on Crime and Safety_FINAL (1).pdf (montgomerycountymd.gov)

# RESJ Impact Statement
## Bill 4-21

[12] Healthy Montgomery Core Measures Data Summary
https://www.montgomerycountymd.gov/healthymontgomery/Resources/Files/Reports/Healthy Montgomery Core Measures 2010-18.pdf
[13] Ibid
[14] WISQARS, Explore Fatal Injury Data Visualization Tool, Causes of Injury-Related Death, 2018, Center for Disease Control and Prevention. https://wisqars-viz.cdc.gov:8006/explore-data/explore/selected-years?ex=eyJ0YmkiOlsiMCJdLCJpbnRlbnRzIjpbljAiXSwibWVjaHMiOlsiMjA4OTAiXSwic3RhdGUiOlsiMjQiXSwicmFjZSI6WyIxIiwiMiIsIjMiLCI0Il0sImV0aG5pY3R5IjpbljEiLCIyIiwiMyJdLCJzZXgiOlsiMSIsIjIiXSwiYWdlR3JvdXBzTWIuljpbljAwLTA0Il0sImFnZUdyb3Vwc01heCI6WyIxOTkiXSwiY3VzdG9tQWdlc01pbiI6WyIwIl0sImN1c3RvbUFnZXNNYXgiOlsiMTk5Il0sImZyb21ZZWFyIjpbljIwMTgiXSwidG9ZZWFyIjpbljIwMTgiXSwieXBsbEFnZXMiOlsiNjUiXSwibWV0cm8iOlsiMSIsIjIiXSwiYWdlYnlzdWdvdG4iOil1WXIiLCJncm91cGJ5IkFHRUdQIn0%3D
[15]
[16] CDC Firearm Data.
[17] Jupiter Independent Research Group, Racial Equity Profile Montgomery County, July 2019, Office of Legislative Oversight, Montgomery County, Maryland.
[18] Marylanders to Prevent Gun Violence. https://mdpgv.org/
[19] Everytown Research https://everytownresearch.org/
[20] The Educational Fund to Stop Gun Violence https://efsgv.org/state/maryland/
[21] Montgomery County Council, Bill No. 27-19 Racial Equity and Social Justice, Montgomery County, MD.

# Economic Impact Statement
**Office of Legislative Oversight**

## BILL 4-21    Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns

## SUMMARY

The Office of Legislative Oversight (OLO) anticipates that enacting Bill 4-21 would have minimal impacts on economic conditions in the County.

## BACKGROUND

The goal of Bill 4-21, introduced on January 19, 2021, is to prohibit the use and sale of "ghost guns."[1] The bill would define "ghost gun" and "undetectable gun" in County law. According to the bill, it would also make the following changes to the laws regarding firearms and other weapons:

- "restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;" and
- "restrict the manufacture, possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly."

Moreover, any violation of these restrictions would be a "Class A violation to which the maximum penalties for a Class A violation apply."

## METHODOLOGIES, ASSUMPTIONS, AND UNCERTAINTIES

OLO does not anticipate that Bill 4-21 would have direct economic impacts on private organizations or residents in the County. However, OLO notes that gun violence has direct and indirect economic costs for victims, perpetrators, and other stakeholders.[2] Any indirect economic impacts from enacting Bill 4-21 would depend primarily on the effectiveness of the restrictions on "ghost" and "undetectable" guns in preventing gun violence in the future. For perspective on the scale of the problem, the Montgomery County Police Department recovered 43 ghost guns in the County in 2020.[3]

---

[1] Montgomery County Council, Bill 4-21, Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns, Introduced on January 19, 2021, Montgomery County, Maryland.

[2] Mark Follman, Julia Lurie, Jaeah Lee, and James West, "The True Cost of Gun Violence in America," Mother Jones, April 15, 2015, https://www.motherjones.com/politics/2015/04/true-cost-of-gun-violence-in-america/; Jaeah Lee and Julia Lurie, "The True Cost of Gun Violence: Our Methodology," Mother Jones, May/June 2015, https://www.motherjones.com/politics/2015/04/methodology-gun-violence-data-ted-miller/; and A State-by-State Examination of the Economic Costs of Gun Violence, U.S. Congress Joint Economic Committee, Democratic Staff, September 18, 2019, https://www.jec.senate.gov/public/_cache/files/9872b4d4-4151-4d3e-8df9-bc565743d990/economic-costs-of-gun-violence---jec-report.pdf.

[3] Unpublished Ghost Gun Data compiled and shared with OLO on December 11, 2020 by the County Council.

**Montgomery County (MD) Council**

(13)

# Economic Impact Statement
Office of Legislative Oversight

## VARIABLES

The variables that could affect the economic impacts of enacting Bill 4-21 are the following:

- Effectiveness of "ghost" and "undisclosed" gun restrictions in preventing gun violence; and
- Amount of criminal and civil penalties incurred by residents who violate the restrictions.

## IMPACTS

WORKFORCE ▪ TAXATION POLICY ▪ PROPERTY VALUES ▪ INCOMES ▪ OPERATING COSTS ▪ PRIVATE SECTOR CAPITAL INVESTMENT ▪ ECONOMIC DEVELOPMENT ▪ COMPETITIVENESS

### Businesses, Non-Profits, Other Private Organizations

OLO believes that Bill 4-21 would not have significant economic impacts on private organizations in the County in terms of the Council's priority indicators, namely business income, workforce, operating costs, capital investments, property values, taxation policy, economic development, and competitiveness.[4]

### Residents

OLO believes that Bill 4-21 would not have significant economic impacts on County residents in terms of the Council's priority indicators. However, households with residents who would have otherwise been killed or injured in gun-related incidents without the "ghost" and "undisclosed" gun restrictions would not experience the net loss of income from medical expenses and permanent or temporary absences from work. Moreover, the enforcement of the restrictions would result in income loss for violators. The maximum penalties would be $1,000 and 6 months in jail for criminal violations and $500 for initial offenses and $750 for repeat offenses for civil violations.

## WORKS CITED

A State-by-State Examination of the Economic Costs of Gun Violence. U.S. Congress Joint Economic Committee. Democratic Staff. September 18, 2019. https://www.jec.senate.gov/public/_cache/files/9872b4d4-4151-4d3e-8df9-bc565743d990/economic-costs-of-gun-violence---jec-report.pdf.

Follman, Mark, Julia Lurie, Jaeah Lee, and James West. "The True Cost of Gun Violence in America." *Mother Jones.* April 15, 2015. https://www.motherjones.com/politics/2015/04/true-cost-of-gun-violence-in-america/.

Montgomery County Code. Section 1-19, Fines and Penalties. https://codelibrary.amlegal.com/codes/montgomerycounty/latest/montgomeryco_md/0-0-0-488.

Montgomery County Council. Bill 10-19, Legislative Branch – Economic Impact Statements – Amendments. Enacted on July 30, 2019. Montgomery County, Maryland.

---

[4] For the Council's priority indicators, see Montgomery County Council, Bill 10-19 Legislative Branch – Economic Impact Statements – Amendments, Enacted on July 30, 2019, Montgomery County, Maryland, 3.

# Economic Impact Statement

**Office of Legislative Oversight**

Montgomery County Council. Bill 4-21, Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns. Introduced on January 19, 2021. Montgomery County, Maryland.

## CAVEATS

Two caveats to the economic analysis performed here should be noted. First, predicting the economic impacts of legislation is a challenging analytical endeavor due to data limitations, the multitude of causes of economic outcomes, economic shocks, uncertainty, and other factors. Second, the analysis performed here is intended to *inform* the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## CONTRIBUTIONS

Stephen Roblin (OLO) drafted this economic impact statement.

**Fiscal Impact Statement**
**Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns**

1. **Legislative Summary**

   Bill 4-21 defines key terms contained in existing firearm laws, and regulates the use, sale, and manufacturing of undetectable weapons with respect to minors and in proximity to public space.  Regarding key terms, the Bill defines an undetectable weapon, and expands the definition of public space to include privately owned properties where the public may assemble.

   Bill 4-21 also requires the Montgomery County Police Department (MCPD) to provide annual reports to the public, the County Executive and the County Council detailing the number and availability of undetectable guns in the County.

2. **An estimate of changes in County revenues and expenditures regardless of whether the revenues or expenditures are assumed in the recommended or approved budget. Includes source of information, assumptions, and methodologies used.**

   This bill is not expected to impact County revenues or expenditures.

3. **Revenue and expenditure estimates covering at least the next 6 fiscal years.**

   There is no anticipated change in revenues and expenditures over the next 6 fiscal years.

4. **An actuarial analysis through the entire amortization period for each bill that would affect retiree pension or group insurance costs.**

   Not applicable.

5. **An estimate of expenditures related to County's information technology (IT) systems, including Enterprise Resource Planning (ERP) systems.**

   Not applicable.

6. **Later actions that may affect future revenue and expenditures if the bill authorizes future spending.**

   The Bill does not authorize future spending.

7. **An estimate of the staff time needed to implement the bill.**

   Implementation of the Bill would not have an impact on staff time.

(16)

8. **An explanation of how the addition of new staff responsibilities would affect other duties.**

   Not applicable.

9. **An estimate of costs when an additional appropriation is needed.**

   There is no additional appropriation needed to implement this bill.

10. **A description of any variable that could affect revenue and cost estimates.**

    Not applicable.

11. **Ranges of revenue or expenditures that are uncertain or difficult to project.**

    Not applicable.

12. **If a bill is likely to have no fiscal impact, why that is the case.**

    The bill updates key terms of existing firearm laws which would not impact existing service delivery with the Montgomery County Police Department, nor would it impact staffing.

    The reporting requirements of the Bill would be included among the existing reports provided to the public.

13. **Other fiscal impacts or comments.**

    Not applicable.

14. **The following contributed to and concurred with this analysis:**

    Neil Shorb, Department of Police

    Taman Morris, Office of Management and Budget

_____

Jennifer Bryant, Director
Office of Management and Budget

02/09/21
Date

(17)

**Testimony on Montgomery County Council Bill 4-21**
**Lead Sponsor: Council Vice President Albornoz**

Lauren Kline
Brady Maryland
5334 Merriam St
Bethesda, MD 20814
lauren@laurenklinehomes.com
(301) 518-9005

As both a longtime resident of Montgomery County (since 1988) who cares deeply about the safety, well-being and quality of life of our community and as the Co-Lead of the Brady Maryland Executive Committee, I am pleased to support this much needed legislation (Council Bill 4-21) to regulate ghost guns and 3-D printed firearms in the County.

Wikipedia defines a ghost gun as "*a term for a (typically) homemade or improvised firearm that lacks commercial serial numbers making these firearms harder to trace*". Ghost guns are also commonly made from parts known as *"... a"80% receiver," "80% finished," "80% complete," or an "unfinished receiver". These are all terms referring to an item that has not yet reached a stage of manufacture that meets the definition of a firearm as defined by the Gun Control Act of 1968 (GCA)*". (Times Union, 9/13/19).

3-D printed guns are firearms that are mostly produced with a 3-D printer. They can be made of plastic or metal. The plastic ones are usually used as improvised guns that evade regulation.

Brady Maryland supports the 2nd Amendment and the right to possess and legally carry firearms. As with all rights, however, the right to carry firearms is not unlimited. The privilege must be exercised responsibly, legally and with regard to the rights and safety of others.

In general, ghost guns and 3-D printed guns pose a unique danger for the following reasons:

- Ghost guns undermine all gun laws. They are untraceable, unserialized and the parts used to assemble ghost guns are available to purchase and construct without any background check. Why are they treated differently than other guns? Are they any less lethal or dangerous?
- Ghost gun kits and parts do not require background checks. As a result, they can be purchased by those who otherwise would be prohibited from purchasing a gun including domestic abusers, minors, gun traffickers and those who want to do harm to others. Why are ghost guns able to evade existing regulations that were created to provide certain safeguards?
- Ghost gun kits and parts are *intentionally* marketed as unregulated and untraceable to appeal to people who want to avoid background checks.
- Ghost guns are constructed using an unfinished frame or receiver, the piece of the firearm that contains the "operating parts" of the firearms mechanism and the very part that is regulated under federal law.
  -When a frame or receiver is unfinished by a small fraction, it is unregulated under both state and federal law.
  -Ghost guns frequently come in kits that include all the parts necessary to turn the unfinished frame into a fully functioning gun

(18)

- 3-D printed guns pose their own separate danger. They are usually created out of polymer plastics which are not picked up by metal detectors.
- Council Bill 4-21 is consistent with the positive steps the Maryland legislature and the Montgomery County Council have already taken to keep our neighborhoods safe from gun violence. Ghost guns and 3-D printed firearms directly undermine the hard work that has already been undertaken at both the state and county level to pass strong but reasonable gun laws that ensure the right to legally possess firearms while also maintaining background checks, tracing ability and other regulations to ensure public safety.

Maryland has already been impacted by ghost guns. The threat will continue to grow as availability to and awareness of these guns increases.

- In December of 2019 a Silver Spring man pled guilty for selling ghost guns to prohibited purchasers.
- In 2019, 117 ghost guns were recovered by Maryland police; in 2020 over 60 guns were recovered in just a 3-month period.
- Between 2016 and 2019, more than 12,000 ghost gun kits were shipped to Maryland with sales increasing by almost a factor of four during these years.

As ghost guns circumvent the regulations that prevent access to guns by minors, Council Bill 4-21 provides important safeguards that help keep firearms out of the hands of underage users. This is not just a theoretical point. In February of 2018, a Montgomery County high schooler brought a homemade handgun to his school. The same 17-year old was also in the process of making an assault style rifle at home.

Bill 4-21 also provides important safeguards by keeping ghost guns away from public spaces including places of worship, schools, libraries, recreational facilities, etc. The public has a right to the same protection from ghost guns as they do from any other regulated firearm.

Thank you to Sponsor Vice President Albornoz and the entire Council for considering this important legislation. Brady Maryland supports taking action to regulate ghost guns and 3-D printed firearms. As a proud Montgomery County resident who chose to settle and raise my 3 daughters here, I also personally applaud taking action to ensure Montgomery County remains safe and a place people where want to live.

(19)

Hello Montgomery County Council,

My name is Nathan, and I am a resident of Montgomery County. I grew up on the eastern shore, and then moved into the county about 5 years ago for work. I love this county, most of my family lives here now, and that is why I feel it is imperative to speak out against bill 4-21. I believe this bill will make the county a more dangerous place.

The main issue that I have with this bill is 57-11 "Firearms in or near places of public assembly". This would ban the right of business owners to possess a firearm at their business without a carry permit. As I am sure you know, carry permits are almost impossible to get in MD. This would force business owners to go unprotected at their place of business or would bare minimum make it much more expensive and time consuming to exercise their 2nd amendment right to protect themselves and their assets.

As far as the new regulations for "ghost guns", while I do understand the concern, I am not sure there is a precedent to enact legislation such as this. There have been no major crimes that I am aware of that have been linked to ghost guns. Most crimes that are committed with firearms are done with stolen or illegal guns. Making ghost guns illegal seems like it would be a redundant step to stop crime.

I appreciate your attempts to make this county a safer place, I just believe there are better and more effective ways to go about it, without restricting the second amendment rights of law-abiding citizens.

Thank you for your time!

(20)



**TESTIMONY OF THE CRITICAL ISSUES FORUM: ADVOCACY**
**FOR SOCIAL JUSTICE OF MONTGOMERY COUNTY, MARYLAND**
**ON FEBRUARY 9, 2021**
**BEFORE THE MONTGOMERY COUNTY COUNCIL**
**IN SUPPORT OF BILL 4-21**

**Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable**
**Guns**

The Critical Issues Forum: Advocacy for Social Justice (CIF) provides this testimony in support of
Bill 4-21, which would prohibit:

- transferring a ghost gun or undetectable gun to a minor,
- manufacturing a gun, including through a 3D printing process, in the presence of a
  minor,
- storing ghost guns, undetectable guns, or gun components in places that the person
  should know are accessible to minors,
- the sale, transfer, manufacture, or possession of ghost guns or undetectable guns within
  100 yards of a place of public assembly, and
- the sale, transfer, possession, or use of a computer code to create a firearm through a
  3D printing process within 100 yards of a place of public assembly.

CIF is a coalition of three Montgomery County synagogues - Temple Beth Ami, Kol Shalom, and
Adat Shalom - that include over 1,750 households and three denominations of Judaism:
Reform, Conservative, and Reconstructionist.  CIF advocates in favor of policy proposals that
advance our core values, including the sanctity of human life.  There can be no question that
protecting our children from the danger of untraceable ghost guns can save lives. These
weapons circumvent the laws that restrict access to firearms by our children, putting their lives
at risk.

Ghost guns are firearms without serial numbers, which are most often assembled from a kit
purchased over the internet, without any of the safeguards contained in federal or state law.
When used in a crime, they are untraceable. These weapons are favored by individuals who are
prohibited from purchasing firearms.  As Maryland Attorney General Brian Frosh recently stated
in a press release announcing that Maryland had joined 19 other states supporting a lawsuit
seeking federal regulation of these firearms: "ghost guns endanger residents of [Maryland] and

(21)

impede law enforcement's ability to investigate and prosecute criminal activity."[1]

The risk that access to ghost guns has for our young people is real.  A 2017 study found that firearms were the second leading cause of death for children aged 1 to 17, surpassed only by motor vehicle injury deaths.[2] The same study reported that from 2012 to 2014 nearly 1300 children died and 5790 were treated for gunshot wounds each year. According to the authors, 53% of those deaths were homicides, 38% were suicides, and 6% were unintentional.  The ability to easily bypass our laws that restrict their purchase of, and access to, firearms by procuring ghost guns through the internet can only increase this toll to us all - adults and children of all ages.

This is a problem that can be solved.  The restrictions proposed in Bill 4-21 are a welcome first step.  By using the county's discretion to regulate firearms access for children and use in public places, the bill strikes at important dangers posed by ghost guns.  Further, action by Montgomery County may encourage our state legislators to enact the ghost gun legislation that has been proposed in the General Assembly this session by Senator Susan Lee and Delegate Leslie Lopez, who have been championing legislation that would close this loophole entirely in our state.

For these reasons, the Critical Issues Forum urges the Council to adopt Bill 4-21

---

[1] AG press release
[2]  Fowler KA, Dahlberg LL, Haileuesus T, et al. Childhood Firearm Injuries in the United States. *Pediatrics*. 2017;140(1): e20163486.

(22)



# ATF Firearms Technology Branch

# Technical Bulletin 14-01

## UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

**October 28, 2013**

# <u>Unfinished "80%" AR-15 Type Receivers</u>

There are many unfinished AR-15 type receivers being marketed as so-called "80%" receivers. It is important to note that Federal firearms statutes and supplemental regulations do not employ the terms "80%," "80% finished," or "80% complete."

These terms are industry vernacular and are neither recognized nor defined in Federal firearms statutes and regulations.  These marketing terms are used by the industry to indicate that, in their opinion, an unfinished receiver has not yet reached a point in the manufacturing process where it should be classified as a "firearm" as defined in the amended Gun Control Act of 1968 (GCA).

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …<u>the frame or receiver of any such weapon</u>*….

Unfinished AR-15 type receivers that do not meet the definition of a "firearm" are not subject to regulation under GCA provisions; however, they are still considered defense articles per the U.S. Munitions Import List and, therefore, require an ATF Form 6 for importation into the U.S.

The ATF Firearms Technology Branch (FTB) has previously determined that an AR-15 type receiver which has <u>no machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)</u> might not be classified as a firearm.  Such a receiver could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess/cavity area.  We have determined that in order to be considered "completely solid and un-machined in the fire-control recess/cavity area," the takedown-pin lug clearance area must be no longer than .800 inch, measured from immediately forward of the front of the buffer-retainer hole. (see photo below)



DEFENDANT'S EXHIBIT

C



Case 8:23-mj-01762-JSS Document 1-18 Filed 12/28/23 Page 91 of 126



In order to preclude classification as a "firearm", this area of the receiver, in addition to being solid, must not contain any holes or dimples for the trigger, hammer, and selector.

However, FTB has examined many "80%" AR-15 type receivers and has found that, in some cases, items being marketed as "80%" actually meet the definition of a "firearm" as defined.

The following photos depict the most commonly encountered variations of unfinished "80%" AR-15 type firearm receivers and are provided to assist you in determining their classification status.



**Example 1**



**Example 2**

Case 8:22-mc-00162-TDC Document 1-13 Filed 12/30/21 Page 93 of 126



**Fire control cavity partially machined**

**Takedown-pin lug area may be machined**

**Firearm**

Example 3



**Solid**

**No holes or dimples for the selector, trigger, or hammer pins**

**Not a firearm**

Example 4



Case 8:22-mj-01362-TGW   Document 1-18   Filed 05/20/22   Page 41 of 42



**Example 5**



**Example 6**



**Example 7**



**Example 8**

This general guidance is provided to assist ATF Special Agents and Industry Operations Investigators, but is not meant to be used in lieu of a formal determination. FTB cannot render a formal determination without physically examining a submitted sample.

If you encounter any variations not depicted or described in this bulletin, or, if you have any additional questions, please contact FTB.

## Chapter 57.   Weapons.

**Cross references**-Furnishing weapons to citizens during emergencies, § 2-15; special zoning requirements for rifle, pistol or skeet shooting ranges, §§ 59-G-2.51, 59-G-2.52.

**State law references**-Carrying weapons, Ann. Code of Md., art. 27, § 36 et seq.; sale, etc., of switchblade knives, Ann. Code of Md., art. 27, § 339; machine guns, Ann. Code of Md., art. 27, §§ 372-383; pistols, Ann. Code of Md., art. 27, §§ 441-448.

§ 57-1. Definitions.
§ 57-2. Firearm Safety Committee.
§ 57-3. Change in urban area boundary.
§ 57-4. Discharge of guns in the urban area.
§ 57-5. Discharge of guns outside the urban area.
§ 57-6. Discharge of bows.
§ 57-7. Access to guns by minors.
§ 57-8.   Child safety handgun devices and handguns
§ 57-9. Unlawful ownership or possession of firearms.
§ 57-10. Keeping guns on person or in vehicles.
§ 57-11. Firearms in or near places of public assembly.
§ 57-12. Sale of fixed ammunition.
§ 57-13. Use of public funds.
§ 57-14. Exemptions from Chapter.
§ 57-15. Penalty.
§ 57-16. Reporting requirement.

### Sec. 57-1. Definitions.

In this Chapter, the following words and phrases have the following meanings:

*3D printing process:* a process of making a three-dimensional, solid object using a computer code or program, including any process in which material is joined or solidified under computer control to create a three-dimensional object.

*Child safety handgun box:* A secure, lockable box designed to hold the handgun being transferred that:

(1)      requires a key or combination to remove;

(2)      renders the handgun inoperable when locked; and

(3)      is approved by Executive regulation under method (2).

*Child safety handgun device:* A child safety handgun lock or child safety handgun box.

*Child safety handgun lock:* A device that when locked in place prevents movement of the trigger of the handgun being transferred without first removing the lock by use of a key or combination.   "Child safety handgun lock" also includes any other device that can be attached to a handgun and:

(1)      requires a key or combination to remove;

1



DEFENDANT'S
EXHIBIT

**D**

(2)     renders the handgun inoperable when locked in place; and

(3)     is approved by Executive regulation under method (2).

*Crime of violence:* Murder, voluntary manslaughter, rape, mayhem, kidnapping, robbery, burglary, housebreaking, arson, assault with intent to murder, ravish or rob, assault with deadly weapon or assault with intent to commit any offense punishable by imprisonment for more than one (1) year.

*Firearm dealer:* A person required by State or federal law to obtain a:

(1)     regulated firearms dealer's license; or

(2)     temporary transfer permit to display a regulated firearm at a gun show.

*Fixed ammunition:* Any ammunition composed of a projectile or projectiles, a casing, an explosive charge and a primer, all of which shall be contained as one (1) unit. Cartridges designed, made and intended to be used exclusively (i) in a device for signaling and safety purposes required or recommended by the United States Coast Guard or (ii) for industrial purposes, shall not be considered fixed ammunition. Curios or relics, as defined in regulations promulgated by the United States Secretary of the Treasury pursuant to 18 United States Code, section 921(A)(13), shall not be considered fixed ammunition.

*Fugitive from justice:* Any person for whom criminal proceedings have been instituted, warrant issued or indictment presented to the grand jury, who has fled from a sheriff or other peace officer within this state, or who has fled from any state, territory, District of Columbia or possession of the United States, to avoid prosecution for crime of violence or to avoid giving testimony in any criminal proceeding involving a felony or treason.

*Gun or firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

(1)     The term "antique firearm" means (a) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and (b) any replica of any firearm described in subparagraph (a) if such replica (i) is not designed or redesigned or using rimfire or conventional centerfire fixed ammunition, or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

(2)     "Ghost gun" means a firearm, including an unfinished frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer under federal law or markings in accordance with 27 C.F.R. § 479.102. It does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

(3)     "Handgun" means any pistol, revolver or other firearm capable of being concealed on the person, including a short-barreled shotgun and a short-barreled rifle as these terms are defined below. "Handgun" does not include a shotgun, rifle, or antique firearm.

(4)     "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(5)     The term "short-barreled rifle" means a rifle having one (1) or more barrels less than sixteen (16) inches in length and any weapon made from a rifle (whether by alternation,

modification or otherwise) if such weapon, as modified, has an overall length of less than twenty-six (26) inches.

(6)     The term "short-barreled shotgun" means a shotgun having one (1) or more barrels less than eighteen (18) inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such weapon as modified has an overall length of less than twenty-six (26) inches.

(7)     "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(8)     "Undetectable gun" means:

(A)     a firearm that, after the removal of all its parts other than a major component, is not detectable by walk-through metal detectors commonly used at airports or other public buildings;

(B)     a major component that, if subjected to inspection by the types of detection devices commonly used at airports or other public buildings for security screening, would not generate an image that accurately depicts the shape of the component; or

(C)     a firearm manufactured wholly of plastic, fiberglass, or through a 3D printing process.

*Gun shop:* An establishment where a handgun, rifle, or shotgun, or ammunition or major component of these guns is sold or transferred.   "Gun shop" does not include an area of an establishment that is separated by a secure, physical barrier from all areas where any of these items is located.

*Gun show:* Any organized gathering where a gun is displayed for sale.

*Major component* means, with respect to a firearm:

(1)     the slide or cylinder or the frame or receiver; and

(2)     in the case of a rifle or shotgun, the barrel.

*Minor:* An individual younger than 18 years old.

*Pistol* or *revolver:* Any gun with a barrel less than twelve (12) inches in length that uses fixed ammunition.

*Place of public assembly:* A "place of public assembly" is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center.   A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building.

*Record plat* means a subdivision plat recorded in the County's land records.

*Sell* or *purchase:* Such terms and the various derivatives of such words shall be construed to include letting on hire, giving, lending, borrowing or otherwise transferring.

*Sporting use:* "Sporting use" of a firearm and ammunition means hunting or target shooting in compliance with all federal, State, and local laws.   Sporting use includes:

(a)     participation in a managed hunt sponsored by a government agency; and

(b)     the sale or other transfer of ammunition by a sporting club for immediate, on-site use at the club.

*Tax assessment record* means the information maintained by the State Department of Assessments and Taxation in its Real Property Database on each parcel of real property located in the County, including the tax map for each parcel.

*Urban area:* That part of the County within the following boundaries:   Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the northeast side of the Potomac River to the emptying of Seneca Creek into the Potomac River; then north along Seneca Creek to Route 112 (Seneca Road); then east along Route 112 to Route 28 (Darnestown Road); then northwest along Route 28 to Route 118 (Darnestown-Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northwest along Route 117 to Little Seneca Creek; then northeast along Little Seneca Creek to Black Hill Regional Park; then along the eastern boundary of Black Hill Regional Park to the Park's southernmost intersection with I-270; then northwest along I-270 to Little Seneca Creek; then north along Little Seneca Creek to West Old Baltimore Road; then east along West Old Baltimore Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road; then southeast on Brink Road to the Town of Laytonsville; then along the northern boundary of the Town of Laytonsville to Route 420 (Sundown Road); then east along Route 420 to Route 650 (Damascus Road); then southeast along Route 650 to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road; then northeast along Brighton Dam Road to Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108; then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the east side of the Potomac Electric Power Company right-of-way to Batson Road; then following along the southern boundary of the Washington Suburban Sanitary Commission property to Kruhm Road; then southeast along Kruhm Road to the Potomac Electric Power Company right-of-way; then southeast along the east side of the Potomac Electric Power Company right-of-way to Route 198; then east along Route 198 to the Prince George's County/Montgomery County boundary line; then southwest along the Montgomery County/Prince George's County boundary line to the Montgomery County/District of Columbia boundary line; then along the Montgomery County/District of Columbia boundary line to the beginning point.

*Vehicle:* Any motor vehicle, as defined in the Transportation Article of the Annotated Code of Maryland, trains, aircraft and vessels. (1981 L.M.C., ch. 42, § 1; 1983 L.M.C., ch. 50, § 1; CY 1991 L.M.C., ch. 21, § 1; 1993 L.M.C., ch. 50, § 1; 1997 L.M.C., ch. 3, § 1; 1997 L.M.C., ch. 14, §1; 1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1; 2018 L.M.C., ch. 34, § 1; 2021 L.M.C., ch. 7, §1.)

## Sec. 57-2. Firearm Safety Committee.

(a)     There is a Firearm Safety Committee with 7 voting members appointed by the County Executive and confirmed by the County Council. The voting members should be trained and experienced in the safe and sportsmanlike use of weapons.   The Executive must designate one voting member to serve as Chair. The Police Range Officer must serve as a non-voting member of the Committee.

4

(b)     The Committee issues indoor and outdoor target, trap, skeet,   and shooting range approval certificates. The Committee may specify the type of gun and ammunition   that may be used on   the range. An approval certificate is valid for 3 years. Before issuing a certificate, the Committee must find that:

(1)     the discharge of guns on the range will not jeopardize life or property; and

(2)     the applicant for the certificate is the owner, lessee, or person lawfully in possession of the land where the range is located.

(c)     The Committee must inspect any firing range operated by the Police Department every 3 years.

(d)     The Committee must create a standard safety checklist to assure that all firing ranges are evaluated using the same criteria.

(e)     The Committee must keep a copy of each certificate.(1981 L.M.C., ch. 42, § 1; FY 1991 L.M.C., ch. 9, § 1; CY 1991 L.M.C., ch. 21, § 1; 2005 L.M.C., ch. 24, § 1.)

**Cross reference**-Boards and commissions generally, § 2-141 et seq.


## Sec. 57-3. Change in urban area boundary.

On February 1 each year, the County Executive, after consulting with the Firearm Safety Committee, may recommend to the County Council any appropriate change in the boundary of the urban area based on new development or reported incidents of weapons discharged near developed areas. In addition, the County Executive, without consultation, may recommend any amendment to the boundary of the urban area at any other time.   (CY 1991 L.M.C., ch. 21, § 1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2018 L.M.C., ch. 34, § 1.)

**Editor's note**—Section 57-3, formerly § 57-2A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


## Sec. 57-4. Discharge of guns in the urban area.

(a)     *Prohibition.*   Except as provided in subsection (b), a person, other than a peace officer or employee of the Maryland Department of Natural Resources performing official duties, must not discharge a gun within the urban area.

(b)     *Exceptions.*   Except as provided in Sections 57-7 and 57-11, a person may discharge a gun:

(1)     on any indoor or outdoor target, trap, skeet, or shooting range that the Firearms Safety Committee has inspected and approved in writing;

(2)     in a private basement or cellar target range;

(3)     when necessary to protect life or property;

(4)     to kill a dangerous animal;

(5)     for discharge of blank cartridges in musical and theatrical performances, parades, or sporting events;

(6)     for salutes by firing squads at military funerals;

(7)     if approved by the Chief of Police, under a deer damage control permit issued by the Maryland Department of Natural Resources;

(8)    for the purpose of deer hunting on private property that is at least 50 acres in size if:

    (A)    the person discharges the gun from an elevated position;

    (B)    the person does not load the gun until the person is located in the elevated position;

    (C)    the person unloads the gun before descending from the elevated position;

    (D)    the projectile has a downward trajectory;

    (E)    the property owner complies with any public notice requirements in applicable regulations; and

    (F)    the property owner gives written notice to the Chief of Police at least 15 days before any gun is discharged on the property which:

    1.    identifies the day or days on which deer hunting will occur;

    2.    identifies the time that deer hunting will begin and end each day;

    3.    lists the name of each individual who will participate in deer hunting; and

    4.    includes a copy of the record plat or tax assessment record for the property; or

(9)    on property owned by the Maryland-National Capital Park and Planning Commission as a part of a deer management program conducted or sanctioned by the Commission that complies with safety requirements approved by the Chief of Police.

(c)    *50-acre threshold.*

(1)    Subject to the requirements of paragraph (2), up to 5 owners of contiguous parcels of property may aggregate their property to meet the 50-acre threshold in subsection (b)(8).

(2)    If property owners aggregate their parcels to achieve the 50-acre threshold in subsection (b)(8), a person may discharge a gun for the purpose of deer hunting on the aggregated property if the person obtains written permission from each property owner, which must include a copy of the record plat or tax assessment record for each parcel in the aggregated property.

(d)    A person who discharges a gun under the authority granted in subsection (b)(7), (b)(8), or (b)(9) is subject to the restrictions imposed by Section 57-5(a) on the discharge of a gun outside the urban area.

(e)    *Regulations.* The County Executive must adopt regulations under method (2) which:

(1)    establish procedures and criteria that the Chief of Police must use to decide whether it is safe to discharge a gun under the circumstances specified in subsection (b)(7); and

(2)    to implement subsection (b)(8):

    (A)    require signs to be posted along the perimeter of each applicable property at least 15 days before any gun is discharged on the property;

    (B)    specify the size, wording, and location of each sign; and

    (C)    identify a method to determine the number of signs that must be posted. (1981 L.M.C., ch. 42, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2007 L.M.C., ch. 21, § 1.)

**Editor's note**—Section 57-4, formerly § 57-3, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-5. Discharge of guns outside the urban area.

(a)     *Prohibition.*   Except as provided in subsection (c)(1) through (c)(6), outside the urban area, a person, other than a peace officer or employee of the Maryland Department of Natural Resources performing official duties, must not:

      (1)     discharge a gun:

          (A)     onto, across, or within 50 yards of a public   road;

          (B)     onto or across property located within 50 yards of a public road;

          (C)     into or within the safety zone (150 yards of a building or camp designed for human occupancy)   without the owner or occupant's written consent; or

          (C)     from, onto, or across public or private property without the owner or occupant's written consent;

      (2)     discharge a full metal jacketed bullet of any caliber from a gun; or

      (3)     except as provided in subsection (b), discharge any fixed ammunition of a caliber higher than .25 caliber from a rifle or pistol.

(b)     *Exception - High Caliber Ammunition.*   A person may discharge fixed ammunition of a caliber higher than .25 from a rifle or pistol at:

          (A)     legal game or varmints on the ground; or

          (B)     a target on or near the ground that will not deflect a bullet.

(c)     *Other Exceptions.*   Except as provided in Sections 57-7 and 57-11, a person may discharge a gun:

      (1)     on any indoor or outdoor target, trap, skeet, or shooting range that the Firearm Safety Committee has inspected and approved in writing;

      (2)     in a private basement or cellar target range;

      (3)     when necessary to protect life or property;

      (4)     to kill a dangerous animal;

      (5)     for discharge of blank cartridges in musical and theatrical performances, parades, or sporting events;

      (6)     for salutes by firing squads at military funerals; or

      (7)     under a deer damage control permit issued by the Maryland Department of Natural Resources. (1981 L.M.C., ch. 42, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2007 L.M.C., ch. 21, § 1.)

**Editor's note**—Section 57-5, formerly § 57-4, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-6. Discharge of bows.

(a)     *Prohibition.*   A person must not discharge a bow in the County:

      (1)     from, onto, or across a public road;

(2)     in violation of the archery hunting safety zone established in Md. Code, Natural Resources, §10-410, as amended, surrounding a building or camp designed for human occupancy without the owner or occupant's written consent; or

(3)     from, onto, or across public or private property without the owner or occupant's written consent;

(b)    *Exception.*  Subsection (a) does not apply to target archery practiced in compliance with safety guidelines established in regulations adopted under method (2).

(c)    A bow hunter must report the failure to recover a wounded deer to the County Police at the end of an unsuccessful search for the animal.   (CY 1991 L.M.C., ch. 21, § 1; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1; 2014 L.M.C., ch. 27, § 1; 2017 L.M.C., ch. 26, §1.)

**Editor's note**—Section 57-6, formerly § 57-4A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-7. Access to guns by minors.

(a)    A person must not give, sell, rent, lend, or otherwise transfer any rifle or shotgun or any ammunition or major component for these guns in the County to a minor.  This subsection does not apply when the transferor is at least 18 years old and is the   parent, guardian, or instructor of the minor, or in connection with a regularly conducted or supervised program of marksmanship or marksmanship training.

(b)    An owner, employee, or agent of a gun shop must not allow a minor to, and a minor must not, enter the gun shop unless the minor is accompanied by a parent or other legal guardian at all times when the minor is in the gun shop.

(c)    A person must not give, sell, rent, lend, or otherwise transfer to a minor:

(1)    a ghost gun or major component of a ghost gun;

(2)    an undetectable gun or major component of an undetectable gun; or

(3)    a computer code or program to make a gun through a 3D printing process.

(d)    A person must not purchase, sell, transfer, possess, or transfer a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

(e)    A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

(f)    This section must be construed as broadly as possible within the limits of State law to protect minors.  (1981 L.M.C., ch. 42, § 1; 1997 L.M.C., ch. 14, § 1; 2001 L.M.C., ch. 11, § 1; 2021 L.M.C., ch. 7, §1.)

**Editor's note**—Section 57-7, formerly § 57-5, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-8. Child safety handgun devices and handguns.

(a)    *Findings.*  The unintentional discharge of handguns often causes accidental death or injury to children.   Additional safeguards are needed to protect children from injury or death from the unintentional discharge of loaded and unlocked handguns.   Requiring a firearm dealer

who transfers a handgun to provide a child safety handgun device when a handgun is transferred can prevent unintentional injuries and fatalities to children.

(b) *Child safety handgun device.*

(1)     A firearm dealer who sells, leases, or otherwise transfers a handgun in the County must provide to the recipient of the handgun a child safety handgun device for the handgun at the time of the transfer.   The dealer may charge for the child safety handgun device.

(2)     A person who purchases or otherwise receives a handgun from a firearm dealer (or any transferor who would be a firearm dealer if the transfer occurred in the State) after October 8, 1997 must obtain a child safety handgun device for the handgun:

(A)     at the time of a transfer in the County; or

(B)     before entering the County with the handgun if the transfer occurred outside the County and the transferee resides in the County.

(c) *Notices.*

(1)     A firearm dealer who sells, leases, or otherwise transfers a handgun must post conspicuously in the dealer's place of business a notice of:

(A)     the requirement in subsection (b) for a child safety handgun device; and

(B)     the prohibition in State law of storing or leaving a loaded firearm in a location where an unsupervised child can gain access to the firearm.

(2)     If the firearm dealer transferring a handgun does not maintain a place of business in a commercial establishment, the dealer must provide the notices required by paragraph (1) in writing when transferring the handgun.

(d) *Enforcement.*   The Department of Health and Human Services and any other department designated by the County Executive enforces this section.

(f) *Regulations.*   The Executive may adopt regulations under method (2) to implement this Section.   (1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1.)

**Editor's note**—Section 57-8, formerly § 57-5A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


## Sec. 57-9. Unlawful ownership or possession of firearms.

A person must not possess, exercise control over, use, carry, transport, or keep a rifle, shotgun, or pistol, if the person:

(a)     is an unlawful user of , addicted to, or is under treatment for an addiction to, marijuana or any depressant or stimulant drug or narcotic drug (as defined in Maryland Criminal Law Code Annotated, sections 1-101, 5-101, 5-401, 5-404, and 5-604); or

(b)     has been convicted in any court of a crime of violence, trafficking in narcotics, a criminal violation of any of the provisions of Maryland Public Safety Code Annotated, sections 5-101 to 5-138, 5-142, or any federal firearms control law; or

(c)     is a fugitive from justice; or

(d)     has been confined to any hospital or institution for treatment of a mental disorder or for mental illness unless a licensed physician has by affidavit stated that the physician is familiar with the person's history of mental illness and that in the physician's opinion the person is not disabled by such illness in a manner which should prevent the person from possessing a rifle or a shotgun; or

(e)   has been confined to any hospital or institution for treatment of alcoholism unless a licensed physician has by affidavit stated that the physician is familiar with the person's history of alcoholism and that, in the physician's opinion, the person is no longer suffering from a disability in such a manner which should prevent the person from possessing a rifle or shotgun. (1981 L.M.C., ch. 42, § 1; 2001 L.M.C., ch. 11, § 1; 2004 L.M.C., ch. 22, §1.)

   **Editor's note**—Section 57-9 is cited and quoted at Furda v. State, 421 Md. 332, 26 A.3d 918 (2011) where the Court of Appeals reversed the decision of the Court of Special Appeals; see also companion case at 194 Md. App. 1, 1 A.3d 528 (2010), also citing Section 57-9.

   Section 57-9, formerly § 57-6, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


## Sec. 57-10. Keeping guns on person or in vehicles.

It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition unless:

   (a)   *Lawful mission.* Such person is then engaged upon a lawful mission for which it is necessary to carry a gun upon his person; or

   (b)   *Special guard, special police, etc.* Such person is employed as a special guard, special police officer or special detective and has been lawfully deputized by the sheriff for the county, or has been appointed a constable in the county, or has been licensed under the laws of the state, should such a law be enacted, to carry such gun and then is on or in the immediate vicinity of the premises of any employer whose occupation lawfully requires the employment of a person carrying a gun while in the discharge of the duties of such employment; or

   (c)   *Military service.* Such person is then lawfully engaged in military service or as a duly authorized peace officer; or

   (d)   *Hunting, target practice, etc.* Such person is engaged in lawful hunting, drill, training or target practice on property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; or

   (e)   *Going to or returning from hunting, target practice, etc.* Such person is engaged in going to or from lawful hunting, drill training or target practice, or in delivering such gun to or carrying it from a gunsmith or repairman, or is engaged in any other lawful transfer of possession; provided, that such person shall be on or traveling upon a public highway or property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; provided further, that such gun shall not be loaded with explosive ammunition. (1981 L.M.C., ch. 42, § 1; 2001 L.M.C., ch. 11, § 1.)

   **Editor's note**—Section 57-10, formerly § 57-7, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


## Sec. 57-11.   Firearms in or near places of public assembly.

   (a)   In or within 100 yards of a place of public assembly, a person must not:

      (1)   sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or

    (2) sell, transfer, possess, or transport a firearm created through a 3D printing process..

  (b) This section does not:

    (1) prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

    (2) apply to a law enforcement officer, or a security guard licensed to carry the firearm;

    (3) apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

    (4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm;

    (5) apply to the possession of a handgun by a person who has received a permit to carry the handgun under State law; or

    (6) apply to separate ammunition or an unloaded firearm:

      (A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

      (B) being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

  (c) This section does not prohibit a gun show at a multipurpose exhibition facility if:

    (1) the facility's intended and actual primary use is firearms sports (hunting or target, trap, or skeet shooting) or education (firearms training); or

    (2) no person who owns or operates the facility or promotes or sponsors the gun show received financial or in-kind support from the County (as defined in Section 57-13(a)) during the preceding 5 years, or after December 1, 2001, whichever is shorter; and

      (A) no other public activity is allowed at the place of public assembly during the gun show; and

      (B) if a minor may attend the gun show:

        (i) the promoter or sponsor of the gun show provides to the Chief of Police, at least 30 days before the show:

          (a) photographic identification, fingerprints, and any other information the Police Chief requires to conduct a background check of each individual who is or works for any promoter or sponsor of the show and will attend the show; and

          (b) evidence that the applicant will provide adequate professional security personnel and any other safety measure required by the Police Chief, and will comply with this Chapter; and

        (ii) the Police Chief does not prohibit the gun show before the gun show is scheduled to begin because:

          (a) the promoter or sponsor has not met the requirements of clause (i); or

          (b) the Police Chief has determined that an individual described in clause (i)(a) is not a responsible individual.

  (d) Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

(1)     does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

(2)     has secure locks on all doors and windows;

(3)     physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

(4)     has adequate security lighting;

(5)     has a functioning alarm system connected to a central station that notifies the police; and

(6)     has liability insurance coverage of at least $1,000,000. (1997 L.M.C., ch. 14, §§1, 2; 1998 L.M.C., ch. 2, §§1, 2; 2001 L.M.C., ch. 11, § 1; 2021 L.M.C., ch. 7, §1.)

**Editor's note**—Section 57-11, formerly § 57-7A, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-12. Sale of fixed ammunition.

(a)     *Legislative intent.* The purpose of this section is to provide support to state and local law enforcement officials in their efforts against crime and violence by placing controls on the flow of dangerous ammunition, in addition to those provided by federal law, and to encourage compliance with the state police department's program of voluntary firearm registration. It is not the purpose of this section to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, or to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes. It is not the purpose of this section to create, nor does it permit the creation of, any separate system of county registration of firearms or ammunition, or the levying of any county fee in connection with any registration of firearms or ammunition. It is specifically not the intent of this section to serve as a revenue generating measure.

(b)     *Registration of ammunition dealers.* Any ammunition dealer (as defined in 18 United States Code, section 921 et seq.) who conducts business in Montgomery County is required to register with the Montgomery County department of police by maintaining on file with that department, at all times, a valid, current copy of his federal ammunition dealer's license.

(c)     *Conditions for sale.* No ammunition dealer may sell fixed ammunition to any other person, unless:

(1)     The sale is made in person;

(2)     The purchaser exhibits, at the time of sale, a valid registration certificate or, in the case of a nonresident, proof that the firearm is lawfully possessed in the jurisdiction where the purchaser resides;

(3)     The fixed ammunition to be sold is of the same caliber or gauge as the firearm described in the registration certificate, or other proof in the case of a nonresident; and

(4)     The purchaser signs a receipt for the ammunition which shall be maintained by the licensed dealer for a period of one (1) year from the date of sale.

(d)     *Exceptions.* The provisions of this section shall not apply to the sale of fixed ammunition:

(1)     Which is suitable for use only in rifles or shotguns generally available in commerce, or to the sale of component parts of these types of ammunition;

(2)     To any person licensed to possess fixed ammunition under an act of Congress and the law of the jurisdiction where the person resides or conducts business; or

(3)     To any law enforcement officer of federal, state, local or any other governmental entity, if the officer has in his possession a statement from the head of his agency stating that the fixed ammunition is to be used in the officer's official duties.

(e)     *Penalties.* Any ammunition dealer who sells fixed ammunition in violation of the provisions of this section shall be guilty of a class C violation, pursuant to section 1-19 of the Montgomery County Code, punishable only by a civil penalty in the amount of fifteen dollars ($15.00).

(f)     *Exception for incorporated municipalities.* This section shall not be effective in any incorporated municipality which by law has authority to enact a law on the same subject. If any such incorporated municipality adopts this section and requests the county to enforce the adopted provisions thereof within its corporate limits, the county may thereafter administer and enforce the same within the incorporated municipality. The county executive is authorized to enter into agreements with incorporated municipalities to enforce and administer the provisions so adopted and to collect the administrative costs of implementation from such municipalities. (1983 L.M.C., ch. 50, § 2.)

**Editor's note**--The above section was held to be invalid by the Court of Appeals in Montgomery County, Maryland, et al. v. Atlantic Gunds, Inc., et al., 302 Md. 540, 489 A.2d 1114 (1985).


## Sec. 57-13. Use of public funds.

(a)     The County must not give financial or in-kind support to any organization that allows the display and sale of guns at a facility owned or controlled by the organization. Financial or in-kind support means any thing of value that is not generally available to similar organizations in the County, such as a grant, special tax treatment, bond authority, free or discounted services, or a capital improvement constructed by the County.

(b)     An organization referred to in subsection (a) that receives direct financial support from the County must repay the support if the organization allows the display and sale of guns at the organization's facility after receiving the County support.   The repayment must include the actual, original value of the support, plus reasonable interest calculated by a method specified by the Director of Finance.   (2001 L.M.C., ch. 11, § 1.)

**Editor's note**—2001 L.M.C., ch. 11, § 2, states:

(a) Section 57-13 of the County Code, as amended by Section 1 of this Act, applies to:

(1) support that an organization receives from the County after December 1, 2001; and

(2) the display of a gun for sale at the facility after December 1, 2001.

(b) Section 57-13 expires on December 1, 2011.

Section 57-13 is cited but not interpreted in Frank Krasner Enterprises, Ltd. v. Montgomery County, 401 F.3d 230 (4th Cir. 2005) because appellants lacked standing.

MONTGOMERY COUNTY CODE

### Sec. 57-14. Exemptions from Chapter.

Nothing in this Chapter applies to the purchase, ownership, or possession of a bona fide antique gun that is incapable of use as a gun.   Except as provided in Sections 57-7 and 57-11, nothing in this Chapter prohibits the owner or tenant of any land from carrying or discharging a gun on that land for the purpose of killing predatory animals which prey on livestock. (1981 L.M.C., ch. 42, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1.)

**Editor's note**—Section 57-14, formerly § 57-8, was renumbered, amended, and retitled pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-15. Penalty.

Any   violation of this Chapter or a condition of an approval certificate issued under this Chapter is a Class A violation to which the maximum penalties for a Class A violation apply. Any violation of Section 57-8 is a Class A civil violation. (Mont. Co. Code 1965, § 109-9; 1983 L.M.C., ch. 22, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1.)

**Editor's note**—Section 57-15, formerly § 57-9, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-16. Reporting requirement.

(a)     The County Police Department must submit a report annually to the County Executive and the County Council regarding the availability and use of ghost guns and undetectable guns in the County.

(b)     The report must include the number of ghost guns and undetectable guns recovered by the Department during the prior year.

(c)     Each report must be available to the public on the Police Department's website. (2021 L.M.C., ch. 7, §1.)

| | |
|---|---|
| Bill No. | 4-97 |
| Concerning: | Weapons - Places of Public Assembly and Access by Minors |
| Revised: | July 1, 1997    Draft No. 8 |
| Introduced: | February 11, 1997 |
| Enacted: | July 1, 1997 |
| Executive: | Returned unsigned |
| Effective: | October 14, 1997 |
| Sunset Date: | None |
| Ch. 14 , Laws of Mont. Co. | 1997 |

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

By:   Councilmembers Berlage, Leggett, Ewing, Subin, and Council President Praisner

## AN ACT to:

(1)   limit the purchase, sale, transfer, possession, and transportation of certain firearms and ammunition with respect to minors or within 100 yards of places of public assembly; and

(2)   generally amend County law regarding weapons.

By amending
    Montgomery County Code
    Chapter 57, Weapons
    Sections 57-1, 57-3, 57-4, 57-5, 57-8

By adding
    Section 57-7A

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| Double underlining | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland, approves the following Act:*



DEFENDANT'S
EXHIBIT

**E**

1   **Section 1.** Sections 57-1, 57-3, 57-4, [[and]] 57-5, and 57-8 are amended

2   and Section 57-7A is added as follows:

3   **57-1. Definitions.**

4   In this Chapter, the following words and phrases have the following

5   meanings:

6                               *       *       *

7   *Gun* or *firearm*:

8                               *       *       *

9   (2)   [The term "handgun" shall include] "Handgun" means any

10          pistol, revolver or other firearm capable of being concealed on

11          the person, including a short-barreled shotgun and a short-

12          barreled rifle as these terms are defined below[; except it shall].

13          "Handgun" does not include a shotgun, rifle, or antique

14          firearm.

15  (3)   [The term "rifle"] "Rifle" means a weapon designed or

16          redesigned, made or remade, and intended to be fired from the

17          shoulder and to use the energy of the explosive in a fixed

18          metallic cartridge to fire only a single projectile through a

19          rifled bore for each single pull of the trigger.

20                              *       *       *

21  (6)   [The term "shotgun"] "Shotgun" means a weapon designed or

22          redesigned, made or remade, and intended to be fired from the

23          shoulder and to use the energy of the explosive in a fixed

24          shotgun shell to fire through a smooth bore either a number of

1        ball shot or a single projectile for each single pull of the

2        trigger.

3        *Gun shop*: An establishment where a **handgun, rifle, or shotgun,** or

4        ammunition or major component of these guns is sold[[.]] or

5        transferred[[, manufactured, repaired, or transported]]. "Gun shop" does not

6        include an area of an establishment that is separated by a secure, physical

7        barrier from all areas where any of these items is located.

8                    *    *    *

9        *Minor:* An individual younger than 18 years old.

10      *Place of public assembly:* [["Place"]] A "place of public assembly"

11      [[includes]] is a [[: (1)]] government owned park identified by the

12      Maryland-National Capital Park and Planning Commission; place of

13      worship; elementary or secondary school; [[public building, or child care

14      center]] public library; or [[(2) swim club or cultural,]] government owned

15      or operated recreational [[, sports or social center that admits **minors**]]

16      facility. A **place of public assembly** includes all property associated with

17      the place, such as a parking lot or grounds of a building.

18                 *    *    *

19      *Sporting use*: "Sporting use" of a firearm and ammunition means hunting or

20      target shooting in compliance with all federal, State, and local laws.

21      **Sporting use** includes:

22      (a)    participation in a managed hunt sponsored by a government agency;

23          and

24      (b)    the sale or other transfer of ammunition by a sporting club for

25          immediate, on-site use at the club.

1                                      *       *       *

2 **57-3.**          **Discharge of guns in the urban area.**

3          A person, other than a peace officer or employee of the Maryland

4 Department of Natural Resources performing official duties, must not discharge a

5 gun within the urban area. [[This section does not apply to the]] Except as

6 provided in Sections 57-5 and 57-7A, a person may discharge [[of]] a gun:

7                                        *       *       *

8 **57-4.**          **Discharge of guns outside the urban area.**

9                                        *       *       *

10         (b)      [[Paragraph (a)(1) does not apply to the]] Except as provided in

11                 Sections 57-5 and 57-7A, a person may discharge [[of]] a gun:

12                                        *       *       *

13 **57-5.**          **[Transfer of rifles or shotguns to] Access to guns by minors.**

14         (a)      [It shall be unlawful for any] A person [to] must not give, sell, rent,

15                 lend, or otherwise transfer any [[handgun,]] rifle[[,]] or shotgun

16                 [designed to use explosive ammunition] or any [projectile therefor

17                 within] ammunition or major component for these guns in the

18                 [county] County to a minor [under the age of eighteen (18) years;

19                 provided, that nothing contained within this section shall be

20                 construed to]. This subsection does not apply [where the relationship

21                 of] when the transferor is at least 18 years old and is the parent [and

22                 child], guardian [and ward], or [adult] instructor [and pupil exists

23                 between such person and] of the minor, or in connection with a

24                 regularly conducted or supervised program of marksmanship or

25                 marksmanship training [or participation].

                          f: bills 9704guns\9704bil8.doc

1    (b)    An owner, employee, or agent of a **gun shop** must not allow a minor

2           to, and a minor must not, enter the **gun shop** unless the minor is

3           accompanied by a parent or other legal guardian at all times when the

4           minor is in the **gun shop**.

5    (c)    This section must be construed as broadly as possible within the

6           limits of State law to protect minors.

7                    *      *      *

8  **57-7A.**    **Firearms in or near places of public assembly.**

9    (a)    A person must not sell, transfer, [[manufacture, repair,]] possess, or

10          transport a handgun, rifle, or shotgun, or ammunition for these

11          firearms, in or within 100 yards of a **place of public assembly**.

12    (b)    This section does not:

13         (1)    prohibit the teaching of firearms safety or other educational or

14             sporting use [[by adults within]] in the areas described in

15             subsection (a);

16         (2)    apply to a law enforcement officer [[acting in the officer's

17             official capacity]], or a security guard licensed to carry the

18             firearm; [[or]]

19         (3)    apply to the possession of a firearm or ammunition in the

20             person's own home;

21         (4)    apply to the possession of one firearm, and ammunition for the

22             firearm, at a business by either the owner or one authorized

23             employee of the business;

24         (5)    apply to the possession of a handgun by a person who has

25             received a permit to carry the handgun under State law;

1       (6)    apply to a sale or other transfer of a firearm or ammunition in a

2               gun shop operating continuously at the same location since

3               before the place of public assembly was established if the place

4               is established after January 1, 1997; or

5       [[(5)]]

6       (7)    apply to [[the transportation of]] separate ammunition or an

7               unloaded firearm [[that is]]:

8           (A)    transported in [[a locked container]] an enclosed case or

9                   in a locked firearms rack on a motor vehicle; or

10          (B)    being surrendered in connection with a gun turn-in or

11                   similar program approved by a law enforcement agency.

12   **57-8.**       **Exemptions from provisions of chapter.**

13       Nothing in this [[chapter shall apply]] Chapter applies to the purchase,

14 ownership or possession of bona fide antique guns which are incapable of use as a

15 gun. [[Further]] Except as provided in Sections 57-5 and 57-7A, nothing in this

16 [[chapter shall be deemed to prohibit]] Chapter prohibits the owner or tenant of

17 any land from carrying or discharging a firearm on [[his]] that land for the purpose

18 of killing predatory animals which prey on, damage or destroy [[his]] property,

19 livestock, or crops.

20   **Sec. 2.**       **Transition.**

21       Notwithstanding Section 57-7A, as added by Section 1, a gun shop owned

22 and operated by a firearms dealer licensed under Maryland or federal law on

23 January 1, 1997, may conduct regular, continuous operations in the same

24 permanent location until the later of:

25       (a)    two years after this Act takes effect; or

1      <u>(b)</u>    <u>up to five years after this Act takes effect, during the remaining term</u>

2          <u>of a lease for the gun shop premises if the lease is in effect when this</u>

3          <u>Act takes effect. The remaining term does not include any optional</u>

4          <u>extensions of the lease.</u>

5  The gun shop must not expand its inventory[[,]] <u>(the number of guns or rounds of</u>

6  <u>ammunition displayed or stored at the gun shop at one time) or</u> square footage[[,

7  or other aspect of its operation]] by more than 10 percent<u>, or expand the type of</u>

8  <u>guns (handgun, rifle, or shotgun) or ammunition offered for sale</u> during the [[two-

9  year]] <u>transition</u> period [[beginning on the date this Act takes effect]] <u>in this</u>

10  <u>Section</u>.

11  *Approved:*

12  Marilyn J. Praisner, President, County Council      July 7, 1997    Date

13  *Approved:*

14  **RETURNED UNSIGNED**        **July 14, 1997**

    Douglas M. Duncan, County Executive        Date

15  *This is a correct copy of Council action.*

16  Mary A. Edgar, CMC, Secretary of the Council      July 14, 1997    Date

# LAWS
## of
# MONTGOMERY COUNTY

## 1966

DEFENDANT'S
EXHIBIT

**F**

## LAWS OF MONTGOMERY COUNTY 1966

(3) The fire shall be attended at all times by an attendant over twenty-one years of age until it is completely extinguished.

(4) The nearest fire department shall be notified by the [developer, builder, or sawmill operator] *permittee* prior to the start of fire and be furnished an estimated time of burning.

(5) If due to dry weather, winds, and other like conditions it is the opinion of the local fire chief or his agent that the fire creates a hazard, the fire chief or his agent may order same to be extinguished.

(6) Clearance, as designated by the Fire Marshal shall be maintained around all [bonfires] *open fires.*

(7) *Rubber tires, crank case oil, or other materials which create dense smoke or emissions injurious or noxious to people or property shall not be burned, either continuously or starting.*

(8) *Smoke density shall not exceed Ringelmann No. 2 for more than 3 minutes in any hour.*

[ T B : N ] *The owner, operator, or other person in charge of a sawmill shall not remove such mill from any place of operation without first disposing of all slash, slabs, sawdust or other debris resulting from such operation. Before abandoning such operational site, the owner or operator or other person shall notify the Fire Marshal of the abandonment in order that the Fire Marshal may inspect the site.*

BE IT FURTHER ORDAINED that—

Chapter 87, Montgomery County Code 1960 is hereby amended to read as follows:

Section 87-9. (2)

All incinerators shall be operated in such a manner that they shall not emit fly ash in excess of 0.85 pounds per one thousand pounds *of dry flue gas, corrected to twelve per cent $CO_2$ or fifty per cent excess air,* nor shall they produce smoke in excess *of those limitations imposed in Section 8 of the "Air Pollution Control Ordinance."* Any incinerator [not] being operated not in accordance with these specifications shall be corrected within the time specified by written notice of the [Director] *Health Officer* or his authorized agent, to the owner, his agent or operator [thereof] *of the incinerator.*

BE IT FURTHER ORDAINED that Ordinance No. 4-114, Laws of Montgomery County 1962, is hereby amended to read as follows:

## O...... LATIONS

Section 9f. Dust Air Pollution

[Upon a finding by the Director that] In order to avoid injurious effects to persons and damage to property resulting from the emission of dust or other air pollutants *and to obtain compliance with the Air Pollution Control Ordinance,* the Director shall have authority to [prescribe] *require employment* of methods for the control of said dust and air pollutants including but not limited to the following: (a) complete or partial enclosure of all machinery used in the crushing, washing, sorting or processing of rock, sand, gravel or other natural resources; (b) spraying by hand or automatic spraying devices; (c) installation of dust inhibitors and dust control devices; [Air pollution measurements shall be taken at the places prescribed in Section 9a (1), (2) or (3).]

BE IT FURTHER ORDAINED that Ordinance No. 5-189 is declared an emergency measure for the immediate preservation of the public health and safety and shall become effective immediately upon adoption except that—

(1) Where compliance with Sections 3, 4 and 6 of Chapter 74A requires major alteration in physical plants, a period not to exceed one (1) year from said effective date shall be allowed for such compliance. This exception shall not apply to motor vehicles.

(2) Section 6a (2) (d) of Chapter 74A, "That no leaves shall be burned in those areas where provision is made for public collection thereof," shall not become effective until September 1, 1966, except that during the interim, the County Manager is authorized to ban the burning of leaves for any period during which he determines that atmospheric or other conditions are such as to produce intolerable or unsafe conditions if burning of leaves is permitted.

Adopted: October 19, 1965.

Ordinance No. 5-140     Re: Ordinance Regulating Transfer of Pistols.

BE IT ORDAINED by the County Council for Montgomery County, Maryland, that Chapter 103, titled "Weapons," Montgomery County Code 1960, is hereby amended as follows:

Sec. 1. Section 103-1, titled "Definitions," Chapter 103, titled "Weapons," Montgomery County Code 1960, is hereby amended by

## LAWS OF MONTGOMERY COUNTY 1966

adding certain new definitions to be arranged alphabetically with existing definitions in said section:

"Crime of violence": shall mean murder, voluntary man-slaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to murder, ravish or rob; assault with a deadly weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.

"Dealer": shall include any person engaged in the business of selling firearms at wholesale or retail, or any person engaged in the business of renting or repairing such firearms, or any person who is either licensed, or required to be licensed as such under State or Federal law.

"Fixed Ammunition": shall mean any ammunition composed of a projectile or projectiles, a casing and a primer, all of which shall be contained as one unit.

"Fugitive from justice": shall mean any person for whom criminal proceedings have been instituted, warrant issued, or indictment presented to the grand jury, who has fled from a sheriff or other peace officer within this State, or who has fled from any State, territory or the District of Columbia, or possession of the United States, to avoid prosecution for crime of violence or to avoid giving testimony in any criminal proceeding involving a crime or treason.

"Habitual drunkard": shall mean any person who has been convicted of being drunk three or more times within a period of one year.

"Person": shall include an individual, partnership, association or corporation.

"Pistol or Revolver": shall mean any gun with a barrel less than sixteen (16) inches in length that uses fixed ammunition.

"Sell, and Purchase": and the various derivatives of such words: shall be construed to include letting on hire, giving, lending, borrowing or otherwise transferring.

"Subversive Organization": shall include any "subversive organization" or "Foreign subversive organization" as defined by Article 85A, Sec. 1, Annotated Code of Maryland, 1957.

"Subversive Person": shall include any person as defined by Article 85A, Sec. 1, Annotated Code of Maryland, 1957.

## ORDINANCES, RULES AND REGULATIONS

"Superintendent of Police": shall mean the Superintendent of Police for Montgomery County, Maryland, or his duly author-ized agents.

"Unsound Mind": shall include any person who is, or has a history of (1) psychosis, or (2) brain dysfunction with or with-out specific mental retardation.

Sec. 2. Section 103-6, titled "Transfer to minors prohibited; exceptions," Chapter 103, titled "Weapons," Montgomery County Code 1960, is hereby amended to read as follows:

It shall be unlawful for any person to give, sell, rent, lend or otherwise transfer any [gun] rifle or shotgun designed to use explosive ammunition or any projectile therefor within the county to a minor under the age of [sixteen] eighteen years, or to give, sell, rent, lend or otherwise transfer any pistol de-signed to use explosive ammunition or any projectile therefor within the county to a minor under the age of twenty-one years. [except] Provided, however, that nothing contained within this subsection shall be construed to apply where the relationship of parent and child, guardian and ward, or adult instructor and pupil exist between such person and the minor, or in connection with a regularly conducted or supervised program of marksman-ship training or participation.

Sec. 3. Chapter 103, titled "Weapons" Montgomery County Code 1960, is hereby amended by adding new Sections 103-10 through 103-18, inclusive, to read as follows:

Sec. 103-10. Unlawful possession of a pistol.

It shall be unlawful for any person to own or keep a rifle, shotgun, or pistol, or have a rifle, shotgun, or pistol in his pos-session or control within the county, if: (1) he is a drug addict, or (2) he has been convicted in this State or elsewhere of a crime of violence, trafficking in narcotics, or violating any of the provisions of Article 27, subtitle "Pistols," Annotated Code of Maryland 1957, or (3) he is an habitual drunkard, or (4) he is of unsound mind, or (5) he is a subversive person, or (6) a member of a subversive organization.

Sec. 103-10. Unlawful possession of a pistol.

It shall be unlawful for any person to sell, give, or otherwise transfer a pistol to, or keep a pistol for, or intentionally make a pistol available to any person whom he knows, or has reasonable cause to believe, (1) has been so convicted, or (2) is a drug

LAWS OF MONTGOMERY COUNTY 1966

addict, or (3) is an habitual drunkard, or (4) is of unsound mind, or (5) is a subversive person, or (6) a member of a subversive organization.

Sec. 103-11. Dealers not to sell, etc. to minors and other persons.

No dealer shall sell, barter, give or furnish, or cause to be sold, bartered, given or furnished to any minor under twenty-one (21) years of age, a pistol. Nor shall any dealer sell, lend, rent, or otherwise transfer any pistol to any person who has validly been denied the right to purchase, borrow, rent, or otherwise acquire a pistol, by the Superintendent of Police, under the provisions of this Ordinance.

Sec. 103-12. Acquisition of pistols from dealers.

Any person desiring to purchase, borrow, rent or otherwise acquire a pistol from a dealer shall make application on forms provided by the Superintendent of Police which shall be signed in triplicate by such person stating his full name, address, occupation, place and date of birth, the date and hour of application, make, model, serial number, and a statement that he has never been convicted in this State or elsewhere of a crime of violence, that he is not an habitual drunkard, or a drug addict, and that he has never been committed to an institution for treatment of a mental illness from which he has not been discharged for a period of three years prior to the date of his application to purchase a pistol, or is a subversive person, or is a subversive person, or a member of a subversive organization. Within eight hours after receipt of such application, the dealer who proposes to sell a pistol shall sign and attach his address and mail or deliver, two copies of such statement to the Superintendent of Police, together with a stamped, self-addressed envelope. A copy of the application shall be retained by the dealer for three years. Upon receipt of an application from the dealer, the Superintendent of Police shall stamp the time and date received and return one copy to the dealer.

Sec. 103-13. Five day waiting period for sale of pistol.

No dealer shall deliver any pistol to any purchaser thereof until five (5) days, excluding Saturdays, Sundays and holidays, shall have elapsed from the time the application has been received by the Superintendent of Police; provided, that the Superintendent of Police may, in his sole discretion, authorize in writing the seller to deliver a pistol to the purchaser during the Five

ORDINANCES, RULES AND REGULATIONS

day period. Provided, that the Superintendent of Police may, in his sole discretion, extend such Five day period, for a period not to exceed fifteen days, by written notice to the seller. In the event of an extension of the Five day period, the Superintendent of Police shall include in the written notice the reason therefor.

Sec. 103-14. Notice of dealers.

If, within the Five (5) day period, or extension thereof as herein provided, the Superintendent of Police shall inform, in writing, the dealer who proposes to sell the pistol that the application to purchase is denied, it shall be unlawful for the dealer to deliver the pistol to the applicant. A notification of denial by the Superintendent of Police shall be furnished to the applicant by the dealer and the dealer shall not deliver or disclose the information contained therein to anyone else without the express permission of the applicant. The Superintendent shall deny the application to purchase a pistol of any applicant that (1) is under the age of twenty-one (21) years, or (2) is a drug addict, or (3) has been convicted of a crime of violence, trafficking in narcotics, or violation of any of the provisions of Article 27, subtitle, "Pistols," Annotated Code of Maryland, 1957, or (4) is an habitual drunkard, or (5) is of unsound mind, or (6) is a subversive person, or (7) is a member of a subversive organization. Further, the Superintendent of Police shall inform the applicant, in writing, of the specific reasons for denying said application.

Sec. 103-15. Exception.

Those who desire to purchase pistols from time to time without the waiting period prescribed above may apply to the Superintendent of Police for a Certificate of Identity.

The Superintendent of Police shall require of the applicant for a Certificate of Identity, his name, address, occupation, brief physical description, date and place of birth, fingerprints, photograph and signature. After fifteen (15) days from the date of application, and in the absence of evidence that the applicant (1) is a drug addict, or (2) has been convicted in this State or elsewhere for, or there are charges pending against him in this State or elsewhere for, a crime of violence or trafficking in narcotics, or (3) has been convicted of violating any of the provisions of Article 27, subtitle "Pistols," Annotated Code of Maryland 1957, or (4) is an habitual drunkard, or (5) he is of unsound mind, or (6) is a subversive person, or (7) is a member of

LAWS OF MONTGOMERY COUNTY 1966

a subversive organization, and upon payment of such fee not to exceed $5.00 as may be required by the Superintendent of Police, the Superintendent of Police shall issue the requested Certificate of Identity.

The Certificate of Identity shall be suitably laminated to prevent alteration and shall bear the name, address, brief physical description, photograph and signature of the one to whom it is issued. It shall also bear a serial number, the issue date, and the expiration date, which shall be two years from the date of issue, and the statement that the one to whom it is issued is entitled to purchase pistols from a licensed dealer without the prescribed waiting period.

A Certificate of Identity may be cancelled by the Superintendent of Police should conclusive evidence appear that the holder (1) is a drug addict, or (2) he has been convicted in this State or elsewhere of, or there are charges pending against him in this State or elsewhere for, a crime of violence or trafficking in narcotics, or (3) has been convicted of violating any of the provisions of Article 27, subtitle "Pistols," Annotated Code of Maryland, or (5) is an habitual drunkard, or (6) he is of unsound mind, or (7) he is a subversive person, or (8) he is a member of a subversive organization.

In the event of a cancellation, the holder is to be informed by registered U. S. Mail and all licensed dealers are to be notified of the name and serial number of the cancelled Certificate.

Sec. 103-16. Right of appeal.

Any purchaser, aggrieved by any decision of the Superintendent of Police may, within ten (10) days after receipt of the letter of denial by the Superintendent of Police, appeal said decision to the County Board of Appeals for Montgomery County, Maryland, by a petition setting forth the reasons for such appeal, whereupon the Board shall, after a hearing, affirm, modify or reverse the action of the Superintendent of Police.

Sec. 103-17. Exemptions.

This Ordinance shall not apply to (1) marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law enforcement officers currently employed as such, (2) any person having State Department diplomatic immunity to any person employed in or by an official branch of a Federal, State or local government whose duty includes law enforcement in the nature of a

ORDINANCES, RULES AND REGULATIONS

police officer, (3) purchases by any dealer, (4) rental on the premises of pistols by persons twenty-one (21) years of age or over while upon the premises and being used upon a supervised rifle or pistol range, (5) the delivery of a pistol to its lawful owner by any person with whom such pistol has been left on consignment, for safekeeping, or for repairs, or (6) a wholesale purchase from a dealer by any person, firm or corporation regularly engaged in the business of manufacturing, repairing or selling pistols at retail.

Sec. 103-18. Saving clause.

Should any section, subsection, sentence, clause or phrase of this Chapter be declared invalid by a court of competent jurisdiction, such decision shall not affect the validity of the chapter in its entirety or of any part thereof other than that so declared to be invalid. The County Council for Montgomery County, Maryland, hereby declares that it would have adopted this chapter and each section, subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.

Adopted: November 9, 1965.

Ordinance No. 5-148

BE IT ORDAINED by the County Council for Montgomery County, Maryland, sitting as a District Council for that portion of the Maryland-Washington Regional District located within Montgomery County, that—

The Montgomery County Zoning Ordinance adopted May 31, 1958, being Chapter 104, Montgomery County Code 1960, as amended, is hereby amended to read as follows:

Amend Section 104-13B b(6), title "Development Standards. Set-backs," as follows:

"No building or structure, other than entrance gate houses, shall be located within 100 feet of any exterior boundary line of the tract except that for 40% of the boundary line, the minimum set-back may be reduced to 50 feet [.]; and except further, that where the exterior boundary line adjoins property owned or occupied by any

# MONTGOMERY COUNTY CODE

## 1955

Consisting of a compilation and codification of the public local laws of Montgomery County, the laws applicable to special taxing areas, the city, town and village laws, the bicounty district laws, and the ordinances, rules and regulations of the County, so as to set forth all such laws, ordinances, rules and regulations which are general and permanent in character as they are in force on August 15, 1955

## Volume 2

PUBLISHED BY ORDER OF THE COUNTY COUNCIL

*Under the Supervision of*
CHARLES M. IRELAN
*County Attorney*

MICHIE CITY PUBLICATIONS COMPANY
CHARLOTTESVILLE, VIRGINIA
1955

DEFENDANT'S EXHIBIT

G

§ 94-37                    MONTGOMERY COUNTY CODE                    § 94-38

**Sec. 94-37. Penalty.**

Any person violating any term, condition or provision of this chapter shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars for each offense. (Jour. A-31, Ord. 2-11, April 10, 1951. Jour. A-33, Ord. 2-49, Feb. 19, 1952.)

**Sec. 94-38. Appeals.[1]**

Any person feeling aggrieved by the denial, suspension or revocation of any registration card by the director shall have the opportunity to appeal from such denial, suspension or revocation to the county council and to show cause why such license should be issued or should not be suspended or revoked; provided, that such appeal is noted with the clerk of the county council within ten days after such person is notified of such action. A registered letter from the director to the last address on file with the department for the person against whom action has been or is to be taken shall be sufficient notification for the purposes of any action taken by the director under the provisions of this chapter. (Jour. A-31, Ord. 2-11, April 10, 1951. Jour. A-33, Ord. 2-49, Feb. 19, 1952.)

---

1. Section 2-81 of this Code provides that appeals under this section shall be heard by the county board of appeals.

---

§ 95-1                          WEAPONS                          § 95-1

**CHAPTER 95.**

**WEAPONS.[2]**

§ 95-1.  Definitions.
§ 95-2.  Use by children under seventeen years of age; penalty.
§ 95-3.  Range approval committee established; powers, duties and functions.
§ 95-4.  Discharge—Prohibited generally; exceptions.
§ 95-5.  Same—On or near highways or buildings.
§ 95-6.  Transfer to minors prohibited; exceptions.
§ 95-7.  Possession prohibited; exceptions.
§ 95-8.  Exemptions from chapter.
§ 95-9.  Penalty.

**Sec. 95-1. Definitions.**

The following words as used in this chapter, shall for the purpose of this chapter, have the meanings respectively ascribed to them in this section:

*Gun* shall include any firearm, rifle, shotgun, revolver, pistol, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

*Urban area* shall include that portion of the county lying within the following boundaries:

Beginning at a point where the Maryland-District of Columbia boundary line in the county intersects the Maryland-Virginia boundary line on the southwest side of the Potomac River; running thence in a northwesterly direction along the said Maryland-Virginia boundary line to a point opposite the mouth of Rocky Run, said point being the meeting point of the Maryland-Virginia boundary line and the Washington Suburban Sanitary District line; thence with said Washington Suburban Sanitary District line and crossing the Potomac River to the north side of MacArthur Boulevard; thence easterly along the north side of MacArthur Boulevard to Persimmon Tree Road; thence northwesterly along Persimmon Tree Road to River Road; thence northwesterly along River Road to Falls Road (Md. Route # 189); thence northeasterly along Kendale Road; thence easterly along Kendale Road to the northwest boundary of the property of the Sisters of Mercy; thence northeasterly along the northwesterly boundary of the property of the Sisters of

---

2. As to authority of county to adopt ordinances regulating, etc., firearms, see § 18-2 of this Code.

§ 95-2   MONTGOMERY COUNTY CODE   § 95-2

Mercy to Bells Mill Road; thence easterly and southeasterly along Bells Mill Road to Seven Locks Road; thence northerly along Seven Locks Road to its intersection with Montrose Road; thence easterly along Montrose Road to its intersection with U. S. Route 240; thence northwesterly along U. S. 240 to its intersection with the corporate limits of the Town of Rockville, as the same was established as of the effective date of Chapter 626, Laws of Maryland 1953; thence following said corporate limits to their intersection with Viers Mill Road; thence southeasterly along Viers Mill Road to Rock Creek; thence following the meanderings of Rock Creek in a northwesterly direction to the Norbeck-Rockville Road; thence along the Norbeck-Rockville Road in a northwesterly direction to its intersection with Georgia Avenue extended; thence in a southerly direction along Georgia Avenue extended to its intersection with the Bel Pre Road; thence in an easterly direction along the Bel Pre Road to the Town of Layhill; thence along the Bonifant Road in an easterly direction to its intersection with the Colesville-Ashton Road; thence along the Colesville-Ashton Road in a southerly direction to its intersection with the Beltsville Road at the Town of Colesville; thence in a southeasterly direction along the Beltsville Road to its intersection with the Montgomery County-Prince George's County boundary line; thence with the said Montgomery County-Prince George's County boundary line to the Montgomery County-District of Columbia boundary line; thence along the Montgomery County-District of Columbia boundary line to the place of beginning.

The term "urban area" shall also include all incorporated cities, towns or villages of the county. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 1. Jour. A-37, Ord. 2-141, April 22, 1954, sec. 1. Ord. 2-167, July 22, 1954, sec. 1.)

### Sec. 95.2. Use by children under seventeen years of age; penalty.

It shall be unlawful for any person under the age of seventeen years to discharge any firearms or high-powered air rifles whatsoever at any time within the county suburban district; provided, however, that the provisions of this section shall not apply to any person while engaged in hunting game during the hunting season, to anyone shooting skeet or clay pigeons, or to anyone shooting at a licensed shooting gallery or licensed target range.

Any person who shall violate the provisions of this section shall, upon conviction, be deemed guilty of a misdemeanor and shall be punished by a fine of not less than five dollars nor more than fifty dollars for each violation, and in default of any fine so imposed

1268

§ 95-3   WEAPONS   § 95-4

may be imprisoned for a period not to exceed thirty days for each violation. (Jour. A-18, p. 124, May 29, 1944. Mont. Co. Code (1950), sec. 165-1.)

### Sec. 95.3. Range approval committee established; powers, duties and functions.

There is hereby established a range approval committee for the urban area of the county, to be composed of five qualified parties who are citizens of the county and who shall be appointed by the county council and who shall serve without compensation. One ex officio member shall be an employee of the division of police protection, one ex officio member shall be appointed from the department of inspection and licenses, and three members shall be appointed to serve for a period of three years, provided that the initial appointments pursuant to this section shall have staggered terms of one, two and three years, and that appointments made thereafter shall be for three years. One each of the three members shall be appointed from lists of names submitted by the Maryland State Rifle and Pistol Association, the Isaac Walton League and the League of Maryland Sportsmen, respectively. Ex officio members shall serve at the pleasure of the county council. The committee shall issue target, trap and skeet range and shooting area approval certificates, which certificates may specify the time and manner of shooting and the type of gun or ammunition which may be used on such range or area. Any such approval certificate shall be valid for eighteen months after its issuance, and shall be issued only upon a finding by a majority of the committee that the discharge of guns upon such ranges or areas will not jeopardize life or property. No range or area shooting certificates shall be issued except upon the written application of the owner, lessee or person lawfully in possession of the land upon which is located the range or area sought to be licensed or approved. Copies of all approval certificates shall be sent by the committee to the police station or substation having jurisdiction, and copies of the po- certificates shall be submitted to the county council, and a record of same incorporated into the minutes. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 2. Ord. 3-22, May 3, 1955.)

### Sec. 95.4. Discharge—Prohibited generally; exceptions.

It shall be unlawful for any person to discharge any gun within the urban area, whether the gun is loaded with blank or live cartridges or projectiles of any kind. This section shall not apply to the discharge of guns on any target, trap or skeet range or shoot-

1269

§ 95-5      MONTGOMERY COUNTY CODE      § 95-7

ing area which has been inspected and approved in writing by the range approval committee, or to the discharge of guns by any person in a private basement or cellar target range, or to the discharge of guns where necessary to protect life or property or to kill any dangerous animal, or to any duly authorized peace officer acting in the proper performance of his official duties, or to the discharge of blank cartridges in theatrical performances or sporting events, or to the firing of salutes by firing squads at military funerals. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 3.)

**Sec. 95-5. Same—On or near highways or buildings.**

It shall be unlawful for any person to discharge a gun from, on-to, across or within one hundred yards of any public highway or building in the county; provided, that this section shall not apply to any discharge of a gun permitted by section 95-4 of this Code. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 6. Ord. 2-168, July 22, 1954, sec. 2.)

**Sec. 95-6. Transfer to minors prohibited; exceptions.**

It shall be unlawful for any person to give, sell, rent, lend or otherwise transfer any gun designed to use explosive ammunition or any projectile therefor within the county to a minor under the age of sixteen years, except where the relationship of parent and child, guardian and ward, or adult instructor and pupil exists between such person and the minor. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 4.)

**Sec. 95-7. Possession prohibited; exceptions.**

It shall be unlawful for any person to have upon his person, concealed or exposed, any gun designed to use explosive ammunition unless:

(a) *Lawful mission.* Such person is then engaged upon a lawful mission for which it is necessary to carry a gun upon his person; or

(b) *Special guard, special police, etc.* Such person is employed as a special guard, special police officer or special detective and is lawfully commissioned or licensed to carry such gun and then is on or in the immediate vicinity of the premises of any employer whose occupation lawfully requires the employment of a person carrying a gun while in the discharge of the duties of such employment; or

(c) *Military service.* Such person is then lawfully engaged in military service or as a duly authorized peace officer; or

(d) *Hunting, target practice, etc.* Such person be engaged in lawful hunting, drill, training or target practice on property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; or,

(e) *Going to or returning from hunting, target practice, etc.* Such person be engaged in going to or from lawful hunting, drill, training or target practice, or in delivering such gun to or carrying it from a gunsmith or repairman, or be engaged in any other lawful transfer of possession; provided, that such person is on or travelling upon a public highway or property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; and, provided further, that such gun is not loaded with explosive ammunition. (Jour. A-30, Ord. 48, Oct. 3, 1950. Jour. A-32, Ord. 2-31, Aug. 28, 1951. Ord. 2-168, July 22, 1954, sec. 1.)

**Sec. 95-8. Exemptions from chapter.**

Nothing in this chapter shall apply to the purchase, ownership or possession of bona fide antique guns which are incapable of use, as a gun. Further, nothing in this chapter shall prohibit the owner or tenant of any land from carrying or discharging a firearm on his land for the purpose of killing predatory animals which prey upon, damage or destroy his property, livestock or crops. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 7. Ord. 2-168, July 22, 1954, sec. 3.)

**Sec. 95-9. Penalty.**

Except as otherwise provided in section 95-2 of this Code, any person who shall violate any of the provisions of this chapter or of the conditions of an approval certificate issued hereunder shall be deemed guilty of a misdemeanor and shall be punishable by a fine of not to exceed twenty-five dollars or imprisonment of not to exceed ten days in jail. (Jour. A-30, Ord. 48, Oct. 3, 1950, sec. 8.)