**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.,* | **Case No.: 485899V** |
| *Plaintiffs,* | |
| vs. | **EXPEDITED HEARING REQUESTED** |
| **MONTGOMERY COUNTY, MARYLAND**, | |
| *Defendant*. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND MOTION TO DISMISS
EXPEDITED HEARING REQUESTED**

**INTRODUCTION**

On May 28, 2021, plaintiffs filed the Complaint in this matter, challenging Montgomery County Bill 4-21. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment and supporting memorandum ("P. Mem."), seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint.

On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. This Court set a hearing date for July 15, 2021, the day before the County ordinance would have become effective. On July 12, 2021, the day defendant's answer or responsive pleading would have been due, defendant removed the entire case to federal district court under 28 U.S.C. § 1441. The July 15, 2021 hearing was cancelled.

- Page 1 -

On February 7, 2022, acting on plaintiffs' motion for a remand, the federal district court remanded Counts I, II and III to this Court. *Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022). A copy of the remand order and the district court's slip opinion are attached as Exhibits A and B, respectively. The district court retained jurisdiction and held in abeyance Count IV of the Complaint, which alleged Bill 4-21 was fatally vague under the Due Process Clause of the Fourteenth Amendment and under Article 24 of the Maryland Declaration of Rights. Count IV is thus no longer before this Court.

On February 22, 2022, defendant filed a motion to dismiss and alternative motion for summary judgment on all counts of the Complaint before this Court, as well as its opposition to plaintiffs' motion for partial summary judgment. Pursuant to Rule 2-311, and Rule 2-501, plaintiffs respectfully submit this memorandum in opposition to the defendant's motion and in further support of plaintiffs' emergency motion for partial summary judgment on Counts I and II of the Complaint. For the reasons set forth in plaintiffs' June 16, 2021 motion and supporting memorandum and in this Opposition, defendant's motion should be denied and plaintiffs' motion for declaratory and equitable relief on Counts I and II should be granted, enjoining defendant, Montgomery County ("County"), from enforcing Bill 4-21. While plaintiffs did not originally seek summary judgment on Count III, the issues presented are purely questions of law and can be decided on the defendant's motion for summary judgment. Plaintiffs, no less than defendant, are entitled to a declaration of the parties' rights on defendant's motion. See P. Mem. at 48.

**ARGUMENT**

## I.    AT LEAST ONE PLAINTIFF HAS STANDING ON EACH COUNT

Defendant argues first that the Complaint should be dismissed because the plaintiffs lack standing. (Def. Mem. at 11). That assertion is not remotely serious. To have standing to seek declaratory relief under MD Code, Courts and Judicial Proceedings, § 3-409(a), a plaintiff need only allege that he or she has suffered "some kind of special damage from such wrong differing in character and kind from that suffered by the general public." *Voters Organized for the Integrity of City Elections v. Baltimore City Elections Bd*., 451 Md. 377, 396, 152 A.3d 827 (2017). A declaratory judgment is appropriate if even "one plaintiff" has standing. (451 Md. at 398). The County does not dispute that pre-enforcement review is fully available under this test. *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases). The authority on which the County relies is not to the contrary. The County simply ignores the test established by this body of recent case law.

At least one plaintiff has standing to bring each count of this Verified Complaint. All of the individual and corporate plaintiffs (save Carlos Rabanales and Maryland Shall Issue, Inc. ("MSI")) are residents of Montgomery County, and either do business in Montgomery County (plaintiffs Engage Armament and I.C.E. Firearms & Defensive Training, LLC.), or are employees or owners of these two corporate entities. Plaintiff Engage Armament alleges it possesses, sells and acts a dealer for "ghost guns" and components banned by Bill 4-21, and transfers such items to lawful purchasers "in the presence" of minors when accompanied by a parent. (Complaint ¶ 26). Plaintiffs Andrew Raymond, Brandon Ferrell and Deryck Weaver all specifically allege they possess one or more "ghost guns" regulated by Bill 4-21. Complaint ¶¶ 26, 27, 29, 30. Plaintiff I.C.E. Firearms and its owner, Ronald David, likewise allege they possess parts, including

1   unfinished receivers banned by Bill 4-21. Such allegations easily distinguish these plaintiffs from

2   the "general public," as these individuals and companies are directly regulated by Bill 4-21. Each

3   of the plaintiffs alleges their locations (homes or businesses) are arguably within the scope of those

4   locations newly regulated by Bill 4-21. The County does not contest any of these allegations and

5   each are supported by sworn declarations.

6        Similarly, the supervisory employees of Engage Armament, Brandon Ferrell and Deryck

7   Weaver, are directly impacted by Bill 4-21's regulation of possession of firearms by such

8   employees, as is their employer, Engage Armament. (Complaint, ¶¶ 29, 30). Plaintiff, Andrew

9   Raymond is directly affected as an owner of Engage Armament (Complaint ¶ 27), and thus has

10  standing to challenge Bill 4-21's regulation of firearms possessed by business owners as does

11  plaintiff Ronald David, the owner of I.C.E. Firearms. (Complaint, ¶33). Andrew Raymond also

12  has standing to challenge Bill 4-21's regulation of possession of "ghost guns" with respect to

13  minors, as he has two minor children who reside with him at his residence in Montgomery County.

14  (Complaint ¶ 27). Plaintiff Deryck Weaver likewise has one minor child residing at his residence

15  in Montgomery County. (Complaint ¶ 30).

16       Plaintiff Carlos Rabanales, a co-owner of Engage Armament, is a resident of Frederick

17  County, and he is individually affected by Bill 4-21's criminalization of his activities at Engage

18  Armament and his ability to travel into Montgomery County with parts and materials from

19  Frederick County to make a living in Montgomery County. (Complaint ¶ 28). The County disputes

20  **none** of these allegations. Each of the foregoing verified allegations is specific, supported by sworn

21  declarations and make clear each of the individual plaintiffs could be sent to prison by Bill 4-21.

22  If these persons do not have standing, then no one does. *Lujan v. Defenders of Wildlife*, 504 U.S.

23

- Page 4 -

555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury.").

MSI alleges its membership includes persons who likewise own or possess "ghost guns" and components regulated by Bill 4-21 in Montgomery County, that it participated in the regulatory consideration of Bill 4-21 by filing comments and objections, and that the Bill, as enacted, burdens the ability of MSI members to keep and bear arms within Montgomery County, including firearms that are otherwise lawful in Maryland. (Complaint ¶¶ 24, 25). These verified allegations are sufficient to establish MSI's standing. See *Fraternal Order of Police v. Montgomery Cty*., 446 Md. 490, 506-07, 132 A.3d 311 (2016) (holding that a police union had standing to challenge the County's use of public funds to defeat a referendum concerning a statute on collective bargaining because statute affected the scope of bargaining by the union on behalf of its members).

But this Court need not address MSI's standing, as at least "one" of the other plaintiffs has standing to seek declaratory relief, and all it takes is "one" plaintiff. *Voters Organized for the Integrity of City Elections*, 451 Md. at 398. The rule in the federal courts is the same. For example, in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020), the Fourth Circuit relied on well-established case law to hold that the federal and State licensed firearms dealer plaintiff in that case (Atlantic Guns) had Article III standing to sue on its own behalf **and** had third-party standing to sue on behalf of customers and "other similarly situated persons" in a constitutional challenge to MD Code, Public Safety, § 5-117.1. (971 F.3d at 216). The Fourth Circuit concluded that it was therefore unnecessary to reach the standing of other plaintiffs, including MSI. (971 F.3d at 214 & n.5). Plaintiff Engage Armament is likewise a federal and State licensed firearms dealer (Complaint ¶ 26), and has the same standing here as Atlantic Guns had in *MSI*. See, e.g., *Saint*

*Luke Institute, Inc. v. Jones*, 471 Md. 312, 350, 241 A.3d 886 (2020) (relying on federal standing law in holding plaintiff had third party standing). Defendant's motion to dismiss should be denied.

## I.      BILL 4-21 IS CONTRARY TO THE EXPRESS POWERS ACT (COUNT II).

### A.      Bill 4-21 Exceeds the Scope of Regulatory Power Authorized by the General Assembly in Enacting Section 4-209(b).

Under the Express Powers Act, MD Code, Local Government, §10-206, Montgomery County laws must be "not inconsistent with State law," and the County is barred from enacting laws that are "preempted by or in conflict with public general law." The County does not deny it is bound by the Express Powers Act, but asserts that Bill 4-21 is authorized by MD Code, Criminal Law, 4-209(b)(1), and that the County is thus compliant with the Express Powers Act. Section 4-209(b)(1) does not save Bill 4-21.

As the federal district court noted in remanding this case, there is no case law or other binding authority on the scope of Section 4-209(b)(1). Slip op. at 8. Indeed, as that court also noted (id.), the only decision to address the scope of authority bestowed by Section 4-209(b) is *Mora v. City of Gaithersburg,* 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). *Mora* held that "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation," holding further there can be no doubt that "the exceptions [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly construable." (Id.). *Mora* was discussed in plaintiffs' supporting memorandum (at 9, 32) and yet, remarkably, the County ignores *Mora*. This Court should follow *Mora* and strictly construe Section 4-209(b)(1).

In any event, Bill 4-21 goes far beyond what is authorized by Section 4-209(b). The controlling aspect of the Section 4-209(b)(1) exceptions is that the County's authority to regulate

1   is restricted to within **100 yards** of places of "public assembly." Bill 4-21 flouts that restriction

2   and effectively amends Section 4-209(b)(1) by broadly defining "place of public assembly" to

3   include every location, public **or private** "where the public may assemble." County Code, § 57-1.

4   Bill 4-21 then amends existing County law to greatly expand the specific locations that are

5   "included" within this definition. See *Tribbitt v. State,* 403 Md. 638 943 A.2d 1260 (2008) ("when

6   the drafters use the term 'includes,' it is generally intended to be used as 'illustration and not ...

7   limitation'") (citation omitted). See P. Mem. at 40-45.

8       As explained in plaintiffs' opening memorandum (P. Mem. at 10-11), the County is not at

9   liberty to expand the exceptions set out in Section 4-209(b)(1), by broadly defining the meaning

10  of these statutory terms. Even the County admits the list of locations in Bill 4-21 is "somewhat

11  larger" (Def. Mem. at 31) than that set forth in Section 4-209(b)(1). That admission is both a gross

12  understatement and fatal to the Bill, as the County has no authority to enlarge the list set out in

13  Section 4-209(b)(1) **at all**. The County is restricted to what the legislature has authorized. Whether

14  a particular location is a place of public assembly requires a case-by-case determination, not an *a*

15  *priori* redefinition by the County.

16      The County argues (Opp. Mem. at 31-32) that the "plain language" of Section 4-209(b)(1)

17  leaves it free to define a "place of public assembly" to include places where people "may assemble."

18  Yet, nothing in the language of Section 4-209(b)(1) speaks in terms of "may assemble," much less

19  purports to authorize the County to define the term so as to expand the regulatory reach of Section

20  4-209(b)(). Rather, it authorizes regulation within 100 yards of specific places and "other places

21  **of** public assembly," a term which denotes, in the present tense, **public** places that **are** typically

22  used to assemble by the public, not places that "may" be used in the future. Plaintiffs' homes and

23  business are not places where the public normally "assembles."

The County endorses (Def. Mem. at 30) plaintiffs' reliance (P.Mem. at 14) on the *ejusdem generis* canon of construction, but fails to grasp that this canon **restricts** the scope of the term "place of public assembly" to those **public** places that are **similar** to the **public** places listed in Section 4-209(b)(1), *i.e.,* similar to "a park, church, school, public building." (Id.). Again, plaintiffs' private homes and businesses are not such places. It is facially absurd to argue, as the County does (Def. Mem. at 30), that defining a "place of public assembly" to include all places, "whether the place is publicly or privately owned," where people "may assemble" is "co-extensive" with "a park, church, school or public building." Rather, the County's redefinition of "place of public assembly," was intended to be and is a dramatic expansion far beyond those locations specified in Section 4-209(b)(1). The County's expanded list of specific locations to include "privately owned" places lefts no doubt on that score.

Of course, whether a given location is a "place of public assembly" may not be clear in every case. What should be clear, however, is that the County may not redefine terms enacted by the General Assembly to mean whatever the County would like them to mean and thus broaden the scope of the exception and expand its regulatory power. By limiting the geographic scope of Section 4-209(b) to locations within 100 yards of specified places, the General Assembly obviously intended to **limit** the scope of County authority. While the County derides plaintiffs' suggestion that the term "may assemble" could include virtually every sidewalk and street where two or more persons "may" meet (Def. Mem. at 31), the County never even attempts to proffer a different, more limited definition consistent with the language of Bill 4-21. Plaintiff's interpretation is both facially reasonable (P. Mem. at 40) and consistent with the County's avowed purpose of expanding its regulatory reach.

**B.      Bill 4-21 Is Expressly Preempted By Other Maryland Statutes**

1     Defendant does not deny Bill 4-21 conflicts with no fewer than five express firearms

2    preemption statutes, one of which was enacted into law as recently as March of 2021 by the

3    Maryland General Assembly. See MD Code, Public Safety, § 5-207(a) (enacted in 2021 and

4    expressly preempting a County from regulating "the transfer of a rifle or shotgun"); MD Code,

5    Public Safety, § 5-133(a) (amended in 2003 and expressly preempting a County from regulating

6    "the possession of a regulated firearm"); MD Code, Public Safety, § 5-134(a) (amended in 2003

7    and expressly preempting a County from regulating "the transfer of a regulated firearm"); MD

8    Code, Public Safety, § 5-104 (amended in 2003 and expressly preempting a County from

9    regulating the "sale of a regulated firearm"); 1972 Session Laws of Maryland, Ch. 13, § 6

10    (expressly preempting "the right of political subdivisions" to regulate "the wearing, carrying, or

11    transporting of handguns"). See P. Mem. at 14 *et seq.*

12     Rather, the County asserts the Court should reconcile these provisions so as to give effect

13    to all of these provisions. (Def. Mem. at 32-33). We agree. See *Maryland-National Capital Park*

14    *& Planning Comm'n v. Anderson*, 395 Md. 172, 183, 909 A.2d 694 (2006). Such reconciliation is

15    easily achieved here. As outlined above and as *Mora* held, the Section 4-209(b)(1) exceptions are

16    to be narrowly construed precisely to avoid conflicts. The 100-yard limitation imposed by Section

17    4-209(b)(1) should be strictly enforced to prohibit the County from extending that limitation

18    through the artifice of defining statutory terms selected by the General Assembly. Under that

19    approach, Bill 4-21 fails, as the Bill impermissibly reaches into any place where people "may

20    assemble," which is literally everywhere in the County, far beyond the 100-yard distance specified

21    in Section 4-209(b)(1). Such reach effectively nullifies all these other preemption provisions in

22    Montgomery County. Manifestly, that result is contrary to any reasonable construction of

23    legislative intent. See *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186 (2005)

("The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.").

The County also contends Section 4-209(b)(1) trumps all these statutes because four of these five statutes were originally enacted prior to the 1985 enactment of Section 4-209. (Def. Mem. at 34). In particular, the County places heavy reliance on a 1991 Attorney General Opinion that purports to apply the general canon of construction that a later enacted law controls over an earlier enacted law. Yet, the County largely ignores plaintiffs' point (P. Mem. at 18), that all these preemption provisions were repealed and reenacted in 2003 by the General Assembly, **after** the 2002 recodification of Section 4-209. See 2003 Maryland Laws Ch. 5. The canon that later enacted statutes control over earlier statutes is based on the notion that such legislative action is an indication of legislative intent. Here, the 2003 legislation expressly **repealed** earlier versions of these preemption provisions and enacted **new** versions with **new** language. (Id.). That legislative action post-dates the 1985 enactment of Section 4-209.

In so doing, the General Assembly was obviously fully aware of the provisions of Section 4-209, which had been recodified without change a year earlier in 2002. While the Revisor's notes suggest that parts of these 2003 statutes were intended to be enacted without substantive change from earlier versions, that point merely means the preemption provisions were not intended to be substantively limited in their reach by any prior legislation. What controls is that these preemption provisions were repealed and reenacted in 2003 with new language, **after** the 2002 recodification of Section 4-209, and that reality necessarily embodies a legislative intention to give these preemption provisions full effect, notwithstanding the 2002 recodification of Section 4-209.

Significantly, each of these newly enacted preemption provisions in 2003 preempt County regulation of "regulated firearms." The term "regulated firearms" did not exist in 1985, when

- Page 10 -

Section 4-209 was enacted. Rather, that term was first used in 1996. See 1996 Session Laws, Ch. 562. The 2003 repeal and enactment of these preemption provisions shows that the General Assembly adopted a comprehensive approach to preemption of local regulation of "regulated firearms." Again, that 2003 legislation is later than the General Assembly's earlier codification of Section 4-209 in 2002.

The weakness of defendant's argument is starkly demonstrated by how defendant attempts, but fails, to deal with the preemption provisions of MD Code, Public Safety, § 5-207(a), a new provision enacted in 2021. Ignoring its now inconvenient argument that the later enactment governs, defendant contends that Section 5-207(a) should not be read to be an "implied repeal" of Section 4-209(b). (Def. Mem. at 35). That contention is makeweight. At the least, Section 5-207 superseded Section 4-209 by virtue of being enacted after Section 4-209. More fundamentally, this 2021 enactment of Section 5-207(a) shows the General Assembly's renewed commitment to preemption in general, as that preemption provision is plainly modeled after the other preemption provisions, discussed above, which were repealed and reenacted in 2003. That suggests, once again, that state-wide preemption provisions should be given preference and the exception provisions of Section 4-209(b) should be narrowly construed, as *Mora* held.

The County also argues (Def. Mem. at 33) in cases of conflict, the more specific statute controls over the more general statute. Again, we agree. See P. Mem. at 14-15. But the County errs in asserting Section 4-209(b) is more specific and thus controlling. Each of the preemption statutes, listed above, addresses a very specific subject matter, and purports to impose an absolute preemption as to that specific subject matter and activity. For example, three of the five provisions address preemption of a particular type of activity (possession or transfer or sale) with respect to a "regulated firearm." The fourth provision preempts local regulation with respect to "the wearing,

carrying, or transporting of handguns" which are also "regulated firearms" under Section 5-101(r)(1) of the Public Safety Article.

The fifth provision, Section 5-207(a), preempts County regulation of the "transfer of a rifle or shotgun," which is also very specific, both as to the subject matter (rifle or shotgun) and the activity (transfer). In contrast, Section 4-209(b)(1) grants limited exceptions from the otherwise broad preemption provisions of Section 4-209(a), which address **all types** of firearms and **all types** of activities, *viz,* "the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation" of "a handgun, rifle, or shotgun" and "ammunition" for these types of firearms. By any measure, the specialized preemption provisions are more specific than Section 4-209.

**C.      Bill 4-21 Is "Inconsistent" With Other Maryland Statutes.**

**1.      Bill 4-21's reach into private homes and businesses.**

As explained in plaintiffs' opening brief (P. Mem. at 22, *et seq*.), Bill 4-21 prohibits activities that are expressly permitted by MD Code, Criminal Law, 4-203(b). See Section 4-203(b)(6) (allowing the wear, carry, and transport of handguns "on real estate that the person owns or leases or where the person resides" without a permit and by an owner of a business without a permit "within the confines of a business establishment that the person owns or leases"); Section 4-203(b)(7) (allowing wear and carry and transport of a handgun without a permit by authorized supervisory employees of a business "within the confines" of a business). Bill 4-21 bans the possession of a "ghost gun" and the "major components" of all types of firearms on private property, in the home, and it requires a business owner and "one" supervisory employee of the business to obtain a carry permit for possession of "one" firearm at the business. It also reaches and regulations mere possession of all firearms on private property. All of this is inconsistent with State law.

1   Indeed, Section 4-203(b)(6), exempts wear, carry and transport of a handgun on any "real

2   estate that the person owns or leases or where the person resides," while County Code, § 5-11(b)(3)

3   exempts only the possession of a "firearm" or ammunition "in the person's own home," and thus

4   is far narrower than the possession, wear, carry or transport of a *handgun* authorized by Section 4-

5   203(b)(6). Indeed, in limiting the exemption for possession of all "firearms" to the interior of one's

6   "own home," Section 5-11(b) allows Section 5-11(a) to reach possession of a *long gun* anywhere

7   on any private property, including private property owned or leased by the home owner. As noted,

8   Bill 4-21 amends Section 5-11(a) to reach  such private property as it redefines a "place of public

9   assembly" to include places where the public "may assemble," **regardless** of "whether the place

10   is publicly or privately owned." Yet, as explained *infra* (at 18-20), nothing in the comprehensive

11   regulatory scheme for firearms enacted by the General Assembly regulates (much less bans) the

12   otherwise lawful possession of a long gun on any private property, much less on private property

13   a person "owns or leases" or where the person "resides."

14   Similarly, the exemption in County Code, § 5-11(b)(4), not only requires the business

15   owner and the supervisory employee to obtain a carry permit, it limits the business owner to "one"

16   firearm and ammunition for that "one" firearm, and further limits the exemption to "one"

17   supervisory employee. Yet, nothing in Section 4-203(b)(6) limits the owner to "one" firearm, much

18   less ammunition for that "one" firearm. Nothing in Section 4-203(b)(7) limits the owner to "one"

19   authorized supervisory employee. As noted, State law does not regulate the possession of a loaded

20   or unloaded long gun on private property. Yet, Section 5-11(b)(4) would ban "possession" of any

21   "firearm," including a *long gun*, by a business owner or an authorized supervisory employee unless

22   these persons had a State Police-issued permit to wear, carry or transport *a handgun*. The State

23   Police do not issue handgun carry permits for such purposes under MD Code, Public Safety, §5-

- Page 13 -

306. Such regulatory provisions are inconsistent with the foregoing provisions of Section 4-203(b) and State law in general, and thus violate the Express Powers Act. See P. Mem. at 8.

The County wrongly argues these conflicts do not exist because they are supposedly based on plaintiffs' "overbroad reading" of the Bill's definition of "place of public assembly" as encompassing most if not all of Montgomery County. In essence, the County is contending its definition of "place of public assembly" does not reach into homes and businesses. (Def. Mem. at 39). Yet, the ban on "ghost guns" in the home is **expressly** stated in County Code, Section § 57-11(b)(3), and thus necessarily embodies the County's intent to reach into the home. The ban on possession of "ghost guns" in the mere "presence" of a minor likewise easily reaches into the home. County Code, § 57-7(d). The County does not deny that it amended Section 57-11(a) to reach and regulate possession of all firearms (including long guns) on "privately owned" property. These express bans make clear the County fully intended to reach into the sanctity of the home, including all property owned or leased by a person or where a person resides. The same point is equally true for the Bill's **express** regulation of business owners and supervisory employees in County Code, § 57-11(b)(4). The County has not disputed the Verified Complaint's factual allegations that each of the individual plaintiffs' homes (save that of plaintiff Carlos Rabanales) and business locations are "arguably within 100 yards of a place of public assembly" as defined by Bill 4-21. Each of these plaintiffs is thus regulated by Bill 4-21 in a manner inconsistent with State law.

Home possession of firearms is also constitutionally protected by *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), which struck down DC's ban on handguns and held that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (Emphasis added). Plaintiffs thus argued that this Court should interpret Section 4-209(b) narrowly so as to avoid that constitutional issue. See

1   P. Mem. at 33. Section 4-209(b)(1) is thus best read, consistent with its text and purposes, to govern

2   **public** areas within 100 yards of "a place of public assembly," not private homes and businesses

3   or private land not normally open to "public assembly." Such private homes, businesses and land

4   are not akin to a "park, church, school, public building" specified in Section 4-209(b)(1)(iii). The

5   rule is "[c]ommon sense must guide us in our interpretation of statutes, and 'we seek to avoid

6   constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Marriott*

7   *Employees Federal Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 445, 697 A.2d

8   455 (1997) (quoting *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994). Defendant's response

9   (Def. Mem. at 31) that a "church" is private and thus Section 4-209(b)(1) allows it to reach into all

10   **other** types of private property is utterly untenable under this principle.

11        The County concedes any reach into the home would raise the constitutional issue, but

12   asserts the right does not obtain because plaintiffs could protect themselves with other types of

13   firearms. (Def. Mem. at 38 n.21). That "use other guns" argument was expressly rejected in *Heller*,

14   554 U.S. at 629, with respect to handguns, and has yet to be accepted by the Supreme Court or by

15   **any** lower court with respect to "ghost guns" or "major components of all types of firearm banned

16   by Bill 4-21 in the home.[1] Defendant's argument is also not responsive to plaintiffs' point that

17   Section 4-209 should be interpreted narrowly to **avoid** this serious constitutional issue. Maryland

18

19   _____

20

21   [1] The District of Columbia recently settled a federal lawsuit, *Heller v. District of Columbia*,
       No. 21-02376 (D.D.C., filed Sept. 08, 2021), in which the DC ban on "ghost guns" was challenged

22   under the Second Amendment, by enacting new legislation that protected both the right of
       possession and the Second Amendment right to build firearms for personal use. See Ghost Gun

23   Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code
       § 7-2502.02 (December 13, 2021).

1    law requires no less. See, e.g., *Schochet v. State*, 320 Md. 714, 730, 580 A.2d 176 (1990) ("a statute

2    will be construed so as to avoid a serious constitutional question").

3         Also flawed is the County's contention that Section 4-203(b) is irrelevant because it was

4    enacted in 1972, before the enactment of Section 4-209. First, the Court has a duty to reconcile

5    these statutes, rather hold that one statute or the other is completely ousted. Second, in any event,

6    the General Assembly revisited and revised Section 4-203 with the enactment of the Firearms

7    Safety Act of 2013, 2013 Maryland Laws, Ch. 427, and elected not to change any of the specific

8    provisions on which plaintiffs rely here. The general rule is that "[w]here sections of a statute have

9    been amended but certain provisions have been left unchanged, we must generally assume that the

10   legislature intended to leave the untouched provisions' original meaning intact." *American Cas.*

11   *Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994). In cases of conflict, that intent

12   should be controlling over a statute, such as Section 4-209, that was last amended in 2010, in a

13   revision that **further restricted** the County's authority under Section 4-209(b) by adding new

14   subsection (b)(3). See 2010 Session Laws, Ch 712. That 2010 legislation, cited by defendant (Def.

15   Mem. at 35 n.18), thus hardly supports a broad reading of Section 4-209(b)(1).

### 2.    Bill 4-21's provisions with respect to minors

17        As set out in plaintiffs' opening brief (P. Mem. at 26, *et seq.*), the Bill's provisions with

18   respect to minors are also inconsistent with MD Code, Public Safety, § 5-133(d)(2)(i), and MD

19   Code, Criminal Law, § 4-104(b)(1). Particularly egregious is the Bill's provision that "a person

20   may not even "purchase, sell, transfer, possess, or transfer a ghost gun . . . *in the presence of a*

21   *minor*." That ban on activities of an adult in the mere "presence" of a minor is not authorized by

22   Section 4-209(b). As the Attorney General's Opinion referenced by the County makes clear, the

23   exception for local regulation of minors was intended to allow a County to regulate minor **access**

1   to firearm, not adult activities in the mere "presence" of a minor. See P. Mem. at 28. The County

2   never responds to that point.

3       Indeed, interpreting this minors provision of Section 4-209(b) broadly would raise

4   profound constitutional problems concerning the constitutional rights of parents to raise their

5   children, a right recognized in *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); and

6   *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). The Court of Appeals thus

7   narrowly construes State regulations and statutes to avoid such issues. *Koshko*, 398 Md. at 422-27.

8   The County contends this right is limited to "the custody of children" (Def. Mem. at 41 n.22), but

9   that contention was expressly rejected in *Frase*, 379 Md. at 124, which held parental rights were

10  not limited to "visitation disputes," but applied broadly to "other areas of [State] interference" as

11  well. Plaintiffs relied on these holdings in *Frase* and *Koshko* (P. Mem. at 28), but defendant ignores

12  these decisions completely.

### 3.   Implied Preemption

14      As set forth in plaintiffs' opening brief (P. Mem. at 19, *et seq.*), Bill 4-21 is impliedly

15  preempted by a comprehensive scheme of regulation of the sale, possession, transfer and transport

16  by the State law. Specifically, Bill 4-21 "deals with an area in which the General Assembly has

17  acted with such force that an intent to occupy the entire field must be implied." *Howard County v.*

18  *Potomac Electric Power Co.*, 319 Md. 511, 522, 573 A.2d 821 (1990). Here, as stated in *Mora*,

19  "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation."

20  *Mora*, 462 F.Supp.2d at 689.

21      Virtually all the factors that should be considered in making that implied preemption

22  determination are present here. See *Board of County Commissioners v. Perennial Solar, LLC,* 464

23  Md. 610, 619-20, 212 A.3d 868 (2019) (collecting the case law). No municipality or county has

1   ever attempted to enact legislation remotely similar to Bill 4-21. As *Mora* indicates, the State also

2   enacted a comprehensive system regulating firearms. The State Police have exclusive control over

3   the availability of carry permits under MD Code, Public Safety, § 5-306, and the State has

4   established a comprehensive system of regulation of State licensed dealers, such as plaintiff

5   Engage Armament.[2] Regulated firearms, which are handguns under MD Code, Public Safety, § 5-

6   101(r)(1), are extensively regulated by State law, which requires a prospective purchaser to

7   complete an "application," MD Code, Public Safety, §§ 5-117, 5-118, and the application be

8   approved by the Maryland State Police, MD Code, Public Safety, § 5-120, which must conduct its

9   own background investigation of the applicant, MD Code, Public Safety, § 5-121. A purchaser

10  must wait at least 7 days, but not more than 90 days, before completing the purchase of a regulated

11  firearm, MD Code, Public Safety, § 5-123, and may only purchase one regulated firearm every 30

12  days, MD Code, Public Safety, § 5-128. No person (with few exceptions) is permitted to purchase

13  or sell a handgun unless the purchaser has a Handgun Qualification License issued by the State

14

15

16  _____

17

18      [2] See MD Code, Public Safety, § 5-106 (requiring a dealer's license issued by the State
    Police before a person may engage "in the business of selling, renting, or transferring regulated
19  firearms"); MD Code, Public Safety, § 5-107 (specifying the contents of an application for a
    dealer's license); MD Code, Public Safety, § 5-108 (requiring a background check for a dealer's
20  license); MD Code, Public Safety, § 5-109 (requiring an investigation to determine the truth or
    falsity of the information supplied and the statements made in an application for a dealer's license);
21  MD Code, Public Safety, § 5-111 (establishing the terms of a dealer's license). Dealers were
    further extensively regulated in 2013 with the enactment of the Firearms Safety Act of 2013, 2013
22  Session Laws Ch. 427 (amending MD Code, Public Safety, §§ 5-110, 5-114, 5-115, 5-146).
    Dealers are also subject to extensive regulation by the Maryland State Police, including regulations
23  controlling what firearms dealers may sell and where dealers may conduct business. See COMAR
    §§ 29.03.01.42-.57. This is as comprehensive as it gets.

Police under MD Code, Public Safety, § 5-117.1. Private sales of regulated firearms must go through the same process as dealer sales. MD Code, Public Safety, § 5-124.

In contrast, while the State requires that a private sale of a long gun to non-family members be accomplished through a NICS background check as facilitated by a licensed dealer (not the State Police), MD Code, Public Safety, § 5-204.1, the State has otherwise elected to leave the sale of long guns to federal regulation without imposing the complex overlay of State regulation applicable to regulated firearms. Similarly, the State has enacted special rules for the wear, carry, and transport of handguns, MD Code, Criminal Law, § 4-203, but not for long guns. Long guns, unlike handguns, may thus be carried and transported outside the home without a carry permit issued by the State Police and may even be possessed and carried fully loaded, except in or on a vehicle. MD Code, Natural Resources, § 10-410(c)(1).

Moreover, any otherwise qualified person may purchase as many long guns as he or she likes, without being restricted to one purchase every 30-days, and without any waiting period. A minor may freely possess a long gun under State law, but a person under the age of 21 may not possess a handgun, except under limited circumstances. MD Code, Public Safety, §5-133(d). A new resident of Maryland must register a regulated firearm within 90 days, MD Code, Public Safety, § 5-143, but need not register a long gun. A federally licensed dealer need only become a State licensed dealer to sell regulated firearms, not long guns. See MD Code, Public Safety, § 5-101(e) (defining "dealer's license"). A person who inherits a regulated firearm must complete the entire application process outlined above, MD Code, Public Safety, § 5-102, but no such requirement is imposed for long guns. The State severely punishes knowing non-compliance with laws governing regulated firearms with five years of imprisonment, MD Code, Public Safety, § 5-144, but such punishments are not applicable to long guns.

By any measure, the General Assembly has "enacted extensive and comprehensive legislation in the field" of firearms regulation. *Potomac Elec. Power Co. v. Montgomery County*, 80 Md.App. 107, 110, 560 A.2d 50 (1989). Such a system of comprehensive legislation is "the primary indicia" for determining the question of implied preemption. *Perennial Solar*, 464 Md. at 620. As noted, this comprehensive system includes multiple express preemption provisions, including Section 4-209(a), that necessarily embody the legislature's desire to exercise control over this field. This whole system of carefully calibrated regulation is contradicted by Bill 4-21's undifferentiated, County-wide regulation of the sale, transfer, possession or transport of a "handgun, rifle, or shotgun." County Code, 57-11(a). For example, it is apparent that State law sharply distinguishes between "regulated firearms" and long guns. It is equally apparent that Bill 4-21 treats all firearms the same. The resulting dual regulatory system virtually ensures "confusion" among ordinary, law-abiding persons who live in or travel through Montgomery County. *Potomac Electric*, 80 Md. App. at 110.

Defendant does not deny the comprehensive nature of State regulation, but justifies Bill 4-21 by asserting the General Assembly has authorized local regulation in Section 4-209(b). (Def. Mem. at 37). That assertion misses that point. The State has occupied the field and thus preempted regulation of firearm possession, sale, transfer, and transport except in the very narrow areas permitted by Section 4-209(b). As explained above, there can be little doubt that Bill 4-21 reaches far beyond these very limited exceptions to achieve near County-wide, across-the-board regulation of firearms of all types. See P. Mem. at 31. In an Attorney General Opinion not cited by the County, the Attorney General "cautioned" against county regulations like Bill 4-21, stating that Section 4-209(b)'s "authorization for local regulation 'with respect to minors' cannot be a pretext for regulation of adults' access to handguns." 82 Op. Att'y. 84, 86 (1997). As the Attorney General

- Page 20 -

stated, "[t]he Legislature could not have intended to authorize localities to achieve indirectly what they may not achieve directly: across-the-board regulation of firearms." (Id.). Here, Bill 4-21 does precisely that.

*State v. Phillips*, 210 Md. App. 239, 63 A.3d 51 (2013), on which defendant also relies (Def. Mem. at 37), is not to the contrary. In *Phillips*, the issue was whether Baltimore City's ordinance requiring gun offenders to register with the Police Commissioner was impliedly preempted. The court cited the preemption provisions of Section 4-209, but noted the complainant in that case "does not contend, nor could he that the Act is expressly preempted by conflict," because the Act at issue "does not regulate the possession or sale of a firearm." (210 Md.App. at 280). Here, of course, Bill 4-21 does "regulate the possession or sale of a firearm." *Phillips* provides no guidance on whether such a county law is preempted.

## II.   BILL 4-21 IS NOT A LOCAL LAW (COUNT I)

As detailed in plaintiffs' opening brief (P. Mem. at 31), Bill 4-21 is not a "local law" within the meaning of Article XI, § 3. It should be obvious the regulation of firearms in the manner attempted by Bill 4-21 "deals with the general public welfare, a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386 (1976). Thus, "some statutes, local in form, have been held to be general laws, since they affect the interest of the whole state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). We stress again that Bill 4-21 is not limited to "ghost guns," but rather broadly regulates all firearms and "major components" throughout the County. See County Code, § 57-11(a). Such regulations "affect the interest of the whole state."

1    The result is the same even if Bill 4-21 is viewed as a "ghost gun" ordinance. As noted in
2    plaintiffs' opening brief (P. Mem. at 34), the General Assembly has considered State-wide
3    regulation of "ghost guns" in the last three legislative Sessions. By the end of this legislative
4    Session, the General Assembly will likely have enacted a "ghost gun" law. See Senate Bill 387,
5    https://bit.ly/3HsrZBj, and the cross-filed House Bill 425. https://bit.ly/3C7rgEE. HB 425 has just
6    received a favorable report from House Judiciary Committee and soon will be voted on in the
7    House of Delegates. https://bit.ly/3C7rgEE. The Attorney General and legislative leaders have
8    called for the enactment of this legislation, and action by the General Assembly on these bills is
9    considered quite likely. See https://bit.ly/3psu2z8. These bills seek to incorporate the approach
10   taken by the ATF in its proposed rule that will be issued, in final form, not later than June of 2022.
11   See 87 Fed. Reg. at 5111 (January 31, 2022), an approach not followed by Bill 4-21. These bills
12   also create a pathway for continued possession of homemade firearms by current owners, a
13   provision in direct conflict with the approach followed by Bill 4-21. Contrary to Bill 4-21, these
14   bills do not regulate "component" parts of firearms. These bills embody a recognition that "ghost
15   guns" are a matter of State-wide concern and enactment of these bills will bring Bill 4-21 into
16   direct conflict with State law in violation of the Express Powers Act.

17       Defendant does not address plaintiffs' reliance on the test articulated in *Steimel* and *Cole.*
18   Defendant ignores *Cole* entirely and cites *Steimel* only for a different proposition, *viz*., that a local
19   law may not be "drawn" to apply to two more geographical subdivisions of the State. (Def. Mem.
20   at 17). As noted, *Steimel also* states a law is a prohibited "general law" if it "*deals with* the . . . a
21   subject which is of significant interest not just to any one county, but rather to more than one
22   geographical subdivision, or even to the entire state." *Steimel*, 278 Md. 5 (emphasis added). *Cole*
23   referenced this test and expressly endorsed *Norris v. Mayor & City Council of Baltimore*, 172 Md.

1  667, 192 A. 531, 538 (1937); *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66 (1891); *Gaither v.*

2  *Jackson*, 147 Md. 655, 128 A. 769 (1925); and *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 (1936).

3  In each of those cases, the Court struck down an ordinance because it was not a "local law." *Cole*

4  explained that the controlling "rationale" of these cases was "that while the immediate objective

5  sought to be achieved was local in character, the statutes *indirectly affected* matters of significant

6  interest to the entire state." *Cole*, 249 Md. at 434-35 (emphasis added). By ignoring this point,

7  defendant effectively concedes that Bill 4-21 "indirectly affect[s] matters of significant interest to

8  the entire state" under *Cole*.

9       Defendant tries to argue that Bill 4-21 does not sweep broadly, but that effort fails. As

10  noted, Bill 4-21expressly bans, in County Code, § 57-11(a), the sale, transfer, possession or

11  transport of **all** firearms within 100 yards of the Bill's vastly expanded "places of public assembly,"

12  subject only to a limited list of exceptions set out in County Code, Section 57-11(b). For example,

13  Section 57-11(b)(6) exempts "an unloaded firearm" from the bans imposed by Section 57-11(a).

14  Yet, even as thus limited, that ban is exceedingly broad, as Section 57-11(a) could be applied to

15  ban hunting with a loaded firearm or mere possession of any loaded firearm anywhere in the

16  County, including on "privately owned" land or even at a firing range of which the County has

17  several. See P. Mem. at 25. Under Bill 4-21, "ghost guns" (or a frame or receiver of a "ghost gun")

18  may not be possessed by an adult in the mere "presence" of a minor or by an adult in the home.

19  The County has no response and thus concedes these points.

20       Such regulation of all firearms in Montgomery County "indirectly affect[s] matters of

21  significant interest to the entire State," *Cole*, 249 Md. at 434-35, because Maryland residents

22  throughout the State, as well as non-residents, may travel through Montgomery County and may

23  purchase, possess or transfer firearms and components in the County under State and federal law.

1   Bill 4-21 certainly directly and adversely affects plaintiff Carlos Rabanales, who lives in Frederick

2   County, but travels to, and works at, Engage Armament in Montgomery County. (Complaint ¶ 28).

3   State-wide protection for such commerce lies at heart of the rationale for the express preemption

4   provisions discussed above. Uniform state-wide treatment of this subject matter ensures that

5   innocent persons are not criminally ensnared by local firearms regulations that could otherwise

6   differ from county to county, city to city, town to town. For example, a person from Garrett County

7   traveling in Montgomery County cannot be expected to be aware of or comply with the manifestly

8   odd provision of Bill 4-21 that regulates all firearms at all publicly or privately owned locations

9   within 100 yards of where the public "may assemble." Again, no other jurisdiction has such a law.

10   If the County may legally enact legislation such as Bill 4-21, then other jurisdictions will likewise

11   feel free to do so with still different requirements. The potential for massive confusion and

12   discriminatory arrests and prosecutions is apparent.

13        Ignoring these considerations, the County focuses on Bill 4-21's **separate** prohibition on

14   "undetectable" guns, arguing "major components" of an undetectable gun "would be easily

15   identified as part of an "undetectable gun" and thus there is no "genuine possibility" a law

16   enforcement officer could "confuse" "ghost gun" components with the components "of an ordinary

17   firearm." (Def. Mem. at 20). Yet, the Bill, in County Code, § 57-11(a), **also** bans "ghost guns" and

18   major components of **all** firearms, not merely those which are "undetectable." A "ghost gun" is

19   defined in County Code, § 57-1, as any firearm (including an "unfinished" receiver) that lacks a

20   serial number. The term "major component" is defined in County Code, § 57-1 to include a "slide

21   or cylinder or the frame or receiver" and "in the case of a rifle or shotgun, the barrel."

22        Nothing in these definitions is limited to undetectable parts. Slides or cylinders are seldom

23   "undetectable" as they are typically made of or contain metal. The "barrel" of a shotgun or rifle is

- Page 24 -

made entirely of metal. A completely metal "ordinary firearm" may be disassembled into these parts and, once disassembled (or sold separately), those parts are indistinguishable from a "ghost gun" major component. Under County Code, § 57-11(a), any transport, transfer or possession of any of these "components" for any "handgun, rifle or shotgun" could subject a person to arrest and prosecution. A shipment or sale of such a component to or by any person, **including a licensed dealer,** would be banned as well. None of the exceptions to Section 57-11(a) set out in Section 57-11(b) even mentions "components" so the sweep of Section 57-11(a) is completely unhindered as to components. Thus, contrary to the County's assertion (Def. Mem. at 19), mere possession of a "component" is banned in the home no less than anywhere else by County Code, § 57-11(a), as the Section 57-11(b) exemption for the home is limited to "a firearm" and "ammunition" and the "major components" banned by Bill 4-21 (other than a frame or receiver) are simply not "firearms" under State and federal law. See P. Mem. at 5, 45.

These "major components" of an "ordinary firearm" are not serialized, and a slide, barrel, or a cylinder can be used to build a completely legal firearm that is not a "ghost gun." The builder need only use serialized receivers, which are sold at Federal Firearms Licensees in Maryland and throughout the United States. See P. Mem. at 45. Bill 4-21 thus criminalizes a hobbyist whose possession of these components is completely innocent and lawful. See Maryland State Police Advisory LD-FRS-14-003 (May 16, 2014) (available at https://bit.ly/35wbl6M). It also criminalizes the business operations of all Class 07 federally licensed manufacturers in the County, including plaintiff Engage Armament, which are authorized and directed by federal law, 18 U.S.C. § 923(i), to engrave serial numbers on the receivers they manufacture. (Complaint ¶ 26). All such persons and manufacturers possess and use "major components" to legally build firearms. Plainly,

1   the County lacks the detailed understanding of firearms, the firearms industry and of federal and

2   State firearms law necessary to regulate intelligently.

3       The County likewise ignores that Bill 4-21 never defines what constitutes an "unfinished

4   frame or receiver," which Bill 4-21 includes in its definition of a "ghost gun" and thus bans

5   everywhere in the County, including in the home and in the "presence" of a minor. The lack of a

6   definition makes this ban both hopelessly vague and unknowably broad as it could include a solid

7   block of aluminum or polymer from which an actual receiver could be milled or crafted. See P.

8   Mem. at 44. Bill 4-21 would even ban Class 07 federally licensed manufacturers, like Engage

9   Armament, from making or possessing "unfinished" receivers during the manufacturing business,

10   as Bill 4-21 makes no exception for licensed dealers. See *Polymer80, Inc. v. Sisolak*, No. 21-CV-

11   00690 (3d Jud. District for Co. of Lyon, December 10, 2021), *appeal dismissed sub nom., Sisolak*

12   *v. Polymer80, Inc*., 502 P.3d 184 (Nev. 2022) (invalidating Nevada's "ghost gun" law because it

13   failed to define "unfinished" frame or receiver) (opinion attached as Exhibit C). While plaintiffs'

14   vagueness claims in Count IV have been retained by the federal district court, the *scope* of Bill 4-

15   21 is before this Court on the other Counts of the Complaint. These matters are all "of State-wide

16   concern" for the reasons set forth above.

**III.   BILL 4-21 IS A *PER SE* TAKING UNDER THE MARYLAND**
17   **CONSTITUTION (COUNT III)**

18       Count III of the complaint alleges that the County's ban on the mere possession of a "ghost

19   gun" and/or of "major components" is a Taking under the Maryland Takings Clause, Article III, §

20   40 of the Maryland Constitution, and a deprivation of property without due process under the Due

21   Process Clause of Article 24 of the Maryland Declaration of Rights. According to the County, Bill

22   4-21 is an exercise of its "police powers" and therefore not a Taking. See Def. Mem. at 4, 42. That

23

1    contention is wrong as a matter of law.

2           These provisions of the Maryland Constitution are interpreted in *pari materia* with the Fifth

3    Amendment. The Court of Appeals' decision in *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d

4    1061, 1070-72 (2002), so holds and makes clear that "[n]o matter how 'rational' under particular

5    circumstances, the State is constitutionally precluded from abolishing a vested property right." The

6    County's "rational" reasons for Bill 4-21 are thus irrelevant. If Bill 4-21 abolishes a vested property

7    right, then it is a Taking, *quod erat demonstrandum*. Bill 4-21 does precisely that.

8           In *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 968

9    (2011), the Court of Appeals explained that the "vested right" analysis is controlled by whether

10   the statute in question is retroactive, explaining that "[r]etrospective statutes are those 'acts which

11   operate on transactions which have occurred or rights and obligations which existed before passage

12   of the act.'" (30 A.3d at 969) (citation omitted). Federal law under the Fifth Amendment is in

13   accord. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992) (to escape the

14   Takings Clause, the government must show "that the proscribed use interests were not part of [the

15   owner's] title to begin with"). Here, the County does not dispute that plaintiffs possessed "ghost

16   guns" and components through "transactions" that occurred prior to the enactment of Bill 4-21.

17   The Bill is thus unquestionably "retroactive" under *Muskin* to the extent it operates on this

18   previously acquired property.

19          Likewise, there can be no dispute that the Maryland Takings Clause fully protects personal

20   property, including firearms. A "vested" right is simply a "property right under Maryland property

21   law." *Muskin*, 422 Md. at 560. In *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967

22   (2004), the Court of Appeals held Maryland's Taking Clause and Due Process Clause are violated

23   "[w]henever a property owner is deprived of the beneficial use of his property or restraints are

- Page 27 -

imposed that materially affect the property's value, without legal process or compensation." *Serio* applied that rule to hold that the refusal of a county police department to relinquish a firearm so that a convicted felon could exercise his remaining "ownership" interest violated these provisions of the Maryland Constitution. (863 A.2d at 966, 968). See also *Pitsenberger v. Pitsenberger*, 287 Md. 20, 410 A.2d 1052, 1057-1060 & n.5 (1980). The Fifth Amendment's Taking Clause likewise fully protects personal property. See *Horne v. Dep't. of Agric*., 576 U.S. 350, 358 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

In Maryland, "property is a term that has broad and comprehensive significance; it embraces '*everything which has exchangeable value* or goes to make up a man's wealth....'" *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995) (citation omitted) (emphasis added). See *Serio*, 863 A.2d at 965 (relying on *Dodds*). The rule is the same under the Fifth Amendment. *United States v. General Motors*, 323 U.S. 373, 378 (1945) ("[t]he constitutional provision is addressed to every sort of interest the citizen may possess"). It is beyond obvious that "ghost guns" are "property" under *Dodds* and *Serio* and that Bill 4-21 completely deprives the plaintiffs of "the beneficial use" of their property. Bill 4-21 not only bans "possession" of "ghost guns" and components, it bans the sale, transfer and transport as well. County Code, § 57-11(a). These property interests abolished by Bill 4-21 far exceed the "ownership" interest that *Serio* held to be protected.

Such regulation "goes too far" and is thus a *per se* Taking. A *per se* Taking is present where the regulation is so complete "that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 538 (2005). The "ouster" referenced in *Lingle* is the ouster of *possession*. Id., at 539; *Lucas*, 505 U.S. at 1014 (noting that the "practical ouster of

possession" is the "functional equivalent of" a "direct appropriation"); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (same). *Accord Steel v. Cape Corp.*, 111 Md. App. 1, 23-24, 677 A.2d 634 (1996) (following *Lucas*); *Offen v. County Council*, 96 Md.App. 526, 552, 625 A.2d 424 (1993), *rev'd in part on other grounds*, 334 Md. 499, 639 A.2d 1070 (1994) (relying on *Lucas,* noting that "'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation'") (quoting *Lucas* 505 U.S. at 1017). Bill 4-21 "ousts" plaintiffs here of their right of possession and destroys every *other* stick in the proverbial bundle of sticks that comprise property. *Compare Andrus v. Allard*, 444 U.S. 51, 65 (1979) (holding there was no Taking of personal property where the law at issue allowed the owners to retain the rights to possess, donate, and devise their property), *with Horne*, 576 U.S. at 364 (finding a Taking of personal property where there was a loss of possession and distinguishing *Andrus* on that basis).

Contrary to the County's contention, these principles are not trumped by the County's "police powers." In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982), the Supreme Court specifically noted that the lower court had determined that the alleged Taking there involved a "legitimate public purpose" and thus was "within the State's police power." The Court stated that it had "no reason to question that determination," but nonetheless expressly held that *"[i]t is a separate question* . . . whether an otherwise valid regulation so frustrates property rights that compensation must be paid." (Id). (Emphasis added). *Lucas* made the same point, holding that "the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. *If it were, departure would virtually always be allowed." Lucas*, 505 U.S. at 1027. (Emphasis added).

If "police powers" were all that mattered, then "just compensation" under the Takings Clause would hardly **ever** be available as the power to conduct **any** Taking for a "public use" is

1    "coterminous" with a jurisdiction's "police power." *Hawaii Housing Authority v. Midkiff*, 467 U.S.

2    229, 240 (1984). See also *Kelo v. City of New London,* 545 U.S. 469, 480 (2005) (same). The

3    County's "police power" argument thus proves too much, a point that *Loretto* and *Lucas* recognize.

4    As the Fourth Circuit recently concluded in *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir.

5    2021), "[t]hat Government actions taken pursuant to the police power are not per se exempt from

6    the Takings Clause is axiomatic in the Supreme Court's jurisprudence." Maryland case law is in

7    full accord. See *Muskin*, 422 Md. at 565 ("When a statute enacted under the police power,

8    purporting to regulate private property, takes private property completely from an individual for a

9    public purpose, the doctrine of eminent domain is invoked, and the State must provide just

10    compensation for the taking."); *City of Annapolis v. Waterman*, 357 Md. 484, 509, 745 A.2d 1000

11    (2000) (following *Lucas* and holding "even if there is a valid, connected public purpose, i.e., an

12    essential nexus, there still must be compensation for the taking"); *Steel*, 111 Md.App. at 17 (finding

13    the regulation to be "a reasonable application of the police power" and then moving on to the

14    "second step of the takings analysis" under *Lucas*).

15          The foregoing Takings analysis assumes that Bill 4-21 is an authorized and lawful exercise

16    of the County's police power. If, as argued above, Bill 4-21 is not a "local law" under the Maryland

17    Constitution, or is otherwise contrary to the Express Powers Act, then the deprivation of property

18    rights by Bill 4-21 would not be a "reasonable application of the police power" and would thus

19    fail at the first "step" of the Takings analysis. *Steel*, 111 Md.App. at 17. The owner is still entitled

20    to "just compensation" for such any Taking that arose from such unlawful acts. (Id.). See *Lingle*,

21    544 U.S. at 543 ("if a government action is found to be impermissible . . . that is the end of the

22    inquiry"); *Del-Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362-63 (Fed. Cir.

23    1998) (unlawful government action may still be a Taking).

1    The County likewise errs in relying on (Def. Mem. at 46) the Fourth Circuit's split decision

2    in *Maryland Shall Issue v. Hogan,* 963 F.3d 356 (4th Cir. 2020), *cert. denied,* 141 S.Ct. 2595

3    (2021) ("*MSI*"). There, the majority refused to accept the State's argument, likewise presented by

4    the County here, that "police powers" were sufficient. Rather, the majority held that the Takings

5    Clause was not violated where the State law did not require that the property in question be "turned

6    over" to the State or a third party. (963 F.3d at 366). Contrary to the County's belief, nothing in

7    that majority opinion holds that the State's police power obviates a Taking, without more. Indeed,

8    the Fourth Circuit's recent ruling in *Yawn*, noted above, makes clear that is not so. Under *Serio*, a

9    Taking under the Maryland Constitution is presented where the statute deprives the owner of the

10   "beneficial use" of the owner's property right. No change of possession is required.

11   Ignoring *Serio* and *Dodds*, the *MSI* majority also held that the statute there was not a Taking

12   under the Maryland Constitution, because it was not "retroactive" under *Muskin*. According to the

13   court, that was so because the plaintiffs there had "fair notice of the change in the law." (963 F.3d

14   at 367). The *MSI* majority reasoned that Article III, § 40, turned on whether the statute "'would

15   impair rights a party possessed when he acted, increase a party's liability for past conduct, or

16   impose new duties with respect to transactions already completed.'" (Id.), quoting *John Deere*

17   *Const. & Forestry Co. v. Reliable Tractor, Inc*., 406 Md. 139, 957 A.2d 595, 599 (2008).

18   That analysis is misguided. First, the *John Deere* decision, cited by the *MSI* majority, is

19   not a Takings case, it was a due process case. More importantly, "retroactivity" as applied to a

20   Takings challenge means the same thing it meant in *Lucas*, *viz.,* that the statute "operates" on

21   "rights . . . which existed before passage of the act." *Muskin*, 422 Md. at 555. While *Muskin* used

22   due process principles set out in *John Deere* to help define the "unique property interest" adversely

23   affected by the statute there at issue (422 Md. at 559), the Court went on to find a Taking of this

- Page 31 -

1    "unique" interest even though the Court *also* found that plaintiffs there had "fair notice." (422 Md.

2    at 558). That holding contradicts the *MSI* majority's holding that "fair notice" is enough. *Muskin*

3    applied traditional Takings principles to hold that there was a Taking, and that analysis did not

4    include the due process test applied by the *MSI* majority. (422 Md. at 563-68).

Under *Muskin*, due process principles may help define a "unique" property interest, but

6    nothing in *Muskin* purported to overrule the *Dodds* definition of "property" applied in *Serio* and

7    at issue here. See *McCree v. State*, 441 Md. 4, 16, 105 A.3d 456 (2014) (applying *Dodds* in a

8    decision that post-dates *Muskin* by three years). Under *Dodds*, there is nothing "unique" about

9    plaintiffs' property rights at issue here. Thus, unlike in *Muskin*, there is no need to resort to due

10   process nuances to define "property." It is enough that plaintiffs legally possessed their personal

11   property before Bill 4-21 was enacted. As the Court of Appeals stated in *Pitsenberger*, "possessory

12   interests in property are within the protection of the Fourteenth Amendment" (287 Md. at 29),

13   noting further that "Article III, § 40 and the Fourteenth Amendment have the same meaning in

14   reference to a 'taking' of property." (287 Md. at 33 n.5), citing *Bureau of Mines v. George's Creek*,

15   272 Md. 143, 156, 321 A.2d 748 (1974) ("The constitutional provision is addressed to every sort

16   of interest the citizen may possess.").

For the reasons set out in the dissenting opinion, the *MSI* majority's ruling that there is no

18   Taking unless the State (or third party) assumes possession of the property is also dead wrong

19   under the Takings Clause of the Fifth Amendment. See 963 F.3d at 377 (Richardson, J., dissenting).

20   The majority's analysis is incompatible with the Supreme Court's decision in *General Motors*,

21   where the Court held that "the deprivation of the former owner rather than the accretion of a right

22   or interest to the sovereign constitutes the taking." (323 U.S. at 377). The majority in *MSI* did not

23   even cite, much less discuss, *General Motors*. The majority likewise took no notice of the

- Page 32 -

statement in *Lucas* that the effect is to be determined "from the landowner's point of view." (505 U.S. at 1017). In short, from the owner's "point of view," a criminal law that bans possession deprives the owner of his or her property regardless of whether there has been an "accretion of the right" of possession to the State. See *MSI*, 963 F.3d at 375-76 (Richardson, J., dissenting). The dissent would have sustained the Maryland Takings claim for the same reasons the dissent would have sustained the Fifth Amendment claim. (963 F.3d at 376 n.12). The dissent was correct.

Defendant also relies on *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404 (4th Cir. 2007), as somehow creating a "police power" exception to the Takings Clause. (Def. Mem. at 45). That reliance is misplaced, again for the reasons set forth by the dissent in *MSI*. See 963 F.3d at 377-78 (Richardson, J., dissenting). Any such interpretation of *Holliday* is likewise precluded by the Fourth Circuit's recent and subsequent ruling in *Yawn*, noted above, which dismissed as contrary to Supreme Court jurisprudence the notion that "police power" is a complete defense to a Takings claim. *Yawn*, 1 F.4th at195. This Court should follow the dissent's Takings analysis and the *Yawn* ruling, not the majority's flawed approach.

In any event, this Court is not bound by lower federal court decisions and thus must address this question *de novo. Pope v. State*, 284 Md. 309, 320 n.10 396 A.2d 1054 (1979) (holding that unlike the decisions of the Supreme Court of the United States, decisions of federal courts of appeal are not binding on Maryland courts); *Henry v. Gateway, Inc.*, 187 Md. App. 647, 666, 979 A.2d 287 (2009) (same); *Whalen v. HPRB*, 2020 WL 2501446 at *5 (Md. App. 2020) (same). In so doing, the Court should look to the recent decision by the Federal Circuit in which the court declined to follow the *MSI* majority's approach to property. *McCutchen v. United States*, 14 F.4th 1355, 1366 n.6 (Fed. Cir. 2021). While the Federal Circuit also declined to accept the government's reliance on its "police power," it held that the plaintiffs' challenge to a federal rule that banned

continued possession of specific personal property failed because plaintiffs did not have a sufficient *pre-existing* property interest that *pre-dated* the regulation in question. *McCutchen*, 14 F.4th at 1363-65.

That particular result in *McCutchen* is, of course, inapposite, as the plaintiffs here have fully protected, vested property rights under *Dodds* in the property acquired prior to Bill 4-21's enactment, as discussed above. However, the Federal Circuit's analysis of general Takings principles is consistent with the approach taken by the dissent in *MSI* and by *Dua*, *Muskin*, *Serio*, *Steel, Waterman* and *Offen*, discussed above. The *McCutchen* court's refusal to accept the government's "police power" argument is likewise persuasive authority on that point as is the Fourth Circuit's recent ruling in *Yawn*, noted above. These decisions and opinions should guide this Court's analysis, not the *MSI* majority's misguided approach. To date, we have found no other appellate court of any jurisdiction that has followed the *MSI* majority's outlier analysis.

In sum, this Court should declare that Bill 4-21 is a Taking under Article III, § 40 of the Maryland Constitution, and a deprivation of property without due process in violation of Article 24 of the Declaration of Rights. The appropriate relief is an injunction barring enforcement until just compensation is accorded. *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521 A.2d 313 (1986). Indeed, such relief is required by the text of Article III, § 40, which provides that "[t]he General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, *being first paid or tendered* to the party entitled to such compensation." (Emphasis added). The County has yet to pay or tender payment to plaintiffs.

Plaintiffs are entitled to just compensation under Count III for the Takings and deprivation of private property that occurred after Bill 4-21 became effective on July 16, 2021. The controlling

- Page 34 -

rule is set forth in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 320 (1987), where the Supreme Court held that the government has a "duty to provide compensation for the period during which the taking was effective." See *Steel*, 111 Md.App. at 21 (applying *First English*). The Court should apply MD Rule 2-602, find there is no just reason for delay, order the entry of final judgment granting plaintiffs declaratory and injunctive relief on Counts I, II and III, and thereafter schedule further proceedings for the determination of just compensation under *First English*.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment should be granted and defendant's motion to dismiss and for summary judgment should be denied. The Court should issue declaratory and injunctive relief as to Count III in addition to Counts I and II. Plaintiffs respectfully request an expedited hearing and a decision on these motions at the earliest practicable date.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing Plaintiffs' Opposition To Defendant's Motion For Summary Judgment And Motion To Dismiss Expedited Hearing Requested was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane         patricia.kane@montgomerycountymd.gov

Sean Charles O Hara            sean.ohara@montgomerycountymd.gov

Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANELES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

     Plaintiffs,

     v.

MONTGOMERY COUNTY, MARYLAND,

     Defendant.

Civil Action No. TDC-21-1736

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED

that:

1. Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance,

    ECF No. 18, is GRANTED IN PART and DENIED IN PART.

2. Counts 1, 2, and 3 of Plaintiffs' Complaint are severed and remanded to the Circuit Court

    for Montgomery County, Maryland.

3. This action is STAYED, and Count 4 is held in abeyance pending the resolution of Counts

    1, 2, and 3 in the state court proceeding.

4. The parties shall file a Joint Status Report every **90 days** to report on the progress of the state court proceeding.

5. Within **14 days** of the resolution of Counts 1, 2, and 3 in the state court proceeding, the parties shall file a Joint Status Report reporting on that resolution and requesting either that the stay be lifted or that this case be dismissed.

Date: February 7, 2022

THEODORE D. CHUANG
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

     Plaintiffs,

     v.

MONTGOMERY COUNTY, MARYLAND,

     Defendant.

Civil Action No. TDC-21-1736

**MEMORANDUM OPINION**

Plaintiffs have filed this civil action against Defendant Montgomery County, Maryland ("the County"), alleging that a recently enacted County ordinance regulating ghost guns and other undetectable guns violates Article XI-E of the Maryland Constitution; the Maryland Express Powers Act; the Takings Clause of the Maryland Constitution; the Due Process Clause of Article 24 of the Maryland Declaration of Rights; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Pending before the Court is Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local

**EXHIBIT B**

R. 105.6.  For the reasons set forth below, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On April 16, 2021, the County Executive of Montgomery County signed into law Bill No. 4-21, legislation passed by the Montgomery County Council to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns.  Bill No. 4-21 amended the County's existing firearms ordinance by adding such guns and their components to the list of items subject to the County's prohibitions on the transfer of guns to a minor and on the sale, transfer, possession, or transport of firearms within 100 yards of a place of public assembly.  Bill No. 4-21 also expanded the definition of a "place of public assembly" to include "a place where the public may assemble, whether the place is publicly or privately owned."  Bill No. 4-21 at 4, Compl. Ex. A, ECF No. 7.  Finally, the bill added a requirement for the Montgomery County Police Department to report annually on the availability and use of ghost guns and undetectable guns within the County.  The effective date of Bill No. 4-21 was July 16, 2021.

On May 25, 2021, Plaintiffs filed this action in the Circuit Court for Montgomery County, Maryland, alleging four counts numbered as follows:  (1) that by expanding the "place of public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland Constitution to enact local laws; (2) that Bill No. 4-21's amendments are inconsistent with and preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann., Local Gov't § 10-206 (LexisNexis 2013); (3) that Bill No. 4-21 violates the Takings Clause of the Maryland Constitution, Md. Const. art. III, § 40, and the Due Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process Clause") by depriving gun owners of property without legal process or compensation; and (4) that Bill No. 4-21's definitions of "place

2

of public assembly," "ghost gun," "major component," and other terms are unconstitutionally vague, in violation of the Maryland Due Process Clause and the Due Process Clause of the Fourteenth Amendment. Plaintiffs requested a declaratory judgment on all four counts, a preliminary and permanent injunction barring enforcement of Bill No. 4-21, compensatory and punitive damages for the Fourteenth Amendment violation pursuant to 42 U.S.C. § 1983, and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

On June 16, 2021, Plaintiffs filed an Emergency Motion for Partial Summary Judgment, which was scheduled for a hearing in the Circuit Court on July 15, 2021. On July 12, 2021, before the hearing could take place, the County removed the case to this Court pursuant to 28 U.S.C. § 1441 based on federal question jurisdiction.

## DISCUSSION

In their Motion, Plaintiffs argue that the state law claims in this case should be severed and remanded to state court because (1) severance and remand is mandatory under 28 U.S.C. § 1441(c); and (2) remand is warranted under 28 U.S.C. § 1367 because the state law claims predominate and this case raises novel or complex issues of state law. Plaintiffs also request that the remaining federal claim be stayed pending completion of the state court proceedings on the remanded state law claims.

## I. Section 1441

Plaintiffs first argue that severance and remand is mandatory under 28 U.S.C. § 1441(c), which provides, in relevant part, that:

(1)  If a civil action includes—

(A)  a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and

> (B)    a claim not within the original or supplemental jurisdiction of the
> district court or a claim that has been made nonremovable by statute,
>
> the entire action may be removed if the action would be removable without
> the inclusion of the claim described in subparagraph (B).
>
> (2)    Upon removal of an action described in paragraph (1), the district court shall
> sever from the action all claims described in paragraph (1)(B) and shall
> remand the severed claims to the State court from which the action was
> removed.

28 U.S.C. § 1441(c).

This provision does not require remand. Although it requires severance and remand of "all claims described in paragraph (1)(B)," which as relevant here consists of any "claim not within the original or supplemental jurisdiction of the district court," such severance is not required because all of the state law claims are within this Court's supplemental jurisdiction. 28 U.S.C. § 1441(c)(2). A federal district court has supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, where the Court has original jurisdiction over Plaintiffs' federal due process claim and the state law claims provide different legal theories by which Plaintiffs challenge the same County ordinance at issue in the federal claim, the Court concludes that it has supplemental jurisdiction over the state law claims. Plaintiffs do not argue otherwise. Because the state law claims here are not subject to the mandatory severance and remand provision of 28 U.S.C. § 1441(c)(2), remand is not warranted on that basis.

## II.    Section 1367

That severance and remand is not mandatory does not the end the inquiry. Historically, pendent or supplemental jurisdiction has been "a doctrine of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (stating that 28 U.S.C. § 1367 codified the doctrine of pendent jurisdiction developed in *Gibbs*).

Under § 1367, a federal district court "may decline to exercise supplemental jurisdiction over a claim" if:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    the district court has dismissed all claims over which it has original jurisdiction, or

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Pursuant to this provision, a court has the "inherent power . . . in cases removed from State court, to remand." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001).  In deciding "the additional question of whether to remand" claims to state court, a court should consider "principles of economy, convenience, fairness, and comity" and "whether the efforts of a party in seeking remand amount to a 'manipulative tactic.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)).  Here, Plaintiffs argue that declining supplemental jurisdiction and remanding the state law claims is warranted because the state law claims substantially predominate over the federal claim, and they raise a novel or complex issue of state law.

### A.    Substantially Predominate

The United States Supreme Court has stated that federal district courts should decline to exercise jurisdiction over state law claims if the state law issues substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs,* 383 U.S. at 726.  "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage," a district court "may fairly" decline to exercise jurisdiction over the state claim. *Id.* at 727.  State law claims may predominate when "the state law claims are more complex or require more judicial resources to adjudicate or are more

5

salient in the case as a whole than the federal law claims." *Diven v. Amalgamated Transit Union Int'l*, 38 F.3d 598, 602 (D.C. Cir. 1994) (citation omitted). Here, while Plaintiffs do not suggest that the proof required differs for the state law claims as compared to the federal claim, the scope of the issues raised and the comprehensiveness of the remedy sought illustrate that the state law claims substantially predominate over the federal due process claim.

Although the County argues that the scope of the issues is "essentially identical across all four counts" because both the federal claim and the collection of state law claims would require analysis of the term "place of public assembly" as defined in Bill No. 4-21, Opp'n Mot. Remand at 8-9, ECF No. 19, the Court does not construe the scope of the state law claims so narrowly. The state law claims collectively constitute a frontal attack on the validity of Bill No. 4-21 based on an array of state constitutional and statutory arguments. Counts 1 and 2 argue that the County's enactment of Bill No. 4-21 violated provisions of the Maryland Constitution and state statutes that limit the authority of the county to legislate on firearms. Count 2 in particular asserts that numerous different provisions of Bill No. 4-21 conflict with or are preempted by state law, in violation of Maryland's Express Powers Act. Count 3 asserts that all of the limitations on gun possession throughout Bill No. 4-21 violate state constitutional provisions barring the taking of private property without due process and compensation. In contrast, the sole federal claim in Count 4 is limited in scope. It challenges the County's definition of specific words and phrases such as "public," "may assemble," "library," "recreational facility," "park," "unfinished receiver," and "major component" as unconstitutionally vague and overly broad as to invite arbitrary enforcement, in violation of the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 58-62, ECF No. 7.

6

Moreover, the state law claims are more complex and would likely require more judicial resources to resolve. While the federal claim would primarily require the Court to examine specific phrases in Bill No. 4-21, the state law claims require the Court to look beyond the text and analyze the interplay between the bill and various Maryland constitutional and state law provisions. For example, the claim in Count 1 that the County is not authorized to enact this legislation requires analysis of whether it is the type of "local law[]" permitted by Article XI-E of the Maryland Constitution. Md. Const. art. XI-E. In response, the County states that its authority to legislate in this instance arises not from Article XI-E, but instead from Article XI-A, thus requiring the Court to analyze both provisions to evaluate the scope of the County's authority under the Maryland Constitution. *See* Md. Const. arts. XI-A, XI-E. Count 2, which alleges that Bill No. 4-21 conflicts with and is preempted by state law, requires an analysis of the six different Maryland statutes that Plaintiffs claim to preempt or conflict with Bill No. 4-21. Although the County argues that there is no preemption because Bill No. 4-21 fits within a statutory exception permitting a county to regulate certain specific gun activities, *see* Md. Code Ann., Crim. Law § 4-209(b) (LexisNexis 2021), consideration of that argument would require the Court to separately analyze that statute and Maryland firearm preemption law more generally. Further, the state constitutional claims in Count 3 add another complex legal analysis relating to two state constitutional provisions to the range of issues presented by the state law claims.

The comprehensiveness of the remedies sought also illustrates that the state law claims predominate. Plaintiffs primarily seek declaratory and injunctive relief against enforcement of Bill No. 4-21. If successful on the state law claims, the scope of that relief would be broader than what they could obtain by prevailing on the federal claim alone. For example, Plaintiffs' success on the federal due process claim likely would not bar enforcement of provisions of Bill No. 4-21

7

unconnected to the terms challenged as unconstitutionally vague, such as the limitations on transferring to a minor ghost guns not containing an unfinished receiver or guns made through a 3-D printing process. Because resolution of the federal claim in Plaintiffs' favor would still require consideration of whether the state law claims invalidate other provisions of Bill No. 4-21, the remedy sought through the federal claim is less comprehensive than the remedy sought through the state law claims.

For these reasons, the Court concludes that the state law claims "substantially predominate" over the federal claim. The state claims "constitute[] the real body of [the] case," and the federal claim here is "only an appendage." *Gibbs*, 383 U.S. at 727.

### B.  Novel or Complex Issue of State Law

As for whether the state law claims present a novel or complex issue of state law, the Court also finds that at least one of Plaintiffs' claims presents such an issue, specifically, Plaintiffs' assertion in Count 2 that Bill No. 4-21 is preempted by state law. In Count 2, Plaintiffs challenge Bill No. 4-21 based on the assertion that six different Maryland state statutes conflict with or preempt it in some way. Although the County argues that the preemption issue is limited to the question of whether Bill No. 4-21 fits within the explicit statutory exception to preemption of firearms regulations which permits a county to regulate the "purchase, sale, transfer, ownership, possession, and transportation" of firearms "with respect to minors" or within 100 yards of a "place of public assembly," Md. Code Ann., Crim. Law § 4-209(b)(1), the existence of this provision does not resolve the question of whether Bill No. 4-21 conflicts with the other allegedly preemptive or conflicting state statutes, or how such conflicts should be reconciled with section 4-209(b). The parties have not cited, and the Court has not identified, any controlling authority applying that statutory exception or meaningfully interpreting its scope.

8

Notably, the existing law relating to whether Maryland has preempted local government laws regulating firearms, including the coverage of section 4-209, is not easily navigated. In *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675 (D. Md. 2006), a judge in this District analyzing section 4-209 and several other state statutory provisions that preempt local authority to regulate firearms concluded that "[s]tate law has so thoroughly and pervasively covered the subject of firearms regulation and the subject so demands uniform state treatment, that any non-specified regulation by local governments is clearly preempted." *Id.* at 687, 690 (holding that the City of Gaithersburg's questionnaire, which requested more information for the return of a firearm than that required under state law to possess a firearm, was preempted by state law), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). The court further concluded that "there can be no doubt that the exceptions to otherwise blanket preemption" in Maryland state law "are narrow and strictly construable." *Id.* Subsequently, in *State v. Phillips*, 63 A.3d 51 (Md. Ct. Spec. App. 2013), the Maryland Court of Special Appeals held that a local ordinance that was not expressly preempted by section 4-209(a) was not impliedly preempted because Maryland "ha[d] not so extensively regulated the field of firearm use, possession, and transfer that all local laws relating to firearms are preempted." *Id.* at 56, 75-76 (holding that a Baltimore City ordinance requiring certain persons convicted of gun offenses to register with the police commissioner was not void based on preemption). Against this landscape, another judge in this District has noted that there is a "lack of clarity regarding the preemption of local law" on firearm use, possession, and transfer. *Blue v. Batth*, No. GJH-15-1024, 2017 WL 4162244, at *5 n.7 (D. Md. Sept. 18, 2017).

Significantly, while the County cites to two opinions from the Maryland Attorney General addressing preemption of local gun laws, no party has cited to authority from the Maryland Court of Appeals interpreting section 4-209. The sole Maryland Court of Appeals case referenced by

the County, *Montgomery County v. Atlantic Guns, Inc.*, 489 A.2d 1114 (Md. 1985), interprets a predecessor preemption provision and is thus of limited value. *See id.* at 1115, 1118 (finding a county ordinance regulating loaded handguns to be preempted because the express preemption provision barring regulation of handguns applied to the regulation of ammunition).

Against this backdrop of limited relevant Maryland case law, the preemption issue presented is a matter of first impression. The Maryland courts have yet to consider and resolve a challenge to Bill No. 4-21, on preemption grounds or otherwise, and they have not considered Plaintiffs' specific theory under Count 2 that the County's broadened definition of "place of public assembly" has expanded the regulation of firearms beyond what is permitted by section 4-209(b). Under these circumstances, the Court finds that the state law claims involve a "novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Because the Court finds that the state law claims both substantially predominate over the federal claim and that at least one state law claim involves a novel or complex issue of state law, the Court may decline to exercise supplemental jurisdiction over the state law claims.

### C.    Other Considerations

In determining whether to remand, the Court also considers the principles of economy, convenience, fairness, and comity and whether the party seeking remand is engaged in a manipulative tactic. *Hinson*, 239 F.3d at 617. The Court does not find that Plaintiffs have engaged in a manipulative tactic in seeking remand, so the Court will focus on the other factors.

Principles of economy and convenience generally support keeping all claims in one forum. In this instance, however, Plaintiffs request a remand of state law claims and a stay of the sole remaining federal claim until the state claims are resolved. This approach would mitigate concerns about economy and convenience by preventing the County from having to litigate simultaneously

in two separate forums and, depending on the proceedings in state court, may obviate the need to litigate the federal claim to completion. Moreover, because this action is in the early stages of litigation and the parties do not anticipate discovery, there is no concern about having wasted judicial resources by remanding at this stage of the action.

The County argues that because the legal theories advanced by Plaintiffs "contain significant overlap," there is a risk that issues of estoppel may complicate adjudication of the federal claim. Opp'n Mot. Remand at 10. The Court finds that Plaintiffs' claims in Counts 1-3 are different enough in nature and scope from the federal claim that this risk is not significant. Although this risk may be greater as to Count 4, in which the federal and state vagueness claims are largely duplicative, the Court will address this risk by exercising supplemental jurisdiction over the state law claim in Count 4 and declining to sever and remand that claim.

Most importantly, the Court finds that any benefits of judicial economy or convenience that could be achieved by keeping all of the claims in one forum are significantly outweighed by the principles of fairness and comity, which favor remand of the state law claims. This litigation is at its core about whether a local government ordinance regulating firearms violates the Maryland Constitution and state law restrictions on such local government provisions. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. Accordingly, the Court concludes that interests of comity outweigh any minimal federal interest in having this Court insert itself into what is primarily a dispute over the scope of a local government's authority to legislate under state law. *See, e.g., Kimberlin v. Nat'l Bloggers Club*, No. GJH–13–3059, 2015 WL 1242763, at *18 (D. Md. Mar. 17, 2015) (declining to exercise supplemental jurisdiction because "no federal policy . . . would be furthered" by the Court

presiding over state law claims and one federal claim). The Court will therefore decline to exercise supplemental jurisdiction over Counts 1-3 and will sever those counts and remand them to state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Sever and Remand All State Law Claims will be GRANTED IN PART and DENIED IN PART in that the Court will decline to exercise supplemental jurisdiction over the claims in Counts 1, 2, and 3, which will be severed and remanded to the Circuit Court for Montgomery County, and Count 4 will be stayed and held in abeyance pending the state court's resolution of Counts 1, 2, and 3. A separate order shall issue.

Date: February 7, 2022

THEODORE D. CHUANG
United States District Judge

1  Case No.  21-CV-00690

2  Dept. No.  I

3  The undersigned affirms that this document
4  does not contain the social security number
   of any individual.
5

**FILED**

2021 DEC 10  AM 9: 54

TANYA SCHRINE
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT

*Kathy Thomas*

6

## IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

7
## IN AND FOR THE COUNTY OF LYON

8

POLYMER80, INC.,

9
           Plaintiff,

10

11         vs.

12  STEPHEN SISOLAK, Governor of Nevada, AARON
    FORD, Attorney General of Nevada, GEORGE
13  TOGLIATTI, Director of the Nevada Department
    of Public Safety, MINDY MCKAY, Administrator
14  of the Records, Communications, and Compliance
15  Division of the Nevada Department of Public
    Safety,
16
           Defendants.
17  _____/

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER GRANTING SUMMARY
JUDGMENT IN FAVOR OF
PLAINTIFF, POLYMER80, INC.**

18
        This matter is before the Court upon the parties' competing Motions for Summary Judgment
19
20  both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter

21  was set for argument on November 23, 2021.  Plaintiff was present and represented by Brad

22  Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

23  of Greenspoon Marder LLP, who was present in Court.  The Defendants were represented by Craig

24  A. Newby, Esq., Deputy Solicitor General, who was present in Court.

25      This Court, having reviewed and considered the parties' respective motions and oppositions

26  for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing
27
    upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and
28

**EXHIBIT  C**                      Page 1 of 17

1   good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW,
2   AND ORDERS.

3                                          **I**

4                          **PROCEDURAL HISTORY**

5

6          During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB
7   286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts
8   relating to unfinished frames or receivers under certain circumstances; … providing penalties; and
9   providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB
10  286 into law on June 7, 2021.

11         On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against
12  Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada,
13  George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay,
14  Administrator of the Records, Communications, and Compliance Division of the Nevada
15  Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and
16  3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the
17  State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a
18  Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and
19  a Permanent Injunction barring enforcement of the new law.

20         On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and*
21  *Preliminary Injunction.* After briefing and a hearing, this Court, on July 16, 2021, entered its *Order*
22  *Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That
23  Order is currently pending appeal at the Nevada Supreme Court.

24

25

26

27  _____

28  [1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286
    Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021, that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited trial date of November 30, 2021. That Order also provided that the parties could engage in discovery through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive motions. By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop the evidentiary record to be presented upon motions for summary judgment and/or at trial.

In the ensuing months, the parties proceeded with discovery. Both Polymer80 and Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2] Pursuant to the parties' Stipulation, this Court directed that they file their oppositions to the other side's summary judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing on November 23, 2021. That hearing was held as scheduled and the Court heard substantial argument from the parties. Notably, both parties agreed at that hearing that this Court could decide this case upon the record before it at that point, and that a trial was unnecessary. At the conclusion of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment. This Order follows and memorializes that ruling.

Accordingly,

IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set forth herein and on the record at the November 23, 2021, hearing.

---

[2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an appeal from this Court's *Order Granting Preliminary Injunction*. Thereafter, Defendants filed a Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure question of law that would be resolved upon their then-pending appeal. This Court denied Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion in granting interim relief. Moreover, a stay would have only delayed a ruling on the constitutionality of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.

## II

## **CONTESTED PROVISIONS OF AB 286**

The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by adding, among others, the following provisions, which are the subject of this proceeding.

First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

> 1.      A person shall not possess, purchase, transport or receive an unfinished frame or receiver unless:
> (a) The person is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.
>
> 2.      A person who violates this section:
> (a) For the first offense, is guilty of a gross misdemeanor; and
> (b)  For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130.[3]

Plainly, this provision makes it a crime to "possess, purchase, transport or receive an unfinished frame or receiver" in the State of Nevada.

Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

> 1.      A person shall not sell, offer to sell or transfer an unfinished frame or receiver unless:
> (a) The person is:
> (1) A firearms importer or manufacturer; and
> (2) The recipient of the unfinished frame or receiver is a firearms importer or manufacturer; or
> (b)  The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.

---

[3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison and a fine of up to $5,000.00.

2.      A person who violates this section:
        (a) For the first offense, is guilty of a gross misdemeanor; and
        (b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130

This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver" in the State of Nevada.

Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or receiver" to Nevada law and defines that term as follows:

9.      "Unfinished frame or receiver" means a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.[4]

## III

### STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than simply show that there is some metaphysical doubt as to the operative facts in order to avoid

---

[4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment relating to the efficacy of those provisions.

1  summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2  724, 732 (2005) (quotations omitted). "The nonmoving party must, by affidavit or otherwise, set

3  forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4  judgment entered against him." *Id.* And, the party opposing summary judgment cannot build a case

5  on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6  *Nevada Bell*, 108 Nev. 105, 110 (1992)). Critically, the Nevada Supreme Court, as the parties have

7  acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8  Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9  *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009). As explained below, there are no

10 "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11 this action on summary judgment upon the record before it.

12  **IV**

13  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14  Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15 It manufactures, designs, and distributes gun-related products, components, and after-market

16 accessories. The legislative history reveals that AB 286 has targeted, at least partially, certain of

17 Polymer80's business products. Defendants have also admitted as much in their Answer and in their

18 moving papers. As set forth in the testimony of Assemblywoman Sandra Jauregui:

19
20     . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
    largest manufacturers of ghost guns.

21 <u>Minutes</u>, Assembly Committee on Judiciary, p.6 (March 17, 2021). Assemblyman Wheeler stated

22 therein:

23     The kit guns you called ghost guns are used by a lot of hobbyists.
24     Under federal law, those are quite legal, so outlawing them in Nevada,
    as this bill tries to do, basically puts a company [Polmer80] in my
25     district out of business. . . .
    We are going to drive a company in my district out of business, but
26     people can still buy them in Kentucky. . .

27

28

Page 6 of 17

Minutes, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

**A.    STANDING OF POLMER80**

In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.   The Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts in their Motion that they indeed have standing.

NRS 30.040 provides, in pertinent part:

> **NRS 30.040.   Questions of construction or validity of . . . statutes.**
>
> 1. Any person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

NRS 30.040(1).   In Nevada, the issue of Standing is a question of law.   *Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

> The question of standing concerns whether the party seeking relief has a sufficient interest in the litigation. The primary purpose of this standing inquiry is to ensure the litigant will vigorously and effectively present his or her case against an adverse party. Thus, a requirement of standing is that the litigant personally suffer injury that can be fairly traced to the allegedly unconstitutional statute and which would be redressed by invalidating the statute. A general interest in the matter is normally insufficient: a party must show a personal injury.

*Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct. 7, 2021), (Citations Omitted).

---

[5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286 all indicating the negative impact of the bill on their ability to conduct business in the State of Nevada.

This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the constitutionality of AB 286. Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its ongoing conduct. Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of AB 286 takes effect January 1, 2022. Accordingly, it is ripe for this Court to determine whether or not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.

Polymer80 satisfies the requirement to show that they would "personally suffer injury that can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony criminal prosecution each time they produce a product which allegedly falls under the purview of the statute. Further, Polymer80 would suffer significant economic loss as set forth in the Deposition testimony submitted, and uncontested by the Defendants. This, combined with the legislative history showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that, unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for facial invalidity of the statute – which is Polymer80's only true redress.

This Court determines that Polymer80 will suffer irreparable harm in the absence of declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice of the conduct being criminalized.[6]

---

[6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would mitigate any harm as all Polymer80 would have to do is put a serial number on its products. The

**B.     STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

The question before this Court is essentially whether or not AB 286 is unconstitutionally vague under the Due Process Clause of the Nevada Constitution.  It is undisputed that Section 3 and Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D felonies.

Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty, or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006).

> Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional.  The court must interpret a statute in a reasonable manner, that is, [t]he words of the statute should be construed in light of the policy and spirit of the law, and the interpretation made should avoid absurd results.  In reviewing a statute, it should be given [its] plain meaning and must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a provision nugatory.

*Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009).  In reviewing the statute, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).

The Nevada Supreme Court has adopted a two-pronged test for determining whether a criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

---

argument was abandoned on summary judgment.  Section 3(1)(b) and Section 3.5(1)(b) by their own terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be imprinted with a serial number.  It is undisputed that the products produced by Polymer80 are not required by federal law to have a serial number imprinted on them.

1  Constitution. *See, e.g., Flamingo Paradise Gaming,* 125 Nev. at 510; *Gallegos v. State,* 123 Nev.

2  289, 294 (2007).

3
4          A criminal statute can be invalidated for vagueness (1) if it fails to
           provide a person of ordinary intelligence fair notice of what is
           prohibited *or* (2) if it is so standardless that it authorizes or encourages

5          seriously discriminatory enforcement.

6  *Scott v. First Jud. Dist. Ct.,* 131 Nev. 1015, 1021 (2015). Although both civil and criminal statutes

7  are judged under the same test, the Nevada Supreme Court has explained:

8
9          [T]here are two approaches to a facial vagueness challenge depending
           on the type of statute at issue. The first approach arises under a facial
           challenge to a civil statute and the plaintiff must show that the statute

10         is impermissibly vague in all of its applications. In making this
           showing, [a] complainant who engages in some conduct that is clearly

11         proscribed cannot complain of the vagueness of the law as applied to

12         the conduct of others. **But, when the statute involves criminal
           penalties or constitutionally protected rights, the second**

13         **approach involves a higher standard of whether "vagueness
           permeates the text.**

14

15  *Flamingo,* 125 Nev. at 512.[7] Where a statute imposes criminal penalties, as is the case with AB 286,

16  the more exacting standard for Constitutionality is imposed.

17         Under the higher standard, the question becomes whether vagueness

18         so permeates the text that the statute cannot meet these requirements
           in most applications; and thus, this standard provides for the

19         possibility that some applications of the law would not be void, but
           the statute would still be invalid if void in most circumstances.

20
21  *Flamingo,* 125 Nev. at 507.

22

23

24  _____

25  [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed
    conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin,* 99 Nev. 336,

26  340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.,* 455 U.S. 489, 495 (1982). This
    Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly

27  proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness
    challenges need to show that the law is "impermissibly vague in all its applications."

28

In this Court's view, AB 286, a criminal enactment, fails under both prongs for various reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law. While similar, "the first prong is concerned with guiding those who may be subject to potentially vague statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of statutes." *Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

## C.   SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED

Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with fair notice of the conduct which it proscribes. The underlying purpose of this factor is to give a person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*, 123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport, receipt, transfer and sale of what the statute calls an "unfinished frame or receiver." While AB 286 purports to define the term "unfinished frame or receiver," that definition is as follows:

> [A] blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

This definition does not provide a person of ordinary intelligence with adequate notice of what AB 286 criminalizes.

As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada legislative statutory enactment. The terms used in the definition of "unfinished frame or receiver" are not defined elsewhere in the statute. These terms include - blank, casting, machined body, machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control cavity area.

The definition does not tell anyone when during the manufacturing process a blank, casting, or machined body (whatever those terms mean) has gone through the "major machining operations"

(whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct to comply with the law. As a result, this Court finds that the text of AB 286 does not provide fair notice of whatever it criminalizes. To this end, this Court asked on multiple occasions during oral argument on the Motion for Summary Judgment what those terms as used in AB 286 mean. Tellingly, the Defendants could not in any manner explain their meaning(s).

This Court inquired whether or not the common law defined the terms used in AB 286, and the response that this Court received was clearly in the negative. As such, this Court cannot use the common law to decipher, clarify, or define the inherently vague terms of AB 286. This fact distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of indecent exposure – a common law crime), where the Nevada Supreme Court found that that the common law can provide a definition as to what conduct a statute prohibits. This Court inquired as to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and, again, the answer was no. As a consequence, this case is also distinguishable from *Silverwing Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020), (Commonly accepted definition of "subdivision" contained within the State's planning and zoning statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law elsewhere defined an allegedly ambiguous term. Thus, neither the common law nor any other Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

While portions of AB 286 incorporate certain terms that are defined in federal legislation, this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal definitions relating to firearms or the Gun Control Act into AB 286. Here, the Nevada Legislature purposely included some federal definitions into AB 286 but, deliberately did not include others. From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent some legislative declaration to the contrary. Simply put, had the Nevada Legislature wished to incorporate other federal definitions into AB 286, it knew how to do so and would have done so. It

1 did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed

2 to do.[8]

3     In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the

4 same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive

5 from justice." The legislature failed to define what the term "fugitive from justice" meant in relation

6 to the statute. The District Court upheld the validity of the statute and applied the federal definition

7 of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed

8 stating:

9
10
11
12
13

> Unlike Congress, the Nevada Legislature has not defined "fugitive
> from justice." By failing to adopt the federal definition of "fugitive
> from justice" or include any definition of that phrase. . ., the
> Legislature failed to provide the public with statutory notice of what
> that term means. It could arguably encompass a wide variety of
> circumstances. . . The fact that the district court, sua sponte, adopted
> the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that
> deficiency.

14 *Gallegos v. State*, 123 Nev. @ 294-95.

15     Finally, the legislative history of AB 286 does not shed any light on the undefined terms used

16 in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates

17 that the State Legislature received comments during the legislative process that AB 286 was vague,

18 and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than

19 address the issue through comments or revising the text of AB 286, the Nevada Legislature remained

20 silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

21
22
23

24 _____

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to

25 define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the

26 hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary

27 of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

28

and undefined terms used in AB 286. It is noteworthy that the parties agreed that the legislative history for AB 286 gives this Court no information to determine what the Nevada Legislature meant when adopting and implementing the definition of "unfinished frame or receiver." Tellingly, not even Webster's Dictionary defines a majority of these terms.

Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for vagueness. This Court finds this contention unpersuasive. The criminal acts defined in Sections 3 and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the possession and sale of "unfinished frames and receivers," whatever those things may actually be. And, the person possessing or selling those "unfinished frames and receivers" need not have any particular specific intent. In fact, AB 286 only and very generally employs intent in the definition of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm." The use of the word "intended" in this definition does not create the *scienter* element defendants claim to exist within Section 3 and Section 3.5 of the bill.

Here, a literal reading of the definitional statute requires that the blank, casting or machined body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm. Nowhere in the definitional statute does it indicate who would have to have intended the unfinished frame or receiver to be transformed into a firearm. Is it the manufacturer like Polymer80? It is undisputed that it is their intent not to make a firearm. Is it the seller of a gun kit? They have no intent to make a firearm. The object itself cannot transfer specific intent to the possessor of the item.

Even if this Court were to assume an intent element was specifically meant to apply to any individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally vague. For example, if Section 3 criminalized the possession of a blank, casting, or machined body only if the person who possessed such an item (whatever it might actually be) specifically intended to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still be unconstitutionally vague.

In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

machining, and (ii) already be formed or machined to the point at which most of the major machining operations have been completed. Yet, none of these terms are defined, nor is there any way to know when "most of the major machining operations have been completed," and then what "additional machining" must still occur and when. Accordingly, any specific intent that can be read into Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB 286 still fails to provide adequate notice as to what it specifically criminalizes.

Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or common law. Consequently, the only notice of what AB 286 criminalizes is provided in the statute itself. However, the law does not provide adequate notice of what it criminalizes, given that the definition of "unfinished frame or receiver" uses a myriad undefined terms. Moreover, the combined use of these undefined terms results in an overall failure to provide a person of ordinary intelligence with fair notice of what is criminalized. As there is no well-established or ordinary meaning to the terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.

**D.      SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015). The Court finds that it is.

As explained by the Nevada Supreme Court:

> The concern under this prong is the scope of discretion left to law enforcement officials and prosecutors. Our fear is that absent adequate guidelines, a criminal statute may permit a standardless sweep, which would allow the police, prosecutors, and juries to 'pursue their personal predilections.'

*Gallegos*, 125 Nev. @ 296. (Citation Omitted)

AB 286 fails to establish clear standards that law enforcement can use to determine whether the law is violated. At its most basic, there is no clear standard for law enforcement to use to

1   determine when an "unfinished frame or receiver" comes into existence. Unlike the federal

2   regulatory process to determine whether a frame or lower receiver is considered a firearm under the

3   Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame

4   or receiver" actually comes into existence. The most any court can glean from the definition is that

5   it is something less than a firearm and more than a block of raw material. Where on the scale in

6   between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the

7   law and left to the sole discretion of law enforcement and prosecutors. When does the machining

8   process start? When does the raw material become machined and through what processes? What

9   constitutes a "major machining operation" versus machining itself? Would the "fire-control cavity"

10   be considered a "major machining operation" or is it excluded? What additional machining needs to

11   be completed? It is unclear and undefined under the statute.

12   Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike

13   as they, in their sole discretion and without guidance, could label almost anything an "unfinished

14   frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.

15   There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing

16   their personal predilections.

17   Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section

18   3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law. Therefore,

19   enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary

20   and discriminatory enforcement.

21   For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are

22   unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23   **V**

24   **ORDER AND JUDGMENT**

25   Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are

26   unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence

27   with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and

28   encourages seriously arbitrary and discriminatory enforcement.

1    Good cause appearing,

2    IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3    GRANTED.

4    IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5    DENIED.

6    IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7    Polymer80 and against Defendants; to wit,

8    IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9    Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10   State Constitution.

11   IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12   Polymer80 and against Defendants; to wit,

13   IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14   Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15   Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16   Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17   and their respective successors, officers, agents, servants, and employees and anyone acting in

18   concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19   Section 3 and Section 3.5 of AB 286.

20   IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21   this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22   exonerated and released to Polymer80 forthwith.

23   THIS IS A FINAL JUDGMENT.

24   DATED this 10th day of December, 2021.

25

26   _____
     JOHN P. SCHLEGELMILCH,
27   DISTRICT JUDGE

28

1    Case No. 21-CV-00690

2    Dept. No. I

3                                    **Certificate of Mailing**

4            I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5    Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6    mailed at Yerington, Nevada addressed to:

7    Gregory L. Zunino, Esq.
     *Emailed*: gzunino@ag.nv.gov
8

9    Brad M. Johnston, Esq.
     *Emailed: bjohnston@shjnevada.com*
10

11   James J. McGuire, Esq.
     *Emailed: james.mcguire@gmlaw.com*
12

13   Michael Patrick, Esq.
     *Emailed: michael.patrick@gmlaw.com*

14   Mark Doerr
     *Emailed: mark.doerr@gmlaw.com*
15

16   Craig A. Newby, Esq.
     *Emailed: CNewby@ag.nv.gov*
17

18

19           DATED: This _10 th_ day of December, 2021.

20

21                                              _____
22                                              Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28

**IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al**., | |
| *Plaintiffs,* | |
| **vs.** | **CASE NO.: 485899V** |
| **MONTGOMERY COUNTY, MARYLAND**, | |
| *Defendant.* | |

**ORDER AND FINAL JUDGMENT GRANTING DECLARATORY**
**AND EQUITABLE RELIEF**

1. On May 28, 2021, Plaintiffs filed a four-count Verified Complaint in this Court, seeking declaratory and equitable relief as to County Bill 4-21, which made numerous changes to Chapter 57, Weapons, of the Montgomery County Code. The law went into effect on July 16, 2021. Count I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within the meaning of Article XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted by or is inconsistent with numerous provisions of State law. Count III alleges that Bill 4-21 constitutes an illegal Taking under the Maryland Takings Clause, Article III, §40 of the Maryland Constitution, and a deprivation of property without due process in violation of Article 24 of the Maryland Declaration of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

2. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint and a hearing was

**- 1 -**

scheduled for July 15, 2021. Plaintiffs at that time did not seek relief under Count III of the Complaint.

3.   On July 12, 2021, in lieu of answering the Complaint, defendant removed the entire case to federal district court pursuant to 28 U.S.C. § 1441.  On February 7, 2022, the federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain jurisdiction over Count IV. Count IV of the Complaint is therefore no longer before this Court on plaintiffs' motion.

4.   On February 22, 2022, defendant filed a Motion to Dismiss and Alterative Motion for Summary Judgment, and an Opposition to plaintiffs' motion for partial summary judgment. Defendant's motions sought dismissal or summary judgment on all the State law claims, including Count III on which plaintiff had not previously sought summary judgment.

5.   March 7, 2022, plaintiffs filed their opposition to defendant's motion and requested declaratory and equitable relief as to all claims before this Court, including Count III. Defendant likewise requests declaratory relief as to all claims before this Court.

WHEREFORE, this Court:

A.   FINDS that all the parties, including plaintiffs, are entitled to a declaration of rights under MD Code, Courts and Judicial Proceedings, § 3-402, on Counts I, II and III of the Complaint;

B.   ORDERS that plaintiffs' motion for partial summary judgment is granted on Count I of the Complaint, and DECLARES that Bill 4-21 is not a "local law" within the meaning of Article XI, § 3 of the Maryland Constitution and is thus invalid, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count I;

C.   ORDERS that plaintiffs' motion for partial summary judgment is granted on Count II of the Complaint, and DECLARES that Bill 4-21 violates the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is not authorized by MD Code, Criminal Law, § 4-209(b),

and is thus preempted by MD Code, Criminal Law, § 4-209(a), and is otherwise in conflict or inconsistent with numerous other provisions of State law within the meaning of the Express Powers Act, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count II;

D. FINDS that Count III of the Complaint is before this Court for a decision on defendant's motion for summary judgment and DECLARES that Bill 4-21 is a *per se* Takings under Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and is facially a deprivation of property without due process in violation of Article 24 of the Maryland Declaration of Rights in so far as Bill 4-21 purports to ban the possession, sale, transport or transfer of any personal property, lawfully acquired, owned or possessed by plaintiffs or others prior to the July 16, 2021, effective date of Bill 4-21, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count III as to all such property until or unless full just compensation is paid or tendered to plaintiffs and others by defendant, as agreed to by the parties or awarded by a jury;

E.  ORDERS that defendant's motion to dismiss is denied as the Court finds and declares that at least one plaintiff has standing to sue on each Count of the Complaint that remains before this Court, and further ORDERS that defendant's alternative motion for summary judgment on Counts I, II, and III of the Complaint is denied on the merits;

F.  FINDS that under MD Rule 2-602 there is no just reason for delay and therefore ORDERS that FINAL JUDGMENT granting declaratory and injunctive relief on Counts I, II, III, as set forth above, be entered in favor of plaintiffs and against defendant; and

G.  ORDERS that further proceedings for assessing and awarding the amount of just compensation due under Count III for Takings and deprivation of private property that occurred in the time period between the July 16, 2021, effective date of Bill 4-21 and the date of this ORDER, will be scheduled as the Court may hereafter direct by separate order.

_____

Judge, Circuit Court for
Montgomery County, Maryland

cc:  All Parties of record.

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing proposed Order And Final Judgment Granting Declaratory And Equitable Relief was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:


Edward Barry Lattner            Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane          patricia.kane@montgomerycountymd.gov

Sean Charles O Hara             sean.ohara@montgomerycountymd.gov


Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
   *Counsel for Plaintiffs*