**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.**, *et al.*, | **Case No.: 485899V** |
| *Plaintiffs,* | |
| vs. | **EXPEDITED HEARING REQUESTED** |
| **MONTGOMERY COUNTY, MARYLAND**, | |
| *Defendant.* | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S SUBMISSION
CONCERNING HB 425 AND SB 387**

## I.      INTRODUCTION

On April 14, 2022, plaintiffs submitted a "Supplemental Memorandum Regarding Enactment Of Senate Bill 387 And House Bill 425 Into Law And Motion For Expedited Hearing And Decision" ("P. HB425/SB387 Mem."). On May 12, 2022, defendant, Montgomery County, Maryland ("the County") submitted "Defedant's [Sic] Reply To Plaintiffs' Supplemental Memorandum Regarding Enactment Of Senate Bill 387 And House Bill 425 Into Law" ("Def. HB425/SB387 Mem."). Defendant's memorandum raises new arguments that warrant a response.

## II.     DEFENDANT'S RESORT TO A "FUNCTIONAL TEST" IS CONTRARY
## TO MOST RECENT AUTHORITY FROM THE COURT OF APPEALS

Count II of plaintiffs' verified Complaint challenges Bill 4-21 as contrary to the Express Powers Act, MD Code, Local Government, §§ 10-206. Plaintiffs expressly rely on the Express Powers Act in its prior memorandum concerning the enactment of HB425/SB387. See P. HB425/SB387 Mem. at 2, 7. As noted in plaintiffs' prior memoranda (P. SJ Mem. at 7), under the

Express Powers Act, a county may not enact any legislation that is "inconsistent with State law" and may exercise their local "powers" "only to the extent that the powers are not preempted by or in conflict with public general law." MD Code, Local Government, § 10-206(a),(b).

The County claims for the first time that "Maryland has employed two tests to determine whether state law conflict preempts local law: the functional test and the verbal test. Under the functional test, a local law is not conflict preempted if it advances, or is consistent with, the state law's purposes." (Def. HB425/SB387 Mem. at 3). The County then goes on to assert that Bill 4-21, challenged in this case, does not conflict with HB425/SB387, despite the many inconsistencies and conflicts set out in plaintiffs' memorandum, because the County supported the original version of the bills and because HB425/SB387 "advances" regulation of so-called "ghost guns." While the County does not deign to cite the Express Powers Act anywhere in their latest pleading, the County appears to argue that its new-found principle requires that Bill 4-21 be sustained. The County's argument fails at every step.

The County first overlooks the two most recent decisions of the Court of Appeals applying the Express Powers Act: *Angel Enterprises Limited Partnership v. Talbot County*, 474 Md. 237, 254 A.3d 446 (2021), and *K. Hovnanian Homes of Maryland, LLC v. Mayor of Havre de Grace*, 472 Md. 267, 292, 244 A.3d 1174 (2021). In *Angel Enterprises*, case, the plaintiffs challenged a Talbot County ordinance that imposed civil fines for violation of County Code provisions that purported to regulate the clearing of trees and construction of a driveway by plaintiffs. Under those county code provisions, Talbot County required that any appeal of civil fines levied were to take place via an administrative appeal to a county board of appeals. Both the Court of Special Appeals and Talbot County Circuit Court sustained this administrative scheme. (474 Md. at 240-41). The Court of Appeals reversed.

1    In so holding, the Court of Appeals stated that "when a party is challenging the authority

2    of a local government to take a particular action, *it is important to strip away the labels* and

3    consider the particular governmental action that is sought to be undertaken." Id. at 259 (emphasis

4    supplied). The Court of Appeals explained that the first step in applying this test was to "identify

5    the precise nature of the governmental action in question," and the second step was "whether the

6    local government 'has the legal authority to undertake the action, and if so, whether the

7    contemplated action was correctly undertaken consistent with that grant of authority action in

8    question.'" (Id. at 259-60) (quoting *K. Hovnanian Homes of Maryland,* 472 Md. at 292). Applying

9    this test, the Court of Appeals held that even though Talbot County had the legal authority to

10   impose civil fines and had the legal authority to regulate the subject matter (id at 265), the appeal

11   procedures were nonetheless invalid under the Express Powers Act because the county's

12   provisions were "inconsistent with the applicable provisions of State law, which vest original

13   jurisdiction in the courts for the adjudication of civil penalties established by a charter county in

14   the exercise of its express powers, as well as in the exercise of additional powers authorized by

15   [State law]." Id. at 269. See also *K. Hovnanian Homes*, 472 Md. at 291 ("where the General

16   Assembly has provided a municipality with the authority to exercise an express power by

17   ordinance, the ordinance 'may not conflict with State law'") (quoting MD Code, Local

18   Government, § 5-203(b)).

19   In short, *Angel Enterprises* makes clear that "labels" do not control and thus it simply does

20   not matter whether the local ordinance serves the same general "purpose" as State law. Rather, the

21   only thing that matters under this controlling precedent is whether the local governmental entity

22   (1) has the power to regulate in a given area, and (2) whether the local law is "inconsistent" or "in

23   conflict" with State law. If the local law fails either prong, then it is *ultra vires*. Full stop. Here,

for all the reasons set forth previously in plaintiffs' memorandum supporting summary judgment and in their opposition to defendant's motion to dismiss or alternative motion for summary judgment, Montgomery County lacks the authority under MD Code, Criminal Law, § 4-209, to regulate firearms in the manner accomplished by Bill 4-21. That ends the analysis.

But even assuming *arguendo* that it does have the authority, the County's regulation of firearms must still not be "inconsistent" or "in conflict" with State law, and that is true regardless of whether it shares the same general purpose of State law. Stated simply, "a County may not prohibit something permitted by State legislation or permit something prohibited by State legislation." *Caffrey v. Department of Liquor Control for Montgomery County,* 370 Md. 272, 305, 805 A.2d 268 (2002). *Rossberg v. State*, 111 Md. 394, 74 A. 581, 584 (1909) ("ordinances which assume directly or indirectly to permit acts or occupations which the state statutes prohibit, or to prohibit acts permitted by statute or constitution, are under the familiar rule for validity of ordinances uniformly declared to be null and void"). Defendant's latest filing cites both *Caffrey* and *Rossberg*, and concedes that "a local law is conflict preempted if it prohibits conduct that the state law expressly permits," but asserts that rule does not apply if the local law is "consistent" with "the purposes of Maryland law." See Def. HB425/SB387 Mem. at 3.

The County's assertion is simply false. As *Caffrey* and *Rossberg* make clear, a county ordinance is invalid if it prohibits acts that are permitted under State law. Nothing in that simple test requires any consideration of a local law's "purpose." But a county law may still be "inconsistent" with State law (and thus fail), even though it did not actually prohibit conduct permitted by State law. After all, the Express Powers Act bans both county laws "inconsistent" with State law, MD Code, Local Government, § 10-206(a), and as well as county laws "in conflict" with State law. (Id. § 10-206(b). *Lyles v. Santander Consumer USA Inc.*, --- Md. ---, --- A.3d ---,

- Page 4 -

2022 WL 1513656 at *6 (May 13, 2022) ("[w]e read the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory") (citations and internal quotes omitted). For example, in *Angel Enterprises*, the county administrative scheme was invalid because it was "inconsistent" with State 'law that assigned jurisdiction to the Maryland courts even though the Court of Appeals agreed that Talbot County in that case had full authority to regulate in the area. No direct conflict was required, as Talbot County did not prohibit any acts otherwise permitted by State law. Rather, it created an administrative scheme that failed to recognize, and was thus "inconsistent" with, the approach specified in State law.

In *K. Hovnanian Homes*, State law required that the municipality's authority to enter into agreements must be pursuant to a duly enacted ordinance and the Court of Appeals held that the municipal failure to enact such ordinance was fatal to the municipality's actions for that reason. See *K. Hovnanian Homes*, 472 Md. at 295. In neither *Angel Enterprises* nor *K. Hovnanian Homes* did the Court of Appeals stop to inquire as to whether the local law was consistent with the "purposes" of State law. The textual inconsistency with the text of State law was sufficient. In this case, plaintiffs have shown that Bill 4-21 directly prohibits activities and conduct that is permitted by State law, including conduct contemplated and permitted by HB425/SB387. Plaintiffs have likewise shown that Bill 4-21 is "inconsistent" with the regulatory scheme created by HB425/SB387 as well as with the statutory scheme enacted by other Maryland firearms laws. No more is required.

Relying heavily on *Ad + Soil, Inc. v. County Com'rs of Queen Anne's County*, 307 Md. 307, 333, 513 A.2d 893 (1986), the County argues that "the legislature's failure to 'address the interaction of its statutes with pre-existing local … laws suggests that it intended no change in the

applicability of the local laws.'" Def. HB425/SB387 Mem. at 6. Yet, in the discussion cited by the County, *Ad + Soil* addressed "field" preemption, and merely held that State law did not occupy the field to the exclusion of local zoning ordinances, a matter that the Court recognized to be one of the "cornerstones of this state's system of land use control." *Ad + Soil*, 397 Md. at 333-34. When the Court of Appeals addressed conflict preemption later on in its opinion, the Court merely held that the local zoning ordinance did not prohibit what was permitted by State law and was not inconsistent with State law on the facts there presented. (Id. at 336).

Nothing in *Ad + Soil* contradicts the approach followed by the Court of Appeals more recently in *Angel Enterprises*. Nothing in *Ad + Soil* even mentions the Maryland Constitutional limitations on county enactment of "general laws" or the Express Powers Act, which limits the power of counties. Moreover, unlike the local zoning law at issue in *Ad + Soil,* where local zoning regulation was the rule and was thus entitled to a presumption of validity, *Ad + Soil*, 307 Md. at 334, Bill 4-21 regulates firearms, an area of law (firearms) where the County's power has long been tightly constricted by multiple express preemption provisions, including MD Code, Criminal Law, § 4-209, which is the sole source of authority claimed by the County here.

Indeed, the part of Section 4-209 on which the County relies, subsection 4-209(b)(1), is but a mere exception to the broad preemption imposed by subsection 4-209(a). The general rule is that such exceptions are to be narrowly construed so as to avoid undermining the general provision. See, e.g., *Blue v. Prince George's County*, 434 Md. 681 76 A.3d 1129 (2013) ("Under the canons of statutory construction, '[w]hen a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions.'") (quoting Norman J. Singer and J.D. Shambie, *Sutherland Statutes and Statutory Construction* (2013), § 47:11). See also *Taylor v. Friedman*, 344 Md. 572, 581, 689 A.2d 59 (1997) (noting "the

1  rule of statutory construction dealing with statutes that express a general rule, followed by one or

2  more specific exceptions to the general rule. Under those circumstances, a court ordinarily cannot

3  add to the list of exceptions."); *Radio Communications, Inc. v. Public Service Commission of*

4  *Maryland*, 50 Md.App. 422, 442, 441 A.2d 346 (1982) ("'Grandfather rights' are considered

5  exceptions to statutes and must be strictly and narrowly construed."). Plainly, the County's law is

6  entitled to no presumption of validity.

7  Similarly, in *City of Baltimore v. Sitnick*, 254 Md. 303, 312, 255 A.2d 376 (1969), in the

8  portion cited by the County, the Court likewise addressed field preemption, but in the portion not

9  cited by the County, the Court noted that Express Powers Act preserved "the dominance of a public

10 general law over local ordinances, in an area where conflict may exist." *Sitnick* is thus of no aid to

11 the County here. In *National Asphalt Pavement Ass'n, Inc. v. Prince George's County*, 292 Md.

12 754, 78-79, 37 A.2d 651 (1981), also cited by the County, the Court addressed solely field

13 preemption in the area of employment discrimination. The Express Powers Act was not even

14 mentioned. Plaintiffs have quite deliberately not claimed "field" preemption in this case. While

15 the exceptions set forth in subsection 4-209(b) may suggest that State firearms law does not

16 entirely "occupy the field," the elaborate and comprehensive scheme of firearm regulation created

17 by State law makes especially clear that the subsection 4-209(b) exceptions should be very

18 narrowly construed in order to avoid interfering with that State regulation, including the regulatory

19 scheme created by HB425/SB387. See *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675, 689

20 (2006), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008) (noting that "the exceptions to

21 otherwise blanket preemption [in Section 4-209] are narrow and strictly construable").

22

23

- Page 7 -

**III.     THE LEGISLATIVE HISTORY OF HB425/SB387
          SUPPORTS PLAINTIFFS**

The County argues that Bill 4-21 is not preempted by HB425/SB387 because the County testified at the legislative hearings on this legislation and that the General Assembly was thus aware of Bill 4-21 when it enacted this legislation. The County even goes so far as to attach its testimony before the General Assembly to its latest filing in an effort to demonstrate how it supported the enactment of HB425/SB387. The County is truly grasping at straws. Indeed, the legislative history of HB425/SB387 demonstrates that the General Assembly amended this legislation during the Session precisely to permit the very activities that the County outright bans in Bill 4-21. Thus, far from endorsing the County's law, the General Assembly quite deliberately enacted State-wide legislation that is quite inconsistent and in direct conflict with Bill 4-21.

While the County touts its participation in the legislative process that led to the enactment of HB425/SB387, plaintiff Maryland Shall Issue ("MSI") also actively participated in that process. See County Exhs. M & N (listing undersigned counsel as a witness on behalf of MSI). MSI submitted a 17-page, single-spaced memorandum of law on the many issues posed by the bills, as originally drafted. That Testimony is attached herewith as Exhibit A. MSI's participation was instrumental in the changes to the original bills and those changes are precisely the areas where Bill 4-21 conflicts with HB425/SB387 most starkly. Those changes all took place initially in the Senate Judicial Proceedings Committee ("JPR") and in the Senate only to be adopted later by the House after the Senate adopted them. In contrast, the House originally passed HB 425 without amendment. https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/hb0425.

This Court need only compare the original version of SB387 to the version that actually became law to see how dramatically the final bills were changed from the originals. As far as we

are aware, the County played absolutely no role whatsoever in these amendments made in JPR and

adopted by the Senate and thereafter in the House. Neither Bill 4-21 nor Montgomery County was

ever even mentioned in JPR during the voting session. https://youtu.be/0SgLZKYxAX4?t=3740,

or in the House Judiciary Committee when it considered the amendments to SB387 after it was

amended and adopted by the Senate and sent to the House.

https://www.youtube.com/watch?v=95T1_M0gGKY. The Fiscal Note on SB387, cited by the

County (County Exh. P), was drafted and presented on the original version of SB387, well before

JPR drastically altered SB387 in Committee. The County's testimony, cited by the County (County

Exhs J. & K), was all submitted in February of 2022, well before JPR amended the bill in

Committee. The JPR Floor Report for SB387, cited by the County (County Exh. O), merely notes

that local jurisdictions, such as "San Diego," California and Montgomery County, had started "to

address privately made firearms," but nothing in that Floor Report can be read to endorse such

local laws, much less the County's particular law.

     The changes made by JPR and the Senate to SB387 are fundamentally inconsistent with

the approach followed by the County in enacting Bill 4-21. For example, the original bills, on

which the County testified in support, broadly defined an unfinished frame or receiver to ban "zero

percent" receivers, which are merely blocks of metal or plastic advertised or sold as zero percent

receivers. See Section 5-701(h)(2). MSI pointed out the patent absurdity of this provision

(Testimony at 8-9), and, as a result, the SB387 provision banning such zero percent receivers was

stripped out of SB387. See Section 5-701(h). In contrast, Bill 4-21 bans possession of all "ghost

guns" (Section 57-11(a)), and defines "ghost guns" to include any "unfinished frame or receiver"

that lacks a serial number engraved by a federally licensed manufacturer or importer in a manner

compliant with federal law. See County Code Section 57-1(2). By definition, "zero percent" receivers lack such serial numbers.

Similarly, MSI argued that the bills should be amended to provide a way for the future private manufacture of firearms for personal use. See Testimony at 15. As enacted, SB387 was amended to provide an express avenue for such home manufacture of firearms. See Section 5-703(b)(3). Under this provision, private persons are expressly permitted make and keep unfinished frames and receivers as long as such items, when sufficiently finished under the amended definition of an unfinished frame or receiver, are serialized by a Federal Firearms Licensee ("FFL"). That serialization may be **either** in accordance with federal law, "**or**" through an alternative serialization protocol under which the owner may have a FFL serialize the firearm with the type of number specified in HB425/SB387, and then register it with the Maryland State Police. See Section 5-703(b)(2). In contrast, Bill 4-21 does not allow any future manufacture of firearms for personal use at all, and instead bans all possession by all persons, including FFLs. See County Code 57-11(a). In addition, Bill 4-21 expressly requires that the content of the serial number comply with federal standards set forth in 27 C.F.R. § 479.102. See Section 57-1(2). The alternative method of serialization allowed by HB425/SB387 does not comply with federal law, but the method ensures "traceability" because HB425/SB387 requires that a frame or receiver serialized in this fashion also be registered with the State Police. See Section 5-703(b)(2)(ii). Yet, mere possession of a firearm serialized and registered in this alternative manner would be a crime under Bill 4-21 because the serial number would not be compliant with 27 C.F.R. § 479.102.

MSI also asserted in its Testimony that the definition for unfinished frames or receivers in the original bills was hopelessly vague and such vagueness, coupled with the lack of a *mens rea* provision, made the bills unconstitutional under *Lawrence v. State*, 475 Md. 384, 408, 257 A.3d

588, 602 (2021). Testimony at 10. JPR and the Senate agreed. As a result, SB387 was amended to be consistent with the definitions provided in the federal ATF Rule that has since become final. See Section 3 of HB425/SB387 (requiring that the law be interpreted in a manner consistent with the ATF Rule's definitions). The ATF Rule newly defines receivers and frames in great detail. See 87 Fed. Reg. at 24735 (amending 27 C.F.R. §478.12). SB387 was also amended to comply with *Lawrence* by including an express *mens rea* provision. See Section 5-703(b)(1). In contrast, Bill 4-21 makes no attempt to define unfinished frame or receiver and utterly lacks any *mens rea* requirement. Bill 4-21 is thus unconstitutional on these grounds alone. See *Lawrence*, 475 Md. at 408; P. Mem. In Support of Summary Judgment at 36 *et seq*.

These are merely the highlights of the changes made by JPR and adopted by the Senate. Additional conflicts between HB425/SB387 and Bill 4-21 are more fully set forth in plaintiffs' Supplemental Memorandum Concerning the Enactment of HB425/SB387. MSI still vigorously opposed the enactment of HB425/SB387, but SB387, as thus amended, received rare, bi-partisan support in JPR, https://youtu.be/0SgLZKYxAX4?t=3740, and in the Senate. https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0387. The amendments to SB387 also drew the full support of Attorney General Frosh, who urged the House of Delegates to adopt the Senate's amendments. See https://youtu.be/Y2gVUR-e4cI?t=2538. The Attorney General's support was important, as HB425/SB387 was originally written by the Attorney General's Office and introduced at his request in both chambers of the General Assembly. See https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/hb0425, and https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0387.

All these changes to the original version of SB387 occurred even though JPR and the Senate were aware of Bill 4-21, as the County argues. Yet, as this legislative history makes plain,

1   the General Assembly paid little heed to Bill 4-21. SB387, as enacted, can hardly be said to have

2   endorsed the County's radically different approach to the regulation of unserialized firearms. In

3   short, this legislative history supports plaintiffs, not the County. This Court should thus reject the

4   County's desperate resort to "purpose." As the Court of Appeals recently stated, courts in this State

5   are to "'assume that the legislature's intent is expressed in the statutory language and thus our

6   statutory interpretation focuses primarily on the language of the statute to determine the purpose

7   and intent of the General Assembly.'" *Berry v. Queen*, 469 Md. 674, 687, 233 A.3d 42 (2020)

8   (quoting *Brown v. State*, 454 Md. 546, 550-51, 165 A.3d 398 (2017)). The text, discussed above,

9   makes clear that the General Assembly elected to take a different road than that taken by the

10  County. The text is confirmed by the legislative history. That ends the inquiry. Bill 4-21 must give

11  way to that legislative judgment.

12          Finally, the County ardently denies that Bill 4-21 makes "it 'legally impossible' for the

13  owner of a ghost gun to transport that gun to a federal licensee in the County to either sell it (to

14  the federal licensee) or have it serialized." Def. HB425/SB387 Mem. at 5. The County does not

15  address, much less deny, the other conflicts and inconsistencies between Bill 4-21 and

16  HB425/SB387, detailed in plaintiffs' supplemental memorandum and summarized above. In any

17  event, the County's naked denial blinks reality. By its express terms, Bill 4-21 amends County

18  Code 57-11(a) to ban the sale, transfer, possession or transport of any "ghost gun," which the

19  County defines to include any "unfinished frame or receiver that lacks a unique serial number

20  engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer or maker or

21  importer in accordance with 27 C.F.R. § 479.102." Section 57-1(2). None of the exceptions to

22  these bans specified in Section 57.11(b) remotely apply and the County points to none. These bans

23  apply to everyone.

Bill 4-21 adversely affects all the plaintiffs, but perhaps most significantly impacts plaintiff Engage Armament, which is a State and federally licensed firearms dealer and manufacturer. See Verified Complaint, ¶ 26. As such, Engage is **expressly** exempted from HB425/SB387. See Section 5-702(2). Specifically, under Section 5-702(2), as enacted by HB425/SB387, a person may freely sell, transfer or deliver "an unfinished frame or receiver" to "(i) a federally licensed firearms dealer; (ii) a federally licensed firearms manufacturer; or (iii) a federally licensed firearms importer." (Id.). These federally licensed dealers, manufacturers and importers may possess such unfinished frames and receivers. (Id.). Indeed, as explained above, FFLs, like Engage, are key players in the serialization and registration statutory scheme created by HB425/SB387. And, as noted in plaintiffs' summary judgment papers, the County is **expressly preempted** from regulating sales of regulated firearms by State firearms licensees, like Engage. See MD Code, Public Safety, § 5-104 ("This subtitle *supersedes* any restriction that a local jurisdiction in the State imposes on a sale of a regulated firearm, and the State *preempts the right of any local jurisdiction to regulate the sale of a regulated firearms*."). (Emphasis added). See P. Mem. In Support of Summary Judgment at 19; Opposition of Plaintiffs to Def. Motion for Summary Judgment at 9.

Bill 4-21 not only negates the serialization statutory scheme performed by FFLs, as set out in HB425/SB38, it also violates Engage's right to sell a handgun free of County regulation under the preemption provisions of Section 5-104. Specifically, Bill 4-21 expressly regulates the sale of any "handgun" (Section 57-11(a)) and a handgun is a "regulated firearm" under State law. See MD Code, Public Safety, § 5-101(r)(1). As a federally licensed manufacturer, Engage is also authorized by federal law to engrave serial numbers onto firearms, 18 U.S.C. § 923(i), and has the expensive equipment and the expertise to perform the serialization services mandated by HB425/SB387. See Statement of Engage Armament, attached to MSI's Testimony on HB425 and

SB387. Yet, Engage is barred from rendering serialization services to owners (and on behalf of other FFLs) in this State because it may not possess such unserialized firearms under Bill 4-21. While the County denies this reality, it pointedly never attempts to explain its reasoning or how the serialization provisions of HB425/SB387 could possibly be consistent with the express ban on the transport and possession of unserialized firearms imposed by Bill 4-21. At a minimum, like the county law at issue in *Angel Enterprises*, Bill 4-21 is "inconsistent" with the HB425/SB387 statutory scheme. It is also "inconsistent" with the multitude of other State laws and the State regulatory scheme specified in plaintiffs' summary judgment papers. It is therefore invalid.

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for summary judgment should be granted and defendant's motion to dismiss and for summary judgment should be denied.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005

Dated: May 15, 2022                          *Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

**MARYLAND SHALL ISSUE, INC.**, *et al.*,

    *Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND**,

    *Defendant.*

**Case No.: 485899V**

**CERTIFICATE OF SERVICE**

    The undersigned counsel hereby certifies that on May 15, 2022, a copy of the foregoing Memorandum In Response To Defendant's Submission Concerning HB 425 And SB387 was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara         sean.ohara@montgomerycountymd.gov

                /s/ *Mark W. Pennak*

                MARK W. PENNAK
                *Counsel for Plaintiffs*



MARYLAND SHALL ISSUE®
SELF DEFENSE IS A CIVIL RIGHT

**February 7, 2022**

# WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO HB 425 and SB 387

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is a Section 501(c)(4), all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of Maryland and of the Bar of the District of Columbia. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland firearms law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License ("HQL") and a certified NRA instructor in rifle, pistol, personal protection in the home, personal protection outside the home and in muzzle-loader. I appear today as President of MSI in opposition to HB 425 and SB 387.

## The Bills and Framework of State and Federal Law

The bills would create a massive new gun ban on the possession, receipt, sale, transfer or purchase of un-serialized unfinished receivers and frames. The bills provide that "person may not **purchase, receive, sell, offer to sell, or transfer** an unfinished frame or receiver unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms." This ban would go into effect on June 1, 2022. Next, the bills ban mere **possession of** an unserialized, privately made firearm on or after January 1, 2023. To be lawfully kept after January 1, 2023, all unfinished frames and receivers would have to be serialized as the bills describe. The mere possession of any unserialized item considered to be a firearm is a criminal offense as of 1/1/2023.

The bills create a very broad and new definition of "firearm" to make clear that unfinished receivers will now be considered to be a "firearm." Specifically, the bills define "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that (1) Has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm; or (2) Is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted." In this respect, the bills go far beyond the definition of a firearm set forth in federal law. Under federal law, 18 U.S.C. 921(a)(3), a firearm is defined as "(A) any weapon (including a starter gun) which will or is designed to

**EXHIBIT A**                                    1

or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

A similar definition is set forth in current Maryland law. See Md. Code Public Safety, 5-101(h). These bills would amend Section 5-101(h) to include as well an "unfinished frame or receiver" and then define an "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that: * * * (2) Is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted." Under this definition, a "zero percent" receiver (a solid block of aluminum, for example) would fall under the bills' coverage if it is sold or marketed as such. The bills do not even attempt to define the meaning of "readily completed, assembled or converted." Nothing in the bills purport to incorporate federal law in this definition.

Notwithstanding the bills' new and radically different definition of a "firearm," the bills otherwise piggyback heavily on federal law. For example, the ban on an unfinished frame or receiver in new Section 5-703(a) applies to all such items "unless it is required by federal law to be, and has been imprinted with a serial number by a federally licensed firearms manufacturer, or federally licensed firearms importer in compliance with all federal laws and regulations…." Similarly, for existing privately made firearms, the bills require that, before January 1, 2023, a federally licensed dealer, importer, manufacturer, or other federal licensee authorized by federal law to "provide marking services" mark firearms with a serial number that consists of the first three and last five digits of their FFL number, plus "another number," presumably one selected by the federally licensed manufacturer or importer.

The bills require that the inscriptions be in compliance with the federal rules that define depth, height, and method. Specifically, federally licensed manufacturers and importers are required to engrave serial numbers on firearms. See 18 U.S.C. § 923(i). Federal regulations concerning Section 923(i) (also incorporated by the bills) require that the markings required by Section 923(i) must be to a minimum death of .003 inches and in a print size no smaller than 1/16 inches and "must be placed in a manner not susceptible of being readily obliterated, altered, or removed." 27 C.F.R. § 478.92(a)(1). That process requires a precise and expensive engraving machine. The bills do not require that any federally licensee actually perform this service and the bills likewise do not purport to limit the fees that potential engravers are able to charge. A violation of any of these requirements is punishable by up to 3 years in prison and/or a $10,000 fine for each violation as each violation is deemed by these bills to be a "separate crime."

Finally, it must be noted that pending regulations issued by the ATF propose to change how the ATF defines a firearm within the definition established by 18 U.S.C. § 921(a)(3)(providing: "The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."). The notice of proposed rulemaking for these ATF regulations was issued on May 21, 2021. See 86 Fed. Reg. 27720-01 (May 21, 2021). As proposed, the ATF rule would define unfinished receiver "kits" to fall within the federal definition of a "firearm." See 86 Fed. Reg. at 27726. The proposed rule would also define "readily be converted" under Section 921(a)(3) to mean "a process that is fairly or reasonably efficient, quick, and easy, but not necessarily

the most efficient, speedy, or easy process." (Id. at 27730). The regulations would then list a number of factors to be considered in applying that definition, including cost and difficulty of conversion or assembly. Unlike these bills, nothing in those regulations would purport to reach any "unfinished receiver" that is "marketed or sold to the public to become or be used" as a receiver. Nothing in these proposed regulations would purport to bar private persons from manufacturing their own privately made firearms or otherwise prohibit the possession of such firearms manufactured in the past. These federal regulations are expected to issue in final no later than June of 2022. See *Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions—Fall 2021*, 87 Fed. Reg. at 5111 (January 31, 2022).

## A.    Privately Manufactured Firearms Are Rarely Used In Crime And Existing Owners Are Law-Abiding Hobbyists, Not Criminals

These new provisions, if enacted, would burden and penalize an activity that has been perfectly legal under federal and state law for the entire history of the United States, *viz.*, the manufacture of homemade guns for personal use. Under Federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). However, "it is illegal to transfer such weapons in any way." *Defense Distributed v. United States,* 838 F.3d 451, 454 (5th Cir. 2016). This manufacture typically "involves starting with an '80% lower receiver,' which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver." (Id).

Manufacturing a typical "80% lower" into a "functional lower receiver" is not a trivial process. It takes tools, expertise and hours of time. Miscues are common and, when made, essentially convert the "80% lower" into scrap. Individuals who undertake this process are hobbyists. Even after the receiver is successfully made, the owner would still have to purchase the additional parts, such as a barrel, the trigger, slide and all the internal parts to complete the assembly. All these additional parts are expensive. With the cost of the tools to mill the receiver, plus the cost of the parts, a final assembled homemade gun may cost **more to make than** it would to actually buy an identical gun from a dealer.

The complexity of this process has been pointed out in court filings by the ATF and the U.S. Department of Justice. For example, in *State of California v. BATF*, No. 20-cv-0761 (N.D. Cal.), the Department of Justice and the ATF explained:

> An unfinished receiver that has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)," see ATF Firearms Technology Branch Technical Bulletin 14-01 ("Bulletin 14-01"), filed in Calif. Rifle and Pistol Ass'n v. ATF, Case No. 1:14-cv-01211, ECF No. 24 at 285 (E.D. Cal. Jan. 9, 2015), requires that numerous steps be performed simply to yield a receiver, that then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive. These milling and metalworking steps—each of which require skills, tools, and time—include: 1) "milling out of fire-control cavity"; 2) "drilling of selector-lever hole"; 3) "cutting of trigger slot"; 4) "drilling of trigger pin hole; and 5) "drilling of hammer pin hole." Compl. Ex. 9. Importantly, ATF will treat any "indexing"—the inclusion, in the receiver blank, of visual or physical indicators regarding the two-dimensional or three-dimensional parameters of the machining that must be conducted—as rendering the receiver blank a firearm. See Compl. Ex.

12; Ex. 13; Shawn J. Nelson, Unfinished Lower Receivers, 63 U.S. Attorney's Bulletin No. 6 at 44-49 (Nov. 2015) ("Nelson, Unfinished Receivers"), available at: https://go.usa.gov/x7pP3. This prevents the makers of receiver blanks from annotating the blank to instruct the purchaser as to the precise measurements needed, in three dimensions, to "excavate the fire control cavity and drill the holes for the selector pin, the trigger pin, and the hammer pin." Nelson, Unfinished Receivers, at 47. The need to conduct these machining steps from scratch, without indexing, and "carefully" means a working gun cannot be produced "without difficulty." Id. And the work to excavate the cavities and drill holes in a solid, unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area. See id. Therefore, the receiver cannot be completed "without delay," even leaving aside the further assembly with many other parts needed to have a weapon that can expel a bullet by explosive action. A receiver blank therefore may not "readily be converted" into a firearm.

Federal Defendants' Notice Of Motion And Motion To Dismiss Plaintiffs' Complaint For Declaratory And Injunctive Relief, at 16-17 (filed Nov. 30, 2020).

There has been much ado made about "kits" that are available from manufacturers, such as Polymer 80 and others. Accordingly to the ATF, such "kits" are made by non-licensed manufacturers "who manufacture partially complete, disassembled, or inoperable frame or receiver kits, to include both firearm parts kits that allow a person to make only a frame or receiver, and those kits that allow a person to make a complete weapon." 86 Fed. Reg. at 27736. Several points bear mentioning. Kits are thus designed to be easier to complete.

First, most (if not all) of the unserialized "ghost guns" recovered by the police in Maryland are made from such kits. Indeed, the Baltimore Police Department has announced to great fanfare that ghost gun seizures have increased over the last few years. Yet, according to information we have obtained from the Baltimore Police Department, the BPD seized 2,355 guns in 2021. Of that number, according to the BPD, 352 were "ghost guns," including guns made from kits (Polymer 80s). That is slightly less than **15%** of the total number of guns seized in 2021. Baltimore's problem with illegal guns is thus far vaster than "ghost guns." The BPD does not identify separately the number ghost guns actually used in violent crimes and there are few statistics available on the number of ghost guns actually used in crime. What numbers that are available suggest that the use of ghost guns in violent crime is extremely rare. For example, "the Justice Department reported that more than 23,000 weapons without serial numbers were seized by law enforcement between 2016 and 2020 and were linked to 325 homicides or attempted homicides." https://bit.ly/3GgaT94. That 325 homicides or attempted homicides represent a tiny percentage of the universe of 23,000 ghost guns seized (0.14%).

Legislation, such as these bills, focusing on "ghost guns" thus will not make the slightest dent in the soaring homicide rate. The numbers in Baltimore bear that out. For example, in 2011, the BPD seized 2,178 firearms (no ghost guns) and the number of murders was 196, of which 88 resulted in arrests (a 44.9% clearance rate). In 2011 there were also 379 non-fatal shootings. In 2020, the BPD seized roughly the **same number** of guns (2,244) (including 128 ghost guns), and yet the number of murders was 335 of which only 102 resulted in arrests (a 28.7% arrest clearance rate). And by 2020, the number of non-fatal shootings had nearly doubled from 2011 to 724. Similarly, BPD's weapons possession arrests were 1,224

in 2011, but virtually the same in 2020 (1,233), but the number of murders in 2020 were **81.1%** higher than in 2011. See Attachment.

We note with sadness that Baltimore is headed for a new record in homicides with 36 killings in January 2022, a pace that would result in 432 murders for 2022, a number never seen in Baltimore before. https://bit.ly/3KYQzN1. No word from the BPD if any of these killings came from the use of "ghost guns." The BPD has not released murder arrest numbers for 2021, but we are informed that there were 337 homicides in 2021, 2,355 gun seizures and 726 non-fatal shootings, numbers not much different than 2020. The high number of shootings that were non-fatal suggests the hospitals in Baltimore have vastly improved their ability to treat gunshot wounds. But for that success, the number of murders in Baltimore would be much higher. We note that in the years between 2011 and 2021, the General Assembly enacted numerous gun control statutes, including the much-touted Firearms Safety Act of 2013. None of those laws had the slightest impact on crime in Baltimore. These bills would likewise have no impact. Baltimore is awash in guns.

At a minimum, it should be obvious that there is no correlation (much less cause and effect) between guns seized and violent crime. A more relevant statistic is the clearance rate for serious crimes. As noted above, BPD's arrest clearance rate for murder in 2020 was a merely 28.7% and only 44.9% in 2011. By comparison, the nationwide clearance rate for murder is 54.4%. https://bit.ly/3s3qiVb. Baltimore's clearance rate for homicides is plainly abysmal, a reality that does not go unnoticed by violent criminals and law-abiding citizens alike. See Johns Hopkins Center for Gun Policy and Research, *Reducing Violence And Building Trust* at 5 (June 2020) ("In Baltimore neighborhoods most impacted by gun violence, residents lack faith in BPD's ability to bring individuals who commit violence to justice. Perceived risk of being shot and perceptions that illegal gun carrying is likely to go unpunished lead some residents to view gun carrying as a necessary means for self-defense."). In any event, there is no evidence of which we are aware that the inability to trace an unserialized firearm actually has prevented an arrest for **any** serious violent crime. The General Assembly seriously errs in focusing on "ghost guns" when it should be paying attention to the soaring rate of violent crime.

Second, the proposed regulations issued by the ATF would effectively ban unserialized kits by reclassifying them as "firearms" for purposes of federal law. That reclassification of kits would mean that the frame or receiver of the kit would be required to be serialized (and sold through FFLs like other firearms). Specifically, under the proposed rule, "weapon parts kits with partially complete frames or receivers containing the necessary parts such that they may readily be completed, assembled, converted, or restored to expel a projectile by the action of an explosive would be "firearms" for which each frame or receiver of the weapon, as defined under this rule, would need to be marked." (86 Fed. Reg. at 27736). After the proposed rule goes into effect in June of 2022, such **unserialized** kits will thus be completely unavailable commercially. Likewise unavailable would be any "readily be converted" unfinished frames or receivers, as the ATF proposed rule would likewise deem such items to be firearms and thus must be serialized in order to be sold legally and only then through FFLs who would perform backgrounds checks for these items, just like for any other type of firearm. The only unserialized receivers that would remain unregulated by the ATF would be those receivers that are NOT "readily" converted or assembled into a completed receiver, such as blocks of aluminum sold as "zero percent" receivers and that number is vastly smaller than the current universe of "ghost guns." As noted, the ATF proposed regulations

heavily tighten the definition of "readily" converted, thereby **further** limiting the number and availability of these remaining types of unfinished receivers.

**B.      The Bills Would Do Nothing To Prevent Or Deter Criminals From Acquiring Guns While Criminalizing Existing, Law-Abiding Hobbyists**

The ATF proposed rule would ban unserialized "kits" and would dry up the market for unserialized receivers. Period, full stop. Yet, ironically, the bans imposed by these bills would not stop any criminal from actually acquiring any non-regulated receivers that would be left, such as "zero percent receivers." Such items would still not be "firearms" under federal law and thus would not be regulated by federal law. Such items thus would remain available all over the United States, even if the bills should become law and were perfectly enforced 100% of the time. The market for these items is nationwide in scope. Accordingly, nothing in the bans imposed by these bills would or could actually stop any criminal or disqualified person from acquiring all the hardware necessary to make his own gun. All such a person would need do is drive to another state and buy over the counter. The idea that these bills would prevent crime or acquisition of a "ghost gun" is thus sheer fantasy. The ATF rule will do all the work in limiting availability.

**More importantly,** a disqualified person would not be deterred by these bills because such a disqualified person is **already** precluded by federal law from possessing **any** modern firearm or modern ammunition of **any** type. 18 U.S.C. § 922(g). Actual or constructive possession of a modern firearm or ammunition by a person subject to this firearms disability is a felony, punishable by up to **10** years imprisonment under federal law. See 18 U.S.C. § 924(a)(2). The same disqualification and similar punishments are also **already** imposed under existing Maryland law. See MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). Simple actual or constructive possession of a receiver **alone** (as further defined by the ATF rule) would be sufficient to constitute a violation of these existing laws, as a receiver **alone** is considered a "firearm" under **existing** Maryland and federal law. See 18 U.S.C. § 921(a)(3); MD Code, Public Safety, § 5-101(h)(1)(ii). These bills would not change that reality an iota. See https://bit.ly/3rgG9Au (announcing arrests and prosecutions of violent criminals and illegal gun manufacturers in Cecil County).

These bills go beyond the requirements of federal law and the proposed ATF regulations by making possession of existing privately manufactured firearms illegal. That result simply criminalizes innocent, law-abiding hobbyists and gun owners who have done nothing wrong. Existing criminals in possession of a "ghost gun" can be and should be arrested for illegal possession and the existing punishments for such illegal possession are far harsher than those imposed by these bills. These bills will not change that legal reality. Yet, these bills will also result in the arrest of law-abiding hobbyists. The reality is that few existing, otherwise law-abiding owners of these homemade guns will know or realize that possession of their existing firearms or unfinished frames has been banned. Actual compliance by existing owners will thus likely be virtually non-existent. In short, the bills are utterly **pointless** as a public safety measure. They would succeed only in turning otherwise law-abiding citizens into criminals. That is not sound public policy.

## C.     The Bills Impose Impracticable Requirements

The bills provide that "ON OR AFTER JANUARY 1, 2023, A PERSON MAY NOT POSSESS A FIREARM UNLESS:
(1) THE FIREARM IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED FIREARMS IMPORTER WITH A SERIAL NUMBER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS; OR
(2) THE FIREARM HAS BEEN IMPRINTED BY A FEDERALLY LICENSED FIREARMS DEALER OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES WITH THE FIRST THREE AND LAST FIVE DIGITS OF THE LICENSEE'S FEDERAL FIREARMS LICENSE NUMBER, FOLLOWED BY A HYPHEN, AND THEN FOLLOWED BY ANOTHER NUMBER." Taken together, these requirements banning possession go far beyond federal law. They severely criminalizes (with 3 years of imprisonment) innocent possession by law-abiding hobbyists who may have built these firearms or possessed these frames for years, including all privately made guns built since 1968, a period of approximately 53 years. The bills thus encompass an untold number of home-built firearms, probably numbering in the tens of thousands. The requirements imposed by the bills simply cannot be met, much less by the January 1, 2023, effective date of these bills.

The bills would require every innocent owner of a receiver (or existing firearm) to have it "imprinted" with a serial number "issued by" a federal licensed "firearms manufacturer" importer or other "federal licensee authorized to provide marking services." Such a licensed manufacturer is also known as a "Class 07" FFL and these manufacturers necessarily possess the equipment and expertise to perform serial number markings, as Section 923(i) has imposed this requirement on manufacturers since 1968. While there are many other, non-manufacturer FFLs in Maryland, almost all of these FFLs are dealers who merely sell firearms or perform transfers and are thus classified as Class 01 FFLs. See https://www.atf.gov/resource-center/types-federal-firearms-licenses-ffls. These Class 01 dealers do not perform engraving required by Section 923(i) as they are not manufacturers or importers, the two types of entities on whom the duty to engrave serial numbers is imposed by Section 923(i). The proposed ATF rule would require a federally licensed dealer to perform engravings *only* if an unserialized firearm was accepted by the dealer and thus entered in the dealer's A&D books as an acquired firearm. See 86 Fed. Reg. at 27737 ("FFLs would be required to mark PMFs within 7 days of the firearm being received by a licensee, or before disposition, whichever first occurs."). Since Class 01 dealers cannot perform this function, this requirement would be primarily applicable to Class 07 manufacturers, of which there are relatively few in Maryland, as compared to Class 01 dealers. Nothing in the ATF rule would require any dealer to accept a homemade gun into his inventory or perform any engraving.

The bills require that the marking be done "in compliance with all federal laws," and thus the bills would require the federal licensee to meet the engraving requirements specified in Section 923(i) and implementing federal regulations. Federal regulations require that the markings must be to a minimum death of .003 inches and in a print size no smaller than 1/16 inches and "must be placed in a manner not susceptible of being readily obliterated, altered, or removed." 27 C.F.R. §478.92(a)(1). That process requires a precision engraving

machine. For example, an entry level engraving machine that can fully comply with federal law costs in the neighborhood of $7,000 and that machine is of low quality. Engage Armaments, a Class 07 manufacturer in Rockville, MD, uses a $75,000 engraving machine to engrave serial numbers. See attached 2021 illustrated testimony of Andrew Starr Raymond, Co-Owner – Engage Armament LLC, of Rockville, MD (submitted with respect to 2021 bills HB 638 and SB 624). Relatively few manufacturers with this sort of capability to 'imprint' a serial number in compliance with federal law even exist in Maryland. Class 01 dealers, of which there are hundreds in Maryland, have neither the expertise nor the equipment to engrave a serial number in a manner compliant with Section 923(i). No serial number can be engraved in a polymer frame, as such number could be easily obliterated in this relatively soft material and polymer burns when engraving is attempted with lasers or other hot engraving tools. Existing manufacturers of polymer frames, such as Glock and Sig Sauer, thus use a metal plate insert on which to do such engraving. Arguably, Class 01 dealers are not even authorized by federal law to engage in such engraving as federal law, Section 923(i), expressly is limited to "manufacturers" and "importers."

The bills also require that any federally licensed manufacturer, importer or other federal licensee "authorized to perform marking services" must also "retain records for all firearms imprinted in accordance with all federal laws and regulations applicable to the sale of a firearm." That requirement would impose additional legal risks and costs on the Class 07 dealer, above and beyond the costs of maintaining the equipment and the training necessary to perform engraving markings to the level required by Section 923(i) and federal regulations. Few, if any, dealers would take on these additional costs and risks necessary to meet the demand that would be created by these bills. In sum, these risks and the high costs associated with investing in the equipment and training additional personnel necessary to perform the required engraving would ensure that very few dealers would offer the engraving services to existing owners. Thus, there is no likelihood that such services would be actually available to existing owners by January 1, 2023, the effective date of the ban on mere possession. These practical realities effectively convert the bills into a total ban on the possession of any existing receiver or firearm as it would be virtually impossible for all the existing owners to obtain a serial number. The mere six months available to obtain the required engraving is unrealistically short.

## D.   These Bills Are Overbroad and Violative of the Due Process Clause of the 14th Amendment

As noted, the bills impose a new definition of a "firearm" that goes beyond any federal definition of "firearm." That definition would be far stricter than any definition of firearm that would be imposed by the proposed ATF rule. Specifically, the bills define a firearm to include "A FORGED, CAST, PRINTED, EXTRUDED, OR MACHINED BODY OR SIMILAR ARTICLE THAT: * * * (2) **IS MARKETED OR SOLD TO THE PUBLIC TO BECOME OR BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM ONCE COMPLETED, ASSEMBLED, OR CONVERTED**." Mere possession of such an object would be criminalized after January 1, 2023. This definition leads to absurd results. There is no "reasonable person" modifier for the ban on the possession of an object that was marketed or sold for this purpose. There is no *mens rea* requirement. The bills impose strict criminal liability for mere innocent possession.

For example, under these provisions, the bills would impose a ban on the mere possession of a "zero percent" receiver (a solid block of aluminum) marketed as such. **See e.g.**:



And because that block of aluminum was originally marketed as a zero percent receiver, the bills would criminalize mere possession of the block even though the possessor of this block of solid aluminum intended to use it as a paper weight or a book end or (in the undersigned's case) as a means to illustrate the absurdities of Maryland ghost gun bills. And because the bills strictly ban mere possession, regardless of whether the possessor even knew that the block of aluminum had been "marketed" for these purposes, the bills would likewise criminalize a person who was **utterly unaware** that the block was originally marketed as a "zero percent receiver." In short, the reach of the bills is vastly overbroad.

This overbroad coverage of the bills is particularly pernicious as the bills contain no *mens rea* requirement and thus impose strict criminal liability for simple possession (or constructive possession) without regard to the owner's actual purpose, knowledge or intent. In contrast, an intent or knowledge requirement is part and parcel of federal gun control law. See, e.g., *Rehaif v. United States*, 139 S.Ct. 2191 (2019) (holding that the "knowingly" requirement on the federal ban on possession of a firearm by an illegal alien required proof that the alien actually knew that he was illegally in the United States). This sort of *mens rea* requirement is also part of Maryland law. See, e.g., *Chow v. State*, 393 Md. 431 (2006) (holding that a knowing violation of a Maryland statute making it unlawful for a person who is not a regulated gun owner to sell, rent, transfer, or purchase any regulated firearm without complying with application process and seven-day waiting period requires that a defendant knows that the activity they are engaging in is illegal).

Indeed, most recently, the Maryland Court of Appeals has stressed the importance of a *mens rea* requirement in the context of Maryland's ban on carrying a handgun imposed by Md. Code Criminal Law, § 4-203(a)(1) (providing that "person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person"). *Lawrence v. State*, 475 Md. 384, 408, 257 A.3d 588, 602 (2021) (discussing the Supreme Court's longstanding presumption that criminal statutes should generally include a *mens rea* requirement). The *Lawrence* Court even suggested that a strict liability law could violate the Due Process Clause for lack of notice, taking the extraordinary step of expressly communicating this point to the General Assembly. See *Lawrence*, 475 Md. at 420-21. As the Court stated, these "policy concerns" made it appropriate "to signal to the General Assembly" that, "in light of these policy concerns, ... legislation ought to be considered" to

address the scope CR § 4-203(a)(1)(i) given its classification as a strict liability offense." (Id. at 422). The General Assembly ignores such "signals" at its peril.

Here, because the bills impose strict liability, it would not matter if the existing owners simply were unaware that these new requirements even exist. Without doing a thing, they would unknowingly wake up on January 1, 2023, as criminals. Such a law is violative of the Due Process Clause as it criminalizes entirely passive conduct by a person who is without actual knowledge of the requirement. See *Lambert v. California*, 355 U.S. 225, 228 (1957) (striking down a California statute under the Due Process Clause where "entirely passive conduct could subject a defendant to conviction without any knowledge of their duty to comply with the statute"); *Lawrence*, 475 Md. at 420-21 (citing *Lambert*). It should be obvious that few law-abiding citizens follow the legislative sausage-making of the Maryland General Assembly. See also *Conley v. United States*, 79 A.3d 270, 282 (D.C. 2013) ("[T]he requirement of notice embodied in due process 'places some limits' on the application of these tenets [that ignorance of the law is no defense] when a law criminalizes 'conduct that is wholly passive' ... [and] unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.").

Indeed, *Lawrence* makes clear that this lack of a *mens rea* requirement plus the use of vague, ill-defined terms will virtually ensure that these bills will be struck down as unconstitutionally vague. As noted above, *Lawrence* took pains to expressly "signal" the General Assembly that the ban on carrying a handgun "**about**" the person found in Md. Code Criminal Law, § 4-203(b)(1), is unconstitutionally vague and that the Court would strike it down on that basis in the next appropriate case. See *Lawrence*, 475 Md. at 420-21. These bills are fatally vague in the same way. In particular, the bills criminalize the possession of any unfinished receiver that can be "readily" converted into a firearm. That term is inherently vague. While federal law, 18 U.S.C. § 921(a)(1)(3) uses the same term, existing federal regulations have long limited that term by defining "frame or receiver" to mean: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." See 27 C.F.R. § 478.11. As explained above, the ATF and the Department of Justice have long maintained that an 80% unfinished receiver is not a firearm within the meaning of Section 921(a)(3) because such an object is not "readily converted" into a firearm. The ATF proposed regulation likewise refines that existing definition of a frame or receiver so as to tighten the definition of "readily converted" to include kits and other items. See 86 Fed. Reg. at 27730. These bills are devoid of such limiting definitions.

Context also matters. Unlike the bans imposed by these bills, federal law is far narrower, as nothing federal law purports to criminalize mere *possession* of a receiver by an otherwise law-abiding person, much less criminalize the mere possession of an "unfinished" receiver. And nothing in federal law, including the proposed federal ATF regulations, purport to ban or limit an individual's right to make firearms at home for personal use. In contrast, these bills criminalize mere innocent possession and are completely silent as to the meaning of "readily." Indeed, the bills do not even purport to incorporate the federal definition, either the existing definition or the proposed AFT changes to that definition of "readily." A person is left totally at sea as to the meaning under these bills.

In contrast, as noted above, federal firearms law imposes specific *mens rea* requirements. For example, a violation of 18 U.S.C. § 922(a)(1)(B) (barring "any person" except federal

licensees from engaging in the "business" of the manufacture of firearms) is not a crime unless the person "willfully" violates that provision. See 18 U.S.C. § 924(a)(1)(D). Such a "willful" violation is a 5 year federal felony. (Id.). The Supreme Court has held that "in order to establish a 'willful' violation of a statute, 'the Government **must prove that the defendant acted with knowledge that his conduct was unlawful.**'" *Bryan v. United States*, 524 U.S. 814, 191-92 (1998), quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (emphasis added). No such *mens rea* requirement is found in these bills.

As noted above, the same unconstitutional lack of notice is self-evident in the bills' strict liability ban on possession of any item that is "marketed" or "sold" as an unfinished lower receiver, as the bills do not require any knowledge that the item was thus marketed or sold. The bills would ban a block of aluminum if it was marketed or sold as zero percent receiver, but would permit the sale and possession of the **same** block of aluminum if it was marketed or sold as something else. That result is bizarre. Either the block of aluminum is a significant threat to public safety or it is not – how it is "marketed" ought to be irrelevant. In any event, a person possessing such a block of aluminum may have no idea how it was sold or marketed, yet the mere possession of the block would be criminalized by these bills. Indeed, apparent from obvious circumstances, such as a printed advertisement, the term "marketed" is simply too vague to provide an intelligible standard.

The Supreme Court has made clear that such vagueness is particularly intolerable where the terms affect the exercise of a constitutional right. See, e.g., *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999). There, the Court found highly significant that the loitering ordinance in question was a "criminal law that contains no *mens rea* requirement" and concluded "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." Id. at 55. See also *Colautii v. Franklin*, 439 U.S. 379, 394 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*.") (collecting cases). As explained below, these bills use vague language in an effort to regulate the exercise of a Second Amendment right to make firearms for personal use, a practice long steeped in our Nation's history and traditions. In short, these bills will not survive a constitutional vagueness challenge.

Indeed, Nevada's "ghost gun" law was recently struck down on vagueness grounds for failing to adequately define "unfinished frame or receiver" under the Due Process Clause of the Nevada constitution. *Polymer80, Inc. v. Sisolak*, No. 21-CV-00690 (3d Jud. District for Co. of Lyon, December 10, 2021). The court found it significant that Nevada statute, like these bills, did not contain a *scienter* or *mens rea* standard.  See Id., slip op. at 14. The Nevada courts employ the same test for vagueness as employed by Maryland Court of Appeals under Article 24 of the Maryland Declaration of Rights and by the federal courts under the Due Process Clauses of the Fifth and Fourteenth Amendments. See, e.g., *Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 510 (2009) ("A criminal statute can be invalidated for vagueness ( 1) if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *Galloway v. State*, 365 Md. 599, 614-15, 781 A.2d 851 (2001) ("The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties'" and must provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and "must eschew arbitrary enforcement in addition to being intelligible to

the reasonable person."); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"). These bills are awaiting the same fate as the Nevada statute.

Here, for example, the bills' criminal penalties could be imposed **even though** it would take substantial expertise and a very sophisticated milling machine costing many thousands of dollars to convert a "zero percent" receiver block of aluminum into an 80% receiver, not to mention the *additional* milling that would be required to convert it into an actual **finished** receiver. As explained above, additional assembly of more parts (a barrel, a trigger, a slide and associated springs and parts) would then be necessary to covert that finished receiver into something that could actually fire a round of ammunition. It blinks reality to believe that such an object is a significant threat to public safety requiring the imposition of strict liability. That is particularly so when federal law already ban any person (other than an licensee) from engaging in the "business" of manufacture, and federal and State law already criminalizes possession of any receiver by disqualified persons. As the Supreme Court stated in *Rehaif*, it is a "basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will.'" *Rehaif*, 139 S.Ct. at 2196, quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769). As a matter of sound public policy and simple fairness, the General Assembly should not be enacting criminal statutes without a *mens rea* requirement. *Morissette v. United States*, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").

Then there are other absurdities associated with the extreme overbreadth of the bills. For example, as explained, the bills effectively require that a Class 07 manufacturer engrave a serial number on this solid block of aluminum marketed as a "zero percent" receiver. Yet, that serial number would then be obliterated should that block ever be actually milled. Any such removal of the serial number would be a **federal felony** under 18 U.S.C. § 922(k), which makes it a crime to "possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered." A knowing violation of Section 922(k) is punished by up to 5 years in a federal prison. See 18 U.S.C. § 924(a)(1)(B). That reality illustrates the legal absurdity of criminalizing the possession of objects that are **not** regulated by federal law. In short, in their attempt to be all-encompassing, the bills create multiple unconstitutional traps for the unwary. **The bills thus invite arbitrary and discriminatory enforcement. We all know which segments of society will bear the enforcement brunt of these bills.** See *McDonnell v. United States*, 136 S. Ct. 2355, 2373-74 (2016) (noting that "we cannot construe a criminal statute on the assumption that the Government will 'use it responsibly'") (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). In short, given that the ATF is about to abolish the sale of unserialized kits and anything else that can be "readily" converted into a receiver, it is overkill to go beyond that regulation to criminalize additional items, especially in a bill that otherwise incorporates and relies on federal law as setting the appropriate standards.

E.    **These Bills Are Unconstitutional Under The Second Amendment**

As noted, this bills imposes a categorical ban on the mere possession in the home of a previously-owned unfinished receiver or a firearm without a serial number. Such a gun ban violates the Second Amendment right of owners to possess firearms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742, 750 (2010). Even under the least demanding test ("intermediate scrutiny"), if the State can accomplish its legitimate objectives without a ban (a naked desire to ban guns or penalize gun owners is not legitimate), then the State must use that alternative. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). Stated differently, under intermediate scrutiny, the State has the burden to demonstrate that its law does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interest." Id. at 2535, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989). See also *NY State Rifle & Pistol Assn. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), *cert. denied*, 579 U.S. 517 (2016) (striking down a 7 round load limit in a firearm magazine because the limit was "untethered from the stated rationale"). See also *Reynolds v. Middleton*, 779 F.3d 222, 232 (4th Cir. 2015) (holding that, under the intermediate scrutiny test as construed in *McCullen*, the government must "prove that it actually tried other methods to address the problem"). (Emphasis in original).

The test for "strict scrutiny" is even more demanding as, under that test, the State must prove both a "compelling need" and that it used the "least" restrictive alternative in addressing that need. See *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 813 (2000). More generally, the constitutionality of gun laws must be analyzed under the "text, history and tradition" test that was actually used in *Heller* and *McDonald*. See, e.g., *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). There is no "text, history or tradition" that could possibly support the types of bans imposed by these bills.

We are compelled to note that the Supreme Court may well clarify the appropriate standard of review for Second Amendment cases in its upcoming decision in in *NYSRPA v. Bruen*, No. 20-843, *cert. granted*, 141 S.Ct. 2566 (2021). *Bruen* was argued November 3, 2021, and a decision is expected by June of this year. See also *ANJRPC v. Bruck*, No. 20-1507 (SCt.) (challenging New Jersey's ban on so-called large capacity magazines; the petition for certiorari in that case is presently being held by the Supreme Court pending a decision in *Bruen*). We note as well that Maryland's ban on so-called "assault weapons" is currently before the Supreme Court on a petition for certiorari in *Bianchi v. Frosh*, No. 21-902 (S.Ct.) (docketed December 16, 2021). A decision in *Bruen* may well affect the disposition of that petition as well.

*Heller* held that guns in "common use" by law abiding persons are prima facie protected arms under the Second Amendment. *Heller*, 554 U.S. at 627. Homemade guns easily satisfy this requirement as there are literally tens of thousands of such guns made over many years throughout the United States. Guns for personal use have been made at home for centuries, even before the Revolutionary War. The State simply may not disregard that reality and outright ban all home manufacture of firearms. See *Caetano v. Massachusetts*, 136 S.Ct.1027 (2016) (summarily reversing Massachusetts' highest court for failing to follow the reasoning of *Heller* in sustaining a state ban on stun guns); *Ramirez v. Commonwealth,* 479

Mass. 331, 332, 352 (2017) (on remand from *Caetano*, holding that "the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment" and declaring the State's absolute ban to be "facially invalid"). Homemade guns are at least as much "in common use" as stun guns at issue in *Caetano*.

Here, the supposed evil that these bills purport to address is guns without serial numbers because such guns are not "traceable." That interest is necessarily limited. Tracing runs out after identification of the gun's first purchaser and firearms may be stolen or sold and resold many times in their lifetime. As explained above, criminals, who may not possess firearms at all, will not be deterred by the bills as possession of a firearm by a prohibited person is already a 10-year federal felony, 18 U.S.C. § 922(g), and a serious crime under existing State law, MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). No criminal not deterred by the prospect of a federal felony conviction will be deterred by these bills. The few crimes that are solved by tracing guns left at a crime scene are only a small fraction of guns used in crimes because relatively few guns are actually traced by the ATF. See David B. Kopel, Clueless: The Misuse of BATF Firearms Tracing Data. http://www.davekopel.org/2A/LawRev/CluelessBATFtracing.htm. See also Police Departments Fail to Regularly Trace Crime Guns. https://www.thetrace.org/2018/12/police-departments-gun-trace-atf/. The ATF itself has cautioned against any use of trace data, noting that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download. As the ATF further notes, "[n]ot all firearms used in crime are traced and not all firearms traced are used in crime," stating further that "[f]irearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime."

But, if the concern is truly that these guns lack a serial number for tracing (rather than an illegitimate desire to criminalize gun owners and hobbyists), then that concern can be fully addressed without banning homemade guns. Specifically, there are alternatives to bans. For example, a law passed in California (which is ranked by the Giffords Law Center as having the most restrictive gun laws in the nation) provides that a new resident to the state shall apply to the Department of Justice for a unique serial number within 60 days of arrival for any firearm the resident wishes to possess in the state that the resident previously self-manufactured or self-assembled or a firearm the resident owns, that does not have a unique serial number or other mark of identification. As of July 1, 2018, prior to manufacturing or assembling a new firearm, a person is required to apply to California for a unique serial number. The gun owner is then simply required to engrave that number onto the receiver and report back to California with proof that he or she has done so. As of January 1, 2019, owners of existing guns were required to apply for such serial numbers and perform this engraving. See California Penal Code §§ 29180-29184. In short, assembly of new homemade guns and existing possession is permitted as long as this serial number is obtained, engraved and reported. California Penal Code §29180. In this way, the owner is identified and the gun is fully "traceable" and thus no longer a so-called "ghost gun." A violation of the California law is punishable with a year imprisonment or a $1,000 fine if the firearm was a handgun and by 6 months imprisonment and a fine for other types of firearms. (Id.). Connecticut uses a similar system. See Conn. Gen. Stat. 29-36a,b.

Indeed, D.C. has responded to a federal lawsuit by amending its "ghost gun" law to specifically provide that an owner "may register a self-manufactured firearm that does not bear a serial number as described in paragraph (l)(B) of this subsection, if, prior to finishing the frame or receiver, the applicant has caused a unique serial number to be engraved, casted, stamped (impressed), or placed on the unfinished frame or receiver, as set forth in subparagraphs (B) and (C) of this paragraph." Ghost Gun Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code § 7-2502.02 (December 13, 2021). This approach allows the continued manufacture of privately made firearms while addressing the perceived need for a serial number. The D.C. approach does not require adherence to federal Section 923(i) standards for such future manufacture – it allows the owner to engrave a number as long as he or she confirms with the MPD "that the proposed serial number has not already been registered to another firearm." (Id.) As these laws indicate, there are less restrictive alternatives. If D.C. can do this, then Maryland can too. There is no reason to take the extreme step of flatly banning homemade guns or converting existing owners into criminals. Under *Heller*, the State may not reject this alternative simply because a draconian general ban is more convenient. Gun owners may not be criminalized for such flimsy reasons. See, e.g., *Bonidy v. Postal Service*, 790 F.3d 1121, 1127 (10th Cir. 2015), *cert. denied*, 577 U.S. 1216 (2016) ("administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny").

We note in this regard that, in 2019, the House Judiciary Committee favorably reported and the House of Delegates ultimately passed HB 740 (the bill died in the Senate). That bill expressly required the State Police to conduct a study of this California alternative. These bills unaccountably abandon that approach. Yet, this California approach is even more appropriate (from the State's perspective) given that the ATF regulations will go into effect in June of 2022. Those regulations will effectively dry up the interstate availability of unserialized kits and other unserialized unfinished receivers that may be "readily" converted into firearms. Those regulations will thus effectively address the future availability of "ghost guns" as no current manufacturer of such unserialized unfinished receivers or kits would be allowed to continue to sell such items. Doing so would be a federal felony, nationwide. See 18 U.S.C. § 922(a)(1)(A)(barring "any person" except federal licensees, from engaging in the "business" of manufacturing or, in the course of such business, from shipping, transporting or receiving any firearm in interstate or foreign commerce); 18 U.S.C. § 924(a)(1)(D) (punishing such conduct as a felony). The bills thus should be **more accommodating** to existing owners, not more punitive. There is no need to pursue a scorched earth policy against existing law-abiding owners who have committed no crime. The State should have zero interest in needlessly criminalizing otherwise law-abiding Marylanders. Maryland already has more than enough criminals. Plainly, these bills have not exhausted reasonable alternatives.

## F.   The Penalties Are Excessively Severe

As noted, under these bills any violation is punishable by imprisonment for up to three years for each violation and/or a fine of $10,000 for each violation (the bills make clear that "each violation . . . is a separate crime"). As noted above, not even California imposes such severe penalties. Similarly, D.C. punishes a violation of its "ghost gun" statute with not more than 1 year imprisonment and a fine of $2,500. Code of the District of Columbia § 22–4515. By

making each privately manufactured firearm a separate crime, the bills empower prosecutors to seek extreme prison terms and fines in the aggregate if the owner happened to possess multiple privately manufactured firearms, as many hobbyists do. Such penalties are breathtaking when applied to existing owners who may have legally possessed their privately manufactured firearms for decades, without incident or any problem. Suddenly, these owners will have a mere 6 months to find a Class 07 FFL manufacturer who is willing and able to mark all his or her homemade firearms in accordance with the bills' strict requirements. And that is assuming that these owners even know about these requirements.

Indeed, only last Session, the "ghost gun" bills would have imposed only **a civil penalty** for a first offense, not a severe, disqualifying, criminal penalty. See HB 638 and SB 624 (providing that "for a first violation, is guilty of a **civil offense** and on conviction shall be fined not less than $1,000 but not exceeding $2,500"). Those bills did not make each violation "a separate crime." Under these prior bills, a **second conviction** would have been punishable by imprisonment for 2 years and a $5,000 fine, still less than 3 years and the $10,000 fine imposed **for each violation** by these bills. A misdemeanor crime punishable by 2 years or less is not disqualifying under State and federal law. See 18 U.S.C. § 921(a)(20)(B); Md. Code Public Safety, § 5-101(g)(3). HB 638 and SB 624 last Session thus did not create the permanent disqualification created by these bills. What has changed (other than the involvement of Attorney General Frosh)? There is no evidence whatsoever that existing, law-abiding owners have suddenly turned to a life of crime. Disqualified persons, or persons who misuse their firearms or illegally manufacture and sell guns can be and are arrested and charged with existing serious crimes without criminalizing the law-abiding owners. There is no public safety justification for treating these law-abiding citizens in such a vindictive, cavalier manner.

## G.    The Bills' Exemption For Firearms Made "Before 1968" Is Erroneous

The bills provide that the requirements imposed by the bills do not apply to "A FIREARM THAT: (I) WAS MANUFACTURED BEFORE 1968." This exemption is in apparent recognition that serial numbers were not required by federal law until the enactment of the federal Gun Control Act of 1968, Public Law 90-618, 82 Stat. 1213 (1968). However, the Gun Control Act of 1968 was not even enacted into law until October 22, 1968, and that portion of the Act requiring serial numbers (Section 923(i) enacted as part of Section 102 of the Act) did not go into effect until December 16, 1968. See Section 105(a), 82 Stat. at 1226. Thus, by exempting only firearms manufactured "before 1968" the bills erroneously include unserialized firearms made between January 1, 1968, and December 15, 1968. Many thousands of firearms without serial numbers were undoubtedly manufactured during that nearly year-long time period. Many, if not most, of those firearms cannot be distinguished from guns made prior to 1968. The bills' reference to "before 1968" is just lazy and sloppy draftsmanship. The bills should be thus amended to recognize the correct effective date of the Gun Control Act of 1968. After all, this is a criminal statute and thus must be written with precision. See, e.g., *United States v. Vuitch*, 402 U.S. 62, 69 n.3 (1971) (noting the need for "necessary precision in [a] criminal statute").

## CONCLUSION

Given all the problems, detailed above, the bills have plainly not been fully thought out. For all these reasons, we strongly urge an unfavorable report.

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

| YEAR | ARRESTS | HOMICIDES | MURDER ARRESTS | GUN SEIZURES | WEAPONS POSSESSION ARRESTS | NONFATAL SHOOTINGS |
|------|---------|-----------|----------------|--------------|----------------------------|--------------------|
| 1990 | 61,394 | 305 | 347 | 2487 | 1727 | N/A |
| 1991 | 65,033 | 304 | 322 | 2754 | 1865 | N/A |
| 1992 | 65,214 | 335 | 335 | 3614 | 1895 | N/A |
| 1993 | 69,699 | 353 | 382 | 3571 | 1852 | N/A |
| 1994 | 70,354 | 321 | 382 | 3478 | 1693 | N/A |
| 1995 | 73,521 | 325 | 496 | 3566 | 1791 | N/A |
| 1996 | 55,662 | 333 | 463 | 4241 | 1758 | N/A |
| 1997 | 71,709 | 313 | 271 | 4560 | 1923 | N/A |
| 1998 | 82,377 | 315 | 557 | 3718 | 1646 | N/A |
| 1999 | 80,775 | 305 | 501 | 3545 | 1228 | N/A |
| 2000 | 81,225 | 261 | 239 | 4117 | 1019 | 725 |
| 2001 | 93,778 | 256 | 245 | 2822 | 1418 | 684 |
| 2002 | 102,396 | 253 | 214 | 3598 | 1241 | 610 |
| 2003 | 110,164 | 270 | 194 | 3173 | 1305 | 545 |
| 2004 | 100,388 | 276 | 156 | 2791 | 1211 | 636 |
| 2005 | 99,980 | 269 | 128 | 5110 | 1407 | 557 |
| 2006 | 90,283 | 276 | 119 | 3055 | 1348 | 657 |
| 2007 | 82,529 | 282 | 125 | 3495 | 1328 | 651 |
| 2008 | 78,511 | 234 | 103 | 2714 | 1325 | 585 |
| 2009 | 75,194 | 238 | 132 | 2674 | 1162 | 450 |
| 2010 | 64,525 | 223 | 126 | 2378 | 1271 | 419 |
| 2011 | 60,009 | 196 | 88 | 2178 | 1224 | 379 |
| 2012 | 56,649 | 218 | 94 | 2296 | 1169 | 370 |
| 2013 | 50,424 | 233 | 115 | 2205 | 1280 | 402 |
| 2014 | 46,231 | 211 | 86 | 1874 | 1299 | 370 |
| 2015 | 32,939 | 344 | 106 | 1900 | 1227 | 635 |
| 2016 | 25,432 | 318 | 140 | 2124 | 1244 | 666 |
| 2017 | 29,042 | 343 | 125 | 1917 | 1080 | 702 |
| 2018 | 25,563 | 309 | 101 | 3911 | 1257 | 677 |
| 2019 | 24,826 | 348 | 89 | 2203 | 1161 | 770 |
| 2020 | 16,204 | 335 | 102 | 2244 | 1233 | 724 |
| 2021 | 13,592 | 337 | POLICE OWE ME THIS | 2,355 | 1,438 | 726 |

NR?



# *ENGAGE ARMAMENT, L.L.C.*

### *701 E. GUDE DRIVE, STE 101, ROCKVILLE, MD 20850 301-838-3151*

**WRITTEN TESTIMONY OF ANDREW RAYMOND, OWNER OF ENGAGE ARMAMENT LLC, AGAINST HOUSE BILL 638**

To Whom It May Concern,

My name is Andrew Raymond, and I am the co-owner of Engage Armament LLC, a federally licensed firearms manufacturer who has been in business for 11 years. I am a lifelong Maryland resident, and my family has been in Maryland on both sides for at least 337 years.

Part of firearm manufacturing is engraving the ATF required information on a firearm. I would say we have become experts on firearm markings over the past years and have invested more than $75,000 in firearm marking equipment to not only comply with the federal regulations but also to have the most advanced equipment to do so. Our main tool is a 60W fiber laser made <u>entirely</u> in the United States.

From both the cost and technical implications, there are a multitude of issues with this bill.

The cost of getting quality equipment to do the job effectively. As mentioned early, we spent quite a bit of money getting quality equipment, but even cheap imported equipment to mark metal will cost at least $7,000 and do a poor job of doing so, especially considering depth and permanency of the engraving.

The cost to the consumer will also increase significantly. For example, presently for NFA engraving we charge $45 which is the basic requirement of name/city/state under the National Firearms Act. This bill requires individuals to have their information engraved along with serial number, model AND after 1st January 2022 the manufacturers and "importers" info. This is substantially more required markings; therefore costs are going to quite high. For example, if I need to mark the info of the person who made the forging, plus my own info, and the gun information that could easily run $90 or more. That is on an item that would normally cost about $50 for an AR forging. I should also mention that I did ask for friends/acquaintances who I knew built their own firearms for a brief rundown of the numbers of items they may have. It appears most people who enjoy this hobby have many items that would fall under this bill. For example, engraving 5 items at $90 per engraving would cost $450. Many of these people are on the younger side, and in our current economy might not be able to afford compliance with the bill.

The other issues are technical. The first to be the actual act of marking the "receivers". Generally, these "receivers" are made either out of metal or polymer. Polymer has a great deal of variance to it and engraving settings from one type of polymer will catch another set on fire:



Here you can see a magazine catching fire using the settings from a known German polymer on this unknown polymer. The result is:



This marking is not legible and would not be compliant. Not to mention most people would now consider the product destroyed.

The next technical issue is sizing. While a metal "receiver" has a multitude of places to pollute with engravings, a good percentage of these products are polymer. A good example of the sizing issue would be the Polymer 80 "receivers" which are probably the most common plastic hobby "receivers" we see. These have a small metal piece imbedded in the polymer specifically for engraving purposes:



This small metal piece usually gives us only enough space for a serial number. In fact, to add the requirements from this law would require us to bring the size down to the point where it would not be compliant or readily legible. The below picture is a laser overlay of the space required for compliant sized markings using my personal information:



As you can see, the required engraving cannot fit in the supplied space. Once again, this is using my personal info as required under the law.

We should also consider required markings of original manufacturer and seller/importer into the state. This would double the space requirement and would not be feasible to do. Shrinking the size would not be compliant/legible either. The below is an example of that information at the minimum compliant size:



In order to fit <u>only one set</u> of the required markings my information must be shrunk to .055 which is not compliant. In the below picture, that is the 3rd example:



Another issue is going to be the length of the individual's name. For example, one of our customers is named "Ad****** Ra************* Kr******". His name has 32 characters not including spaces. I have no idea how we can fit that along with city, state, caliber etc. I am also not going to charge standard rates for an engraving of this size and will have to move to a per character rate.   I believe this will disproportionately effect persons of color and increase their cost to comply with this law.

Manufacturers/brokers will not be able to effectively fit the required information on all types of these "receivers" in a compliant fashion as there will just not be enough space on a good percentage of these items.

The cost to the customer is also going to go up substantially if people even decide to continue their hobby or be compliant.

While my company stands to gain financially from it, we stand against it not only on principle but also upon the basis of the unfeasible practicality of the requirements. I urge you to fully consider the cost implications, practicality, and the inequity of this bill and issue an unfavorable report.


Sincerely,


Andrew Starr Raymond
Co-Owner – Engage Armament LLC
andy@engagearmament.com



FILED

2021 DEC 10   AM 9: 54

TANYA SCHEIDE
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT

Kathy Thomas

1  Case No.  21-CV-00690

2  Dept. No.  I

3  The undersigned affirms that this document
   does not contain the social security number
4  of any individual.

5

6

7

8

### IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

### IN AND FOR THE COUNTY OF LYON

9  POLYMER80, INC.,

                                              **FINDINGS OF FACT,**
10              Plaintiff,                     **CONCLUSIONS OF LAW, AND**
                                              **ORDER GRANTING SUMMARY**
11     vs.                                     **JUDGMENT IN FAVOR OF**
                                              **PLAINTIFF, POLYMER80, INC.**
12  STEPHEN SISOLAK, Governor of Nevada, AARON
    FORD, Attorney General of Nevada, GEORGE
13  TOGLIATTI, Director of the Nevada Department
    of Public Safety, MINDY MCKAY, Administrator
14  of the Records, Communications, and Compliance
    Division of the Nevada Department of Public
15  Safety,

16              Defendants.
17  _____/

18          This matter is before the Court upon the parties' competing Motions for Summary Judgment

19  both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter

20  was set for argument on November 23, 2021.  Plaintiff was present and represented by Brad

21  Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

22  of Greenspoon Marder LLP, who was present in Court.  The Defendants were represented by Craig

23  A. Newby, Esq., Deputy Solicitor General, who was present in Court.

24          This Court, having reviewed and considered the parties' respective motions and oppositions

25  for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing

26  upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and

27

28

good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS.

## I

## **PROCEDURAL HISTORY**

During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB 286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts relating to unfinished frames or receivers under certain circumstances; … providing penalties; and providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB 286 into law on June 7, 2021.

On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada, George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay, Administrator of the Records, Communications, and Compliance Division of the Nevada Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and a Permanent Injunction barring enforcement of the new law.

On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and Preliminary Injunction*. After briefing and a hearing, this Court, on July 16, 2021, entered its *Order Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That Order is currently pending appeal at the Nevada Supreme Court.

---

[1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286 Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021, that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited trial date of November 30, 2021.  That Order also provided that the parties could engage in discovery through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive motions.  By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop the evidentiary record to be presented upon motions for summary judgment and/or at trial.

In the ensuing months, the parties proceeded with discovery.  Both Polymer80 and Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2]  Pursuant to the parties' Stipulation, this Court directed that they file their oppositions to the other side's summary judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing on November 23, 2021.  That hearing was held as scheduled and the Court heard substantial argument from the parties.  Notably, both parties agreed at that hearing that this Court could decide this case upon the record before it at that point, and that a trial was unnecessary.  At the conclusion of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment.  This Order follows and memorializes that ruling.

Accordingly,

IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set forth herein and on the record at the November 23, 2021, hearing.

---

[2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an appeal from this Court's *Order Granting Preliminary Injunction*.  Thereafter, Defendants filed a Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure question of law that would be resolved upon their then-pending appeal.  This Court denied Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion in granting interim relief.  Moreover, a stay would have only delayed a ruling on the constitutionality of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.

## II

### CONTESTED PROVISIONS OF AB 286

The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by adding, among others, the following provisions, which are the subject of this proceeding.

First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

> 1.      A person shall not possess, purchase, transport or receive an unfinished frame or receiver unless:
> (a) The person is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.
>
> 2.      A person who violates this section:
> (a) For the first offense, is guilty of a gross misdemeanor; and
> (b)  For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130.[3]

Plainly, this provision makes it a crime to "possess, purchase, transport or receive an unfinished frame or receiver" in the State of Nevada.

Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

> 1.      A person shall not sell, offer to sell or transfer an unfinished frame or receiver unless:
> (a) The person is:
> (1) A firearms importer or manufacturer; and
> (2) The recipient of the unfinished frame or receiver is a firearms importer or manufacturer; or
> (b)  The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.

---

[3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison and a fine of up to $5,000.00.

2.     A person who violates this section:
        (a) For the first offense, is guilty of a gross misdemeanor; and
        (b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130

This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver" in the State of Nevada.

Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or receiver" to Nevada law and defines that term as follows:

9.     "Unfinished frame or receiver" means a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.[4]

## III

### STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than simply show that there is some metaphysical doubt as to the operative facts in order to avoid

---

[4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment relating to the efficacy of those provisions.

1  summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2  724, 732 (2005) (quotations omitted). "The nonmoving party must, by affidavit or otherwise, set

3  forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4  judgment entered against him." *Id.* And, the party opposing summary judgment cannot build a case

5  on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6  *Nevada Bell*, 108 Nev. 105, 110 (1992)). Critically, the Nevada Supreme Court, as the parties have

7  acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8  Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9  *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009). As explained below, there are no

10  "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11  this action on summary judgment upon the record before it.

12                                          **IV**

13                    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14          Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15  It manufactures, designs, and distributes gun-related products, components, and after-market

16  accessories. The legislative history reveals that AB 286 has targeted, at least partially, certain of

17  Polymer80's business products. Defendants have also admitted as much in their Answer and in their

18  moving papers. As set forth in the testimony of Assemblywoman Sandra Jauregui:

19              . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
20              largest manufacturers of ghost guns.

21  Minutes, Assembly Committee on Judiciary, p.6 (March 17, 2021). Assemblyman Wheeler stated

22  therein:

23              The kit guns you called ghost guns are used by a lot of hobbyists.
24              Under federal law, those are quite legal, so outlawing them in Nevada,
                as this bill tries to do, basically puts a company [Polmer80] in my
25              district out of business. . . .
                We are going to drive a company in my district out of business, but
26              people can still buy them in Kentucky. . .

27

28

Minutes, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

## A.    STANDING OF POLMER80

In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.   The Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts in their Motion that they indeed have standing.

NRS 30.040 provides, in pertinent part:

> **NRS 30.040.  Questions of construction or validity of . . . statutes.**
>
> 1. Any person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

NRS 30.040(1).  In Nevada, the issue of Standing is a question of law.  *Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

> The question of standing concerns whether the party seeking relief has a sufficient interest in the litigation. The primary purpose of this standing inquiry is to ensure the litigant will vigorously and effectively present his or her case against an adverse party. Thus, a requirement of standing is that the litigant personally suffer injury that can be fairly traced to the allegedly unconstitutional statute and which would be redressed by invalidating the statute. A general interest in the matter is normally insufficient: a party must show a personal injury.

*Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct. 7, 2021), (Citations Omitted).

---

[5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286 all indicating the negative impact of the bill on their ability to conduct business in the State of Nevada.

This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the constitutionality of AB 286. Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its ongoing conduct. Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of AB 286 takes effect January 1, 2022. Accordingly, it is ripe for this Court to determine whether or not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.

Polymer80 satisfies the requirement to show that they would "personally suffer injury that can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony criminal prosecution each time they produce a product which allegedly falls under the purview of the statute. Further, Polymer80 would suffer significant economic loss as set forth in the Deposition testimony submitted, and uncontested by the Defendants. This, combined with the legislative history showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that, unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for facial invalidity of the statute – which is Polymer80's only true redress.

This Court determines that Polymer80 will suffer irreparable harm in the absence of declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice of the conduct being criminalized.[6]

---

[6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would mitigate any harm as all Polymer80 would have to do is put a serial number on its products. The

**B.      STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

The question before this Court is essentially whether or not AB 286 is unconstitutionally vague under the Due Process Clause of the Nevada Constitution.  It is undisputed that Section 3 and Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D felonies.

Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty, or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006).

> Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional.  The court must interpret a statute in a reasonable manner, that is, [t]he words of the statute should be construed in light of the policy and spirit of the law, and the interpretation made should avoid absurd results.  In reviewing a statute, it should be given [its] plain meaning and must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a provision nugatory.

*Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009).  In reviewing the statute, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).

The Nevada Supreme Court has adopted a two-pronged test for determining whether a criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

---

argument was abandoned on summary judgment.  Section 3(1)(b) and Section 3.5(1)(b) by their own terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be imprinted with a serial number.  It is undisputed that the products produced by Polymer80 are not required by federal law to have a serial number imprinted on them.

1  Constitution. *See, e.g., Flamingo Paradise Gaming,* 125 Nev. at 510; *Gallegos v. State*, 123 Nev.

2  289, 294 (2007).

3
4  > A criminal statute can be invalidated for vagueness (1) if it fails to
   > provide a person of ordinary intelligence fair notice of what is
   > prohibited *or* (2) if it is so standardless that it authorizes or encourages
5  > seriously discriminatory enforcement.

6  *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).  Although both civil and criminal statutes

7  are judged under the same test, the Nevada Supreme Court has explained:

8
9  > [T]here are two approaches to a facial vagueness challenge depending
   > on the type of statute at issue. The first approach arises under a facial
   > challenge to a civil statute and the plaintiff must show that the statute
10 > is impermissibly vague in all of its applications. In making this
   > showing, [a] complainant who engages in some conduct that is clearly
11 > proscribed cannot complain of the vagueness of the law as applied to
12 > the conduct of others. **But, when the statute involves criminal**
   > **penalties or constitutionally protected rights, the second**
13 > **approach involves a higher standard of whether "vagueness**
   > **permeates the text.**
14

15 *Flamingo,* 125 Nev. at 512.[7]  Where a statute imposes criminal penalties, as is the case with AB 286,

16 the more exacting standard for Constitutionality is imposed.

17 > Under the higher standard, the question becomes whether vagueness
   > so permeates the text that the statute cannot meet these requirements
18 > in most applications; and thus, this standard provides for the
   > possibility that some applications of the law would not be void, but
19 > the statute would still be invalid if void in most circumstances.
20
21 *Flamingo,* 125 Nev. at 507.

22
23
24 _____
25 [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin*, 99 Nev. 336,
26 340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 495 (1982). This Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly
27 proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness challenges need to show that the law is "impermissibly vague in all its applications."
28

In this Court's view, AB 286, a criminal enactment, fails under both prongs for various reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law.  While similar, "the first prong is concerned with guiding those who may be subject to potentially vague statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of statutes." *Silver v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

## C.    SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED

Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with fair notice of the conduct which it proscribes.  The underlying purpose of this factor is to give a person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*, 123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport, receipt, transfer and sale of what the statute calls an "unfinished frame or receiver." While AB 286 purports to define the term "unfinished frame or receiver," that definition is as follows:

> [A] blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

This definition does not provide a person of ordinary intelligence with adequate notice of what AB 286 criminalizes.

As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada legislative statutory enactment.  The terms used in the definition of "unfinished frame or receiver" are not defined elsewhere in the statute.  These terms include - blank, casting, machined body, machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control cavity area.

The definition does not tell anyone when during the manufacturing process a blank, casting, or machined body (whatever those terms mean) has gone through the "major machining operations"

1   (whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of

2   a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct

3   to comply with the law.  As a result, this Court finds that the text of AB 286 does not provide fair

4   notice of whatever it criminalizes.  To this end, this Court asked on multiple occasions during oral

5   argument on the Motion for Summary Judgment what those terms as used in AB 286 mean.

6   Tellingly, the Defendants could not in any manner explain their meaning(s).

7           This Court inquired whether or not the common law defined the terms used in AB 286, and

8   the response that this Court received was clearly in the negative.  As such, this Court cannot use the

9   common law to decipher, clarify, or define the inherently vague terms of AB 286.  This fact

10  distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of

11  indecent exposure – a common law crime), where the Nevada Supreme Court found that that the

12  common law can provide a definition as to what conduct a statute prohibits.  This Court inquired as

13  to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and,

14  again, the answer was no.  As a consequence, this case is also distinguishable from *Silverwing*

15  *Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020),

16  (Commonly accepted definition of "subdivision" contained within the State's planning and zoning

17  statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law

18  elsewhere defined an allegedly ambiguous term.  Thus, neither the common law nor any other

19  Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

20          While portions of AB 286 incorporate certain terms that are defined in federal legislation,

21  this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal

22  definitions relating to firearms or the Gun Control Act into AB 286.  Here, the Nevada Legislature

23  purposely included some federal definitions into AB 286 but, deliberately did not include others.

24  From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent

25  some legislative declaration to the contrary.  Simply put, had the Nevada Legislature wished to

26  incorporate other federal definitions into AB 286, it knew how to do so and would have done so.  It

27

28

did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed to do.[8]

In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive from justice." The legislature failed to define what the term "fugitive from justice" meant in relation to the statute. The District Court upheld the validity of the statute and applied the federal definition of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed stating:

> Unlike Congress, the Nevada Legislature has not defined "fugitive from justice." By failing to adopt the federal definition of "fugitive from justice" or include any definition of that phrase. . ., the Legislature failed to provide the public with statutory notice of what that term means. It could arguably encompass a wide variety of circumstances. . . The fact that the district court, sua sponte, adopted the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that deficiency.

*Gallegos v. State*, 123 Nev. @ 294-95.

Finally, the legislative history of AB 286 does not shed any light on the undefined terms used in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates that the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

---

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

and undefined terms used in AB 286.  It is noteworthy that the parties agreed that the legislative history for AB 286 gives this Court no information to determine what the Nevada Legislature meant when adopting and implementing the definition of "unfinished frame or receiver."  Tellingly, not even Webster's Dictionary defines a majority of these terms.

Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for vagueness.  This Court finds this contention unpersuasive.  The criminal acts defined in Sections 3 and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the possession and sale of "unfinished frames and receivers," whatever those things may actually be.  And, the person possessing or selling those "unfinished frames and receivers" need not have any particular specific intent.  In fact, AB 286 only and very generally employs intent in the definition of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm."  The use of the word "intended" in this definition does not create the *scienter* element defendants claim to exist within Section 3 and Section 3.5 of the bill.

Here, a literal reading of the definitional statute requires that the blank, casting or machined body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm.  Nowhere in the definitional statute does it indicate who would have to have intended the unfinished frame or receiver to be transformed into a firearm.  Is it the manufacturer like Polymer80?  It is undisputed that it is their intent not to make a firearm.  Is it the seller of a gun kit?  They have no intent to make a firearm.  The object itself cannot transfer specific intent to the possessor of the item.

Even if this Court were to assume an intent element was specifically meant to apply to any individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally vague.  For example, if Section 3 criminalized the possession of a blank, casting, or machined body only if the person who possessed such an item (whatever it might actually be) specifically intended to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still be unconstitutionally vague.

In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

1   machining, and (ii) already be formed or machined to the point at which most of the major machining

2   operations have been completed.  Yet, none of these terms are defined, nor is there any way to know

3   when "most of the major machining operations have been completed," and then what "additional

4   machining" must still occur and when.  Accordingly, any specific intent that can be read into

5   Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB

6   286 still fails to provide adequate notice as to what it specifically criminalizes.

7        Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or

8   common law.  Consequently, the only notice of what AB 286 criminalizes is provided in the statute

9   itself.  However, the law does not provide adequate notice of what it criminalizes, given that the

10  definition of "unfinished frame or receiver" uses a myriad undefined terms.  Moreover, the combined

11  use of these undefined terms results in an overall failure to provide a person of ordinary intelligence

12  with fair notice of what is criminalized.  As there is no well-established or ordinary meaning to the

13  terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process

14  Clause of the Nevada Constitution.

15

16  **D.    SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT**

17  **AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

18

19        This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages

20  seriously discriminatory enforcement."  *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).

    The Court finds that it is.

21

22        As explained by the Nevada Supreme Court:

23        The concern under this prong is the scope of discretion left to law
          enforcement officials and prosecutors. Our fear is that absent adequate
24        guidelines, a criminal statute may permit a standardless sweep, which
          would allow the police, prosecutors, and juries to 'pursue their
25        personal predilections.'

26  *Gallegos*, 125 Nev. @ 296.  (Citation Omitted)

27        AB 286 fails to establish clear standards that law enforcement can use to determine whether

28  the law is violated.  At its most basic, there is no clear standard for law enforcement to use to

1  determine when an "unfinished frame or receiver" comes into existence.   Unlike the federal
2  regulatory process to determine whether a frame or lower receiver is considered a firearm under the
3  Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame
4  or receiver" actually comes into existence.  The most any court can glean from the definition is that
5  it is something less than a firearm and more than a block of raw material.  Where on the scale in
6  between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the
7  law and left to the sole discretion of law enforcement and prosecutors.  When does the machining
8  process start?  When does the raw material become machined and through what processes?  What
9  constitutes a "major machining operation" versus machining itself?  Would the "fire-control cavity"
10  be considered a "major machining operation" or is it excluded? What additional machining needs to
11  be completed?  It is unclear and undefined under the statute.

12  Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike
13  as they, in their sole discretion and without guidance, could label almost anything an "unfinished
14  frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.
15  There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing
16  their personal predilections.

17  Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section
18  3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law.   Therefore,
19  enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary
20  and discriminatory enforcement.

21  For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are
22  unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23  V

24  **ORDER AND JUDGMENT**

25  Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are
26  unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence
27  with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and
28  encourages seriously arbitrary and discriminatory enforcement.

1      Good cause appearing,

2      IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3   GRANTED.

4      IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5   DENIED.

6      IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7   Polymer80 and against Defendants; to wit,

8      IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9   Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10   State Constitution.

11      IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12   Polymer80 and against Defendants; to wit,

13      IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14   Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15   Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16   Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17   and their respective successors, officers, agents, servants, and employees and anyone acting in

18   concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19   Section 3 and Section 3.5 of AB 286.

20      IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21   this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22   exonerated and released to Polymer80 forthwith.

23      THIS IS A FINAL JUDGMENT.

24      DATED this 10th day of December, 2021.

25

26                                    _____
                                      JOHN P. SCHLEGELMILCH,
27                                    DISTRICT JUDGE

28

1   Case No. 21-CV-00690

2   Dept. No. I

3

**<u>Certificate of Mailing</u>**

4         I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5   Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6   mailed at Yerington, Nevada addressed to:

7   Gregory L. Zunino, Esq.
     *Emailed:* gzunino@ag.nv.gov
8

9   Brad M. Johnston, Esq.
     *Emailed: bjohnston@shjnevada.com*
10

11   James J. McGuire, Esq.
     *Emailed: james.mcguire@gmlaw.com*

12
   Michael Patrick, Esq.
13   *Emailed: michael.patrick@gmlaw.com*

14   Mark Doerr
     *Emailed: mark.doerr@gmlaw.com*
15

16   Craig A. Newby, Esq.
     *Emailed: CNewby@ag.nv.gov*
17

18

19         DATED: This _10th_ day of December, 2021.

20

21                              Al Nelson

22                    Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28