18   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

carriage outright, 26 States had "may issue" licensing regimes, 7 States had "shall issue" regimes, and 1 State (Vermont) allowed concealed carriage without a permit. Congressional Research Service, Gun Control: Concealed Carry Legislation in the 115th Congress 1 (Jan. 30, 2018). Thus, it has only been in the last few decades that States have shifted toward "shall issue" licensing laws. Prior to that, most States operated "may issue" licensing regimes without legal or practical problem.

Moreover, even considering, as the Court does, only the present state of play, its tally provides an incomplete picture because it accounts for only the number of States with "may issue" regimes, not the number of people governed by those regimes. By the Court's count, the seven "may issue" jurisdictions are New York, California, Hawaii, Maryland, Massachusetts, New Jersey, and the District of Columbia. *Ante,* at 5–6. Together, these seven jurisdictions comprise about 84.4 million people and account for over a quarter of the country's population. U. S. Census Bureau, 2020 Population and Housing State Data (Aug. 12, 2021) (2020 Population), https://www.census.gov/library/visualizations/interactive/2020-population-and-housing-state-data.html. Thus, "may issue" laws can hardly be described as a marginal or outdated regime.

And there are good reasons why these seven jurisdictions may have chosen not to follow other States in shifting toward "shall issue" regimes. The seven remaining "may issue" jurisdictions are among the most densely populated in the United States: the District of Columbia (with an average of 11,280.0 people/square mile in 2020), New Jersey (1,263.0), Massachusetts (901.2), Maryland (636.1), New York (428.7), California (253.7), and Hawaii (226.6). U. S. Census Bureau, Historical Population Density (1910–2020) (Apr. 26, 2001), https://www.census.gov/data/tables/time-series/dec/density-data-text.html. In comparison, the average population density of the United States as a whole is

EXHIBIT
1 (Part B)

BREYER, J., dissenting

93.8 people/square mile, and some States have population densities as low as 1.3 (Alaska), 5.9 (Wyoming), and 7.4 (Montana) people/square mile.  *Ibid.*  These numbers reflect in part the fact that these "may issue" jurisdictions contain some of the country's densest and most populous urban areas, *e.g.,* New York City, Los Angeles, San Francisco, the District of Columbia, Honolulu, and Boston.  U. S. Census Bureau, Urban Area Facts (Oct. 8, 2021), https://www.census .gov/programs-surveys/geography/guidance/geo-areas/ urban-rural/ua-facts.html.  New York City, for example, has a population of about 8.5 million people, making it more populous than 38 States, and it squeezes that population into just over 300 square miles.  Quick Facts: New York City; 2020 Population; Brief for City of New York as *Amicus Curiae* 8, 22.

As I explained above, *supra,* at 8–9, densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas.  It is thus easy to see why the seven "may issue" jurisdictions might choose to regulate firearm carriage more strictly than other States.  See Grossman 199 ("We find strong evidence that more urban states are less likely to shift to 'shall issue' than rural states").

New York and its *amici* present substantial data justifying the State's decision to retain a "may issue" licensing regime.  The data show that stricter gun regulations are associated with lower rates of firearm-related death and injury.  See, *e.g.,* Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 9–11; Brief for Former Major City Police Chiefs as *Amici Curiae* 9–12; Brief for Educational Fund 25–28; Brief for Social Scientists et al. as *Amici Curiae* 9–19.  In particular, studies have shown that "may issue" licensing regimes, like New York's, are associated with lower homicide rates and lower violent crime rates than "shall issue" licensing regimes.  For example, one study compared homicide rates across all 50 States during

BREYER, J., dissenting

the 25-year period from 1991 to 2015 and found that "shall issue" laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates. Siegel, 107 Am. J. Pub. Health, at 1924–1925, 1927. Another study longitudinally followed 33 States that had adopted "shall-issue" laws between 1981 and 2007 and found that the adoption of those laws was associated with a 13%–15% increase in rates of violent crime after 10 years. Donohue, 16 J. Empirical Legal Studies, at 200, 240. Numerous other studies show similar results. See, *e.g.,* Siegel, 36 J. Rural Health, at 261 (finding that "may issue" laws are associated with 17% lower firearm homicide rates in large cities); C. Crifasi et al., Association Between Firearm Laws and Homicide in Urban Counties, 95 J. Urb. Health 383, 387 (2018) (finding that "shall issue" laws are associated with a 4% increase in firearm homicide rates in urban counties); M. Doucette, C. Crifasi, & S. Frattaroli, Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017), 109 Am. J. Pub. Health 1747, 1751 (Dec. 2019) (finding that States with "shall issue" laws between 1992 and 2017 experienced 29% higher rates of firearm-related workplace homicides); Brief for Social Scientists et al. as *Amici Curiae* 15–16, and nn. 17–20 (citing "thirteen . . . empirical papers from just the last few years linking ["shall issue"] laws to higher violent crime").

JUSTICE ALITO points to competing empirical evidence that arrives at a different conclusion. *Ante,* at 3, n. 1 (concurring opinion). But these types of disagreements are exactly the sort that are better addressed by legislatures than courts. The Court today restricts the ability of legislatures to fulfill that role. It does so without knowing how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties. And it does so without giving the State an opportunity to develop the

Cite as: 597 U. S. ___ (2022)            21

BREYER, J., dissenting

evidentiary record to answer those questions. Yet it strikes
down New York's licensing regime as a violation of the Sec-
ond Amendment.

### III
#### A

How does the Court justify striking down New York's law
without first considering how it actually works on the
ground and what purposes it serves? The Court does so by
purporting to rely nearly exclusively on history. It requires
"the government [to] affirmatively prove that its firearms
regulation is part of the historical tradition that delimits
the outer bounds of 'the right to keep and bear arms.'" *Ante,*
at 10. Beyond this historical inquiry, the Court refuses to
employ what it calls "means-end scrutiny." *Ibid.* That is,
it refuses to consider whether New York has a compelling
interest in regulating the concealed carriage of handguns or
whether New York's law is narrowly tailored to achieve that
interest. Although I agree that history can often be a useful
tool in determining the meaning and scope of constitutional
provisions, I believe the Court's near-exclusive reliance on
that single tool today goes much too far.

The Court concedes that no Court of Appeals has adopted
its rigid history-only approach. See *ante,* at 8. To the con-
trary, every Court of Appeals to have addressed the ques-
tion has agreed on a two-step framework for evaluating
whether a firearm regulation is consistent with the Second
Amendment. *Ibid.; ante,* at 10, n. 4 (majority opinion) (list-
ing cases from the First, Second, Third, Fourth, Fifth,
Sixth, Seventh, Ninth, Tenth, Eleventh, and D. C. Circuits).
At the first step, the Courts of Appeals use text and history
to determine "whether the regulated activity falls within
the scope of the Second Amendment." *Ezell* v. *Chicago,* 846
F. 3d 888, 892 (CA7 2017). If it does, they go on to the sec-
ond step and consider "'the strength of the government's
justification for restricting or regulating'" the Second

BREYER, J., dissenting

Amendment right. *Ibid.* In doing so, they apply a level of "means-ends" scrutiny "that is proportionate to the severity of the burden that the law imposes on the right": strict scrutiny if the burden is severe, and intermediate scrutiny if it is not. *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 700 F. 3d 185, 195, 198, 205 (CA5 2012).

The Court today replaces the Courts of Appeals' consensus framework with its own history-only approach. That is unusual. We do not normally disrupt settled consensus among the Courts of Appeals, especially not when that consensus approach has been applied without issue for over a decade. See Brief for Second Amendment Law Professors as *Amici Curiae* 4, 13–15; see also this Court's Rule 10. The Court attempts to justify its deviation from our normal practice by claiming that the Courts of Appeals' approach is inconsistent with *Heller.* See *ante,* at 10. In doing so, the Court implies that all 11 Courts of Appeals that have considered this question misread *Heller.*

To the contrary, it is this Court that misreads *Heller.* The opinion in *Heller* did focus primarily on "constitutional text and history," *ante,* at 13 (majority opinion), but it did *not* "rejec[t] . . . means-end scrutiny," as the Court claims, *ante,* at 15. Consider what the *Heller* Court actually said. True, the Court spent many pages in *Heller* discussing the text and historical context of the Second Amendment. 554 U. S., at 579–619. But that is not surprising because the *Heller* Court was asked to answer the preliminary question whether the Second Amendment right to "bear Arms" encompasses an individual right to possess a firearm in the home for self-defense. *Id.,* at 577. The *Heller* Court concluded that the Second Amendment's text and history were sufficiently clear to resolve that question: The Second Amendment, it said, does include such an individual right. *Id.,* at 579–619. There was thus no need for the Court to go further—to look beyond text and history, or to suggest what

Cite as: 597 U. S. ____ (2022)          23

BREYER, J., dissenting

analysis would be appropriate in other cases where the text and history are not clear.

But the *Heller* Court did not end its opinion with that preliminary question. After concluding that the Second Amendment protects an individual right to possess a firearm for self-defense, the *Heller* Court added that that right is "not unlimited." *Id.,* at 626. It thus had to determine whether the District of Columbia's law, which banned handgun possession in the home, was a permissible regulation of the right. *Id.,* at 628–630. In answering that second question, it said: "Under *any of the standards of scrutiny that we have applied to enumerated constitutional rights,* banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.,* at 628–629 (emphasis added; footnote and citation omitted). That language makes clear that the *Heller* Court understood some form of means-end scrutiny to apply. It did not need to specify whether that scrutiny should be intermediate or strict because, in its view, the District's handgun ban was so "severe" that it would have failed either level of scrutiny. *Id.,* at 628–629; see also *id.,* at 628, n. 27 (clarifying that rational-basis review was not the proper level of scrutiny).

Despite *Heller*'s express invocation of means-end scrutiny, the Court today claims that the majority in *Heller* rejected means-end scrutiny because it rejected my dissent in that case. But that argument misreads both my dissent and the majority opinion. My dissent in *Heller* proposed directly weighing "the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other." *Id.,* at 689. I would have asked "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.,* at 689–690. The majority rejected my dissent,

BREYER, J., dissenting

not because I proposed using means-end scrutiny, but because, in its view, I had done the opposite. In its own words, the majority faulted my dissent for proposing "a *freestanding* 'interest-balancing' approach" that accorded with "*none of the traditionally expressed levels* [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis)." *Id.,* at 634 (emphasis added).

The majority further made clear that its rejection of freestanding interest balancing did *not* extend to traditional forms of means-end scrutiny. It said: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Ibid.* To illustrate this point, it cited as an example the First Amendment right to free speech. *Id.,* at 635. Judges, of course, regularly use means-end scrutiny, including both strict and intermediate scrutiny, when they interpret or apply the First Amendment. See, *e.g., United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 813 (2000) (applying strict scrutiny); *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 186, 189–190 (1997) (applying intermediate scrutiny). The majority therefore cannot have intended its opinion, consistent with our First Amendment jurisprudence, to be read as rejecting all traditional forms of means-end scrutiny.

As *Heller*'s First Amendment example illustrates, the Court today is wrong when it says that its rejection of means-end scrutiny and near-exclusive focus on history "accords with how we protect other constitutional rights." *Ante,* at 15. As the Court points out, we do look to history in the First Amendment context to determine "whether the expressive conduct falls outside of the category of protected speech." *Ibid.* But, if conduct falls within a category of protected speech, we then use means-end scrutiny to determine whether a challenged regulation unconstitutionally burdens that speech. And the degree of scrutiny we apply

BREYER, J., dissenting

often depends on the type of speech burdened and the severity of the burden. See, *e.g., Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721, 734 (2011) (applying strict scrutiny to laws that burden political speech); *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) (applying intermediate scrutiny to time, place, and manner restrictions); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 564–566 (1980) (applying intermediate scrutiny to laws that burden commercial speech).

Additionally, beyond the right to freedom of speech, we regularly use means-end scrutiny in cases involving other constitutional provisions. See, *e.g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993) (applying strict scrutiny under the First Amendment to laws that restrict free exercise of religion in a way that is not neutral and generally applicable); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995) (applying strict scrutiny under the Equal Protection Clause to race-based classifications); *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988) (applying intermediate scrutiny under the Equal Protection Clause to sex-based classifications); see also *Virginia* v. *Moore*, 553 U. S. 164, 171 (2008) ("When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness").

The upshot is that applying means-end scrutiny to laws that regulate the Second Amendment right to bear arms would not create a constitutional anomaly. Rather, it is the Court's rejection of means-end scrutiny and adoption of a rigid history-only approach that is anomalous.

## B

The Court's near-exclusive reliance on history is not only unnecessary, it is deeply impractical. It imposes a task on the lower courts that judges cannot easily accomplish. Judges understand well how to weigh a law's objectives (its

BREYER, J., dissenting

"ends") against the methods used to achieve those objectives (its "means"). Judges are far less accustomed to resolving difficult historical questions. Courts are, after all, staffed by lawyers, not historians. Legal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.

The Court's insistence that judges and lawyers rely nearly exclusively on history to interpret the Second Amendment thus raises a host of troubling questions. Consider, for example, the following. Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the Second Amendment change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history? See S. Cornell, *Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss," 56 UCLA L. Rev. 1095, 1098 (2009) (describing "law office history" as "a results oriented methodology in which evidence is selectively gathered and interpreted to produce a preordained conclusion").

Consider *Heller* itself. That case, fraught with difficult historical questions, illustrates the practical problems with expecting courts to decide important constitutional questions based solely on history. The majority in *Heller* undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to "keep and bear Arms" historically encompassed an "individual right to possess and carry weapons in case of confrontation"—that is, for self-defense. 554 U. S., at 592; see also *id.*, at 579–619. Justice Stevens' dissent conducted an

BREYER, J., dissenting

equally searching textual and historical inquiry and concluded, to the contrary, that the term "bear Arms" was an idiom that protected only the right "to use and possess arms in conjunction with service in a well-regulated militia." *Id.,* at 651. I do not intend to relitigate *Heller* here. I accept its holding as a matter of *stare decisis*. I refer to its historical analysis only to show the difficulties inherent in answering historical questions and to suggest that judges do not have the expertise needed to answer those questions accurately.

For example, the *Heller* majority relied heavily on its interpretation of the English Bill of Rights. Citing Blackstone, the majority claimed that the English Bill of Rights protected a "'right of having and using arms for self-preservation and defence.'" *Id.,* at 594 (quoting 1 Commentaries on the Laws of England 140 (1765)). The majority interpreted that language to mean a private right to bear arms for self-defense, "having nothing whatever to do with service in a militia." 554 U. S., at 593. Two years later, however, 21 English and early American historians (including experts at top universities) told us in *McDonald* v. *Chicago*, 561 U. S. 742 (2010), that the *Heller* Court had gotten the history wrong: The English Bill of Rights "did not . . . protect an individual's right to possess, own, or use arms for private purposes such as to defend a home against burglars." Brief for English/Early American Historians as *Amici Curiae* in *McDonald* v. *Chicago*, O. T. 2009, No. 08–1521, p. 2. Rather, these *amici* historians explained, the English right to "have arms" ensured that the Crown could not deny Parliament (which represented the people) the power to arm the landed gentry and raise a militia—or the right of the people to possess arms to take part in that militia—"should the sovereign usurp the laws, liberties, estates, and Protestant religion of the nation." *Id.,* at 2–3. Thus, the English right did protect a right of "self-preservation and defence," as Blackstone said, but that right "was to

28   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

be exercised not by individuals acting privately or independently, but as a militia organized by their elected representatives," *i.e.,* Parliament. *Id.,* at 7–8. The Court, not an expert in history, had misread Blackstone and other sources explaining the English Bill of Rights.

And that was not the *Heller* Court's only questionable judgment. The majority rejected Justice Stevens' argument that the Second Amendment's use of the words "bear Arms" drew on an idiomatic meaning that, at the time of the founding, commonly referred to military service. 554 U. S., at 586. Linguistics experts now tell us that the majority was wrong to do so. See, *e.g.,* Brief for Corpus Linguistics Professors and Experts as *Amici Curiae* (Brief for Linguistics Professors); Brief for Neal Goldfarb as *Amicus Curiae*; Brief for Americans Against Gun Violence as *Amicus Curiae* 13–15. Since *Heller* was decided, experts have searched over 120,000 founding-era texts from between 1760 and 1799, as well as 40,000 texts from sources dating as far back as 1475, for historical uses of the phrase "bear arms," and they concluded that the phrase was overwhelmingly used to refer to "'war, soldiering, or other forms of armed action by a group rather than an individual.'" Brief for Linguistics Professors 11, 14; see also D. Baron, Corpus Evidence Illuminates the Meaning of Bear Arms, 46 Hastings Const. L. Q. 509, 510 (2019) ("Non-military uses of *bear arms* in reference to hunting or personal self-defense are not just rare, they are almost nonexistent"); *id.,* at 510–511 (reporting 900 instances in which "bear arms" was used to refer to military or collective use of firearms and only 7 instances that were either ambiguous or without a military connotation).

These are just two examples. Other scholars have continued to write books and articles arguing that the Court's decision in *Heller* misread the text and history of the Second Amendment. See generally, *e.g.,* M. Waldman, The Second Amendment (2014); S. Cornell, The Changing Meaning of

BREYER, J., dissenting

the Right To Keep and Bear Arms: 1688–1788, in Guns in Law 20–27 (A. Sarat, L. Douglas, & M. Umphrey eds. 2019); P. Finkelman, The Living Constitution and the Second Amendment: Poor History, False Originalism, and a Very Confused Court, 37 Cardozo L. Rev. 623 (2015); D. Walker, Necessary to the Security of Free States: The Second Amendment as the Auxiliary Right of Federalism, 56 Am. J. Legal Hist. 365 (2016); W. Merkel, *Heller* as Hubris, and How *McDonald* v. *City of Chicago* May Well Change the Constitutional World as We Know It, 50 Santa Clara L. Rev. 1221 (2010).

I repeat that I do not cite these arguments in order to relitigate *Heller*. I wish only to illustrate the difficulties that may befall lawyers and judges when they attempt to rely *solely* on history to interpret the Constitution. In *Heller*, we attempted to determine the scope of the Second Amendment right to bear arms by conducting a historical analysis, and some of us arrived at very different conclusions based on the same historical sources. Many experts now tell us that the Court got it wrong in a number of ways. That is understandable given the difficulty of the inquiry that the Court attempted to undertake. The Court's past experience with historical analysis should serve as a warning against relying exclusively, or nearly exclusively, on this mode of analysis in the future.

Failing to heed that warning, the Court today does just that. Its near-exclusive reliance on history will pose a number of practical problems. First, the difficulties attendant to extensive historical analysis will be especially acute in the lower courts. The Court's historical analysis in this case is over 30 pages long and reviews numerous original sources from over 600 years of English and American history. *Ante,* at 30–62. Lower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of

BREYER, J., dissenting

searching historical surveys that the Court's approach re-
quires.  Tellingly, even the Courts of Appeals that have ad-
dressed the question presented here (namely, the constitu-
tionality of public carriage restrictions like New York's)
"have, in large part, avoided extensive historical analysis."
*Young* v. *Hawaii*, 992 F. 3d 765, 784–785 (CA9 2021) (col-
lecting cases).  In contrast, lawyers and courts are well
equipped to administer means-end scrutiny, which is regu-
larly applied in a variety of constitutional contexts, see *su-
pra,* at 24–25.

Second, the Court's opinion today compounds these prob-
lems, for it gives the lower courts precious little guidance
regarding how to resolve modern constitutional questions
based almost solely on history.  See, *e.g., ante,* at 1
(BARRETT, J., concurring) ("highlight[ing] two methodologi-
cal points that the Court does not resolve").  The Court de-
clines to "provide an exhaustive survey of the features that
render regulations relevantly similar under the Second
Amendment." *Ante,* at 20.  Other than noting that its his-
tory-only analysis is "neither a . . . straightjacket nor a . . .
blank check," the Court offers little explanation of how
stringently its test should be applied.  *Ante,* at 21.  Ironi-
cally, the only two "relevan[t]" metrics that the Court does
identify are "how and why" a gun control regulation "bur-
den[s the] right to armed self-defense." *Ante,* at 20.  In
other words, the Court believes that the most relevant met-
rics of comparison are a regulation's means (how) and ends
(why)—even as it rejects the utility of means-end scrutiny.

What the Court offers instead is a laundry list of reasons
to discount seemingly relevant historical evidence.  The
Court believes that some historical laws and decisions can-
not justify upholding modern regulations because, it says,
they were outliers.  It explains that just two court decisions
or three colonial laws are not enough to satisfy its test.
*Ante,* at 37, 57.  But the Court does not say how many cases
or laws would suffice "to show a tradition of public-carry

BREYER, J., dissenting

regulation." *Ante,* at 37.   Other laws are irrelevant, the
Court claims, because they are too dissimilar from New
York's concealed-carry licensing regime.  See, *e.g., ante,* at
48–49.   But the Court does not say what "representative
historical analogue," short of a "twin" or a "dead ringer,"
would suffice.  See *ante,* at 21 (emphasis deleted).  Indeed,
the Court offers many and varied reasons to reject potential
representative analogues, but very few reasons to accept
them.  At best, the numerous justifications that the Court
finds for rejecting historical evidence give judges ample
tools to pick their friends out of history's crowd.  At worst,
they create a one-way ratchet that will disqualify virtually
any "representative historical analogue" and make it nearly
impossible to sustain common-sense regulations necessary
to our Nation's safety and security.

   Third, even under ideal conditions, historical evidence
will often fail to provide clear answers to difficult questions.
As an initial matter, many aspects of the history of firearms
and their regulation are ambiguous, contradictory, or dis-
puted.   Unsurprisingly, the extent to which colonial stat-
utes enacted over 200 years ago were actually enforced, the
basis for an acquittal in a 17th-century decision, and the
interpretation of English laws from the Middle Ages (to
name just a few examples) are often less than clear.  And
even historical experts may reach conflicting conclusions
based on the same sources.  Compare, *e.g.,* P. Charles, The
Faces of the Second Amendment Outside the Home: History
Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev.
1, 14 (2012), with J. Malcolm, To Keep and Bear Arms: The
Origins of an Anglo-American Right 104 (1994).  As a result,
history, as much as any other interpretive method, leaves
ample discretion to "loo[k] over the heads of the [crowd] for
one's friends."  A. Scalia & B. Garner, Reading Law: The
Interpretation of Legal Texts 377 (2012).

   Fourth, I fear that history will be an especially inade-

32   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

quate tool when it comes to modern cases presenting modern problems. Consider the Court's apparent preference for founding-era regulation. See *ante,* at 25–28. Our country confronted profoundly different problems during that time period than it does today. Society at the founding was "predominantly rural." C. McKirdy, Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in District of Columbia v. Heller, 45 Capital U. L. Rev. 107, 151 (2017). In 1790, most of America's relatively small population of just four million people lived on farms or in small towns. *Ibid.* Even New York City, the largest American city then, as it is now, had a population of just 33,000 people. *Ibid.* Small founding-era towns are unlikely to have faced the same degrees and types of risks from gun violence as major metropolitan areas do today, so the types of regulations they adopted are unlikely to address modern needs. *Id.,* at 152 ("For the most part, a population living on farms and in very small towns did not create conditions in which firearms created a significant danger to the public welfare"); see also *supra,* at 8–9.

This problem is all the more acute when it comes to "modern-day circumstances that [the Framers] could not have anticipated." *Heller*, 554 U. S., at 721–722 (BREYER, J., dissenting). How can we expect laws and cases that are over a century old to dictate the legality of regulations targeting "ghost guns" constructed with the aid of a three-dimensional printer? See, *e.g.,* White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership It Needs To Enforce Our Gun Laws (Apr. 11, 2022), https://whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/. Or modern laws requiring all gun shops to offer smart guns, which can only be fired by authorized users? See, *e.g.,* N. J. Stat. Ann. §2C:58–

BREYER, J., dissenting

2.10(a) (West Cum. Supp. 2022). Or laws imposing additional criminal penalties for the use of bullets capable of piercing body armor? See, *e.g.,* 18 U. S. C. §§921(a)(17)(B), 929(a).

The Court's answer is that judges will simply have to employ "analogical reasoning." *Ante,* at 19–20. But, as I explained above, the Court does not provide clear guidance on how to apply such reasoning. Even seemingly straightforward historical restrictions on firearm use may prove surprisingly difficult to apply to modern circumstances. The Court affirms *Heller's* recognition that States may forbid public carriage in "sensitive places." *Ante,* at 21–22. But what, in 21st-century New York City, may properly be considered a sensitive place? Presumably "legislative assemblies, polling places, and courthouses," which the Court tells us were among the "relatively few" places "where weapons were altogether prohibited" in the 18th and 19th centuries. *Ante,* at 21. On the other hand, the Court also tells us that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines th[at] category . . . far too broadly." *Ante,* at 22. So where does that leave the many locations in a modern city with no obvious 18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say.

Although I hope—fervently—that future courts will be able to identify historical analogues supporting the validity of regulations that address new technologies, I fear that it will often prove difficult to identify analogous technological and social problems from Medieval England, the founding era, or the time period in which the Fourteenth Amendment was ratified. Laws addressing repeating crossbows, launcegays, dirks, dagges, skeines, stilladers, and other ancient weapons will be of little help to courts confronting modern problems. And as technological progress pushes

BREYER, J., dissenting

our society ever further beyond the bounds of the Framers' imaginations, attempts at "analogical reasoning" will become increasingly tortured.  In short, a standard that relies solely on history is unjustifiable and unworkable.

## IV

Indeed, the Court's application of its history-only test in this case demonstrates the very pitfalls described above. The historical evidence reveals a 700-year Anglo-American tradition of regulating the public carriage of firearms in general, and concealed or concealable firearms in particular.  The Court spends more than half of its opinion trying to discredit this tradition.  But, in my view, the robust evidence of such a tradition cannot be so easily explained away.  Laws regulating the public carriage of weapons existed in England as early as the 13th century and on this Continent since before the founding.  Similar laws remained on the books through the ratifications of the Second and Fourteenth Amendments through to the present day. Many of those historical regulations imposed significantly stricter restrictions on public carriage than New York's licensing requirements do today.  Thus, even applying the Court's history-only analysis, New York's law must be upheld because "historical precedent from before, during, and . . . after the founding evinces a comparable tradition of regulation." *Ante,* at 18 (majority opinion) (internal quotation marks omitted).

### A. England.

The right codified by the Second Amendment was "'inherited from our English ancestors.'" *Heller*, 554 U. S., at 599 (quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897)); see also *ante,* at 30 (majority opinion).  And some of England's earliest laws regulating the public carriage of weapons were precursors of similar American laws enacted

BREYER, J., dissenting

roughly contemporaneously with the ratification of the Second Amendment. See *infra,* at 40–42. I therefore begin, as the Court does, *ante,* at 30–31, with the English ancestors of New York's laws regulating public carriage of firearms.

The relevant English history begins in the late-13th and early-14th centuries, when Edward I and Edward II issued a series of orders to local sheriffs that prohibited any person from "going armed." See 4 Calendar of the Close Rolls, Edward I, 1296–1302, p. 318 (Sept. 15, 1299) (1906); *id.,* at 588 (July 16, 1302); 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304) (1908); *id.,* Edward II, 1307–1313, at 52 (Feb. 9, 1308) (1892); *id.,* at 257 (Apr. 9, 1310); *id.,* at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326) (1898); 1 Calendar of Plea and Memoranda Rolls of the City of London, 1323–1364, p. 15 (Nov. 1326) (A. Thomas ed. 1926). Violators were subject to punishment, including "forfeiture of life and limb." See, *e.g.,* 4 Calendar of the Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299) (1906). Many of these royal edicts contained exemptions for persons who had obtained "the king's special licence." See *ibid.*; 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304); *id.,* Edward II, 1307–1313, at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326). Like New York's law, these early edicts prohibited public carriage absent special governmental permission and enforced that prohibition on pain of punishment.

The Court seems to suggest that these early regulations are irrelevant because they were enacted during a time of "turmoil" when "malefactors . . . harried the country, committing assaults and murders." *Ante,* at 31 (internal quotation marks omitted). But it would seem to me that what the Court characterizes as a "right of armed self-defense" would be more, rather than less, necessary during a time of "turmoil." *Ante,* at 20. The Court also suggests that laws that were enacted before firearms arrived in England, like

BREYER, J., dissenting

these early edicts and the subsequent Statute of Northampton, are irrelevant. *Ante,* at 32. But why should that be? Pregun regulations prohibiting "going armed" in public illustrate an entrenched tradition of restricting public carriage of weapons. That tradition seems as likely to apply to firearms as to any other lethal weapons—particularly if we follow the Court's instruction to use analogical reasoning. See *ante,* at 19–20. And indeed, as we shall shortly see, the most significant prefirearm regulation of public carriage— the Statute of Northampton—was in fact applied to guns once they appeared in England. See *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)

The Statute of Northampton was enacted in 1328. 2 Edw. 3, 258, c. 3. By its terms, the statute made it a criminal offense to carry arms without the King's authorization. It provided that, without such authorization, "no Man great nor small, of what Condition soever he be," could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Ibid.* For more than a century following its enactment, England's sheriffs were routinely reminded to strictly enforce the Statute of Northampton against those going armed without the King's permission. See Calendar of the Close Rolls, Edward III, 1330–1333, at 131 (Apr. 3, 1330) (1898); 1 Calendar of the Close Rolls, Richard II, 1377–1381, at 34 (Dec. 1, 1377) (1914); 2 *id.,* Richard II, 1381–1385, at 3 (Aug. 7, 1381) (1920); 3 *id.,* Richard II, 1385–1389, at 128 (Feb. 6, 1386) (1921); *id.,* at 399–400 (May 16, 1388); 4 *id.,* Henry VI, 1441–1447, at 224 (May 12, 1444) (1937); see also 11 Tudor Royal Proclamations, The Later Tudors: 1553– 1587, pp. 442–445 (Proclamation 641, 21 Elizabeth I, July 26, 1579) (P. Hughes & J. Larkin eds. 1969).

The Court thinks that the Statute of Northampton "has little bearing on the Second Amendment," in part because

BREYER, J., dissenting

it was "enacted . . . more than 450 years before the ratification of the Constitution." *Ante,* at 32. The statute, however, remained in force for hundreds of years, well into the 18th century. See 4 W. Blackstone, Commentaries 148–149 (1769) ("The offence of *riding* or *going armed,* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; *and is particularly prohibited by the Statute of Northampton*" (first emphasis in original, second emphasis added)). It was discussed in the writings of Blackstone, Coke, and others. See *ibid.*; W. Hawkins, 1 Pleas of the Crown 135 (1716) (Hawkins); E. Coke, The Third Part of the Institutes of the Laws of England 160 (1797). And several American Colonies and States enacted restrictions modeled on the statute. See *infra,* at 40–42. There is thus every reason to believe that the Framers of the Second Amendment would have considered the Statute of Northampton a significant chapter in the Anglo-American tradition of firearms regulation.

The Court also believes that, by the end of the 17th century, the Statute of Northampton was understood to contain an extratextual intent element: the intent to cause terror in others. *Ante,* at 34–38, 41. The Court relies on two sources that arguably suggest that view: a 1686 decision, *Sir John Knight's Case,* and a 1716 treatise written by Serjeant William Hawkins. *Ante,* at 34–37. But other sources suggest that carrying arms in public was prohibited *because* it naturally tended to terrify the people. See, *e.g.,* M. Dalton, The Country Justice 282–283 (1690) ("[T]o wear Armor, or Weapons not usually worn, . . . seems also be a breach, or means of breach of the Peace . . . ; *for* they strike a fear and terror in the People" (emphasis added)). According to these sources, terror was the natural consequence—not an additional element—of the crime.

I find this view more persuasive in large part because it is not entirely clear that the two sources the Court relies on

BREYER, J., dissenting

actually support the existence of an intent-to-terrify requirement. Start with *Sir John Knight's Case*, which, according to the Court, considered Knight's arrest for walking "'about the streets'" and into a church "'armed with guns.'" *Ante,* at 34 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep., at 76). The Court thinks that Knight's acquittal by a jury demonstrates that the Statute of Northampton only prohibited public carriage of firearms with an intent to terrify. *Ante,* at 34–35. But by now the legal significance of Knight's acquittal is impossible to reconstruct. Brief for Patrick J. Charles as *Amicus Curiae* 23, n. 9. The primary source describing the case (the English Reports) was notoriously incomplete at the time *Sir John Knight's Case* was decided. *Id.,* at 24–25. And the facts that historians can reconstruct do not uniformly support the Court's interpretation. The King's Bench required Knight to pay a surety to guarantee his future good behavior, so it may be more accurate to think of the case as having ended in "a conditional pardon" than acquittal. *Young,* 992 F. 3d, at 791; see also *Rex* v. *Sir John Knight*, 1 Comb. 40, 90 Eng. Rep. 331 (K. B. 1686). And, notably, it appears that Knight based his defense on his loyalty to the Crown, not a lack of intent to terrify. 3 The Entring Book of Roger Morrice 1677–1691: The Reign of James II, 1685–1687, pp. 307–308 (T. Harris ed. 2007).

Similarly, the passage from the Hawkins treatise on which the Court relies states that the Statute of Northampton's prohibition on the public carriage of weapons did not apply to the "wearing of Arms . . . unless it be accompanied with such Circumstances as are apt to terrify the People." Hawkins 136. But Hawkins goes on to enumerate relatively narrow circumstances where this exception applied: when "Persons of Quality . . . wea[r] common Weapons, or hav[e] their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use

BREYER, J., dissenting

of them," or to persons merely wearing "privy Coats of Mail." *Ibid.* It would make little sense if a narrow exception for nobility, see Oxford English Dictionary (3d ed., Dec. 2012), https://www.oed.com/view/Entry/155878 (defining "quality," A.I.5.a), and "privy coats of mail" were allowed to swallow the broad rule that Hawkins (and other commentators of his time) described elsewhere. That rule provided that "there may be an Affray where there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is . . . strictly prohibited by [the Statute of Northampton]." Hawkins 135. And it provided no exception for those who attempted to "excuse the wearing such Armour in Publick, by alleging that . . . he wears it for the Safety of his Person from . . . Assault." *Id.,* at 136. In my view, that rule announces the better reading of the Statute of Northampton—as a broad prohibition on the public carriage of firearms and other weapons, without an intent-to-terrify requirement or exception for self-defense.

Although the Statute of Northampton is particularly significant because of its breadth, longevity, and impact on American law, it was far from the only English restriction on firearms or their carriage. See, *e.g.,* 6 Hen. 8 c. 13, §1 (1514) (restricting the use and ownership of handguns); 25 Hen. 8 c. 17, §1 (1533) (same); 33 Hen. 8 c. 6, §§1–2 (1541) (same); 25 Edw. 3, st. 5, c. 2 (1350) (making it a "Felony or Trespass" to "ride armed covertly or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance") (brackets and footnote omitted). Whatever right to bear arms we inherited from our English forebears, it was qualified by a robust tradition of public carriage regulations.

As I have made clear, I am not a historian. But if the foregoing facts, which historians and other scholars have

BREYER, J., dissenting

presented to us, are even roughly correct, it is difficult to
see how the Court can believe that English history fails to
support legal restrictions on the public carriage of firearms.

B. The Colonies.

The American Colonies continued the English tradition
of regulating public carriage on this side of the Atlantic.  In
1686, the colony of East New Jersey passed a law providing
that "no person or persons . . . shall presume privately to
wear any pocket pistol, skeines, stilladers, daggers or dirks,
or other unusual or unlawful weapons within this Prov-
ince."  An Act Against Wearing Swords, &c., ch. 9, in
Grants, Concessions, and Original Constitutions of the
Province of New Jersey 290 (2d ed. 1881).  East New Jersey
also specifically prohibited "planter[s]" from "rid[ing] or
go[ing] armed with sword, pistol, or dagger."  *Ibid.*  Massa-
chusetts Bay and New Hampshire followed suit in 1692 and
1771, respectively, enacting laws that, like the Statute of
Northampton, provided that those who went "armed Offen-
sively" could be punished.  An Act for the Punishing of
Criminal Offenders, 1692 Mass. Acts and Laws no. 6, pp.
11–12; An Act for the Punishing of Criminal Offenders,
1771 N. H. Acts and Laws ch. 6, §5, p. 17.

It is true, as the Court points out, that these laws were
only enacted in three colonies.  *Ante,* at 37.  But that does
not mean that they may be dismissed as outliers.  They
were successors to several centuries of comparable laws in
England, see *supra,* at 34–40, and predecessors to numer-
ous similar (in some cases, materially identical) laws en-
acted by the States after the founding, see *infra,* at 41–42.
And while it may be true that these laws applied only to
"dangerous and unusual weapons," see *ante,* at 38 (majority
opinion), that category almost certainly included guns, see
Charles, 60 Clev. St. L. Rev., at 34, n. 181 (listing 18th cen-
tury sources defining "'offensive weapons'" to include "'Fire
Arms'" and "'Guns'"); *State* v. *Huntly,* 25 N. C. 418, 422

BREYER, J., dissenting

(1843) (*per curiam*) ("A gun is an 'unusual weapon,' where-with to be armed and clad").  Finally, the Court points out that New Jersey's ban on public carriage applied only to certain people or to the concealed carriage of certain smaller firearms.  *Ante,* at 39–40.  But the Court's refusal to credit the relevance of East New Jersey's law on this basis raises a serious question about what, short of a "twin" or a "dead ringer," qualifies as a relevant historical analogue.  See *ante,* at 21 (majority opinion) (emphasis deleted).

### C. The Founding Era.

The tradition of regulations restricting public carriage of firearms, inherited from England and adopted by the Colonies, continued into the founding era.  Virginia, for example, enacted a law in 1786 that, like the Statute of Northampton, prohibited any person from "go[ing] nor rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the Country."  1786 Va. Acts, ch. 21.  And, as the Court acknowledges, "public-carry restrictions proliferate[d]" after the Second Amendment's ratification five years later in 1791.  *Ante,* at 42.  Just a year after that, North Carolina enacted a law whose language was lifted from the Statute of Northampton virtually verbatim (vestigial references to the King included).  Collection of Statutes, pp. 60–61, ch. 3 (F. Martin ed. 1792).  Other States passed similar laws in the late-18th and 19th centuries.  See, *e.g.,* 1795 Mass. Acts and Laws ch. 2, p. 436; 1801 Tenn. Acts pp. 260–261; 1821 Me. Laws p. 285; see also Charles, 60 Clev. St. L. Rev., at 40, n. 213 (collecting sources).

The Court discounts these laws primarily because they were modeled on the Statute of Northampton, which it believes prohibited only public carriage with the intent to terrify.  *Ante,* at 41.  I have previously explained why I believe

BREYER, J., dissenting

that preventing public terror was one *reason* that the Statute of Northampton prohibited public carriage, but not an *element* of the crime. See *supra,* at 37–39. And, consistent with that understanding, American regulations modeled on the Statute of Northampton appear to have been understood to set forth a broad prohibition on public carriage of firearms without any intent-to-terrify requirement. See Charles, 60 Clev. St. L. Rev., at 35, 37–41; J. Haywood, A Manual of the Laws of North-Carolina, pt. 2, p. 40 (3d ed.1814); J. Ewing, The Office and Duty of a Justice of the Peace 546 (1805).

The Court cites three cases considering common-law offenses, *ante,* at 42–44, but those cases do not support the view that only public carriage in a manner likely to terrify violated American successors to the Statute of Northampton. If anything, they suggest that public carriage of firearms was not common practice. At least one of the cases the Court cites, *State* v. *Huntly*, wrote that the Statute of Northampton codified a pre-existing common-law offense, which provided that "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, *by* terrifying the good people of the land." 25 N. C., at 420–421 (quoting 4 Blackstone, Commentaries, at 149; emphasis added). *Huntly* added that "[a] gun is an 'unusual weapon'" and that "[n]o man amongst us carries it about with him, as one of his every-day accoutrements—as a part of his dress—and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment." 25 N. C., at 422. True, *Huntly* recognized that citizens were nonetheless "at perfect liberty" to carry for "lawful purpose[s]"—but it specified that those purposes were "business or amusement." *Id.,* at 422–423. New York's law similarly recognizes that hunting, target shooting, and certain professional activities are proper causes justifying lawful carriage of a firearm. See *supra,* at 12–13. The other two

BREYER, J., dissenting

cases the Court cites for this point similarly offer it only limited support—either because the atextual intent element the Court advocates was irrelevant to the decision's result, see *O'Neill* v. *State*, 16 Ala. 65 (1849), or because the decision adopted an outlier position not reflected in the other cases cited by the Court, see *Simpson* v. *State*, 13 Tenn. 356, 360 (1833); see also *ante,* at 42–43, 57 (majority opinion) (refusing to give "a pair of state-court decisions" "disproportionate weight"). The founding-era regulations—like the colonial and English laws on which they were modeled—thus demonstrate a longstanding tradition of broad restrictions on public carriage of firearms.

### D. The 19th Century.

Beginning in the 19th century, States began to innovate on the Statute of Northampton in at least two ways. First, many States and Territories passed bans on concealed carriage or on any carriage, concealed or otherwise, of certain concealable weapons. For example, Georgia made it unlawful to carry, "unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence." Ga. Code §4413 (1861). Other States and Territories enacted similar prohibitions. See, *e.g.,* Ala. Code §3274 (1852) (banning, with limited exceptions, concealed carriage of "a pistol, or any other description of fire arms"); see also *ante,* at 44, n. 16 (majority opinion) (collecting sources). And the Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1–2, p. 94. These 19th-century bans on concealed carriage were stricter than New York's law, for they prohibited concealed carriage with at most limited exceptions, while New York permits concealed carriage

BREYER, J., dissenting

with a lawfully obtained license. See *supra,* at 12. Moreover, as *Heller* recognized, and the Court acknowledges, "the majority of the 19th-century courts to consider the question held that [these types of] prohibitions on carrying concealed weapons *were lawful* under the Second Amendment or state analogues." 554 U. S., at 626 (emphasis added); see also *ante,* at 44.

The Court discounts this history because, it says, courts in four Southern States suggested or held that a ban on concealed carriage was only lawful if open carriage or carriage of military pistols was allowed. *Ante,* at 44–46. (The Court also cites *Bliss* v. *Commonwealth,* 12 Ky. 90 (1822), which invalidated Kentucky's concealed-carry prohibition as contrary to that State's Second Amendment analogue. *Id.,* at 90–93. *Bliss* was later overturned by constitutional amendment and was, as the Court appears to concede, an outlier. See *Peruta* v. *County of San Diego,* 824 F. 3d 919, 935–936 (CA9 2016); *ante,* at 45.) Several of these decisions, however, emphasized States' leeway to regulate firearms carriage as necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence." *State* v. *Smith,* 11 La. 633 (1856); see also *Andrews* v. *State,* 50 Tenn. 165, 179–180 (1871) (stating that "the right to *keep*" rifles, shotguns, muskets, and repeaters could not be "*infringed* or *forbidden,*" but "[t]heir *use* [may] be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good, so as not to infringe the right secured and the necessary incidents to the exercise of such right"); *State* v. *Reid,* 1 Ala. 612, 616 (1840) (recognizing that the constitutional right to bear arms "necessarily . . . leave[s] with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals"). And other courts upheld concealed-carry restrictions without any reference to an exception allowing

BREYER, J., dissenting

open carriage, so it is far from clear that the cases the Court cites represent a consensus view. See *State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833); *State* v. *Buzzard*, 4 Ark. 18 (1842). And, of course, the Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.

The second 19th-century innovation, adopted in a number of States, was surety laws. Massachusetts' surety law, which served as a model for laws adopted by many other States, provided that any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon," and who lacked "reasonable cause to fear an assualt [*sic*]," could be made to pay a surety upon the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Other States and Territories enacted identical or substantially similar laws. See, *e.g.,* Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat., ch. 16, §17; W. Va. Code, ch. 153, §8 (1868); 1862 Pa. Laws p. 250, §6. These laws resemble New York's licensing regime in many, though admittedly not all, relevant respects. Most notably, like New York's proper cause requirement, the surety laws conditioned public carriage in at least some circumstances on a special showing of need. Compare *supra,* at 13, with Mass. Rev. Stat., ch. 134, §16.

The Court believes that the absence of recorded cases involving surety laws means that they were rarely enforced. *Ante,* at 49–50. Of course, this may just as well show that these laws were normally followed. In any case, scholars cited by the Court tell us that "traditional case law research is not especially probative of the application of these restrictions" because "in many cases those records did not survive the passage of time" or "are not well indexed or digitally searchable." E. Ruben & S. Cornell, Firearms

BREYER, J., dissenting

Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130–131, n. 53 (2015). On the contrary, "the fact that restrictions on public carry were well accepted in places like Massachusetts and were included in the relevant manuals for justices of the peace" suggests "that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law." *Id.*, at 131, n. 53 (citation omitted). The surety laws and broader bans on concealed carriage enacted in the 19th century demonstrate that even relatively stringent restrictions on public carriage have long been understood to be consistent with the Second Amendment and its state equivalents.

E. Postbellum Regulation.

After the Civil War, public carriage of firearms remained subject to extensive regulation. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 908 (1866) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons"). Of course, during this period, Congress provided (and commentators recognized) that firearm regulations could not be designed or enforced in a discriminatory manner. See *ibid.*; Act of July 16, 1866, §14, 14 Stat. 176–177 (ensuring that all citizens were entitled to the "full and equal benefit of all laws . . . including the constitutional right to keep and bear arms . . . without respect to race or color, or previous condition of slavery"); see also The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. But that by-now uncontroversial proposition says little about the validity of nondiscriminatory restrictions on public carriage, like New York's.

What is more relevant for our purposes is the fact that, in the postbellum period, States continued to enact generally applicable restrictions on public carriage, many of

BREYER, J., dissenting

which were even more restrictive than their predecessors. See S. Cornell & J. Florence, The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation? 50 Santa Clara L. Rev. 1043, 1066 (2010). Most notably, many States and Western Territories enacted stringent regulations that prohibited *any* public carriage of firearms, with only limited exceptions. For example, Texas made it a misdemeanor to carry in public "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense" absent "reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1. Similarly, New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." 1869 Terr. of N. M. Laws ch. 32, §1. New Mexico's prohibition contained only narrow exceptions for carriage on a person's own property, for self-defense in the face of immediate danger, or with official authorization. *Ibid.* Other States and Territories adopted similar laws. See, *e.g.,* 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23; 1881 Kan. Sess. Laws §23, p. 92; 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16.

When they were challenged, these laws were generally upheld. P. Charles, The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters, 64 Clev. St. L. Rev. 373, 414 (2016); see also *ante,* at 56–57 (majority opinion) (recognizing that postbellum Texas law and court decisions support the validity of New York's licensing regime); *Andrews,* 50 Tenn., at 182 (recognizing that "a man may well be prohibited from carrying his arms to church, or other public assemblage," and that the carriage of arms other than rifles, shot guns, muskets, and repeaters "may be prohibited if the Legislature

BREYER, J., dissenting

deems proper, absolutely, at all times, and under all circumstances").

The Court's principal answer to these broad prohibitions on public carriage is to discount gun control laws passed in the American West. *Ante,* at 58–61. It notes that laws enacted in the Western Territories were "rarely subject to judicial scrutiny." *Ante,* at 60. But, of course, that may well mean that "[w]e . . . can assume it settled that these" regulations were "consistent with the Second Amendment." See *ante,* at 21 (majority opinion). The Court also reasons that laws enacted in the Western Territories applied to a relatively small portion of the population and were comparatively short lived. See *ante,* 59–61. But even assuming that is true, it does not mean that these laws were historical aberrations. To the contrary, bans on public carriage in the American West and elsewhere constitute just one chapter of the centuries-old tradition of comparable firearms regulations described above.

F. The 20th Century.

The Court disregards "20th-century historical evidence." *Ante,* at 58, n. 28. But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913. See *supra,* at 12. That alone gives it a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." 554 U. S., at 626–627, and n. 26; see C. Larson, Four Exceptions in Search of a Theory: *District of Columbia* v. *Heller* and Judicial *Ipse Dixit,* 60 Hastings L. J. 1371, 1374–1379 (2009) (concluding that "'prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms'" have their origins in the 20th century); *Kanter* v. *Barr,* 919 F. 3d 437, 451 (CA7 2019) (Barrett, J., dissenting) ("Founding-era legislatures

BREYER, J., dissenting

did not strip felons of the right to bear arms simply because
of their status as felons"). Like JUSTICE KAVANAUGH, I un-
derstand the Court's opinion today to cast no doubt on that
aspect of *Heller*'s holding. *Ante,* at 3 (concurring opinion).
But unlike JUSTICE KAVANAUGH, I find the disconnect be-
tween *Heller*'s treatment of laws prohibiting, for example,
firearms possession by felons or the mentally ill, and the
Court's treatment of New York's licensing regime, hard to
square. The inconsistency suggests that the Court today
takes either an unnecessarily cramped view of the relevant
historical record or a needlessly rigid approach to analogi-
cal reasoning.

\*      \*      \*

The historical examples of regulations similar to New
York's licensing regime are legion. Closely analogous Eng-
lish laws were enacted beginning in the 13th century, and
similar American regulations were passed during the colo-
nial period, the founding era, the 19th century, and the 20th
century. Not all of these laws were identical to New York's,
but that is inevitable in an analysis that demands exami-
nation of seven centuries of history. At a minimum, the
laws I have recounted *resembled* New York's law, similarly
restricting the right to publicly carry weapons and serving
roughly similar purposes. That is all that the Court's test,
which allows and even encourages "analogical reasoning,"
purports to require. See *ante,* at 21 (disclaiming the neces-
sity of a "historical *twin*").

In each instance, the Court finds a reason to discount the
historical evidence's persuasive force. Some of the laws
New York has identified are too old. But others are too re-
cent. Still others did not last long enough. Some applied to
too few people. Some were enacted for the wrong reasons.
Some may have been based on a constitutional rationale
that is now impossible to identify. Some arose in histori-
cally unique circumstances. And some are not sufficiently

50   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

analogous to the licensing regime at issue here.  But if the examples discussed above, taken together, do not show a tradition and history of regulation that supports the validity of New York's law, what could?  Sadly, I do not know the answer to that question.  What is worse, the Court appears to have no answer either.

V

We are bound by *Heller* insofar as *Heller* interpreted the Second Amendment to protect an individual right to possess a firearm for self-defense.  But *Heller* recognized that that right was not without limits and could appropriately be subject to government regulation.  554 U. S., at 626–627.  *Heller* therefore does not require holding that New York's law violates the Second Amendment.  In so holding, the Court goes beyond *Heller*.

It bases its decision to strike down New York's law almost exclusively on its application of what it calls historical "analogical reasoning."  *Ante,* at 19–20.  As I have admitted above, I am not a historian, and neither is the Court.  But the history, as it appears to me, seems to establish a robust tradition of regulations restricting the public carriage of concealed firearms.  To the extent that any uncertainty remains between the Court's view of the history and mine, that uncertainty counsels against relying on history alone.  In my view, it is appropriate in such circumstances to look beyond the history and engage in what the Court calls means-end scrutiny.  Courts must be permitted to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the Second Amendment right, and, if appropriate, any less restrictive alternatives.

The Second Circuit has previously done just that, and it held that New York's law does not violate the Second Amendment.  See *Kachalsky*, 701 F. 3d, at 101.  It first evaluated the degree to which the law burdens the Second

BREYER, J., dissenting

Amendment right to bear arms. *Id.,* at 93–94. It concluded that the law "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," but does not burden the right to possess a firearm in the home, where *Heller* said "'the need for defense of self, family, and property is most acute.'" *Kachalsky,* 701 F. 3d, at 93–94 (quoting *Heller,* 554 U. S., at 628). The Second Circuit therefore determined that the law should be subject to heightened scrutiny, but not to strict scrutiny and its attendant presumption of unconstitutionality. 701 F. 3d, at 93–94. In applying such heightened scrutiny, the Second Circuit recognized that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id.,* at 97. I agree. As I have demonstrated above, see *supra,* at 3–9, firearms in public present a number of dangers, ranging from mass shootings to road rage killings, and are responsible for many deaths and injuries in the United States. The Second Circuit then evaluated New York's law and concluded that it is "substantially related" to New York's compelling interests. *Kachalsky,* 701 F. 3d, at 98–99. To support that conclusion, the Second Circuit pointed to "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Id.,* at 99. We have before us additional studies confirming that conclusion. See, *e.g., supra,* at 19–20 (summarizing studies finding that "may issue" licensing regimes are associated with lower rates of violent crime than "shall issue" regimes). And we have been made aware of no less restrictive, but equally effective, alternative. After considering all of these factors, the Second Circuit held that New York's law does not unconstitutionally burden the right to bear arms under the Second Amendment. I would affirm that holding.

52   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe.  The Court today strikes down that law based only on the pleadings.  It gives the State no opportunity to present evidence justifying its reasons for adopting the law or showing how the law actually operates in practice, and it does not so much as acknowledge these important considerations.  Because I cannot agree with the Court's decision to strike New York's law down without allowing for discovery or the development of any evidentiary record, without considering the State's compelling interest in preventing gun violence and protecting the safety of its citizens, and without considering the potentially deadly consequences of its decision, I respectfully dissent.

2022 WL 2339412

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED
FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS
SUBJECT TO REVISION OR WITHDRAWAL.

Court of Special Appeals of Maryland.

ROBERT L. FOOKS

v.

STATE OF MARYLAND

No. 269, Sept. Term, 2021
|
Filed: June 29, 2022

Circuit Court for Wicomico County

Case No. C-22-CR-21-000030

Nazarian, Friedman, Battaglia, Lynne A. (Senior Judge, Specially Assigned), JJ.

**Opinion**

Opinion by Nazarian, J.

**\*1** Robert Fooks was charged by way of criminal information with ten counts of illegal possession of a rifle or shotgun, three counts of illegal possession of a regulated firearm, and one count of theft. He moved to dismiss all firearm-related charges on the ground that they violated his Second Amendment right to bear arms. The Circuit Court for Wicomico County denied the motion. Mr. Fooks entered a conditional guilty plea to two counts of illegal possession of a regulated firearm and reserved the right to appeal the denial of his motion to dismiss. On appeal, Mr. Fooks argues that the statutory scheme used to charge and convict him is facially unconstitutional or unconstitutional as applied to him. We disagree and affirm.

**I. BACKGROUND**

On January 26, 2021, the State charged Mr. Fooks with thirteen counts of unlawfully possessing various firearms between November 12, 2018 and July 18, 2020.[1] The criminal information alleged that a 2016 conviction of

constructive criminal contempt disqualified Mr. Fooks from possessing firearms,[2] and the charges included violations of two provisions of the Public Safety Article ("PS") of the Maryland Code (2003, 2018 Repl. Vol.). Section 5-133(b)(2) provides that "a person may not possess a regulated firearm if the person ... has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years[.]" Similarly, PS § 5-205(b)(2) provides that "[a] person may not possess a rifle or shotgun ... if the person has been convicted of a violation classified as a crime under common law and received a term of imprisonment of more than 2 years[.]"[3]

On February 3, 2021 defense counsel filed a motion to dismiss, asserting that the firearm-related charges infringed on Mr. Fooks's right to bear arms, as guaranteed to him by the Second Amendment of the Constitution of the United States. Mr. Fooks argued that PS §§ 5-133(b)(2) and 5-205(b)(2) were unconstitutional as applied to him because "[t]he only reason that Mr. Fooks has been disqualified from possessing a firearm is a prior constructive criminal contempt conviction" for failure to pay child support. He cited a line of Fourth Circuit cases (we'll discuss these in detail later) that apply a two-prong test to determine the constitutionality of a disarmament law. The defense maintained that the *first* prong of the test requires *either* (a) the challenger to rebut a presumption of lawfulness by proving that the facts of their case are different from "ordinary challenges" to felon disarmament laws, *or* (b) if the challenger is disqualified because of a common law crime conviction (and not a statutory felony), a "historical review to evaluate whether rights, as understood in 1791, are burdened by the statute ...."

**\*2** Mr. Fooks argued that he satisfied the first prong under either analysis because he was "a law abiding, responsible citizen ...." The court could find that PS §§ 5-133(b)(2) and 5-205(b)(2) were not presumptively lawful as applied to him, he said, because a conviction for constructive criminal contempt is different from a conviction for a violent, serious felony. Alternatively, since contempt is considered a common law offense in Maryland, the court could engage in a historical review to determine that he would not have been excluded from possessing a firearm in 1791.

If the court finds that the challenger satisfies the first prong, then it proceeds to the *second* prong and determines whether the challenged law passes judicial scrutiny. The defense asserted that the State had the burden to demonstrate that

EXHIBIT B

PS §§ 5-133(b)(2) and 5-205(b)(2) satisfied intermediate scrutiny, which they defined as "a reasonable fit between the challenged regulation and a substantial government objective" (cleaned up). And as applied to this case, he argued, "there is not even rational basis to conclude that disqualifying a person, convicted for failing to pay child support, serves the government goal of reducing gun violence in any capacity." Because PS §§ 5-133(b)(2) and 5-205(b)(2) failed to satisfy intermediate scrutiny, the defense asked the court to dismiss the charges against Mr. Fooks.

On March 8, 2021, the State responded. It emphasized that "[w]hile the [r]ight to [b]ear [a]rms is a fundamental constitutional right, much like other rights, their bounds are not endless." The State recounted a history of PS § 5-133(b)'s precursor and concluded that the statutory text "makes it clear that the legislature recognized that there would be certain crimes that did not carry felony convictions, that still should prohibit an individual from possessing a firearm."

The State argued that Mr. Fooks's motion "m[et] its demise, squarely on the two-pronged framework used in analyzing as-applied challenges to firearm prohibitions." The State asserted that the court didn't need to conduct a historical review under the first prong of the test " 'to determine whether the conduct at issue was understood to be within the scope of the Second Amendment at the time of ratification' " (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017)). Rather, the court could instead conduct a "streamlined analysis," by " 'supplant[ing] the historical inquiry with the more direct question of whether the challenger's conduct is within the protected Second Amendment right of law abiding, responsible, citizens to use arms in defense of hearth and home' " (quoting *Hamilton*, 848 F.3d at 624).

Applying this framework, the State disputed that Mr. Fooks's conduct fell "within the protected right of law-abiding, responsible citizens to use arms in defense of hearth and home," because although he possessed the firearms, he never owned them. Instead, he stole the firearms from a relative (hence the theft charge) and sold them at a pawn shop. In other words, the State asserted that because Mr. Fooks did not have a Second Amendment right in someone else's firearms, his case was not different from "ordinary challenges" to disarmament laws. Therefore, PS §§ 5-133(b)(2) and 5-205(b)(2) were not unconstitutional as applied to Mr. Fooks

and were "valid regulation[s] to one's Second Amendment right."

The court held a hearing on the motion to dismiss on March 17, 2021. The defense asked the court to evaluate the challenged statutes using the historical inquiry analysis because subsections (b)(2) of both §§ 5-133 and 5-205 had never been upheld as valid. Because Maryland lacked case law concerning these specific statutory provisions, the defense argued, there could be no presumption of validity.

The court asked whether it could find PS §§ 5-133(b)(2) and 5-205(b)(2) presumptively valid based solely on the legislature's determination that people convicted of a common law crime who receive a prison term of more than two years should be disqualified from possessing a firearm. The defense rejected this position, arguing that just because a legislature passes a valid law does not make it presumptively constitutional. And under the historical inquiry approach, Mr. Fooks claimed there was no evidence that a criminal contempt conviction would have barred him from possessing a firearm in 1791.

**\*3** Turning to the second prong, Mr. Fooks argued that PS §§ 5-133(b)(2) and 5-205(b)(2) were "not narrowly tailored to serve a significant government interest[,]"and that the government's interest in disqualifying individuals convicted of a crime from possessing a firearm "burden[s] substantially more conduct than is necessary ...." Mr. Fooks's conduct of failing to pay child support, he argued, fell outside the scope of the government's interest and thus burdened Mr. Fooks more than necessary.

The court took issue with defense counsel's characterization of Mr. Fooks's conviction, asserting that "the criminality [was] the contempt of court, not the underlying basis for the contempt of court[.]" It was Mr. Fooks's failure to follow a court order, regardless of what that court order specified, that enabled the sentencing court to sentence Mr. Fooks to more than two years' incarceration. Defense counsel suggested that even considering the "contempt as a whole" didn't lead to the conclusion that Mr. Fooks was a dangerous person. Based on the State's failure to prove that Mr. Fooks was a dangerous person and the lack of "historical proof" that criminal contempt was meant to be a disqualifying crime in 1791, defense counsel contended that PS §§ 5-133(b)(2) and 5-205(b)(2) were unconstitutional as applied to Mr. Fooks.

The State urged the court to evaluate the constitutionality of §§ PS 5-133(b)(2) and 5-205(b)(2) using the streamlined approach. Under this analysis, the court would determine whether Mr. Fooks "is a law abiding responsible citizen to use arms in defense of hearth and home." The State mentioned the landmark firearms case, *District of Columbia v. Heller*, 554 U.S. 570 (2008), and noted that the Supreme Court "specifically stated that nothing in the [*Heller*] opinion should cast doubt on the prohibitions against the possession of firearms." Therefore, the State argued, Sections 5-133(b)(2) and 5-205(b)(2) were presumptively valid. The State also argued that Mr. Fooks lacked standing to challenge his firearm-related charges because he didn't own the firearms, and his possession of them was "not used in protection of hearth and home ...." And as such, the State asserted, the motions court was barred from proceeding to the second prong of the test and considering whether the statutory provisions survived judicial scrutiny.

Defense counsel replied that Mr. Fooks had standing to challenge the laws "by virtue of being charged with possession of firearms .... " The court asked whether it mattered that Mr. Fooks did not own the firearms he was charged with possessing:

> I suppose, if [Mr. Fooks's] just here to say [the firearms] weren't mine, I never had possession of them, but I would like to assert my Second Amendment right. I don't know, I might be wrong, Counsel, but I saw in the State's answer that ... their contention that [the guns] were not his, he was not possessing them in an effort to protect hearth and home, that he was selling them, it was a commercial transaction. And, in essence, that raised the question that if ... the absence of the ability to claim ownership or control, other than for purposes of pawning them, where does that come into play in this analysis that you're all giving me?

Defense counsel responded that the court was supposed to consider the conviction that disqualifies firearm possession in the first place, not the charge of firearm possession itself.

The court was confused by this distinction: "If you were just challenging the statute, not as applied, but just the statute based on the plain language of the statute, that would be one thing. But your argument is as applied, as applied means to the facts." The court reserved ruling on Mr. Fooks's motion to dismiss and provided the parties with an opportunity to research the standing issue.

**\*4** On March 22, 2021, Mr. Fooks supplemented his original motion to dismiss. The defense argued that Mr. Fooks had standing to make an as-applied challenge to PS §§ 5-133(b)(2) and 5-205(b)(2) because Mr. Fooks was "not alleged to have possessed any firearms which required special permits." In addition, defense counsel asserted a facial constitutional challenge for the first time:

> Typically, to be successful in challenging a statute on its face, a facial challenge must show that there are no circumstances under which the statute would be constitutional. [Mr. Fooks] was operating under this rule when [he] improvidently indicated [at the motions hearing] that [he] was not making a facial challenge. However, when a challenged statute infringes fundamental rights, such as by being so vague that it violates due process, or so overbroad that it infringes on protected speech, the Court must strike down the statute. If the statute encroaches on fundamental rights in marginal cases, even if not directly in the challenger's case, it provides standing to the party to challenge the statute even if it were constitutional on an as-applied basis.

> Here, [Mr. Fooks] respectfully requests the Court to consider this challenge as well, though [Mr. Fooks] does not believe it changes the analysis significantly. On a facial challenge where fundamental rights are involved, a court would consider imaginary marginal cases, even where the challenger's case is constitutional. As argued at the Motions Hearing, this case is the imaginary marginal case: the common law offense which disqualified Mr. Fooks is Contempt. Most, if not all, common law offenses are more serious than Contempt.

(Cleaned up.) The supplement concluded that "given the benign nature of Mr. Fooks'[s] disqualifying offense," the analysis of whether PS §§ 5-133(b)(2) and 5-205(b)(2) were facially unconstitutional was "no different" than the analysis of whether the statutes were unconstitutional as applied. Counsel asked the court to "avoid the facial

challenge" by "granting the motion to dismiss[ ] based on a[n] as-applied challenge."

The State replied on April 14, 2021 and reiterated its argument "that Mr. Fooks does not have a Second Amendment right in someone else's guns," and thus that the statutes were both facially constitutional and constitutional as applied. That same day, the circuit court, without any explanation, denied Mr. Fooks's motion to dismiss. Mr. Fooks entered a conditional plea and the court sentenced him to two consecutive five-year terms of imprisonment, suspending all but time served. The court also placed Mr. Fooks on two years of supervised probation.

Mr. Fooks noted a timely appeal. We supply additional facts as necessary below.

## II. DISCUSSION

On appeal, Mr. Fooks contends that the circuit court erred in denying Mr. Fooks's motion to dismiss.[4] *First*, Mr. Fooks argues that Maryland's statutory scheme regarding disarmament laws is facially unconstitutional. *Second*, he argues that PS §§ 5-133(b)(2) and 5-205(b)(2) are unconstitutional as applied to him. The State responds that the circuit court properly denied Mr. Fooks's motion to dismiss because PS §§ 5-133(b)(2) and 5-205(b)(2) "comport with the Second Amendment."

*5 "The standard of review of the grant or denial of a motion to dismiss is whether the trial court was legally correct." *Myers v. State*, 248 Md. App. 422, 430–31 (2020) (cleaned up). "We review the denial of a motion to dismiss de novo." *Id.* at 431 (citations omitted). Further, "[t]he proper scope of a constitutional right, and its application to a particular set of facts, are issues of law." *Pizza di Joey, LLC v. Mayor of Balt.*, 470 Md. 308, 339 (2020) (citations omitted). "Therefore, we review such questions *de novo*." *Id.* (citing *Schisler v. State*, 394 Md. 519, 535 (2006)).

## A. A Brief Overview Of Second Amendment Jurisprudence.
We begin with the Second Amendment to the United States Constitution, which provides that "[a] well regulated militia, being necessary to the security of a free State, the right of

the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment applies to the states by way of the Due Process Clause of the Fourteenth Amendment. *McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010).

The analytical starting point in any modern-day Second Amendment case is the Supreme Court's decision in *Heller*. In *Heller*, the Court considered the constitutionality of the District of Columbia's prohibition on handgun possession in the home. 554 U.S. at 573. The seminal issue was whether the Second Amendment "protects only the right to possess and carry a firearm in connection with militia service" or whether "it protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home." *Id.* at 577. The Court reasoned that "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause." *Id.* But the Court noted as well that the prefatory clause "does not limit the [operative clause] grammatically, but rather announces a purpose." *Id.* The Court concluded, therefore, "that the Second Amendment conferred an individual right to keep and bear arms" unconnected with militia service. *Id.* at 595.

But the Court emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and observed that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citation omitted). The Court declined to "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment" and cautioned that "nothing in our opinion should be taken to cast doubt on the [ ] prohibitions on the possession of firearms by felons and the mentally ill, ... or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Court identified "these presumptively lawful regulatory measures only as examples" and its list did "not purport to be exhaustive." *Id.* at 627 n.26.

In *McDonald*, the Court reiterated *Heller's* holding "that individual self-defense is 'the *central component*' of the Second Amendment right." 561 U.S. at 767 (*quoting*

*Heller*, 554 U.S. at 599) (emphasis in original). The Court maintained that "*Heller* makes it clear that this right is 'deeply rooted in this Nation's history and tradition.' " *Id.* at 768 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). It also "repeat[ed] those assurances" made in *Heller*—"that our holding did not cast doubt on such [ ] regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' " *id.* at 786 (quoting *Heller*, 554 U.S. at 626–27), and did "not imperil every law regulating firearms." *Id.*

**\*6** This brings us to *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 20-843, 597 U.S. --- (June 23, 2022), decided after this case was submitted. *Bruen* addressed the constitutionality of state limitations on carry licenses for *law-abiding* citizens and held that those citizens' right to own and carry firearms extended beyond the home into public spaces. *See, e.g., id.*, slip op. at 1. *Bruen* didn't deal at all with limitations grounded in prior criminal behavior. The majority opinion refers repeatedly to law-abiding citizens' rights to own and carry handguns and takes care to note that its analysis builds on *Heller* and *McDonald*, *see Bruen*, slip op. at 10–22, which, as we discussed just above, expressly did not cast doubt on laws limiting disqualified persons' access to guns. *See also id.* ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms.") (Kavanaugh, J., concurring), slip op. at 3 (quoting *Heller*, 554 U.S. at 626–27). As we'll discuss below, *Bruen* narrowed the general Second Amendment analysis of laws limiting the right to keep and bear arms to focus solely on whether limitations on gun ownership fall within the scope of protected Second Amendment activity. The Court defined those boundaries solely by reference to historical traditions of firearms regulation and eliminated any means-ends analysis of those laws. *Id.*, slip op. at 10–22. That analytical shift doesn't affect the analysis or outcome here, though—for reasons we'll explain, Mr. Fook's arguments here will fail at the first analytical step.

With this framework in mind, we turn to the contentions before us here.

**B.** PS §§ 5-133(b)(2) And 5-205(b)(2) Are Not Facially Unconstitutional.

Mr. Fooks argues *first* that "[t]he contours of the Second Amendment's guarantee of the fundamental right to keep and bear arms do not permit the criminalization of possession of a rifle/shotgun or regulated firearm ... based upon a conviction for the common law crime of 'constructive criminal contempt.' " For that reason, he contends, PS §§ 5-133(b)(2) and 5-205(b)(2) are facially unconstitutional. The State responds that Mr. Fooks's facial challenge is unpreserved. But even if we find the challenge preserved, the State asserts that it's meritless because Mr. Fooks failed to "assert that there is no set of circumstances under which the statutes would be constitutional ...."

*1. Mr. Fooks's facial challenge is preserved.*

Before reaching the merits, we address the State's contention that Mr. Fooks's facial constitutional challenge is not preserved for appellate review. The State argues Mr. Fooks failed to "explicitly state that he is asserting a facial challenge to PS §§ 5-133 and 5-205" in any of his pleadings:

> [Mr.] Fooks repeatedly asserted below that he was asserting an as-applied challenge. It was not until *after* the motions hearing that [Mr.] Fooks filed a supplement in which he stated that he "improvidently indicated that [he] was not making a facial challenge." The circuit court, however, denied [Mr.] Fooks's motion to dismiss before the State filed its response to that supplement. [Mr.] Fooks did not properly present his facial challenge to the circuit court, and it appears that the court did not even address it. This Court should deem the issue waived and decline to review it. Md. Rule 8-131(a).

(Cleaned up.) (Emphasis in original.)

Generally, we "will not decide any other issue unless it plainly appears by the record to have been raised in *or* decided by the trial court ...." Md. Rule 8-131(a) (emphasis added). Under the plain language of the Rule, we may consider issues that were not decided by the circuit court so long as the parties raised the issues there. *See Sellman v. State*, 152 Md. App. 1, 24 (2003) ("It is not necessary that the issue have been decided, so long as it was raised."); *Stevenson v. State*, 180 Md. App. 440, 447 (2008) ("Here, the circuit court denied

appellant's motion, but declined to address the merits of her claim. Before this Court, appellant raises the same issue that she presented to the circuit court; therefore, despite the circuit court's avoidance of that issue, it is properly before us.").

During the motions hearing, defense counsel challenged PS §§ 5-133(b)(2) and 5-205(b)(2) only on an as-applied basis. In the supplement, defense counsel acknowledged that "to be successful" when asserting a facial constitutional challenge, the "facial challenge must show that there are no circumstances under which the statute would be constitutional." The defense stated it "was operating under this rule when it improvidently indicated that it was not making a facial challenge" during the motions hearing. The court reserved ruling on the motion, however, and provided the parties with an opportunity to conduct further research to supplement their arguments. In its supplemental filing, the defense found another way to assert a facial constitutional challenge—"when a challenged statute infringes fundamental rights ... the Court must strike down the statute." In the supplement, counsel for Mr. Fooks asked the court explicitly to consider the facial challenge when ruling on the motion.

**\*7** We are comfortable that Mr. Fooks raised a facial constitutional challenge in the circuit court. The fact that the court denied Mr. Fooks's motion to dismiss without explanation does not negate that Mr. Fooks asked the court (albeit in his supplement to the original motion) to consider a facial challenge when determining the constitutionality of PS § 5-133(b)(2) and 5-205(b)(2). His appellate claim that these laws are facially unconstitutional is preserved adequately, and we will address it.

### 2. Despite being preserved, Mr. Fooks's facial challenge fails.

The State insists that even if Mr. Fooks's facial challenge is preserved, it nevertheless is "meritless." Mr. Fooks responds that because a conviction of constructive criminal contempt "contains no element of violence, or anything that bespeaks of dangerousness[,]" "the statutory [firearm possession] scheme" under which Mr. Fooks was charged "infringes upon [his] fundamental, deeply-rooted, Second Amendment right" to bear arms. He asserts that not only is criminal contempt "an otherwise nondescript common law offense whose nomenclature does not make readily apparent

any particular conduct or concomitant intent," it also is "exceedingly broad."

The disqualification at issue prohibits a person who "has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years" from possessing firearms. PS § 5-133(b)(2). [5] Our *first* task, then, is to determine whether constructive criminal contempt meets this definition. Criminal contempt is a common law offense. *In re Ann M.*, 309 Md. 564, 569 (1987). And because there are no sentencing guidelines or statutory provisions to guide sentencing for criminal contempt convictions, [6] a court's "power to punish for contempt arises from the common law and is deemed essential for the protection and existence of the courts." *Id.* at 568 (citations omitted). Moreover, "the only restrictions on sentencing for a common-law crime are (absent a penalty prescribed by statute) that the sentence be within the reasonable discretion of the trial judge and that it not be cruel and unusual punishment." *Street v. State*, 307 Md. 262, 266 (1986). When Mr. Fooks was convicted of constructive criminal contempt, he received a term of imprisonment of more than four years, so under a plain reading of PS §§ 5-133(b)(2) and 5-205(b)(2), he is prohibited from possessing firearms.

We *next* must determine whether PS §§ 5-133(b)(2) and 5-205(b)(2) are facially unconstitutional. A facial constitutional challenge is "[a] claim that a statute is unconstitutional on its face—that is, that it always operates unconstitutionally." Facial Challenge, Black's Law Dictionary (11th ed. 2019). "[T]o be successful, a facial challenge must establish that there is no set of circumstances under which the statute would be constitutional." *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016) (cleaned up). "[A] party has standing to raise a facial challenge only if the statute or practice that is the subject of the facial challenge may violate a fundamental constitutional right." *Id.* (citation omitted). Because *Heller* held that the right to bear arms is a fundamental constitutional right, Mr. Fooks has standing to raise his facial challenge.

**\*8** But Mr. Fooks has failed to show that there are no set of circumstances under which PS §§ 5-133(b)(2) and 5-205(b)(2) are constitutional. He makes no mention and provides no examples of how PS §§ 5-133(b)(2) and 5-205(b)(2) are unconstitutional in all potential applications. Indeed, Mr. Fooks has failed to show that the

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

statutes are unconstitutional in *any* applications. The fact that constructive criminal contempt "contains no elements of violence" proves nothing by itself. As we discuss below, there is no requirement that an individual be convicted of a violent crime to be prohibited from possessing a firearm.

As far as we can tell, neither the Court of Appeals nor this Court has considered the constitutionality of public safety disqualification provisions.[7] In *Corcoran v. Sessions*, 261 F. Supp. 3d 579 (D. Md. 2017), however, the United States District Court for the District of Maryland did. Mr. Corcoran was convicted in Virginia of unauthorized use of a vehicle. *Id.* at 583. Years later in Maryland, Mr. Corcoran applied for a handgun license. *Id.* at 584. The Maryland State Police denied his application because the Virginia conviction disqualified him from possessing a firearm in Maryland. *Id.* at 585. Mr. Corcoran sued, arguing that Maryland's firearm prohibitions infringed on his Second Amendment right to bear arms "by failing to differentiate between violent and non-violent offenders." *Id.* at 587.

The district court disagreed. The court compared the statute under which Mr. Corcoran was disqualified from possessing a firearm, PS § 5-133(b)(1), with a federal prohibition statute, 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person[ ] who ... has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. The court cited *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), where the Fourth Circuit cited *Heller's* 'presumptively lawful' language" to conclude that 18 U.S.C. § 922(g)(1) "did not violate the Second Amendment on its face." *Corcoran*, 261 F. Supp. 3d at 588. The court determined that the Fourth Circuit's analysis in *Moore* applied to Mr. Corcoran's challenge of PS § 5-133(b)(1):

> [Mr.] Corcoran's attempt to distinguish the federal and Maryland laws is unpersuasive. He is correct that § 922(g)(1) and the Maryland Firearms Prohibitions differ in that the federal law looks to the maximum sentence in the jurisdiction in which the proceedings were held, whereas the Maryland laws look to the closest equivalent crime listed within its own Criminal Article. This distinction, however, does not alter the application of the *Moore* analysis to this case, especially in light of the Fourth Circuit's holding in *Hamilton* [v. *Pallozzi*, 848 F.3d 614

(4th Cir. 2017)] that analysis of 18 U.S.C. § 922(g)(1) is equally applicable to Maryland's firearms regulatory scheme. ... In this context, the State to which the two laws look to in order to determine whether a crime amounts to a disqualifying crime is irrelevant. Thus, *Moore's* reference to the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on [ ] prohibitions on the possession of firearms by felons ..." has equal application to the instant case.

*Id.* at 588–89 (footnotes omitted). Therefore, Mr. Corcoran failed to "show[ ] that Maryland's Firearms Prohibitions are unconstitutional in all their applications." *Id.* at 589.

**\*9** So too here. We recognize that the Supreme Court's presumption that the Second Amendment did not apply to "prohibitions on the possession of firearms" only explicitly mentioned those classified as "felons and the mentally ill ...." *Heller*, 554 U.S. at 626. But the Court also stated explicitly that this classification was an example and was not meant to be an all-inclusive list, *id.* at 627 n.26, and nothing in *Bruen* even purports to question, let alone alter, this principle. A statute prohibiting an individual convicted of a common law crime and sentenced to more than two years' incarceration is presumptively lawful, and Mr. Fooks has failed to rebut that presumption. He also has provided us with no evidence that PS §§ 5-133(b)(2) and 5-205(b)(2) are unconstitutional in all their applications. We hold that PS §§ 5-133(b)(2) and 5-205(b)(2) are facially constitutional.

## C. PS §§ 5-133(b)(2) And 5-205(b)(2) Are Not Unconstitutional As Applied To Mr. Fooks.

Determining that PS §§ 5-133(b)(2) and 5-205(b)(2) are facially constitutional does not resolve Mr. Fooks's *second* argument—that the statutes are unconstitutional as applied to him. An as-applied challenge is "a claim that a statute is unconstitutional on the facts of a particular case or in its application to a particular party." As-Applied Challenge, Black's Law Dictionary (11th ed. 2019). "A party always has standing to raise an as-applied challenge ...." *Seenath*, 448 Md. at 181.

Mr. Fooks provides us with several reasons why PS §§ 5-133(b)(2) and 5-205(b)(2) are unconstitutional as applied to him:

- A conviction of criminal contempt "is not a felony, *per se*, and is not inherently dangerous."

- The State provided no evidence that Mr. Fooks sustained a criminal contempt conviction after acting violently.

- Under the historical inquiry analysis, it cannot be said with certainty "that constructive criminal contemnors were historically considered beyond the scope of the protections of the Second Amendment, nor can such an offense be fairly considered a 'serious crime.'"

- Disqualifying Mr. Fooks from possessing a firearm "does nothing to further the State's interest in dispossessing dangerous felons or violent misdemeanants of their firearms." The prohibition is "simply not a 'reasonable fit' to the State's interests."

Mr. Fooks asserts that, for these reasons, we "cannot abide a result that criminalizes the fundamental Second Amendment constitutional right to keep and bear arms because of a prior conviction for a non-violent, non-serious offense that is so inherently broad and vague in its nature as 'constructive criminal contempt,'" for "failure to pay child support." We disagree.

We walk *first* through the analysis for determining the constitutionality of an as-applied challenged disarmament law. *Second*, we analyze whether we may consider a law presumptively valid and bypass a historical inquiry approach for as-applied challenges, and we determine that PS §§ 5-133(b)(2) and 5-205(b)(2) are presumptively valid. *Third*, we conclude that Mr. Fooks's conduct is not "within the protected Second Amendment right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Hamilton*, 848 F.3d at 624 (*quoting Heller*, 554 U.S. at 635; *Moore*, 666 F.3d at 318–19). And for these reasons, PS §§ 5-133(b)(2) and 5-205(b)(2) are not unconstitutional as applied to Mr. Fooks.

*1. The Fourth Circuit framework for as-applied challenges*

Because this is an issue of first impression in Maryland, we look to other jurisdictions for guidance. *Jocelyn P. v. Joshua P.*, 250 Md. App. 435, 468 (2021) ("Without Maryland caselaw to guide our inquiry, we look to other states that have addressed the issue ...."). In 2010, the Fourth Circuit "established a two-prong test for assessing a Second Amendment challenge." *Hamilton*, 848 F.3d at 623. This is commonly called the *Chester* test. *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). The *first* prong requires the court to determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* at 680 (cleaned up). If "the conduct at issue" was not "understood to be within the scope of the right at the time of ratification," the law is valid. *Id.* (citing *Heller*, 554 U.S. at 625). If, however, "the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood," the court must "apply[ ] an appropriate form of means-end scrutiny." *Id.* (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

**\*10** Two years later, however, the Fourth Circuit "refined and crystallized" the *Chester* test. *Hamilton*, 848 F.3d at 623 (citing *Moore*, 666 F.3d at 318). In *Moore*, 666 F.3d at 313, the Fourth Circuit allowed for a "'more streamlined [analysis] when a presumptively lawful regulatory measure is under review.'" *Hamilton*, 848 F.3d at 623 (*quoting Moore*, 666 F.3d at 318). Under the streamlined test, "a litigant claiming an otherwise constitutional enactment is invalid as applied to him must show that his factual circumstances remove his challenge from the realm of ordinary challenges." *Moore*, 666 F.3d at 319.

In *Hamilton*, the Fourth Circuit considered the constitutionality of the same Maryland statute considered in *Corcoran*, PS § 5-133(b)(1). 848 F.3d at 623. PS § 5-133(b)(1) provides that "a person may not possess a regulated firearm if the person ... has been convicted of a disqualifying crime[.]" Mr. Hamilton was convicted in Virginia of "receiving property by stolen, counterfeit, or misrepresented credit card," "credit card counterfeiting," and "credit card theft." *Hamilton*, 848 F.3d at 619. The first two convictions were felonies, thus disqualifying him from possessing a firearm in Maryland. *Id.* Mr. Hamilton wanted to apply for a permit to carry a handgun in Maryland, but "was ultimately informed by an Assistant Attorney General that he could not possess a firearm in Maryland unless he obtained a full pardon from the Governor of Virginia." *Id.* So Mr. Hamilton filed a lawsuit, seeking "a declaration that the

regulatory scheme [(⬚ PS §§ 5-133(b)(1) and 5-205(b)(1))] is unconstitutional under the Second Amendment as applied to him ...." *Id.*

The United States District Court for the District of Maryland applied the two-prong test and concluded that Mr. Hamilton failed to satisfy the first prong because he did "not show[ ] that his factual circumstances remove his challenge from the realm of ordinary challenges." *Id.* (cleaned up). After recognizing that ⬚ PS §§ 5-133(b)(1) and 5-205(b)(1) were presumptively lawful, the court proceeded with the streamlined analysis. Because the court determined that Mr. Hamilton was not a law-abiding responsible citizen "to whom Second Amendment protections enure," it ended its inquiry and dismissed Mr. Hamilton's compliant. ⬚ *Id.* at 623. Mr. Hamilton filed a timely appeal to the Fourth Circuit.

On appeal, Mr. Hamilton argued against a streamlined analysis, stating that the court "essentially dispense[s] with the second step in as-applied felon-disarmament challenges ... , assume[s] there can be no justification for disarming someone who is a law-abiding, responsible citizen, and evaluate[s] all the factual circumstances of the challenger at step one of the *Chester* inquiry." *Id.* at 623–24 (cleaned up). The Fourth Circuit disagreed, reasoning that the court "still conduct[s] the traditional second step of applying an appropriate means-end scrutiny even for laws that receive a streamlined analysis." *Id.* at 624 (*citing* ⬚ *United States v. Hosford*, 843 F.3d 161, 167 (4th Cir. 2016)).

The only difference between the traditional *Chester* test and the streamlined *Moore* test was whether the court had to conduct "an extensive historical inquiry" at the first step. *Id.* If a challenged law is presumptively valid and the challenger does not rebut the presumption, the court will "effectively supplant the historical inquiry with the more direct question of whether the challenger's conduct is within the protected Second Amendment right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.' " *Id.* (quoting ⬚ *Heller*, 554 U.S. at 635; ⬚ *Moore*, 666 F.3d at 318–19). If Mr. Hamilton could demonstrate that he was a law-abiding, responsible citizen, the court would proceed to the second prong and conduct a means-end scrutiny analysis. *Id.*

**\*11** Under the first prong, the Fourth Circuit held "that a challenger convicted of a state law felony generally cannot satisfy step one of the *Chester* inquiry ...." ⬚ *Id.* at 625. The court reasoned that the "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment," except if the "conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful." ⬚ *Id.* at 626. In light of these principles, the court concluded that Mr. Hamilton failed to satisfy step one of the *Chester* inquiry:

> Theft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law.
>
> [Mr.] Hamilton is a state law felon, has not received a pardon, and the basis for his conviction has not been declared unconstitutional or otherwise unlawful. As such, he cannot state a claim for an as-applied Second Amendment to Maryland's regulatory scheme for handguns and long guns.

*Id.* at 627–28 (footnote omitted). Because Mr. Hamilton failed the first step of the two-prong test, the court was not required to conduct a means-end analysis. The Fourth Circuit affirmed the dismissal.

In *Bruen*, in the context of evaluating New York's licensing laws, the Supreme Court declined to adopt both prongs of the two-prong test. "Despite the popularity of this two-step approach" and the fact that the federal Courts of Appeals unanimously had adopted and followed it, the Court considered the test to contain "one step too many." *Bruen*, slip op. at 10. "In keeping with *Heller*," the Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct":

> To justify its regulation, the government may not simply posit that the regulation serves an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the

Second Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961).

*Bruen*, slip op. at 8 (footnote omitted). The Court rejected the notion that *Heller* and *McDonald* supported means-ends scrutiny in the Second Amendment context. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 10.

### 2. PS §§ 5-133(b)(2) and 5-205(b)(2) are presumptively lawful.

Our *first* task, then, is to determine whether PS §§ 5-133(b)(2) and 5-205(b)(2) are presumptively lawful. As discussed above, we hold that they are. The burden is on Mr. Fooks to rebut the presumption. He disputes that a prohibition from possessing firearms because of a criminal contempt conviction is presumptively lawful. He argues that because "the Supreme Court did not include 'criminal contemnors as a class,' and it is at least unclear whether history meant to include them, it must be assumed that Mr. Fooks'[s] Second Amendment rights remained intact" (cleaned up). But again, the Supreme Court recognized in *Heller* the "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. These "presumptively lawful regulatory measures" were merely examples and not meant "to be exhaustive." *Id.* at 627 n.26.

**\*12** We agree with the circuit court that a court could find a statute presumptively valid based solely on the legislature's determination that people convicted of a common law crime who receive a prison term of more than two years should be disqualified from possessing a firearm. A look at the statutory language also supports a conclusion that the statutes are presumptively valid. Section 5-133(b)(2) provides that "a person may not possess a ... firearm if the person ... has been convicted of a violation classified as a common law crime and *received a term of imprisonment of*

*more than 2 years*[.]" (Emphasis added.) The statute is not ambiguous. The legislature didn't provide that *any* common law conviction disqualified an individual from possessing firearms. It enumerated specifically that the individual had to receive a sentence of more than two years to be disqualified. It is the sentence imposed, not the classification of the common law crime, that determines the seriousness of the offense. As the State characterized it in its brief, "[Mr.] Fooks was not stripped of his constitutional right to keep and bear arms because he simply *failed* to pay child support" (emphasis in original). Rather, he "was convicted of *willfully* refusing to comply with a court order to support his children, and the circumstances of his defiance were so egregious that the circuit court sentenced [him] to serve *over two years' incarceration*." (Emphasis in original.) This is hardly a controversial prospect—indeed, the Family Law Article authorizes sentences of up to three years for failing to pay child support. *See* Maryland Code (1984, 2019 Repl. Vol.), § 10-203(c) of the Family Law Article (providing for a three-year maximum penalty for willfully failing to pay child support). We don't know why Mr. Fook's underlying case proceeded under common law criminal contempt rather than as a family law case, but it doesn't matter. The conviction and sentence are valid, and PS §§ 5-133(b)(2) and 5-205(b)(2) are presumptively lawful.

### 3. Mr. Fooks's conduct does not fall "within the protected Second Amendment right of law-abiding, responsible citizens to use arms in defense of hearth and home." [8]

Because the statutes are presumptively lawful, the Fourth Circuit's analysis directed us to look next at whether Mr. Fooks's "conduct is within the protected Second Amendment right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.' " *Hamilton*, 848 F.3d at 624 (quoting *Heller*, 554 U.S. at 635; *Moore*, 666 F.3d at 318–19). *Bruen* does as well, but it defines the boundaries of firearms regulation solely in historical terms. *Bruen*, slip op. at 17 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

Beyond saying, without historical support, that criminal contemnors weren't included in the historic definition of "felons" excluded from firearms regulation, Mr. Fooks asks

us, in effect, to treat him as a law-abiding, responsible citizen for Second Amendment purposes because criminal contempt is non-violent and the State failed to prove that he is a dangerous person. The State responds that the correct question is whether the disqualifying offense is serious, not whether it's violent. In the State's view, the fact "[t]hat there is concededly no evidence of violence in the record is therefore not dispositive of whether" Mr. Fooks is a law-abiding, responsible citizen for these purposes.

Again, Maryland courts have not addressed this directly, but others have. Last year, the Supreme Court of Wisconsin addressed an as-applied Second Amendment challenge in a case similar to this one. *State v. Roundtree*, 952 N.W.2d 765 (Wis. 2021). Mr. Roundtree appealed his conviction for possession of a firearm as a felon, arguing that "Wisconsin's lifetime firearm ban for all felons is unconstitutional as applied ... because his conviction over ten years ago for failure to pay child support does not justify such a ban." *Id.* at 767. Mr. Roundtree asserted that his conviction for failure to pay child support was "a nonviolent felony" and that disqualifying him from owning a firearm served "no public safety objective ...." *Id.* The court held that the felon-in-possession "statute [was] constitutional as applied to [Mr.] Roundtree because it is substantially related to important governmental objectives, namely public safety and the prevention of gun violence." *Id.*

The court reasoned that "failure to pay child support is every bit as serious as [other crimes]. Those who fail to make support payments deprive the very people they should be protecting most, their own children, from receiving basic necessities. ... By all accounts this is a serious offense." *Id.* at 773. And "[s]imply because [Mr. Roundtree's] crime was not physically violent in nature, it does not follow that the felon-in-possession statute cannot be constitutionally applied to" him. *Id.* at 774. The Court concluded that "even if a felon has not exhibited signs of physical violence, it is reasonable for the State to want to keep firearms out of the hands of those who have shown a willingness to not only break the law, but to commit a crime serious enough that the legislature has denominated it a felony ...." *Id.*

*13 Although it's true that Wisconsin classifies failure to pay child support as a felony and Maryland doesn't, the way we label an offense doesn't necessarily preclude us from still considering that offense serious. A quick glance at the statutory language confirms this. PS § 5-133(b)(1) prohibits an individual convicted of a disqualifying crime from possessing a firearm, and the range of disqualifying crimes includes crimes that aren't felonies or violent:

(1) a crime of violence;

(2) a violation classified as a felony in the State; or

(3) a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

PS § 5-101(g)(1)–(3). By its plain language, then, the legislature intended for individuals convicted of violent crimes to be disqualified from possessing a firearm. But the legislature also prohibits a "fugitive from justice" from possessing a firearm. PS § 5-133(b)(3). Although there is no indication that fugitives from justice are dangerous or violent, the legislature decided that such a status was serious enough to prohibit a fugitive from possessing a firearm. The same rationale applies to individuals convicted of common law offenses who receive a term of imprisonment of *more than two years*. In other words, all of the prohibitions enumerated in PS § 5-133(b)(1)–(13) are defined by conduct and statuses that the legislature has denominated as serious enough to be disqualifying.[9]

Mr. Fooks is not, for these purposes, a law-abiding citizen. It's not just that he failed to pay child support, but his failure rose to the level of criminal contempt that was punished by a sentence of longer than two years. His conduct fell outside the scope protected by the Second Amendment, and PS §§ 5-133(b)(2) and 5-205(b)(2) are not unconstitutional as applied to him.

## JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. APPELLANT TO PAY COSTS.

### All Citations

--- A.3d ----, 2022 WL 2339412

## Footnotes

1    Mr. Fooks was charged with illegally possessing regulated firearms, rifles, and shotguns. Title 5 of the Public Safety Article, "Firearms," encompasses both regulated firearms and rifles or shotguns. To avoid any confusion, and because it doesn't alter our analysis, we refer to the weapons collectively as "firearms."

2    Mr. Fooks asserts that he was convicted of constructive criminal contempt in 2017. However, Maryland's Electronic Courts case management system indicates that Mr. Fooks pleaded guilty to the constructive criminal contempt charge on October 13, 2016.

3    The court sentenced Mr. Fooks to four years and six months of imprisonment for the contempt conviction. The record is unclear, however, on how long of that sentence he actually served.

4    Mr. Fooks phrased the Question Presented in his brief as follows:

       Did the Motions court err in denying Mr. Fooks' motion to dismiss because Maryland Code, Public Safety Article, § 5-205(b) and     § 5-133(b), are unconstitutional, or are unconstitutional as applied in this case?

    The State phrased its Question Presented as follows:

       Did the circuit court properly deny Fooks's motion to dismiss because Sections 5-205(b)(2) and 5-133(b)(2) of the Public Safety Article of the Maryland Code comport with the Second Amendment?

5    The language of     PS §§ 5-133(b)(2) and 5-205(b)(2) are nearly identical, with the exception that     § 5-133(b)(2) states "classified as a common law crime" and § 5-205(b)(2) states "classified as a crime under common law[.]"

6    Indeed, the Maryland Sentencing Guidelines Manual states that criminal contempt is "excluded from guidelines coverage[.]" Md. State Comm'n on Crim. Sent'g Pol'y, Md. Sent'g Guidelines Manual (Feb. 1, 2022), at 1.

7    Mr. Fooks points us to     *Williams v. State*, 417 Md. 479 (2011), but that case concerned a conviction stemming from the Criminal Law article, not the Public Safety article.

8       *Hamilton*, 848 F.3d at 624 (cleaned up).

9    These same thirteen prohibitions are enumerated in PS § 5-205—the only difference being these prohibitions apply to shotguns and rifles, not regulated firearms.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



**BRIAN E. FROSH**
*Attorney General*

**ELIZABETH F. HARRIS**
*Chief Deputy Attorney General*

**CAROLYN QUATTROCKI**
*Deputy Attorney General*

## STATE OF MARYLAND
## OFFICE OF THE ATTORNEY GENERAL

FACSIMILE NO. 410-576-7036

WRITER'S DIRECT DIAL NO.

(410) 576-6579
phughes@oag.state.md.us

July 6, 2022

Captain Andrew J. Rossignol
Commander, Licensing Division
Maryland Department of State Police
1201 Reisterstown Road
Pikesville, Maryland 21208-3899

Dear Captain Rossignol:

You have asked two questions about the effect on Maryland law of the United States Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, No. 20-843, 2022 WL 2251305 (June 23, 2022). Maryland law currently provides that a permit to wear, carry, or transport a handgun shall be issued only to a person who "has good and substantial reason" to do so, "such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." Md. Code Ann., Pub. Safety ("PS") § 5-306(a)(6)(ii). But the Supreme Court recently struck down a similar provision of New York law as unconstitutional under the Second and Fourteenth Amendments of the U.S. Constitution. You have thus asked whether Maryland's "good and substantial reason" requirement is likewise unconstitutional. And if that requirement is unconstitutional, you also asked whether the Department of State Police (the "Department") is required to continue enforcing it until a court specifically rules on the constitutionality of Maryland's provision.

As explained in more detail below, Maryland's "good and substantial reason" requirement is now clearly unconstitutional, based on controlling Supreme Court precedent that is directly on point. Indeed, the Court of Special Appeals concluded as much just a few days ago in an unreported decision. *In re Rounds*, No. 1533, Sept. Term, 2021 (Md. Ct. Spec. App. July 1, 2022) (unreported). Thus, the Department is not required to continue enforcing—and, in fact, may not continue to enforce—the "good and substantial reason" requirement in processing public-carry permit applications.

**EXHIBIT C**

Captain Andrew J. Rossignol
July 6, 2022
Page 2

But that conclusion applies only to the "good and substantial reason" requirement. That is, with limited exceptions specifically authorized by law, it remains illegal for an individual to carry, wear, or transport a handgun in public in Maryland without a permit from the Department of State Police. *See* Md. Code Ann., Crim. Law ("CL") § 4-203. The Department also must continue to enforce all other statutory prerequisites for the issuance of public-carry permits. For example, among other statutory prerequisites, the Department still is prohibited from issuing a permit to an applicant who has been convicted of "a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed," PS § 5-306(a)(2)(i), or who has "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another," PS § 5-306(a)(6)(i). In addition, Maryland's laws and regulations prohibiting the carrying of handguns in certain sensitive places—like schools—remain in effect.

To be clear, this advice letter does not address the wisdom of the Supreme Court's interpretation of the Second Amendment. The Attorney General has made clear that he disagrees with the Court's decision and that, in his view, the decision will lead to "more deaths and more pain in a country already awash in gun violence." But the Office of the Attorney General's role in answering your questions is a different one—to offer "our best legal analysis," 106 *Opinions of the Attorney General* 82, 91 (2021), on the current constitutionality of the "good and substantial reason" requirement to the clients responsible for administering that requirement.

# I
# Background

Under Maryland law, an individual generally must have a permit to carry, wear, or transport a handgun in public. PS § 5-303; *see also* CL § 4-203. To obtain that permit, an applicant must satisfy several requirements. PS § 5-306. One of those requirements, as relevant here, is that the Secretary of State Police must find, based on an investigation, that the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." PS § 5-306(a)(6)(ii). That requirement has long been interpreted to mean that, to be granted a license, an applicant must have greater need to carry a handgun than members of the general public. *See Woollard v. Gallagher*, 712 F.3d 865, 869-70 (4th Cir. 2013). To satisfy that burden, applicants must show either a heightened need because of their profession or an "apprehen[sion] [of] danger" that is objectively reasonable, *see Snowden v. Handgun Permit Review Bd.*, 45 Md. App. 464, 469 (1980), and rises above the level of a "vague threat" or a "general fear of living in a dangerous society," *Woollard*, 712 F.3d at

Captain Andrew J. Rossignol
July 6, 2022
Page 3

870 (cleaned up) (quoting *Scherr v. Handgun Permit Review Bd.*, 163 Md. App. 417, 437 (2005)).

## II
## Analysis

Your first question is whether the Supreme Court's decision in *Bruen* renders unconstitutional Maryland's "good and substantial reason" requirement. Although Maryland's requirement was not directly before the Supreme Court in *Bruen*, the Court of Special Appeals recently concluded in an unpublished opinion that—given the similarity between the provision of New York law struck down in *Bruen* and Maryland's "good and substantial reason" requirement—Maryland's requirement is now unconstitutional as well. *Rounds*, slip op. at 1, 4-8. Under the New York law at issue in *Bruen*, an applicant for a license to carry a firearm outside the home for self-defense had to show "proper cause" for the issuance of a license. *Bruen*, slip op. at 3. "Proper cause" was defined as "a special need for self-protection distinguishable from that of the general community." *Id.* (citation omitted). The Supreme Court concluded that this New York requirement to "demonstrate[] a special need for self-defense" violated the Constitution. *Id.*, slip op. at 1-2.

That same conclusion applies to Maryland's "good and substantial reason" requirement. New York's licensing provision, as the Court of Special Appeals recognized, is similar to Maryland's "good and substantial reason" requirement, given the way that Maryland's requirement has long been interpreted by the Department and by the Maryland courts. *See Rounds*, slip op. at 7-8. In fact, the Supreme Court specifically noted in its opinion that five other states—including Maryland—had licensing regimes that, like New York's, "condition[] issuance of a license to carry on a citizen's showing of some additional special need," *Bruen*, slip op. at 1-2, 5-6, which is what the Supreme Court found to be unconstitutional about New York's regime. Regardless of any differences that might exist between New York's "proper cause" requirement and Maryland's "good and substantial reason" requirement, then, they are the same in the way that mattered to the Supreme Court: Maryland "issues public-carry licenses only when an applicant demonstrates a special need for self-defense." *Id.* at 1-2. Thus, Maryland's "good and substantial reason" requirement is now clearly unconstitutional under *Bruen*.

The next question is whether the Department is nonetheless required to continue enforcing the "good and substantial reason" requirement. Ordinarily, a State agency must comply with the enactments of the General Assembly that govern its conduct. *See, e.g.*, 106 *Opinions of the Attorney General* 38, 52-53 (2021). After all, the General Assembly's enactments are presumed to be constitutional. *See, e.g.*, *State ex rel. Att'y Gen. v. Burning Tree Club, Inc.*, 301 Md. 9, 35 (1984). And only a court, not the Office of the Attorney

Captain Andrew J. Rossignol
July 6, 2022
Page 4

General, can "invalidate an act of the General Assembly." *E.g.*, 106 *Opinions of the Attorney General* at 92.

Here, the Court of Special Appeals has found that Maryland's "good and substantial reason" requirement is unconstitutional. *See Rounds*, slip op. at 2. Although it did so in an unreported decision—which lacks precedential effect—the Department is no longer obligated to enforce the requirement because, as the Court of Special Appeals recognized, the requirement is clearly unconstitutional under controlling Supreme Court precedent. Indeed, when a statutory provision is clearly unconstitutional under controlling Supreme Court case law that is directly on point, the Office of the Attorney General has generally advised that the statutory provision is "unenforceable." *E.g.*, 71 *Opinions of the Attorney General* 266, 270, 272 (1986); 70 *Opinions of the Attorney General* 3, 20 (1985) (advising the then-Secretary of Health and Mental Hygiene that certain abortion laws were unconstitutional and "may not be enforced"); *see also* 49 *Opinions of the Attorney General* 243, 246-47 (1964) (concluding that "no tax can be collected" under a statute where a recent Supreme Court decision "unavoidably requires" a conclusion of its unconstitutionality).[1] Continued enforcement of a clearly unconstitutional statute would also expose State officials to the risk of litigation and individual liability under federal law. *See* 42 U.S.C. § 1983. Of course, given that the General Assembly's enactments are presumed to be constitutional, this Office will conclude only in rare cases that a Maryland law is unconstitutional and that it does not need to be enforced. *See* 93 *Opinions of the Attorney General* 154, 161 (2008). But this is one of those rare cases: the *Bruen* Court all but explicitly stated that Maryland's "good and substantial reason" requirement is invalid for the same reasons as New York's "proper cause" requirement.

To be clear, however, the "good and substantial reason" requirement is the only statutory prerequisite for the issuance of a public-carry permit that has been rendered unconstitutional by *Bruen*. As the Supreme Court made clear in its opinion, states may still enforce requirements designed to ensure that "those [individuals] bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, slip op. at 30 n.9 (citation omitted). In particular, the Court emphasized that "nothing in [its] analysis" should be understood as calling into doubt requirements, such as background checks and firearm safety training, that are included under the so-called "shall-issue" permitting regimes that apply in most other states (and that also apply in Maryland). *Id.*; *see also id.* (Kavanaugh, J., concurring), slip op. at 1-2 (explaining that "[t]he Court's decision

---

[1] More difficult questions about the authority of an agency to decline to enforce a State law may arise when the constitutionality of a statute has been called into serious question by case law, but the statute is not yet *clearly* unconstitutional under controlling authority that is squarely on point. There is no need to consider those questions here.

Captain Andrew J. Rossignol
July 6, 2022
Page 5

addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by 6 States including New York" and that even those states "may continue to require licenses for carrying handguns for self-defense so long as [they] employ objective licensing requirements like those used by the 43 shall-issue States").

There is also no reason under Maryland law why the "good and substantial reason" requirement cannot be severed from the rest of the statute. Whether a state statute is severable "is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). And Maryland law contains a "strong presumption" in favor of the severability of Maryland statutes. *See, e.g., Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 596 (2001). Indeed, the General Assembly itself has reiterated that presumption by declaring that "[t]he finding by a court that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless . . . the remaining valid portions alone are incomplete and incapable of being executed in accordance with legislative intent." Md. Code Ann., Gen. Prov. § 1-210(b). There is no reason to think that the General Assembly, had it known that the "good and substantial reason" requirement was unconstitutional, would have wanted the rest of the statute to be invalidated.[2]

Thus, the Department must continue to apply all other requirements governing the qualifications to obtain public-carry permits. For example, among other qualifications, the Department must still deny a permit to an applicant who has "been convicted of a felony

---

[2] Some language in the Court's opinion refers to New York's licensing "regime" as unconstitutional. *E.g., Bruen*, slip op. at 2. But, reading the opinion as a whole, it is clear from context that the Court invalidated only New York's requirement of "proper cause," not its entire licensing regime. *See, e.g., id.*, slip op. at 30, 63 (holding that the "proper-cause requirement" is unconstitutional). In addition, because the State may still require anyone who wishes to carry a handgun in public to obtain a permit and meet certain other requirements, *see id.*, slip op. at 30 n.9, *Bruen* does not seem to impose any blanket prohibition on the criminal prosecution of individuals who carry handguns without a permit, regardless of whether they were charged before or after *Bruen* was decided. *See* CL § 4-203. Although this Office has not yet had the opportunity to exhaustively research the matter, this appears to be so for at least two reasons. First, the Court of Appeals has held that an individual who did not apply for a permit lacked standing to challenge the constitutionality of the permit requirement as part of a challenge to their criminal conviction. *See Williams v. State*, 417 Md. 479, 482, 488 & n.7 (2011). Second, even assuming the existence of standing, a defendant would at the very least need to show that the defendant was "otherwise qualified to receive a license" absent the "good and substantial reason" requirement—that is, that the defendant satisfied all other prerequisites for a permit. *See Dubose v. United States*, 213 A.3d 599, 604-05 (D.C. 2019) (reaching that conclusion following invalidation of the District of Columbia's own "may-issue" provision); *Hooks v. United States*, 191 A.3d 1141, 1144-46 (D.C. 2018) (same).

Captain Andrew J. Rossignol
July 6, 2022
Page 6

or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed," PS § 5-306(a)(2)(i); who has "been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance," PS § 5-306(a)(3); or who is "an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction," PS § 5-306(a)(4). Similarly, with certain limited exceptions, the Department must still deny a permit to an applicant who has not completed a "firearms training course approved by the Secretary." PS § 5-306(a)(5). And, as another example, the Department must still deny a permit to an individual if, "based on an investigation," the Department finds that the individual has "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." PS § 5-306(a)(6)(i).

It is also worth noting that the Supreme Court's decision does not require the State of Maryland to allow for the public carry of firearms in every type of location in the State, without any limits. Rather, the Court in *Bruen* explicitly reaffirmed that states may still prohibit carrying firearms in "sensitive places such as schools and government buildings," though it did not "comprehensively define" every location that would (or would not) qualify as a "sensitive place[]." *Bruen*, slip op. at 21-22 (citation omitted). That means that even those individuals with a public-carry permit remain prohibited from carrying firearms in certain sensitive places, such as schools, where doing so is prohibited by law. *See, e.g.*, CL § 4-102(b) ("A person may not carry or possess a firearm . . . on public school property."); Md. Code Ann., State Gov't § 2-1702(e) (generally prohibiting firearms in State legislative buildings); COMAR 04.05.01.03B (generally prohibiting firearms in State buildings).[3]

Although this letter is not an official Opinion of the Attorney General, I hope it is responsive to your request.

Sincerely,

Patrick B. Hughes
Chief Counsel, Opinions & Advice

---

[3] To be clear, this is not intended to be a comprehensive list of sensitive-place restrictions under Maryland law.

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,          *

      Plaintiffs                                          *

      v.                                                  *          Case No.: 485899V

MONTGOMERY COUNTY, MARYLAND          *

      Defendant                                           *

### JOINT MOTION TO AMEND SCHEDULING ORDER

Plaintiffs, Maryland Shall Issue, Inc., et al., and Defendant Montgomery County, Maryland, by and through their undersigned counsel and pursuant to the Rules of this Court, respectfully request that this Court suspend (1) the July 20 deadline for filing a Pretrial Statement and (2) the July 28 Pretrial/Status Hearing for the following reasons:

    1.    On May 28, 2021, Plaintiffs filed a four-count Complaint in this Court, seeking declaratory and injunctive relief regarding County Bill 4-21, which made changes to Chapter 57of the Montgomery County Code ("Weapons"). The law went into effect on July 16, 2021.

    2.    The Counts and declarations sought by Plaintiffs are as follows:

        •    Count I: the Bill is not a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

        •    Count II: the Bill is preempted by and in conflict with State law;

        •    Count III: the Bill is an unconstitutional taking under Md. Const. art. III § 40 and Md. Decl. Rights art. 24;

        •    Count IV: the Bill violates due process because it is unconstitutionally vague under Md. Decl. Rights art. 24 and U.S. Const. 14th Amendment (the latter claim also seeks damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively).

    3.    On July 12, 2021, the County removed the Complaint to the United States District Court for the District of Maryland.

4.      By Order dated February 7, 2022, the federal court granted, in part, Plaintiffs' Motion to Remand. The federal court remanded Counts I, II, and III to this Court while retaining, but holding in abeyance, Count IV pending resolution of the other claims in this Court.

5.      The parties have filed cross-motions to dismiss and/or for summary judgment that will dispose of all pending claims. This Court has specially set the parties' cross-motions for a one-hour hearing on July 19, 2022.

6.      This Court's February 25, 2022, Scheduling Order presently provides that the parties must file their Pretrial statement by July 20, 2022 and sets the Pretrial/Status Hearing for July 28, 2022.

7.      Given the likelihood that this Court will grant one of the parties' dispositive motions, it would be an inefficient use of judicial resources to prepare Pretrial Statements and hold a Pretrial/Status conference. If, for some reason, the parties' joint motions do not resolve all pending claims, those matters can be rescheduled.

WHEREFORE, the parties respectfully requests that this Court suspend (1) the July 20 deadline for filing a Pretrial Statement and (2) the July 28 Pretrial/Status Hearing.

Respectfully submitted,

/s/ *Mark W. Pennak*
MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
(301) 873-3671
CPF ID No. 1905150005
Attorney for Plaintiffs

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of July 2022, a copy of the foregoing was electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

modify scheduling order
21-003732

3

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

    *Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND,**

    *Defendant.*

Case No.: 485899V

## CONSENT ORDER

Upon consideration of plaintiffs' consent motion for a postponement of the May 23, 2022

Hearing scheduled in this matter, it is this

_____2nd_____ day of _____June_____, 2022, by the Circuit Court for Montgomery County

hereby,

ORDERED, that plaintiffs' consent motion is granted and a hearing on plaintiffs' renewed motion

for summary judgment and defendant's motion to dismiss and alternative motion for summary

judgment will be scheduled for one hour at such time and date when the Court is prepared to hear

both plaintiffs' motion for summary judgment and defendant's motion to dismiss and for summary

judgment, and the respective oppositions, at the same time.

_Joan E. Ryon_

Judge, Circuit Court for
Montgomery County, Maryland

cc: All Parties of record.

Entered: Clerk, Circuit Court for
Montgomery County, MD
June 2, 2022

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on May 20, 2022, a copy of the foregoing proposed Consent Order was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.*, | **Case No.: 485899V** |
| *Plaintiffs,* | |
| vs. | **EXPEDITED HEARING REQUESTED** |
| **MONTGOMERY COUNTY, MARYLAND,** | |
| *Defendant.* | |

**PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT**

Pursuant to MD Rule 2-311, MD Rule 2-501 and MD Rule 2-602, plaintiffs respectfully renew plaintiffs' motion for summary judgment, previously filed with this Court on June 16, 2021. Pursuant to MD Code, Courts and Judicial Proceedings, § 3-409(e), plaintiffs respectfully request "a speedy hearing" on this motion and that the Court "advance it on the calendar" to be heard and decided as soon as possible. Plaintiffs hereby incorporate by reference and renew their May 19, 2022 motion for expedition as applied to the Court's consideration of this motion for summary judgment as well as consideration of defendant's pending motion to dismiss and alternative motion for summary judgment.

In support of this renewed motion for summary judgment, plaintiffs hereby incorporate by reference (1) the verified Complaint and the attachments filed with the Complaint, filed May 28, 2021, (2) the memorandum of law and motion and declarations filed in support of plaintiffs' June 16, 2022 Motion for Summary Judgment, (3) plaintiffs' memorandum filed in opposition to defendant's motion to dismiss and alternative motion for summary judgement and in support of

- Page 1 -

1    plaintiffs' motion for summary judgment, filed March 10, 2022, (4) plaintiffs' Supplemental

2    Memorandum Regarding Enactment Of Senate Bill 387 And House Bill 425 Into Law, filed April

3    14, 2022, (5) plaintiffs' Memorandum In Response To Defendant's Submission Concerning HB

4    425 and SB 387, filed May 16, 2022, and (6) any other matters of record, including proposed

5    orders, filed by plaintiffs in this case to date.

6          Summary judgment for declaratory and equitable relief is sought on Counts I, II and III of

7    the Complaint. Count I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within

8    the meaning of Article XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates

9    the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted

10   by or is inconsistent with numerous provisions of State law. Count III alleges that Bill 4-21

11   constitutes an illegal Taking under the Maryland Takings Clause, Article III, §40 of the Maryland

12   Constitution, and a deprivation of property without due process in violation of Article 24 of the

13   Maryland Declaration of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under

14   both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland

15   Declaration of Rights.

16         On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment,

17   seeking declaratory and equitable relief on Counts I, II and IV of the Complaint, and a hearing on

18   that motion was scheduled for July 15, 2021. Plaintiffs at that time did not seek relief under Count

19   III of the Complaint. On July 12, 2021, in lieu of answering the Complaint, defendant removed the

20   entire case to federal district court pursuant to 28 U.S.C. § 1441. On February 7, 2022, the federal

21   district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain

22   jurisdiction over Count IV.

23         On February 22, 2022, after remand, defendant filed a Motion to Dismiss and Alternative

- Page 2 -

1  Motion for Summary Judgment, and an Opposition to plaintiffs' motion for partial summary

2  judgment. Defendant's motions sought dismissal or summary judgment on Counts I, II and III.

3  Defendant requested declaratory relief as to all claims before this Court. On March 10, 2022,

4  plaintiffs filed their Opposition to defendant's motion and requested declaratory and equitable

5  relief as to all claims before this Court, including Count III. With this renewed motion for summary

6  judgment, plaintiff renew that request for declaratory and equitable relief on Counts I, II and III.

7      Plaintiffs' June 16, 2021 Motion for Summary Judgment only sought summary Judgment

8  on Counts I, II and IV of the Complaint. However, as noted above and explained in plaintiffs'

9  March 10, 2022, Opposition to defendant's motion to dismiss and alternative motion for summary

10  judgment, jurisdiction over Count IV of the Complaint has been retained by the federal district

11  court in the order that remanded Counts I-III back to this Court.  Count IV remains before the

12  federal district court where proceedings on Count IV are being held in abeyance pending a final

13  judgment of this Court on Counts I-III of the Complaint. Count IV of the Complaint is thus no

14  longer before this Court and that part of plaintiffs' June 16, 2021 motion for summary judgment

15  solely addressing Count IV may therefore be disregarded. As also explained in plaintiffs' March

16  10, 2022 Opposition, defendant's motion for summary judgment seeks a declaration of rights on

17  Count III of the Complaint and plaintiffs are thus likewise entitled to a declaration of rights on

18  Count III on defendant's motion as a matter of law.

19      Accordingly, this renewed motion for summary judgment encompasses all Counts of the

20  Complaint that were remanded by the federal district court, including Count III of the Complaint.

21  No additional briefing is necessary or sought on this renewed motion for summary judgment, as

22  all the remanded Counts of the Complaint have already been thoroughly briefed on the cross-

23  motions for summary judgment. Plaintiffs have no objection to defendant's prior pleadings being

24

- Page 3 -

1   deemed filed in opposition to this renewed motion for summary judgment.

2   　　　As detailed in plaintiffs' Opposition to defendant's motions, plaintiffs are entitled to "just

3   compensation" on the takings claim set forth in Count III. The **amount** of such just compensation

4   has yet to briefed by the parties. Plaintiffs therefore respectfully suggest that the Court apply MD

5   Rule 2-602 and hold that there is no just reason for delay and enter final judgment granting

6   declaratory and equitable relief on Counts I and II and III. Such an order will permit an immediate

7   appeal on questions of law presented by these Counts, should any party so desire. The Court should

8   schedule further proceedings for a determination of the amount of just compensation due under

9   Count III. Defendant has not opposed that request for a Rule 2-602 determination. Plaintiffs hereby

10   incorporate by reference the proposed order submitted with its Opposition on March 10, 2022.

11   　　　　　　　　　　　　　　**CONCLUSION**

12   　　　For all the foregoing reasons, this Court should grant plaintiffs' motion for summary

13   judgment for declaratory and equitable relief on Counts I, II and III of the Complaint. The Court

14   should apply MD Rule 2-602 and hold that there is no just reason for delay and enter final judgment

15   granting declaratory and equitable relief for plaintiffs on these Counts. The Court should schedule

16   further proceedings for a determination of just compensation under Count III.

17   　　　　　　　　　　　Respectfully submitted,

18   　　　　　　　　　　　*/s/ Mark W. Pennak*

19   　　　　　　　　　　　MARK W. PENNAK
　　　　　　　　　　　　　Maryland Shall Issue, Inc.
20   　　　　　　　　　　　9613 Harford Rd, Ste C #1015
　　　　　　　　　　　　　Baltimore, MD 21234-21502
21   　　　　　　　　　　　mpennak@marylandshallissue.org
　　　　　　　　　　　　　Phone: (301) 873-3671
22   　　　　　　　　　　　MD Atty No. 1905150005
　　　Dated: May 20, 2022　　　*Counsel for Plaintiffs*

23

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC.**, *et al.*,

    *Plaintiffs*,

vs.

                            **Case No.: 485899V**

**MONTGOMERY COUNTY, MARYLAND**,

    *Defendant*.

**CERTIFICATE OF SERVICE**

    The undersigned counsel hereby certifies that on May 20, 2022, a copy of the foregoing Plaintiffs' Motion for Summary Judgment was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner      Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane     patricia.kane@montgomerycountymd.gov

Sean Charles O Hara      sean.ohara@montgomerycountymd.gov

                      /s/ *Mark W. Pennak*

                      MARK W. PENNAK
                      *Counsel for Plaintiffs*

- Page 5 -

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

**MARYLAND SHALL ISSUE, INC.,** *et al.,*        **Case No.: 485899V**

       *Plaintiffs,*

vs.                                                                 **EXPEDITED HEARING REQUESTED**

**MONTGOMERY COUNTY, MARYLAND,**

       *Defendant.*

**PLAINTIFFS' CONSENT MOTION FOR A POSTPONEMENT
OF THE MAY 23, 2022 HEARING**

      Plaintiffs hereby respectfully move this Court for an order postponing the hearing currently scheduled for May 23, 2022 in the above-captioned matter. Defendant, Montgomery County, Maryland, consents to this motion. As set forth in the parties prior Joint Motion for additional time, filed on April 28, 2002, and in plaintiffs' motion for clarification, filed May 19, 2022, the parties are agreed that plaintiffs' motion for summary judgment should be heard at the same time as defendant's pending motion to dismiss and alternative motion for summary judgment. To perfect the record, plaintiffs have filed a renewed motion for summary judgment that simply incorporates the pleadings filed to date, thereby obviating the need for further briefing. The parties remain in agreement that the time allocated for hearing on these motions should be one hour in duration. Plaintiffs hereby reiterate plaintiffs' alternative motion for expedition, filed May 19, 2022.

**CONCLUSION**

For all the foregoing reasons, this Court should postpone the May 23, 2022 Hearing until such date as the Court is prepared to hear **both** plaintiffs' motion for summary judgment **and** defendant's motion to dismiss and for summary judgment, and the respective oppositions, at the same time. This Court should grant plaintiffs' pending motion for expedition for a hearing on all these pending and schedule a hearing and issue a decision on plaintiffs' motion and defendant's motions as soon as possible.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
Dated: May 20, 2022                *Counsel for Plaintiffs*

- Page 2 -

1

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

2

3   **MARYLAND SHALL ISSUE, INC.,** *et al.,*

4          *Plaintiffs,*

5   vs.                                     **Case No.: 485899V**

6   **MONTGOMERY COUNTY, MARYLAND,**

7          *Defendant.*

8

9

10                              **CERTIFICATE OF SERVICE**

11          The undersigned counsel hereby certifies that on May 20, 2022, a copy of the foregoing

12   Plaintiffs' Consent Motion For A Postponement Of The May 23, 2022 Hearing was served on the

13   following counsel for defendant Montgomery County via the MDEC e-filing system:

14   Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

15   Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

16   Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

17

18

19                              /s/ *Mark W. Pennak*

20                              MARK W. PENNAK
                                *Counsel for Plaintiffs*

21

22

23

                                - Page 3 -

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

    *Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND,**

    *Defendant.*

**Case No.: 485899V**

**EXPEDITED HEARING REQUESTED**

**PLAINTIFFS' MOTION FOR CLARIFICATION OR, IN THE ALTERNATIVE, RENEWED MOTION FOR EXPEDITION**

Plaintiffs respectfully submit this motion for clarification concerning the scope of the Hearing currently scheduled for May 23, 2022. In the alternative, plaintiffs hereby renew their April 14, 2022 Motion for Expedition for a hearing and a decision on plaintiffs' June 16, 2021 Motion for Summary Judgment. For the reasons set forth below, this Court should hear, on May 23, 2022, plaintiffs' long-pending motion for summary judgment along with defendant's motion to dismiss and alternative motion for summary judgment, filed in February 2022. Alternatively, the Court should grant, on an expedited basis, a hearing and issue a decision on plaintiffs' pending motion for summary judgment.

**A.     The Pending Motions for Summary Judgment**

On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. An emergency hearing was scheduled for July 15, 2021, on that motion.  On July 12, 2021, in lieu of answering the Complaint, defendant removed the entire case to federal district court pursuant to 28 U.S.C. §

- Page 1 -

1   1441. As a result, the June 15, 2021 Hearing was canceled by the Court. On February 7, 2022, the

2   federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to

3   retain jurisdiction over Count IV. Count IV of the Complaint is therefore no longer before this

4   Court on plaintiffs' motion.

5        On February 22, 2022, after remand of the case from federal district court, defendant filed

6   a Motion to Dismiss and Alterative Motion for Summary Judgment, **and** an Opposition to plaintiffs'

7   still-pending motion for partial summary judgment. Defendant's motions sought dismissal or

8   summary judgment on all the State law claims, including Count III on which plaintiff had not

9   previously sought summary judgment. On March 7, 2022, plaintiffs filed their opposition to

10  defendant's motion and requested declaratory and equitable relief as to all claims before this Court,

11  including Count III. Defendant likewise requested declaratory relief as to all claims that remained

12  before this Court.

13  **B.**    **Plaintiffs' April 14, 2022 Motion For Expedition**

14       On April 14, 2022, plaintiffs filed a supplemental memorandum concerning the enactment

15  by the General Assembly of HB 425 and SB 387. Combined with that supplemental memorandum

16  was Motion for Expedited Hearing and Decision, specifically requesting expedition "on plaintiffs'

17  motion for partial summary judgment as well as on the Motion to Dismiss and Alternative Motion

18  for Summary Judgment filed by defendant." In an order filed April 20, 2022, this Court dismissed

19  as "**MOOT**" plaintiffs' motion for expedition. (Emphasis added).

20       On April 20, 2002, this Court also issued an order scheduling a hearing on defendant's

21  motion to dismiss and alternative motion for summary judgment and on plaintiffs' opposition to

22  those motions for May 23, 2022. Plaintiffs' motion for summary judgment was not mentioned in

23  that order, even though plaintiffs' motion for expedition has been denied as "MOOT."

- Page 2 -

1    Undersigned counsel believed that the omission of any mention of plaintiffs' motion for summary

2    judgment in the Hearing order was simply an oversight as the motion for expedition could not be

3    "MOOT" unless the Court had intended to include plaintiffs' motion for summary judgment in the

4    May 23, 2022 Hearing. That conclusion also made obvious sense, given that the briefing on both

5    sets of motions was combined and a decision on one set of motions would quite likely be

6    dispositive of the other set of motions

7            Defendant shared that belief. On April 28, 2022, plaintiffs and defendants filed a Joint

8    Motion with the Court requesting a total of one hour for the May 23, 2022 Hearing. The Joint

9    Motion made clear that the parties believed that the May 23, 2022 Hearing encompassed the

10   pending motions of summary judgment filed by **both** plaintiffs and defendant, noting that "[t]his

11   Court has scheduled oral argument **on the parties' cross-motions** for May 23, 2022; only 30

12   minutes are allotted for argument." The request for extra time was intended to accommodate

13   counsels' desire to more fully address both sets of motions. As that Joint Motion also makes clear,

14   the parties desired to argue both sets of motions on May 23, 2022.

15   **C.    This Court's Latest Order**

16           In order filed today, May 18, 2022, this Court granted "in part" the Joint Motion to Extend

17   time to one hour, stating that oral argument would be "on Defendant's Motion to Dismiss or,

18   Alternatively, for Summary Judgment, filed on February 22, 2022, and Plaintiffs' Opposition

19   thereto, as these are the only matters pending before the Court for hearing on May 23, 2022." By

20   that limitation, undersigned counsel now understands the Court to be **excluding** argument on

21   plaintiffs' pending motion for summary judgment. Respectfully, any such exclusion of plaintiffs'

22   motion for summary judgment would be counterproductive to the prompt and fair resolution of

23   this case and a needless waste of the resources of this Court and of the parties.

- Page 3 -

1    Plaintiffs thus respectfully request clarification or reconsideration concerning the scope of

2    argument for the May 23, 2022 Hearing. As noted, the cross-motions for summary judgment were

3    briefed in combination. As the Joint Motion suggests, it will be difficult if not impossible to limit

4    argument to defendant's motion as the merits issues in both motions are the same. As noted above,

5    both plaintiffs and defendant seek declaratory relief on all claims presently before the Court.

6        Alternatively, if the May 23, 2022 Hearing will actually exclude argument and relief on

7    plaintiffs' June 16, 2021 Motion for Summary Judgment, then plaintiffs' April 14, 2022 Motion

8    for Expedition is not "MOOT" and never was. In that case, the April 20, 2022 Order of this Court

9    denying plaintiffs' Motion for Expedition as "MOOT" was erroneously entered and should be

10   vacated and replaced with a new Order disposing of the Motion to Expedite. Should the Court elect

11   to limit the May 23, 2022 Hearing to defendant's motion, then plaintiffs hereby respectfully renew

12   their April 14, 2022 request for expedition as applied to plaintiffs' motion for summary judgment

13   and request an expedited hearing and decision on that motion for summary judgment.

14       All the reasons for expedition detailed in plaintiffs' April 14, 2022 Motion for Expedition

15   still apply. Specifically, as explained in that Motion, the General Assembly has enacted HB 425

16   and SB 387 into law, with an effective date of June 1, 2022. Yet, Bill 4-21 effectively precludes

17   implementation of HB 425 and SB 387 in Montgomery County and thus bars participation by

18   plaintiff Engage Armament, a federally licensed Class 07 manufacturer, in the serialization process

19   established by HB 425 and SB 387. See Plaintiffs' Memorandum In Response To Defendant's

20   Submission Concerning HB 425 And SB 387 at 13-14 (filed May 15, 2022). The time limitation

21   for serialization by existing owners established in HB 425 and SB 387 is currently running. See *id.*

22   at 3. Time of the essence.

23

24

                                        - Page 4 -

1

**CONCLUSION**

2          For all the foregoing reasons, this Court should hear **both** plaintiffs' motion for summary

3   judgment **and** defendant's motion to dismiss and for summary judgment at the May 23, 2022

4   Hearing. Alternatively, this Court should grant plaintiffs' motion for expedited treatment of

5   plaintiffs' June 16, 2021 Motion for Summary Judgment and schedule a hearing and issue a

6   decision on that Motion for Summary Judgment as soon as possible.

7                                                    Respectfully submitted,

8                                                    */s/ Mark W. Pennak*

9                                                    MARK W. PENNAK
                                                     Maryland Shall Issue, Inc.
10                                                   9613 Harford Rd, Ste C #1015
                                                     Baltimore, MD 21234-21502
11                                                   mpennak@marylandshallissue.org
                                                     Phone: (301) 873-3671
12                                                   MD Atty No. 1905150005
     Dated: May 18, 2022                             *Counsel for Plaintiffs*
13

14

15

16

17

18

19

20

21

22

23

24

1

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

2

3    **MARYLAND SHALL ISSUE, INC.,** *et al.,*

4             *Plaintiffs,*

5    vs.                                          **Case No.: 485899V**

6    **MONTGOMERY COUNTY, MARYLAND**,

7             *Defendant.*

8

9

10                        **CERTIFICATE OF SERVICE**

11        The undersigned counsel hereby certifies that on May 18, 2022, a copy of the foregoing

12   Plaintiffs Motion For Clarification Or, In The Alternative, Renewed Motion To Expedite was

13   served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

14   Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

15   Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

16   Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

17

18

19                                  */s/ Mark W. Pennak*

20                                  MARK W. PENNAK
                                    *Counsel for Plaintiffs*
21

22

23

24                                  - Page 6 -

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.*, | * |
| | * |
| **Plaintiffs,** | * |
| **v.** | *    **Case No. 485899-V** |
| | * |
| **MONTGOMERY COUNTY, MARYLAND** | * |
| | * |
| **Defendant.** | * |

## ORDER

**UPON CONSIDERATION** of the Joint Motion to Extend Time (To One Hour) For Argument on Parties' Cross-Motions for Summary Judgment, filed on April 28, 2022, it is this ___17th___ day of May, 2022 by the Circuit Court for Montgomery County, Maryland

**ORDERED,** that the Joint Motion to Extend Time (To One Hour) For Argument on Parties' Cross-Motions for Summary Judgment, filed on April 28, 2022 be, and hereby is, **GRANTED IN PART** to allot one hour for oral argument on May 23, 2022 on Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment, filed on February 22, 2022, and Plaintiffs' Opposition thereto, as these are the only matters pending before the Court for hearing on May 23, 2022.

*Joan E. Ryon*
_____
**JOAN E. RYON, Judge**
Circuit Court for Montgomery County, Maryland

Entered: Clerk, Circuit Court for
Montgomery County, MD
May 18, 2022

1

2

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

3

4

**MARYLAND SHALL ISSUE, INC.,** *et al.*,          **Case No.: 485899V**

            *Plaintiffs,*

5

vs.                                                      **EXPEDITED HEARING REQUESTED**

6

**MONTGOMERY COUNTY, MARYLAND,**

7

            *Defendant.*

8

9

10

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S SUBMISSION
CONCERNING HB 425 AND SB 387**

11

**I.      INTRODUCTION**

12

            On April 14, 2022, plaintiffs submitted a "Supplemental Memorandum Regarding

13

Enactment Of Senate Bill 387 And House Bill 425 Into Law And Motion For Expedited Hearing

14

And Decision" ("P. HB425/SB387 Mem."). On May 12, 2022, defendant, Montgomery County,

15

Maryland ("the County") submitted "Defedant's [Sic] Reply To Plaintiffs' Supplemental

16

Memorandum Regarding Enactment Of Senate Bill 387 And House Bill 425 Into Law" ("Def.

17

HB425/SB387 Mem."). Defendant's memorandum raises new arguments that warrant a response.

18

**II.     DEFENDANT'S RESORT TO A "FUNCTIONAL TEST" IS CONTRARY
         TO MOST RECENT AUTHORITY FROM THE COURT OF APPEALS**

19

20

            Count II of plaintiffs' verified Complaint challenges Bill 4-21 as contrary to the Express

21

Powers Act, MD Code, Local Government, §§ 10-206. Plaintiffs expressly rely on the Express

22

Powers Act in its prior memorandum concerning the enactment of HB425/SB387. See P.

23

HB425/SB387 Mem. at 2, 7. As noted in plaintiffs' prior memoranda (P. SJ Mem. at 7), under the

24

- Page 1 -

1    Express Powers Act, a county may not enact any legislation that is "inconsistent with State law"

2    and may exercise their local "powers" "only to the extent that the powers are not preempted by or

3    in conflict with public general law." MD Code, Local Government, § 10-206(a),(b).

4         The County claims for the first time that "Maryland has employed two tests to determine

5    whether state law conflict preempts local law: the functional test and the verbal test. Under the

6    functional test, a local law is not conflict preempted if it advances, or is consistent with, the state

7    law's purposes." (Def. HB425/SB387 Mem. at 3). The County then goes on to assert that Bill 4-

8    21, challenged in this case, does not conflict with HB425/SB387, despite the many inconsistencies

9    and conflicts set out in plaintiffs' memorandum, because the County supported the original version

10    of the bills and because HB425/SB387 "advances" regulation of so-called "ghost guns." While the

11    County does not deign to cite the Express Powers Act anywhere in their latest pleading, the County

12    appears to argue that its new-found principle requires that Bill 4-21 be sustained. The County's

13    argument fails at every step.

14         The County first overlooks the two most recent decisions of the Court of Appeals applying

15    the Express Powers Act: *Angel Enterprises Limited Partnership v. Talbot County*, 474 Md. 237,

16    254 A.3d 446 (2021), and *K. Hovnanian Homes of Maryland, LLC v. Mayor of Havre de Grace*,

17    472 Md. 267, 292, 244 A.3d 1174 (2021). In *Angel Enterprises*, case, the plaintiffs challenged a

18    Talbot County ordinance that imposed civil fines for violation of County Code provisions that

19    purported to regulate the clearing of trees and construction of a driveway by plaintiffs. Under those

20    county code provisions, Talbot County required that any appeal of civil fines levied were to take

21    place via an administrative appeal to a county board of appeals. Both the Court of Special Appeals

22    and Talbot County Circuit Court sustained this administrative scheme. (474 Md. at 240-41). The

23    Court of Appeals reversed.

1      In so holding, the Court of Appeals stated that "when a party is challenging the authority

2      of a local government to take a particular action, *it is important to strip away the labels* and

3      consider the particular governmental action that is sought to be undertaken." Id. at 259 (emphasis

4      supplied). The Court of Appeals explained that the first step in applying this test was to "identify

5      the precise nature of the governmental action in question," and the second step was "whether the

6      local government 'has the legal authority to undertake the action, and if so, whether the

7      contemplated action was correctly undertaken consistent with that grant of authority action in

8      question.'" (Id. at 259-60) (quoting *K. Hovnanian Homes of Maryland,* 472 Md. at 292). Applying

9      this test, the Court of Appeals held that even though Talbot County had the legal authority to

10     impose civil fines and had the legal authority to regulate the subject matter (id at 265), the appeal

11     procedures were nonetheless invalid under the Express Powers Act because the county's

12     provisions were "inconsistent with the applicable provisions of State law, which vest original

13     jurisdiction in the courts for the adjudication of civil penalties established by a charter county in

14     the exercise of its express powers, as well as in the exercise of additional powers authorized by

15     [State law]." Id. at 269. See also *K. Hovnanian Homes*, 472 Md. at 291 ("where the General

16     Assembly has provided a municipality with the authority to exercise an express power by

17     ordinance, the ordinance 'may not conflict with State law'") (quoting MD Code, Local

18     Government, § 5-203(b)).

19     In short, *Angel Enterprises* makes clear that "labels" do not control and thus it simply does

20     not matter whether the local ordinance serves the same general "purpose" as State law. Rather, the

21     only thing that matters under this controlling precedent is whether the local governmental entity

22     (1) has the power to regulate in a given area, and (2) whether the local law is "inconsistent" or "in

23     conflict" with State law. If the local law fails either prong, then it is *ultra vires*. Full stop. Here,

24

                                              - Page 3 -

1    for all the reasons set forth previously in plaintiffs' memorandum supporting summary judgment

2    and in their opposition to defendant's motion to dismiss or alternative motion for summary

3    judgment, Montgomery County lacks the authority under MD Code, Criminal Law, § 4-209, to

4    regulate firearms in the manner accomplished by Bill 4-21. That ends the analysis.

5      But even assuming *arguendo* that it does have the authority, the County's regulation of

6    firearms must still not be "inconsistent" or "in conflict" with State law, and that is true regardless

7    of whether it shares the same general purpose of State law. Stated simply, "a County may not

8    prohibit something permitted by State legislation or permit something prohibited by State

9    legislation." *Caffrey v. Department of Liquor Control for Montgomery County,* 370 Md. 272, 305,

10    805 A.2d 268 (2002). *Rossberg v. State*, 111 Md. 394, 74 A. 581, 584 (1909) ("ordinances which

11    assume directly or indirectly to permit acts or occupations which the state statutes prohibit, or to

12    prohibit acts permitted by statute or constitution, are under the familiar rule for validity of

13    ordinances uniformly declared to be null and void"). Defendant's latest filing cites both *Caffrey*

14    and *Rossberg*, and concedes that "a local law is conflict preempted if it prohibits conduct that the

15    state law expressly permits," but asserts that rule does not apply if the local law is "consistent"

16    with "the purposes of Maryland law." See Def. HB425/SB387 Mem. at 3.

17      The County's assertion is simply false. As *Caffrey* and *Rossberg* make clear, a county

18    ordinance is invalid if it prohibits acts that are permitted under State law. Nothing in that simple

19    test requires any consideration of a local law's "purpose." But a county law may still be

20    "inconsistent" with State law (and thus fail), even though it did not actually prohibit conduct

21    permitted by State law. After all, the Express Powers Act bans both county laws "inconsistent"

22    with State law, MD Code, Local Government, § 10-206(a), and as well as county laws "in conflict"

23    with State law. (Id. § 10-206(b). *Lyles v. Santander Consumer USA Inc.*, --- Md. ---, --- A.3d ---

- Page 4 -

1  2022 WL 1513656 at *6 (May 13, 2022) ("[w]e read the statute as a whole to ensure that no word,

2  clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory")

3  (citations and internal quotes omitted). For example, in *Angel Enterprises*, the county

4  administrative scheme was invalid because it was "inconsistent" with State 'law that assigned

5  jurisdiction to the Maryland courts even though the Court of Appeals agreed that Talbot County

6  in that case had full authority to regulate in the area. No direct conflict was required, as Talbot

7  County did not prohibit any acts otherwise permitted by State law. Rather, it created an

8  administrative scheme that failed to recognize, and was thus "inconsistent" with, the approach

9  specified in State law.

10      In *K. Hovnanian Homes*, State law required that the municipality's authority to enter into

11  agreements must be pursuant to a duly enacted ordinance and the Court of Appeals held that the

12  municipal failure to enact such ordinance was fatal to the municipality's actions for that reason.

13  See *K. Hovnanian Homes*, 472 Md. at 295. In neither *Angel Enterprises* nor *K. Hovnanian Homes*

14  did the Court of Appeals stop to inquire as to whether the local law was consistent with the

15  "purposes" of State law. The textual inconsistency with the text of State law was sufficient. In this

16  case, plaintiffs have shown that Bill 4-21 directly prohibits activities and conduct that is permitted

17  by State law, including conduct contemplated and permitted by HB425/SB387. Plaintiffs have

18  likewise shown that Bill 4-21 is "inconsistent" with the regulatory scheme created by

19  HB425/SB387 as well as with the statutory scheme enacted by other Maryland firearms laws. No

20  more is required.

21      Relying heavily on *Ad + Soil, Inc. v. County Com'rs of Queen Anne's County*, 307 Md.

22  307, 333, 513 A.2d 893 (1986), the County argues that "the legislature's failure to 'address the

23  interaction of its statutes with pre-existing local ... laws suggests that it intended no change in the

- Page 5 -

1    applicability of the local laws.'" Def. HB425/SB387 Mem. at 6. Yet, in the discussion cited by the

2    County, *Ad + Soil* addressed "field" preemption, and merely held that State law did not occupy

3    the field to the exclusion of local zoning ordinances, a matter that the Court recognized to be one

4    of the "cornerstones of this state's system of land use control." *Ad + Soil*, 397 Md. at 333-34.

5    When the Court of Appeals addressed conflict preemption later on in its opinion, the Court merely

6    held that the local zoning ordinance did not prohibit what was permitted by State law and was not

7    inconsistent with State law on the facts there presented. (Id. at 336).

8          Nothing in *Ad + Soil* contradicts the approach followed by the Court of Appeals more

9    recently in *Angel Enterprises*. Nothing in *Ad + Soil* even mentions the Maryland Constitutional

10   limitations on county enactment of "general laws" or the Express Powers Act, which limits the

11   power of counties. Moreover, unlike the local zoning law at issue in *Ad + Soil,* where local zoning

12   regulation was the rule and was thus entitled to a presumption of validity, *Ad + Soil*, 307 Md. at

13   334, Bill 4-21 regulates firearms, an area of law (firearms) where the County's power has long

14   been tightly constricted by multiple express preemption provisions, including MD Code, Criminal

15   Law, § 4-209, which is the sole source of authority claimed by the County here.

16         Indeed, the part of Section 4-209 on which the County relies, subsection 4-209(b)(1), is but

17   a mere exception to the broad preemption imposed by subsection 4-209(a). The general rule is that

18   such exceptions are to be narrowly construed so as to avoid undermining the general provision.

19   See, e.g., *Blue v. Prince George's County*, 434 Md. 681 76 A.3d 1129 (2013) ("Under the canons

20   of statutory construction, '[w]hen a general provision in a statute has certain limited exceptions,

21   all doubts should be resolved in favor of the general provision rather than the exceptions.'")

22   (quoting Norman J. Singer and J.D. Shambie, *Sutherland Statutes and Statutory Construction*

23   (2013), § 47:11). See also *Taylor v. Friedman*, 344 Md. 572, 581, 689 A.2d 59 (1997) (noting "the

- Page 6 -

1   rule of statutory construction dealing with statutes that express a general rule, followed by one or

2   more specific exceptions to the general rule. Under those circumstances, a court ordinarily cannot

3   add to the list of exceptions."); *Radio Communications, Inc. v. Public Service Commission of*

4   *Maryland*, 50 Md.App. 422, 442, 441 A.2d 346 (1982) ("'Grandfather rights' are considered

5   exceptions to statutes and must be strictly and narrowly construed."). Plainly, the County's law is

6   entitled to no presumption of validity.

7         Similarly, in *City of Baltimore v. Sitnick*, 254 Md. 303, 312, 255 A.2d 376 (1969), in the

8   portion cited by the County, the Court likewise addressed field preemption, but in the portion not

9   cited by the County, the Court noted that Express Powers Act preserved "the dominance of a public

10  general law over local ordinances, in an area where conflict may exist." *Sitnick* is thus of no aid to

11  the County here. In *National Asphalt Pavement Ass'n, Inc. v. Prince George's County*, 292 Md.

12  754, 78-79, 37 A.2d 651 (1981), also cited by the County, the Court addressed solely field

13  preemption in the area of employment discrimination. The Express Powers Act was not even

14  mentioned. Plaintiffs have quite deliberately not claimed "field" preemption in this case. While

15  the exceptions set forth in subsection 4-209(b) may suggest that State firearms law does not

16  entirely "occupy the field," the elaborate and comprehensive scheme of firearm regulation created

17  by State law makes especially clear that the subsection 4-209(b) exceptions should be very

18  narrowly construed in order to avoid interfering with that State regulation, including the regulatory

19  scheme created by HB425/SB387. See *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675, 689

20  (2006), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008) (noting that "the exceptions to

21  otherwise blanket preemption [in Section 4-209] are narrow and strictly construable").

22

23

24

- Page 7 -

III.    **THE LEGISLATIVE HISTORY OF HB425/SB387
SUPPORTS PLAINTIFFS**

The County argues that Bill 4-21 is not preempted by HB425/SB387 because the County testified at the legislative hearings on this legislation and that the General Assembly was thus aware of Bill 4-21 when it enacted this legislation. The County even goes so far as to attach its testimony before the General Assembly to its latest filing in an effort to demonstrate how it supported the enactment of HB425/SB387. The County is truly grasping at straws. Indeed, the legislative history of HB425/SB387 demonstrates that the General Assembly amended this legislation during the Session precisely to permit the very activities that the County outright bans in Bill 4-21. Thus, far from endorsing the County's law, the General Assembly quite deliberately enacted State-wide legislation that is quite inconsistent and in direct conflict with Bill 4-21.

While the County touts its participation in the legislative process that led to the enactment of HB425/SB387, plaintiff Maryland Shall Issue ("MSI") also actively participated in that process. See County Exhs. M & N (listing undersigned counsel as a witness on behalf of MSI). MSI submitted a 17-page, single-spaced memorandum of law on the many issues posed by the bills, as originally drafted. That Testimony is attached herewith as Exhibit A. MSI's participation was instrumental in the changes to the original bills and those changes are precisely the areas where Bill 4-21 conflicts with HB425/SB387 most starkly. Those changes all took place initially in the Senate Judicial Proceedings Committee ("JPR") and in the Senate only to be adopted later by the House after the Senate adopted them. In contrast, the House originally passed HB 425 without amendment. https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/hb0425.

This Court need only compare the original version of SB387 to the version that actually became law to see how dramatically the final bills were changed from the originals. As far as we

- Page 8 -

1    are aware, the County played absolutely no role whatsoever in these amendments made in JPR and

2    adopted by the Senate and thereafter in the House. Neither Bill 4-21 nor Montgomery County was

3    ever even mentioned in JPR during the voting session. https://youtu.be/0SgLZKYxAX4?t=3740,

4    or in the House Judiciary Committee when it considered the amendments to SB387 after it was

5    amended     and     adopted     by     the     Senate     and     sent     to     the     House.

6    https://www.youtube.com/watch?v=95T1_M0gGKY. The Fiscal Note on SB387, cited by the

7    County (County Exh. P), was drafted and presented on the original version of SB387, well before

8    JPR drastically altered SB387 in Committee. The County's testimony, cited by the County (County

9    Exhs J. & K), was all submitted in February of 2022, well before JPR amended the bill in

10    Committee. The JPR Floor Report for SB387, cited by the County (County Exh. O), merely notes

11    that local jurisdictions, such as "San Diego," California and Montgomery County, had started "to

12    address privately made firearms," but nothing in that Floor Report can be read to endorse such

13    local laws, much less the County's particular law.

14         The changes made by JPR and the Senate to SB387 are fundamentally inconsistent with

15    the approach followed by the County in enacting Bill 4-21. For example, the original bills, on

16    which the County testified in support, broadly defined an unfinished frame or receiver to ban "zero

17    percent" receivers, which are merely blocks of metal or plastic advertised or sold as zero percent

18    receivers. See Section 5-701(h)(2). MSI pointed out the patent absurdity of this provision

19    (Testimony at 8-9), and, as a result, the SB387 provision banning such zero percent receivers was

20    stripped out of SB387. See Section 5-701(h). In contrast, Bill 4-21 bans possession of all "ghost

21    guns" (Section 57-11(a)), and defines "ghost guns" to include any "unfinished frame or receiver"

22    that lacks a serial number engraved by a federally licensed manufacturer or importer in a manner

23

24

1  compliant with federal law. See County Code Section 57-1(2). By definition, "zero percent"

2  receivers lack such serial numbers.

3       Similarly, MSI argued that the bills should be amended to provide a way for the future

4  private manufacture of firearms for personal use. See Testimony at 15. As enacted, SB387 was

5  amended to provide an express avenue for such home manufacture of firearms. See Section 5-

6  703(b)(3). Under this provision, private persons are expressly permitted make and keep unfinished

7  frames and receivers as long as such items, when sufficiently finished under the amended

8  definition of an unfinished frame or receiver, are serialized by a Federal Firearms Licensed

9  ("FFL"). That serialization may be **either** in accordance with federal law, "**or**" through an

10  alternative serialization protocol under which the owner may have a FFL serialize the firearm with

11  the type of number specified in HB425/SB387, and then register it with the Maryland State Police.

12  See Section 5-703(b)(2). In contrast, Bill 4-21 does not allow any future manufacture of firearms

13  for personal use at all, and instead bans all possession by all persons, including FFLs. See County

14  Code 57-11(a). In addition, Bill 4-21 expressly requires that the content of the serial number

15  comply with federal standards set forth in 27 C.F.R. § 479.102. See Section 57-1(2). The

16  alternative method of serialization allowed by HB425/SB387 does not comply with federal law,

17  but the method ensures "traceability" because HB425/SB387 requires that a frame or receiver

18  serialized in this fashion also be registered with the State Police. See Section 5-703(b)(2)(ii). Yet,

19  mere possession of a firearm serialized and registered in this alternative manner would be a crime

20  under Bill 4-21 because the serial number would not be compliant with 27 C.F.R. § 479.102.

21       MSI also asserted in its Testimony that the definition for unfinished frames or receivers in

22  the original bills was hopelessly vague and such vagueness, coupled with the lack of a *mens rea*

23  provision, made the bills unconstitutional under *Lawrence v. State*, 475 Md. 384, 408, 257 A.3d

24

1    588, 602 (2021). Testimony at 10. JPR and the Senate agreed. As a result, SB387 was amended to

2    be consistent with the definitions provided in the federal ATF Rule that has since become final.

3    See Section 3 of HB425/SB387 (requiring that the law be interpreted in a manner consistent with

4    the ATF Rule's definitions). The ATF Rule newly defines receivers and frames in great detail. See

5    87 Fed. Reg. at 24735 (amending 27 C.F.R. §478.12). SB387 was also amended to comply with

6    *Lawrence* by including an express *mens rea* provision. See Section 5-703(b)(1). In contrast, Bill

7    4-21 makes no attempt to define unfinished frame or receiver and utterly lacks any *mens rea*

8    requirement. Bill 4-21 is thus unconstitutional on these grounds alone. See *Lawrence*, 475 Md. at

9    408; P. Mem. In Support of Summary Judgment at 36 *et seq.*

10          These are merely the highlights of the changes made by JPR and adopted by the Senate.

11   Additional conflicts between HB425/SB387 and Bill 4-21 are more fully set forth in plaintiffs'

12   Supplemental Memorandum Concerning the Enactment of HB425/SB387. MSI still vigorously

13   opposed the enactment of HB425/SB387, but SB387, as thus amended, received rare, bi-partisan

14   support   in   JPR,   https://youtu.be/0SgLZKYxAX4?t=3740,   and   in   the   Senate.

15   https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0387. The amendments to SB387

16   also drew the full support of Attorney General Frosh, who urged the House of Delegates to adopt

17   the Senate's amendments. See https://youtu.be/Y2gVUR-e4cI?t=2538. The Attorney General's

18   support was important, as HB425/SB387 was originally written by the Attorney General's Office

19   and   introduced   at   his   request   in   both   chambers   of   the   General   Assembly.   See

20   https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/hb0425,                         and

21   https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0387.

22          All these changes to the original version of SB387 occurred even though JPR and the

23   Senate were aware of Bill 4-21, as the County argues. Yet, as this legislative history makes plain,

- Page 11 -

1    the General Assembly paid little heed to Bill 4-21. SB387, as enacted, can hardly be said to have

2    endorsed the County's radically different approach to the regulation of unserialized firearms. In

3    short, this legislative history supports plaintiffs, not the County. This Court should thus reject the

4    County's desperate resort to "purpose." As the Court of Appeals recently stated, courts in this State

5    are to "'assume that the legislature's intent is expressed in the statutory language and thus our

6    statutory interpretation focuses primarily on the language of the statute to determine the purpose

7    and intent of the General Assembly.'" *Berry v. Queen*, 469 Md. 674, 687, 233 A.3d 42 (2020)

8    (quoting *Brown v. State*, 454 Md. 546, 550-51, 165 A.3d 398 (2017)). The text, discussed above,

9    makes clear that the General Assembly elected to take a different road than that taken by the

10   County. The text is confirmed by the legislative history. That ends the inquiry. Bill 4-21 must give

11   way to that legislative judgment.

12         Finally, the County ardently denies that Bill 4-21 makes "it 'legally impossible' for the

13   owner of a ghost gun to transport that gun to a federal licensee in the County to either sell it (to

14   the federal licensee) or have it serialized." Def. HB425/SB387 Mem. at 5. The County does not

15   address, much less deny, the other conflicts and inconsistencies between Bill 4-21 and

16   HB425/SB387, detailed in plaintiffs' supplemental memorandum and summarized above. In any

17   event, the County's naked denial blinks reality. By its express terms, Bill 4-21 amends County

18   Code 57-11(a) to ban the sale, transfer, possession or transport of any "ghost gun," which the

19   County defines to include any "unfinished frame or receiver that lacks a unique serial number

20   engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer or maker or

21   importer in accordance with 27 C.F.R. § 479.102." Section 57-1(2). None of the exceptions to

22   these bans specified in Section 57.11(b) remotely apply and the County points to none. These bans

23   apply to everyone.

1          Bill 4-21 adversely affects all the plaintiffs, but perhaps most significantly impacts plaintiff

2    Engage Armament, which is a State and federally licensed firearms dealer and manufacturer. See

3    Verified Complaint, ¶ 26. As such, Engage is **expressly** exempted from HB425/SB387. See

4    Section 5-702(2). Specifically, under Section 5-702(2), as enacted by HB425/SB387, a person may

5    freely sell, transfer or deliver "an unfinished frame or receiver" to "(i) a federally licensed firearms

6    dealer; (ii) a federally licensed firearms manufacturer; or (iii) a federally licensed firearms

7    importer." (Id.). These federally licensed dealers, manufacturers and importers may possess such

8    unfinished frames and receivers. (Id.). Indeed, as explained above, FFLs, like Engage, are key

9    players in the serialization and registration statutory scheme created by HB425/SB387. And, as

10   noted in plaintiffs' summary judgment papers, the County is **expressly preempted** from regulating

11   sales of regulated firearms by State firearms licensees, like Engage. See MD Code, Public Safety,

12   § 5-104 ("This subtitle *supersedes* any restriction that a local jurisdiction in the State imposes on

13   a sale of a regulated firearm, and the State *preempts the right of any local jurisdiction to regulate*

14   *the sale of a regulated firearms*."). (Emphasis added). See P. Mem. In Support of Summary

15   Judgment at 19; Opposition of Plaintiffs to Def. Motion for Summary Judgment at 9.

16         Bill 4-21 not only negates the serialization statutory scheme performed by FFLs, as set out

17   in HB425/SB38, it also violates Engage's right to sell a handgun free of County regulation under

18   the preemption provisions of Section 5-104. Specifically, Bill 4-21 expressly regulates the sale of

19   any "handgun" (Section 57-11(a)) and a handgun is a "regulated firearm" under State law. See

20   MD Code, Public Safety, § 5-101(r)(1). As a federally licensed manufacturer, Engage is also

21   authorized by federal law to engrave serial numbers onto firearms, 18 U.S.C. § 923(i), and has the

22   expensive equipment and the expertise to perform the serialization services mandated by

23   HB425/SB387. See Statement of Engage Armament, attached to MSI's Testimony on HB425 and

- Page 13 -

1  SB387. Yet, Engage is barred from rendering serialization services to owners (and on behalf of

2  other FFLs) in this State because it may not possess such unserialized firearms under Bill 4-21.

3  While the County denies this reality, it pointedly never attempts to explain its reasoning or how

4  the serialization provisions of HB425/SB387 could possibly be consistent with the express ban on

5  the transport and possession of unserialized firearms imposed by Bill 4-21. At a minimum, like

6  the county law at issue in *Angel Enterprises*, Bill 4-21 is "inconsistent" with the HB425/SB387

7  statutory scheme. It is also "inconsistent" with the multitude of other State laws and the State

8  regulatory scheme specified in plaintiffs' summary judgment papers. It is therefore invalid.

9  **CONCLUSION**

10      For all the foregoing reasons, plaintiffs' motion for summary judgment should be granted

11  and defendant's motion to dismiss and for summary judgment should be denied.

12                          Respectfully submitted,

13                          */s/ Mark W. Pennak*

14                          MARK W. PENNAK
                        Maryland Shall Issue, Inc.

15                          9613 Harford Rd, Ste C #1015
                        Baltimore, MD 21234-21502

16                          mpennak@marylandshallissue.org
                        Phone: (301) 873-3671

17                          MD Atty No. 1905150005
    Dated: May 16, 2022            *Counsel for Plaintiffs*

18

19

20

21

22

23

24                              - Page 14 -

1

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

2

3   **MARYLAND SHALL ISSUE, INC.,** *et al.,*

4          *Plaintiffs,*

5   vs.                                        **Case No.: 485899V**

6   **MONTGOMERY COUNTY, MARYLAND,**

7          *Defendant.*

8

9

10                   **CERTIFICATE OF SERVICE**

11          The undersigned counsel hereby certifies that on May 16, 2022, a copy of the foregoing

12   Plaintiffs' Memorandum In Response To Defendant's Submission Concerning HB 425 And

13   SB387 was served on the following counsel for defendant Montgomery County via the MDEC e-

14   filing system:

15   Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

16   Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

17   Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

18

19

20                        */s/ Mark W. Pennak*

21                        MARK W. PENNAK
                          *Counsel for Plaintiffs*

22

23

24                              - Page 15 -



**MARYLAND SHALL ISSUE®**
S E L F  D E F E N S E  I S  A  C I V I L  R I G H T

**February 7, 2022**

# WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO HB 425 and SB 387

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is a Section 501(c)(4), all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of Maryland and of the Bar of the District of Columbia. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland firearms law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License ("HQL") and a certified NRA instructor in rifle, pistol, personal protection in the home, personal protection outside the home and in muzzle-loader. I appear today as President of MSI in opposition to HB 425 and SB 387.

## The Bills and Framework of State and Federal Law

The bills would create a massive new gun ban on the possession, receipt, sale, transfer or purchase of un-serialized unfinished receivers and frames. The bills provide that "person may not **purchase, receive, sell, offer to sell, or transfer** an unfinished frame or receiver unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms." This ban would go into effect on June 1, 2022. Next, the bills ban mere **possession of** an unserialized, privately made firearm on or after January 1, 2023. To be lawfully kept after January 1, 2023, all unfinished frames and receivers would have to be serialized as the bills describe. The mere possession of any unserialized item considered to be a firearm is a criminal offense as of 1/1/2023.

The bills create a very broad and new definition of "firearm" to make clear that unfinished receivers will now be considered to be a "firearm." Specifically, the bills define "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that (1) Has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm; or (2) Is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted." In this respect, the bills go far beyond the definition of a firearm set forth in federal law. Under federal law, 18 U.S.C. 921(a)(3), a firearm is defined as "(A) any weapon (including a starter gun) which will or is designed to

**EXHIBIT A**                              1

or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

A similar definition is set forth in current Maryland law. See Md. Code Public Safety, 5-101(h). These bills would amend Section 5-101(h) to include as well an "unfinished frame or receiver" and then define an "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that: * * * (2) Is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted." Under this definition, a "zero percent" receiver (a solid block of aluminum, for example) would fall under the bills' coverage if it is sold or marketed as such. The bills do not even attempt to define the meaning of "readily completed, assembled or converted." Nothing in the bills purport to incorporate federal law in this definition.

Notwithstanding the bills' new and radically different definition of a "firearm," the bills otherwise piggyback heavily on federal law. For example, the ban on an unfinished frame or receiver in new Section 5-703(a) applies to all such items "unless it is required by federal law to be, and has been imprinted with a serial number by a federally licensed firearms manufacturer, or federally licensed firearms importer in compliance with all federal laws and regulations…." Similarly, for existing privately made firearms, the bills require that, before January 1, 2023, a federally licensed dealer, importer, manufacturer, or other federal licensee authorized by federal law to "provide marking services" mark firearms with a serial number that consists of the first three and last five digits of their FFL number, plus "another number," presumably one selected by the federally licensed manufacturer or importer.

The bills require that the inscriptions be in compliance with the federal rules that define depth, height, and method. Specifically, federally licensed manufacturers and importers are required to engrave serial numbers on firearms. See 18 U.S.C. § 923(i). Federal regulations concerning Section 923(i) (also incorporated by the bills) require that the markings required by Section 923(i) must be to a minimum death of .003 inches and in a print size no smaller than 1/16 inches and "must be placed in a manner not susceptible of being readily obliterated, altered, or removed." 27 C.F.R. § 478.92(a)(1). That process requires a precise and expensive engraving machine. The bills do not require that any federally licensee actually perform this service and the bills likewise do not purport to limit the fees that potential engravers are able to charge. A violation of any of these requirements is punishable by up to 3 years in prison and/or a $10,000 fine for each violation as each violation is deemed by these bills to be a "separate crime."

Finally, it must be noted that pending regulations issued by the ATF propose to change how the ATF defines a firearm within the definition established by 18 U.S.C. § 921(a)(3)(providing: "The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."). The notice of proposed rulemaking for these ATF regulations was issued on May 21, 2021. See 86 Fed. Reg. 27720-01 (May 21, 2021). As proposed, the ATF rule would define unfinished receiver "kits" to fall within the federal definition of a "firearm." See 86 Fed. Reg. at 27726. The proposed rule would also define "readily be converted" under Section 921(a)(3) to mean "a process that is fairly or reasonably efficient, quick, and easy, but not necessarily

the most efficient, speedy, or easy process." (Id. at 27730). The regulations would then list a number of factors to be considered in applying that definition, including cost and difficulty of conversion or assembly. Unlike these bills, nothing in those regulations would purport to reach any "unfinished receiver" that is "marketed or sold to the public to become or be used" as a receiver. Nothing in these proposed regulations would purport to bar private persons from manufacturing their own privately made firearms or otherwise prohibit the possession of such firearms manufactured in the past. These federal regulations are expected to issue in final no later than June of 2022. See *Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions—Fall 2021*, 87 Fed. Reg. at 5111 (January 31, 2022).

## A.  Privately Manufactured Firearms Are Rarely Used In Crime And Existing Owners Are Law-Abiding Hobbyists, Not Criminals

These new provisions, if enacted, would burden and penalize an activity that has been perfectly legal under federal and state law for the entire history of the United States, *viz.*, the manufacture of homemade guns for personal use. Under Federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). However, "it is illegal to transfer such weapons in any way." *Defense Distributed v. United States*, 838 F.3d 451, 454 (5th Cir. 2016). This manufacture typically "involves starting with an '80% lower receiver,' which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver." (Id).

Manufacturing a typical "80% lower" into a "functional lower receiver" is not a trivial process. It takes tools, expertise and hours of time. Miscues are common and, when made, essentially convert the "80% lower" into scrap. Individuals who undertake this process are hobbyists. Even after the receiver is successfully made, the owner would still have to purchase the additional parts, such as a barrel, the trigger, slide and all the internal parts to complete the assembly. All these additional parts are expensive. With the cost of the tools to mill the receiver, plus the cost of the parts, a final assembled homemade gun may cost **more to make than** it would to actually buy an identical gun from a dealer.

The complexity of this process has been pointed out in court filings by the ATF and the U.S. Department of Justice. For example, in *State of California v. BATF*, No. 20-cv-0761 (N.D. Cal.), the Department of Justice and the ATF explained:

> An unfinished receiver that has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)," see ATF Firearms Technology Branch Technical Bulletin 14-01 ("Bulletin 14-01"), filed in Calif. Rifle and Pistol Ass'n v. ATF, Case No. 1:14-cv-01211, ECF No. 24 at 285 (E.D. Cal. Jan. 9, 2015), requires that numerous steps be performed simply to yield a receiver, that then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive. These milling and metalworking steps—each of which require skills, tools, and time—include: 1) "milling out of fire-control cavity"; 2) "drilling of selector-lever hole"; 3) "cutting of trigger slot"; 4) "drilling of trigger pin hole; and 5) "drilling of hammer pin hole." Compl. Ex. 9. Importantly, ATF will treat any "indexing"—the inclusion, in the receiver blank, of visual or physical indicators regarding the two-dimensional or three-dimensional parameters of the machining that must be conducted—as rendering the receiver blank a firearm. See Compl. Ex.

12; Ex. 13; Shawn J. Nelson, Unfinished Lower Receivers, 63 U.S. Attorney's Bulletin No. 6 at 44-49 (Nov. 2015) ("Nelson, Unfinished Receivers"), available at: https://go.usa.gov/x7pP3. This prevents the makers of receiver blanks from annotating the blank to instruct the purchaser as to the precise measurements needed, in three dimensions, to "excavate the fire control cavity and drill the holes for the selector pin, the trigger pin, and the hammer pin." Nelson, Unfinished Receivers, at 47. The need to conduct these machining steps from scratch, without indexing, and "carefully" means a working gun cannot be produced "without difficulty." Id. And the work to excavate the cavities and drill holes in a solid, unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area. See id. Therefore, the receiver cannot be completed "without delay," even leaving aside the further assembly with many other parts needed to have a weapon that can expel a bullet by explosive action. A receiver blank therefore may not "readily be converted" into a firearm.

Federal Defendants' Notice Of Motion And Motion To Dismiss Plaintiffs' Complaint For Declaratory And Injunctive Relief, at 16-17 (filed Nov. 30, 2020).

There has been much ado made about "kits" that are available from manufacturers, such as Polymer 80 and others. Accordingly to the ATF, such "kits" are made by non-licensed manufacturers "who manufacture partially complete, disassembled, or inoperable frame or receiver kits, to include both firearm parts kits that allow a person to make only a frame or receiver, and those kits that allow a person to make a complete weapon." 86 Fed. Reg. at 27736. Several points bear mentioning. Kits are thus designed to be easier to complete.

First, most (if not all) of the unserialized "ghost guns" recovered by the police in Maryland are made from such kits. Indeed, the Baltimore Police Department has announced to great fanfare that ghost gun seizures have increased over the last few years. Yet, according to information we have obtained from the Baltimore Police Department, the BPD seized 2,355 guns in 2021. Of that number, according to the BPD, 352 were "ghost guns," including guns made from kits (Polymer 80s). That is slightly less than **15%** of the total number of guns seized in 2021. Baltimore's problem with illegal guns is thus far vaster than "ghost guns." The BPD does not identify separately the number ghost guns actually used in violent crimes and there are few statistics available on the number of ghost guns actually used in crime. What numbers that are available suggest that the use of ghost guns in violent crime is extremely rare. For example, "the Justice Department reported that more than 23,000 weapons without serial numbers were seized by law enforcement between 2016 and 2020 and were linked to 325 homicides or attempted homicides." https://bit.ly/3GgaT94. That 325 homicides or attempted homicides represent a tiny percentage of the universe of 23,000 ghost guns seized (0.14%).

Legislation, such as these bills, focusing on "ghost guns" thus will not make the slightest dent in the soaring homicide rate. The numbers in Baltimore bear that out. For example, in 2011, the BPD seized 2,178 firearms (no ghost guns) and the number of murders was 196, of which 88 resulted in arrests (a 44.9% clearance rate). In 2011 there were also 379 non-fatal shootings. In 2020, the BPD seized roughly the **same number** of guns (2,244) (including 128 ghost guns), and yet the number of murders was 335 of which only 102 resulted in arrests (a 28.7% arrest clearance rate). And by 2020, the number of non-fatal shootings had nearly doubled from 2011 to 724. Similarly, BPD's weapons possession arrests were 1,224

in 2011, but virtually the same in 2020 (1,233), but the number of murders in 2020 were **81.1%** higher than in 2011. See Attachment.

We note with sadness that Baltimore is headed for a new record in homicides with 36 killings in January 2022, a pace that would result in 432 murders for 2022, a number never seen in Baltimore before. https://bit.ly/3KYQzN1. No word from the BPD if any of these killings came from the use of "ghost guns." The BPD has not released murder arrest numbers for 2021, but we are informed that there were 337 homicides in 2021, 2,355 gun seizures and 726 non-fatal shootings, numbers not much different than 2020. The high number of shootings that were non-fatal suggests the hospitals in Baltimore have vastly improved their ability to treat gunshot wounds. But for that success, the number of murders in Baltimore would be much higher. We note that in the years between 2011 and 2021, the General Assembly enacted numerous gun control statutes, including the much-touted Firearms Safety Act of 2013. None of those laws had the slightest impact on crime in Baltimore. These bills would likewise have no impact. Baltimore is awash in guns.

At a minimum, it should be obvious that there is no correlation (much less cause and effect) between guns seized and violent crime. A more relevant statistic is the clearance rate for serious crimes. As noted above, BPD's arrest clearance rate for murder in 2020 was a merely 28.7% and only 44.9% in 2011. By comparison, the nationwide clearance rate for murder is 54.4%. https://bit.ly/3s3qiVb. Baltimore's clearance rate for homicides is plainly abysmal, a reality that does not go unnoticed by violent criminals and law-abiding citizens alike. See Johns Hopkins Center for Gun Policy and Research, *Reducing Violence And Building Trust* at 5 (June 2020) ("In Baltimore neighborhoods most impacted by gun violence, residents lack faith in BPD's ability to bring individuals who commit violence to justice. Perceived risk of being shot and perceptions that illegal gun carrying is likely to go unpunished lead some residents to view gun carrying as a necessary means for self-defense."). In any event, there is no evidence of which we are aware that the inability to trace an unserialized firearm actually has prevented an arrest for **any** serious violent crime. The General Assembly seriously errs in focusing on "ghost guns" when it should be paying attention to the soaring rate of violent crime.

Second, the proposed regulations issued by the ATF would effectively ban unserialized kits by reclassifying them as "firearms" for purposes of federal law. That reclassification of kits would mean that the frame or receiver of the kit would be required to be serialized (and sold through FFLs like other firearms). Specifically, under the proposed rule, "weapon parts kits with partially complete frames or receivers containing the necessary parts such that they may readily be completed, assembled, converted, or restored to expel a projectile by the action of an explosive would be "firearms" for which each frame or receiver of the weapon, as defined under this rule, would need to be marked." (86 Fed. Reg. at 27736). After the proposed rule goes into effect in June of 2022, such **unserialized** kits will thus be completely unavailable commercially. Likewise unavailable would be any "readily be converted" unfinished frames or receivers, as the ATF proposed rule would likewise deem such items to be firearms and thus must be serialized in order to be sold legally and only then through FFLs who would perform backgrounds checks for these items, just like for any other type of firearm. The only unserialized receivers that would remain unregulated by the ATF would be those receivers that are NOT "readily" converted or assembled into a completed receiver, such as blocks of aluminum sold as "zero percent" receivers and that number is vastly smaller than the current universe of "ghost guns." As noted, the ATF proposed regulations

heavily tighten the definition of "readily" converted, thereby **further** limiting the number and availability of these remaining types of unfinished receivers.

B.   **The Bills Would Do Nothing To Prevent Or Deter Criminals From Acquiring Guns While Criminalizing Existing, Law-Abiding Hobbyists**

The ATF proposed rule would ban unserialized "kits" and would dry up the market for unserialized receivers. Period, full stop. Yet, ironically, the bans imposed by these bills would not stop any criminal from actually acquiring any non-regulated receivers that would be left, such as "zero percent receivers." Such items would still not be "firearms" under federal law and thus would not be regulated by federal law. Such items thus would remain available all over the United States, even if the bills should become law and were perfectly enforced 100% of the time. The market for these items is nationwide in scope. Accordingly, nothing in the bans imposed by these bills would or could actually stop any criminal or disqualified person from acquiring all the hardware necessary to make his own gun. All such a person would need do is drive to another state and buy over the counter. The idea that these bills would prevent crime or acquisition of a "ghost gun" is thus sheer fantasy. The ATF rule will do all the work in limiting availability.

**More importantly,** a disqualified person would not be deterred by these bills because such a disqualified person is **already** precluded by federal law from possessing **any** modern firearm or modern ammunition of **any** type. 18 U.S.C. § 922(g). Actual or constructive possession of a modern firearm or ammunition by a person subject to this firearms disability is a felony, punishable by up to **10** years imprisonment under federal law. See 18 U.S.C. § 924(a)(2). The same disqualification and similar punishments are also **already** imposed under existing Maryland law. See MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). Simple actual or constructive possession of a receiver **alone** (as further defined by the ATF rule) would be sufficient to constitute a violation of these existing laws, as a receiver **alone** is considered a "firearm" under **existing** Maryland and federal law. See 18 U.S.C. § 921(a)(3); MD Code, Public Safety, § 5-101(h)(1)(ii). These bills would not change that reality an iota. See https://bit.ly/3rgG9Au (announcing arrests and prosecutions of violent criminals and illegal gun manufacturers in Cecil County).

These bills go beyond the requirements of federal law and the proposed ATF regulations by making possession of existing privately manufactured firearms illegal. That result simply criminalizes innocent, law-abiding hobbyists and gun owners who have done nothing wrong. Existing criminals in possession of a "ghost gun" can be and should be arrested for illegal possession and the existing punishments for such illegal possession are far harsher than those imposed by these bills. These bills will not change that legal reality. Yet, these bills will also result in the arrest of law-abiding hobbyists. The reality is that few existing, otherwise law-abiding owners of these homemade guns will know or realize that possession of their existing firearms or unfinished frames has been banned. Actual compliance by existing owners will thus likely be virtually non-existent. In short, the bills are utterly **pointless** as a public safety measure. They would succeed only in turning otherwise law-abiding citizens into criminals. That is not sound public policy.

## C.     The Bills Impose Impracticable Requirements

The bills provide that "ON OR AFTER JANUARY 1, 2023, A PERSON MAY NOT POSSESS A FIREARM UNLESS:
(1) THE FIREARM IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED FIREARMS IMPORTER WITH A SERIAL NUMBER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS; OR
(2) THE FIREARM HAS BEEN IMPRINTED BY A FEDERALLY LICENSED FIREARMS DEALER OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES WITH THE FIRST THREE AND LAST FIVE DIGITS OF THE LICENSEE'S FEDERAL FIREARMS LICENSE NUMBER, FOLLOWED BY A HYPHEN, AND THEN FOLLOWED BY ANOTHER NUMBER." Taken together, these requirements banning possession go far beyond federal law. They severely criminalizes (with 3 years of imprisonment) innocent possession by law-abiding hobbyists who may have built these firearms or possessed these frames for years, including all privately made guns built since 1968, a period of approximately 53 years. The bills thus encompass an untold number of home-built firearms, probably numbering in the tens of thousands. The requirements imposed by the bills simply cannot be met, much less by the January 1, 2023, effective date of these bills.

The bills would require every innocent owner of a receiver (or existing firearm) to have it "imprinted" with a serial number "issued by" a federal licensed "firearms manufacturer" importer or other "federal licensee authorized to provide marking services." Such a licensed manufacturer is also known as a "Class 07" FFL and these manufacturers necessarily possess the equipment and expertise to perform serial number markings, as Section 923(i) has imposed this requirement on manufacturers since 1968. While there are many other, non-manufacturer FFLs in Maryland, almost all of these FFLs are dealers who merely sell firearms or perform transfers and are thus classified as Class 01 FFLs. See https://www.atf.gov/resource-center/types-federal-firearms-licenses-ffls. These Class 01 dealers do not perform engraving required by Section 923(i) as they are not manufacturers or importers, the two types of entities on whom the duty to engrave serial numbers is imposed by Section 923(i). The proposed ATF rule would require a federally licensed dealer to perform engravings *only* if an unserialized firearm was accepted by the dealer and thus entered in the dealer's A&D books as an acquired firearm. See 86 Fed. Reg. at 27737 ("FFLs would be required to mark PMFs within 7 days of the firearm being received by a licensee, or before disposition, whichever first occurs."). Since Class 01 dealers cannot perform this function, this requirement would be primarily applicable to Class 07 manufacturers, of which there are relatively few in Maryland, as compared to Class 01 dealers. Nothing in the ATF rule would require any dealer to accept a homemade gun into his inventory or perform any engraving.

The bills require that the marking be done "in compliance with all federal laws," and thus the bills would require the federal licensee to meet the engraving requirements specified in Section 923(i) and implementing federal regulations. Federal regulations require that the markings must be to a minimum death of .003 inches and in a print size no smaller than 1/16 inches and "must be placed in a manner not susceptible of being readily obliterated, altered, or removed." 27 C.F.R. §478.92(a)(1). That process requires a precision engraving

machine. For example, an entry level engraving machine that can fully comply with federal law costs in the neighborhood of $7,000 and that machine is of low quality. Engage Armaments, a Class 07 manufacturer in Rockville, MD, uses a $75,000 engraving machine to engrave serial numbers. See attached 2021 illustrated testimony of Andrew Starr Raymond, Co-Owner – Engage Armament LLC, of Rockville, MD (submitted with respect to 2021 bills HB 638 and SB 624). Relatively few manufacturers with this sort of capability to 'imprint' a serial number in compliance with federal law even exist in Maryland. Class 01 dealers, of which there are hundreds in Maryland, have neither the expertise nor the equipment to engrave a serial number in a manner compliant with Section 923(i). No serial number can be engraved in a polymer frame, as such number could be easily obliterated in this relatively soft material and polymer burns when engraving is attempted with lasers or other hot engraving tools. Existing manufacturers of polymer frames, such as Glock and Sig Sauer, thus use a metal plate insert on which to do such engraving. Arguably, Class 01 dealers are not even authorized by federal law to engage in such engraving as federal law, Section 923(i), expressly is limited to "manufacturers" and "importers."

The bills also require that any federally licensed manufacturer, importer or other federal licensee "authorized to perform marking services" must also "retain records for all firearms imprinted in accordance with all federal laws and regulations applicable to the sale of a firearm." That requirement would impose additional legal risks and costs on the Class 07 dealer, above and beyond the costs of maintaining the equipment and the training necessary to perform engraving markings to the level required by Section 923(i) and federal regulations. Few, if any, dealers would take on these additional costs and risks necessary to meet the demand that would be created by these bills. In sum, these risks and the high costs associated with investing in the equipment and training additional personnel necessary to perform the required engraving would ensure that very few dealers would offer the engraving services to existing owners. Thus, there is no likelihood that such services would be actually available to existing owners by January 1, 2023, the effective date of the ban on mere possession. These practical realities effectively convert the bills into a total ban on the possession of any existing receiver or firearm as it would be virtually impossible for all the existing owners to obtain a serial number. The mere six months available to obtain the required engraving is unrealistically short.

### D.   These Bills Are Overbroad and Violative of the Due Process Clause of the 14th Amendment

As noted, the bills impose a new definition of a "firearm" that goes beyond any federal definition of "firearm." That definition would be far stricter than any definition of firearm that would be imposed by the proposed ATF rule. Specifically, the bills define a firearm to include "A FORGED, CAST, PRINTED, EXTRUDED, OR MACHINED BODY OR SIMILAR ARTICLE THAT: * * * (2) **IS MARKETED OR SOLD TO THE PUBLIC TO BECOME OR BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM ONCE COMPLETED, ASSEMBLED, OR CONVERTED**." Mere possession of such an object would be criminalized after January 1, 2023. This definition leads to absurd results. There is no "reasonable person" modifier for the ban on the possession of an object that was marketed or sold for this purpose. There is no *mens rea* requirement. The bills impose strict criminal liability for mere innocent possession.

For example, under these provisions, the bills would impose a ban on the mere possession of a "zero percent" receiver (a solid block of aluminum) marketed as such. **See e.g.:**



And because that block of aluminum was originally marketed as a zero percent receiver, the bills would criminalize mere possession of the block even though the possessor of this block of solid aluminum intended to use it as a paper weight or a book end or (in the undersigned's case) as a means to illustrate the absurdities of Maryland ghost gun bills. And because the bills strictly ban mere possession, regardless of whether the possessor even knew that the block of aluminum had been "marketed" for these purposes, the bills would likewise criminalize a person who was **utterly unaware** that the block was originally marketed as a "zero percent receiver." In short, the reach of the bills is vastly overbroad.

This overbroad coverage of the bills is particularly pernicious as the bills contain no *mens rea* requirement and thus impose strict criminal liability for simple possession (or constructive possession) without regard to the owner's actual purpose, knowledge or intent. In contrast, an intent or knowledge requirement is part and parcel of federal gun control law. See, e.g., *Rehaif v. United States*, 139 S.Ct. 2191 (2019) (holding that the "knowingly" requirement on the federal ban on possession of a firearm by an illegal alien required proof that the alien actually knew that he was illegally in the United States). This sort of *mens rea* requirement is also part of Maryland law. See, e.g., *Chow v. State*, 393 Md. 431 (2006) (holding that a knowing violation of a Maryland statute making it unlawful for a person who is not a regulated gun owner to sell, rent, transfer, or purchase any regulated firearm without complying with application process and seven-day waiting period requires that a defendant knows that the activity they are engaging in is illegal).

Indeed, most recently, the Maryland Court of Appeals has stressed the importance of a *mens rea* requirement in the context of Maryland's ban on carrying a handgun imposed by Md. Code Criminal Law, § 4-203(a)(1) (providing that "person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person"). *Lawrence v. State*, 475 Md. 384, 408, 257 A.3d 588, 602 (2021) (discussing the Supreme Court's longstanding presumption that criminal statutes should generally include a *mens rea* requirement). The *Lawrence* Court even suggested that a strict liability law could violate the Due Process Clause for lack of notice, taking the extraordinary step of expressly communicating this point to the General Assembly. See *Lawrence*, 475 Md. at 420-21. As the Court stated, these "policy concerns" made it appropriate "to signal to the General Assembly" that, "in light of these policy concerns, ... legislation ought to be considered" to

address the scope CR § 4-203(a)(1)(i) given its classification as a strict liability offense." (Id. at 422). The General Assembly ignores such "signals" at its peril.

Here, because the bills impose strict liability, it would not matter if the existing owners simply were unaware that these new requirements even exist. Without doing a thing, they would unknowingly wake up on January 1, 2023, as criminals. Such a law is violative of the Due Process Clause as it criminalizes entirely passive conduct by a person who is without actual knowledge of the requirement. See *Lambert v. California*, 355 U.S. 225, 228 (1957) (striking down a California statute under the Due Process Clause where "entirely passive conduct could subject a defendant to conviction without any knowledge of their duty to comply with the statute"); *Lawrence*, 475 Md. at 420-21 (citing *Lambert*). It should be obvious that few law-abiding citizens follow the legislative sausage-making of the Maryland General Assembly. See also *Conley v. United States*, 79 A.3d 270, 282 (D.C. 2013) ("[T]he requirement of notice embodied in due process 'places some limits' on the application of these tenets [that ignorance of the law is no defense] when a law criminalizes 'conduct that is wholly passive' ... [and] unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.").

Indeed, *Lawrence* makes clear that this lack of a *mens rea* requirement plus the use of vague, ill-defined terms will virtually ensure that these bills will be struck down as unconstitutionally vague. As noted above, *Lawrence* took pains to expressly "signal" the General Assembly that the ban on carrying a handgun **"about"** the person found in Md. Code Criminal Law, § 4-203(b)(1), is unconstitutionally vague and that the Court would strike it down on that basis in the next appropriate case. See *Lawrence*, 475 Md. at 420-21. These bills are fatally vague in the same way. In particular, the bills criminalize the possession of any unfinished receiver that can be "readily" converted into a firearm. That term is inherently vague. While federal law, 18 U.S.C. § 921(a)(1)(3) uses the same term, existing federal regulations have long limited that term by defining "frame or receiver" to mean: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." See 27 C.F.R. § 478.11. As explained above, the ATF and the Department of Justice have long maintained that an 80% unfinished receiver is not a firearm within the meaning of Section 921(a)(3) because such an object is not "readily converted" into a firearm. The ATF proposed regulation likewise refines that existing definition of a frame or receiver so as to tighten the definition of "readily converted" to include kits and other items. See 86 Fed. Reg. at 27730. These bills are devoid of such limiting definitions.

Context also matters. Unlike the bans imposed by these bills, federal law is far narrower, as nothing federal law purports to criminalize mere *possession* of a receiver by an otherwise law-biding person, much less criminalize the mere possession of an "unfinished" receiver. And nothing in federal law, including the proposed federal ATF regulations, purport to ban or limit an individual's right to make firearms at home for personal use. In contrast, these bills criminalize mere innocent possession and are completely silent as to the meaning of "readily." Indeed, the bills do not even purport to incorporate the federal definition, either the existing definition or the proposed AFT changes to that definition of "readily." A person is left totally at sea as to the meaning under these bills.

In contrast, as noted above, federal firearms law imposes specific *mens rea* requirements. For example, a violation of 18 U.S.C. § 922(a)(1)(B) (barring "any person" except federal

licensees from engaging in the "business" of the manufacture of firearms) is not a crime unless the person "willfully" violates that provision. See 18 U.S.C. § 924(a)(1)(D). Such a "willful" violation is a 5 year federal felony. (Id.). The Supreme Court has held that "in order to establish a 'willful' violation of a statute, 'the Government **must prove that the defendant acted with knowledge that his conduct was unlawful**.'" *Bryan v. United States*, 524 U.S. 814, 191-92 (1998), quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (emphasis added). No such *mens rea* requirement is found in these bills.

As noted above, the same unconstitutional lack of notice is self-evident in the bills' strict liability ban on possession of any item that is "marketed" or "sold" as an unfinished lower receiver, as the bills do not require any knowledge that the item was thus marketed or sold. The bills would ban a block of aluminum if it was marketed or sold as zero percent receiver, but would permit the sale and possession of the **same** block of aluminum if it was marketed or sold as something else. That result is bizarre. Either the block of aluminum is a significant threat to public safety or it is not – how it is "marketed" ought to be irrelevant. In any event, a person possessing such a block of aluminum may have no idea how it was sold or marketed, yet the mere possession of the block would be criminalized by these bills. Indeed, apparent from obvious circumstances, such as a printed advertisement, the term "marketed" is simply too vague to provide an intelligible standard.

The Supreme Court has made clear that such vagueness is particularly intolerable where the terms affect the exercise of a constitutional right. See, e.g., *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999). There, the Court found highly significant that the loitering ordinance in question was a "criminal law that contains no *mens rea* requirement" and concluded "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." Id. at 55. See also *Colautii v. Franklin*, 439 U.S. 379, 394 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*.") (collecting cases). As explained below, these bills use vague language in an effort to regulate the exercise of a Second Amendment right to make firearms for personal use, a practice long steeped in our Nation's history and traditions. In short, these bills will not survive a constitutional vagueness challenge.

Indeed, Nevada's "ghost gun" law was recently struck down on vagueness grounds for failing to adequately define "unfinished frame or receiver" under the Due Process Clause of the Nevada constitution. *Polymer80, Inc. v. Sisolak*, No. 21-CV-00690 (3d Jud. District for Co. of Lyon, December 10, 2021). The court found it significant that Nevada statute, like these bills, did not contain a *scienter* or *mens rea* standard.  See Id., slip op. at 14. The Nevada courts employ the same test for vagueness as employed by Maryland Court of Appeals under Article 24 of the Maryland Declaration of Rights and by the federal courts under the Due Process Clauses of the Fifth and Fourteenth Amendments. See, e.g., *Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 510  (2009) ("A criminal statute can be invalidated for vagueness ( 1) if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *Galloway v. State*, 365 Md. 599, 614-15, 781 A.2d 851 (2001) ("The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties'" and must provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and "must eschew arbitrary enforcement in addition to being intelligible to

the reasonable person."); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"). These bills are awaiting the same fate as the Nevada statute.

Here, for example, the bills' criminal penalties could be imposed **even though** it would take substantial expertise and a very sophisticated milling machine costing many thousands of dollars to convert a "zero percent" receiver block of aluminum into an 80% receiver, not to mention the *additional* milling that would be required to convert it into an actual **finished** receiver. As explained above, additional assembly of more parts (a barrel, a trigger, a slide and associated springs and parts) would then be necessary to covert that finished receiver into something that could actually fire a round of ammunition. It blinks reality to believe that such an object is a significant threat to public safety requiring the imposition of strict liability. That is particularly so when federal law already ban any person (other than an licensee) from engaging in the "business" of manufacture, and federal and State law already criminalizes possession of any receiver by disqualified persons. As the Supreme Court stated in *Rehaif*, it is a "basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will.'" *Rehaif*, 139 S.Ct. at 2196, quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769). As a matter of sound public policy and simple fairness, the General Assembly should not be enacting criminal statutes without a *mens rea* requirement. *Morissette v. United States*, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").

Then there are other absurdities associated with the extreme overbreadth of the bills. For example, as explained, the bills effectively require that a Class 07 manufacturer engrave a serial number on this solid block of aluminum marketed as a "zero percent" receiver. Yet, that serial number would then be obliterated should that block ever be actually milled. Any such removal of the serial number would be a **federal felony** under 18 U.S.C. § 922(k), which makes it a crime to "possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered." A knowing violation of Section 922(k) is punished by up to 5 years in a federal prison. See 18 U.S.C. § 924(a)(1)(B). That reality illustrates the legal absurdity of criminalizing the possession of objects that are **not** regulated by federal law. In short, in their attempt to be all-encompassing, the bills create multiple unconstitutional traps for the unwary. **The bills thus invite arbitrary and discriminatory enforcement. We all know which segments of society will bear the enforcement brunt of these bills.** See *McDonnell v. United States*, 136 S. Ct. 2355, 2373-74 (2016) (noting that "we cannot construe a criminal statute on the assumption that the Government will 'use it responsibly'") (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). In short, given that the ATF is about to abolish the sale of unserialized kits and anything else that can be "readily" converted into a receiver, it is overkill to go beyond that regulation to criminalize additional items, especially in a bill that otherwise incorporates and relies on federal law as setting the appropriate standards.

## E.    These Bills Are Unconstitutional Under The Second Amendment

As noted, this bills imposes a categorical ban on the mere possession in the home of a previously-owned unfinished receiver or a firearm without a serial number. Such a gun ban violates the Second Amendment right of owners to possess firearms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742, 750 (2010). Even under the least demanding test ("intermediate scrutiny"), if the State can accomplish its legitimate objectives without a ban (a naked desire to ban guns or penalize gun owners is not legitimate), then the State must use that alternative. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). Stated differently, under intermediate scrutiny, the State has the burden to demonstrate that its law does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interest." Id. at 2535, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989). See also *NY State Rifle & Pistol Assn. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), *cert. denied*, 579 U.S. 517 (2016) (striking down a 7 round load limit in a firearm magazine because the limit was "untethered from the stated rationale"). See also *Reynolds v. Middleton*, 779 F.3d 222, 232 (4th Cir. 2015) (holding that, under the intermediate scrutiny test as construed in *McCullen*, the government must "prove that it actually tried other methods to address the problem"). (Emphasis in original).

The test for "strict scrutiny" is even more demanding as, under that test, the State must prove both a "compelling need" and that it used the "least" restrictive alternative in addressing that need. See *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 813 (2000). More generally, the constitutionality of gun laws must be analyzed under the "text, history and tradition" test that was actually used in *Heller* and *McDonald*. See, e.g., *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). There is no "text, history or tradition" that could possibly support the types of bans imposed by these bills.

We are compelled to note that the Supreme Court may well clarify the appropriate standard of review for Second Amendment cases in its upcoming decision in in *NYSRPA v. Bruen*, No. 20-843, *cert. granted*, 141 S.Ct. 2566 (2021). *Bruen* was argued November 3, 2021, and a decision is expected by June of this year. See also *ANJRPC v. Bruck*, No. 20-1507 (SCt.) (challenging New Jersey's ban on so-called large capacity magazines; the petition for certiorari in that case is presently being held by the Supreme Court pending a decision in *Bruen*). We note as well that Maryland's ban on so-called "assault weapons" is currently before the Supreme Court on a petition for certiorari in *Bianchi v. Frosh*, No. 21-902 (S.Ct.) (docketed December 16, 2021). A decision in *Bruen* may well affect the disposition of that petition as well.

*Heller* held that guns in "common use" by law abiding persons are prima facie protected arms under the Second Amendment. *Heller*, 554 U.S. at 627. Homemade guns easily satisfy this requirement as there are literally tens of thousands of such guns made over many years throughout the United States. Guns for personal use have been made at home for centuries, even before the Revolutionary War. The State simply may not disregard that reality and outright ban all home manufacture of firearms. See *Caetano v. Massachusetts*, 136 S.Ct.1027 (2016) (summarily reversing Massachusetts' highest court for failing to follow the reasoning of *Heller* in sustaining a state ban on stun guns); *Ramirez v. Commonwealth*, 479

Mass. 331, 332, 352 (2017) (on remand from *Caetano*, holding that "the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment" and declaring the State's absolute ban to be "facially invalid"). Homemade guns are at least as much "in common use" as stun guns at issue in *Caetano*.

Here, the supposed evil that these bills purport to address is guns without serial numbers because such guns are not "traceable." That interest is necessarily limited. Tracing runs out after identification of the gun's first purchaser and firearms may be stolen or sold and resold many times in their lifetime. As explained above, criminals, who may not possess firearms at all, will not be deterred by the bills as possession of a firearm by a prohibited person is already a 10-year federal felony, 18 U.S.C. § 922(g), and a serious crime under existing State law, MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). No criminal not deterred by the prospect of a federal felony conviction will be deterred by these bills. The few crimes that are solved by tracing guns left at a crime scene are only a small fraction of guns used in crimes because relatively few guns are actually traced by the ATF. See David B. Kopel, Clueless: The Misuse of BATF Firearms Tracing Data. http://www.davekopel.org/2A/LawRev/CluelessBATFtracing.htm. See also Police Departments Fail to Regularly Trace Crime Guns. https://www.thetrace.org/2018/12/police-departments-gun-trace-atf/. The ATF itself has cautioned against any use of trace data, noting that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download. As the ATF further notes, "[n]ot all firearms used in crime are traced and not all firearms traced are used in crime," stating further that "[f]irearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime."

But, if the concern is truly that these guns lack a serial number for tracing (rather than an illegitimate desire to criminalize gun owners and hobbyists), then that concern can be fully addressed without banning homemade guns. Specifically, there are alternatives to bans. For example, a law passed in California (which is ranked by the Giffords Law Center as having the most restrictive gun laws in the nation) provides that a new resident to the state shall apply to the Department of Justice for a unique serial number within 60 days of arrival for any firearm the resident wishes to possess in the state that the resident previously self-manufactured or self-assembled or a firearm the resident owns, that does not have a unique serial number or other mark of identification. As of July 1, 2018, prior to manufacturing or assembling a new firearm, a person is required to apply to California for a unique serial number. The gun owner is then simply required to engrave that number onto the receiver and report back to California with proof that he or she has done so. As of January 1, 2019, owners of existing guns were required to apply for such serial numbers and perform this engraving. See California Penal Code §§ 29180-29184. In short, assembly of new homemade guns and existing possession is permitted as long as this serial number is obtained, engraved and reported. California Penal Code §29180. In this way, the owner is identified and the gun is fully "traceable" and thus no longer a so-called "ghost gun." A violation of the California law is punishable with a year imprisonment or a $1,000 fine if the firearm was a handgun and by 6 months imprisonment and a fine for other types of firearms. (Id.). Connecticut uses a similar system. See Conn. Gen. Stat. 29-36a,b.

Indeed, D.C. has responded to a federal lawsuit by amending its "ghost gun" law to specifically provide that an owner "may register a self-manufactured firearm that does not bear a serial number as described in paragraph (l)(B) of this subsection, if, prior to finishing the frame or receiver, the applicant has caused a unique serial number to be engraved, casted, stamped (impressed), or placed on the unfinished frame or receiver, as set forth in subparagraphs (B) and (C) of this paragraph." Ghost Gun Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code § 7-2502.02 (December 13, 2021). This approach allows the continued manufacture of privately made firearms while addressing the perceived need for a serial number. The D.C. approach does not require adherence to federal Section 923(i) standards for such future manufacture – it allows the owner to engrave a number as long as he or she confirms with the MPD "that the proposed serial number has not already been registered to another firearm." (Id.) As these laws indicate, there are less restrictive alternatives. If D.C. can do this, then Maryland can too. There is no reason to take the extreme step of flatly banning homemade guns or converting existing owners into criminals. Under *Heller*, the State may not reject this alternative simply because a draconian general ban is more convenient. Gun owners may not be criminalized for such flimsy reasons. See, e.g., *Bonidy v. Postal Service*, 790 F.3d 1121, 1127 (10th Cir. 2015), *cert. denied*, 577 U.S. 1216 (2016) ("administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny").

We note in this regard that, in 2019, the House Judiciary Committee favorably reported and the House of Delegates ultimately passed HB 740 (the bill died in the Senate). That bill expressly required the State Police to conduct a study of this California alternative. These bills unaccountably abandon that approach. Yet, this California approach is even more appropriate (from the State's perspective) given that the ATF regulations will go into effect in June of 2022. Those regulations will effectively dry up the interstate availability of unserialized kits and other unserialized unfinished receivers that may be "readily" converted into firearms. Those regulations will thus effectively address the future availability of "ghost guns" as no current manufacturer of such unserialized unfinished receivers or kits would be allowed to continue to sell such items. Doing so would be a federal felony, nationwide. See 18 U.S.C. § 922(a)(1)(A)(barring "any person" except federal licensees, from engaging in the "business" of manufacturing or, in the course of such business, from shipping, transporting or receiving any firearm in interstate or foreign commerce); 18 U.S.C. § 924(a)(1)(D) (punishing such conduct as a felony). The bills thus should be **more accommodating** to existing owners, not more punitive. There is no need to pursue a scorched earth policy against existing law-abiding owners who have committed no crime. The State should have zero interest in needlessly criminalizing otherwise law-abiding Marylanders. Maryland already has more than enough criminals. Plainly, these bills have not exhausted reasonable alternatives.

## F.    The Penalties Are Excessively Severe

As noted, under these bills any violation is punishable by imprisonment for up to three years for each violation and/or a fine of $10,000 for each violation (the bills make clear that "each violation . . . is a separate crime"). As noted above, not even California imposes such severe penalties. Similarly, D.C. punishes a violation of its "ghost gun" statute with not more than 1 year imprisonment and a fine of $2,500. Code of the District of Columbia § 22–4515. By

making each privately manufactured firearm a separate crime, the bills empower prosecutors to seek extreme prison terms and fines in the aggregate if the owner happened to possess multiple privately manufactured firearms, as many hobbyists do. Such penalties are breathtaking when applied to existing owners who may have legally possessed their privately manufactured firearms for decades, without incident or any problem. Suddenly, these owners will have a mere 6 months to find a Class 07 FFL manufacturer who is willing and able to mark all his or her homemade firearms in accordance with the bills' strict requirements. And that is assuming that these owners even know about these requirements.

Indeed, only last Session, the "ghost gun" bills would have imposed only **a civil penalty** for a first offense, not a severe, disqualifying, criminal penalty. See HB 638 and SB 624 (providing that "for a first violation, is guilty of a **civil offense** and on conviction shall be fined not less than $1,000 but not exceeding $2,500"). Those bills did not make each violation "a separate crime." Under these prior bills, a **second conviction** would have been punishable by imprisonment for 2 years and a $5,000 fine, still less than 3 years and the $10,000 fine imposed **for each violation** by these bills. A misdemeanor crime punishable by 2 years or less is not disqualifying under State and federal law. See 18 U.S.C. § 921(a)(20)(B); Md. Code Public Safety, § 5-101(g)(3). HB 638 and SB 624 last Session thus did not create the permanent disqualification created by these bills. What has changed (other than the involvement of Attorney General Frosh)? There is no evidence whatsoever that existing, law-abiding owners have suddenly turned to a life of crime. Disqualified persons, or persons who misuse their firearms or illegally manufacture and sell guns can be and are arrested and charged with existing serious crimes without criminalizing the law-abiding owners. There is no public safety justification for treating these law-abiding citizens in such a vindictive, cavalier manner.

## G.    The Bills' Exemption For Firearms Made "Before 1968" Is Erroneous

The bills provide that the requirements imposed by the bills do not apply to "A FIREARM THAT: (I) WAS MANUFACTURED BEFORE 1968." This exemption is in apparent recognition that serial numbers were not required by federal law until the enactment of the federal Gun Control Act of 1968, Public Law 90-618, 82 Stat. 1213 (1968). However, the Gun Control Act of 1968 was not even enacted into law until October 22, 1968, and that portion of the Act requiring serial numbers (Section 923(i) enacted as part of Section 102 of the Act) did not go into effect until December 16, 1968. See Section 105(a), 82 Stat. at 1226. Thus, by exempting only firearms manufactured "before 1968" the bills erroneously include unserialized firearms made between January 1, 1968, and December 15, 1968. Many thousands of firearms without serial numbers were undoubtedly manufactured during that nearly year-long time period. Many, if not most, of those firearms cannot be distinguished from guns made prior to 1968. The bills' reference to "before 1968" is just lazy and sloppy draftsmanship. The bills should be thus amended to recognize the correct effective date of the Gun Control Act of 1968. After all, this is a criminal statute and thus must be written with precision. See, e.g., *United States v. Vuitch*, 402 U.S. 62, 69 n.3 (1971) (noting the need for "necessary precision in [a] criminal statute").

## CONCLUSION

Given all the problems, detailed above, the bills have plainly not been fully thought out. For all these reasons, we strongly urge an unfavorable report.

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

| YEAR | ARRESTS | HOMICIDES | MURDER ARRESTS | GUN SEIZURES | WEAPONS POSSESSION ARRESTS | NONFATAL SHOOTINGS | |
|------|---------|-----------|----------------|--------------|----------------------------|--------------------|---|
| 1990 | 61,394 | 305 | 347 | 2487 | | 1727 N/A | |
| 1991 | 65,033 | 304 | 322 | 2754 | | 1865 N/A | |
| 1992 | 65,214 | 335 | 335 | 3614 | | 1895 N/A | |
| 1993 | 69,699 | 353 | 382 | 3571 | | 1852 N/A | |
| 1994 | 70,354 | 321 | 382 | 3478 | | 1693 N/A | |
| 1995 | 73,521 | 325 | 496 | 3566 | | 1791 N/A | |
| 1996 | 55,662 | 333 | 463 | 4241 | | 1758 N/A | |
| 1997 | 71,709 | 313 | 271 | 4560 | | 1923 N/A | |
| 1998 | 82,377 | 315 | 557 | 3718 | | 1646 N/A | |
| 1999 | 80,775 | 305 | 501 | 3545 | | 1228 N/A | |
| 2000 | 81,225 | 261 | 239 | 4117 | | 1019 | 725 |
| 2001 | 93,778 | 256 | 245 | 2822 | | 1418 | 684 |
| 2002 | 102,396 | 253 | 214 | 3598 | | 1241 | 610 |
| 2003 | 110,164 | 270 | 194 | 3173 | | 1305 | 545 |
| 2004 | 100,388 | 276 | 156 | 2791 | | 1211 | 636 |
| 2005 | 99,980 | 269 | 128 | 5110 | | 1407 | 557 |
| 2006 | 90,283 | 276 | 119 | 3055 | | 1348 | 657 |
| 2007 | 82,529 | 282 | 125 | 3495 | | 1328 | 651 |
| 2008 | 78,511 | 234 | 103 | 2714 | | 1325 | 585 |
| 2009 | 75,194 | 238 | 132 | 2674 | | 1162 | 459 |
| 2010 | 64,525 | 223 | 126 | 2378 | | 1271 | 419 |
| 2011 | 60,009 | 196 | 88 | 2178 | | 1224 | 379 |
| 2012 | 56,649 | 218 | 94 | 2296 | | 1169 | 370 |
| 2013 | 50,424 | 233 | 115 | 2205 | | 1280 | 402 |
| 2014 | 46,231 | 211 | 86 | 1874 | | 1299 | 370 |
| 2015 | 32,939 | 344 | 106 | 1900 | | 1227 | 635 |
| 2016 | 25,432 | 318 | 140 | 2124 | | 1244 | 666 |
| 2017 | 29,042 | 343 | 125 | 1917 | | 1080 | 702 |
| 2018 | 25,563 | 309 | 101 | 3911 | | 1257 | 677 |
| 2019 | 24,826 | 348 | 89 | 2203 | | 1161 | 770 |
| 2020 | 16,204 | 335 | 102 | 2244 | | 1233 | 724 |
| 2021 | 13,592 | 337 POLICE OWE ME THIS | | 2,355 | | 1,438 726 | |

NR?



# ENGAGE ARMAMENT, L.L.C.

**701 E. GUDE DRIVE, STE 101, ROCKVILLE, MD 20850 301-838-3151**

**WRITTEN TESTIMONY OF ANDREW RAYMOND, OWNER OF ENGAGE ARMAMENT LLC, AGAINST HOUSE BILL 638**

To Whom It May Concern,

My name is Andrew Raymond, and I am the co-owner of Engage Armament LLC, a federally licensed firearms manufacturer who has been in business for 11 years. I am a lifelong Maryland resident, and my family has been in Maryland on both sides for at least 337 years.

Part of firearm manufacturing is engraving the ATF required information on a firearm. I would say we have become experts on firearm markings over the past years and have invested more than $75,000 in firearm marking equipment to not only comply with the federal regulations but also to have the most advanced equipment to do so. Our main tool is a 60W fiber laser made <u>entirely</u> in the United States.

From both the cost and technical implications, there are a multitude of issues with this bill.

The cost of getting quality equipment to do the job effectively. As mentioned early, we spent quite a bit of money getting quality equipment, but even cheap imported equipment to mark metal will cost at least $7,000 and do a poor job of doing so, especially considering depth and permanency of the engraving.

The cost to the consumer will also increase significantly. For example, presently for NFA engraving we charge $45 which is the basic requirement of name/city/state under the National Firearms Act. This bill requires individuals to have their information engraved along with serial number, model AND after 1st January 2022 the manufacturers and "importers" info. This is substantially more required markings; therefore costs are going to quite high. For example, if I need to mark the info of the person who made the forging, plus my own info, and the gun information that could easily run $90 or more. That is on an item that would normally cost about $50 for an AR forging. I should also mention that I did ask for friends/acquaintances who I knew built their own firearms for a brief rundown of the numbers of items they may have. It appears most people who enjoy this hobby have many items that would fall under this bill. For example, engraving 5 items at $90 per engraving would cost $450. Many of these people are on the younger side, and in our current economy might not be able to afford compliance with the bill.

The other issues are technical. The first to be the actual act of marking the "receivers". Generally, these "receivers" are made either out of metal or polymer. Polymer has a great deal of variance to it and engraving settings from one type of polymer will catch another set on fire:



Here you can see a magazine catching fire using the settings from a known German polymer on this unknown polymer. The result is:



This marking is not legible and would not be compliant. Not to mention most people would now consider the product destroyed.

The next technical issue is sizing. While a metal "receiver" has a multitude of places to pollute with engravings, a good percentage of these products are polymer. A good example of the sizing issue would be the Polymer 80 "receivers" which are probably the most common plastic hobby "receivers" we see. These have a small metal piece imbedded in the polymer specifically for engraving purposes:



This small metal piece usually gives us only enough space for a serial number. In fact, to add the requirements from this law would require us to bring the size down to the point where it would not be compliant or readily legible. The below picture is a laser overlay of the space required for compliant sized markings using my personal information:



As you can see, the required engraving cannot fit in the supplied space. Once again, this is using my personal info as required under the law.

We should also consider required markings of original manufacturer and seller/importer into the state. This would double the space requirement and would not be feasible to do. Shrinking the size would not be compliant/legible either. The below is an example of that information at the minimum compliant size:



In order to fit only one set of the required markings my information must be shrunk to .055 which is not compliant. In the below picture, that is the 3rd example:



Another issue is going to be the length of the individual's name. For example, one of our customers is named "Ad****** Ra************* Kr******". His name has 32 characters not including spaces. I have no idea how we can fit that along with city, state, caliber etc. I am also not going to charge standard rates for an engraving of this size and will have to move to a per character rate.   I believe this will disproportionately effect persons of color and increase their cost to comply with this law.

Manufacturers/brokers will not be able to effectively fit the required information on all types of these "receivers" in a compliant fashion as there will just not be enough space on a good percentage of these items.

The cost to the customer is also going to go up substantially if people even decide to continue their hobby or be compliant.

While my company stands to gain financially from it, we stand against it not only on principle but also upon the basis of the unfeasible practicality of the requirements. I urge you to fully consider the cost implications, practicality, and the inequity of this bill and issue an unfavorable report.


Sincerely,


Andrew Starr Raymond
Co-Owner – Engage Armament LLC
andy@engagearmament.com

1   Case No. 21-CV-00690

2   Dept. No. I

3
  The undersigned affirms that this document
4   does not contain the social security number
  of any individual.
5

FILED

2021 DEC 10  AM 9: 54

TANYA SCHEUNE
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT



6

## IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

7

## IN AND FOR THE COUNTY OF LYON

8

9   POLYMER80, INC.,

10           Plaintiff,

11       vs.

12   STEPHEN SISOLAK, Governor of Nevada, AARON
  FORD, Attorney General of Nevada, GEORGE
13   TOGLIATTI, Director of the Nevada Department
  of Public Safety, MINDY MCKAY, Administrator
14   of the Records, Communications, and Compliance
15   Division of the Nevada Department of Public
  Safety,
16

17           Defendants.

                                /

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER GRANTING SUMMARY
JUDGMENT IN FAVOR OF
PLAINTIFF, POLYMER80, INC.**

18

19       This matter is before the Court upon the parties' competing Motions for Summary Judgment

20   both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter

21   was set for argument on November 23, 2021.  Plaintiff was present and represented by Brad

22   Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

23   of Greenspoon Marder LLP, who was present in Court. The Defendants were represented by Craig

24   A. Newby, Esq., Deputy Solicitor General, who was present in Court.

25       This Court, having reviewed and considered the parties' respective motions and oppositions

26   for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing

27
  upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and
28

good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS.

# I

## PROCEDURAL HISTORY

During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB 286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts relating to unfinished frames or receivers under certain circumstances; ... providing penalties; and providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB 286 into law on June 7, 2021.

On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada, George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay, Administrator of the Records, Communications, and Compliance Division of the Nevada Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and a Permanent Injunction barring enforcement of the new law.

On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and Preliminary Injunction*. After briefing and a hearing, this Court, on July 16, 2021, entered its *Order Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That Order is currently pending appeal at the Nevada Supreme Court.

---

[1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286 Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

1    Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021,

2    that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited

3    trial date of November 30, 2021.  That Order also provided that the parties could engage in discovery

4    through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive

5    motions.  By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop

6    the evidentiary record to be presented upon motions for summary judgment and/or at trial.

7    In the ensuing months, the parties proceeded with discovery.  Both Polymer80 and

8    Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2]  Pursuant to the

9    parties' Stipulation, this Court directed that they file their oppositions to the other side's summary

10   judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing

11   on November 23, 2021.  That hearing was held as scheduled and the Court heard substantial

12   argument from the parties.  Notably, both parties agreed at that hearing that this Court could decide

13   this case upon the record before it at that point, and that a trial was unnecessary.  At the conclusion

14   of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment.  This Order

15   follows and memorializes that ruling.

16   Accordingly,

17   IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is

18   GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set

19   forth herein and on the record at the November 23, 2021, hearing.

20

21

22

23   _____

[2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an
24   appeal from this Court's *Order Granting Preliminary Injunction*.  Thereafter, Defendants filed a
     Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure
25   question of law that would be resolved upon their then-pending appeal.  This Court denied
     Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not
26   AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion
     in granting interim relief.  Moreover, a stay would have only delayed a ruling on the constitutionality
27   of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.

28

## II

### CONTESTED PROVISIONS OF AB 286

The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by adding, among others, the following provisions, which are the subject of this proceeding.

First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

> 1.    A person shall not possess, purchase, transport or receive an unfinished frame or receiver unless:
> (a) The person is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.
>
> 2.    A person who violates this section:
> (a) For the first offense, is guilty of a gross misdemeanor; and
> (b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130.[3]

Plainly, this provision makes it a crime to "possess, purchase, transport or receive an unfinished frame or receiver" in the State of Nevada.

Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

> 1.    A person shall not sell, offer to sell or transfer an unfinished frame or receiver unless:
> (a) The person is:
> (1) A firearms importer or manufacturer; and
> (2) The recipient of the unfinished frame or receiver is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.

---

[3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison and a fine of up to $5,000.00.

Page 4 of 17

1             2.     A person who violates this section:

2                  (a) For the first offense, is guilty of a gross misdemeanor;
          and

3                  (b) For the second or any subsequent offense is guilty of a

4            category D felony and shall be punished as provided in NRS
          193.130

5        This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver"

6  in the State of Nevada.

7        Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or

8  receiver" to Nevada law and defines that term as follows:

9             9.     "Unfinished frame or receiver" means a blank, a casting or

10           a machined body that is intended to be turned into the frame or lower
          receiver of a firearm with additional machining and which has been

11           formed or machined to the point at which most of the major
          machining operations have been completed to turn the blank, casting

12           or machined body into a frame or lower receiver of a firearm even
          if the fire-control cavity area of the blank, casting or machined body

13           is still completely solid and unmachined.

14       Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the

15 Due Process Clause of the Nevada Constitution.[4]

16                                         **III**

17                   **STANDARD ON SUMMARY JUDGMENT**

18       Summary judgment is appropriate, where "the pleadings, depositions, answers to

19 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

20 genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

21 of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to

22 the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than

23 simply show that there is some metaphysical doubt as to the operative facts in order to avoid

24

25

26

27 [4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment
relating to the efficacy of those provisions.

28

1  summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2  724, 732 (2005) (quotations omitted). "The nonmoving party must, by affidavit or otherwise, set

3  forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4  judgment entered against him." *Id.* And, the party opposing summary judgment cannot build a case

5  on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6  *Nevada Bell*, 108 Nev. 105, 110 (1992)). Critically, the Nevada Supreme Court, as the parties have

7  acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8  Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9  *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009). As explained below, there are no

10  "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11  this action on summary judgment upon the record before it.

12                                                        IV

13                          **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14         Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15  It manufactures, designs, and distributes gun-related products, components, and after-market

16  accessories. The legislative history reveals that AB 286 has targeted, at least partially, certain of

17  Polymer80's business products. Defendants have also admitted as much in their Answer and in their

18  moving papers. As set forth in the testimony of Assemblywoman Sandra Jauregui:

19                        . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
                          largest manufacturers of ghost guns.
20

21  Minutes, Assembly Committee on Judiciary, p.6 (March 17, 2021). Assemblyman Wheeler stated

22  therein:

23                        The kit guns you called ghost guns are used by a lot of hobbyists.
                          Under federal law, those are quite legal, so outlawing them in Nevada,
24                        as this bill tries to do, basically puts a company [Polmer80] in my
                          district out of business. . . .
25                        We are going to drive a company in my district out of business, but
26                        people can still buy them in Kentucky. . .

27

28

1   <u>Minutes</u>, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

2   **A.**    **STANDING OF POLMER80**

3        In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of

4   Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.   The

5   Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts

6   in their Motion that they indeed have standing.

7        NRS 30.040 provides, in pertinent part:

8            **NRS 30.040.  Questions of construction or validity of . . . statutes.**

9

10                1.  Any person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of

11            construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

12   NRS 30.040(1).  In Nevada, the issue of Standing is a question of law.  *Arguello v. Sunset Station,*

13   *Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

14

15            The question of standing concerns whether the party seeking relief has a sufficient interest in the litigation. The primary purpose of this standing inquiry is to ensure the litigant will vigorously and

16            effectively present his or her case against an adverse party. Thus, a requirement of standing is that the litigant personally suffer injury that

17            can be fairly traced to the allegedly unconstitutional statute and which would be redressed by invalidating the statute. A general interest in

18            the matter is normally insufficient: a party must show a personal injury.

19

20   *Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct.

21   7, 2021), (Citations Omitted).

22

23

24

25

26   [5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286

27   all indicating the negative impact of the bill on their ability to conduct business in the State of Nevada.

28

This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the constitutionality of AB 286.  Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its ongoing conduct.  Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of AB 286 takes effect January 1, 2022.  Accordingly, it is ripe for this Court to determine whether or not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.

Polymer80 satisfies the requirement to show that they would "personally suffer injury that can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony criminal prosecution each time they produce a product which allegedly falls under the purview of the statute.  Further, Polymer80 would suffer significant economic loss as set forth in the Deposition testimony submitted, and uncontested by the Defendants.  This, combined with the legislative history showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that, unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for facial invalidity of the statute – which is Polymer80's only true redress.

This Court determines that Polymer80 will suffer irreparable harm in the absence of declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice of the conduct being criminalized.[6]

---

[6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would mitigate any harm as all Polymer80 would have to do is put a serial number on its products.  The

**B.    STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

The question before this Court is essentially whether or not AB 286 is unconstitutionally vague under the Due Process Clause of the Nevada Constitution.  It is undisputed that Section 3 and Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D felonies.

Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty, or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006).

> Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional.  The court must interpret a statute in a reasonable manner, that is, [t]he words of the statute should be construed in light of the policy and spirit of the law, and the interpretation made should avoid absurd results. In reviewing a statute, it should be given [its] plain meaning and must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a provision nugatory.

*Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009).  In reviewing the statute, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).

The Nevada Supreme Court has adopted a two-pronged test for determining whether a criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

---

argument was abandoned on summary judgment. Section 3(1)(b) and Section 3.5(1)(b) by their own terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be imprinted with a serial number. It is undisputed that the products produced by Polymer80 are not required by federal law to have a serial number imprinted on them.

1   Constitution. *See, e.g., Flamingo Paradise Gaming*, 125 Nev. at 510; *Gallegos v. State*, 123 Nev.

2   289, 294 (2007).

3

4               A criminal statute can be invalidated for vagueness (1) if it fails to
                provide a person of ordinary intelligence fair notice of what is
                prohibited *or* (2) if it is so standardless that it authorizes or encourages
5               seriously discriminatory enforcement.

6   *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).  Although both civil and criminal statutes

7   are judged under the same test, the Nevada Supreme Court has explained:

8

9               [T]here are two approaches to a facial vagueness challenge depending
                on the type of statute at issue. The first approach arises under a facial
                challenge to a civil statute and the plaintiff must show that the statute
10              is impermissibly vague in all of its applications. In making this
                showing, [a] complainant who engages in some conduct that is clearly
11              proscribed cannot complain of the vagueness of the law as applied to
                the conduct of others. **But, when the statute involves criminal**
12              **penalties or constitutionally protected rights, the second**
                **approach involves a higher standard of whether "vagueness**
13              **permeates the text.**

14

15  *Flamingo*, 125 Nev. at 512.[7]  Where a statute imposes criminal penalties, as is the case with AB 286,

16  the more exacting standard for Constitutionality is imposed.

17              Under the higher standard, the question becomes whether vagueness
                so permeates the text that the statute cannot meet these requirements
18              in most applications; and thus, this standard provides for the
                possibility that some applications of the law would not be void, but
19              the statute would still be invalid if void in most circumstances.

20
    *Flamingo*, 125 Nev. at 507.
21

22

23

24  _____

25  [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed
    conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin*, 99 Nev. 336,
26  340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 495 (1982). This
    Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly
27  proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness
    challenges need to show that the law is "impermissibly vague in all its applications."
28

                                    Page 10 of 17

In this Court's view, AB 286, a criminal enactment, fails under both prongs for various reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law. While similar, "the first prong is concerned with guiding those who may be subject to potentially vague statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of statutes." *Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

## C.   SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED

Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with fair notice of the conduct which it proscribes. The underlying purpose of this factor is to give a person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*, 123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport, receipt, transfer and sale of what the statute calls an "unfinished frame or receiver." While AB 286 purports to define the term "unfinished frame or receiver," that definition is as follows:

> [A] blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

This definition does not provide a person of ordinary intelligence with adequate notice of what AB 286 criminalizes.

As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada legislative statutory enactment. The terms used in the definition of "unfinished frame or receiver" are not defined elsewhere in the statute. These terms include - blank, casting, machined body, machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control cavity area.

The definition does not tell anyone when during the manufacturing process a blank, casting, or machined body (whatever those terms mean) has gone through the "major machining operations"

1  (whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of
2  a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct
3  to comply with the law.  As a result, this Court finds that the text of AB 286 does not provide fair
4  notice of whatever it criminalizes.  To this end, this Court asked on multiple occasions during oral
5  argument on the Motion for Summary Judgment what those terms as used in AB 286 mean.
6  Tellingly, the Defendants could not in any manner explain their meaning(s).

7       This Court inquired whether or not the common law defined the terms used in AB 286, and
8  the response that this Court received was clearly in the negative.  As such, this Court cannot use the
9  common law to decipher, clarify, or define the inherently vague terms of AB 286.  This fact
10  distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of
11  indecent exposure – a common law crime), where the Nevada Supreme Court found that that the
12  common law can provide a definition as to what conduct a statute prohibits.  This Court inquired as
13  to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and,
14  again, the answer was no.  As a consequence, this case is also distinguishable from *Silverwing*
15  *Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020),
16  (Commonly accepted definition of "subdivision" contained within the State's planning and zoning
17  statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law
18  elsewhere defined an allegedly ambiguous term.  Thus, neither the common law nor any other
19  Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

20       While portions of AB 286 incorporate certain terms that are defined in federal legislation,
21  this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal
22  definitions relating to firearms or the Gun Control Act into AB 286.  Here, the Nevada Legislature
23  purposely included some federal definitions into AB 286 but, deliberately did not include others.
24  From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent
25  some legislative declaration to the contrary.  Simply put, had the Nevada Legislature wished to
26  incorporate other federal definitions into AB 286, it knew how to do so and would have done so.  It
27
28

did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed to do.[8]

In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive from justice." The legislature failed to define what the term "fugitive from justice" meant in relation to the statute. The District Court upheld the validity of the statute and applied the federal definition of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed stating:

> Unlike Congress, the Nevada Legislature has not defined "fugitive from justice." By failing to adopt the federal definition of "fugitive from justice" or include any definition of that phrase. . ., the Legislature failed to provide the public with statutory notice of what that term means. It could arguably encompass a wide variety of circumstances. . . The fact that the district court, sua sponte, adopted the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that deficiency.

*Gallegos v. State*, 123 Nev. @ 294-95.

Finally, the legislative history of AB 286 does not shed any light on the undefined terms used in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates that the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

---

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

1   and undefined terms used in AB 286.  It is noteworthy that the parties agreed that the legislative

2   history for AB 286 gives this Court no information to determine what the Nevada Legislature meant

3   when adopting and implementing the definition of "unfinished frame or receiver."  Tellingly, not

4   even Webster's Dictionary defines a majority of these terms.

5          Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for

6   vagueness.  This Court finds this contention unpersuasive.  The criminal acts defined in Sections 3

7   and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the

8   possession and sale of "unfinished frames and receivers," whatever those things may actually be.

9   And, the person possessing or selling those "unfinished frames and receivers" need not have any

10  particular specific intent.  In fact, AB 286 only and very generally employs intent in the definition

11  of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or

12  a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm."  The

13  use of the word "intended" in this definition does not create the *scienter* element defendants claim

14  to exist within Section 3 and Section 3.5 of the bill.

15         Here, a literal reading of the definitional statute requires that the blank, casting or machined

16  body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm.

17  Nowhere in the definitional statute does it indicate who would have to have intended the unfinished

18  frame or receiver to be transformed into a firearm. Is it the manufacturer like Polymer80?  It is

19  undisputed that it is their intent not to make a firearm.  Is it the seller of a gun kit?  They have no

20  intent to make a firearm.  The object itself cannot transfer specific intent to the possessor of the item.

21         Even if this Court were to assume an intent element was specifically meant to apply to any

22  individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally

23  vague.  For example, if Section 3 criminalized the possession of a blank, casting, or machined body

24  only if the person who possessed such an item (whatever it might actually be) specifically intended

25  to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still

26  be unconstitutionally vague.

27         In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined

28  body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

machining, and (ii) already be formed or machined to the point at which most of the major machining operations have been completed. Yet, none of these terms are defined, nor is there any way to know when "most of the major machining operations have been completed," and then what "additional machining" must still occur and when. Accordingly, any specific intent that can be read into Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB 286 still fails to provide adequate notice as to what it specifically criminalizes.

Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or common law. Consequently, the only notice of what AB 286 criminalizes is provided in the statute itself. However, the law does not provide adequate notice of what it criminalizes, given that the definition of "unfinished frame or receiver" uses a myriad undefined terms. Moreover, the combined use of these undefined terms results in an overall failure to provide a person of ordinary intelligence with fair notice of what is criminalized. As there is no well-established or ordinary meaning to the terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.

**D.    SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015). The Court finds that it is.

As explained by the Nevada Supreme Court:

> The concern under this prong is the scope of discretion left to law enforcement officials and prosecutors. Our fear is that absent adequate guidelines, a criminal statute may permit a standardless sweep, which would allow the police, prosecutors, and juries to 'pursue their personal predilections.'

*Gallegos*, 125 Nev. @ 296. (Citation Omitted)

AB 286 fails to establish clear standards that law enforcement can use to determine whether the law is violated. At its most basic, there is no clear standard for law enforcement to use to

1  determine when an "unfinished frame or receiver" comes into existence. Unlike the federal

2  regulatory process to determine whether a frame or lower receiver is considered a firearm under the

3  Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame

4  or receiver" actually comes into existence. The most any court can glean from the definition is that

5  it is something less than a firearm and more than a block of raw material. Where on the scale in

6  between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the

7  law and left to the sole discretion of law enforcement and prosecutors. When does the machining

8  process start? When does the raw material become machined and through what processes? What

9  constitutes a "major machining operation" versus machining itself? Would the "fire-control cavity"

10 be considered a "major machining operation" or is it excluded? What additional machining needs to

11 be completed? It is unclear and undefined under the statute.

12      Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike

13 as they, in their sole discretion and without guidance, could label almost anything an "unfinished

14 frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.

15 There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing

16 their personal predilections.

17      Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section

18 3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law. Therefore,

19 enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary

20 and discriminatory enforcement.

21      For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are

22 unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23                                   **V**

24                      **ORDER AND JUDGMENT**

25      Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are

26 unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence

27 with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and

28 encourages seriously arbitrary and discriminatory enforcement.

1    Good cause appearing,

2    IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3    GRANTED.

4    IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5    DENIED.

6    IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7    Polymer80 and against Defendants; to wit,

8    IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9    Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10   State Constitution.

11   IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12   Polymer80 and against Defendants; to wit,

13   IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14   Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15   Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16   Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17   and their respective successors, officers, agents, servants, and employees and anyone acting in

18   concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19   Section 3 and Section 3.5 of AB 286.

20   IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21   this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22   exonerated and released to Polymer80 forthwith.

23   THIS IS A FINAL JUDGMENT.

24   DATED this 10th day of December, 2021.

25

26                                    JOHN P. SCHLEGELMILCH,

27                                    DISTRICT JUDGE

28

1    Case No. 21-CV-00690

2    Dept. No. I

3                              **Certificate of Mailing**

4           I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5    Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6    mailed at Yerington, Nevada addressed to:

7    Gregory L. Zunino, Esq.
     *Emailed*: gzunino@ag.nv.gov
8

9    Brad M. Johnston, Esq.
     *Emailed: bjohnston@shjnevada.com*
10

11   James J. McGuire, Esq.
     *Emailed: james.mcguire@gmlaw.com*
12

13   Michael Patrick, Esq.
     *Emailed: michael.patrick@gmlaw.com*

14   Mark Doerr
     *Emailed: mark.doerr@gmlaw.com*
15

16   Craig A. Newby, Esq.
     *Emailed: CNewby@ag.nv.gov*
17

18

19          DATED: This 10 th day of December, 2021.

20

21                                                    al Nelson
22                                          Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28

**IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

MARYLAND SHALL ISSUE, INC., et al.,

*Plaintiffs,*

vs.                                                    **CASE NO.: 485899V**

MONTGOMERY COUNTY, MARYLAND,

*Defendant.*

---

**PLAINTIFFS' MOTION TO EXCEED PAGE LIMITATION
ON MEMORANDUM IN RESPONSE TO DEFENDANT'S SUBMISSION
CONCERNING HB 425 AND SB 387**

Plaintiffs, by and through counsel and pursuant to the Rules of this Court, hereby move for

leave to exceed the page limitation applicable to the accompanying PLAINTIFFS'

MEMORANDUM IN RESPONSE TO DEFENDANT'S SUBMISSION CONCERNING HB 425

AND SB 387. That Memorandum is 14 pages long, including the caption and signature block. For

the following reasons, this motion should be granted:

1. On May 28, 2021, Plaintiffs filed a four-count Verified Complaint in this Court, seeking

declaratory and equitable relief as to County Bill 4-21, which made numerous changes to Chapter

57, Weapons, of the Montgomery County Code. The law went into effect on July 16, 2021. Count

I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within the meaning of Article

XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates the Express Powers

Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted by or is inconsistent

with numerous provisions of State law. Count III alleges that Bill 4-21 constitutes an illegal Taking

under the Maryland Takings Clause, Article III, §40 of the Maryland Constitution, and a

**1**

deprivation of property without due process in violation of Article 24 of the Maryland Declaration of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

2. On June 16, 2021, prior to the entry of any scheduling order, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. The Motion was two pages long, not counting the supporting declarations and attachment, and the supporting memorandum of law was 51 pages long, not counting the certificate of service. Plaintiffs requested an emergency hearing on their motion.

3. This Court granted plaintiffs' hearing request and scheduled a hearing on plaintiffs' emergency motion for July 15, 2021. However, on July 12, 2021, in lieu of answering or filing a response to plaintiffs' motion, defendant removed the entire case to federal district court pursuant to 28 U.S.C. § 1441. That removal deprived this Court of jurisdiction to hear the case and the July 15, 2021, hearing was accordingly cancelled. Plaintiffs promptly moved in federal district court to sever the State law claims set forth in Counts I, II, III and IV from the sole federal claim stated in Count IV of the Complaint and to remand the State law claims back to this Court.

4. On February 7, 2022, the federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain jurisdiction over Count IV, which included both a State constitutional claim under Article 24 and a federal due process claim brought under 42 U.S.C. § 1983. Both Count IV claims alleged that Bill 4-21 was unconstitutionally vague. After receiving the remand order, this Court entered a Scheduling Order, dated February 25, 2022.

5. On February 22, 2022, defendant filed a Motion to Dismiss and Alterative Motion for Summary Judgment, and an Opposition to plaintiffs' motion for summary judgment. That motion was two pages long and the supporting memorandum filed with defendant's motion and opposition

2

was 48 pages long, not counting extensive attachments. Defendant's motion sought dismissal or summary judgment on all the State law claims that were remanded from federal district court, including Count III on which plaintiff had not previously sought summary judgment. Defendant also filed a motion for leave to exceed the page limitation set forth in the Scheduling Order. Plaintiffs have no objection to defendant's motion to exceed the page limit. In response, plaintiffs' likewise filed a motion for leave to exceed the page limit. All these motions are still pending.

6. As is apparent, the issues presented are complex and important as they involve fundamental questions of preemption and the scope of Montgomery County's power to enact legislation that conflicts or is inconsistent with numerous provisions of State law and is otherwise alleged to in violation of multiple provisions of the Maryland Constitution. In particular, the very recent enactment of SB 387/HB 425 by the General Assembly is fundamental to this inquiry as County Bill 4-21 is in direct conflict and inconsistent with that legislation. These issues fully warrant extended briefing and argument. The pending motions will likely be dispositive of all liability issues, as there are no disputed issues of facts. Such briefing ensures that the Court has the benefit of fully developed arguments.

WHEREFORE, plaintiffs respectfully seeks leave to exceed to the Court's page limitation for their Opposition to defendant's motion.

Respectfully submitted,

/s/ Mark W. Pennak

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
Counsel for Plaintiffs

3

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on May 16, 2022, a copy of the foregoing Plaintiffs' Motion To Exceed Page Limitation was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

4

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Case No.: 485899V |
| | * | |
| MONTGOMERY COUNTY, MARYLAND | * | |
| | * | |
| Defendant | * | |

### DEFEDANT'S REPLY TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM REGARDING ENACTMENT OF SENATE BILL 387 AND HOUSE BILL 425 INTO LAW

### INTRODUCTION

In response to the increasing number of ghost guns recovered by law enforcement, last month the General Assembly enacted Senate Bill 387 (2022 Md. Laws ch. 19) (**Ex. H**)[1] and House Bill 425 (2022 Md. Laws ch. 18) (**Ex. I**). The bills are identical. Consistent with new federal firearms regulations, 87 Fed. Reg. 24652-24749 (eff. Aug. 24, 2022), this new state law expands the definition of "firearm" to include an unfinished frame or receiver and thereby closes the loophole that allowed unlicensed individuals to sell "do-it-yourself" unserialized (ghost) guns without a background check. These unfinished frames or receivers will be subject to the same rules applicable to other firearms.

As discussed below, Bill 4-21 is not preempted by, or in conflict with, SB 387/HB 425.

### SB 387/HB 425

Effective June 1, 2022, SB 387/HB 425 prohibits a person from purchasing, receiving, selling, offering to sell, or transferring an "unfinished frame or receiver" or a firearm unless it serialized by a federal firearms licensee. Md. Code Ann., Public Safety (PS) § 5-703(a). The

---

[1] County Exs. A - G are attached to its Mot. Summ. J.

term "firearm" is broadened to include an "unfinished frame or receiver," PS § 5-101(h)(iii), which in turn is defined as an article that "has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm." § 5-701(h). This definition is consistent with the new federal firearms regulations.

Effective March 1, 2023, a person must not possess a firearm (now including an unfinished frame or receiver) unless it either serialized in accordance with federal law or imprinted with the owner's zip code, initials, and another unique number, and then registered with the State Police. PS § 5-703(b)(2). A person who either receives an unserialized firearm through inheritance or manufactures an unserialized firearm without the use of any prefabricated parts, has 30 days to have that firearm serialized.

## ANALYSIS

### Conflict

"The crux of conflict preemption is that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not **expressly** permitted. Conflict preemption occurs when a local law prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Montgomery Cty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 688 (2019) (emphasis in original) (internal quotations and citations omitted). Maryland courts have thus long followed the concurrent powers doctrine, committed to the principle that "[a]dditional regulation by [a local] ordinance does not render [the local ordinance] void" even though the state may have enacted statutes regulating a field. *Rossberg v. State*, 111 Md. 394 (1909) (citation omitted); *accord E. Tar Prods. Corp. v. State Tax Comm'n of Maryland*, 176 Md. 290, 296-97 (1939) (observing that a local law requiring "more than the [state] statute requires creates no conflict").

2

Historically, Maryland has employed two tests to determine whether state law conflict preempts local law: the functional test and the verbal test. Under the functional test, a local law is not conflict preempted if it advances, or is consistent with, the state law's purposes.[2] *See Mayor & City Council of Balt. v. Hart*, 395 Md. 394, 409 (2006); *Caffrey v. Dep't of Liquor Control for Montgomery Cty.*, 370 Md. 272, 306-07 (2002) (citing *Mayor & Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979) ("Municipalities are free to provide for additional standards and safeguards in harmony with concurrent state legislation.")). Under the verbal test, a local law is conflict preempted if it prohibits conduct that the state law expressly permits. *City of Balt. v. Sitnick*, 254 Md. 303, 317 (1969).

In 2006, the Court of Appeals indicated in *Hart* that the functional test has "tak[en] priority over the verbal test under the conflict rule." 395 Md. at 409 (quoting J. Scott Smith, *State and Local Legislative Powers: An Analysis of the Conflict and Preemption Doctrines in Maryland*, 8 U. Balt. L. Rev. 300, 308-09 (1979)). Regardless of which test is employed, Bill 4-21 does not conflict with state law.

A decision upholding Bill 4-21 would fit comfortably within a century-long line of Court of Appeals' decisions upholding local laws that advanced, or were consistent with, the purposes of Maryland law. In a 1909 case, the Court of Appeals upheld a local law prohibiting the sale of cocaine and imposing harsher penalties than Maryland law because "further and additional penalties may be imposed by [local law], without creating inconsistency." *Rossberg v. State*, 111 Md. 394 (1909). And in 1922, the Court of Appeals upheld a local law exempting emergency vehicles from yielding, even though a state law required them to do so, because "it was not the purpose of the municipality to derogate in any respect from the general rule laid down by the

---

[2] But a local law is not in conflict with state law merely because it would frustrate some underlying state purpose. *Complete Lawn Care, Inc.*, 240 Md. App. at 688.

3

[General Assembly], but only to grant certain priorities when human life might be at stake." *State v. Brown*, 142 Md. 27 (1922).

In 1969, the Court of Appeals upheld a local law setting a higher minimum wage within the locality than did state law because the locality sought to achieve the same goal as the state—prohibiting the payment of substandard wages. *Sitnick*, 254 Md. at 307, 321 (citation omitted). In 1979, the Court upheld a city charter provision permitting port wardens to consider environmental factors when approving wharf construction as consistent with state law, even though state law did not list those factors as considerations, because the purpose of both laws was to allow port wardens to regulate construction on the waterways. *Annapolis Waterfront Co.*, 284 Md. at 392. Finally, in 2006, the Court of Appeals upheld a local law requiring emergency vehicles to stop at red traffic signals, even though state law permitted them to proceed after slowing down, because the local law advanced the state law's underlying safety purposes. *Hart*, 395 Md. at 409-10.

Putting aside that Bill 4-21 is expressly authorized by CL § 4-209(b)(1) (which should end the argument altogether), Bill 4-21 advances the goal of SB 387/HB 425—eliminating the dangers posed by unserialized ghost guns. SB 387/HB 425 attacks the problem directly by requiring those guns to be serialized and treated like other firearms. Bill 4-21 does this by regulating those remaining unserialized guns with respect to minors and within 100 yards of or in a place of public assembly. As discussed below, the General Assembly identified Bill 4-21 as complementary local legislation when it was considering SB 387/HB 425.

Neither does Bill 4-21 conflict with SB 387/HB 425 under the verbal test. Even explicit state statutory exemptions permitting specific conduct have not been interpreted by Maryland courts as express permission—demonstrating the high degree of verbal conflict necessary to

4

preempt local law. For example, the Court of Appeals has held that Maryland employment laws, which exempt some employers from state non-discrimination laws, do not prevent local governments from imposing their own non-discrimination requirements on the very employers the state exempts. *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Cty.*, 292 Md. 75, 79 (1981) (upholding local blanket non-discrimination prohibition despite a state exemption for employers with fewer than 15 employees); *Montrose Christian School Corp. v. Walsh*, 363 Md. 565, 581 (2001) (likewise for religious entities). The Court reasoned that the exempted employers were "not permitted by the statute to discriminate in their employment practices; they simply [were] not covered." *Nat'l Asphalt Pavement Ass'n, Inc.*, 292 Md. at 79.

There is no verbal conflict here. County law, including Bill 4-21, does not address the licensing of firearms dealers, the serialization of firearms, or the necessity of a background check. Bill 4-21 regulates ghost and undetectable guns with respect to **minors** and within 100 yards of or in a **place of public assembly**, precisely as authorized by the General Assembly in Md. Code Ann. Crim. Law (CL) § 4-209(b)(1). Thus, Bill 4-21 does not ban or criminalize the possession of unserialized ghost guns "throughout Montgomery County," as Plaintiffs suggest. Pls.' Supp. Mem. 2 & 4. Neither does Bill 4-21 make it "legally impossible" for the owner of a ghost gun to transport that that gun to a federal licensee in the County to either sell it (to the federal licensee) or have it serialized. Pls.' Supp. Memo. 4-5.[3] Both the state and county bills seek to enhance public safety by reducing the number of unserialized ghost guns. Because the new state law requires that unfinished frames or receivers be serialized (like other firearms), there will hopefully be an ever-shrinking number of unserialized ghost guns subject to Bill 4-21.

---

[3] Plaintiffs also suggest that Bill 4-21 conflicts with SB 387/HB 425 because the former bans the sale, transfer, possession, and transportation of "major components" of firearms while the latter "does not purport to regulate 'major components.'" Pls.' Supp. Mem. 5. Putting aside Plaintiffs' inaccurate characterization of Bill 4-21 (it does not ban major components), there can be no conflict where local address a matter unaddressed by state law.

**Preemption**

The new state law did not preempt the County's authority under CL § 4-209(b)(1). As the County noted in its Mot. Summ. J. 35-36, because "the General Assembly is presumed to be aware of existing local law when it legislates," the legislature's failure to "address the interaction of its statutes with pre-existing local … laws suggests that it intended no change in the applicability of the local laws." *Ad + Soil, Inc. v. Cty. Comm'rs of Queen Anne's Cty.*, 307 Md. 307, 333 (1986); *see also City of Balt. v. Sitnick*, 254 Md. 303, 322 ("There is a presumption of statutory construction that the Legislature acts with the knowledge of existing laws on the subject matter under consideration."). As in *Sitnick*, SB 387 and HB 425 "included no repealer of the [local] law[s] nor, as a matter of fact, the standard clause repealing all inconsistent laws." 254 Md. at 322. This failure to grapple with preexisting local law "is an important factor indicating that there was no intent by the General Assembly to preempt the field." *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Cty.*, 292 Md. 75, 79 (1981). *See also Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979). This failure to "mention[] preexisting local … ordinances [is] a clear indication that the General Assembly did not intend to preempt these local laws." *Bd. of Child Care of Balt. Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 698 (1989).

Reliance upon presumption is not necessary here, as the General Assembly was told of, and explicitly acknowledged, preexisting County law regulating ghost and undetectable guns. And, aware of that local regulation, the General Assembly chose not to revisit the grant of local authority in CL § 4-209(b)(1) or preempt the County's local regulation.

In his oral testimony supporting HB 425 before the House Judiciary Committee, the

6

County Executive made explicit reference to the County's recent enactment of County Bill 4-21[4]

and noted that, although the law was under challenge (*i.e.*, this lawsuit), the County was

"energized" by momentum in Annapolis on ghost guns.[5]

     The County submitted written testimony in support of both SB 387 (**Ex. J**) and HB 425

(**Ex. K**), noting the increasing number of ghost guns being recovered by law enforcement

officials in the County and the use of ghost guns in some recent County shootings.[6]

> The danger of these deadly weapons is that they can be easily assembled from components bought online with no required background check, have no serial numbers, and are, therefore, untraceable. These fully functional firearms are often difficult to identify as guns due to their shape or configuration and can evade metal detectors or x-ray machines creating a potential threat to public safety. Tragically, last month's shooting at Magruder High School involved a 17-year-old using a 9 mm ghost gun purchased online to shoot and seriously harm a fellow student inside the school. And last summer at a recreation center in Germantown, a ghost gun was used by a 14-year-old to fatally shoot a 20-year-old. While it's not fully known how many ghost guns are used in crimes, Montgomery County Department of Police reports that the number is rising. In 2021, 70 ghost guns were recovered from crime scenes in the County- up from 16 ghost guns in 2019 and 56 ghost guns in 2020.

> With increasing incidents of gun violence in Maryland, Montgomery County supports stricter gun safety laws to include untraceable and undetectable firearms. We urge the Committee to adopt a favorable report on HB 425.

     The Senate Judicial Proceedings Committee Floor Report (**Ex. O**), as well as the

Department of Legislative Services Fiscal Notes that accompanied SB 387 (**Ex. P**) and HB 425

(**Ex. Q**) reveal that, like Bill 4-21, the state bills were intended to address the increasing number

---

[4] The County Executive's testimony, available on the General Assembly website, begins around 1:06:53. https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&ys=2022RS&clip=JUD_2_9_2022_meeting_1&url=https%3A%2F%2Fmgahouse.maryland.gov%2Fmga%2Fplay%2F9205a485-2ac3-4674-bfe0-a1a38317bad2%2F%3Fcatalog%2F03e481c7-8a42-4438-a7da-93ff74bdaa4c%26playfrom%3D3215343.

[5] The County Executive also testified in support of SB 387 before Senate Judicial Proceedings Committee. https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&ys=2022RS&clip=JPR_2_16_2022_meeting_1&url=https%3A%2F%2Fmgahouse.maryland.gov%2Fmga%2Fplay%2Ff8abc56e-c69e-41ba-ba75-3485182db38f%2F%3Fcatalog%2F03e481c7-8a42-4438-a7da-93ff74bdaa4c%26playfrom%3D9760051.

[6] The County's Victim Services Advisory Board also supported SB 387. **Ex. L.** The attached witness signup sheets, printed from the General Assembly's website, also evidence the receipt of this written and oral testimony for SB 387 (**Ex. M**) and HB 425 (**Ex. N**) (highlighting added to identify County speakers).

of unserialized ghost guns recovered by law enforcement. And they also noted complementary local legislation that has been enacted to address the problem, including Bill 4-21 (emphasis added).

> **Background:** According to the U.S. Department of Justice, between 2016 and 2020, more than 23,000 ghost guns were recovered by law enforcement from potential crime scenes, including 325 in connection with homicides and attempted homicides. In November 2020, the Baltimore Sun reported that between 2016 and 2019, more than 12,000 build kits were shipped to Maryland, with total sales of the kits exceeding $1.0 million. The Baltimore Sun further reported that the Baltimore City Police Department recovered 126 privately made firearms in 2020 compared to 29 recovered in 2019, and that nearly one-quarter of such firearms recovered were from individuals under the age of 21.
>
> Eight states (California, Connecticut, Hawaii, Nevada, New Jersey, New York, Rhode Island, and Washington) and the District of Columbia have enacted laws regulating privately made firearms to varying degrees. California and Connecticut have enacted laws that require privately made firearms to be registered and marked with a serial number obtained from a governmental agency within each state. Nevada and New Jersey require serialization of unfinished frames and receivers by federally licensed firearms manufacturers and importers. The District of Columbia passed legislation in 2020 to ban build kits and specifically the possession of unfinished frames and receivers and untraceable firearms.
>
> Some cities and local jurisdictions have also started to implement laws to address privately made firearms. In August 2021, San Diego became the first city in California to prohibit the sale of unserialized frames and receivers, and San Francisco passed similar legislation shortly thereafter. **In Maryland, Montgomery County passed legislation in April 2021 to restrict the access of privately made firearms to minors and in places of public assembly within the county.**

It is self-evident that SB 387/HB 425 does not expressly preempt Bill 4-21 or any local regulation of firearms. Neither does it impliedly preempt Bill 4-21. Indeed, the record demonstrates that the County actively supported SB 387/HB 425 and that the General Assembly saw Bill 4-21 as a legitimate legislative response to the alarming proliferation of unserialized ghost guns.

8

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

*Attorneys for Defendant Montgomery
County, Maryland*
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of May 2022, a copy of the foregoing was
electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

9

Def.'s Reply to Pls.' Supp.
21-003732

Case 8:22-cv-01967-TDC   Document 6-2   Filed 08/08/22   Page 144 of 254  E-FILED; Montgomery Circuit Court
Docket: 5/12/2022 2:12 PM; Submission: 5/12/2022 2:12 PM

LAWRENCE J. HOGAN, JR., Governor                    Ch. 19

Chapter 19

**(Senate Bill 387)**

AN ACT concerning

**Public Safety – Untraceable Firearms**

FOR the purpose of altering a certain definition of "firearm" to include a certain unfinished frame or receiver; prohibiting a person from purchasing, receiving, selling, offering to sell, or transferring an unfinished frame or ~~receiver, or~~ receiver; prohibiting a person from selling, offering to sell, or transferring a certain firearm; prohibiting a person from possessing a firearm on or after a certain date, unless it is required by federal law to be, and has been, imprinted with a certain number in a certain manner; requiring the Secretary of State Police to suspend a certain dealer's license if the dealer is charged with a certain crime; requiring the Secretary to revoke a certain dealer's license if the dealer is convicted of a certain crime; providing for a system of registration of a certain firearm with the Secretary; ~~requiring a certain person to register a certain firearm;~~ requiring the Governor to include a certain appropriation in the annual State budget; and generally relating to firearms.

BY repealing and reenacting, without amendments,
    Article – Public Safety
    Section 5–101(a)
    Annotated Code of Maryland
    (2018 Replacement Volume and 2021 Supplement)

BY repealing and reenacting, with amendments,
    Article – Public Safety
    Section 5–101(h) and 5–114
    Annotated Code of Maryland
    (2018 Replacement Volume and 2021 Supplement)

BY adding to
    Article – Public Safety
    Section 5–701 through ~~5–705~~ 5–706 to be under the new subtitle "Subtitle 7. Untraceable Firearms"
    Annotated Code of Maryland
    (2018 Replacement Volume and 2021 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article – Public Safety**

5–101.



Ch. 19                         2022 LAWS OF MARYLAND

(a)     In this subtitle the following words have the meanings indicated.

(h)     (1)     "Firearm" means:

                (i)     a weapon that expels, is designed to expel, or may readily be
converted to expel a projectile by the action of an explosive; [or]

                (ii)    the frame or receiver of such a weapon; **OR**

                **(III)   AN UNFINISHED FRAME OR RECEIVER, AS DEFINED IN §
5–701 OF THIS TITLE.**

        (2)     "Firearm" includes a starter gun.

5–114.

(a)     (1)     The Secretary shall suspend a dealer's license if the licensee:

                (i)     is under indictment for a crime of violence; [or]

                (ii)    is arrested for a violation of this subtitle that prohibits the
purchase or possession of a regulated firearm; **OR**

                **(III)   IS CHARGED WITH A CRIME UNDER SUBTITLE 7 OF THIS
TITLE.**

        (2)     (i)     The Secretary may suspend a dealer's license if the licensee is
not in compliance with the record keeping and reporting requirements of § 5–145 of this
subtitle.

                (ii)    The Secretary may lift a suspension under this paragraph after
the licensee provides evidence that the record keeping violation has been corrected.

(b)     The Secretary shall revoke a dealer's license if:

        (1)     it is discovered that false information has been supplied or false
statements have been made in an application required by this subtitle; or

        (2)     the licensee:

                (i)     is convicted of a disqualifying crime;

                (ii)    is convicted of a violation classified as a common law crime and
receives a term of imprisonment of more than 2 years;

LAWRENCE J. HOGAN, JR., Governor                    Ch. 19

   (iii) is a fugitive from justice;

   (iv) is a habitual drunkard;

   (v) is addicted to a controlled dangerous substance or is a habitual user;

   (vi) has spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless the licensee produces a physician's certificate, issued after the last institutionalization and certifying that the licensee is capable of possessing a regulated firearm without undue danger to the licensee or to another;

   (vii) has knowingly or willfully manufactured, offered to sell, or sold a handgun not on the handgun roster in violation of § 5–406 of this title; [or]

   (viii) has knowingly or willfully participated in a straw purchase of a regulated firearm; **OR**

   **(IX) IS CONVICTED OF A CRIME UNDER SUBTITLE 7 OF THIS TITLE.**

  (c) If the Secretary suspends or revokes a dealer's license, the Secretary shall notify the licensee in writing of the suspension or revocation.

  (d) A person whose dealer's license is suspended or revoked may not engage in the business of selling, renting, or transferring regulated firearms, unless the suspension or revocation has been subsequently withdrawn by the Secretary or overruled by a court in accordance with § 5–116 of this subtitle.

### SUBTITLE 7. UNTRACEABLE FIREARMS.

**5–701.**

  **(A) IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.**

  **(B) "ANTIQUE FIREARM" HAS THE MEANING STATED IN § 4–201 OF THE CRIMINAL LAW ARTICLE.**

  **(C) "FEDERALLY LICENSED FIREARMS DEALER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO DEAL IN FIREARMS.**

(D)   "FEDERALLY LICENSED FIREARMS IMPORTER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO IMPORT FIREARMS.

(E)   "FEDERALLY LICENSED FIREARMS MANUFACTURER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO MANUFACTURE FIREARMS.

(F)   "FIREARM" HAS THE MEANING STATED IN § 5–101 OF THIS TITLE.

(G)   "SECRETARY" MEANS THE SECRETARY OF STATE POLICE OR THE SECRETARY'S DESIGNEE.

(H)   "UNFINISHED FRAME OR RECEIVER" MEANS A FORGED, CAST, PRINTED, EXTRUDED, OR MACHINED BODY OR SIMILAR ARTICLE THAT:

(1)   HAS REACHED A STAGE IN MANUFACTURE WHERE IT MAY READILY BE COMPLETED, ASSEMBLED, OR CONVERTED TO BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM; OR

(2)   IS MARKETED OR SOLD TO THE PUBLIC TO BECOME OR BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM ONCE COMPLETED, ASSEMBLED, OR CONVERTED.

5–702.

THIS SUBTITLE DOES NOT APPLY TO:

(1)   A FIREARM THAT:

(I)   WAS MANUFACTURED BEFORE OCTOBER 22, 1968; OR

(II)   IS AN ANTIQUE FIREARM;

(2)   A SALE, AN OFFER TO SELL, A TRANSFER, OR A DELIVERY OF A FIREARM OR AN UNFINISHED FRAME OR RECEIVER TO, OR POSSESSION OF A FIREARM OR UNFINISHED FRAME OR RECEIVER BY:

(I)   A FEDERALLY LICENSED FIREARMS DEALER;

(II)   A FEDERALLY LICENSED FIREARMS MANUFACTURER; OR

(III)   A FEDERALLY LICENSED FIREARMS IMPORTER; OR

LAWRENCE J. HOGAN, JR., Governor                    Ch. 19

    **(3)**   A TRANSFER OR SURRENDER OF A FIREARM OR AN UNFINISHED FRAME OR RECEIVER TO A LAW ENFORCEMENT AGENCY.

**5–703.**

    (A)   <u>**(1)**</u>   A PERSON MAY NOT PURCHASE, RECEIVE, SELL, OFFER TO SELL, OR TRANSFER AN UNFINISHED FRAME OR RECEIVER UNLESS IT IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED WITH A SERIAL NUMBER BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED FIREARMS IMPORTER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS.

    <u>**(2)**</u>   <u>EXCEPT AS PROVIDED IN PARAGRAPH (1) OF THIS SUBSECTION, A PERSON MAY NOT SELL, OFFER TO SELL, OR TRANSFER A FIREARM UNLESS IT IS IMPRINTED WITH A SERIAL NUMBER AS DESCRIBED UNDER SUBSECTION (B) OF THIS SECTION.</u>

    (B)   <u>**(1)**</u>   <u>THIS SUBSECTION DOES NOT APPLY TO:</u>

    <u>(I)</u>   <u>POSSESSION OF A FIREARM UNLESS A PERSON KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM WAS NOT IMPRINTED WITH A SERIAL NUMBER AS DESCRIBED UNDER THIS SUBSECTION;</u>

    <u>(II)</u>   <u>POSSESSION OF A FIREARM THAT DOES NOT COMPLY WITH THE MARKING REQUIREMENTS DESCRIBED UNDER THIS SUBSECTION BY A PERSON WHO RECEIVED THE FIREARM THROUGH INHERITANCE, AND IS NOT OTHERWISE PROHIBITED FROM POSSESSING THE FIREARM, FOR A PERIOD NOT EXCEEDING 30 DAYS AFTER INHERITING THE FIREARM; OR</u>

    <u>(III)</u>   <u>POSSESSION OF AN UNFINISHED FRAME OR RECEIVER BY A PERSON THAT MADE OR MANUFACTURED THE UNFINISHED FRAME OR RECEIVER, WITHOUT THE USE OF ANY PREFABRICATED PARTS, AND WHO IS NOT OTHERWISE PROHIBITED FROM POSSESSING THE UNFINISHED FRAME OR RECEIVER, FOR A PERIOD NOT EXCEEDING 30 DAYS AFTER THE PERSON MADE OR MANUFACTURED THE UNFINISHED FRAME OR RECEIVER.</u>

    <u>**(2)**</u>   ON OR AFTER ~~JANUARY~~ <u>MARCH</u> 1, 2023, A PERSON MAY NOT POSSESS A FIREARM UNLESS:

    ~~(1)~~  <u>(I)</u>   THE FIREARM IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED BY A FEDERALLY LICENSED FIREARMS MANUFACTURER, ~~OR~~ FEDERALLY LICENSED FIREARMS IMPORTER<u>, OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES</u>, WITH A SERIAL NUMBER IN

COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS; OR

~~(2)~~ (II)    THE FIREARM:

1.    HAS BEEN IMPRINTED BY A FEDERALLY LICENSED FIREARMS DEALER, FEDERAL FIREARMS MANUFACTURER, OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES, WITH ~~THE FIRST THREE AND LAST FIVE DIGITS OF THE LICENSEE'S FEDERAL FIREARMS LICENSE NUMBER, FOLLOWED BY A HYPHEN, AND THEN FOLLOWED BY ANOTHER NUMBER~~:

A.    THE ZIP CODE OF THE CURRENT ~~LEGAL~~ OWNER OR PERSON THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM;

B.    THE INITIALS OF THE CURRENT ~~LEGAL~~ OWNER OR PERSON THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM; AND

C.    A NUMBER THAT DOES NOT MATCH A NUMBER USED BY THE CURRENT ~~LEGAL~~ OWNER ON ANOTHER FIREARM OR BY THE PERSON WHO MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM ON ANY OTHER FIREARM THAT THE PERSON HAS MADE, COMPLETED, OR INITIALLY ASSEMBLED; AND

2.    HAS BEEN REGISTERED WITH THE SECRETARY.

(C)    (1)    A PERSON WHO VIOLATES SUBSECTION (A) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 5 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.

(2)    A PERSON WHO VIOLATES SUBSECTION (B) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 2 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.

(3)    EACH VIOLATION OF THIS SECTION IS A SEPARATE CRIME.

(D)    A FEDERALLY LICENSED FIREARMS DEALER OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES WHO IMPRINTS A FIREARM UNDER SUBSECTION ~~(B)(2)~~ (B)(2)(II) OF THIS SECTION SHALL:

~~(1)~~    IMPRINT THE FIREARM IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO AFFIXING SERIAL NUMBERS TO FIREARMS, INCLUDING:

LAWRENCE J. HOGAN, JR., Governor                    Ch. 19

~~(I)~~ (1)          MINIMUM SIZE AND DEPTH REQUIREMENTS; AND

~~(II)~~ (2)          REQUIREMENTS THAT THE NUMBERS NOT BE
READILY SUSCEPTIBLE TO BEING OBLITERATED, ALTERED, OR REMOVED~~; AND~~.

~~(2)    RETAIN    RECORDS    FOR    ALL    FIREARMS    IMPRINTED    IN
ACCORDANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE
SALE OF A FIREARM.~~

5–704.

~~(A)    A PERSON WHO MAKES, COMPLETES, OR INITIALLY ASSEMBLES A
FIREARM, OR THE CURRENT LEGAL OWNER OF THE FIREARM, SHALL REGISTER THE
FIREARM WITH THE SECRETARY.~~

~~(B)~~    THE SECRETARY SHALL MAINTAIN A SYSTEM TO REGISTER FIREARMS
IMPRINTED WITH SERIAL NUMBERS UNDER § 5–703(B)(2)(II) OF THIS SUBTITLE.

~~(C)~~ (B)    REGISTRATION DATA PROVIDED FOR REGISTRATION IS NOT OPEN
TO PUBLIC INSPECTION.

~~(D)    (1)    EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION,
INFORMATION OR EVIDENCE OBTAINED FROM A REGISTRATION APPLICATION OR
RECORDS REQUIRED TO BE SUBMITTED TO REGISTER A FIREARM UNDER THIS
SECTION MAY NOT BE USED, DIRECTLY OR INDIRECTLY, AS EVIDENCE AGAINST THE
PERSON APPLYING TO REGISTER THE FIREARM IN A CRIMINAL PROCEEDING FOR A
VIOLATION OF LAW THAT OCCURRED BEFORE OR AT THE TIME THE PERSON APPLIED
TO REGISTER THE FIREARM OR PROVIDE RECORDS REQUIRED TO REGISTER THE
FIREARM.~~

~~(2)    INFORMATION    DESCRIBED    IN    PARAGRAPH    (1)    OF    THIS
SUBSECTION MAY BE USED AS EVIDENCE IN A PROSECUTION RELATING TO
PROVIDING FALSE INFORMATION.~~

~~(E)~~ (C)    FOR EACH FISCAL YEAR, THE GOVERNOR SHALL INCLUDE IN THE
ANNUAL STATE BUDGET AN APPROPRIATION OF AT LEAST $150,000 TO FUND
REGISTRATION ACTIVITIES CONDUCTED BY THE SECRETARY UNDER THIS SECTION.

~~(A)    A PERSON WHO VIOLATES THIS SUBTITLE IS GUILTY OF A
MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT
EXCEEDING 3 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.~~

~~(B)    EACH VIOLATION OF THIS SUBTITLE IS A SEPARATE CRIME.~~

– 7 –

Ch. 19                     2022 LAWS OF MARYLAND

**5–705.**

        THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE PROVISIONS OF THIS SUBTITLE.

**5–706.**

        NOTHING IN THIS SUBTITLE MAY BE CONSTRUED IN A MANNER THAT ABRIDGES OR OTHERWISE LIMITS A PERSON'S RIGHT AGAINST SELF–INCRIMINATION UNDER THE UNITED STATES CONSTITUTION OR THE MARYLAND DECLARATION OF RIGHTS.

        SECTION 2. AND BE IT FURTHER ENACTED, That, if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act that can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

        SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall be construed in a manner that is consistent with proposed federal rule 2021R–05, updating parts 447, 478, and 479 of the Code of Federal Regulations, published in the Federal Register (Volume 86, No. 97) on May 21, 2021. If the proposed federal rule is modified at the time of adoption, this Act shall be construed in a manner that is consistent with those modifications.

        SECTION 3. 4. AND BE IT FURTHER ENACTED, That this Act shall take effect June 1, 2022.

**Enacted under Article II, § 17(b) of the Maryland Constitution, April 9, 2022.**

LAWRENCE J. HOGAN, JR., Governor                          Ch. 18

Chapter 18

**(House Bill 425)**

AN ACT concerning

**Public Safety – Untraceable Firearms**

FOR the purpose of altering a certain definition of "firearm" to include a certain unfinished
frame or receiver; prohibiting a person from purchasing, receiving, selling, offering
to sell, or transferring an unfinished frame or ~~receiver, or~~ *receiver; prohibiting a*
*person from selling, offering to sell, or transferring a certain firearm; prohibiting a*
*person from* possessing a firearm on or after a certain date, unless it is required by
federal law to be, and has been, imprinted with a certain number in a certain
manner; requiring the Secretary of State Police to suspend a certain dealer's license
if the dealer is charged with a certain crime; requiring the Secretary to revoke a
certain dealer's license if the dealer is convicted of a certain crime; *providing for a*
*system of registration of a certain firearm with the Secretary; requiring the Governor*
*to include a certain appropriation in the annual State budget;* and generally relating
to firearms.

BY repealing and reenacting, without amendments,
      Article – Public Safety
      Section 5–101(a)
      Annotated Code of Maryland
      (2018 Replacement Volume and 2021 Supplement)

BY repealing and reenacting, with amendments,
      Article – Public Safety
      Section 5–101(h) and 5–114
      Annotated Code of Maryland
      (2018 Replacement Volume and 2021 Supplement)

BY adding to
      Article – Public Safety
      Section 5–701 through ~~5–705~~ *5–706* to be under the new subtitle "Subtitle 7.
          Untraceable Firearms"
      Annotated Code of Maryland
      (2018 Replacement Volume and 2021 Supplement)

   SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
That the Laws of Maryland read as follows:

**Article – Public Safety**

5–101.



Ch. 18                    2022 LAWS OF MARYLAND

(a)      In this subtitle the following words have the meanings indicated.

(h)      (1)      "Firearm" means:

(i)      a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; [or]

(ii)      the frame or receiver of such a weapon**; OR**

**(III)      AN UNFINISHED FRAME OR RECEIVER, AS DEFINED IN §  5–701 OF THIS TITLE.**

(2)      "Firearm" includes a starter gun.

5–114.

(a)      (1)      The Secretary shall suspend a dealer's license if the licensee:

(i)      is under indictment for a crime of violence; [or]

(ii)      is arrested for a violation of this subtitle that prohibits the purchase or possession of a regulated firearm**; OR**

**(III)      IS CHARGED WITH A CRIME UNDER SUBTITLE 7 OF THIS TITLE.**

(2)      (i)      The Secretary may suspend a dealer's license if the licensee is not in compliance with the record keeping and reporting requirements of § 5–145 of this subtitle.

(ii)      The Secretary may lift a suspension under this paragraph after the licensee provides evidence that the record keeping violation has been corrected.

(b)      The Secretary shall revoke a dealer's license if:

(1)      it is discovered that false information has been supplied or false statements have been made in an application required by this subtitle; or

(2)      the licensee:

(i)      is convicted of a disqualifying crime;

(ii)      is convicted of a violation classified as a common law crime and receives a term of imprisonment of more than 2 years;

– 2 –

LAWRENCE J. HOGAN, JR., Governor                    Ch. 18

(iii)    is a fugitive from justice;

(iv)    is a habitual drunkard;

(v)    is addicted to a controlled dangerous substance or is a habitual user;

(vi)    has spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless the licensee produces a physician's certificate, issued after the last institutionalization and certifying that the licensee is capable of possessing a regulated firearm without undue danger to the licensee or to another;

(vii)    has knowingly or willfully manufactured, offered to sell, or sold a handgun not on the handgun roster in violation of § 5–406 of this title; [or]

(viii)    has knowingly or willfully participated in a straw purchase of a regulated firearm; **OR**

**(IX)    IS CONVICTED OF A CRIME UNDER SUBTITLE 7 OF THIS TITLE**.

(c)    If the Secretary suspends or revokes a dealer's license, the Secretary shall notify the licensee in writing of the suspension or revocation.

(d)    A person whose dealer's license is suspended or revoked may not engage in the business of selling, renting, or transferring regulated firearms, unless the suspension or revocation has been subsequently withdrawn by the Secretary or overruled by a court in accordance with § 5–116 of this subtitle.

## SUBTITLE 7. UNTRACEABLE FIREARMS.

**5–701.**

**(A)    IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.**

**(B)    "ANTIQUE FIREARM" HAS THE MEANING STATED IN § 4–201 OF THE CRIMINAL LAW ARTICLE.**

**(C)    "FEDERALLY LICENSED FIREARMS DEALER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO DEAL IN FIREARMS.**

– 3 –

Ch. 18                    2022 LAWS OF MARYLAND

(D)   "FEDERALLY LICENSED FIREARMS IMPORTER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO IMPORT FIREARMS.

(E)   "FEDERALLY LICENSED FIREARMS MANUFACTURER" MEANS A PERSON LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES TO MANUFACTURE FIREARMS.

(F)   "FIREARM" HAS THE MEANING STATED IN § 5–101 OF THIS TITLE.

(G)   "SECRETARY" MEANS THE SECRETARY OF STATE POLICE OR THE SECRETARY'S DESIGNEE.

(H)   "UNFINISHED FRAME OR RECEIVER" MEANS A FORGED, CAST, PRINTED, EXTRUDED, OR MACHINED BODY OR SIMILAR ARTICLE THAT:

(1)   HAS REACHED A STAGE IN MANUFACTURE WHERE IT MAY READILY BE COMPLETED, ASSEMBLED, OR CONVERTED TO BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM; OR

(2)   ~~IS MARKETED OR SOLD TO THE PUBLIC TO BECOME OR BE USED AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM ONCE COMPLETED, ASSEMBLED, OR CONVERTED~~.

5–702.

THIS SUBTITLE DOES NOT APPLY TO:

(1)   A FIREARM THAT:

(I)   WAS MANUFACTURED BEFORE *OCTOBER 22,* 1968; OR

(II)   IS AN ANTIQUE FIREARM;

(2)   A SALE, AN OFFER TO SELL, A TRANSFER, OR A DELIVERY OF A FIREARM OR AN UNFINISHED FRAME OR RECEIVER TO, OR POSSESSION OF A FIREARM OR UNFINISHED FRAME OR RECEIVER BY:

(I)   A FEDERALLY LICENSED FIREARMS DEALER;

(II)   A FEDERALLY LICENSED FIREARMS MANUFACTURER; OR

(III)   A FEDERALLY LICENSED FIREARMS IMPORTER; OR

– 4 –

LAWRENCE J. HOGAN, JR., Governor                    Ch. 18

(3)    A TRANSFER OR SURRENDER OF A FIREARM OR AN UNFINISHED FRAME OR RECEIVER TO A LAW ENFORCEMENT AGENCY.

**5–703.**

(A)    *(1)*    A PERSON MAY NOT PURCHASE, RECEIVE, SELL, OFFER TO SELL, OR TRANSFER AN UNFINISHED FRAME OR RECEIVER UNLESS IT IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED WITH A SERIAL NUMBER BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED FIREARMS IMPORTER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS.

*(2)    EXCEPT AS PROVIDED IN PARAGRAPH (1) OF THIS SUBSECTION, A PERSON MAY NOT SELL, OFFER TO SELL, OR TRANSFER A FIREARM UNLESS IT IS IMPRINTED WITH A SERIAL NUMBER AS DESCRIBED UNDER SUBSECTION (B) OF THIS SECTION.*

(B)    *(1)    THIS SUBSECTION DOES NOT APPLY TO:*

*(I)    POSSESSION OF A FIREARM UNLESS A PERSON KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM WAS NOT IMPRINTED WITH A SERIAL NUMBER AS DESCRIBED UNDER THIS SUBSECTION;*

*(II)    POSSESSION OF A FIREARM THAT DOES NOT COMPLY WITH THE MARKING REQUIREMENTS DESCRIBED UNDER THIS SUBSECTION BY A PERSON WHO RECEIVED THE FIREARM THROUGH INHERITANCE, AND IS NOT OTHERWISE PROHIBITED FROM POSSESSING THE FIREARM, FOR A PERIOD NOT EXCEEDING 30 DAYS AFTER INHERITING THE FIREARM; OR*

*(III)    POSSESSION OF AN UNFINISHED FRAME OR RECEIVER BY A PERSON THAT MADE OR MANUFACTURED THE UNFINISHED FRAME OR RECEIVER, WITHOUT THE USE OF ANY PREFABRICATED PARTS, AND WHO IS NOT OTHERWISE PROHIBITED FROM POSSESSING THE UNFINISHED FRAME OR RECEIVER, FOR A PERIOD NOT EXCEEDING 30 DAYS AFTER THE PERSON MADE OR MANUFACTURED THE UNFINISHED FRAME OR RECEIVER.*

*(2)*    ON OR AFTER ~~JANUARY~~ *MARCH* 1, 2023, A PERSON MAY NOT POSSESS A FIREARM UNLESS:

~~(1)~~    *(I)*    THE FIREARM IS REQUIRED BY FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED FIREARMS IMPORTER WITH A SERIAL NUMBER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS; OR

Ch. 18                    2022 LAWS OF MARYLAND

(2)    (II)    THE FIREARM:

1.    HAS BEEN IMPRINTED BY A FEDERALLY LICENSED FIREARMS DEALER, *FEDERAL FIREARMS MANUFACTURER,* OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES, WITH ~~THE FIRST THREE AND LAST FIVE DIGITS OF THE LICENSEE'S FEDERAL FIREARMS LICENSE NUMBER, FOLLOWED BY A HYPHEN, AND THEN FOLLOWED BY ANOTHER NUMBER~~:

*A.    THE ZIP CODE OF THE CURRENT OWNER OR PERSON THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM;*

*B.    THE INITIALS OF THE CURRENT OWNER OR PERSON THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM; AND*

*C.    A NUMBER THAT DOES NOT MATCH A NUMBER USED BY THE CURRENT OWNER ON ANOTHER FIREARM OR BY THE PERSON WHO MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM ON ANY OTHER FIREARM THAT THE PERSON HAS MADE, COMPLETED, OR INITIALLY ASSEMBLED; AND*

*2.    HAS BEEN REGISTERED WITH THE SECRETARY.*

(C)    *(1)    A PERSON WHO VIOLATES SUBSECTION (A) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 5 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.*

*(2)    A PERSON WHO VIOLATES SUBSECTION (B) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 2 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.*

*(3)    EACH VIOLATION OF THIS SECTION IS A SEPARATE CRIME.*

*(D)*    A FEDERALLY LICENSED FIREARMS DEALER OR OTHER FEDERAL LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES WHO IMPRINTS A FIREARM UNDER SUBSECTION ~~(B)(2)~~ *(B)(2)(II)* OF THIS SECTION SHALL:

(1)    IMPRINT THE FIREARM IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO AFFIXING SERIAL NUMBERS TO FIREARMS, INCLUDING:

~~(I)~~ *(1)*    MINIMUM SIZE AND DEPTH REQUIREMENTS; AND

– 6 –

LAWRENCE J. HOGAN, JR., Governor                    Ch. 18

~~(II)~~ *(2)*        REQUIREMENTS THAT THE NUMBERS NOT BE READILY SUSCEPTIBLE TO BEING OBLITERATED, ALTERED, OR REMOVED~~; AND~~.

~~(2)   RETAIN   RECORDS   FOR   ALL   FIREARMS   IMPRINTED   IN ACCORDANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE SALE OF A FIREARM.~~

5–704.

~~(A)   A  PERSON  WHO  VIOLATES  THIS  SUBTITLE  IS  GUILTY  OF  A MISDEMEANOR   AND   ON   CONVICTION   IS   SUBJECT   TO   IMPRISONMENT   NOT EXCEEDING 3 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.~~

~~(B)   EACH VIOLATION OF THIS SUBTITLE IS A SEPARATE CRIME.~~

*(A)      THE SECRETARY SHALL MAINTAIN A SYSTEM TO REGISTER FIREARMS IMPRINTED WITH SERIAL NUMBERS UNDER § 5–703(B)(2)(II) OF THIS SUBTITLE.*

*(B)      REGISTRATION DATA PROVIDED FOR REGISTRATION IS NOT OPEN TO PUBLIC INSPECTION.*

*(C)      FOR EACH FISCAL YEAR, THE GOVERNOR SHALL INCLUDE IN THE ANNUAL STATE BUDGET AN APPROPRIATION OF AT LEAST $150,000 TO FUND REGISTRATION ACTIVITIES CONDUCTED BY THE SECRETARY UNDER THIS SECTION.*

5–705.

THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE PROVISIONS OF THIS SUBTITLE.

*5–706.*

*NOTHING IN THIS SUBTITLE MAY BE CONSTRUED IN A MANNER THAT ABRIDGES OR OTHERWISE LIMITS A PERSON'S RIGHT AGAINST SELF–INCRIMINATION UNDER THE UNITED STATES CONSTITUTION OR THE MARYLAND DECLARATION OF RIGHTS.*

SECTION 2. AND BE IT FURTHER ENACTED, That, if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act that can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

Ch. 18                     2022 LAWS OF MARYLAND

   *SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall be construed in a manner that is consistent with proposed federal rule 2021R–05, updating parts 447, 478, and 479 of the Code of Federal Regulations, published in the Federal Register (Volume 86, No. 97) on May 21, 2021. If the proposed federal rule is modified at the time of adoption, this Act shall be construed in a manner that is consistent with those modifications.*

   SECTION ~~3.~~ *4.* AND BE IT FURTHER ENACTED, That this Act shall take effect June 1, 2022.

**Enacted under Article II, § 17(b) of the Maryland Constitution, April 9, 2022.**

# Montgomery County
## Office of Intergovernmental Relations

**ROCKVILLE:  240-777-6550**                 **ANNAPOLIS:  240-777-8270**

**SB 387**                                          **DATE: February 16, 2022**

**SPONSOR:**  The President (By Request - Office of the Attorney General) and Senator Lee

**ASSIGNED TO:**  Judicial Proceedings

**CONTACT PERSON:**  Sara Morningstar (Sara. Morningstar@montgomerycountymd.gov)

**POSITION:  SUPPORT**

---

### Public Safety – Untraceable Firearms

Gun violence in the United States is a public health issue that cannot be ignored any longer. The alarming rise in "ghost guns" or untraceable firearms confiscated by Maryland law enforcement, aligned with the reported national surge of legal gun purchases made during the pandemic, requires that 2022 be the year for Maryland to adopt legislation to ban ghost guns.

Effective June 1, 2022, SB 387 will ban the purchase, sale and transfer of an unfinished frame or receiver if it does not have a serial number imprinted by a licensed manufacturer. Marylanders who already own these handmade firearms will have until January 1, 2023, to take them to a federally-licensed firearms dealer to have a serial number and manufacturing information engraved on the weapon. Failure to comply with the law will result in a misdemeanor punishable by up to three years in jail and a fine of up to $10,000.  The ban will not apply to guns manufactured before 1968 or to antique firearms.

The danger of these deadly weapons is that they can be easily assembled from components bought online with no required background check, have no serial numbers, and are, therefore, untraceable.  These fully functional firearms are often difficult to identify as guns due to their shape or configuration and can evade metal detectors or x-ray machines creating a potential threat to public safety.  Tragically, last month's shooting at Magruder High School involved a 17-year-old using a 9 mm ghost gun purchased online to shoot and seriously harm a fellow student inside the school.  And last summer at a recreation center in Germantown, a ghost gun was used by a 14-year-old to fatally shoot a 20-year-old. While it's not fully known how many ghost guns are used in crimes, Montgomery County Department of Police reports that the number is rising.  In 2021, 70 ghost guns were recovered from crime scenes in the County – up from 16 ghost guns in 2019 and 56 ghost guns in 2020.

With increasing incidents of gun violence in Maryland, Montgomery County supports stricter gun safety laws to include untraceable and undetectable firearms. We would urge the Committee adopt a favorable report on SB 387.



FILED, Montgomery Circuit Court
Docket: 5/12/2022 2:12 PM; Submission: 5/12/2022 2:12 PM

# Montgomery County
## Office of Intergovernmental Relations

| ROCKVILLE:  240-777-6550 | ANNAPOLIS:  240-777-8270 |
|---|---|

**HB 425**                                    **DATE:  February 9, 2022**

**SPONSOR:**  The Speaker (By Request – Office of the Attorney General) and
               Delegate Lopez

**ASSIGNED TO:**  Judiciary

**CONTACT PERSON:**  Sara Morningstar   (Sara.Morningstar@montgomerycountymd.gov)

**POSITION:  SUPPORT**

---

### Public Safety – Untraceable Firearms

Gun violence in the United States is a public health issue that cannot be ignored any longer. The alarming rise in "ghost guns" or untraceable firearms confiscated by Maryland law enforcement, aligned with the reported national surge of legal gun purchases made during the pandemic, requires that 2022 be the year for Maryland to adopt legislation to ban ghost guns.

Effective June 1, 2022, HB 425 will ban the purchase, sale, and transfer of an unfinished frame or receiver if it does not have a serial number imprinted by a licensed manufacturer. Marylanders who already own these handmade firearms will have until January 1, 2023 to take them to a federally-licensed firearms dealer to have a serial number and manufacturing information engraved on the weapon.  Failure to comply with the law will result in a misdemeanor punishable by up to three years in jail and a fine of up to $10,000.  The ban will not apply to guns manufactured before 1968 or to antique firearms.

The danger of these deadly weapons is that they can be easily assembled from components bought online with no required background check, have no serial numbers, and are, therefore, untraceable.  These fully functional firearms are often difficult to identify as guns due to their shape or configuration and can evade metal detectors or x-ray machines creating a potential threat to public safety.  Tragically, last month's shooting at Magruder High School involved a 17-year-old using a 9 mm ghost gun purchased online to shoot and seriously harm a fellow student inside the school.  And last summer at a recreation center in Germantown, a ghost gun was used by a 14-year-old to fatally shoot a 20-year-old.  While it's not fully known how many ghost guns are used in crimes, Montgomery County Department of Police reports that the number is rising.  In 2021, 70 ghost guns were recovered from crime scenes in the County- up from 16 ghost guns in 2019 and 56 ghost guns in 2020.

With increasing incidents of gun violence in Maryland, Montgomery County supports stricter gun safety laws to include untraceable and undetectable firearms.  We urge the Committee to adopt a favorable report on HB 425.

DEFENDANT'S
EXHIBIT

**K**



VICTIM SERVICES ADVISORY BOARD

February 16, 2022

The Honorable William C. Smith, Jr.
Chair, Senate Judicial Proceedings Committee
2 East, Miller Senate Office Building
Annapolis, Maryland 21401

Re:  Support  - SB387 - Public Safety - Untraceable Firearms

Dear Chairman Smith:

Senate Bill 387 addresses the need to monitor and control the use of "do-it-yourself" (DIY) or "ghost guns" by extending the definition of regulated firearms to include certain unfinished frames or receivers. Additionally, the bill requires that all firearms are marked with a unique serial number and that individuals possessing such firearms maintain a certain log.  Penalties are imposed for violations in the manufacture, possession, sale, and transfer of these firearms.

The Montgomery County Victim Services Advisory Board (VSAB) advises the County Council and County Executive on assisting victims and their family members who experience violent crimes including domestic violence, sexual assault and homicide.  Montgomery County experienced 35 homicides in 2021, the most in one year for the past 32 years.  (https://wjla.com/news/local/montgomery-county-murder-homicide-deadliest-year-record-germantown-fatal-shooting-circle-gate-drive-seneca-valley, Dec. 24, 2021).  Montgomery County is reporting more serious domestic violence crimes than ever before. (https://wtop.com/montgomery-county, Oct. 13, 2021). The county's inability to track weapons used in such violence puts victims at significantly greater risk.

Too many - almost a half dozen - ghost guns have been found in Montgomery County schools this year already.  (https://www.nbcwashington.com/news/local/dc-gun-violence/new-legislation-would-ban-ghost-guns-in-maryland/2942514, Jan. 20, 2022).  County ghost gun seizures increased fivefold in two years, from 16 in 2019 to 70 in 2021.  (https://bethesdamagazine.com/bethesda-beat/government/advocates-officials-focus-on-ghost-gun-crackdown-after-magruder-shooting/, Jan. 26, 2022). More than 12,000 ghost gun kits were shipped to Maryland between 2016 and 2019, and the Bureau of Alcohol, Tobacco and Firearms (ATF) reported 117 ghost guns recovered in the state in 2019. (https://wjla.com/news/local/ghost-guns-ban-maryland-rally-moms-students-demand-action-everytown-for-gun-safety-brian-frosh-attorney-general-tuesday-lawyers-mall-annapolis-senator-will-smith, Jan. 24, 2022). The state regulation of these dangerous firearms is long overdue.

VSAB asks the committee to issue a favorable report on Senate Bill 387.

Sincerely,

Amos Hicks III
VSAB Member

Department of Health and Human Services

DEFENDANT'S
EXHIBIT

L

1301 Piccard Drive, Suite 4100  • Rockville, Maryland 20850 • 240-777-1355 • 240-777-1329 FAX

# Witness Signup

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Adams, William | | UNF | Oppose SB0387.pdf | JPR |
| Adamson, Jeff | | UNF | Adamson SB387Testimony.pdf | JPR |
| Ali, Saqib | | FAV | Oral Testimony | JPR |
| Amsbaugh, Brent | | UNF | SB0387 Testimony.pdf | JPR |
| Andraka, Nicholas | | UNF | Oral Testimony Senate Bill 387.pdf | JPR |
| Apple, Chris | | FAV | Oral Testimony SB0387_Chris_Apple_FAV.pdf | JPR |
| Aziz, Malik | Chief of Prince George's County Police Department | FAV | Oral Testimony | JPR |
| BAILEY, JOSHUA | | UNF | Oral Testimony Letter to MD Senate.pdf | JPR |
| Bailey, Michael | | UNF | No Testimony | JPR |
| Balazek, John | Self | UNF | Oral Testimony | JPR |
| Barbieri, Nicholas | | UNF | No Testimony | JPR |
| Bartlett, Olivia | DoTheMostGood | FAV | SB0387-FAV-DTMG-2-16-22.pdf | JPR |
| Bartlett, Olivia | DoTheMostGood | FAV | SB0387-FAV-DTMG-3-23-22.pdf | JUD |
| Beller, Joel | Baltimore County Government | FAV | BaltimoreCounty_FAV_SB0387.pdf | JPR |
| Beller, Joel | Baltimore County Government | FAV | BaltimoreCounty_FAV_SB0387.pdf | JUD |
| Benjamin, Peter | Marylanders to Prevent Gun Violence | FAV | Oral Testimony | JPR |
| Bledsoe, Janice | Baltimore City State's Attorney Office | FWA | Oral Testimony | JPR |
| Boston, Frank | | UNF | Oral Testimony | JPR |
| Brown, Anthony G. | House of Representatives | FAV | Oral Testimony | JPR |
| Brown, Michael | | UNF | SB0387_brownmj_unf.pdf | JPR |
| Burke, Michael | Maryland Shall Issue | UNF | Oral Testimony MFB - Testimony on HB 485 and SB 387.pdf | JPR |
| Caine, Brian | | UNF | SB0387_Brian_Caine_unf.pdf | JPR |
| Carlin-Weber, Daniel | | UNF | Oral Testimony DC-W_SB387_UNF.pdf | JPR |
| Carrington, Darrell | Carrington & Associates, LLC | FAV | Carrington 2022 PGC - SB 387 - Public Safety - Unt | JUD |



| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Ceresi, Austin | | UNF | SB0387 Testimony.pdf | JPR |
| Cockrum, Chris | Accuforge | UNF | SB0387_Testimony_Accuforge_20220215.pdf | JPR |
| Collins, Michael | Baltimore City State's Attorney's Office | FWA | SB387 Amedment.BCSAO.pdf | JPR |
| Conway, Mark | | FAV | Oral Testimony | JPR |
| Cyphers, Moira | Compass Government Relations | FAV | Oral Testimony Giffords Testimony in Support of SB 387.pdf | JPR |
| Davis, Scott | | UNF | WRITTEN TESTIMONY SCOTT GREGORY DAVIS UNFAVORABLE | JPR |
| Davis, Sherrie-Lynn | | UNF | Written testimony of Sherrie-Lynn H Davis unfavora | JPR |
| DeTello, Jessica | | UNF | SB387_Jessica_DeTello.pdf | JPR |
| DeTello, Lydia | | UNF | Oral Testimony SB387_Lydia_DeTello.pdf | JPR |
| DeTello, Nicholas | | UNF | Oral Testimony SB387_Nicholas_DeTello.pdf | JPR |
| Doherty, Mike | Maryland State Rifle & Pistol Association | UNF | MSRPA Opposes SB387-2022.pdf | JPR |
| Dolan, John | | UNF | SB387_JohnDolan_unf.pdf | JPR |
| Dubovsky, Stephen | | UNF | No Testimony | JPR |
| Dummitt, Ashley | | UNF | Oral Testimony HB425_SB387 Testimony.pdf | JPR |
| Egan, Ashley | UULM-MD | FAV | SB 387 -Support-UULM-MD Jan Bird, MD.docx - Google | JPR |
| Egan, Ashley | UULM-MD | FAV | SB 387 -Support-UULM-MD Jan Bird, MD jud.docx - Go | JUD |
| Elrich, Marc | Montgomery County Government | FAV | Oral Testimony | JPR |
| Fedorko, Joel | | UNF | sb387.pdf | JPR |
| Frey, Leslie | Montgomery County | FAV | VSAB Support Ltr Ghost Guns Senate 2022.pdf | JPR |
| Frosh, Brian | Office of the Attorney General | FAV | Oral Testimony 2022-02-16 SB 387 (Support).pdf | JPR |
| Frosh, Brian | Office of the Attorney General | FAV | 2022-03-23 SB 387 (Cross-over Support).pdf | JUD |
| Frosh, Brian | Attorney General of Maryland | FAV | No Testimony | JUD |
| Fry, Donald | Greater Baltimore Committee | FAV | SB0387 - 2.16.22 -- Public Safety - Untraceable Fi | JPR |
| Gentry, Patrick | | UNF | Oral Testimony As a gun owner, I enjoy the building and engineeri | JPR |
| Gibson, Rich | Howard County State's Attorney's Office | FWA | SB 0387_Howard Co State's Attorney_FWA 2.14.22.pdf | JPR |
| Goode, Willow | The League of Women Voters Maryland | FAV | SB387-Public Safety-Untraceable Firearms .pdf | JPR |

| Name | Organization | Position | Testimony | Committee |
|------|--------------|----------|-----------|-----------|
| Grose, James | | UNF | Oral Testimony | JPR |
| Gross, Kenneth | | UNF | SB387 Testimony 2022.pdf | JPR |
| GUNDLING, JOHN | | UNF | MD Senate JPC Opposing Testimony SB387.pdf | JPR |
| Hall, Dillon | | UNF | SB387_HB425 DH Testimony.pdf | JPR |
| Harman, David | | UNF | Letter written in Opposition to Senate Bill 387.pd | JPR |
| Hayes, Justin | Comptroller of Maryland | FAV | 2-16-2022 - SB387 - Public Safety - Untraceable Fi | JPR |
| Herren, Karen | | FAV | Oral Testimony (Final)Ghost Guns 2022 SB387.pdf | JPR |
| Hewitt, Scott | | UNF | grassley_to_justice_dept.guncrimeinitiative.pdf Senate Judicial Proceedings Committee, Testimony i | JPR |
| Hinkle, Russell | | UNF | RJH SB387 UNF.pdf | JPR |
| Hodge, Daryl | | UNF | Oral Testimony Ghost Gun Testimony.pdf | JPR |
| Hollywood, Nicole | | FAV | Oral Testimony 2.16 MD Mom Testimony.pdf | JPR |
| Hudson, Lee | Delaware-Maryland Synod, ELCA | FAV | sb387, ghost guns, 2022.pdf | JUD |
| Johnston, Stephen | | UNF | SB387 UNFAVORABLE - Stephen Johnston.pdf | JPR |
| Josselyn, John | 2A Maryland | UNF | Oral Testimony SB0387_Testimony_Unfavorable_2-16-22.pdf | JPR |
| Kasemeyer, Pam | | FAV | SB0387_FAV_City of Rockville_Public Safety - Untra | JPR |
| Kasuba, Thomas | | UNF | Oral Testimony Kasuba_OPPOSE_SB0387.pdf Kasuba2_OPPOSE_SB0387.pdf | JPR |
| Kohler, Gene | | UNF | SB 387 Gene Kohler.pdf | JPR |
| Koravos, JoAnne | Montgomery County Women's Democratic Club | FAV | WDC Testimony SB0387_2022.pdf | JPR |
| Kraska, MJ | Maryland Catholic Conference | FAV | MD Catholic Conference_FAV_SB0387.pdf | JPR |
| Kraska, MJ | Maryland Catholic Conference | FAV | MD Catholic Conference_FAV_SB0387.pdf | JUD |
| Krone, Christine | | FAV | No Testimony | JPR |
| Kryger, William | | UNF | SB0387 Unfavorable Position.pdf | JPR |
| Lee, Susan | | FAV | Oral Testimony SB387_FAV_Lee_2022.pdf | JPR |
| Levy, Samuel | Everytown for Gun Safety | FAV | MD SB 387 Testimony.pdf | JPR |
| Lieberman, Jim | CIF | FAV | SB 387 ghost gun testimony 2-15- 22 ..pdf | JPR |
| Lipko, Seth | | UNF | No Testimony | JPR |

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Love, William | | UNF | No Testimony | JPR |
| Lowe, Mary Pat | Moms Demand Action | FAV | Oral Testimony | JPR |
| McAdam, Hunter | | UNF | _SB387_htm_unf.pdf | JPR |
| McCann Jr, William B | | UNF | SB 387 McCann Unfav.pdf | JPR |
| McCarthy, John | Montgomery County State's Attorney's Office | FAV | Oral Testimony | JPR |
| McGuire, James | | UNF | Oral Testimony mcguire_opposed_sb-0387.pdf | JPR |
| Mehu, Natasha | Mayor's Office of Government Relations | FAV | SB0387-JPR-FAV.pdf | JPR |
| Mehu, Natasha | Mayor's Office of Government Relations | FAV | SB0387-JUD-FAV.pdf | JUD |
| Menendez, Daniel | | UNF | RE_ HB425_SB387 (4).pdf | JPR |
| Mooney, Karla | TWAW / DC Project / MSI | UNF | Oral Testimony Testimony SB 0387_HB 0425 Untraceable Firearms.pd | JPR |
| Morningstar, Sara | Montgomery County Government | FAV | SB 387 - MoCo_Morningstar_FAV (GA 22).pdf | JPR |
| Morris, Laura | Moms Demand Action | FAV | Oral Testimony | JPR |
| Munson II, Jon | | UNF | SB_327_JonCMunsonII_UNFAVORABLE.pdf | JPR |
| Novotny, Art | | UNF | Art_Novotny_UNF_SB387.pdf | JPR |
| Novotny, Katie | | UNF | Oral Testimony Katie_Novotny_UNF_SB387.pdf | JPR |
| Paylor, Perry | State's Attorney's Office for Prince George's County | FAV | Oral Testimony | JPR |
| Pennak, Mark | Maryland Shall Issue, Inc. | UNF | Oral Testimony MSI Testimony on HB 425 and SB 387 Final.final.pdf | JPR |
| Peterson, Matt | | FAV | SB 387 - Ghost Guns.pdf | JPR |
| Phelps, Ken | Maryland Episcopal Public Policy Network | FAV | 2022 SB 0387 - FAVORABLE.pdf | JPR |
| Phelps, Ken | Maryland Episcopal Public Policy Network | FAV | 2022 SB 0387 - FAVORABLE.pdf | JUD |
| Pica, John | Pica & Associates, LLC | UNF | NSFF SB 387 - Untraceable Firearms - Oppose.pdf | JPR |
| Plante, Cecilia | Maryland Legislative Coalition | FAV | SB0387_Untraceable_Firearms_MLC_FAV.pdf | JPR |
| Plante, Cecilia | Maryland Legislative Coalition | FAV | SB0387_Untraceable_Firearms_MLC_FAV.pdf | JUD |
| President, President | | FAV | Oral Testimony | JPR |
| President, President | | FAV | Oral Testimony | JUD |

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Reid, Denise | Moms Demand Action | FAV | Oral Testimony | JPR |
| Sanchez, Osiris | | UNF | SB0387_Osiris Sanchez_UNF.pdf | JPR |
| Schardt , Tanya | Brady | FAV | Brady.SB387.Support.pdf | JPR |
| Scott, Brandon | Mayor, Baltimore City Administration | FAV | Oral Testimony | JPR |
| Shapiro, Melanie | Maryland Network Against Domestic Violence | FAV | Oral Testimony SB 387_MNADV_FAV.pdf | JPR |
| Shapiro, Melanie | Maryland Network Against Domestic Violence | FAV | SB 387_MNADV_FAV_JUD.pdf | JUD |
| Sharpless, Bradford | | UNF | SB 387, Untraceable Firearms, 2022, Sharpless.pdf | JPR |
| Spiker, D.J. | National Rifle Association | UNF | Oral Testimony | JPR |
| Stramella, Scott | | UNF | SB387 Opposition.pdf | JPR |
| Sugar, Earle | | UNF | SB0387_Earle Sugar_UNF.pdf | JPR |
| Testimony, All | | N/A | Merged Testimony as of 2-16-2022 at 1006 AM | JPR |
| Toscano, Christopher | | UNF | TOSCANO_ Written Testimony on SB0387 Untraceable Fi | JPR |
| Upman, Patrick | | UNF | SB387.pdf | JPR |
| Veith, Danielle | Maryland Moms Demand Action | FAV | Oral Testimony | JPR |
| Williams, Krystal | MARYLAND OFFICE OF THE PUBLIC DEFENDER | UNF | No Testimony | JPR |
| Williams, Peggy | | UNF | No Testimony | JPR |
| Wojtysiak, Theodore | | UNF | SB387.pdf | JPR |
| Worley , Richard | Baltimore Police Department | FAV | Oral Testimony SB 387 BPD Support.pdf | JPR |
| Yiannakis, Christin | | UNF | No Testimony | JPR |
| Yontef-McGrath, Amy | Maryland Moms Demand Action and Students Demand Action | FAV | Oral Testimony | JPR |

# Witness Signup

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Abrams, Stephan | Brady | FAV | Oral Testimony | JUD |
| Adamson, Jeff | | UNF | Adamson SB387_HB425Testimony.pdf | JUD |
| Anders, Neal | Maryland Shall Issue | UNF | No Testimony | JUD |
| Andraka, Nicholas | | UNF | House Bill 425.pdf | JUD |
| Aziz, Malik | Chief of Prince George's County Police Department | FAV | Oral Testimony | JUD |
| Bagwell, Ashlie | | FAV | 2022 JCRC HB 425 Public Safety Untraceable Firearm | JUD |
| BAILEY, JOSHUA | | UNF | Oral Testimony Letter to MD House.pdf | JUD |
| Bartlett, Olivia | DoTheMostGood | FAV | HB0425-FAV-DTMG-2-9-22.pdf | JUD |
| Beller, Joel | Baltimore County Government | FAV | BaltimoreCounty_FAV_HB0425.pdf | JUD |
| Bledsoe, Janice | Baltimore City State's Attorney Office | FWA | Oral Testimony | JUD |
| Bowman, Robert | | UNF | Oral Testimony | JUD |
| Braveboy, Aisha | Prince George's County State's Attorney | FAV | Oral Testimony HB425 Written Testimony (A. Braveboy).pdf | JUD |
| Caine, Brian | | UNF | hb0425_opposition.pdf | JUD |
| Carlin-Weber, Daniel | | UNF | DC-W_HB425_UNF.pdf | JUD |
| Chamblee, Andrea | Moms Demand Action | FAV | Oral Testimony | JUD |
| Cheakalos, Paul | | UNF | No Testimony | JUD |
| Colburn, Ashley | None | UNF | HB0425_Written Testimony of Ashley Colburn.pdf | JUD |
| Crisafulli, Matthew | Worcester County Sheriffs Office | UNF | HB 425 Crisafulli.pdf | JUD |
| Davis, Scott | | UNF | WRITTEN TESTIMONY OF SCOTT G. DAVIS IN OPPOSITION | JUD |
| DeTello, Lydia | | UNF | Lydia DeTello.pdf | JUD |
| DeTello, Nicholas | | UNF | Oral Testimony HB0425_Nicholas_DeTello.pdf | JUD |
| Ditraglia, Frank | | UNF | No Testimony | JUD |
| Dudley, Kara | | FAV | Oral Testimony | JUD |
| Egan, Ashley | UULM-MD | FAV | HB 425 -Support-UULM-MD Jan Bird, MD.docx - Google | JUD |

DEFENDANT'S EXHIBIT
N

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Elbourn, James | | UNF | No Testimony | JUD |
| Elrich, Marc | Montgomery County Government | FAV | Oral Testimony | JUD |
| Ferguson, Jesse | | UNF | Oral Testimony | JUD |
| Fink, Nelda | | UNF | No Testimony | JUD |
| Fry, Donald | Greater Baltimore Committee | FAV | HB0425 - 2.9.22 -- Public Safety - Untraceable Fir | JUD |
| Gahler, Sheriff Jeff | Harford County Sheriff's Office | UNF | Oral Testimony HB425 Untraceable Firearms.pdf | JUD |
| Gay, Morris | | UNF | Oral Testimony HB425- Opposed.pdf | JUD |
| Gay, Timothy | | UNF | New PDF document.pdf | JUD |
| Gentry, Patrick | | UNF | As a gun owner, I enjoy the building and engineeri | JUD |
| Gibson, Rich | Howard County State's Attorney's Office | FWA | Oral Testimony HB 0425_Howard Co SAO_fav with amendments_Untracea | JUD |
| Gross, Kenneth | | UNF | HB0425 Testimony 2022.pdf | JUD |
| Hall, Dillon | | UNF | SB387_HB425 DH Testimony.pdf | JUD |
| Harrison , Michael | Baltimore Police Department | FAV | Oral Testimony HB 441 BPD Support.pdf | JUD |
| Hayes, Justin | Comptroller of Maryland | FAV | 2-9-2022 Final - HB425 Public Safety - Untraceabl | JUD |
| Herren, Karen | | FAV | Oral Testimony (Final)Ghost Guns 2022 HB425.pdf | JUD |
| Hershon, Edward | Hershon Legal, LLC | UNF | Oral Testimony | JUD |
| Hill, Robert | Montgomery County State's Attorney's Office and Maryland State's Attorney's Association | FAV | Oral Testimony | JUD |
| Hines Jr, John | | UNF | Oral Testimony | JUD |
| Hollywood, Nicole | | FAV | Oral Testimony | JUD |
| Johnston, Stephen | | UNF | HB425 UNFAVORABLE - Stephen Johnston.pdf | JUD |
| Josselyn, John | 2A Maryland | UNF | Oral Testimony HB0425_Testimony_Unfavorable_2-7-22.pdf | JUD |
| Joyce, Kevin | | UNF | HB425.pdf | JUD |
| Kasemeyer, Pam | | FAV | No Testimony | JUD |
| Kasemeyer, Pam | City of Rockville | FAV | City of Rockville - FAV | JUD |
| Kasuba, Thomas | | UNF | Oral Testimony KASUBA_OPPOSE_HB0425.pdf | JUD |
| Kemerer, Hannibal | Office of Attorney General | FAV | Oral Testimony 2022-02-09 HB 425 (Support).pdf | JUD |

| Name | Organization | Position | Testimony | Committee |
|---|---|---|---|---|
| Klein, Michelle | | UNF | No Testimony | JUD |
| Kraska, MJ | Maryland Catholic Conference | FAV | MD Catholic Conference_FAV_HB0425.pdf | JUD |
| Ladd, Melissa | | FAV | Oral Testimony ML HB 425 Testimony.docx.pdf | JUD |
| Landau, Mindy | Brady United Against Gun Violence | FAV | Oral Testimony GG Test imony2-9-22.pdf | JUD |
| Lerol, Travis | Travis Lerol | UNF | Oral Testimony HB425.pdf | JUD |
| Levy, Samuel | Everytown for Gun Safety | FAV | Oral Testimony | JUD |
| Lewis, Mike | Maryland Chiefs & Sheriffs Associations | UNF | Oral Testimony PUBLIC SAFETY - UNTRACEABLE FIREARMS - HOUSE BILL | JUD |
| Lieberman, Jim | CIF | FAV | HR 425 ghost gun testimony 830 am 2-6-22 for filin | JUD |
| Long, Lauren | | UNF | Please do not pass this bill.pdf | JUD |
| Lopez, Lesley | | FAV | Oral Testimony HB 425 Sponsor Testimony.pdf | JUD |
| Love, William | | UNF | No Testimony | JUD |
| Lowman, Lisa | Moms Demand Action-Maryland Chapter | FAV | Oral Testimony | JUD |
| Mansfield, Andrea | Maryland Chiefs & Sheriffs Associations | INFO | MCPA-HB425.pdf | JUD |
| Martínez, Ana | | FAV | Oral Testimony | JUD |
| McCann Jr, William B | | UNF | Oral Testimony McCann TESTIMONY HB425 + SB387 2022-02-07.pdf | JUD |
| McCarthy, John | Montgomery County State's Attorney's Office | FAV | Mccarthy HB425.pdf | JUD |
| McGettigan, James | | UNF | Oral Testimony HB0425.pdf | JUD |
| Mehu, Natasha | Mayor's Office of Government Relations | FAV | HB0425-JUD-FAV.pdf | JUD |
| Menendez, Daniel | | UNF | Oral Testimony RE_ HB425_SB387 (1).pdf | JUD |
| Milano, Leslie | Montgomery County Women's Democratic Club | FAV | Oral Testimony | JUD |
| Mooney, Karla | TWAW / DC Project / MSI | UNF | Testimony HB 0425 Untraceable Firearms.pdf | JUD |
| Morch, Giselle | Marylanders to Prevent Gun Violence | FAV | Oral Testimony | JUD |
| Morningstar, Sara | Montgomery County Government | FAV | HB 425 - MoCo_Morningstar_FAV (GA 22).pdf | JUD |
| Novotny, Art | | UNF | Art_Novotny_UNF_HB425.pdf | JUD |
| Novotny, Katie | | UNF | Oral Testimony Katie_Novotny_UNF_HB425.pdf | JUD |
| PARRISH, GEORGE | | UNF | No Testimony | JUD |

| Name | Organization | Position | Testimony | Committee |
|---|---|---|---|---|
| Paylor, Perry | State's Attorney's Office for Prince George's County | FAV | Oral Testimony | JUD |
| Pennak, Mark | Maryland Shall Issue, Inc. | UNF | Oral Testimony MSI Testimony on HB 425 and SB 387 Final3.pdf | JUD |
| Peterson, Matt | | FAV | HB 425 - Ghost Guns.pdf | JUD |
| Phelps, Ken | Maryland Episcopal Public Policy Network | FAV | 2022 HB 0425 - FAVORABLE.pdf | JUD |
| Pilling, Ronald | Jesse Klump Memorial Fund, Inc. | FAV | hb0425 written testimony feb 7 2022.pdf | JUD |
| Pucino, David | Giffords | FAV | Oral Testimony | JUD |
| regan, charles | | UNF | 2022 testimony on home built guns.pdf | JUD |
| riley, joseph | Maryland State's Attorneys Association | FAV | Oral Testimony | JUD |
| Santos, Trevor | National Shooting Sports Foundation | UNF | Oral Testimony MD_2022_ HB 425 - Untraceable Firearms - Oppose.pd | JUD |
| Scarborough, Brenda | | UNF | HB0425 Oppose.pdf | JUD |
| Schardt , Tanya | Brady | FAV | HB0425.Brady.pdf | JUD |
| Schipper, Daniel | | UNF | Bill HB0425.pdf | JUD |
| Scott, Brandon | Mayor, Baltimore City Administration | FAV | Oral Testimony | JUD |
| Shapiro, Melanie | Maryland Network Against Domestic Violence | FAV | Oral Testimony HB 425_MNADV_FAV.pdf | JUD |
| Sharpless, Bradford | | UNF | No Testimony | JUD |
| Simonson, Grace | | FAV | Oral Testimony | JUD |
| Speaker, Speaker | | FAV | Oral Testimony | JUD |
| Stramella, Scott | | UNF | HB425 Opposition.pdf | JUD |
| Sugar, Earle | | UNF | Earle_Sugar_Opposed_HB0425_2022 Revision 1.pdf | JUD |
| Tchantchou, Kevine | Lith Home LLC | INFO | No Testimony | JUD |
| Toscano, Christopher | | UNF | TOSCANO_ Written Testimony on HB0425 Untaceable Fi | JUD |
| Van Hollen, Chris | US Senator | FAV | Senator Van Hollen - FAV | JUD |
| Williams, Peggy | | UNF | No Testimony | JUD |
| Wolcott, Clinton | | FAV | Oral Testimony | JUD |
| Yu, Alfred | | UNF | Oral Testimony HB425-SB387 testimony - Yu.pdf | JUD |

| Name | Organization | Position | Testimony | Committee |
|------|-------------|----------|-----------|-----------|
| Ziegelbauer, Joe | | FAV | Oral Testimony | JUD |

# SENATE JUDICIAL PROCEEDINGS COMMITTEE

### WILLIAM C. SMITH, JR., CHAIR · COMMITTEE REPORT SYSTEM
### DEPARTMENT OF LEGISLATIVE SERVICES · 2022 MARYLAND GENERAL ASSEMBLY

## FLOOR REPORT
### Senate Bill 387

### Public Safety - Untraceable Firearms

**SPONSORS:** The President (By Request - Office of the Attorney General) and Senator Lee

**COMMITTEE RECOMMENDATION:**      **Favorable with Amendments (9)**

**SHORT SUMMARY:**

As amended, this bill, with specified exceptions, (1) prohibits a person from purchasing, receiving, selling, offering to sell, or transferring an "unfinished frame or receiver" unless it is required by federal law to be, and has been, imprinted with a serial number, as specified; (2) prohibits a person from selling, offering to sell, or transferring a firearm lacking a specified serial number; and (3) beginning March 1, 2023, prohibits a person from possessing a firearm unless the firearm is imprinted with specified information. The bill also (1) requires registration of specified firearms with the Secretary of State Police; (2) establishes procedures for registration; (3) establishes penalties for violations of the bill's provisions relating to untraceable firearms; and (4) expands the definition of a "firearm" to include an unfinished frame or receiver. The bill takes effect June 1, 2022.

**COMMITTEE AMENDMENTS:**      **There are nine (9) committee amendments**

AMENDMENT NO. 1:   is technical.

AMENDMENT NO. 2:   alters the bill's exceptions.

AMENDMENT NO. 3:   alters the definition of an "unfinished frame or receiver".

AMENDMENT NO. 4:   establishes a mens rea requirement for possession offenses under the bill.

AMENDMENT NO. 5:   alters marking requirements for firearms, as specified.



AMENDMENT NO. 6:    alters the date after which a person may be subject to the bill's requirements relating to possession of specified firearms.

AMENDMENT NO. 7:    establishes a prohibition on sale, offers for sale, and transfers of specified firearms, alters the bill's penalty provisions, and strikes record–keeping language.

AMENDMENT NO. 8:    establishes a requirement that a certain person register a firearm with the Secretary of State Police, provides for that registration, and requires an annual appropriation, as specified.

AMENDMENT NO. 9:    provides for the construction of the bill.

## SUMMARY OF BILL:

### *Untraceable Firearms*

A person is prohibited from purchasing, receiving, selling, offering to sell, or transferring an unfinished frame or receiver unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms.

Beginning March 1, 2023, a person may not possess a firearm unless:

- the firearm is required by federal law to be, and has been, imprinted by a federally licensed firearms manufacturer or federally licensed firearms importer with a serial number in compliance with all federal laws and regulations applicable to the manufacture and import of firearms; or
- the firearm has been imprinted by a federally licensed firearms dealer, or other federal licensee authorized to provide marking services, as specified.

A federally licensed firearms dealer, or other federal licensee authorized to provide marking services, who imprints a firearm under the bill's provisions must (1) imprint the firearm in compliance with all federal laws and regulations applicable to affixing serial numbers to firearms, as specified.

A violator of the bill's provisions relating to the purchase, receipt, sale, offer for sale, and transfer of unfinished frames or receivers, as well as those provisions relating to the sale, offer for sale, or transfer of a firearm lacking marking or serialization or which are not

registered in accordance with the bill's provisions are guilty of a misdemeanor and subject to maximum penalties of imprisonment not exceeding 5 years and/or a $10,000 fine.

A violator of the bill's provisions relating to the possession of a firearm lacking marking or serialization or which are not registered in accordance with the bill's provisions are guilty of a misdemeanor and subject to maximum penalties of imprisonment not exceeding 2 years and/or a $10,000 fine.

The provisions relating to untraceable firearms do not apply to (1) a firearm that was manufactured before 1968 or is an antique firearm; (2) a sale, an offer to sell, a transfer, or a delivery of a firearm or an unfinished frame or receiver to, or possession of a firearm or unfinished frame or receiver by, a federally licensed firearms dealer, a federally licensed firearms manufacturer, or a federally licensed firearms importer; or (3) a transfer or surrender of a firearm or an unfinished frame or receiver to a law enforcement agency.

The provisions relating to possession of a firearm that is not marked or serialized or registered in accordance with the bill's provisions do not apply to a person unless the person knows or reasonably should have known that the firearm is not imprinted with a serial number, as specified.

A person who makes, completes, or initially assembles a firearm or the current legal owner of a firearm that is not imprinted with a serial number must register the firearm with the Secretary of State Police. The Secretary is required to maintain a system to register firearms, as specified. Registration data provided for registration under the bill is not open to public inspection. Moreover, information or evidence obtained from a registration application or records required to be submitted to register a firearm under the bill may not be used against the person applying to register the firearm in a criminal proceeding for a violation of law that occurred before or at the time the person applied to register the firearm or provide records required to register the firearm. However, this information may be sued as evidence in a prosecution relating to providing false information.

Each year, the Governor is required to include an appropriation in the annual State budget of at least $150,000 to fund registration activities conducted by the Secretary under the bill's provisions.

The Secretary of State Police may adopt regulations to carry out these provisions.

The bill's amendments provide that the bill is to be construed in a manner that is consistent with proposed federal rules regarding privately made firearms. If the proposed federal rules are modified at the time of their adoption, the bill is required to be construed in a manner that is consistent with those modifications.

"Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Federal Firearms Licensed Dealers*

The Secretary of State Police must suspend a dealer's license if the licensee is charged with a crime under the bill's provisions relating to untraceable firearms. The Secretary must revoke a dealer's license if the licensee is convicted of a crime under the same provisions.

**BACKGROUND:**

According to the U.S. Department of Justice, between 2016 and 2020, more than 23,000 ghost guns were recovered by law enforcement from potential crime scenes, including 325 in connection with homicides and attempted homicides. In November 2020, the Baltimore Sun reported that between 2016 and 2019, more than 12,000 build kits were shipped to Maryland, with total sales of the kits exceeding $1.0 million. The Baltimore Sun further reported that the Baltimore City Police Department recovered 126 privately made firearms in 2020 compared to 29 recovered in 2019, and that nearly one-quarter of such firearms recovered were from individuals under the age of 21.

Eight states (California, Connecticut, Hawaii, Nevada, New Jersey, New York, Rhode Island, and Washington) and the District of Columbia have enacted laws regulating privately made firearms to varying degrees. California and Connecticut have enacted laws that require privately made firearms to be registered and marked with a serial number obtained from a governmental agency within each state. Nevada and New Jersey require serialization of unfinished frames and receivers by federally licensed firearms manufacturers and importers. The District of Columbia passed legislation in 2020 to ban build kits and specifically the possession of unfinished frames and receivers and untraceable firearms.

Some cities and local jurisdictions have also started to implement laws to address privately made firearms. In August 2021, San Diego became the first city in California to prohibit the sale of unserialized frames and receivers, and San Francisco passed similar legislation shortly thereafter. In Maryland, Montgomery County passed legislation in April 2021 to restrict the access of privately made firearms to minors and in places of public assembly within the county.

**FISCAL IMPACT:**

**State Effect:** As drafted, a potential minimal increase in general fund revenues and expenditures due to the bill's penalty provisions was expected. It is unknown at this time what impact, if any, the bill's amendments will have on State finances.

**Local Effect:** As drafted, a potential minimal increase in local revenues and expenditures due to the bill's penalty provisions was expected. It is unknown at this time what, if any, impact the bill's amendments will have on local finances.

**Small Business Effect:** Minimal.

**ADDITIONAL INFORMATION:**

**Prior Introductions:** None.

**Cross File:** Designated  HB 425 (The Speaker)(By Request - Office of the Attorney General) and Delegate Lopez - Judiciary.

**COUNSEL: Lancaster**

SB 387

# Department of Legislative Services
Maryland General Assembly
2022 Session

## FISCAL AND POLICY NOTE
### Third Reader - Revised

Senate Bill 387

(The President)(By Request - Office of the Attorney General) and Senator Lee

Judicial Proceedings

Judiciary

---

### Public Safety - Untraceable Firearms

---

This bill, with specified exceptions, (1) requires the Secretary of State Police to maintain a system to register firearms imprinted with serial numbers, as specified, and (2) prohibits a person from purchasing, receiving, selling, offering to sell, or transferring an "unfinished frame or receiver" or a firearm unless imprinted with specified information. The Governor must include at least $150,000 in the annual State budget to fund registration activities conducted by the Secretary under the bill. The bill also (1) requires the Secretary to suspend or revoke a dealer's license under specified conditions relating to untraceable firearms; (2) establishes penalties for violations of specified provisions of the bill; and (3) expands the definition of a "firearm" to include an unfinished frame or receiver. The bill must be construed in a manner that is consistent with a specified proposed federal rule regarding privately made firearms. If the proposed federal rule is modified at the time of adoption, the bill must be construed in a manner that is consistent with those modifications. Provisions of the bill are severable. **The bill takes effect June 1, 2022.**

---

### Fiscal Summary

**State Effect:** No effect in FY 2022. General fund expenditures increase by at least $150,000 annually beginning in FY 2024 due to the mandated appropriation; although discretionary, this analysis assumes funding is also provided in FY 2023. Potential minimal increase in general fund revenues and expenditures due to the bill's penalty provisions. **This bill establishes a mandated appropriation beginning in FY 2024.**

| (in dollars) | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 |
|---|---|---|---|---|---|
| Revenues | $0 | $0 | $0 | $0 | $0 |
| GF Expenditure | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Net Effect | ($150,000) | ($150,000) | ($150,000) | ($150,000) | ($150,000) |

Note:() = decrease; GF = general funds; FF = federal funds; SF = special funds; - = indeterminate increase; (-) = indeterminate decrease


DEFENDANT'S
EXHIBIT
P

**Local Effect:**  Potential minimal increase in local revenues and expenditures due to the bill's penalty provisions.

**Small Business Effect:**  Minimal.

---

## Analysis

**Bill Summary:**

*Untraceable Firearms*

A person is prohibited from purchasing, receiving, selling, offering to sell, or transferring an *unfinished frame or receiver* unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms. Except as otherwise authorized, a person may not sell, offer to sell, or transfer a *firearm* unless it is imprinted with a specified serial number.

A violator of the provisions relating to required imprinting is guilty of a misdemeanor and on conviction is subject to imprisonment for up to five years and/or a fine of up to $10,000. Each violation is a separate crime.

Beginning March 1, 2023, a person may not possess a firearm unless:

- the firearm has been registered with the Secretary of State Police; and
- (1) the firearm is required by federal law to be, and has been, imprinted by a federally licensed firearms manufacturer or federally licensed firearms importer, or other federal licensee authorized to provide marking services, with a serial number in compliance with all federal laws and regulations applicable to the manufacture and import of firearms or (2) the firearm has been imprinted by a federally licensed firearms dealer, federal firearms manufacturer, or other federal licensee authorized to provide marking services with specified information.

The prohibition that begins March 1, 2023, does not apply to:

- possession of a firearm unless a person knew or reasonably should have known that the firearm was not imprinted with a serial number, as specified;

SB 387/ Page 2

- possession of a firearm that does not comply with the marking requirements by a person who received the firearm through inheritance, and is not otherwise prohibited from possessing the firearm, for up to 30 days after inheriting the firearm; or
- possession of an unfinished frame or receiver by a person that made or manufactured the unfinished frame or receiver, without the use of any prefabricated parts, and who is not otherwise prohibited from possessing the unfinished frame or receiver for up to 30 days after the person made or manufactured the unfinished frame or receiver.

A violator of the prohibition that begins March 1, 2023, is guilty of a misdemeanor and on conviction is subject to imprisonment for up to two years and/or a fine of up to $10,000. Each violation is a separate crime.

A federally licensed firearms dealer or other federal licensee authorized to provide marking services who imprints a firearm under the bill's provisions must imprint the firearm in compliance with all federal laws and regulations applicable to affixing serial numbers to firearms, as specified.

The provisions relating to untraceable firearms do not apply to (1) a firearm that was manufactured before October 22, 1968, or is an antique firearm; (2) a sale, an offer to sell, a transfer, or a delivery of a firearm or an unfinished frame or receiver to, or possession of a firearm or unfinished frame or receiver by, a federally licensed firearms dealer, a federally licensed firearms manufacturer, or a federally licensed firearms importer; or (3) a transfer or surrender of a firearm or an unfinished frame or receiver to a law enforcement agency.

Nothing in the bill may be construed in a manner that abridges or otherwise limits a person's right against self-incrimination under the U.S. Constitution or the Maryland Declaration of Rights.

Registration data provided for registration of a firearm under the bill's provisions is not open to public inspection.

The Secretary of State Police may adopt regulations to carry out these provisions.

"Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

SB 387/ Page 3

*Federal Firearms Licensed Dealers*

The Secretary of State Police must suspend a dealer's license if the licensee is charged with a crime under the bill's provisions relating to untraceable firearms. The Secretary must revoke a dealer's license if the licensee is convicted of a crime under the same provisions.

**Current Law:** Generally, State law prohibits a person from manufacturing for distribution or sale a handgun that is not included on the handgun roster in the State. However, law enforcement may not be aware of firearms manufactured within a person's home for personal use until the firearm is used or transferred. The federal Undetectable Firearms Act prohibits a person from manufacturing, importing, selling, shipping, delivering, possessing, transferring, or receiving any firearm that is not as detectable by a walk-through metal detection as a security exemplar containing 3.7 ounces of steel, or any firearm with major components that do not generate an accurate image before standard airport imaging technology. The federal prohibition was first enacted in 1988 and was renewed for 10 years in December 2013.

**Background:** According to the U.S. Department of Justice, between 2016 and 2020, more than 23,000 ghost guns were recovered by law enforcement from potential crime scenes, including 325 in connection with homicides and attempted homicides. In November 2020, the *Baltimore Sun* reported that between 2016 and 2019, more than 12,000 build kits were shipped to Maryland, with total sales of the kits exceeding $1.0 million. The *Baltimore Sun* further reported that the Baltimore City Police Department recovered 126 privately made firearms in 2020 compared to 29 recovered in 2019, and that nearly one-quarter of such firearms recovered were from individuals under the age of 21.

Eight states (California, Connecticut, Hawaii, Nevada, New Jersey, New York, Rhode Island, and Washington) and the District of Columbia have enacted laws regulating privately made firearms to varying degrees. California and Connecticut have enacted laws that require privately made firearms to be registered and marked with a serial number obtained from a governmental agency within each state. Nevada and New Jersey require serialization of unfinished frames and receivers by federally licensed firearms manufacturers and importers. The District of Columbia passed legislation in 2020 to ban build kits and specifically the possession of unfinished frames and receivers and untraceable firearms.

Some cities and local jurisdictions have also started to implement laws to address privately made firearms. In August 2021, San Diego became the first city in California to prohibit the sale of unserialized frames and receivers, and San Francisco passed similar legislation shortly thereafter. In Maryland, Montgomery County passed legislation in April 2021 to restrict the access of privately made firearms to minors and in places of public assembly within the county.

SB 387/ Page 4

**State Expenditures:** The bill requires the Governor to include in the annual State budget an appropriation of at least $150,000 to fund registration activities conducted by the Secretary of State Police under the bill. Accordingly, general fund expenditures increase by at least $150,000 annually beginning in fiscal 2024 due to the mandated appropriation. Because the Department of State Police (DSP) is expected to incur costs in fiscal 2023 (as discussed below), this estimate assumes that $150,000 in general funds is also provided in fiscal 2023; however, funding in that year is discretionary.

DSP operates a licensing portal to handle registration requirements relating to firearms. In order to track the new registration requirements under the bill, DSP needs to revise the licensing portal at a cost of $150,000 in fiscal 2023 only. As noted above, although funding is discretionary in fiscal 2023, this analysis assumes that funding is provided in that year so that DSP can upgrade the licensing portal. This analysis further assumes that the mandated funding in subsequent years is used for other DSP registration-related functions resulting from the bill.

---

## Additional Information

**Prior Introductions:**  None.

**Designated Cross File:**  HB 425 (The Speaker)(By Request - Office of the Attorney General) and Delegate Lopez - Judiciary.

**Information Source(s):**  Maryland State Commission on Criminal Sentencing Policy; Judiciary (Administrative Office of the Courts); Office of the Public Defender; Maryland State's Attorneys' Association; Department of Public Safety and Correctional Services; Department of State Police; U.S. Department of Justice; *Baltimore Sun*; Department of Legislative Services

**Fiscal Note History:** First Reader - February 7, 2022
fnu2/lgc     Third Reader - March 21, 2022
                   Revised - Amendment(s) - March 21, 2022

---

Analysis by:  Shirleen M. E. Pilgrim      Direct Inquiries to:
                                          (410) 946-5510
                                          (301) 970-5510

HB 425

# Department of Legislative Services
Maryland General Assembly
2022 Session

## FISCAL AND POLICY NOTE
### Enrolled - Revised

| House Bill 425 | (The Speaker)(By Request - Office of the Attorney General) and Delegate Lopez |
| Judiciary | Judicial Proceedings |

### Public Safety - Untraceable Firearms

This bill, with specified exceptions, (1) requires the Secretary of State Police to maintain a system to register firearms imprinted with serial numbers, as specified, and (2) prohibits a person from purchasing, receiving, selling, offering to sell, or transferring an "unfinished frame or receiver" or a firearm unless imprinted with specified information. The Governor must include at least $150,000 in the annual State budget to fund registration activities conducted by the Secretary under the bill. The bill also (1) requires the Secretary to suspend or revoke a dealer's license under specified conditions relating to untraceable firearms; (2) establishes penalties for violations of specified provisions of the bill; and (3) expands the definition of a "firearm" to include an unfinished frame or receiver. The bill must be construed in a manner that is consistent with a specified proposed federal rule regarding privately made firearms. If the proposed federal rule is modified at the time of adoption, the bill must be construed in a manner that is consistent with those modifications. Provisions of the bill are severable. **The bill takes effect June 1, 2022.**

### Fiscal Summary

**State Effect:** No effect in FY 2022. General fund expenditures increase by at least $150,000 annually beginning in FY 2024 due to the mandated appropriation; although discretionary, this analysis assumes funding is also provided in FY 2023. Potential minimal increase in general fund revenues and expenditures due to the bill's penalty provisions. **This bill establishes a mandated appropriation beginning in FY 2024.**

| (in dollars) | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 |
|---|---|---|---|---|---|
| Revenues | $0 | $0 | $0 | $0 | $0 |
| GF Expenditure | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Net Effect | ($150,000) | ($150,000) | ($150,000) | ($150,000) | ($150,000) |

Note:() = decrease; GF = general funds; FF = federal funds; SF = special funds; - = indeterminate increase; (-) = indeterminate decrease



**Local Effect:**  Potential minimal increase in local revenues and expenditures due to the bill's penalty provisions.

**Small Business Effect:**  Minimal.

# Analysis

**Bill Summary:**

*Untraceable Firearms*

A person is prohibited from purchasing, receiving, selling, offering to sell, or transferring an *unfinished frame or receiver* unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms. Except as otherwise authorized, a person may not sell, offer to sell, or transfer a *firearm* unless it is imprinted with a specified serial number.

A violator of the provisions relating to required imprinting is guilty of a misdemeanor and on conviction is subject to imprisonment for up to five years and/or a fine of up to $10,000. Each violation is a separate crime.

Beginning March 1, 2023, a person may not possess a firearm unless:

- the firearm has been registered with the Secretary of State Police; and
- (1) the firearm is required by federal law to be, and has been, imprinted by a federally licensed firearms manufacturer or federally licensed firearms importer with a serial number in compliance with all federal laws and regulations applicable to the manufacture and import of firearms or (2) the firearm has been imprinted by a federally licensed firearms dealer, federal firearms manufacturer, or other federal licensee authorized to provide marking services with specified information.

The prohibition that begins March 1, 2023, does not apply to:

- possession of a firearm unless a person knew or reasonably should have known that the firearm was not imprinted with a serial number, as specified;
- possession of a firearm that does not comply with the marking requirements by a person who received the firearm through inheritance, and is not otherwise prohibited from possessing the firearm, for up to 30 days after inheriting the firearm; or

- possession of an unfinished frame or receiver by a person that made or manufactured the unfinished frame or receiver, without the use of any prefabricated parts, and who is not otherwise prohibited from possessing the unfinished frame or receiver for up to 30 days after the person made or manufactured the unfinished frame or receiver.

A violator of the prohibition that begins March 1, 2023, is guilty of a misdemeanor and on conviction is subject to imprisonment for up to two years and/or a fine of up to $10,000. Each violation is a separate crime.

A federally licensed firearms dealer or other federal licensee authorized to provide marking services who imprints a firearm under the bill's provisions must imprint the firearm in compliance with all federal laws and regulations applicable to affixing serial numbers to firearms, as specified.

The provisions relating to untraceable firearms do not apply to (1) a firearm that was manufactured before October 22, 1968, or is an antique firearm; (2) a sale, an offer to sell, a transfer, or a delivery of a firearm or an unfinished frame or receiver to, or possession of a firearm or unfinished frame or receiver by, a federally licensed firearms dealer, a federally licensed firearms manufacturer, or a federally licensed firearms importer; or (3) a transfer or surrender of a firearm or an unfinished frame or receiver to a law enforcement agency.

Nothing in the bill may be construed in a manner that abridges or otherwise limits a person's right against self-incrimination under the U.S. Constitution or the Maryland Declaration of Rights.

Registration data provided for registration of a firearm under the bill's provisions is not open to public inspection.

The Secretary of State Police may adopt regulations to carry out these provisions.

"Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Federal Firearms Licensed Dealers*

The Secretary of State Police must suspend a dealer's license if the licensee is charged with a crime under the bill's provisions relating to untraceable firearms. The Secretary must revoke a dealer's license if the licensee is convicted of a crime under the same provisions.

**Current Law:** Generally, State law prohibits a person from manufacturing for distribution or sale a handgun that is not included on the handgun roster in the State. However, law

enforcement may not be aware of firearms manufactured within a person's home for personal use until the firearm is used or transferred. The federal Undetectable Firearms Act prohibits a person from manufacturing, importing, selling, shipping, delivering, possessing, transferring, or receiving any firearm that is not as detectable by a walk-through metal detection as a security exemplar containing 3.7 ounces of steel, or any firearm with major components that do not generate an accurate image before standard airport imaging technology. The federal prohibition was first enacted in 1988 and was renewed for 10 years in December 2013.

**Background:** According to the U.S. Department of Justice, between 2016 and 2020, more than 23,000 ghost guns were recovered by law enforcement from potential crime scenes, including 325 in connection with homicides and attempted homicides. In November 2020, the *Baltimore Sun* reported that between 2016 and 2019, more than 12,000 build kits were shipped to Maryland, with total sales of the kits exceeding $1.0 million. The *Baltimore Sun* further reported that the Baltimore City Police Department recovered 126 privately made firearms in 2020 compared to 29 recovered in 2019, and that nearly one-quarter of such firearms recovered were from individuals under the age of 21.

Eight states (California, Connecticut, Hawaii, Nevada, New Jersey, New York, Rhode Island, and Washington) and the District of Columbia have enacted laws regulating privately made firearms to varying degrees. California and Connecticut have enacted laws that require privately made firearms to be registered and marked with a serial number obtained from a governmental agency within each state. Nevada and New Jersey require serialization of unfinished frames and receivers by federally licensed firearms manufacturers and importers. The District of Columbia passed legislation in 2020 to ban build kits and specifically the possession of unfinished frames and receivers and untraceable firearms.

Some cities and local jurisdictions have also started to implement laws to address privately made firearms. In August 2021, San Diego became the first city in California to prohibit the sale of unserialized frames and receivers, and San Francisco passed similar legislation shortly thereafter. In Maryland, Montgomery County passed legislation in April 2021 to restrict the access of privately made firearms to minors and in places of public assembly within the county.

**State Expenditures:** The bill requires the Governor to include in the annual State budget an appropriation of at least $150,000 to fund registration activities conducted by the Secretary of State Police under the bill. Accordingly, general fund expenditures increase by at least $150,000 annually beginning in fiscal 2024 due to the mandated appropriation. Because the Department of State Police (DSP) is expected to incur costs in fiscal 2023 (as discussed below), this estimate assumes that $150,000 in general funds is also provided in fiscal 2023; however, funding in that year is discretionary.

HB 425/ Page 4

DSP operates a licensing portal to handle registration requirements relating to firearms. In order to track the new registration requirements under the bill, DSP needs to revise the licensing portal at a cost of $150,000 in fiscal 2023 only. As noted above, although funding is discretionary in fiscal 2023, this analysis assumes that funding is provided in that year so that DSP can upgrade the licensing portal. This analysis further assumes that the mandated funding in subsequent years is used for other DSP registration-related functions resulting from the bill.

---

## Additional Information

**Prior Introductions:**  None.

**Designated Cross File:**  SB 387 (The President)(By Request - Office of the Attorney General) and Senator Lee - Judicial Proceedings.

**Information Source(s):**  Maryland State Commission on Criminal Sentencing Policy; Judiciary (Administrative Office of the Courts); Office of the Public Defender; Maryland State's Attorneys' Association; Department of Public Safety and Correctional Services; Department of State Police; U.S. Department of Justice; *Baltimore Sun*; Department of Legislative Services

**Fiscal Note History:**          First Reader - February 7, 2022
fnu2/lgc                                    Third Reader - March 15, 2022
                                                 Enrolled - April 7, 2022
                                                         Revised - Amendment(s) - April 7, 2022

---

Analysis by:  Shirleen M. E. Pilgrim                    Direct Inquiries to:
                                                                              (410) 946-5510
                                                                              (301) 970-5510

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * |
| | * |
| Plaintiffs | * |
| | * |
| v. | *    Case No.: 485899V |
| | * |
| MONTGOMERY COUNTY, MARYLAND | * |
| | * |
| Defendant | * |

**JOINT MOTION TO EXTEND TIME (TO ONE HOUR) FOR ARGUMENT ON
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs, Maryland Shall Issue, Inc., et al., and Defendant Montgomery County, Maryland, by and through their undersigned counsel and pursuant to the Rules of this Court, respectfully request that this Court extend the time allotted for argument on the parties' cross-motions for summary judgment scheduled for May 23, 2022 to one hour, and as grounds therefore, state as follows:

1.      On May 28, 2021, Plaintiffs filed a four-count Complaint in this Court, seeking declaratory relief and an injunction against enforcing County Bill 4-21, which made changes to Chapter 57, Weapons, of the Montgomery County Code. Complaint ¶ 1. The law went into effect on July 16, 2021. *Id.*

2.      The Counts and declarations sought by Plaintiffs are as follows:

• Count I: the Bill is not a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

• Count II: the Bill is preempted by and in conflict with State law;

• Count III: the Bill is an unconstitutional taking under Md. Const. art. III § 40 and Md. Decl. Rights art. 24 (this count also seeks "just compensation" from the County);

• Count IV: the Bill violates due process because it is unconstitutionally vague under Md. Decl. Rights art. 24 and U.S. Const. 14th Amendment (the latter claim

also seeks damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively).

3.      Plaintiffs filed a 52-page Motion for Partial Summary Judgment on June 16, 2021.

4.      On July 12, 2021, the County removed the Complaint to the United States District Court for the District of Maryland. On July 19, the federal court denied Plaintiffs' Motion, without prejudice, because the federal court's case management order precluded filing a motion without first seeking a pre-motion conference with the court. Thereafter, Plaintiffs filed a Motion to Remand the Complaint to state court. The County opposed that Motion.

5.      By Order dated February 7, 2022, the federal court granted, in part, Plaintiffs' Motion to Remand. The federal court remanded Counts I, II, and III to this Court while retaining, but holding in abeyance, Count IV pending resolution of the other claims in this Court.

6.      On February 22, 2022, Defendant Montgomery County, Maryland filed a 48-page Motion to Dismiss or, Alternatively for Summary Judgment, and Opposition to Plaintiffs' Motion for Partial Summary Judgment in this Court.

7.      On March 7, 2022, Plaintiffs filed a 37-page opposition to the County's Motion Dismiss and/or Summary Judgment and more recently filed a Supplemental Memorandum Regarding Enactment of Senate Bill 387 and House Bill 425.

8.      This Court has scheduled oral argument on the parties' cross-motions for May 23, 2022; only 30 minutes are allotted for argument.

9.      Given the complexity of the issues raised in Counts I-III, the normal 30 minutes allotted for oral argument will not be sufficient. Therefore, the parties request that this Court extend the time allotted for argument on the parties' cross-motions scheduled for May 23, 2022, for total argument time not to exceed 1 hour.

10.     This motion is made to avoid any prejudice that would result from imposition of

2

the ordinary oral argument time limitation for dispositive motions.

WHEREFORE, the parties respectfully requests that this Court set the parties' cross-motions for total argument time not to exceed 1 hour on May 23, 2022.

Respectfully submitted,

/s/ Mark W. Pennak
MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
(301) 873-3671
CPF ID No. 1905150005
Attorney for Plaintiffs

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ Patricia Lisehora Kane
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ Edward B. Lattner
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ Sean C. O'Hara
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of April 2022, a copy of the foregoing was electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

motion extend time for argument
21-003732

4

E-FILED; Montgomery Circuit Court
Docket: 4/20/2022 11:56 AM; Submission: 4/20/2022 11:56 AM
Envelope: 4587793

**CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**
50 Maryland Avenue
Rockville, Maryland  20850

**To:**  PATRICIA L  KANE
OFFICE OF COUNTY ATTY MONTGOMERY CO
3RD FL101 MONROE ST
ROCKVILLE MD  20850

Case Number:                                 485899V

**MARYLAND SHALL ISSUE INC ET AL VS MONTGOMERY COUNTY MARYLAND**

Date: 4/20/2022

## NOTICE OF HEARING DATE

This is to notify you that the above entitled case has been set for the events indicated.

| Event Date | Time | Description | Length |
|---|---|---|---|
| 05/23/2022 | 10:00 AM | Hearing - Motion to Dismiss | 10:00 AM - 3:30 PM |

This proceeding is subject to a 30-minute time limit under Maryland Rule 16-201.  If this is the first time this matter has been scheduled, it may be rescheduled by a letter of agreement within 15 days of the date of this notice.  A Motion for Postponement is required for all other requests.

FILED ON: 2-22-2022         DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE
                                            FOR SUMMARY JUDGMENT

FILED ON: 3-7-2022          PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
                                            SUMMARY JUDGMENT AND MOTION TO DISMISS

REMARKS:                       REMOTE HEARING

**Please consult the monitors on the lobby level for your courtroom assignment.**

Handicap parking for the Montgomery County Circuit Court is located along Maryland Avenue near its intersection with Courthouse Square.

**Please direct all inquiries to the Assignment Office.**

Possession and use of cell phones, computers, other electronic devices, and cameras may be limited or prohibited in designated areas of the court facility.  The use of any camera, cell phone, or any electronic device for taking, recording, or transmitting photographs, videos, or other visual images is prohibited in the court facility at all times, unless the court expressly grants permission in a specific instance.

cc:   Mark William Pennak
       Edward B. Lattner
       Sean Charles O'hara

## IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC.**, et al.,

*Plaintiffs,*

vs.                                               **CASE NO.: 485899V**

**MONTGOMERY COUNTY, MARYLAND**,

*Defendant.*

### ORDER

Upon consideration of plaintiffs' motion for an expedited hearing and decision on the pending motions filed by plaintiffs and defendant, and any response thereto, it is this

04/19/2022 day of _____, 2022, by the Circuit Court for Montgomery County hereby,

                                        MOOT.

ORDERED, that plaintiffs' motion to expedite ~~is granted. A hearing on the pending motions will be scheduled at the earliest practicable time and any decision on the pending motions will issue as soon as practicable.~~

04/19/2022 4:00:07 PM

Entered: Clerk, Circuit Court for
Montgomery County, MD
April 20, 2022

Judge, Circuit Court for
Montgomery County, Maryland

Jeannie E. Cho

cc: All Parties of record.

4/19/2022 2:15:29 PM
This is a proper order to be signed

Special Magistrate

- 1 -

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on April 14, 2022, a copy of the foregoing proposed Order was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner        Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara        sean.ohara@montgomerycountymd.gov

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.,* | **Case No.: 485899V** |
| *Plaintiffs,* | |
| vs. | **EXPEDITED HEARING REQUESTED** |
| **MONTGOMERY COUNTY, MARYLAND,** | |
| *Defendant.* | |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM REGARDING
ENACTMENT OF SENATE BILL 387 AND HOUSE BILL 425 INTO LAW
AND
MOTION FOR EXPEDITED HEARING AND DECISION**

**I.      INTRODUCTION**

Pursuant to MD Code, Courts and Judicial Proceedings, § 3-409(e), plaintiffs respectfully renew their request for "a speedy hearing" on plaintiffs' motion for partial summary judgment as well as on the Motion to Dismiss and Alternative Motion for Summary Judgment filed by defendant. Plaintiffs request that the Court "advance it on the calendar" to be heard and decided as soon as possible.

This renewed motion for expedited treatment is necessitated by the enactment by the General Assembly of Senate Bill 387 and House Bill 425, which are identical bills enacted into law on April 9, 2022, after Governor Hogan advised the General Assembly that he would allow these two bills to become law without his signature. SB 387 was thus enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 19. See https://bit.ly/3HsrZBj. HB 425 was enacted under Article II, Section 17(b) of the Maryland Constitution, as Chapter 18. See

- Page 1 -

1    https://bit.ly/3C7rgEE. A copy of HB 425, is attached. As detailed below, SB 387/HB 425 creates

2    specific deadlines for compliance by existing owners of privately made firearms ("PMF") that are

3    regulated by Bill 4-21. Bill 4-21, which defines a PMF to be a scary "ghost gun," Section 57-1(2),

4    regulates such a PMF in a manner that is wildly inconsistent with this newly enacted, State-wide

5    legislation. As detailed below, a prompt decision on the pending motions is needed as soon as

6    possible to allow the full implementation of SB 387/HB 425 in Montgomery County.

7    **II.    BILL 4-21 IS INCONSISTENT WITH SB 387/HB 425**

8          SB 387/HB 425 creates a new subtitle 7 in Title 5 of the Public Safety article of the

9    Maryland Code and regulates the possession of PMFs in ways that are incompatible and in direct

10   conflict with the regulation of PMFs by Bill 4-21. This new legislation thus makes clear that Bill

11   4-21 is not a "local law" within the meaning of Article XI, § 3 of the Maryland Constitution, as

12   alleged in Count I of the Complaint. SB 387/HB 425 impliedly preempts local regulation of PMFs

13   and is also violative of the Express Powers Act, MD Code, Local Government, § 10-206, as alleged

14   in Count II, because Bill 4-21 is "inconsistent" with and otherwise "in conflict with public general

15   law" established by SB 387/HB 425. (Id.).

16         The conflicts between Bill 4-21 and SB 387/HB 425 are many and stark. First, Bill 4-21

17   bans the mere possession of an existing PMFs throughout Montgomery County as of July 16, 2021,

18   the effective date of the Bill. See Section 57-11(a) of the Montgomery County Code, as amended

19   by Bill 4-21. In contrast, SB 387/HB 425 creates two separate regulatory approaches to PMFs.

20   Under the provisions relating to **sales and purchases**, SB 387/HB 425 provides that "a person

21   may not purchase, receive, sell, offer to sell, or transfer an unfinished frame or receiver unless it

22   is required by federal law to be, and has been, imprinted with a serial number by a federally

23   licensed firearms manufacturer or federally licensed firearms importer in compliance with all

- Page 2 -

1   federal laws and regulations applicable to the manufacture and import of firearms." See Section 5-
2   703(a). This provision goes into effect on June 1, 2022. See Section 4 of SB 387/HB 425.

3       SB 387/HB 425 takes a different approach to **possession** of PMFs by existing owners. In
4   contrast to the flat ban on possession enacted by Bill 4-21, SB 387/HB 425 allows existing owners
5   of PMFs to lawfully retain possession if the PMF is serialized by a federal firearms licensee by
6   March 1, 2023, in accordance with federal law. See Section 5-703(b)(2)(i). As explained below,
7   new federal regulations just published by the ATF in final form will require federal licensees to
8   mark PMFs using a specific marking protocol involving the use of the licensee's abbreviated
9   license number. Alternatively, SB 387/HB 425 also provides that existing owners may have their
10  existing PMFs serialized by a federal firearms licensee with a marking system that uses the owner's
11  zip code, initials, and another unique number. See Section 5-703(b)(2)(ii). Under the first
12  alternative, the owner need not register the PMF with State Police, as the federal licensee's ATF
13  number will provide a means of ensuring traceability in much the same manner as firearms are
14  currently traceable. Under the second alternative, such registration is required, thereby ensuring
15  traceability in that manner. See Section 5-703(b)(2)(ii)(2).

16      SB 387/HB 425 also allows a non-licensee to continue to manufacture a firearm for
17  personal use, providing in Section 5-703(b)(1)(iii), that the ban on possession of an unserialized
18  firearm, otherwise imposed by the bills, does not apply to possession of an unfinished frame or
19  receiver by a person who made the unfinished frame or receivers "without the use of any
20  prefabricated parts." See Section 5-703(b)(1)(iii). Such a person has 30 days in which to obtain a
21  serial number from a federal licensee in accordance with the marking protocols set out in Bill
22  387/HB 425. Similarly, SB 387/HB 425 regulates only items that have "reached a stage of
23  manufacture where it may readily be completed, assembled, or converted to be used as the frame

- Page 3 -

1    or receiver of a functional firearm" and thus becomes an "unfinished frame or receiver" as thus

2    defined in the bill in Section 5-701(h). No serialization or registration is required prior to that time.

3    This provision limits the reach of the bills to match the reach of the federal law.

4        SB 387/HB 425 requires the Maryland State Police to create "a system to register firearms"

5    that are imprinted in accordance with the provisions of SB 387/HB 425. See Section 5-704(a). SB

6    387/HB 425 protects such registration information from public disclosure (Section 5-704(b)), and

7    requires the Governor to include in the annual budget an appropriation of at least $150,000 in order

8    "to fund the registration activities" conducted by the State Police (Section 5-704(c)). In contrast,

9    Bill 4-21 criminalizes the possession of all unfinished frames or receivers, regardless of stage of

10   manufacture. See Section 57-1(2) (defining "ghost gun" to include "an unfinished frame or

11   receiver"); Section 57.11(a) (banning the sale, transfer, possession or transport of a "ghost gun").

12   Yet, in stark contrast to SB 387/HB 425, Bill 4-21 makes no attempt to define what constitutes an

13   "unfinished frame or receiver." Bill 4-21 contains no provision that would allow an owner to

14   serialize or register an unfinished frame or receiver or to continue to manufacture firearms for

15   personal use. Bill 4-21 is plainly inconsistent with the elaborate regulatory and registration system

16   created by SB 387/HB 425.

17       SB 387/HB 425 also expressly exempts from its coverage the sale, transfer or delivery, or

18   possession of an unserialized firearm by a federal firearms licensee, such as plaintiff Engage

19   Armament. See Section 5-702(2). Bill 4-21 has no such exemption. Bill 4-21 thus makes it legally

20   impossible for a federal licensee in the County, including Engage Armament, to provide the

21   serialization services expressly allowed and contemplated by SB 387/HB 425. See Section 5-

22   703(b). Similarly, under SB 387/HB 425, an owner of a PMF is free to sell the unserialized firearm

23   to a federal licensee. (Id.). That is legally impossible under Bill 4-21, as the Bill bans both the sale

24

1   and the possession of a "ghost gun," including an "unfinished frame or receiver." See Section 57-

2   11(a).

3          As noted, Bill 4-21 purports to ban "unfinished frames or receivers," but never defines the

4   term, thus creating an extraordinarily vague criminal law. See Plaintiffs Memo. In Support of

5   Motion for Partial Summary Judgment at 44. In contrast, SB 387/HB 425 sets forth a specific

6   definition for this term in Section 5-701(h), and that definition is quite similar to the federal

7   definition of a "firearm" found in 18 U.S.C. § 921(a)(3). SB 387/HB 425 then adds further content

8   to that definition by expressly providing that the provisions of SB 387/HB 425 are to be "construed

9   in a manner that is consistent" with new federal ATF regulations that define "frame or receiver"

10  in greater detail. See Section 3 of SB 387/HB 425. Those federal ATF regulations became final on

11  April 11, 2022. See https://bit.ly/3uzgswM. These new federal regulations also impose very

12  specific requirements on federal firearms licensees (including gunsmiths) to serialize PMFs that

13  may come into their possession. See, e.g., 27 C.F.R. § 478.92 and § 479.102, as amended by the

14  new rule. Thus, SB 387/HB 425 was designed to work in conjunction with these provisions of

15  federal law. The bans imposed by Bill 4-21 are utterly untethered to federal law.

16         Other differences are also apparent. For example, Bill 4-21 purports to ban the sale, transfer,

17  possession, and transport of "major components" of firearms. See Section 57-11(a). SB 387/HB

18  425 does not purport to regulate "major components" (other than a frame or receiver) at all. Under

19  Bill 4-21, the ban on components would prevent a law-abiding resident of the County from

20  building a firearm for personal use by using a fully **serialized** frame or receiver, which are

21  available from federal firearms licensees throughout the United States. Under federal and State

22  law, such a use of a serialized receiver means that the firearm is not a "ghost gun" and is thus

23  perfectly legal under SB 387/HB 425 and federal law. Yet, the manufacture of the same serialized

- Page 5 -

1    firearm would be impossible under Bill 4-21 because of Bill 4-21's bans on "components." See

2    Plaintiff's Memo. In Opposition at 25. Bill 4-21 would likewise ban a federally licensed firearms

3    manufacturer, such as plaintiff Engage Armament, from using components to build an otherwise

4    perfectly lawful firearm that the licensee is fully entitled to manufacture under federal and State

5    law. (Id.). By intentionally not regulating "components," SB 387/HB 425 avoids these absurd

6    results.

7          Bill 4-21 imposes criminal sanctions for mere possession of a "ghost gun" without regard

8    to the intent or knowledge of the possessor and thus creates strict criminal liability for mere

9    possession. Such strict liability imposed by vague legislation is highly questionable under the Due

10   Process Clause of the Fourteenth Amendment. See, e.g., *Lawrence v. State*, 475 Md. 384, 420-21,

11   257 A.3d 588 (2021) (taking pains to expressly "signal" the General Assembly that the ban on

12   carrying a handgun "about" the person found in MD Code Criminal Law, § 4-203(b)(1), is

13   unconstitutionally vague, and that the Court would strike it down on that basis in the next

14   appropriate case). See also Plaintiffs' Memo. In Support of Motion for Partial Summary Judgment

15   at 38 (discussing *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999)).

16         SB 387/HB 425, in contrast, contains an express *mens rea* provision, providing that the ban

17   on possession "does not apply to possession of a firearm unless a person knew or reasonably should

18   have known that the firearm was not imprinted with a serial number as described under this

19   subsection." Section 5-703(b)(1)(i). Similarly, SB 387/HB 425 provides that the ban on possession

20   "does not apply to persons who received the firearm through inheritance," as long as such person

21   gets the firearm serialized by a federal licensee within 30 days of such receipt in accordance with

22   serialization provisions in the bills. See Section 5-703(b)(ii). Bill 4-21 contains no such provision

23   allowing possession by inheritance, much less a provision allowing continued possession through

- Page 6 -

1   serialization. In sum, Bill 4-21 bans the very types of possession expressly permitted by SB

2   387/HB 425, and, by banning possession by a federal licensee, effectively bans serialization

3   services by a federal licensee, as allowed and specified by SB 387/HB 425.

4          For the foregoing reasons, plaintiffs respectfully submit that SB 387/HB 425 has occupied

5   the field of PMF regulation in Maryland and thus has preempted Bill 4-21. See Plaintiffs' Memo.

6   In Support of Motion for Partial Summary Judgment at 19; Plaintiffs' Memo. In Opposition at 17.

7   This legislation by the General Assembly also necessarily embodies a recognition that the

8   regulation of PMFs is a matter of State-wide concern. Bill 4-21 thus "indirectly affects matters of

9   significant interest to the entire state" and is thus not a "local law" within the meaning of the

10  Maryland Constitution. *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). See

11  Plaintiffs' Memo. In Opposition at 21-26. At the very least, Bill 4-21 is "inconsistent" with SB

12  387/HB 425 within the meaning of the Express Powers Act and is thus invalid on that basis as well.

13  (Id. at 6-21).

14         SB 387/HB 425 goes into effect on June 1, 2022. See Section 4. As noted, existing owners

15  have until March 1, 2023, to obtain serialization services from federal licensees. That clock is now

16  ticking. Yet, Bill 4-21 makes it impossible for existing owners to obtain serialization services in

17  Montgomery County, as it bans mere possession by owners and federal firearms licensees alike. It

18  is thus urgent that Bill 4-21 be struck down as soon as possible to allow SB 387/HB 425 to work

19  as intended by the General Assembly. Plaintiffs again respectfully request an expedited hearing

20  and a decision on these pending motions at the earliest practicable date.

21

22

23

24

1

**CONCLUSION**

2    For all the foregoing reasons, this Court should grant expedited hearing and decision on

3  the pending motions. Plaintiffs' motion for partial summary judgment should be granted and

4  defendant's motion to dismiss and for summary judgment should be denied.

5                                              Respectfully submitted,

6                                              */s/ Mark W. Pennak*

7                                              MARK W. PENNAK
                                               Maryland Shall Issue, Inc.
8                                              9613 Harford Rd, Ste C #1015
                                               Baltimore, MD 21234-21502
9                                              mpennak@marylandshallissue.org
                                               Phone: (301) 873-3671
10                                             MD Atty No. 1905150005
                                               *Counsel for Plaintiffs*

11
          Dated: April 14, 2022
12

13

14

15

16

17

18

19

20

21

22

23

24
                                        - Page 8 -

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on April 14, 2022, a copy of the foregoing Plaintiffs' Supplemental Memorandum Regarding Enactment Of Senate Bill 387 And House Bill 425 Into Law and Motion for Expedited Hearing and Decision was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner        Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane      patricia.kane@montgomerycountymd.gov

Sean Charles O Hara         sean.ohara@montgomerycountymd.gov

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

- Page 9 -

# HOUSE BILL 425

(2lr1537)

E4

### *ENROLLED BILL*

*— Judiciary/Judicial Proceedings —*

Introduced by **The Speaker (By Request – Office of the Attorney General) and Delegate Lopez**

Read and Examined by Proofreaders:

_____
Proofreader.

_____
Proofreader.

Sealed with the Great Seal and presented to the Governor, for his approval this

_____ day of _____ at _____ o'clock, _____M.

_____
Speaker.

CHAPTER _____

1   AN ACT concerning

## Public Safety – Untraceable Firearms

3   FOR the purpose of altering a certain definition of "firearm" to include a certain unfinished
4       frame or receiver; prohibiting a person from purchasing, receiving, selling, offering
5       to sell, or transferring an unfinished frame or ~~receiver, or~~ *receiver; prohibiting a*
6       *person from selling, offering to sell, or transferring a certain firearm; prohibiting a*
7       *person from* possessing a firearm on or after a certain date, unless it is required by
8       federal law to be, and has been, imprinted with a certain number in a certain
9       manner; requiring the Secretary of State Police to suspend a certain dealer's license
10      if the dealer is charged with a certain crime; requiring the Secretary to revoke a
11      certain dealer's license if the dealer is convicted of a certain crime; *providing for a*
12      *certain dealer's license if the dealer is convicted of a certain crime; providing for a*
13      *system of registration of a certain firearm with the Secretary; requiring the Governor*
14      *to include a certain appropriation in the annual State budget;* and generally relating
        to firearms.

EXPLANATION: **CAPITALS INDICATE MATTER ADDED TO EXISTING LAW**.
[Brackets] indicate matter deleted from existing law.
Underlining indicates amendments to bill.
~~Strike out~~ indicates matter stricken from the bill by amendment or deleted from the law by amendment.
*Italics indicate opposite chamber/conference committee amendments.*



2                                    HOUSE BILL 425

1   BY repealing and reenacting, without amendments,
2           Article – Public Safety
3           Section 5–101(a)
4           Annotated Code of Maryland
5           (2018 Replacement Volume and 2021 Supplement)

6   BY repealing and reenacting, with amendments,
7           Article – Public Safety
8           Section 5–101(h) and 5–114
9           Annotated Code of Maryland
10          (2018 Replacement Volume and 2021 Supplement)

11  BY adding to
12          Article – Public Safety
13          Section 5–701 through ~~5–705~~ *5–706* to be under the new subtitle "Subtitle 7.
14              Untraceable Firearms"
15          Annotated Code of Maryland
16          (2018 Replacement Volume and 2021 Supplement)

17          SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
18  That the Laws of Maryland read as follows:

19                              **Article – Public Safety**

20  5–101.

21          (a)     In this subtitle the following words have the meanings indicated.

22          (h)     (1)     "Firearm" means:

23                          (i)     a weapon that expels, is designed to expel, or may readily be
24  converted to expel a projectile by the action of an explosive; **[**or**]**

25                          (ii)    the frame or receiver of such a weapon**; OR**

26                          **(III)   AN UNFINISHED FRAME OR RECEIVER, AS DEFINED IN §**
27  **5–701 OF THIS TITLE.**

28                  (2)     "Firearm" includes a starter gun.

29  5–114.

30          (a)     (1)     The Secretary shall suspend a dealer's license if the licensee:

31                          (i)     is under indictment for a crime of violence; **[**or**]**



HOUSE BILL 425                                                    3

1          (ii)    is arrested for a violation of this subtitle that prohibits the
2  purchase or possession of a regulated firearm; **OR**

3          **(III)    IS CHARGED WITH A CRIME UNDER SUBTITLE 7 OF THIS**
4  **TITLE.**

5          (2)    (i)    The Secretary may suspend a dealer's license if the licensee is
6  not in compliance with the record keeping and reporting requirements of § 5–145 of this
7  subtitle.

8          (ii)    The Secretary may lift a suspension under this paragraph after
9  the licensee provides evidence that the record keeping violation has been corrected.

10      (b)    The Secretary shall revoke a dealer's license if:

11          (1)    it is discovered that false information has been supplied or false
12  statements have been made in an application required by this subtitle; or

13          (2)    the licensee:

14          (i)    is convicted of a disqualifying crime;

15          (ii)    is convicted of a violation classified as a common law crime and
16  receives a term of imprisonment of more than 2 years;

17          (iii)    is a fugitive from justice;

18          (iv)    is a habitual drunkard;

19          (v)    is addicted to a controlled dangerous substance or is a habitual
20  user;

21          (vi)    has spent more than 30 consecutive days in a medical institution
22  for treatment of a mental disorder, unless the licensee produces a physician's certificate,
23  issued after the last institutionalization and certifying that the licensee is capable of
24  possessing a regulated firearm without undue danger to the licensee or to another;

25          (vii)    has knowingly or willfully manufactured, offered to sell, or sold
26  a handgun not on the handgun roster in violation of § 5–406 of this title; [or]

27          (viii)    has knowingly or willfully participated in a straw purchase of a
28  regulated firearm; **OR**

29          **(IX)    IS CONVICTED OF A CRIME UNDER SUBTITLE 7 OF THIS**
30  **TITLE.**

4                              HOUSE BILL 425

1        (c)     If the Secretary suspends or revokes a dealer's license, the Secretary shall
2    notify the licensee in writing of the suspension or revocation.

3        (d)     A person whose dealer's license is suspended or revoked may not engage in
4    the business of selling, renting, or transferring regulated firearms, unless the suspension
5    or revocation has been subsequently withdrawn by the Secretary or overruled by a court in
6    accordance with § 5–116 of this subtitle.

7                          SUBTITLE 7. UNTRACEABLE FIREARMS.

8    5–701.

9        (A)     IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS
10   INDICATED.

11       (B)     "ANTIQUE FIREARM" HAS THE MEANING STATED IN § 4–201 OF THE
12   CRIMINAL LAW ARTICLE.

13       (C)     "FEDERALLY LICENSED FIREARMS DEALER" MEANS A PERSON
14   LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
15   EXPLOSIVES TO DEAL IN FIREARMS.

16       (D)     "FEDERALLY LICENSED FIREARMS IMPORTER" MEANS A PERSON
17   LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
18   EXPLOSIVES TO IMPORT FIREARMS.

19       (E)     "FEDERALLY LICENSED FIREARMS MANUFACTURER" MEANS A PERSON
20   LICENSED BY THE FEDERAL BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
21   EXPLOSIVES TO MANUFACTURE FIREARMS.

22       (F)     "FIREARM" HAS THE MEANING STATED IN § 5–101 OF THIS TITLE.

23       (G)     "SECRETARY" MEANS THE SECRETARY OF STATE POLICE OR THE
24   SECRETARY'S DESIGNEE.

25       (H)     "UNFINISHED FRAME OR RECEIVER" MEANS A FORGED, CAST, PRINTED,
26   EXTRUDED, OR MACHINED BODY OR SIMILAR ARTICLE THAT:

27              (1)     HAS REACHED A STAGE IN MANUFACTURE WHERE IT MAY READILY
28   BE COMPLETED, ASSEMBLED, OR CONVERTED TO BE USED AS THE FRAME OR
29   RECEIVER OF A FUNCTIONAL FIREARM; OR

1    ~~(2)~~   ~~IS MARKETED OR SOLD TO THE PUBLIC TO BECOME OR BE USED~~
2    ~~AS THE FRAME OR RECEIVER OF A FUNCTIONAL FIREARM ONCE COMPLETED,~~
3    ~~ASSEMBLED, OR CONVERTED~~.

4    5–702.

5          THIS SUBTITLE DOES NOT APPLY TO:

6          (1)   A FIREARM THAT:

7                (I)    WAS MANUFACTURED BEFORE *OCTOBER 22,* 1968; OR

8                (II)   IS AN ANTIQUE FIREARM;

9          (2)   A SALE, AN OFFER TO SELL, A TRANSFER, OR A DELIVERY OF A
10   FIREARM OR AN UNFINISHED FRAME OR RECEIVER TO, OR POSSESSION OF A
11   FIREARM OR UNFINISHED FRAME OR RECEIVER BY:

12               (I)    A FEDERALLY LICENSED FIREARMS DEALER;

13               (II)   A FEDERALLY LICENSED FIREARMS MANUFACTURER; OR

14               (III)  A FEDERALLY LICENSED FIREARMS IMPORTER; OR

15         (3)   A TRANSFER OR SURRENDER OF A FIREARM OR AN UNFINISHED
16   FRAME OR RECEIVER TO A LAW ENFORCEMENT AGENCY.

17   5–703.

18   (A)   *(1)*   A PERSON MAY NOT PURCHASE, RECEIVE, SELL, OFFER TO SELL,
19   OR TRANSFER AN UNFINISHED FRAME OR RECEIVER UNLESS IT IS REQUIRED BY
20   FEDERAL LAW TO BE, AND HAS BEEN, IMPRINTED WITH A SERIAL NUMBER BY A
21   FEDERALLY LICENSED FIREARMS MANUFACTURER OR FEDERALLY LICENSED
22   FIREARMS IMPORTER IN COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS
23   APPLICABLE TO THE MANUFACTURE AND IMPORT OF FIREARMS.

24         *(2)   EXCEPT AS PROVIDED IN PARAGRAPH (1) OF THIS SUBSECTION, A*
25   *PERSON MAY NOT SELL, OFFER TO SELL, OR TRANSFER A FIREARM UNLESS IT IS*
26   *IMPRINTED WITH A SERIAL NUMBER AS DESCRIBED UNDER SUBSECTION (B) OF THIS*
27   *SECTION.*

28   (B)   *(1)*   *THIS SUBSECTION DOES NOT APPLY TO:*

6                                    HOUSE BILL 425

1                    *(I)      POSSESSION OF A FIREARM UNLESS A PERSON KNEW OR
2     REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM WAS NOT IMPRINTED WITH
3     A SERIAL NUMBER AS DESCRIBED UNDER THIS SUBSECTION;*

4                    *(II)     POSSESSION OF A FIREARM THAT DOES NOT COMPLY WITH
5     THE MARKING REQUIREMENTS DESCRIBED UNDER THIS SUBSECTION BY A PERSON
6     WHO RECEIVED THE FIREARM THROUGH INHERITANCE, AND IS NOT OTHERWISE
7     PROHIBITED FROM POSSESSING THE FIREARM, FOR A PERIOD NOT EXCEEDING 30
8     DAYS AFTER INHERITING THE FIREARM; OR*

9                    *(III)    POSSESSION OF AN UNFINISHED FRAME OR RECEIVER BY A
10    PERSON THAT MADE OR MANUFACTURED THE UNFINISHED FRAME OR RECEIVER,
11    WITHOUT THE USE OF ANY PREFABRICATED PARTS, AND WHO IS NOT OTHERWISE
12    PROHIBITED FROM POSSESSING THE UNFINISHED FRAME OR RECEIVER, FOR A
13    PERIOD NOT EXCEEDING 30 DAYS AFTER THE PERSON MADE OR MANUFACTURED THE
14    UNFINISHED FRAME OR RECEIVER.*

15                   *(2)*     ON OR AFTER ~~JANUARY~~ *MARCH* 1, 2023, A PERSON MAY NOT
16    POSSESS A FIREARM UNLESS:

17                   ~~(1)~~  *(I)*      THE FIREARM IS REQUIRED BY FEDERAL LAW TO BE, AND
18    HAS BEEN, IMPRINTED BY A FEDERALLY LICENSED FIREARMS MANUFACTURER OR
19    FEDERALLY  LICENSED  FIREARMS  IMPORTER  WITH  A  SERIAL  NUMBER  IN
20    COMPLIANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE
21    MANUFACTURE AND IMPORT OF FIREARMS; OR

22                   ~~(2)~~  *(II)*     THE FIREARM*:*

23                            *1.*      HAS BEEN IMPRINTED BY A FEDERALLY LICENSED
24    FIREARMS DEALER, *FEDERAL FIREARMS MANUFACTURER,* OR OTHER FEDERAL
25    LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES, WITH ~~THE FIRST THREE~~
26    ~~AND LAST FIVE DIGITS OF THE LICENSEE'S FEDERAL FIREARMS LICENSE NUMBER,~~
27    ~~FOLLOWED BY A HYPHEN, AND THEN FOLLOWED BY ANOTHER NUMBER~~*:*

28                            *A.*      THE ZIP CODE OF THE CURRENT OWNER OR PERSON
29    THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM;*

30                            *B.*      THE INITIALS OF THE CURRENT OWNER OR PERSON
31    THAT MADE, COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM; AND*

32                            *C.*      A NUMBER THAT DOES NOT MATCH A NUMBER USED BY
33    THE CURRENT OWNER ON ANOTHER FIREARM OR BY THE PERSON WHO MADE,
34    COMPLETED, OR INITIALLY ASSEMBLED THE FIREARM ON ANY OTHER FIREARM THAT
35    THE PERSON HAS MADE, COMPLETED, OR INITIALLY ASSEMBLED; AND*

1          *2.         HAS BEEN REGISTERED WITH THE SECRETARY.*

2      (C)    *(1)      A PERSON WHO VIOLATES SUBSECTION (A) OF THIS SECTION IS*
3  *GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 5*
4  *YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.*

5          *(2)      A PERSON WHO VIOLATES SUBSECTION (B) OF THIS SECTION IS*
6  *GUILTY OF A MISDEMEANOR AND SUBJECT TO IMPRISONMENT NOT EXCEEDING 2*
7  *YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.*

8          *(3)      EACH VIOLATION OF THIS SECTION IS A SEPARATE CRIME.*

9      *(D)*    A FEDERALLY LICENSED FIREARMS DEALER OR OTHER FEDERAL
10  LICENSEE AUTHORIZED TO PROVIDE MARKING SERVICES WHO IMPRINTS A FIREARM
11  UNDER SUBSECTION ~~(B)(2)~~ *(B)(2)(II)* OF THIS SECTION SHALL~~:~~

12          ~~(1)~~    IMPRINT THE FIREARM IN COMPLIANCE WITH ALL FEDERAL LAWS
13  AND REGULATIONS APPLICABLE TO AFFIXING SERIAL NUMBERS TO FIREARMS,
14  INCLUDING:

15              ~~(I)~~ *(1)*    MINIMUM SIZE AND DEPTH REQUIREMENTS; AND

16              ~~(II)~~ *(2)*    REQUIREMENTS THAT THE NUMBERS NOT BE
17  READILY SUSCEPTIBLE TO BEING OBLITERATED, ALTERED, OR REMOVED~~; AND~~.

18          ~~(2)    RETAIN RECORDS FOR ALL FIREARMS IMPRINTED IN~~
19  ~~ACCORDANCE WITH ALL FEDERAL LAWS AND REGULATIONS APPLICABLE TO THE~~
20  ~~SALE OF A FIREARM.~~

21  **5–704.**

22      ~~(A)    A PERSON WHO VIOLATES THIS SUBTITLE IS GUILTY OF A~~
23  ~~MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT~~
24  ~~EXCEEDING 3 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.~~

25      ~~(B)    EACH VIOLATION OF THIS SUBTITLE IS A SEPARATE CRIME.~~

26      *(A)    THE SECRETARY SHALL MAINTAIN A SYSTEM TO REGISTER FIREARMS*
27  *IMPRINTED WITH SERIAL NUMBERS UNDER § 5–703(B)(2)(II) OF THIS SUBTITLE.*

28      *(B)    REGISTRATION DATA PROVIDED FOR REGISTRATION IS NOT OPEN TO*
29  *PUBLIC INSPECTION.*

8                              HOUSE BILL 425

1       *(C)*   *FOR EACH FISCAL YEAR, THE GOVERNOR SHALL INCLUDE IN THE*
2   *ANNUAL STATE BUDGET AN APPROPRIATION OF AT LEAST $150,000 TO FUND*
3   *REGISTRATION ACTIVITIES CONDUCTED BY THE SECRETARY UNDER THIS SECTION.*

4       **5–705.**

5       THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE PROVISIONS
6   OF THIS SUBTITLE.

7       *5–706.*

8       *NOTHING IN THIS SUBTITLE MAY BE CONSTRUED IN A MANNER THAT*
9   *ABRIDGES OR OTHERWISE LIMITS A PERSON'S RIGHT AGAINST SELF–INCRIMINATION*
10  *UNDER THE UNITED STATES CONSTITUTION OR THE MARYLAND DECLARATION OF*
11  *RIGHTS.*

12      SECTION 2. AND BE IT FURTHER ENACTED, That, if any provision of this Act or
13  the application thereof to any person or circumstance is held invalid for any reason in a
14  court of competent jurisdiction, the invalidity does not affect other provisions or any other
15  application of this Act that can be given effect without the invalid provision or application,
16  and for this purpose the provisions of this Act are declared severable.

17      *SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall be construed in*
18  *a manner that is consistent with proposed federal rule 2021R–05, updating parts 447, 478,*
19  *and 479 of the Code of Federal Regulations, published in the Federal Register (Volume 86,*
20  *No. 97) on May 21, 2021. If the proposed federal rule is modified at the time of adoption,*
21  *this Act shall be construed in a manner that is consistent with those modifications.*

22      SECTION 3̶. *4.* AND BE IT FURTHER ENACTED, That this Act shall take effect
23  June 1, 2022.

Approved:

_____

                                                    Governor.

_____

                                    Speaker of the House of Delegates.

_____

                                         President of the Senate.

IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC., et al.,**

*Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND,**

*Defendant.*

**CASE NO.: 485899V**

## PLAINTIFFS' MOTION TO EXCEED PAGE LIMITATION
## ON THEIR OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND
## ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through counsel and pursuant to the Rules of this Court, hereby move for leave to exceed the page limitation applicable to the accompanying Plaintiffs' Opposition To Defendant's Motion For  Summary Judgment And Motion To Dismiss. For the following reasons, this motion should be granted:

1. On May 28, 2021, Plaintiffs filed a four-count Verified Complaint in this Court, seeking declaratory and equitable relief as to County Bill 4-21, which made numerous changes to Chapter 57, Weapons, of the Montgomery County Code. The law went into effect on July 16, 2021. Count I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within the meaning of Article XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted by or is inconsistent with numerous provisions of State law. Count III alleges that Bill 4-21 constitutes an illegal Taking under the Maryland Takings Clause, Article III, §40 of the Maryland Constitution, and a deprivation of property without due process in violation of Article 24 of the Maryland Declaration

1

of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

2.   On June 16, 2021, prior to the entry of any scheduling order, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. The Motion was two pages long, not counting the supporting declarations and attachment, and the supporting memorandum of law was 51 pages long, not counting the certificate of service. Plaintiffs requested an emergency hearing on their motion.

3.   This Court granted plaintiffs' hearing request and scheduled a hearing on plaintiffs' emergency motion for July 15, 2021. However, on July 12, 2021, in lieu of answering or filing a response to plaintiffs' motion, defendant removed the entire case to federal district court pursuant to 28 U.S.C. § 1441. That removal deprived this Court of jurisdiction to hear the case and the July 15, 2021, hearing was accordingly cancelled. Plaintiffs promptly moved in federal district court to sever the State law claims set forth in Counts I, II, III and IV from the sole federal claim stated in Count IV of the Complaint and to remand the State law claims back to this Court.

4.   On February 7, 2022, the federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain jurisdiction over Count IV, which included both a State constitutional claim under Article 24 and a federal due process claim brought under 42 U.S.C. § 1983. Both Count IV claims alleged that Bill 4-21 was unconstitutionally vague. After receiving the remand order, this Court entered a Scheduling Order, dated February 25, 2022.

5.   On February 22, 2022, defendant filed a Motion to Dismiss and Alterative Motion for Summary Judgment, and an Opposition to plaintiffs' motion for summary judgment. That motion was two pages long and the supporting memorandum filed with defendant's motion and opposition was 48 pages long, not counting extensive attachments. Defendant's motion sought dismissal or

summary judgment on all the State law claims that were remanded from federal district court, including Count III on which plaintiff had not previously sought summary judgment. Defendant also filed a motion for leave to exceed the page limitation set forth in the Scheduling Order. Plaintiffs have no objection to defendant's motion to exceed the page limit.

6. As is apparent, the issues presented are complex and important as they involve fundamental questions of preemption and the scope of Montgomery County's power to enact legislation that conflicts or is inconsistent with numerous provisions of State law and is otherwise alleged to in violation of multiple provisions of the Maryland Constitution. These issues fully warrant extended briefing and argument. The accompanying Opposition to defendant's motion to dismiss and for summary judgment is as short as feasible given the length of defendant's 48-page supporting memorandum and motion that addresses all Counts of the Complaint, including Count III, as to which plaintiffs had not previously sought relief in their motion. These pending motions will likely be dispositive of all liability issues, as there are no disputed issues of facts. Such briefing ensures that the Court has the benefit of fully developed arguments.

WHEREFORE, plaintiffs respectfully seeks leave to exceed to the Court's page limitation for their Opposition to defendant's motion.

Respectfully submitted,

/s/ Mark W. Pennak

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
Counsel for Plaintiffs

3

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing Plaintiffs' Motion To Exceed Page Limitation On Opposition To Defendant's Motion To Dismiss And Alternative Motion For Summary Judgment was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner   Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lischora Kane   patricia.kane@montgomerycountymd.gov

Sean Charles O Hara   sean.ohara@montgomerycountymd.gov

Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

4

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

    *Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND,**

    *Defendant.*

**Case No.: 485899V**

**EXPEDITED HEARING REQUESTED**

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS EXPEDITED HEARING REQUESTED

### INTRODUCTION

On May 28, 2021, plaintiffs filed the Complaint in this matter, challenging Montgomery County Bill 4-21. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment and supporting memorandum ("P. Mem."), seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint.

On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. This Court set a hearing date for July 15, 2021, the day before the County ordinance would have become effective. On July 12, 2021, the day defendant's answer or responsive pleading would have been due, defendant removed the entire case to federal district court under 28 U.S.C. § 1441. The July 15, 2021 hearing was cancelled.

- Page 1 -

On February 7, 2022, acting on plaintiffs' motion for a remand, the federal district court remanded Counts I, II and III to this Court. *Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022). A copy of the remand order and the district court's slip opinion are attached as Exhibits A and B, respectively. The district court retained jurisdiction and held in abeyance Count IV of the Complaint, which alleged Bill 4-21 was fatally vague under the Due Process Clause of the Fourteenth Amendment and under Article 24 of the Maryland Declaration of Rights. Count IV is thus no longer before this Court.

On February 22, 2022, defendant filed a motion to dismiss and alternative motion for summary judgment on all counts of the Complaint before this Court, as well as its opposition to plaintiffs' motion for partial summary judgment. Pursuant to Rule 2-311, and Rule 2-501, plaintiffs respectfully submit this memorandum in opposition to the defendant's motion and in further support of plaintiffs' emergency motion for partial summary judgment on Counts I and II of the Complaint. For the reasons set forth in plaintiffs' June 16, 2021 motion and supporting memorandum and in this Opposition, defendant's motion should be denied and plaintiffs' motion for declaratory and equitable relief on Counts I and II should be granted, enjoining defendant, Montgomery County ("County"), from enforcing Bill 4-21. While plaintiffs did not originally seek summary judgment on Count III, the issues presented are purely questions of law and can be decided on the defendant's motion for summary judgment. Plaintiffs, no less than defendant, are entitled to a declaration of the parties' rights on defendant's motion. See P. Mem. at 48.

- Page 2 -

**ARGUMENT**

**I.     AT LEAST ONE PLAINTIFF HAS STANDING ON EACH COUNT**

Defendant argues first that the Complaint should be dismissed because the plaintiffs lack standing. (Def. Mem. at 11). That assertion is not remotely serious. To have standing to seek declaratory relief under MD Code, Courts and Judicial Proceedings, § 3-409(a), a plaintiff need only allege that he or she has suffered "some kind of special damage from such wrong differing in character and kind from that suffered by the general public." *Voters Organized for the Integrity of City Elections v. Baltimore City Elections Bd.*, 451 Md. 377, 396, 152 A.3d 827 (2017). A declaratory judgment is appropriate if even "one plaintiff" has standing. (451 Md. at 398). The County does not dispute that pre-enforcement review is fully available under this test. *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases). The authority on which the County relies is not to the contrary. The County simply ignores the test established by this body of recent case law.

At least one plaintiff has standing to bring each count of this Verified Complaint. All of the individual and corporate plaintiffs (save Carlos Rabanales and Maryland Shall Issue, Inc. ("MSI")) are residents of Montgomery County, and either do business in Montgomery County (plaintiffs Engage Armament and I.C.E. Firearms & Defensive Training, LLC.), or are employees or owners of these two corporate entities. Plaintiff Engage Armament alleges it possesses, sells and acts a dealer for "ghost guns" and components banned by Bill 4-21, and transfers such items to lawful purchasers "in the presence" of minors when accompanied by a parent. (Complaint ¶ 26). Plaintiffs Andrew Raymond, Brandon Ferrell and Deryck Weaver all specifically allege they possess one or more "ghost guns" regulated by Bill 4-21. Complaint ¶¶ 26, 27, 29, 30. Plaintiff I.C.E. Firearms and its owner, Ronald David, likewise allege they possess parts, including

- Page 3 -

1   unfinished receivers banned by Bill 4-21. Such allegations easily distinguish these plaintiffs from

2   the "general public," as these individuals and companies are directly regulated by Bill 4-21. Each

3   of the plaintiffs alleges their locations (homes or businesses) are arguably within the scope of those

4   locations newly regulated by Bill 4-21. The County does not contest any of these allegations and

5   each are supported by sworn declarations.

6        Similarly, the supervisory employees of Engage Armament, Brandon Ferrell and Deryck

7   Weaver, are directly impacted by Bill 4-21's regulation of possession of firearms by such

8   employees, as is their employer, Engage Armament. (Complaint, ¶¶ 29, 30). Plaintiff, Andrew

9   Raymond is directly affected as an owner of Engage Armament (Complaint ¶ 27), and thus has

10  standing to challenge Bill 4-21's regulation of firearms possessed by business owners as does

11  plaintiff Ronald David, the owner of I.C.E. Firearms. (Complaint, ¶33). Andrew Raymond also

12  has standing to challenge Bill 4-21's regulation of possession of "ghost guns" with respect to

13  minors, as he has two minor children who reside with him at his residence in Montgomery County.

14  (Complaint ¶ 27). Plaintiff Deryck Weaver likewise has one minor child residing at his residence

15  in Montgomery County. (Complaint ¶ 30).

16       Plaintiff Carlos Rabanales, a co-owner of Engage Armament, is a resident of Frederick

17  County, and he is individually affected by Bill 4-21's criminalization of his activities at Engage

18  Armament and his ability to travel into Montgomery County with parts and materials from

19  Frederick County to make a living in Montgomery County. (Complaint ¶ 28). The County disputes

20  **none** of these allegations. Each of the foregoing verified allegations is specific, supported by sworn

21  declarations and make clear each of the individual plaintiffs could be sent to prison by Bill 4-21.

22  If these persons do not have standing, then no one does. *Lujan v. Defenders of Wildlife*, 504 U.S.

23

- Page 4 -

1   555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily

2   little question that the action or inaction has caused him injury.").

3        MSI alleges its membership includes persons who likewise own or possess "ghost guns"

4   and components regulated by Bill 4-21 in Montgomery County, that it participated in the

5   regulatory consideration of Bill 4-21 by filing comments and objections, and that the Bill, as

6   enacted, burdens the ability of MSI members to keep and bear arms within Montgomery County,

7   including firearms that are otherwise lawful in Maryland. (Complaint ¶¶ 24, 25). These verified

8   allegations are sufficient to establish MSI's standing. See *Fraternal Order of Police v.*

9   *Montgomery Cty.*, 446 Md. 490, 506-07, 132 A.3d 311 (2016) (holding that a police union had

10  standing to challenge the County's use of public funds to defeat a referendum concerning a statute

11  on collective bargaining because statute affected the scope of bargaining by the union on behalf of

12  its members).

13       But this Court need not address MSI's standing, as at least "one" of the other plaintiffs has

14  standing to seek declaratory relief, and all it takes is "one" plaintiff. *Voters Organized for the*

15  *Integrity of City Elections*, 451 Md. at 398. The rule in the federal courts is the same. For example,

16  in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020), the Fourth Circuit relied on

17  well-established case law to hold that the federal and State licensed firearms dealer plaintiff in that

18  case (Atlantic Guns) had Article III standing to sue on its own behalf **and** had third-party standing

19  to sue on behalf of customers and "other similarly situated persons" in a constitutional challenge

20  to MD Code, Public Safety, § 5-117.1. (971 F.3d at 216). The Fourth Circuit concluded that it was

21  therefore unnecessary to reach the standing of other plaintiffs, including MSI. (971 F.3d at 214 &

22  n.5). Plaintiff Engage Armament is likewise a federal and State licensed firearms dealer

23  (Complaint ¶ 26), and has the same standing here as Atlantic Guns had in *MSI*. See, e.g., *Saint*

1   *Luke Institute, Inc. v. Jones*, 471 Md. 312, 350, 241 A.3d 886 (2020) (relying on federal standing

2   law in holding plaintiff had third party standing). Defendant's motion to dismiss should be denied.

### I.   BILL 4-21 IS CONTRARY TO THE EXPRESS POWERS ACT (COUNT II).

#### A.   Bill 4-21 Exceeds the Scope of Regulatory Power Authorized by the General Assembly in Enacting Section 4-209(b).

6   Under the Express Powers Act, MD Code, Local Government, §10-206, Montgomery

7   County laws must be "not inconsistent with State law," and the County is barred from enacting

8   laws that are "preempted by or in conflict with public general law." The County does not deny it

9   is bound by the Express Powers Act, but asserts that Bill 4-21 is authorized by MD Code, Criminal

10  Law, 4-209(b)(1), and that the County is thus compliant with the Express Powers Act. Section 4-

11  209(b)(1) does not save Bill 4-21.

12  As the federal district court noted in remanding this case, there is no case law or other

13  binding authority on the scope of Section 4-209(b)(1). Slip op. at 8. Indeed, as that court also noted

14  (id.), the only decision to address the scope of authority bestowed by Section 4-209(b) is *Mora v.*

15  *City of Gaithersburg,* 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds*, 519 F.3d

16  216 (4th Cir. 2008). *Mora* held that "the Legislature" has "occup[ied] virtually the entire field of

17  weapons and ammunition regulation," holding further there can be no doubt that "the exceptions

18  [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly

19  construable." (Id.). *Mora* was discussed in plaintiffs' supporting memorandum (at 9, 32) and yet,

20  remarkably, the County ignores *Mora*. This Court should follow *Mora* and strictly construe Section

21  4-209(b)(1).

22  In any event, Bill 4-21 goes far beyond what is authorized by Section 4-209(b). The

23  controlling aspect of the Section 4-209(b)(1) exceptions is that the County's authority to regulate

- Page 6 -

1    is restricted to within **100 yards** of places of "public assembly." Bill 4-21 flouts that restriction

2    and effectively amends Section 4-209(b)(1) by broadly defining "place of public assembly" to

3    include every location, public **or private** "where the public may assemble." County Code, § 57-1.

4    Bill 4-21 then amends existing County law to greatly expand the specific locations that are

5    "included" within this definition. See *Tribbitt v. State,* 403 Md. 638 943 A.2d 1260 (2008) ("when

6    the drafters use the term 'includes,' it is generally intended to be used as 'illustration and not ...

7    limitation'") (citation omitted). See P. Mem. at 40-45.

8         As explained in plaintiffs' opening memorandum (P. Mem. at 10-11), the County is not at

9    liberty to expand the exceptions set out in Section 4-209(b)(1), by broadly defining the meaning

10   of these statutory terms. Even the County admits the list of locations in Bill 4-21 is "somewhat

11   larger" (Def. Mem. at 31) than that set forth in Section 4-209(b)(1). That admission is both a gross

12   understatement and fatal to the Bill, as the County has no authority to enlarge the list set out in

13   Section 4-209(b)(1) **at all**. The County is restricted to what the legislature has authorized. Whether

14   a particular location is a place of public assembly requires a case-by-case determination, not an *a*

15   *priori* redefinition by the County.

16        The County argues (Opp. Mem. at 31-32) that the "plain language" of Section 4-209(b)(1)

17   leaves it free to define a "place of public assembly" to include places where people "may assemble."

18   Yet, nothing in the language of Section 4-209(b)(1) speaks in terms of "may assemble," much less

19   purports to authorize the County to define the term so as to expand the regulatory reach of Section

20   4-209(b)(). Rather, it authorizes regulation within 100 yards of specific places and "other places

21   **of** public assembly," a term which denotes, in the present tense, **public** places that **are** typically

22   used to assemble by the public, not places that "may" be used in the future. Plaintiffs' homes and

23   business are not places where the public normally "assembles."

- Page 7 -

1   The County endorses (Def. Mem. at 30) plaintiffs' reliance (P.Mem. at 14) on the *ejusdem*

2   *generis* canon of construction, but fails to grasp that this canon **restricts** the scope of the term

3   "place of public assembly" to those **public** places that are **similar** to the **public** places listed in

4   Section 4-209(b)(1), *i.e.,* similar to "a park, church, school, public building." (Id.). Again, plaintiffs'

5   private homes and businesses are not such places. It is facially absurd to argue, as the County does

6   (Def. Mem. at 30), that defining a "place of public assembly" to include all places, "whether the

7   place is publicly or privately owned," where people "may assemble" is "co-extensive with "a

8   park, church, school or public building." Rather, the County's redefinition of "place of public

9   assembly," was intended to be and is a dramatic expansion far beyond those locations specified in

10   Section 4-209(b)(1). The County's expanded list of specific locations to include "privately owned"

11   places lefts no doubt on that score.

12   Of course, whether a given location is a "place of public assembly" may not be clear in

13   every case. What should be clear, however, is that the County may not redefine terms enacted by

14   the General Assembly to mean whatever the County would like them to mean and thus broaden

15   the scope of the exception and expand its regulatory power. By limiting the geographic scope of

16   Section 4-209(b) to locations within 100 yards of specified places, the General Assembly

17   obviously intended to **limit** the scope of County authority. While the County derides plaintiffs'

18   suggestion that the term "may assemble" could include virtually every sidewalk and street where

19   two or more persons "may" meet (Def. Mem. at 31), the County never even attempts to proffer a

20   different, more limited definition consistent with the language of Bill 4-21. Plaintiff's

21   interpretation is both facially reasonable (P. Mem. at 40) and consistent with the County's avowed

22   purpose of expanding its regulatory reach.

23   **B.    Bill 4-21 Is Expressly Preempted By Other Maryland Statutes**

- Page 8 -

1          Defendant does not deny Bill 4-21 conflicts with no fewer than five express firearms

2    preemption statutes, one of which was enacted into law as recently as March of 2021 by the

3    Maryland General Assembly. See MD Code, Public Safety, § 5-207(a) (enacted in 2021 and

4    expressly preempting a County from regulating "the transfer of a rifle or shotgun"); MD Code,

5    Public Safety, § 5-133(a) (amended in 2003 and expressly preempting a County from regulating

6    "the possession of a regulated firearm"); MD Code, Public Safety, § 5-134(a) (amended in 2003

7    and expressly preempting a County from regulating "the transfer of a regulated firearm"); MD

8    Code, Public Safety, § 5-104 (amended in 2003 and expressly preempting a County from

9    regulating the "sale of a regulated firearm"); 1972 Session Laws of Maryland, Ch. 13, § 6

10   (expressly preempting "the right of political subdivisions" to regulate "the wearing, carrying, or

11   transporting of handguns"). See P. Mem. at 14 *et seq.*

12          Rather, the County asserts the Court should reconcile these provisions so as to give effect

13   to all of these provisions. (Def. Mem. at 32-33). We agree. See *Maryland-National Capital Park*

14   *& Planning Comm'n v. Anderson*, 395 Md. 172, 183, 909 A.2d 694 (2006). Such reconciliation is

15   easily achieved here. As outlined above and as *Mora* held, the Section 4-209(b)(1) exceptions are

16   to be narrowly construed precisely to avoid conflicts. The 100-yard limitation imposed by Section

17   4-209(b)(1) should be strictly enforced to prohibit the County from extending that limitation

18   through the artifice of defining statutory terms selected by the General Assembly. Under that

19   approach, Bill 4-21 fails, as the Bill impermissibly reaches into any place where people "may

20   assemble," which is literally everywhere in the County, far beyond the 100-yard distance specified

21   in Section 4-209(b)(1). Such reach effectively nullifies all these other preemption provisions in

22   Montgomery County. Manifestly, that result is contrary to any reasonable construction of

23   legislative intent. See *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186 (2005)

1  ("The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the

2  Legislature.").

3      The County also contends Section 4-209(b)(1) trumps all these statutes because four of

4  these five statutes were originally enacted prior to the 1985 enactment of Section 4-209. (Def.

5  Mem. at 34). In particular, the County places heavy reliance on a 1991 Attorney General Opinion

6  that purports to apply the general canon of construction that a later enacted law controls over an

7  earlier enacted law. Yet, the County largely ignores plaintiffs' point (P. Mem. at 18), that all these

8  preemption provisions were repealed and reenacted in 2003 by the General Assembly, **after** the

9  2002 recodification of Section 4-209. See 2003 Maryland Laws Ch. 5. The canon that later enacted

10  statutes control over earlier statutes is based on the notion that such legislative action is an

11  indication of legislative intent. Here, the 2003 legislation expressly **repealed** earlier versions of

12  these preemption provisions and enacted **new** versions with **new** language. (Id.). That legislative

13  action post-dates the 1985 enactment of Section 4-209.

14      In so doing, the General Assembly was obviously fully aware of the provisions of Section

15  4-209, which had been recodified without change a year earlier in 2002. While the Revisor's notes

16  suggest that parts of these 2003 statutes were intended to be enacted without substantive change

17  from earlier versions, that point merely means the preemption provisions were not intended to be

18  substantively limited in their reach by any prior legislation. What controls is that these preemption

19  provisions were repealed and reenacted in 2003 with new language, **after** the 2002 recodification

20  of Section 4-209, and that reality necessarily embodies a legislative intention to give these

21  preemption provisions full effect, notwithstanding the 2002 recodification of Section 4-209.

22      Significantly, each of these newly enacted preemption provisions in 2003 preempt County

23  regulation of "regulated firearms." The term "regulated firearms" did not exist in 1985, when

- Page 10 -

1    Section 4-209 was enacted. Rather, that term was first used in 1996. See 1996 Session Laws, Ch.

2    562. The 2003 repeal and enactment of these preemption provisions shows that the General

3    Assembly adopted a comprehensive approach to preemption of local regulation of "regulated

4    firearms." Again, that 2003 legislation is later than the General Assembly's earlier codification of

5    Section 4-209 in 2002.

6         The weakness of defendant's argument is starkly demonstrated by how defendant attempts,

7    but fails, to deal with the preemption provisions of MD Code, Public Safety, § 5-207(a), a new

8    provision enacted in 2021. Ignoring its now inconvenient argument that the later enactment

9    governs, defendant contends that Section 5-207(a) should not be read to be an "implied repeal" of

10   Section 4-209(b). (Def. Mem. at 35). That contention is makeweight. At the least, Section 5-207

11   superseded Section 4-209 by virtue of being enacted after Section 4-209. More fundamentally, this

12   2021 enactment of Section 5-207(a) shows the General Assembly's renewed commitment to

13   preemption in general, as that preemption provision is plainly modeled after the other preemption

14   provisions, discussed above, which were repealed and reenacted in 2003. That suggests, once again,

15   that state-wide preemption provisions should be given preference and the exception provisions of

16   Section 4-209(b) should be narrowly construed, as *Mora* held.

17        The County also argues (Def. Mem. at 33) in cases of conflict, the more specific statute

18   controls over the more general statute. Again, we agree. See P. Mem. at 14-15. But the County

19   errs in asserting Section 4-209(b) is more specific and thus controlling. Each of the preemption

20   statutes, listed above, addresses a very specific subject matter, and purports to impose an absolute

21   preemption as to that specific subject matter and activity. For example, three of the five provisions

22   address preemption of a particular type of activity (possession or transfer or sale) with respect to

23   a "regulated firearm." The fourth provision preempts local regulation with respect to "the wearing,

- Page 11 -

1   carrying, or transporting of handguns" which are also "regulated firearms" under Section 5-

2   101(r)(1) of the Public Safety Article.

3        The fifth provision, Section 5-207(a), preempts County regulation of the "transfer of a rifle

4   or shotgun," which is also very specific, both as to the subject matter (rifle or shotgun) and the

5   activity (transfer). In contrast, Section 4-209(b)(1) grants limited exceptions from the otherwise

6   broad preemption provisions of Section 4-209(a), which address **all types** of firearms and **all types**

7   of activities, *viz,* "the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession,

8   and transportation" of "a handgun, rifle, or shotgun" and "ammunition" for these types of firearms.

9   By any measure, the specialized preemption provisions are more specific than Section 4-209.

10   **C.    Bill 4-21 Is "Inconsistent" With Other Maryland Statutes.**

11        **1.    Bill 4-21's reach into private homes and businesses.**

12        As explained in plaintiffs' opening brief (P. Mem. at 22, *et seq.*), Bill 4-21 prohibits

13   activities that are expressly permitted by MD Code, Criminal Law, 4-203(b). See Section 4-

14   203(b)(6) (allowing the wear, carry, and transport of handguns "on real estate that the person owns

15   or leases or where the person resides" without a permit and by an owner of a business without a

16   permit "within the confines of a business establishment that the person owns or leases"); Section

17   4-203(b)(7) (allowing wear and carry and transport of a handgun without a permit by authorized

18   supervisory employees of a business "within the confines of" a business). Bill 4-21 bans the

19   possession of a "ghost gun" and the "major components" of all types of firearms on private

20   property, in the home, and it requires a business owner and "one" supervisory employee of the

21   business to obtain a carry permit for possession of "one" firearm at the business. It also reaches

22   and regulations mere possession of all firearms on private property. All of this is inconsistent with

23   State law.

1    Indeed, Section 4-203(b)(6), exempts wear, carry and transport of a handgun on any "real

2    estate that the person owns or leases or where the person resides," while County Code, § 5-11(b)(3)

3    exempts only the possession of a "firearm" or ammunition "in the person's own home," and thus

4    is far narrower than the possession, wear, carry or transport of a *handgun* authorized by Section 4-

5    203(b)(6). Indeed, in limiting the exemption for possession of all "firearms" to the interior of one's

6    "own home," Section 5-11(b) allows Section 5-11(a) to reach possession of a *long gun* anywhere

7    on any private property, including private property owned or leased by the home owner. As noted,

8    Bill 4-21 amends Section 5-11(a) to reach  such private property as it redefines a "place of public

9    assembly" to include places where the public "may assemble," **regardless** of "whether the place

10   is publicly or privately owned." Yet, as explained *infra* (at 18-20), nothing in the comprehensive

11   regulatory scheme for firearms enacted by the General Assembly regulates (much less bans) the

12   otherwise lawful possession of a long gun on any private property, much less on private property

13   a person "owns or leases" or where the person "resides."

14       Similarly, the exemption in County Code, § 5-11(b)(4), not only requires the business

15   owner and the supervisory employee to obtain a carry permit, it limits the business owner to "one"

16   firearm and ammunition for that "one" firearm, and further limits the exemption to "one"

17   supervisory employee. Yet, nothing in Section 4-203(b)(6) limits the owner to "one" firearm, much

18   less ammunition for that "one" firearm. Nothing in Section 4-203(b)(7) limits the owner to "one"

19   authorized supervisory employee. As noted, State law does not regulate the possession of a loaded

20   or unloaded long gun on private property. Yet, Section 5-11(b)(4) would ban "possession" of any

21   "firearm," including a *long gun*, by a business owner or an authorized supervisory employee unless

22   these persons had a State Police-issued permit to wear, carry or transport *a handgun*. The State

23   Police do not issue handgun carry permits for such purposes under MD Code, Public Safety, §5-

- Page 13 -

1    306. Such regulatory provisions are inconsistent with the foregoing provisions of Section 4-203(b)

2    and State law in general, and thus violate the Express Powers Act. See P. Mem. at 8.

3         The County wrongly argues these conflicts do not exist because they are supposedly based

4    on plaintiffs' "overbroad reading" of the Bill's definition of "place of public assembly" as

5    encompassing most if not all of Montgomery County. In essence, the County is contending its

6    definition of "place of public assembly" does not reach into homes and businesses. (Def. Mem. at

7    39). Yet, the ban on "ghost guns" in the home is **expressly** stated in County Code, Section § 57-

8    11(b)(3), and thus necessarily embodies the County's intent to reach into the home. The ban on

9    possession of "ghost guns" in the mere "presence" of a minor likewise easily reaches into the home.

10   County Code, § 57-7(d). The County does not deny that it amended Section 57-11(a) to reach and

11   regulate possession of all firearms (including long guns) on "privately owned" property. These

12   express bans make clear the County fully intended to reach into the sanctity of the home, including

13   all property owned or leased by a person or where a person resides. The same point is equally true

14   for the Bill's **express** regulation of business owners and supervisory employees in County Code,

15   § 57-11(b)(4). The County has not disputed the Verified Complaint's factual allegations that each

16   of the individual plaintiffs' homes (save that of plaintiff Carlos Rabanales) and business locations

17   are "arguably within 100 yards of a place of public assembly" as defined by Bill 4-21. Each of

18   these plaintiffs is thus regulated by Bill 4-21 in a manner inconsistent with State law.

19        Home possession of firearms is also constitutionally protected by *District of Columbia v.*

20   *Heller*, 554 U.S. 570, 635 (2008), which struck down DC's ban on handguns and held that the

21   Second Amendment "*elevates above all other interests* the right of law-abiding, responsible

22   citizens to use arms in defense of hearth and home." (Emphasis added). Plaintiffs thus argued that

23   this Court should interpret Section 4-209(b) narrowly so as to avoid that constitutional issue. See

24

- Page 14 -

1   P. Mem. at 33. Section 4-209(b)(1) is thus best read, consistent with its text and purposes, to govern

2   **public** areas within 100 yards of "a place of public assembly," not private homes and businesses

3   or private land not normally open to "public assembly." Such private homes, businesses and land

4   are not akin to a "park, church, school, public building" specified in Section 4-209(b)(1)(iii). The

5   rule is "[c]ommon sense must guide us in our interpretation of statutes, and 'we seek to avoid

6   constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Marriott*

7   *Employees Federal Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 445, 697 A.2d

8   455 (1997) (quoting *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994). Defendant's response

9   (Def. Mem. at 31) that a "church" is private and thus Section 4-209(b)(1) allows it to reach into all

10  **other** types of private property is utterly untenable under this principle.

11         The County concedes any reach into the home would raise the constitutional issue, but

12  asserts the right does not obtain because plaintiffs could protect themselves with other types of

13  firearms. (Def. Mem. at 38 n.21). That "use other guns" argument was expressly rejected in *Heller*,

14  554 U.S. at 629, with respect to handguns, and has yet to be accepted by the Supreme Court or by

15  **any** lower court with respect to "ghost guns" or "major components of all types of firearm banned

16  by Bill 4-21 in the home.[1] Defendant's argument is also not responsive to plaintiffs' point that

17  Section 4-209 should be interpreted narrowly to **avoid** this serious constitutional issue. Maryland

18

19   _____

20

21        [1] The District of Columbia recently settled a federal lawsuit, *Heller v. District of Columbia*,
     No. 21-02376 (D.D.C., filed Sept. 08, 2021), in which the DC ban on "ghost guns" was challenged
     under the Second Amendment, by enacting new legislation that protected both the right of

22   possession and the Second Amendment right to build firearms for personal use. See Ghost Gun
     Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code

23   § 7-2502.02 (December 13, 2021).

1    law requires no less. See, e.g., *Schochet v. State*, 320 Md. 714, 730, 580 A.2d 176 (1990) ("a statute

2    will be construed so as to avoid a serious constitutional question").

3          Also flawed is the County's contention that Section 4-203(b) is irrelevant because it was

4    enacted in 1972, before the enactment of Section 4-209. First, the Court has a duty to reconcile

5    these statutes, rather hold that one statute or the other is completely ousted. Second, in any event,

6    the General Assembly revisited and revised Section 4-203 with the enactment of the Firearms

7    Safety Act of 2013, 2013 Maryland Laws, Ch. 427, and elected not to change any of the specific

8    provisions on which plaintiffs rely here. The general rule is that "[w]here sections of a statute have

9    been amended but certain provisions have been left unchanged, we must generally assume that the

10   legislature intended to leave the untouched provisions' original meaning intact." *American Case.*

11   *Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994). In cases of conflict, that intent

12   should be controlling over a statute, such as Section 4-209, that was last amended in 2010, in a

13   revision that **further restricted** the County's authority under Section 4-209(b) by adding new

14   subsection (b)(3). See 2010 Session Laws, Ch 712. That 2010 legislation, cited by defendant (Def.

15   Mem. at 35 n.18), thus hardly supports a broad reading of Section 4-209(b)(1).

16          **2.    Bill 4-21's provisions with respect to minors**

17          As set out in plaintiffs' opening brief (P. Mem. at 26, *et seq.*), the Bill's provisions with

18   respect to minors are also inconsistent with MD Code, Public Safety, § 5-133(d)(2)(i), and MD

19   Code, Criminal Law, § 4-104(b)(1). Particularly egregious is the Bill's provision that "a person

20   may not even "purchase, sell, transfer, possess, or transfer a ghost gun . . . *in the presence of a*

21   *minor*." That ban on activities of an adult in the mere "presence" of a minor is not authorized by

22   Section 4-209(b). As the Attorney General's Opinion referenced by the County makes clear, the

23   exception for local regulation of minors was intended to allow a County to regulate minor **access**

- Page 16 -

1    to firearm, not adult activities in the mere "presence" of a minor. See P. Mem. at 28. The County

2    never responds to that point.

3        Indeed, interpreting this minors provision of Section 4-209(b) broadly would raise

4    profound constitutional problems concerning the constitutional rights of parents to raise their

5    children, a right recognized in *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); and

6    *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). The Court of Appeals thus

7    narrowly construes State regulations and statutes to avoid such issues. *Koshko*, 398 Md. at 422-27.

8    The County contends this right is limited to "the custody of children" (Def. Mem. at 41 n.22), but

9    that contention was expressly rejected in *Frase*, 379 Md. at 124, which held parental rights were

10   not limited to "visitation disputes," but applied broadly to "other areas of [State] interference" as

11   well. Plaintiffs relied on these holdings in *Frase* and *Koshko* (P. Mem. at 28), but defendant ignores

12   these decisions completely.

13       **3.  Implied Preemption**

14       As set forth in plaintiffs' opening brief (P. Mem. at 19, *et seq.*), Bill 4-21 is impliedly

15   preempted by a comprehensive scheme of regulation of the sale, possession, transfer and transport

16   by the State law. Specifically, Bill 4-21 "deals with an area in which the General Assembly has

17   acted with such force that an intent to occupy the entire field must be implied." *Howard County v.*

18   *Potomac Electric Power Co.*, 319 Md. 511, 522, 573 A.2d 821 (1990). Here, as stated in *Mora*,

19   "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation."

20   *Mora*, 462 F.Supp.2d at 689.

21       Virtually all the factors that should be considered in making that implied preemption

22   determination are present here. See *Board of County Commissioners v. Perennial Solar, LLC*, 464

23   Md. 610, 619-20, 212 A.3d 868 (2019) (collecting the case law). No municipality or county has

- Page 17 -

1   ever attempted to enact legislation remotely similar to Bill 4-21. As *Mora* indicates, the State also

2   enacted a comprehensive system regulating firearms. The State Police have exclusive control over

3   the availability of carry permits under MD Code, Public Safety, § 5-306, and the State has

4   established a comprehensive system of regulation of State licensed dealers, such as plaintiff

5   Engage Armament.[2] Regulated firearms, which are handguns under MD Code, Public Safety, § 5-

6   101(r)(1), are extensively regulated by State law, which requires a prospective purchaser to

7   complete an "application," MD Code, Public Safety, §§ 5-117, 5-118, and the application be

8   approved by the Maryland State Police, MD Code, Public Safety, § 5-120, which must conduct its

9   own background investigation of the applicant, MD Code, Public Safety, § 5-121. A purchaser

10  must wait at least 7 days, but not more than 90 days, before completing the purchase of a regulated

11  firearm, MD Code, Public Safety, § 5-123, and may only purchase one regulated firearm every 30

12  days, MD Code, Public Safety, § 5-128. No person (with few exceptions) is permitted to purchase

13  or sell a handgun unless the purchaser has a Handgun Qualification License issued by the State

---

17     [2] See MD Code, Public Safety, § 5-106 (requiring a dealer's license issued by the State

18  Police before a person may engage "in the business of selling, renting, or transferring regulated firearms"); MD Code, Public Safety, § 5-107 (specifying the contents of an application for a

19  dealer's license); MD Code, Public Safety, § 5-108 (requiring a background check for a dealer's license); MD Code, Public Safety, § 5-109 (requiring an investigation to determine the truth or

20  falsity of the information supplied and the statements made in an application for a dealer's license); MD Code, Public Safety, § 5-111 (establishing the terms of a dealer's license). Dealers were

21  further extensively regulated in 2013 with the enactment of the Firearms Safety Act of 2013, 2013 Session Laws Ch. 427 (amending MD Code, Public Safety, §§ 5-110, 5-114, 5-115, 5-146).

22  Dealers are also subject to extensive regulation by the Maryland State Police, including regulations controlling what firearms dealers may sell and where dealers may conduct business. See COMAR

23  §§ 29.03.01.42-.57. This is as comprehensive as it gets.

- Page 18 -

1   Police under MD Code, Public Safety, § 5-117.1. Private sales of regulated firearms must go

2   through the same process as dealer sales. MD Code, Public Safety, § 5-124.

3       In contrast, while the State requires that a private sale of a long gun to non-family members

4   be accomplished through a NICS background check as facilitated by a licensed dealer (not the

5   State Police), MD Code, Public Safety, § 5-204.1, the State has otherwise elected to leave the sale

6   of long guns to federal regulation without imposing the complex overlay of State regulation

7   applicable to regulated firearms. Similarly, the State has enacted special rules for the wear, carry

8   and transport of handguns, MD Code, Criminal Law, § 4-203, but not for long guns. Long guns,

9   unlike handguns, may thus be carried and transported outside the home without a carry permit

10  issued by the State Police and may even be possessed and carried fully loaded, except in or on a

11  vehicle. MD Code, Natural Resources, § 10-410(c)(1).

12      Moreover, any otherwise qualified person may purchase as many long guns as he or she

13  likes, without being restricted to one purchase every 30-days, and without any waiting period. A

14  minor may freely possess a long gun under State law, but a person under the age of 21 may not

15  possess a handgun, except under limited circumstances. MD Code, Public Safety, §5-133(d). A

16  new resident of Maryland must register a regulated firearm within 90 days, MD Code, Public

17  Safety, § 5-143, but need not register a long gun. A federally licensed dealer need only become a

18  State licensed dealer to sell regulated firearms, not long guns. See MD Code, Public Safety, § 5-

19  101(e) (defining "dealer's license"). A person who inherits a regulated firearm must complete the

20  entire application process outlined above, MD Code, Public Safety, § 5-102, but no such

21  requirement is imposed for long guns. The State severely punishes knowing non-compliance with

22  laws governing regulated firearms with five years of imprisonment, MD Code, Public Safety, § 5-

23  144, but such punishments are not applicable to long guns.

- Page 19 -

1    By any measure, the General Assembly has "enacted extensive and comprehensive

2    legislation in the field" of firearms regulation. *Potomac Elec. Power Co. v. Montgomery County*,

3    80 Md.App. 107, 110, 560 A.2d 50 (1989). Such a system of comprehensive legislation is "the

4    primary indicia" for determining the question of implied preemption. *Perennial Solar*, 464 Md. at

5    620. As noted, this comprehensive system includes multiple express preemption provisions,

6    including Section 4-209(a), that necessarily embody the legislature's desire to exercise control

7    over this field. This whole system of carefully calibrated regulation is contradicted by Bill 4-21's

8    undifferentiated, County-wide regulation of the sale, transfer, possession or transport of a

9    "handgun, rifle, or shotgun." County Code, 57-11(a). For example, it is apparent that State law

10   sharply distinguishes between "regulated firearms" and long guns. It is equally apparent that Bill

11   4-21 treats all firearms the same. The resulting dual regulatory system virtually ensures "confusion"

12   among ordinary, law-abiding persons who live in or travel through Montgomery County. *Potomac*

13   *Electric*, 80 Md. App. at 110.

14   Defendant does not deny the comprehensive nature of State regulation, but justifies Bill 4-

15   21 by asserting the General Assembly has authorized local regulation in Section 4-209(b). (Def.

16   Mem. at 37). That assertion misses that point. The State has occupied the field and thus preempted

17   regulation of firearm possession, sale, transfer, and transport except in the very narrow areas

18   permitted by Section 4-209(b). As explained above, there can be little doubt that Bill 4-21 reaches

19   far beyond these very limited exceptions to achieve near County-wide, across-the-board regulation

20   of firearms of all types. See P. Mem. at 31. In an Attorney General Opinion not cited by the County,

21   the Attorney General "cautioned" against county regulations like Bill 4-21, stating that Section 4-

22   209(b)'s "authorization for local regulation 'with respect to minors' cannot be a pretext for

23   regulation of adults' access to handguns." 82 Op. Att'y. 84, 86 (1997). As the Attorney General

1  stated, "[t]he Legislature could not have intended to authorize localities to achieve indirectly what

2  they may not achieve directly: across-the-board regulation of firearms." (Id.). Here, Bill 4-21 does

3  precisely that.

4      *State v. Phillips*, 210 Md. App. 239, 63 A.3d 51 (2013), on which defendant also relies

5  (Def. Mem. at 37), is not to the contrary. In *Phillips*, the issue was whether Baltimore City's

6  ordinance requiring gun offenders to register with the Police Commissioner was impliedly

7  preempted. The court cited the preemption provisions of Section 4-209, but noted the complainant

8  in that case "does not contend, nor could he that the Act is expressly preempted by conflict,"

9  because the Act at issue "does not regulate the possession or sale of a firearm." (210 Md.App. at

10  280). Here, of course, Bill 4-21 does "regulate the possession or sale of a firearm." *Phillips*

11  provides no guidance on whether such a county law is preempted.

12  **II.      BILL 4-21 IS NOT A LOCAL LAW (COUNT I)**

13      As detailed in plaintiffs' opening brief (P. Mem. at 31), Bill 4-21 is not a "local law" within

14  the meaning of Article XI, § 3. It should be obvious the regulation of firearms in the manner

15  attempted by Bill 4-21 "deals with the general public welfare, a subject which is of significant

16  interest not just to any one county, but rather to more than one geographical subdivision, or even

17  to the entire state." *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386 (1976). Thus, "some statutes,

18  local in form, have been held to be general laws, since they affect the interest of the whole state."

19  *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). We stress again that Bill 4-21

20  is not limited to "ghost guns," but rather broadly regulates all firearms and "major components"

21  throughout the County. See County Code, § 57-11(a). Such regulations "affect the interest of the

22  whole state."

23

24

1        The result is the same even if Bill 4-21 is viewed as a "ghost gun" ordinance. As noted in

2    plaintiffs' opening brief (P. Mem. at 34), the General Assembly has considered State-wide

3    regulation of "ghost guns" in the last three legislative Sessions. By the end of this legislative

4    Session, the General Assembly will likely have enacted a "ghost gun" law. See Senate Bill 387,

5    https://bit.ly/3HsrZBj, and the cross-filed House Bill 425. https://bit.ly/3C7rgEE. HB 425 has just

6    received a favorable report from House Judiciary Committee and soon will be voted on in the

7    House of Delegates. https://bit.ly/3C7rgEE. The Attorney General and legislative leaders have

8    called for the enactment of this legislation, and action by the General Assembly on these bills is

9    considered quite likely. See https://bit.ly/3psu2z8. These bills seek to incorporate the approach

10   taken by the ATF in its proposed rule that will be issued, in final form, not later than June of 2022.

11   See 87 Fed. Reg. at 5111 (January 31, 2022), an approach not followed by Bill 4-21. These bills

12   also create a pathway for continued possession of homemade firearms by current owners, a

13   provision in direct conflict with the approach followed by Bill 4-21. Contrary to Bill 4-21, these

14   bills do not regulate "component" parts of firearms. These bills embody a recognition that "ghost

15   guns" are a matter of State-wide concern and enactment of these bills will bring Bill 4-21 into

16   direct conflict with State law in violation of the Express Powers Act.

17       Defendant does not address plaintiffs' reliance on the test articulated in *Steimel* and *Cole*.

18   Defendant ignores *Cole* entirely and cites *Steimel* only for a different proposition, *viz.*, that a local

19   law may not be "drawn" to apply to two more geographical subdivisions of the State. (Def. Mem.

20   at 17). As noted, *Steimel* also states a law is a prohibited "general law" if it "*deals with* the . . . a

21   subject which is of significant interest not just to any one county, but rather to more than one

22   geographical subdivision, or even to the entire state." *Steimel*, 278 Md. 5 (emphasis added). *Cole*

23   referenced this test and expressly endorsed *Norris v. Mayor & City Council of Baltimore*, 172 Md.

1  667, 192 A. 531, 538 (1937); *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66 (1891); *Gaither v.*

2  *Jackson*, 147 Md. 655, 128 A. 769 (1925); and *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 (1936).

3  In each of those cases, the Court struck down an ordinance because it was not a "local law." *Cole*

4  explained that the controlling "rationale" of these cases was "that while the immediate objective

5  sought to be achieved was local in character, the statutes *indirectly affected* matters of significant

6  interest to the entire state." *Cole*, 249 Md. at 434-35 (emphasis added). By ignoring this point,

7  defendant effectively concedes that Bill 4-21 "indirectly affect[s] matters of significant interest to

8  the entire state" under *Cole*.

9        Defendant tries to argue that Bill 4-21 does not sweep broadly, but that effort fails. As

10  noted, Bill 4-21expressly bans, in County Code, § 57-11(a), the sale, transfer, possession or

11  transport of **all** firearms within 100 yards of the Bill's vastly expanded "places of public assembly,"

12  subject only to a limited list of exceptions set out in County Code, Section 57-11(b). For example,

13  Section 57-11(b)(6) exempts "an unloaded firearm" from the bans imposed by Section 57-11(a).

14  Yet, even as thus limited, that ban is exceedingly broad, as Section 57-11(a) could be applied to

15  ban hunting with a loaded firearm or mere possession of any loaded firearm anywhere in the

16  County, including on "privately owned" land or even at a firing range of which the County has

17  several. See P. Mem. at 25. Under Bill 4-21, "ghost guns" (or a frame or receiver of a "ghost gun")

18  may not be possessed by an adult in the mere "presence" of a minor or by an adult in the home.

19  The County has no response and thus concedes these points.

20        Such regulation of all firearms in Montgomery County "indirectly affect[s] matters of

21  significant interest to the entire State," *Cole*, 249 Md. at 434-35, because Maryland residents

22  throughout the State, as well as non-residents, may travel through Montgomery County and may

23  purchase, possess or transfer firearms and components in the County under State and federal law.

1   Bill 4-21 certainly directly and adversely affects plaintiff Carlos Rabanales, who lives in Frederick

2   County, but travels to, and works at, Engage Armament in Montgomery County. (Complaint ¶ 28).

3   State-wide protection for such commerce lies at heart of the rationale for the express preemption

4   provisions discussed above. Uniform state-wide treatment of this subject matter ensures that

5   innocent persons are not criminally ensnared by local firearms regulations that could otherwise

6   differ from county to county, city to city, town to town. For example, a person from Garrett County

7   traveling in Montgomery County cannot be expected to be aware of or comply with the manifestly

8   odd provision of Bill 4-21 that regulates all firearms at all publicly or privately owned locations

9   within 100 yards of where the public "may assemble." Again, no other jurisdiction has such a law.

10   If the County may legally enact legislation such as Bill 4-21, then other jurisdictions will likewise

11   feel free to do so with still different requirements. The potential for massive confusion and

12   discriminatory arrests and prosecutions is apparent.

13         Ignoring these considerations, the County focuses on Bill 4-21's **separate** prohibition on

14   "undetectable" guns, arguing "major components" of an undetectable gun "would be easily

15   identified as part of an "undetectable gun" and thus there is no "genuine possibility" a law

16   enforcement officer could "confuse" "ghost gun" components with the components "of an ordinary

17   firearm." (Def. Mem. at 20). Yet, the Bill, in County Code, § 57-11(a), **also** bans "ghost guns" and

18   major components of **all** firearms, not merely those which are "undetectable." A "ghost gun" is

19   defined in County Code, § 57-1, as any firearm (including an "unfinished" receiver) that lacks a

20   serial number. The term "major component" is defined in County Code, § 57-1 to include a "slide

21   or cylinder or the frame or receiver" and "in the case of a rifle or shotgun, the barrel."

22         Nothing in these definitions is limited to undetectable parts. Slides or cylinders are seldom

23   "undetectable" as they are typically made of or contain metal. The "barrel" of a shotgun or rifle is

made entirely of metal. A completely metal "ordinary firearm" may be disassembled into these parts and, once disassembled (or sold separately), those parts are indistinguishable from a "ghost gun" major component. Under County Code, § 57-11(a), any transport, transfer or possession of any of these "components" for any "handgun, rifle or shotgun" could subject a person to arrest and prosecution. A shipment or sale of such a component to or by any person, **including a licensed dealer,** would be banned as well. None of the exceptions to Section 57-11(a) set out in Section 57-11(b) even mentions "components" so the sweep of Section 57-11(a) is completely unhindered as to components. Thus, contrary to the County's assertion (Def. Mem. at 19), mere possession of a "component" is banned in the home no less than anywhere else by County Code, § 57-11(a), as the Section 57-11(b) exemption for the home is limited to "a firearm" and "ammunition" and the "major components" banned by Bill 4-21 (other than a frame or receiver) are simply not "firearms" under State and federal law. See P. Mem. at 5, 45.

These "major components" of an "ordinary firearm" are not serialized, and a slide, barrel, or a cylinder can be used to build a completely legal firearm that is not a "ghost gun." The builder need only use serialized receivers, which are sold at Federal Firearms Licensees in Maryland and throughout the United States. See P. Mem. at 45. Bill 4-21 thus criminalizes a hobbyist whose possession of these components is completely innocent and lawful. See Maryland State Police Advisory LD-FRS-14-003 (May 16, 2014) (available at https://bit.ly/35wbl6M). It also criminalizes the business operations of all Class 07 federally licensed manufacturers in the County, including plaintiff Engage Armament, which are authorized and directed by federal law, 18 U.S.C. § 923(i), to engrave serial numbers on the receivers they manufacture. (Complaint ¶ 26). All such persons and manufacturers possess and use "major components" to legally build firearms. Plainly,

- Page 25 -

1     the County lacks the detailed understanding of firearms, the firearms industry and of federal and

2     State firearms law necessary to regulate intelligently.

3           The County likewise ignores that Bill 4-21 never defines what constitutes an "unfinished

4     frame or receiver," which Bill 4-21 includes in its definition of a "ghost gun" and thus bans

5     everywhere in the County, including in the home and in the "presence" of a minor. The lack of a

6     definition makes this ban both hopelessly vague and unknowably broad as it could include a solid

7     block of aluminum or polymer from which an actual receiver could be milled or crafted. See P.

8     Mem. at 44. Bill 4-21 would even ban Class 07 federally licensed manufacturers, like Engage

9     Armament, from making or possessing "unfinished" receivers during the manufacturing business,

10    as Bill 4-21 makes no exception for licensed dealers. See *Polymer80, Inc. v. Sisolak*, No. 21-CV-

11    00690 (3d Jud. District for Co. of Lyon, December 10, 2021), *appeal dismissed sub nom., Sisolak*

12    *v. Polymer80, Inc.*, 502 P.3d 184 (Nev. 2022) (invalidating Nevada's "ghost gun" law because it

13    failed to define "unfinished" frame or receiver) (opinion attached as Exhibit C). While plaintiffs'

14    vagueness claims in Count IV have been retained by the federal district court, the *scope* of Bill 4-

15    21 is before this Court on the other Counts of the Complaint. These matters are all "of State-wide

16    concern" for the reasons set forth above.

17    **III.   BILL 4-21 IS A *PER SE* TAKING UNDER THE MARYLAND**
               **CONSTITUTION (COUNT III)**

18

19           Count III of the complaint alleges that the County's ban on the mere possession of a "ghost

20    gun" and/or of "major components" is a Taking under the Maryland Takings Clause, Article III, §

21    40 of the Maryland Constitution, and a deprivation of property without due process under the Due

22    Process Clause of Article 24 of the Maryland Declaration of Rights. According to the County, Bill

23    4-21 is an exercise of its "police powers" and therefore not a Taking. See Def. Mem. at 4, 42. That

1   contention is wrong as a matter of law.

2          These provisions of the Maryland Constitution are interpreted in *pari materia* with the Fifth

3   Amendment. The Court of Appeals' decision in *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d

4   1061, 1070-72 (2002), so holds and makes clear that "[n]o matter how 'rational' under particular

5   circumstances, the State is constitutionally precluded from abolishing a vested property right." The

6   County's "rational" reasons for Bill 4-21 are thus irrelevant. If Bill 4-21 abolishes a vested property

7   right, then it is a Taking, *quod erat demonstrandum*. Bill 4-21 does precisely that.

8          In *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 968

9   (2011), the Court of Appeals explained that the "vested right" analysis is controlled by whether

10  the statute in question is retroactive, explaining that "[r]etrospective statutes are those 'acts which

11  operate on transactions which have occurred or rights and obligations which existed before passage

12  of the act.'" (30 A.3d at 969) (citation omitted). Federal law under the Fifth Amendment is in

13  accord. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992) (to escape the

14  Takings Clause, the government must show "that the proscribed use interests were not part of [the

15  owner's] title to begin with"). Here, the County does not dispute that plaintiffs possessed "ghost

16  guns" and components through "transactions" that occurred prior to the enactment of Bill 4-21.

17  The Bill is thus unquestionably "retroactive" under *Muskin* to the extent it operates on this

18  previously acquired property.

19         Likewise, there can be no dispute that the Maryland Takings Clause fully protects personal

20  property, including firearms. A "vested" right is simply a "property right under Maryland property

21  law." *Muskin*, 422 Md. at 560. In *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967

22  (2004), the Court of Appeals held Maryland's Taking Clause and Due Process Clause are violated

23  "[w]henever a property owner is deprived of the beneficial use of his property or restraints are

1    imposed that materially affect the property's value, without legal process or compensation." *Serio*

2    applied that rule to hold that the refusal of a county police department to relinquish a firearm so

3    that a convicted felon could exercise his remaining "ownership" interest violated these provisions

4    of the Maryland Constitution. (863 A.2d at 966, 968). See also *Pitsenberger v. Pitsenberger*, 287

5    Md. 20, 410 A.2d 1052, 1057-1060 & n.5 (1980). The Fifth Amendment's Taking Clause likewise

6    fully protects personal property. See *Horne v. Dep't. of Agric.*, 576 U.S. 350, 358 (2015) ("The

7    Government has a categorical duty to pay just compensation when it takes your car, just as when

8    it takes your home.").

9         In Maryland, "property is a term that has broad and comprehensive significance; it

10    embraces '*everything which has exchangeable value* or goes to make up a man's wealth....'"

11    *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995) (citation omitted) (emphasis added).

12    See *Serio*, 863 A.2d at 965 (relying on *Dodds*). The rule is the same under the Fifth Amendment.

13    *United States v. General Motors*, 323 U.S. 373, 378 (1945) ("[t]he constitutional provision is

14    addressed to every sort of interest the citizen may possess"). It is beyond obvious that "ghost guns"

15    are "property" under *Dodds* and *Serio* and that Bill 4-21 completely deprives the plaintiffs of "the

16    beneficial use" of their property. Bill 4-21 not only bans "possession" of "ghost guns" and

17    components, it bans the sale, transfer and transport as well. County Code, § 57-11(a). These

18    property interests abolished by Bill 4-21 far exceed the "ownership" interest that *Serio* held to be

19    protected.

20         Such regulation "goes too far" and is thus a *per se* Taking. A *per se* Taking is present where

21    the regulation is so complete "that its effect is tantamount to a direct appropriation or ouster."

22    *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). The "ouster" referenced in *Lingle* is the

23    ouster of *possession*. Id., at 539; *Lucas*, 505 U.S. at 1014 (noting that the "practical ouster of

1    possession" is the "functional equivalent of" a "direct appropriation"); *Murr v. Wisconsin*, 137 S.

2    Ct. 1933, 1942 (2017) (same). *Accord Steel v. Cape Corp.*, 111 Md. App. 1, 23-24, 677 A.2d 634

3    (1996) (following *Lucas*); *Offen v. County Council*, 96 Md.App. 526, 552, 625 A.2d 424 (1993),

4    *rev'd in part on other grounds*, 334 Md. 499, 639 A.2d 1070 (1994) (relying on *Lucas*, noting that

5    "'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a

6    physical appropriation'") (quoting *Lucas* 505 U.S. at 1017). Bill 4-21 "ousts" plaintiffs here of

7    their right of possession and destroys every *other* stick in the proverbial bundle of sticks that

8    comprise property. *Compare Andrus v. Allard*, 444 U.S. 51, 65 (1979) (holding there was no

9    Taking of personal property where the law at issue allowed the owners to retain the rights to

10   possess, donate, and devise their property), *with Horne*, 576 U.S. at 364 (finding a Taking of

11   personal property where there was a loss of possession and distinguishing *Andrus* on that basis).

12        Contrary to the County's contention, these principles are not trumped by the County's

13   "police powers." In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982),

14   the Supreme Court specifically noted that the lower court had determined that the alleged Taking

15   there involved a "legitimate public purpose" and thus was "within the State's police power." The

16   Court stated that it had "no reason to question that determination," but nonetheless expressly held

17   that *"[i]t is a separate question . . . whether an otherwise valid regulation so frustrates property*

18   rights that compensation must be paid." (Id). (Emphasis added). *Lucas* made the same point,

19   holding that "the legislature's recitation of a noxious-use justification cannot be the basis for

20   departing from our categorical rule that total regulatory takings must be compensated. *If it were,*

21   *departure would virtually always be allowed." Lucas*, 505 U.S. at 1027. (Emphasis added).

22        If "police powers" were all that mattered, then "just compensation" under the Takings

23   Clause would hardly **ever** be available as the power to conduct **any** Taking for a "public use" is

- Page 29 -

1    "coterminous" with a jurisdiction's "police power." *Hawaii Housing Authority v. Midkiff*, 467 U.S.

2    229, 240 (1984). See also *Kelo v. City of New London,* 545 U.S. 469, 480 (2005) (same). The

3    County's "police power" argument thus proves too much, a point that *Loretto* and *Lucas* recognize.

4    As the Fourth Circuit recently concluded in *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir.

5    2021), "[t]hat Government actions taken pursuant to the police power are not per se exempt from

6    the Takings Clause is axiomatic in the Supreme Court's jurisprudence." Maryland case law is in

7    full accord. See *Muskin*, 422 Md. at 565 ("When a statute enacted under the police power,

8    purporting to regulate private property, takes private property completely from an individual for a

9    public purpose, the doctrine of eminent domain is invoked, and the State must provide just

10   compensation for the taking."); *City of Annapolis v. Waterman*, 357 Md. 484, 509, 745 A.2d 1000

11   (2000) (following *Lucas* and holding "even if there is a valid, connected public purpose, i.e., an

12   essential nexus, there still must be compensation for the taking"); *Steel*, 111 Md.App. at 17 (finding

13   the regulation to be "a reasonable application of the police power" and then moving on to the

14   "second step of the takings analysis" under *Lucas*).

15         The foregoing Takings analysis assumes that Bill 4-21 is an authorized and lawful exercise

16   of the County's police power. If, as argued above, Bill 4-21 is not a "local law" under the Maryland

17   Constitution, or is otherwise contrary to the Express Powers Act, then the deprivation of property

18   rights by Bill 4-21 would not be a "reasonable application of the police power" and would thus

19   fail at the first "step" of the Takings analysis. *Steel*, 111 Md.App. at 17. The owner is still entitled

20   to "just compensation" for such any Taking that arose from such unlawful acts. (Id.). See *Lingle*,

21   544 U.S. at 543 ("if a government action is found to be impermissible . . . that is the end of the

22   inquiry"); *Del-Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362-63 (Fed. Cir.

23   1998) (unlawful government action may still be a Taking).

                                          - Page 30 -

1          The County likewise errs in relying on (Def. Mem. at 46) the Fourth Circuit's split decision

2   in *Maryland Shall Issue v. Hogan,* 963 F.3d 356 (4th Cir. 2020), *cert. denied,* 141 S.Ct. 2595

3   (2021) ("*MSI*"). There, the majority refused to accept the State's argument, likewise presented by

4   the County here, that "police powers" were sufficient. Rather, the majority held that the Takings

5   Clause was not violated where the State law did not require that the property in question be "turned

6   over" to the State or a third party. (963 F.3d at 366). Contrary to the County's belief, nothing in

7   that majority opinion holds that the State's police power obviates a Taking, without more. Indeed,

8   the Fourth Circuit's recent ruling in *Yawn*, noted above, makes clear that is not so. Under *Serio*, a

9   Taking under the Maryland Constitution is presented where the statute deprives the owner of the

10  "beneficial use" of the owner's property right. No change of possession is required.

11         Ignoring *Serio* and *Dodds*, the *MSI* majority also held that the statute there was not a Taking

12  under the Maryland Constitution, because it was not "retroactive" under *Muskin*. According to the

13  court, that was so because the plaintiffs there had "fair notice of the change in the law." (963 F.3d

14  at 367). The *MSI* majority reasoned that Article III, § 40, turned on whether the statute "'would

15  impair rights a party possessed when he acted, increase a party's liability for past conduct, or

16  impose new duties with respect to transactions already completed.'" (Id.), quoting *John Deere*

17  *Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 957 A.2d 595, 599 (2008).

18         That analysis is misguided. First, the *John Deere* decision, cited by the *MSI* majority, is

19  not a Takings case, it was a due process case. More importantly, "retroactivity" as applied to a

20  Takings challenge means the same thing it meant in *Lucas, viz.,* that the statute "operates" on

21  "rights . . . which existed before passage of the act." *Muskin*, 422 Md. at 555. While *Muskin* used

22  due process principles set out in *John Deere* to help define the "unique property interest" adversely

23  affected by the statute there at issue (422 Md. at 559), the Court went on to find a Taking of this

- Page 31 -

1   "unique" interest even though the Court *also* found that plaintiffs there had "fair notice." (422 Md.

2   at 558). That holding contradicts the *MSI* majority's holding that "fair notice" is enough. *Muskin*

3   applied traditional Takings principles to hold that there was a Taking, and that analysis did not

4   include the due process test applied by the *MSI* majority. (422 Md. at 563-68).

5        Under *Muskin*, due process principles may help define a "unique" property interest, but

6   nothing in *Muskin* purported to overrule the *Dodds* definition of "property" applied in *Serio* and

7   at issue here. See *McCree v. State*, 441 Md. 4, 16, 105 A.3d 456 (2014) (applying *Dodds* in a

8   decision that post-dates *Muskin* by three years). Under *Dodds*, there is nothing "unique" about

9   plaintiffs' property rights at issue here. Thus, unlike in *Muskin*, there is no need to resort to due

10  process nuances to define "property." It is enough that plaintiffs legally possessed their personal

11  property before Bill 4-21 was enacted. As the Court of Appeals stated in *Pitsenberger*, "possessory

12  interests in property are within the protection of the Fourteenth Amendment" (287 Md. at 29),

13  noting further that "Article III, § 40 and the Fourteenth Amendment have the same meaning in

14  reference to a 'taking' of property." (287 Md. at 33 n.5), citing *Bureau of Mines v. George's Creek*,

15  272 Md. 143, 156, 321 A.2d 748 (1974) ("The constitutional provision is addressed to every sort

16  of interest the citizen may possess.").

17       For the reasons set out in the dissenting opinion, the *MSI* majority's ruling that there is no

18  Taking unless the State (or third party) assumes possession of the property is also dead wrong

19  under the Takings Clause of the Fifth Amendment. See 963 F.3d at 377 (Richardson, J., dissenting).

20  The majority's analysis is incompatible with the Supreme Court's decision in *General Motors*,

21  where the Court held that "the deprivation of the former owner rather than the accretion of a right

22  or interest to the sovereign constitutes the taking." (323 U.S. at 377). The majority in *MSI* did not

23  even cite, much less discuss, *General Motors*. The majority likewise took no notice of the

- Page 32 -

1   statement in *Lucas* that the effect is to be determined "from the landowner's point of view." (505

2   U.S. at 1017). In short, from the owner's "point of view," a criminal law that bans possession

3   deprives the owner of his or her property regardless of whether there has been an "accretion of the

4   right" of possession to the State. See *MSI*, 963 F.3d at 375-76 (Richardson, J., dissenting). The

5   dissent would have sustained the Maryland Takings claim for the same reasons the dissent would

6   have sustained the Fifth Amendment claim. (963 F.3d at 376 n.12). The dissent was correct.

7        Defendant also relies on *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*,

8   493 F.3d 404 (4th Cir. 2007), as somehow creating a "police power" exception to the Takings

9   Clause. (Def. Mem. at 45). That reliance is misplaced, again for the reasons set forth by the dissent

10  in *MSI*. See 963 F.3d at 377-78 (Richardson, J., dissenting). Any such interpretation of *Holliday*

11  is likewise precluded by the Fourth Circuit's recent and subsequent ruling in *Yawn*, noted above,

12  which dismissed as contrary to Supreme Court jurisprudence the notion that "police power" is a

13  complete defense to a Takings claim. *Yawn*, 1 F.4th at195. This Court should follow the dissent's

14  Takings analysis and the *Yawn* ruling, not the majority's flawed approach.

15       In any event, this Court is not bound by lower federal court decisions and thus must address

16  this question *de novo*. *Pope v. State*, 284 Md. 309, 320 n.10 396 A.2d 1054 (1979) (holding that

17  unlike the decisions of the Supreme Court of the United States, decisions of federal courts of appeal

18  are not binding on Maryland courts); *Henry v. Gateway, Inc.*, 187 Md. App. 647, 666, 979 A.2d

19  287 (2009) (same); *Whalen v. HPRB*, 2020 WL 2501446 at *5 (Md. App. 2020) (same). In so

20  doing, the Court should look to the recent decision by the Federal Circuit in which the court

21  declined to follow the *MSI* majority's approach to property. *McCutchen v. United States*, 14 F.4th

22  1355, 1366 n.6 (Fed. Cir. 2021). While the Federal Circuit also declined to accept the government's

23  reliance on its "police power," it held that the plaintiffs' challenge to a federal rule that banned

1    continued possession of specific personal property failed because plaintiffs did not have a

2    sufficient *pre-existing* property interest that *pre-dated* the regulation in question. *McCutchen*, 14

3    F.4th at 1363-65.

4            That particular result in *McCutchen* is, of course, inapposite, as the plaintiffs here have

5    fully protected, vested property rights under *Dodds* in the property acquired prior to Bill 4-21's

6    enactment, as discussed above. However, the Federal Circuit's analysis of general Takings

7    principles is consistent with the approach taken by the dissent in *MSI* and by *Dua, Muskin, Serio,*

8    *Steel, Waterman* and *Offen*, discussed above. The *McCutchen* court's refusal to accept the

9    government's "police power" argument is likewise persuasive authority on that point as is the

10   Fourth Circuit's recent ruling in *Yawn*, noted above. These decisions and opinions should guide

11   this Court's analysis, not the *MSI* majority's misguided approach. To date, we have found no other

12   appellate court of any jurisdiction that has followed the *MSI* majority's outlier analysis.

13           In sum, this Court should declare that Bill 4-21 is a Taking under Article III, § 40 of the

14   Maryland Constitution, and a deprivation of property without due process in violation of Article

15   24 of the Declaration of Rights. The appropriate relief is an injunction barring enforcement until

16   just compensation is accorded. *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521

17   A.2d 313 (1986). Indeed, such relief is required by the text of Article III, § 40, which provides that

18   "[t]he General Assembly shall enact no Law authorizing private property, to be taken for public

19   use, without just compensation, as agreed upon between the parties, or awarded by a Jury, *being*

20   *first paid or tendered* to the party entitled to such compensation." (Emphasis added). The County

21   has yet to pay or tender payment to plaintiffs.

22           Plaintiffs are entitled to just compensation under Count III for the Takings and deprivation

23   of private property that occurred after Bill 4-21 became effective on July 16, 2021. The controlling

24

- Page 34 -

1    rule is set forth in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,

2    482 U.S. 304, 320 (1987), where the Supreme Court held that the government has a "duty to

3    provide compensation for the period during which the taking was effective." See *Steel*, 111

4    Md.App. at 21 (applying *First English*). The Court should apply MD Rule 2-602, find there is no

5    just reason for delay, order the entry of final judgment granting plaintiffs declaratory and injunctive

6    relief on Counts I, II and III, and thereafter schedule further proceedings for the determination of

7    just compensation under *First English*.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

- Page 35 -

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for partial summary judgment should be granted and defendant's motion to dismiss and for summary judgment should be denied. The Court should issue declaratory and injunctive relief as to Count III in addition to Counts I and II. Plaintiffs respectfully request an expedited hearing and a decision on these motions at the earliest practicable date.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing Plaintiffs' Opposition To Defendant's Motion For Summary Judgment And Motion To Dismiss Expedited Hearing Requested was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara           sean.ohara@montgomerycountymd.gov


Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

- Page 37 -