IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

    *Plaintiffs,*

vs.

**MONTGOMERY COUNTY, MARYLAND,**

    *Defendant.*

**Case No.: 485899V**

**EXPEDITED HEARING REQUESTED**

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS
## EXPEDITED HEARING REQUESTED

### INTRODUCTION

On May 28, 2021, plaintiffs filed the Complaint in this matter, challenging Montgomery County Bill 4-21. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment and supporting memorandum ("P. Mem."), seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint.

On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. This Court set a hearing date for July 15, 2021, the day before the County ordinance would have become effective. On July 12, 2021, the day defendant's answer or responsive pleading would have been due, defendant removed the entire case to federal district court under 28 U.S.C. § 1441. The July 15, 2021 hearing was cancelled.

**EXHIBIT 1 (Part C)**

1    On February 7, 2022, acting on plaintiffs' motion for a remand, the federal district court

2    remanded Counts I, II and III to this Court. *Maryland Shall Issue, Inc. v. Montgomery County*, No.

3    TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022). A copy of the remand order and the district

4    court's slip opinion are attached as Exhibits A and B, respectively. The district court retained

5    jurisdiction and held in abeyance Count IV of the Complaint, which alleged Bill 4-21 was fatally

6    vague under the Due Process Clause of the Fourteenth Amendment and under Article 24 of the

7    Maryland Declaration of Rights. Count IV is thus no longer before this Court.

8    On February 22, 2022, defendant filed a motion to dismiss and alternative motion for

9    summary judgment on all counts of the Complaint before this Court, as well as its opposition to

10   plaintiffs' motion for partial summary judgment. Pursuant to Rule 2-311, and Rule 2-501, plaintiffs

11   respectfully submit this memorandum in opposition to the defendant's motion and in further

12   support of plaintiffs' emergency motion for partial summary judgment on Counts I and II of the

13   Complaint. For the reasons set forth in plaintiffs' June 16, 2021 motion and supporting

14   memorandum and in this Opposition, defendant's motion should be denied and plaintiffs' motion

15   for declaratory and equitable relief on Counts I and II should be granted, enjoining defendant,

16   Montgomery County ("County"), from enforcing Bill 4-21. While plaintiffs did not originally seek

17   summary judgment on Count III, the issues presented are purely questions of law and can be

18   decided on the defendant's motion for summary judgment. Plaintiffs, no less than defendant, are

19   entitled to a declaration of the parties' rights on defendant's motion. See P. Mem. at 48.

20

21

22

23

24

- Page 2 -

1           **ARGUMENT**

2   **I.       AT LEAST ONE PLAINTIFF HAS STANDING ON EACH COUNT**

3           Defendant argues first that the Complaint should be dismissed because the plaintiffs lack

4   standing. (Def. Mem. at 11). That assertion is not remotely serious. To have standing to seek

5   declaratory relief under MD Code, Courts and Judicial Proceedings, § 3-409(a), a plaintiff need

6   only allege that he or she has suffered "some kind of special damage from such wrong differing in

7   character and kind from that suffered by the general public." *Voters Organized for the Integrity of*

8   *City Elections v. Baltimore City Elections Bd.*, 451 Md. 377, 396, 152 A.3d 827 (2017). A

9   declaratory judgment is appropriate if even "one plaintiff" has standing. (451 Md. at 398). The

10  County does not dispute that pre-enforcement review is fully available under this test. *Pizza di*

11  *Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases).

12  The authority on which the County relies is not to the contrary. The County simply ignores the test

13  established by this body of recent case law.

14          At least one plaintiff has standing to bring each count of this Verified Complaint. All of

15  the individual and corporate plaintiffs (save Carlos Rabanales and Maryland Shall Issue, Inc.

16  ("MSI")) are residents of Montgomery County, and either do business in Montgomery County

17  (plaintiffs Engage Armament and I.C.E. Firearms & Defensive Training, LLC.), or are employees

18  or owners of these two corporate entities. Plaintiff Engage Armament alleges it possesses, sells

19  and acts a dealer for "ghost guns" and components banned by Bill 4-21, and transfers such items

20  to lawful purchasers "in the presence" of minors when accompanied by a parent. (Complaint ¶ 26).

21  Plaintiffs Andrew Raymond, Brandon Ferrell and Deryck Weaver all specifically allege they

22  possess one or more "ghost guns" regulated by Bill 4-21. Complaint ¶¶ 26, 27, 29, 30. Plaintiff

23  I.C.E. Firearms and its owner, Ronald David, likewise allege they possess parts, including

                                    - Page 3 -

1   unfinished receivers banned by Bill 4-21. Such allegations easily distinguish these plaintiffs from

2   the "general public," as these individuals and companies are directly regulated by Bill 4-21. Each

3   of the plaintiffs alleges their locations (homes or businesses) are arguably within the scope of those

4   locations newly regulated by Bill 4-21. The County does not contest any of these allegations and

5   each are supported by sworn declarations.

6       Similarly, the supervisory employees of Engage Armament, Brandon Ferrell and Deryck

7   Weaver, are directly impacted by Bill 4-21's regulation of possession of firearms by such

8   employees, as is their employer, Engage Armament. (Complaint, ¶¶ 29, 30). Plaintiff, Andrew

9   Raymond is directly affected as an owner of Engage Armament (Complaint ¶ 27), and thus has

10  standing to challenge Bill 4-21's regulation of firearms possessed by business owners as does

11  plaintiff Ronald David, the owner of I.C.E. Firearms. (Complaint, ¶33). Andrew Raymond also

12  has standing to challenge Bill 4-21's regulation of possession of "ghost guns" with respect to

13  minors, as he has two minor children who reside with him at his residence in Montgomery County.

14  (Complaint ¶ 27). Plaintiff Deryck Weaver likewise has one minor child residing at his residence

15  in Montgomery County. (Complaint ¶ 30).

16      Plaintiff Carlos Rabanales, a co-owner of Engage Armament, is a resident of Frederick

17  County, and he is individually affected by Bill 4-21's criminalization of his activities at Engage

18  Armament and his ability to travel into Montgomery County with parts and materials from

19  Frederick County to make a living in Montgomery County. (Complaint ¶ 28). The County disputes

20  **none** of these allegations. Each of the foregoing verified allegations is specific, supported by sworn

21  declarations and make clear each of the individual plaintiffs could be sent to prison by Bill 4-21.

22  If these persons do not have standing, then no one does. *Lujan v. Defenders of Wildlife*, 504 U.S.

23

- Page 4 -

1   555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily

2   little question that the action or inaction has caused him injury.").

3        MSI alleges its membership includes persons who likewise own or possess "ghost guns"

4   and components regulated by Bill 4-21 in Montgomery County, that it participated in the

5   regulatory consideration of Bill 4-21 by filing comments and objections, and that the Bill, as

6   enacted, burdens the ability of MSI members to keep and bear arms within Montgomery County,

7   including firearms that are otherwise lawful in Maryland. (Complaint ¶¶ 24, 25). These verified

8   allegations are sufficient to establish MSI's standing. See *Fraternal Order of Police v.*

9   *Montgomery Cty.*, 446 Md. 490, 506-07, 132 A.3d 311 (2016) (holding that a police union had

10  standing to challenge the County's use of public funds to defeat a referendum concerning a statute

11  on collective bargaining because statute affected the scope of bargaining by the union on behalf of

12  its members).

13       But this Court need not address MSI's standing, as at least "one" of the other plaintiffs has

14  standing to seek declaratory relief, and all it takes is "one" plaintiff. *Voters Organized for the*

15  *Integrity of City Elections*, 451 Md. at 398. The rule in the federal courts is the same. For example,

16  in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020), the Fourth Circuit relied on

17  well-established case law to hold that the federal and State licensed firearms dealer plaintiff in that

18  case (Atlantic Guns) had Article III standing to sue on its own behalf **and** had third-party standing

19  to sue on behalf of customers and "other similarly situated persons" in a constitutional challenge

20  to MD Code, Public Safety, § 5-117.1, (971 F.3d at 216). The Fourth Circuit concluded that it was

21  therefore unnecessary to reach the standing of other plaintiffs, including MSI. (971 F.3d at 214 &

22  n.5). Plaintiff Engage Armament is likewise a federal and State licensed firearms dealer

23  (Complaint ¶ 26), and has the same standing here as Atlantic Guns had in *MSI*. See, e.g., *Saint*

1    *Luke Institute, Inc. v. Jones*, 471 Md. 312, 350, 241 A.3d 886 (2020) (relying on federal standing

2    law in holding plaintiff had third party standing). Defendant's motion to dismiss should be denied.

3

4    **I.    BILL 4-21 IS CONTRARY TO THE EXPRESS POWERS ACT (COUNT II).**

5         **A.    Bill 4-21 Exceeds the Scope of Regulatory Power Authorized**
         **by the General Assembly in Enacting Section 4-209(b).**

6         Under the Express Powers Act, MD Code, Local Government, §10-206, Montgomery

7    County laws must be "not inconsistent with State law," and the County is barred from enacting

8    laws that are "preempted by or in conflict with public general law." The County does not deny it

9    is bound by the Express Powers Act, but asserts that Bill 4-21 is authorized by MD Code, Criminal

10   Law, 4-209(b)(1), and that the County is thus compliant with the Express Powers Act. Section 4-

11   209(b)(1) does not save Bill 4-21.

12        As the federal district court noted in remanding this case, there is no case law or other

13   binding authority on the scope of Section 4-209(b)(1). Slip op. at 8. Indeed, as that court also noted

14   (id.), the only decision to address the scope of authority bestowed by Section 4-209(b) is *Mora v.*

15   *City of Gaithersburg,* 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds*, 519 F.3d

16   216 (4th Cir. 2008). *Mora* held that "the Legislature" has "occup[ied] virtually the entire field of

17   weapons and ammunition regulation," holding further there can be no doubt that "the exceptions

18   [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly

19   construable." (Id.). *Mora* was discussed in plaintiffs' supporting memorandum (at 9, 32) and yet,

20   remarkably, the County ignores *Mora*. This Court should follow *Mora* and strictly construe Section

21   4-209(b)(1).

22        In any event, Bill 4-21 goes far beyond what is authorized by Section 4-209(b). The

23   controlling aspect of the Section 4-209(b)(1) exceptions is that the County's authority to regulate

1  is restricted to within **100 yards** of places of "public assembly." Bill 4-21 flouts that restriction
2  and effectively amends Section 4-209(b)(1) by broadly defining "place of public assembly" to
3  include every location, public **or private** "where the public may assemble." County Code, § 57-1.
4  Bill 4-21 then amends existing County law to greatly expand the specific locations that are
5  "included" within this definition. See *Tribbitt v. State,* 403 Md. 638 943 A.2d 1260 (2008) ("when
6  the drafters use the term 'includes,' it is generally intended to be used as 'illustration and not ...
7  limitation'") (citation omitted). See P. Mem. at 40-45.

8      As explained in plaintiffs' opening memorandum (P. Mem. at 10-11), the County is not at
9  liberty to expand the exceptions set out in Section 4-209(b)(1), by broadly defining the meaning
10  of these statutory terms. Even the County admits the list of locations in Bill 4-21 is "somewhat
11  larger" (Def. Mem. at 31) than that set forth in Section 4-209(b)(1). That admission is both a gross
12  understatement and fatal to the Bill, as the County has no authority to enlarge the list set out in
13  Section 4-209(b)(1) **at all**. The County is restricted to what the legislature has authorized. Whether
14  a particular location is a place of public assembly requires a case-by-case determination, not an *a*
15  *priori* redefinition by the County.

16      The County argues (Opp. Mem. at 31-32) that the "plain language" of Section 4-209(b)(1)
17  leaves it free to define a "place of public assembly" to include places where people "may assemble."
18  Yet, nothing in the language of Section 4-209(b)(1) speaks in terms of "may assemble," much less
19  purports to authorize the County to define the term so as to expand the regulatory reach of Section
20  4-209(b)(). Rather, it authorizes regulation within 100 yards of specific places and "other places
21  **of** public assembly," a term which denotes, in the present tense, **public** places that **are** typically
22  used to assemble by the public, not places that "may" be used in the future. Plaintiffs' homes and
23  business are not places where the public normally "assembles."

1    The County endorses (Def. Mem. at 30) plaintiffs' reliance (P.Mem. at 14) on the *ejusdem*

2  *generis* canon of construction, but fails to grasp that this canon **restricts** the scope of the term

3  "place of public assembly" to those **public** places that are **similar** to the **public** places listed in

4  Section 4-209(b)(1), *i.e.,* similar to "a park, church, school, public building." (Id.). Again, plaintiffs'

5  private homes and businesses are not such places. It is facially absurd to argue, as the County does

6  (Def. Mem. at 30), that defining a "place of public assembly" to include all places, "whether the

7  place is publicly or privately owned," where people "may assemble" is "co-extensive" with "a

8  park, church, school or public building." Rather, the County's redefinition of "place of public

9  assembly," was intended to be and is a dramatic expansion far beyond those locations specified in

10  Section 4-209(b)(1). The County's expanded list of specific locations to include "privately owned"

11  places lefts no doubt on that score.

12    Of course, whether a given location is a "place of public assembly" may not be clear in

13  every case. What should be clear, however, is that the County may not redefine terms enacted by

14  the General Assembly to mean whatever the County would like them to mean and thus broaden

15  the scope of the exception and expand its regulatory power. By limiting the geographic scope of

16  Section 4-209(b) to locations within 100 yards of specified places, the General Assembly

17  obviously intended to **limit** the scope of County authority. While the County derides plaintiffs'

18  suggestion that the term "may assemble" could include virtually every sidewalk and street where

19  two or more persons "may" meet (Def. Mem. at 31), the County never even attempts to proffer a

20  different, more limited definition consistent with the language of Bill 4-21. Plaintiff's

21  interpretation is both facially reasonable (P. Mem. at 40) and consistent with the County's avowed

22  purpose of expanding its regulatory reach.

23    **B.    Bill 4-21 Is Expressly Preempted By Other Maryland Statutes**

- Page 8 -

1    Defendant does not deny Bill 4-21 conflicts with no fewer than five express firearms

2 preemption statutes, one of which was enacted into law as recently as March of 2021 by the

3 Maryland General Assembly. See MD Code, Public Safety, § 5-207(a) (enacted in 2021 and

4 expressly preempting a County from regulating "the transfer of a rifle or shotgun"); MD Code,

5 Public Safety, § 5-133(a) (amended in 2003 and expressly preempting a County from regulating

6 "the possession of a regulated firearm"); MD Code, Public Safety, § 5-134(a) (amended in 2003

7 and expressly preempting a County from regulating "the transfer of a regulated firearm"); MD

8 Code, Public Safety, § 5-104 (amended in 2003 and expressly preempting a County from

9 regulating the "sale of a regulated firearm"); 1972 Session Laws of Maryland, Ch. 13, § 6

10 (expressly preempting "the right of political subdivisions" to regulate "the wearing, carrying, or

11 transporting of handguns"). See P. Mem. at 14 *et seq.*

12    Rather, the County asserts the Court should reconcile these provisions so as to give effect

13 to all of these provisions. (Def. Mem. at 32-33). We agree. See *Maryland-National Capital Park*

14 *& Planning Comm'n v. Anderson*, 395 Md. 172, 183, 909 A.2d 694 (2006). Such reconciliation is

15 easily achieved here. As outlined above and as *Mora* held, the Section 4-209(b)(1) exceptions are

16 to be narrowly construed precisely to avoid conflicts. The 100-yard limitation imposed by Section

17 4-209(b)(1) should be strictly enforced to prohibit the County from extending that limitation

18 through the artifice of defining statutory terms selected by the General Assembly. Under that

19 approach, Bill 4-21 fails, as the Bill impermissibly reaches into any place where people "may

20 assemble," which is literally everywhere in the County, far beyond the 100-yard distance specified

21 in Section 4-209(b)(1). Such reach effectively nullifies all these other preemption provisions in

22 Montgomery County. Manifestly, that result is contrary to any reasonable construction of

23 legislative intent. See *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186 (2005)

- Page 9 -

1   ("The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the

2   Legislature.").

3        The County also contends Section 4-209(b)(1) trumps all these statutes because four of

4   these five statutes were originally enacted prior to the 1985 enactment of Section 4-209. (Def.

5   Mem. at 34). In particular, the County places heavy reliance on a 1991 Attorney General Opinion

6   that purports to apply the general canon of construction that a later enacted law controls over an

7   earlier enacted law. Yet, the County largely ignores plaintiffs' point (P. Mem. at 18), that all these

8   preemption provisions were repealed and reenacted in 2003 by the General Assembly, **after** the

9   2002 recodification of Section 4-209. See 2003 Maryland Laws Ch. 5. The canon that later enacted

10   statutes control over earlier statutes is based on the notion that such legislative action is an

11   indication of legislative intent. Here, the 2003 legislation expressly **repealed** earlier versions of

12   these preemption provisions and enacted **new** versions with **new** language. (Id.). That legislative

13   action post-dates the 1985 enactment of Section 4-209.

14        In so doing, the General Assembly was obviously fully aware of the provisions of Section

15   4-209, which had been recodified without change a year earlier in 2002. While the Revisor's notes

16   suggest that parts of these 2003 statutes were intended to be enacted without substantive change

17   from earlier versions, that point merely means the preemption provisions were not intended to be

18   substantively limited in their reach by any prior legislation. What controls is that these preemption

19   provisions were repealed and reenacted in 2003 with new language, **after** the 2002 recodification

20   of Section 4-209, and that reality necessarily embodies a legislative intention to give these

21   preemption provisions full effect, notwithstanding the 2002 recodification of Section 4-209.

22        Significantly, each of these newly enacted preemption provisions in 2003 preempt County

23   regulation of "regulated firearms." The term "regulated firearms" did not exist in 1985, when

- Page 10 -

1    Section 4-209 was enacted. Rather, that term was first used in 1996. See 1996 Session Laws, Ch.

2    562. The 2003 repeal and enactment of these preemption provisions shows that the General

3    Assembly adopted a comprehensive approach to preemption of local regulation of "regulated

4    firearms." Again, that 2003 legislation is later than the General Assembly's earlier codification of

5    Section 4-209 in 2002.

6         The weakness of defendant's argument is starkly demonstrated by how defendant attempts,

7    but fails, to deal with the preemption provisions of MD Code, Public Safety, § 5-207(a), a new

8    provision enacted in 2021. Ignoring its now inconvenient argument that the later enactment

9    governs, defendant contends that Section 5-207(a) should not be read to be an "implied repeal" of

10   Section 4-209(b). (Def. Mem. at 35). That contention is makeweight. At the least, Section 5-207

11   superseded Section 4-209 by virtue of being enacted after Section 4-209. More fundamentally, this

12   2021 enactment of Section 5-207(a) shows the General Assembly's renewed commitment to

13   preemption in general, as that preemption provision is plainly modeled after the other preemption

14   provisions, discussed above, which were repealed and reenacted in 2003. That suggests, once again,

15   that state-wide preemption provisions should be given preference and the exception provisions of

16   Section 4-209(b) should be narrowly construed, as *Mora* held.

17        The County also argues (Def. Mem. at 33) in cases of conflict, the more specific statute

18   controls over the more general statute. Again, we agree. See P. Mem. at 14-15. But the County

19   errs in asserting Section 4-209(b) is more specific and thus controlling. Each of the preemption

20   statutes, listed above, addresses a very specific subject matter, and purports to impose an absolute

21   preemption as to that specific subject matter and activity. For example, three of the five provisions

22   address preemption of a particular type of activity (possession or transfer or sale) with respect to

23   a "regulated firearm." The fourth provision preempts local regulation with respect to "the wearing,

- Page 11 -

1    carrying, or transporting of handguns" which are also "regulated firearms" under Section 5-
2    101(r)(1) of the Public Safety Article.

3          The fifth provision, Section 5-207(a), preempts County regulation of the "transfer of a rifle
4    or shotgun," which is also very specific, both as to the subject matter (rifle or shotgun) and the
5    activity (transfer). In contrast, Section 4-209(b)(1) grants limited exceptions from the otherwise
6    broad preemption provisions of Section 4-209(a), which address **all types** of firearms and **all types**
7    of activities, *viz,* "the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession,
8    and transportation" of "a handgun, rifle, or shotgun" and "ammunition" for these types of firearms.
9    By any measure, the specialized preemption provisions are more specific than Section 4-209.

10         **C.**     **Bill 4-21 Is "Inconsistent" With Other Maryland Statutes.**

11              **1.**     **Bill 4-21's reach into private homes and businesses.**

12         As explained in plaintiffs' opening brief (P. Mem. at 22, *et seq*.), Bill 4-21 prohibits
13   activities that are expressly permitted by MD Code, Criminal Law, 4-203(b). See Section 4-
14   203(b)(6) (allowing the wear, carry, and transport of handguns "on real estate that the person owns
15   or leases or where the person resides" without a permit and by an owner of a business without a
16   permit "within the confines of a business establishment that the person owns or leases"); Section
17   4-203(b)(7) (allowing wear and carry and transport of a handgun without a permit by authorized
18   supervisory employees of a business "within the confines of" a business). Bill 4-21 bans the
19   possession of a "ghost gun" and the "major components" of all types of firearms on private
20   property, in the home, and it requires a business owner and "one" supervisory employee of the
21   business to obtain a carry permit for possession of "one" firearm at the business. It also reaches
22   and regulations mere possession of all firearms on private property. All of this is inconsistent with
23   State law.

1       Indeed, Section 4-203(b)(6), exempts wear, carry and transport of a handgun on any "real

2   estate that the person owns or leases or where the person resides," while County Code, § 5-11(b)(3)

3   exempts only the possession of a "firearm" or ammunition "in the person's own home," and thus

4   is far narrower than the possession, wear, carry or transport of a *handgun* authorized by Section 4-

5   203(b)(6). Indeed, in limiting the exemption for possession of all "firearms" to the interior of one's

6   "own home," Section 5-11(b) allows Section 5-11(a) to reach possession of a *long gun* anywhere

7   on any private property, including private property owned or leased by the home owner. As noted,

8   Bill 4-21 amends Section 5-11(a) to reach  such private property as it redefines a "place of public

9   assembly" to include places where the public "may assemble," **regardless** of "whether the place

10  is publicly or privately owned." Yet, as explained *infra* (at 18-20), nothing in the comprehensive

11  regulatory scheme for firearms enacted by the General Assembly regulates (much less bans) the

12  otherwise lawful possession of a long gun on any private property, much less on private property

13  a person "owns or leases" or where the person "resides."

14      Similarly, the exemption in County Code, § 5-11(b)(4), not only requires the business

15  owner and the supervisory employee to obtain a carry permit, it limits the business owner to "one"

16  firearm and ammunition for that "one" firearm, and further limits the exemption to "one"

17  supervisory employee. Yet, nothing in Section 4-203(b)(6) limits the owner to "one" firearm, much

18  less ammunition for that "one" firearm. Nothing in Section 4-203(b)(7) limits the owner to "one"

19  authorized supervisory employee. As noted, State law does not regulate the possession of a loaded

20  or unloaded long gun on private property. Yet, Section 5-11(b)(4) would ban "possession" of any

21  "firearm," including a *long gun*, by a business owner or an authorized supervisory employee unless

22  these persons had a State Police-issued permit to wear, carry or transport *a handgun*. The State

23  Police do not issue handgun carry permits for such purposes under MD Code, Public Safety, §5-

306. Such regulatory provisions are inconsistent with the foregoing provisions of Section 4-203(b) and State law in general, and thus violate the Express Powers Act. See P. Mem. at 8.

The County wrongly argues these conflicts do not exist because they are supposedly based on plaintiffs' "overbroad reading" of the Bill's definition of "place of public assembly" as encompassing most if not all of Montgomery County. In essence, the County is contending its definition of "place of public assembly" does not reach into homes and businesses. (Def. Mem. at 39). Yet, the ban on "ghost guns" in the home is **expressly** stated in County Code, Section § 57-11(b)(3), and thus necessarily embodies the County's intent to reach into the home. The ban on possession of "ghost guns" in the mere "presence" of a minor likewise easily reaches into the home. County Code, § 57-7(d). The County does not deny that it amended Section 57-11(a) to reach and regulate possession of all firearms (including long guns) on "privately owned" property. These express bans make clear the County fully intended to reach into the sanctity of the home, including all property owned or leased by a person or where a person resides. The same point is equally true for the Bill's **express** regulation of business owners and supervisory employees in County Code, § 57-11(b)(4). The County has not disputed the Verified Complaint's factual allegations that each of the individual plaintiffs' homes (save that of plaintiff Carlos Rabanales) and business locations are "arguably within 100 yards of a place of public assembly" as defined by Bill 4-21. Each of these plaintiffs is thus regulated by Bill 4-21 in a manner inconsistent with State law.

Home possession of firearms is also constitutionally protected by *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), which struck down DC's ban on handguns and held that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (Emphasis added). Plaintiffs thus argued that this Court should interpret Section 4-209(b) narrowly so as to avoid that constitutional issue. See

1   P. Mem. at 33. Section 4-209(b)(1) is thus best read, consistent with its text and purposes, to govern

2   **public** areas within 100 yards of "a place of public assembly," not private homes and businesses

3   or private land not normally open to "public assembly." Such private homes, businesses and land

4   are not akin to a "park, church, school, public building" specified in Section 4-209(b)(1)(iii). The

5   rule is "[c]ommon sense must guide us in our interpretation of statutes, and 'we seek to avoid

6   constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Marriott*

7   *Employees Federal Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 445, 697 A.2d

8   455 (1997) (quoting *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994). Defendant's response

9   (Def. Mem. at 31) that a "church" is private and thus Section 4-209(b)(1) allows it to reach into all

10  **other** types of private property is utterly untenable under this principle.

11          The County concedes any reach into the home would raise the constitutional issue, but

12  asserts the right does not obtain because plaintiffs could protect themselves with other types of

13  firearms. (Def. Mem. at 38 n.21). That "use other guns" argument was expressly rejected in *Heller*,

14  554 U.S. at 629, with respect to handguns, and has yet to be accepted by the Supreme Court or by

15  **any** lower court with respect to "ghost guns" or "major components of all types of firearm banned

16  by Bill 4-21 in the home.[1] Defendant's argument is also not responsive to plaintiffs' point that

17  Section 4-209 should be interpreted narrowly to **avoid** this serious constitutional issue. Maryland

18

19  ───────────────

20          [1] The District of Columbia recently settled a federal lawsuit, *Heller v. District of Columbia*,

21  No. 21-02376 (D.D.C., filed Sept. 08, 2021), in which the DC ban on "ghost guns" was challenged
    under the Second Amendment, by enacting new legislation that protected both the right of

22  possession and the Second Amendment right to build firearms for personal use. See Ghost Gun
    Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code

23  § 7-2502.02 (December 13, 2021).

24                                          - Page 15 -

1   law requires no less. See, e.g., *Schochet v. State*, 320 Md. 714, 730, 580 A.2d 176 (1990) ("a statute

2   will be construed so as to avoid a serious constitutional question").

3        Also flawed is the County's contention that Section 4-203(b) is irrelevant because it was

4   enacted in 1972, before the enactment of Section 4-209. First, the Court has a duty to reconcile

5   these statutes, rather hold that one statute or the other is completely ousted. Second, in any event,

6   the General Assembly revisited and revised Section 4-203 with the enactment of the Firearms

7   Safety Act of 2013, 2013 Maryland Laws, Ch. 427, and elected not to change any of the specific

8   provisions on which plaintiffs rely here. The general rule is that "[w]here sections of a statute have

9   been amended but certain provisions have been left unchanged, we must generally assume that the

10  legislature intended to leave the untouched provisions' original meaning intact." *American Casi.*

11  *Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994). In cases of conflict, that intent

12  should be controlling over a statute, such as Section 4-209, that was last amended in 2010, in a

13  revision that **further restricted** the County's authority under Section 4-209(b) by adding new

14  subsection (b)(3). See 2010 Session Laws, Ch 712. That 2010 legislation, cited by defendant (Def.

15  Mem. at 35 n.18), thus hardly supports a broad reading of Section 4-209(b)(1).

16             **2.    Bill 4-21's provisions with respect to minors**

17       As set out in plaintiffs' opening brief (P. Mem. at 26, *et seq.*), the Bill's provisions with

18  respect to minors are also inconsistent with MD Code, Public Safety, § 5-133(d)(2)(i), and MD

19  Code, Criminal Law, § 4-104(b)(1). Particularly egregious is the Bill's provision that "a person

20  may not even "purchase, sell, transfer, possess, or transfer a ghost gun . . . *in the presence of a*

21  *minor*." That ban on activities of an adult in the mere "presence" of a minor is not authorized by

22  Section 4-209(b). As the Attorney General's Opinion referenced by the County makes clear, the

23  exception for local regulation of minors was intended to allow a County to regulate minor **access**

- Page 16 -

1    to firearm, not adult activities in the mere "presence" of a minor. See P. Mem. at 28. The County

2    never responds to that point.

3         Indeed, interpreting this minors provision of Section 4-209(b) broadly would raise

4    profound constitutional problems concerning the constitutional rights of parents to raise their

5    children, a right recognized in *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); and

6    *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). The Court of Appeals thus

7    narrowly construes State regulations and statutes to avoid such issues. *Koshko*, 398 Md. at 422-27.

8    The County contends this right is limited to "the custody of children" (Def. Mem. at 41 n.22), but

9    that contention was expressly rejected in *Frase*, 379 Md. at 124, which held parental rights were

10   not limited to "visitation disputes," but applied broadly to "other areas of [State] interference" as

11   well. Plaintiffs relied on these holdings in *Frase* and *Koshko* (P. Mem. at 28), but defendant ignores

12   these decisions completely.

13                    **3.    Implied Preemption**

14        As set forth in plaintiffs' opening brief (P. Mem. at 19, *et seq.*), Bill 4-21 is impliedly

15   preempted by a comprehensive scheme of regulation of the sale, possession, transfer and transport

16   by the State law. Specifically, Bill 4-21 "deals with an area in which the General Assembly has

17   acted with such force that an intent to occupy the entire field must be implied." *Howard County v.*

18   *Potomac Electric Power Co.*, 319 Md. 511, 522, 573 A.2d 821 (1990). Here, as stated in *Mora*,

19   "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation."

20   *Mora*, 462 F.Supp.2d at 689.

21        Virtually all the factors that should be considered in making that implied preemption

22   determination are present here. See *Board of County Commissioners v. Perennial Solar, LLC*, 464

23   Md. 610, 619-20, 212 A.3d 868 (2019) (collecting the case law). No municipality or county has

                              - Page 17 -

ever attempted to enact legislation remotely similar to Bill 4-21. As *Mora* indicates, the State also enacted a comprehensive system regulating firearms. The State Police have exclusive control over the availability of carry permits under MD Code, Public Safety, § 5-306, and the State has established a comprehensive system of regulation of State licensed dealers, such as plaintiff Engage Armament.[2] Regulated firearms, which are handguns under MD Code, Public Safety, § 5-101(r)(1), are extensively regulated by State law, which requires a prospective purchaser to complete an "application," MD Code, Public Safety, §§ 5-117, 5-118, and the application be approved by the Maryland State Police, MD Code, Public Safety, § 5-120, which must conduct its own background investigation of the applicant, MD Code, Public Safety, § 5-121. A purchaser must wait at least 7 days, but not more than 90 days, before completing the purchase of a regulated firearm, MD Code, Public Safety, § 5-123, and may only purchase one regulated firearm every 30 days, MD Code, Public Safety, § 5-128. No person (with few exceptions) is permitted to purchase or sell a handgun unless the purchaser has a Handgun Qualification License issued by the State

---

[2] See MD Code, Public Safety, § 5-106 (requiring a dealer's license issued by the State Police before a person may engage "in the business of selling, renting, or transferring regulated firearms"); MD Code, Public Safety, § 5-107 (specifying the contents of an application for a dealer's license); MD Code, Public Safety, § 5-108 (requiring a background check for a dealer's license); MD Code, Public Safety, § 5-109 (requiring an investigation to determine the truth or falsity of the information supplied and the statements made in an application for a dealer's license); MD Code, Public Safety, § 5-111 (establishing the terms of a dealer's license). Dealers were further extensively regulated in 2013 with the enactment of the Firearms Safety Act of 2013, 2013 Session Laws Ch. 427 (amending MD Code, Public Safety, §§ 5-110, 5-114, 5-115, 5-146). Dealers are also subject to extensive regulation by the Maryland State Police, including regulations controlling what firearms dealers may sell and where dealers may conduct business. See COMAR §§ 29.03.01.42-.57. This is as comprehensive as it gets.

1   Police under MD Code, Public Safety, § 5-117.1. Private sales of regulated firearms must go
2   through the same process as dealer sales. MD Code, Public Safety, § 5-124.

3          In contrast, while the State requires that a private sale of a long gun to non-family members
4   be accomplished through a NICS background check as facilitated by a licensed dealer (not the
5   State Police), MD Code, Public Safety, § 5-204.1, the State has otherwise elected to leave the sale
6   of long guns to federal regulation without imposing the complex overlay of State regulation
7   applicable to regulated firearms. Similarly, the State has enacted special rules for the wear, carry
8   and transport of handguns, MD Code, Criminal Law, § 4-203, but not for long guns. Long guns,
9   unlike handguns, may thus be carried and transported outside the home without a carry permit
10  issued by the State Police and may even be possessed and carried fully loaded, except in or on a
11  vehicle. MD Code, Natural Resources, § 10-410(c)(1).

12         Moreover, any otherwise qualified person may purchase as many long guns as he or she
13  likes, without being restricted to one purchase every 30-days, and without any waiting period. A
14  minor may freely possess a long gun under State law, but a person under the age of 21 may not
15  possess a handgun, except under limited circumstances. MD Code, Public Safety, §5-133(d). A
16  new resident of Maryland must register a regulated firearm within 90 days, MD Code, Public
17  Safety, § 5-143, but need not register a long gun. A federally licensed dealer need only become a
18  State licensed dealer to sell regulated firearms, not long guns. See MD Code, Public Safety, § 5-
19  101(e) (defining "dealer's license"). A person who inherits a regulated firearm must complete the
20  entire application process outlined above, MD Code, Public Safety, § 5-102, but no such
21  requirement is imposed for long guns. The State severely punishes knowing non-compliance with
22  laws governing regulated firearms with five years of imprisonment, MD Code, Public Safety, § 5-
23  144, but such punishments are not applicable to long guns.

By any measure, the General Assembly has "enacted extensive and comprehensive legislation in the field" of firearms regulation. *Potomac Elec. Power Co. v. Montgomery County,* 80 Md.App. 107, 110, 560 A.2d 50 (1989). Such a system of comprehensive legislation is "the primary indicia" for determining the question of implied preemption. *Perennial Solar,* 464 Md. at 620. As noted, this comprehensive system includes multiple express preemption provisions, including Section 4-209(a), that necessarily embody the legislature's desire to exercise control over this field. This whole system of carefully calibrated regulation is contradicted by Bill 4-21's undifferentiated, County-wide regulation of the sale, transfer, possession or transport of a "handgun, rifle, or shotgun." County Code, 57-11(a). For example, it is apparent that State law sharply distinguishes between "regulated firearms" and long guns. It is equally apparent that Bill 4-21 treats all firearms the same. The resulting dual regulatory system virtually ensures "confusion" among ordinary, law-abiding persons who live in or travel through Montgomery County. *Potomac Electric,* 80 Md. App. at 110.

Defendant does not deny the comprehensive nature of State regulation, but justifies Bill 4-21 by asserting the General Assembly has authorized local regulation in Section 4-209(b). (Def. Mem. at 37). That assertion misses that point. The State has occupied the field and thus preempted regulation of firearm possession, sale, transfer, and transport except in the very narrow areas permitted by Section 4-209(b). As explained above, there can be little doubt that Bill 4-21 reaches far beyond these very limited exceptions to achieve near County-wide, across-the-board regulation of firearms of all types. See P. Mem. at 31. In an Attorney General Opinion not cited by the County, the Attorney General "cautioned" against county regulations like Bill 4-21, stating that Section 4-209(b)'s "authorization for local regulation 'with respect to minors' cannot be a pretext for regulation of adults' access to handguns." 82 Op. Att'y. 84, 86 (1997). As the Attorney General

1   stated, "[t]he Legislature could not have intended to authorize localities to achieve indirectly what

2   they may not achieve directly: across-the-board regulation of firearms." (Id.). Here, Bill 4-21 does

3   precisely that.

4       *State v. Phillips*, 210 Md. App. 239, 63 A.3d 51 (2013), on which defendant also relies

5   (Def. Mem. at 37), is not to the contrary. In *Phillips*, the issue was whether Baltimore City's

6   ordinance requiring gun offenders to register with the Police Commissioner was impliedly

7   preempted. The court cited the preemption provisions of Section 4-209, but noted the complainant

8   in that case "does not contend, nor could he that the Act is expressly preempted by conflict,"

9   because the Act at issue "does not regulate the possession or sale of a firearm." (210 Md.App. at

10  280). Here, of course, Bill 4-21 does "regulate the possession or sale of a firearm." *Phillips*

11  provides no guidance on whether such a county law is preempted.

12      **II.      BILL 4-21 IS NOT A LOCAL LAW (COUNT I)**

13      As detailed in plaintiffs' opening brief (P. Mem. at 31), Bill 4-21 is not a "local law" within

14  the meaning of Article XI, § 3. It should be obvious the regulation of firearms in the manner

15  attempted by Bill 4-21 "deals with the general public welfare, a subject which is of significant

16  interest not just to any one county, but rather to more than one geographical subdivision, or even

17  to the entire state." *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386 (1976). Thus, "some statutes,

18  local in form, have been held to be general laws, since they affect the interest of the whole state."

19  *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). We stress again that Bill 4-21

20  is not limited to "ghost guns," but rather broadly regulates all firearms and "major components"

21  throughout the County. See County Code, § 57-11(a). Such regulations "affect the interest of the

22  whole state."

23

24

1          The result is the same even if Bill 4-21 is viewed as a "ghost gun" ordinance. As noted in

2     plaintiffs' opening brief (P. Mem. at 34), the General Assembly has considered State-wide

3     regulation of "ghost guns" in the last three legislative Sessions. By the end of this legislative

4     Session, the General Assembly will likely have enacted a "ghost gun" law. See Senate Bill 387,

5     https://bit.ly/3HsrZBj, and the cross-filed House Bill 425. https://bit.ly/3C7rgEE. HB 425 has just

6     received a favorable report from House Judiciary Committee and soon will be voted on in the

7     House of Delegates. https://bit.ly/3C7rgEE. The Attorney General and legislative leaders have

8     called for the enactment of this legislation, and action by the General Assembly on these bills is

9     considered quite likely. See https://bit.ly/3psu2z8. These bills seek to incorporate the approach

10    taken by the ATF in its proposed rule that will be issued, in final form, not later than June of 2022.

11    See 87 Fed. Reg. at 5111 (January 31, 2022), an approach not followed by Bill 4-21. These bills

12    also create a pathway for continued possession of homemade firearms by current owners, a

13    provision in direct conflict with the approach followed by Bill 4-21. Contrary to Bill 4-21, these

14    bills do not regulate "component" parts of firearms. These bills embody a recognition that "ghost

15    guns" are a matter of State-wide concern and enactment of these bills will bring Bill 4-21 into

16    direct conflict with State law in violation of the Express Powers Act.

17          Defendant does not address plaintiffs' reliance on the test articulated in *Steimel* and *Cole*.

18    Defendant ignores *Cole* entirely and cites *Steimel* only for a different proposition, *viz*., that a local

19    law may not be "drawn" to apply to two more geographical subdivisions of the State. (Def. Mem.

20    at 17). As noted, *Steimel* also states a law is a prohibited "general law" if it "*deals with* the . . . a

21    subject which is of significant interest not just to any one county, but rather to more than one

22    geographical subdivision, or even to the entire state." *Steimel*, 278 Md. 5 (emphasis added). *Cole*

23    referenced this test and expressly endorsed *Norris v. Mayor & City Council of Baltimore*, 172 Md.

- Page 22 -

1  667, 192 A. 531, 538 (1937); *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66 (1891); *Gaither v.*

2  *Jackson*, 147 Md. 655, 128 A. 769 (1925); and *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 (1936).

3  In each of those cases, the Court struck down an ordinance because it was not a "local law." *Cole*

4  explained that the controlling "rationale" of these cases was "that while the immediate objective

5  sought to be achieved was local in character, the statutes *indirectly affected* matters of significant

6  interest to the entire state." *Cole*, 249 Md. at 434-35 (emphasis added). By ignoring this point,

7  defendant effectively concedes that Bill 4-21 "indirectly affect[s] matters of significant interest to

8  the entire state" under *Cole*.

9         Defendant tries to argue that Bill 4-21 does not sweep broadly, but that effort fails. As

10  noted, Bill 4-21expressly bans, in County Code, § 57-11(a), the sale, transfer, possession or

11  transport of **all** firearms within 100 yards of the Bill's vastly expanded "places of public assembly,"

12  subject only to a limited list of exceptions set out in County Code, Section 57-11(b). For example,

13  Section 57-11(b)(6) exempts "an unloaded firearm" from the bans imposed by Section 57-11(a).

14  Yet, even as thus limited, that ban is exceedingly broad, as Section 57-11(a) could be applied to

15  ban hunting with a loaded firearm or mere possession of any loaded firearm anywhere in the

16  County, including on "privately owned" land or even at a firing range of which the County has

17  several. See P. Mem. at 25. Under Bill 4-21, "ghost guns" (or a frame or receiver of a "ghost gun")

18  may not be possessed by an adult in the mere "presence" of a minor or by an adult in the home.

19  The County has no response and thus concedes these points.

20         Such regulation of all firearms in Montgomery County "indirectly affect[s] matters of

21  significant interest to the entire State," *Cole*, 249 Md. at 434-35, because Maryland residents

22  throughout the State, as well as non-residents, may travel through Montgomery County and may

23  purchase, possess or transfer firearms and components in the County under State and federal law.

1    Bill 4-21 certainly directly and adversely affects plaintiff Carlos Rabanales, who lives in Frederick

2    County, but travels to, and works at, Engage Armament in Montgomery County. (Complaint ¶ 28).

3    State-wide protection for such commerce lies at heart of the rationale for the express preemption

4    provisions discussed above. Uniform state-wide treatment of this subject matter ensures that

5    innocent persons are not criminally ensnared by local firearms regulations that could otherwise

6    differ from county to county, city to city, town to town. For example, a person from Garrett County

7    traveling in Montgomery County cannot be expected to be aware of or comply with the manifestly

8    odd provision of Bill 4-21 that regulates all firearms at all publicly or privately owned locations

9    within 100 yards of where the public "may assemble." Again, no other jurisdiction has such a law.

10   If the County may legally enact legislation such as Bill 4-21, then other jurisdictions will likewise

11   feel free to do so with still different requirements. The potential for massive confusion and

12   discriminatory arrests and prosecutions is apparent.

13       Ignoring these considerations, the County focuses on Bill 4-21's **separate** prohibition on

14   "undetectable" guns, arguing "major components" of an undetectable gun "would be easily

15   identified as part of an "undetectable gun" and thus there is no "genuine possibility" a law

16   enforcement officer could "confuse" "ghost gun" components with the components "of an ordinary

17   firearm." (Def. Mem. at 20). Yet, the Bill, in County Code, § 57-11(a), **also** bans "ghost guns" and

18   major components of **all** firearms, not merely those which are "undetectable." A "ghost gun" is

19   defined in County Code, § 57-1, as any firearm (including an "unfinished" receiver) that lacks a

20   serial number. The term "major component" is defined in County Code, § 57-1 to include a "slide

21   or cylinder or the frame or receiver" and "in the case of a rifle or shotgun, the barrel."

22       Nothing in these definitions is limited to undetectable parts. Slides or cylinders are seldom

23   "undetectable" as they are typically made of or contain metal. The "barrel" of a shotgun or rifle is

1    made entirely of metal. A completely metal "ordinary firearm" may be disassembled into these

2    parts and, once disassembled (or sold separately), those parts are indistinguishable from a "ghost

3    gun" major component. Under County Code, § 57-11(a), any transport, transfer or possession of

4    any of these "components" for any "handgun, rifle or shotgun" could subject a person to arrest and

5    prosecution. A shipment or sale of such a component to or by any person, **including a licensed**

6    **dealer,** would be banned as well. None of the exceptions to Section 57-11(a) set out in Section 57-

7    11(b) even mentions "components" so the sweep of Section 57-11(a) is completely unhindered as

8    to components. Thus, contrary to the County's assertion (Def. Mem. at 19), mere possession of a

9    "component" is banned in the home no less than anywhere else by County Code, § 57-11(a), as

10   the Section 57-11(b) exemption for the home is limited to "a firearm" and "ammunition" and the

11   "major components" banned by Bill 4-21 (other than a frame or receiver) are simply not "firearms"

12   under State and federal law. See P. Mem. at 5, 45.

13        These "major components" of an "ordinary firearm" are not serialized, and a slide, barrel,

14   or a cylinder can be used to build a completely legal firearm that is not a "ghost gun." The builder

15   need only use serialized receivers, which are sold at Federal Firearms Licensees in Maryland and

16   throughout the United States. See P. Mem. at 45. Bill 4-21 thus criminalizes a hobbyist whose

17   possession of these components is completely innocent and lawful. See Maryland State Police

18   Advisory LD-FRS-14-003 (May 16, 2014) (available at https://bit.ly/35wbl6M). It also

19   criminalizes the business operations of all Class 07 federally licensed manufacturers in the County,

20   including plaintiff Engage Armament, which are authorized and directed by federal law, 18 U.S.C.

21   § 923(i), to engrave serial numbers on the receivers they manufacture. (Complaint ¶ 26). All such

22   persons and manufacturers possess and use "major components" to legally build firearms. Plainly,

23

1  the County lacks the detailed understanding of firearms, the firearms industry and of federal and

2  State firearms law necessary to regulate intelligently.

3        The County likewise ignores that Bill 4-21 never defines what constitutes an "unfinished

4  frame or receiver," which Bill 4-21 includes in its definition of a "ghost gun" and thus bans

5  everywhere in the County, including in the home and in the "presence" of a minor. The lack of a

6  definition makes this ban both hopelessly vague and unknowably broad as it could include a solid

7  block of aluminum or polymer from which an actual receiver could be milled or crafted. See P.

8  Mem. at 44. Bill 4-21 would even ban Class 07 federally licensed manufacturers, like Engage

9  Armament, from making or possessing "unfinished" receivers during the manufacturing business,

10  as Bill 4-21 makes no exception for licensed dealers. See *Polymer80, Inc. v. Sisolak*, No. 21-CV-

11  00690 (3d Jud. District for Co. of Lyon, December 10, 2021), *appeal dismissed sub nom., Sisolak*

12  *v. Polymer80, Inc.*, 502 P.3d 184 (Nev. 2022) (invalidating Nevada's "ghost gun" law because it

13  failed to define "unfinished" frame or receiver) (opinion attached as Exhibit C). While plaintiffs'

14  vagueness claims in Count IV have been retained by the federal district court, the *scope* of Bill 4-

15  21 is before this Court on the other Counts of the Complaint. These matters are all "of State-wide

16  concern" for the reasons set forth above.

17  **III.   BILL 4-21 IS A *PER SE* TAKING UNDER THE MARYLAND**
       **CONSTITUTION (COUNT III)**

18

19        Count III of the complaint alleges that the County's ban on the mere possession of a "ghost

20  gun" and/or of "major components" is a Taking under the Maryland Takings Clause, Article III, §

21  40 of the Maryland Constitution, and a deprivation of property without due process under the Due

22  Process Clause of Article 24 of the Maryland Declaration of Rights. According to the County, Bill

23  4-21 is an exercise of its "police powers" and therefore not a Taking. See Def. Mem. at 4, 42. That

- Page 26 -

1 | contention is wrong as a matter of law.

2 |      These provisions of the Maryland Constitution are interpreted in *pari materia* with the Fifth

3 | Amendment. The Court of Appeals' decision in *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d

4 | 1061, 1070-72 (2002), so holds and makes clear that "[n]o matter how 'rational' under particular

5 | circumstances, the State is constitutionally precluded from abolishing a vested property right." The

6 | County's "rational" reasons for Bill 4-21 are thus irrelevant. If Bill 4-21 abolishes a vested property

7 | right, then it is a Taking, *quod erat demonstrandum*. Bill 4-21 does precisely that.

8 |      In *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 968

9 | (2011), the Court of Appeals explained that the "vested right" analysis is controlled by whether

10 | the statute in question is retroactive, explaining that "[r]etrospective statutes are those 'acts which

11 | operate on transactions which have occurred or rights and obligations which existed before passage

12 | of the act.'" (30 A.3d at 969) (citation omitted). Federal law under the Fifth Amendment is in

13 | accord. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992) (to escape the

14 | Takings Clause, the government must show "that the proscribed use interests were not part of [the

15 | owner's] title to begin with"). Here, the County does not dispute that plaintiffs possessed "ghost

16 | guns" and components through "transactions" that occurred prior to the enactment of Bill 4-21.

17 | The Bill is thus unquestionably "retroactive" under *Muskin* to the extent it operates on this

18 | previously acquired property.

19 |      Likewise, there can be no dispute that the Maryland Takings Clause fully protects personal

20 | property, including firearms. A "vested" right is simply a "property right under Maryland property

21 | law." *Muskin*, 422 Md. at 560. In *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967

22 | (2004), the Court of Appeals held Maryland's Taking Clause and Due Process Clause are violated

23 | "[w]henever a property owner is deprived of the beneficial use of his property or restraints are

24 |

1  imposed that materially affect the property's value, without legal process or compensation." *Serio*

2  applied that rule to hold that the refusal of a county police department to relinquish a firearm so

3  that a convicted felon could exercise his remaining "ownership" interest violated these provisions

4  of the Maryland Constitution. (863 A.2d at 966, 968). See also *Pitsenberger v. Pitsenberger*, 287

5  Md. 20, 410 A.2d 1052, 1057-1060 & n.5 (1980). The Fifth Amendment's Taking Clause likewise

6  fully protects personal property. See *Horne v. Dep't. of Agric.*, 576 U.S. 350, 358 (2015) ("The

7  Government has a categorical duty to pay just compensation when it takes your car, just as when

8  it takes your home.").

9    In Maryland, "property is a term that has broad and comprehensive significance; it

10  embraces '*everything which has exchangeable value* or goes to make up a man's wealth....'"

11  *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995) (citation omitted) (emphasis added).

12  See *Serio*, 863 A.2d at 965 (relying on *Dodds*). The rule is the same under the Fifth Amendment.

13  *United States v. General Motors*, 323 U.S. 373, 378 (1945) ("[t]he constitutional provision is

14  addressed to every sort of interest the citizen may possess"). It is beyond obvious that "ghost guns"

15  are "property" under *Dodds* and *Serio* and that Bill 4-21 completely deprives the plaintiffs of "the

16  beneficial use" of their property. Bill 4-21 not only bans "possession" of "ghost guns" and

17  components, it bans the sale, transfer and transport as well. County Code, § 57-11(a). These

18  property interests abolished by Bill 4-21 far exceed the "ownership" interest that *Serio* held to be

19  protected.

20    Such regulation "goes too far" and is thus a *per se* Taking. A *per se* Taking is present where

21  the regulation is so complete "that its effect is tantamount to a direct appropriation or ouster."

22  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). The "ouster" referenced in *Lingle* is the

23  ouster of *possession*. Id., at 539; *Lucas*, 505 U.S. at 1014 (noting that the "practical ouster of

- Page 28 -

possession" is the "functional equivalent of' a "direct appropriation"); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (same). *Accord Steel v. Cape Corp.*, 111 Md. App. 1, 23-24, 677 A.2d 634 (1996) (following *Lucas*); *Offen v. County Council*, 96 Md.App. 526, 552, 625 A.2d 424 (1993), *rev'd in part on other grounds*, 334 Md. 499, 639 A.2d 1070 (1994) (relying on *Lucas,* noting that "'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation'") (quoting *Lucas* 505 U.S. at 1017). Bill 4-21 "ousts" plaintiffs here of their right of possession and destroys every *other* stick in the proverbial bundle of sticks that comprise property. *Compare Andrus v. Allard*, 444 U.S. 51, 65 (1979) (holding there was no Taking of personal property where the law at issue allowed the owners to retain the rights to possess, donate, and devise their property), *with Horne*, 576 U.S. at 364 (finding a Taking of personal property where there was a loss of possession and distinguishing *Andrus* on that basis).

Contrary to the County's contention, these principles are not trumped by the County's "police powers." In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982), the Supreme Court specifically noted that the lower court had determined that the alleged Taking there involved a "legitimate public purpose" and thus was "within the State's police power." The Court stated that it had "no reason to question that determination," but nonetheless expressly held that *"[i]t is a separate question* . . . whether an otherwise valid regulation so frustrates property rights that compensation must be paid." (Id). (Emphasis added). *Lucas* made the same point, holding that "the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. *If it were, departure would virtually always be allowed." Lucas*, 505 U.S. at 1027. (Emphasis added).

If "police powers" were all that mattered, then "just compensation" under the Takings Clause would hardly **ever** be available as the power to conduct **any** Taking for a "public use" is

- Page 29 -

1   "coterminous" with a jurisdiction's "police power." *Hawaii Housing Authority v. Midkiff*, 467 U.S.

2   229, 240 (1984). See also *Kelo v. City of New London,* 545 U.S. 469, 480 (2005) (same). The

3   County's "police power" argument thus proves too much, a point that *Loretto* and *Lucas* recognize.

4   As the Fourth Circuit recently concluded in *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir.

5   2021), "[t]hat Government actions taken pursuant to the police power are not per se exempt from

6   the Takings Clause is axiomatic in the Supreme Court's jurisprudence." Maryland case law is in

7   full accord. See *Muskin*, 422 Md. at 565 ("When a statute enacted under the police power,

8   purporting to regulate private property, takes private property completely from an individual for a

9   public purpose, the doctrine of eminent domain is invoked, and the State must provide just

10  compensation for the taking."); *City of Annapolis v. Waterman*, 357 Md. 484, 509, 745 A.2d 1000

11  (2000) (following *Lucas* and holding "even if there is a valid, connected public purpose, i.e., an

12  essential nexus, there still must be compensation for the taking"); *Steel*, 111 Md.App. at 17 (finding

13  the regulation to be "a reasonable application of the police power" and then moving on to the

14  "second step of the takings analysis" under *Lucas*).

15        The foregoing Takings analysis assumes that Bill 4-21 is an authorized and lawful exercise

16  of the County's police power. If, as argued above, Bill 4-21 is not a "local law" under the Maryland

17  Constitution, or is otherwise contrary to the Express Powers Act, then the deprivation of property

18  rights by Bill 4-21 would not be a "reasonable application of the police power" and would thus

19  fail at the first "step" of the Takings analysis. *Steel*, 111 Md.App. at 17. The owner is still entitled

20  to "just compensation" for such any Taking that arose from such unlawful acts. (Id.). See *Lingle*,

21  544 U.S. at 543 ("if a government action is found to be impermissible . . . that is the end of the

22  inquiry"); *Del-Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362-63 (Fed. Cir.

23  1998) (unlawful government action may still be a Taking).

- Page 30 -

1        The County likewise errs in relying on (Def. Mem. at 46) the Fourth Circuit's split decision

2 in *Maryland Shall Issue v. Hogan,* 963 F.3d 356 (4th Cir. 2020), *cert. denied,* 141 S.Ct. 2595

3 (2021) ("*MSI*"). There, the majority refused to accept the State's argument, likewise presented by

4 the County here, that "police powers" were sufficient. Rather, the majority held that the Takings

5 Clause was not violated where the State law did not require that the property in question be "turned

6 over" to the State or a third party. (963 F.3d at 366). Contrary to the County's belief, nothing in

7 that majority opinion holds that the State's police power obviates a Taking, without more. Indeed,

8 the Fourth Circuit's recent ruling in *Yawn*, noted above, makes clear that is not so. Under *Serio*, a

9 Taking under the Maryland Constitution is presented where the statute deprives the owner of the

10 "beneficial use" of the owner's property right. No change of possession is required.

11        Ignoring *Serio* and *Dodds*, the *MSI* majority also held that the statute there was not a Taking

12 under the Maryland Constitution, because it was not "retroactive" under *Muskin*. According to the

13 court, that was so because the plaintiffs there had "fair notice of the change in the law." (963 F.3d

14 at 367). The *MSI* majority reasoned that Article III, § 40, turned on whether the statute "'would

15 impair rights a party possessed when he acted, increase a party's liability for past conduct, or

16 impose new duties with respect to transactions already completed.'" (Id.), quoting *John Deere*

17 *Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 957 A.2d 595, 599 (2008).

18        That analysis is misguided. First, the *John Deere* decision, cited by the *MSI* majority, is

19 not a Takings case, it was a due process case. More importantly, "retroactivity" as applied to a

20 Takings challenge means the same thing it meant in *Lucas, viz.,* that the statute "operates" on

21 "rights . . . which existed before passage of the act." *Muskin,* 422 Md. at 555. While *Muskin* used

22 due process principles set out in *John Deere* to help define the "unique property interest" adversely

23 affected by the statute there at issue (422 Md. at 559), the Court went on to find a Taking of this

1    "unique" interest even though the Court *also* found that plaintiffs there had "fair notice." (422 Md.

2    at 558). That holding contradicts the *MSI* majority's holding that "fair notice" is enough. *Muskin*

3    applied traditional Takings principles to hold that there was a Taking, and that analysis did not

4    include the due process test applied by the *MSI* majority. (422 Md. at 563-68).

5         Under *Muskin*, due process principles may help define a "unique" property interest, but

6    nothing in *Muskin* purported to overrule the *Dodds* definition of "property" applied in *Serio* and

7    at issue here. See *McCree v. State*, 441 Md. 4, 16, 105 A.3d 456 (2014) (applying *Dodds* in a

8    decision that post-dates *Muskin* by three years). Under *Dodds*, there is nothing "unique" about

9    plaintiffs' property rights at issue here. Thus, unlike in *Muskin*, there is no need to resort to due

10   process nuances to define "property." It is enough that plaintiffs legally possessed their personal

11   property before Bill 4-21 was enacted. As the Court of Appeals stated in *Pitsenberger*, "possessory

12   interests in property are within the protection of the Fourteenth Amendment" (287 Md. at 29),

13   noting further that "Article III, § 40 and the Fourteenth Amendment have the same meaning in

14   reference to a 'taking' of property." (287 Md. at 33 n.5), citing *Bureau of Mines v. George's Creek*,

15   272 Md. 143, 156, 321 A.2d 748 (1974) ("The constitutional provision is addressed to every sort

16   of interest the citizen may possess.").

17        For the reasons set out in the dissenting opinion, the *MSI* majority's ruling that there is no

18   Taking unless the State (or third party) assumes possession of the property is also dead wrong

19   under the Takings Clause of the Fifth Amendment. See 963 F.3d at 377 (Richardson, J., dissenting).

20   The majority's analysis is incompatible with the Supreme Court's decision in *General Motors*,

21   where the Court held that "the deprivation of the former owner rather than the accretion of a right

22   or interest to the sovereign constitutes the taking." (323 U.S. at 377). The majority in *MSI* did not

23   even cite, much less discuss, *General Motors*. The majority likewise took no notice of the

24

- Page 32 -

1    statement in *Lucas* that the effect is to be determined "from the landowner's point of view." (505

2    U.S. at 1017). In short, from the owner's "point of view," a criminal law that bans possession

3    deprives the owner of his or her property regardless of whether there has been an "accretion of the

4    right" of possession to the State. See *MSI*, 963 F.3d at 375-76 (Richardson, J., dissenting). The

5    dissent would have sustained the Maryland Takings claim for the same reasons the dissent would

6    have sustained the Fifth Amendment claim. (963 F.3d at 376 n.12). The dissent was correct.

7         Defendant also relies on *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*,

8    493 F.3d 404 (4th Cir. 2007), as somehow creating a "police power" exception to the Takings

9    Clause. (Def. Mem. at 45). That reliance is misplaced, again for the reasons set forth by the dissent

10   in *MSI*. See 963 F.3d at 377-78 (Richardson, J., dissenting). Any such interpretation of *Holliday*

11   is likewise precluded by the Fourth Circuit's recent and subsequent ruling in *Yawn*, noted above,

12   which dismissed as contrary to Supreme Court jurisprudence the notion that "police power" is a

13   complete defense to a Takings claim. *Yawn*, 1 F.4th at195. This Court should follow the dissent's

14   Takings analysis and the *Yawn* ruling, not the majority's flawed approach.

15        In any event, this Court is not bound by lower federal court decisions and thus must address

16   this question *de novo. Pope v. State*, 284 Md. 309, 320 n.10 396 A.2d 1054 (1979) (holding that

17   unlike the decisions of the Supreme Court of the United States, decisions of federal courts of appeal

18   are not binding on Maryland courts); *Henry v. Gateway, Inc.*, 187 Md. App. 647, 666, 979 A.2d

19   287 (2009) (same); *Whalen v. HPRB,* 2020 WL 2501446 at *5 (Md. App. 2020) (same). In so

20   doing, the Court should look to the recent decision by the Federal Circuit in which the court

21   declined to follow the *MSI* majority's approach to property. *McCutchen v. United States*, 14 F.4th

22   1355, 1366 n.6 (Fed. Cir. 2021). While the Federal Circuit also declined to accept the government's

23   reliance on its "police power," it held that the plaintiffs' challenge to a federal rule that banned

1   continued possession of specific personal property failed because plaintiffs did not have a

2   sufficient *pre-existing* property interest that *pre-dated* the regulation in question. *McCutchen*, 14

3   F.4th at 1363-65.

4        That particular result in *McCutchen* is, of course, inapposite, as the plaintiffs here have

5   fully protected, vested property rights under *Dodds* in the property acquired prior to Bill 4-21's

6   enactment, as discussed above. However, the Federal Circuit's analysis of general Takings

7   principles is consistent with the approach taken by the dissent in *MSI* and by *Dua, Muskin, Serio,*

8   *Steel, Waterman* and *Offen*, discussed above. The *McCutchen* court's refusal to accept the

9   government's "police power" argument is likewise persuasive authority on that point as is the

10  Fourth Circuit's recent ruling in *Yawn*, noted above. These decisions and opinions should guide

11  this Court's analysis, not the *MSI* majority's misguided approach. To date, we have found no other

12  appellate court of any jurisdiction that has followed the *MSI* majority's outlier analysis.

13       In sum, this Court should declare that Bill 4-21 is a Taking under Article III, § 40 of the

14  Maryland Constitution, and a deprivation of property without due process in violation of Article

15  24 of the Declaration of Rights. The appropriate relief is an injunction barring enforcement until

16  just compensation is accorded. *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521

17  A.2d 313 (1986). Indeed, such relief is required by the text of Article III, § 40, which provides that

18  "[t]he General Assembly shall enact no Law authorizing private property, to be taken for public

19  use, without just compensation, as agreed upon between the parties, or awarded by a Jury, *being*

20  *first paid or tendered* to the party entitled to such compensation." (Emphasis added). The County

21  has yet to pay or tender payment to plaintiffs.

22       Plaintiffs are entitled to just compensation under Count III for the Takings and deprivation

23  of private property that occurred after Bill 4-21 became effective on July 16, 2021. The controlling

- Page 34 -

1 | rule is set forth in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,

2 | 482 U.S. 304, 320 (1987), where the Supreme Court held that the government has a "duty to

3 | provide compensation for the period during which the taking was effective." See *Steel*, 111

4 | Md.App. at 21 (applying *First English*). The Court should apply MD Rule 2-602, find there is no

5 | just reason for delay, order the entry of final judgment granting plaintiffs declaratory and injunctive

6 | relief on Counts I, II and III, and thereafter schedule further proceedings for the determination of

7 | just compensation under *First English*.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

- Page 35 -

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for partial summary judgment should be granted and defendant's motion to dismiss and for summary judgment should be denied. The Court should issue declaratory and injunctive relief as to Count III in addition to Counts I and II. Plaintiffs respectfully request an expedited hearing and a decision on these motions at the earliest practicable date.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
*Counsel for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2       The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing

3   Plaintiffs' Opposition To Defendant's Motion For Summary Judgment And Motion To Dismiss

4   Expedited Hearing Requested was served on the following counsel for defendant Montgomery

5   County via the MDEC e-filing system:

6

7   Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

8   Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

9   Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

10

11                          Respectfully submitted,

12                          /s/ *Mark W. Pennak*

13                          MARK W. PENNAK
                            *Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

**IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** | |
| *Plaintiffs,* | |
| **vs.** | **CASE NO.: 485899V** |
| **MONTGOMERY COUNTY, MARYLAND,** | |
| *Defendant.* | |

**ORDER AND FINAL JUDGMENT GRANTING DECLARATORY
AND EQUITABLE RELIEF**

1. On May 28, 2021, Plaintiffs filed a four-count Verified Complaint in this Court, seeking declaratory and equitable relief as to County Bill 4-21, which made numerous changes to Chapter 57, Weapons, of the Montgomery County Code. The law went into effect on July 16, 2021. Count I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within the meaning of Article XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted by or is inconsistent with numerous provisions of State law. Count III alleges that Bill 4-21 constitutes an illegal Taking under the Maryland Takings Clause, Article III, §40 of the Maryland Constitution, and a deprivation of property without due process in violation of Article 24 of the Maryland Declaration of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

2. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint and a hearing was

- 1 -

scheduled for July 15, 2021. Plaintiffs at that time did not seek relief under Count III of the Complaint.

3. On July 12, 2021, in lieu of answering the Complaint, defendant removed the entire case to federal district court pursuant to 28 U.S.C. § 1441. On February 7, 2022, the federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain jurisdiction over Count IV. Count IV of the Complaint is therefore no longer before this Court on plaintiffs' motion.

4. On February 22, 2022, defendant filed a Motion to Dismiss and Alterative Motion for Summary Judgment, and an Opposition to plaintiffs' motion for partial summary judgment. Defendant's motions sought dismissal or summary judgment on all the State law claims, including Count III on which plaintiff had not previously sought summary judgment.

5. March 7, 2022, plaintiffs filed their opposition to defendant's motion and requested declaratory and equitable relief as to all claims before this Court, including Count III. Defendant likewise requests declaratory relief as to all claims before this Court.

WHEREFORE, this Court:

A. FINDS that all the parties, including plaintiffs, are entitled to a declaration of rights under MD Code, Courts and Judicial Proceedings, § 3-402, on Counts I, II and III of the Complaint;

B. ORDERS that plaintiffs' motion for partial summary judgment is granted on Count I of the Complaint, and DECLARES that Bill 4-21 is not a "local law" within the meaning of Article XI, § 3 of the Maryland Constitution and is thus invalid, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count I;

C. ORDERS that plaintiffs' motion for partial summary judgment is granted on Count II of the Complaint, and DECLARES that Bill 4-21 violates the Express Powers Act, MD Code, Local Government, §10-206, because Bill 4-21 is not authorized by MD Code, Criminal Law, § 4-209(b),

- 2 -

and is thus preempted by MD Code, Criminal Law, § 4-209(a), and is otherwise in conflict or inconsistent with numerous other provisions of State law within the meaning of the Express Powers Act, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count II;

D. FINDS that Count III of the Complaint is before this Court for a decision on defendant's motion for summary judgment and DECLARES that Bill 4-21 is a *per se* Takings under Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and is facially a deprivation of property without due process in violation of Article 24 of the Maryland Declaration of Rights in so far as Bill 4-21 purports to ban the possession, sale, transport or transfer of any personal property, lawfully acquired, owned or possessed by plaintiffs or others prior to the July 16, 2021, effective date of Bill 4-21, and further ORDERS that defendant is hereby enjoined from enforcing Bill 4-21 under Count III as to all such property until or unless full just compensation is paid or tendered to plaintiffs and others by defendant, as agreed to by the parties or awarded by a jury;

E. ORDERS that defendant's motion to dismiss is denied as the Court finds and declares that at least one plaintiff has standing to sue on each Count of the Complaint that remains before this Court, and further ORDERS that defendant's alternative motion for summary judgment on Counts I, II, and III of the Complaint is denied on the merits;

F. FINDS that under MD Rule 2-602 there is no just reason for delay and therefore ORDERS that FINAL JUDGMENT granting declaratory and injunctive relief on Counts I, II, III, as set forth above, be entered in favor of plaintiffs and against defendant; and

G. ORDERS that further proceedings for assessing and awarding the amount of just compensation due under Count III for Takings and deprivation of private property that occurred in the time period between the July 16, 2021, effective date of Bill 4-21 and the date of this ORDER, will be scheduled as the Court may hereafter direct by separate order.

_____

Judge, Circuit Court for
Montgomery County, Maryland

cc:  All Parties of record.

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing proposed Order And Final Judgment Granting Declaratory And Equitable Relief was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

- 5 -

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC.,<br>ENGAGE ARMAMENT, LLC,<br>ANDREW RAYMOND,<br>CARLOS RABANELES,<br>BRANDON FERRELL,<br>DERYCK WEAVER,<br>JOSHUA EDGAR,<br>I.C.E. FIREARMS & DEFENSIVE<br>TRAINING, LLC,<br>RONALD DAVID and<br>NANCY DAVID,<br><br>    Plaintiffs,<br><br>    v.<br><br>MONTGOMERY COUNTY, MARYLAND,<br><br>    Defendant. | Civil Action No. TDC-21-1736 |

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, ECF No. 18, is GRANTED IN PART and DENIED IN PART.

2. Counts 1, 2, and 3 of Plaintiffs' Complaint are severed and remanded to the Circuit Court for Montgomery County, Maryland.

3. This action is STAYED, and Count 4 is held in abeyance pending the resolution of Counts 1, 2, and 3 in the state court proceeding.

**EXHIBIT A**

4. The parties shall file a Joint Status Report every **90 days** to report on the progress of the state court proceeding.

5. Within **14 days** of the resolution of Counts 1, 2, and 3 in the state court proceeding, the parties shall file a Joint Status Report reporting on that resolution and requesting either that the stay be lifted or that this case be dismissed.

Date: February 7, 2022

THEODORE D. CHUANG
United States District Judge

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

      Plaintiffs,

      v.

MONTGOMERY COUNTY, MARYLAND,

      Defendant.

Civil Action No. TDC-21-1736

## MEMORANDUM OPINION

Plaintiffs have filed this civil action against Defendant Montgomery County, Maryland ("the County"), alleging that a recently enacted County ordinance regulating ghost guns and other undetectable guns violates Article XI-E of the Maryland Constitution; the Maryland Express Powers Act; the Takings Clause of the Maryland Constitution; the Due Process Clause of Article 24 of the Maryland Declaration of Rights; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Pending before the Court is Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local

## EXHIBIT B

R. 105.6. For the reasons set forth below, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On April 16, 2021, the County Executive of Montgomery County signed into law Bill No. 4-21, legislation passed by the Montgomery County Council to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns. Bill No. 4-21 amended the County's existing firearms ordinance by adding such guns and their components to the list of items subject to the County's prohibitions on the transfer of guns to a minor and on the sale, transfer, possession, or transport of firearms within 100 yards of a place of public assembly. Bill No. 4-21 also expanded the definition of a "place of public assembly" to include "a place where the public may assemble, whether the place is publicly or privately owned." Bill No. 4-21 at 4, Compl. Ex. A, ECF No. 7. Finally, the bill added a requirement for the Montgomery County Police Department to report annually on the availability and use of ghost guns and undetectable guns within the County. The effective date of Bill No. 4-21 was July 16, 2021.

On May 25, 2021, Plaintiffs filed this action in the Circuit Court for Montgomery County, Maryland, alleging four counts numbered as follows: (1) that by expanding the "place of public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland Constitution to enact local laws; (2) that Bill No. 4-21's amendments are inconsistent with and preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann., Local Gov't § 10-206 (LexisNexis 2013); (3) that Bill No. 4-21 violates the Takings Clause of the Maryland Constitution, Md. Const. art. III, § 40, and the Due Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process Clause") by depriving gun owners of property without legal process or compensation; and (4) that Bill No. 4-21's definitions of "place

2

of public assembly," "ghost gun," "major component," and other terms are unconstitutionally vague, in violation of the Maryland Due Process Clause and the Due Process Clause of the Fourteenth Amendment. Plaintiffs requested a declaratory judgment on all four counts, a preliminary and permanent injunction barring enforcement of Bill No. 4-21, compensatory and punitive damages for the Fourteenth Amendment violation pursuant to 42 U.S.C. § 1983, and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

On June 16, 2021, Plaintiffs filed an Emergency Motion for Partial Summary Judgment, which was scheduled for a hearing in the Circuit Court on July 15, 2021. On July 12, 2021, before the hearing could take place, the County removed the case to this Court pursuant to 28 U.S.C. § 1441 based on federal question jurisdiction.

## DISCUSSION

In their Motion, Plaintiffs argue that the state law claims in this case should be severed and remanded to state court because (1) severance and remand is mandatory under 28 U.S.C. § 1441(c); and (2) remand is warranted under 28 U.S.C. § 1367 because the state law claims predominate and this case raises novel or complex issues of state law. Plaintiffs also request that the remaining federal claim be stayed pending completion of the state court proceedings on the remanded state law claims.

**I.      Section 1441**

Plaintiffs first argue that severance and remand is mandatory under 28 U.S.C. § 1441(c), which provides, in relevant part, that:

> (1)     If a civil action includes—
>
> > (A)     a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and

3

> (B)     a claim not within the original or supplemental jurisdiction of the
>         district court or a claim that has been made nonremovable by statute,
>
> the entire action may be removed if the action would be removable without
> the inclusion of the claim described in subparagraph (B).
>
> (2)     Upon removal of an action described in paragraph (1), the district court shall
>         sever from the action all claims described in paragraph (1)(B) and shall
>         remand the severed claims to the State court from which the action was
>         removed.

28 U.S.C. § 1441(c).

This provision does not require remand. Although it requires severance and remand of "all claims described in paragraph (1)(B)," which as relevant here consists of any "claim not within the original or supplemental jurisdiction of the district court," such severance is not required because all of the state law claims are within this Court's supplemental jurisdiction. 28 U.S.C. § 1441(c)(2). A federal district court has supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, where the Court has original jurisdiction over Plaintiffs' federal due process claim and the state law claims provide different legal theories by which Plaintiffs challenge the same County ordinance at issue in the federal claim, the Court concludes that it has supplemental jurisdiction over the state law claims. Plaintiffs do not argue otherwise. Because the state law claims here are not subject to the mandatory severance and remand provision of 28 U.S.C. § 1441(c)(2), remand is not warranted on that basis.

## II.     Section 1367

That severance and remand is not mandatory does not the end the inquiry. Historically, pendent or supplemental jurisdiction has been "a doctrine of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (stating that 28 U.S.C. § 1367 codified the doctrine of pendent jurisdiction developed in *Gibbs*).

4

Under § 1367, a federal district court "may decline to exercise supplemental jurisdiction over a claim" if:

> (1)    the claim raises a novel or complex issue of State law,
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3)    the district court has dismissed all claims over which it has original jurisdiction, or
> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Pursuant to this provision, a court has the "inherent power . . . in cases removed from State court, to remand." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001).  In deciding "the additional question of whether to remand" claims to state court, a court should consider "principles of economy, convenience, fairness, and comity" and "whether the efforts of a party in seeking remand amount to a 'manipulative tactic.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)).  Here, Plaintiffs argue that declining supplemental jurisdiction and remanding the state law claims is warranted because the state law claims substantially predominate over the federal claim, and they raise a novel or complex issue of state law.

### A.    Substantially Predominate

The United States Supreme Court has stated that federal district courts should decline to exercise jurisdiction over state law claims if the state law issues substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs*, 383 U.S. at 726.  "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage," a district court "may fairly" decline to exercise jurisdiction over the state claim. *Id.* at 727.  State law claims may predominate when "the state law claims are more complex or require more judicial resources to adjudicate or are more

5

salient in the case as a whole than the federal law claims." *Diven v. Amalgamated Transit Union Int'l*, 38 F.3d 598, 602 (D.C. Cir. 1994) (citation omitted). Here, while Plaintiffs do not suggest that the proof required differs for the state law claims as compared to the federal claim, the scope of the issues raised and the comprehensiveness of the remedy sought illustrate that the state law claims substantially predominate over the federal due process claim.

Although the County argues that the scope of the issues is "essentially identical across all four counts" because both the federal claim and the collection of state law claims would require analysis of the term "place of public assembly" as defined in Bill No. 4-21, Opp'n Mot. Remand at 8-9, ECF No. 19, the Court does not construe the scope of the state law claims so narrowly. The state law claims collectively constitute a frontal attack on the validity of Bill No. 4-21 based on an array of state constitutional and statutory arguments. Counts 1 and 2 argue that the County's enactment of Bill No. 4-21 violated provisions of the Maryland Constitution and state statutes that limit the authority of the county to legislate on firearms. Count 2 in particular asserts that numerous different provisions of Bill No. 4-21 conflict with or are preempted by state law, in violation of Maryland's Express Powers Act. Count 3 asserts that all of the limitations on gun possession throughout Bill No. 4-21 violate state constitutional provisions barring the taking of private property without due process and compensation. In contrast, the sole federal claim in Count 4 is limited in scope. It challenges the County's definition of specific words and phrases such as "public," "may assemble," "library," "recreational facility," "park," "unfinished receiver," and "major component" as unconstitutionally vague and overly broad as to invite arbitrary enforcement, in violation of the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 58-62, ECF No. 7.

6

Moreover, the state law claims are more complex and would likely require more judicial resources to resolve. While the federal claim would primarily require the Court to examine specific phrases in Bill No. 4-21, the state law claims require the Court to look beyond the text and analyze the interplay between the bill and various Maryland constitutional and state law provisions. For example, the claim in Count 1 that the County is not authorized to enact this legislation requires analysis of whether it is the type of "local law[]" permitted by Article XI-E of the Maryland Constitution. Md. Const. art. XI-E. In response, the County states that its authority to legislate in this instance arises not from Article XI-E, but instead from Article XI-A, thus requiring the Court to analyze both provisions to evaluate the scope of the County's authority under the Maryland Constitution. *See* Md. Const. arts. XI-A, XI-E. Count 2, which alleges that Bill No. 4-21 conflicts with and is preempted by state law, requires an analysis of the six different Maryland statutes that Plaintiffs claim to preempt or conflict with Bill No. 4-21. Although the County argues that there is no preemption because Bill No. 4-21 fits within a statutory exception permitting a county to regulate certain specific gun activities, *see* Md. Code Ann., Crim. Law § 4-209(b) (LexisNexis 2021), consideration of that argument would require the Court to separately analyze that statute and Maryland firearm preemption law more generally. Further, the state constitutional claims in Count 3 add another complex legal analysis relating to two state constitutional provisions to the range of issues presented by the state law claims.

The comprehensiveness of the remedies sought also illustrates that the state law claims predominate. Plaintiffs primarily seek declaratory and injunctive relief against enforcement of Bill No. 4-21. If successful on the state law claims, the scope of that relief would be broader than what they could obtain by prevailing on the federal claim alone. For example, Plaintiffs' success on the federal due process claim likely would not bar enforcement of provisions of Bill No. 4-21

7

unconnected to the terms challenged as unconstitutionally vague, such as the limitations on transferring to a minor ghost guns not containing an unfinished receiver or guns made through a 3-D printing process. Because resolution of the federal claim in Plaintiffs' favor would still require consideration of whether the state law claims invalidate other provisions of Bill No. 4-21, the remedy sought through the federal claim is less comprehensive than the remedy sought through the state law claims.

For these reasons, the Court concludes that the state law claims "substantially predominate" over the federal claim. The state claims "constitute[] the real body of [the] case," and the federal claim here is "only an appendage." *Gibbs*, 383 U.S. at 727.

### B.     Novel or Complex Issue of State Law

As for whether the state law claims present a novel or complex issue of state law, the Court also finds that at least one of Plaintiffs' claims presents such an issue, specifically, Plaintiffs' assertion in Count 2 that Bill No. 4-21 is preempted by state law. In Count 2, Plaintiffs challenge Bill No. 4-21 based on the assertion that six different Maryland state statutes conflict with or preempt it in some way. Although the County argues that the preemption issue is limited to the question of whether Bill No. 4-21 fits within the explicit statutory exception to preemption of firearms regulations which permits a county to regulate the "purchase, sale, transfer, ownership, possession, and transportation" of firearms "with respect to minors" or within 100 yards of a "place of public assembly," Md. Code Ann., Crim. Law § 4-209(b)(1), the existence of this provision does not resolve the question of whether Bill No. 4-21 conflicts with the other allegedly preemptive or conflicting state statutes, or how such conflicts should be reconciled with section 4-209(b). The parties have not cited, and the Court has not identified, any controlling authority applying that statutory exception or meaningfully interpreting its scope.

8

Notably, the existing law relating to whether Maryland has preempted local government laws regulating firearms, including the coverage of section 4-209, is not easily navigated. In *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675 (D. Md. 2006), a judge in this District analyzing section 4-209 and several other state statutory provisions that preempt local authority to regulate firearms concluded that "[s]tate law has so thoroughly and pervasively covered the subject of firearms regulation and the subject so demands uniform state treatment, that any non-specified regulation by local governments is clearly preempted." *Id.* at 687, 690 (holding that the City of Gaithersburg's questionnaire, which requested more information for the return of a firearm than that required under state law to possess a firearm, was preempted by state law), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). The court further concluded that "there can be no doubt that the exceptions to otherwise blanket preemption" in Maryland state law "are narrow and strictly construable." *Id.* Subsequently, in *State v. Phillips*, 63 A.3d 51 (Md. Ct. Spec. App. 2013), the Maryland Court of Special Appeals held that a local ordinance that was not expressly preempted by section 4-209(a) was not impliedly preempted because Maryland "ha[d] not so extensively regulated the field of firearm use, possession, and transfer that all local laws relating to firearms are preempted." *Id.* at 56, 75-76 (holding that a Baltimore City ordinance requiring certain persons convicted of gun offenses to register with the police commissioner was not void based on preemption). Against this landscape, another judge in this District has noted that there is a "lack of clarity regarding the preemption of local law" on firearm use, possession, and transfer. *Blue v. Batth*, No. GJH-15-1024, 2017 WL 4162244, at *5 n.7 (D. Md. Sept. 18, 2017).

Significantly, while the County cites to two opinions from the Maryland Attorney General addressing preemption of local gun laws, no party has cited to authority from the Maryland Court of Appeals interpreting section 4-209. The sole Maryland Court of Appeals case referenced by

9

the County. *Montgomery County v. Atlantic Guns, Inc.*, 489 A.2d 1114 (Md. 1985), interprets a predecessor preemption provision and is thus of limited value. *See id.* at 1115, 1118 (finding a county ordinance regulating loaded handguns to be preempted because the express preemption provision barring regulation of handguns applied to the regulation of ammunition).

Against this backdrop of limited relevant Maryland case law, the preemption issue presented is a matter of first impression. The Maryland courts have yet to consider and resolve a challenge to Bill No. 4-21, on preemption grounds or otherwise, and they have not considered Plaintiffs' specific theory under Count 2 that the County's broadened definition of "place of public assembly" has expanded the regulation of firearms beyond what is permitted by section 4-209(b). Under these circumstances, the Court finds that the state law claims involve a "novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Because the Court finds that the state law claims both substantially predominate over the federal claim and that at least one state law claim involves a novel or complex issue of state law, the Court may decline to exercise supplemental jurisdiction over the state law claims.

## C.  Other Considerations

In determining whether to remand, the Court also considers the principles of economy, convenience, fairness, and comity and whether the party seeking remand is engaged in a manipulative tactic. *Hinson*, 239 F.3d at 617. The Court does not find that Plaintiffs have engaged in a manipulative tactic in seeking remand, so the Court will focus on the other factors.

Principles of economy and convenience generally support keeping all claims in one forum. In this instance, however, Plaintiffs request a remand of state law claims and a stay of the sole remaining federal claim until the state claims are resolved. This approach would mitigate concerns about economy and convenience by preventing the County from having to litigate simultaneously

10

in two separate forums and, depending on the proceedings in state court, may obviate the need to litigate the federal claim to completion. Moreover, because this action is in the early stages of litigation and the parties do not anticipate discovery, there is no concern about having wasted judicial resources by remanding at this stage of the action.

The County argues that because the legal theories advanced by Plaintiffs "contain significant overlap," there is a risk that issues of estoppel may complicate adjudication of the federal claim. Opp'n Mot. Remand at 10. The Court finds that Plaintiffs' claims in Counts 1-3 are different enough in nature and scope from the federal claim that this risk is not significant. Although this risk may be greater as to Count 4, in which the federal and state vagueness claims are largely duplicative, the Court will address this risk by exercising supplemental jurisdiction over the state law claim in Count 4 and declining to sever and remand that claim.

Most importantly, the Court finds that any benefits of judicial economy or convenience that could be achieved by keeping all of the claims in one forum are significantly outweighed by the principles of fairness and comity, which favor remand of the state law claims. This litigation is at its core about whether a local government ordinance regulating firearms violates the Maryland Constitution and state law restrictions on such local government provisions. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. Accordingly, the Court concludes that interests of comity outweigh any minimal federal interest in having this Court insert itself into what is primarily a dispute over the scope of a local government's authority to legislate under state law. *See, e.g., Kimberlin v. Nat'l Bloggers Club*, No. GJH–13–3059, 2015 WL 1242763, at *18 (D. Md. Mar. 17, 2015) (declining to exercise supplemental jurisdiction because "no federal policy . . . would be furthered" by the Court

11

presiding over state law claims and one federal claim). The Court will therefore decline to exercise supplemental jurisdiction over Counts 1-3 and will sever those counts and remand them to state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Sever and Remand All State Law Claims will be GRANTED IN PART and DENIED IN PART in that the Court will decline to exercise supplemental jurisdiction over the claims in Counts 1, 2, and 3, which will be severed and remanded to the Circuit Court for Montgomery County, and Count 4 will be stayed and held in abeyance pending the state court's resolution of Counts 1, 2, and 3. A separate order shall issue.

Date:   February 7, 2022

THEODORE D. CHUANG
United States District Judge

FILED

1  Case No. 21-CV-00690

2  Dept. No. I                                    2021 DEC 10  AM 9: 54

3  The undersigned affirms that this document     TANYA SCHRINE
                                                   COURT ADMINISTRATOR
4  does not contain the social security number    THIRD JUDICIAL DISTRICT
   of any individual.                              
5

6           IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

7                       IN AND FOR THE COUNTY OF LYON

8
   POLYMER80, INC.,
9
                    Plaintiff,                     **FINDINGS OF FACT,**
10                                                 **CONCLUSIONS OF LAW, AND**
                                                   **ORDER GRANTING SUMMARY**
11          vs.                                    **JUDGMENT IN FAVOR OF**
                                                   **PLAINTIFF, POLYMER80, INC.**
12  STEPHEN SISOLAK, Governor of Nevada, AARON
    FORD, Attorney General of Nevada, GEORGE
13  TOGLIATTI, Director of the Nevada Department
    of Public Safety, MINDY MCKAY, Administrator
14  of the Records, Communications, and Compliance
    Division of the Nevada Department of Public
15  Safety,

16
                    Defendants.
17  _____/

18          This matter is before the Court upon the parties' competing Motions for Summary Judgment

19  both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter
20
    was set for argument on November 23, 2021.  Plaintiff was present and represented by Brad
21
22  Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

23  of Greenspoon Marder LLP, who was present in Court.  The Defendants were represented by Craig

24  A. Newby, Esq., Deputy Solicitor General, who was present in Court.

25          This Court, having reviewed and considered the parties' respective motions and oppositions
26
    for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing
27
28  upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and

    **EXHIBIT C**                    Page 1 of 17

good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS.

**I**

## PROCEDURAL HISTORY

During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB 286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts relating to unfinished frames or receivers under certain circumstances; ... providing penalties; and providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB 286 into law on June 7, 2021.

On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada, George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay, Administrator of the Records, Communications, and Compliance Division of the Nevada Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and a Permanent Injunction barring enforcement of the new law.

On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and Preliminary Injunction*. After briefing and a hearing, this Court, on July 16, 2021, entered its *Order Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That Order is currently pending appeal at the Nevada Supreme Court.

---

[1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286 Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

1    Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021,

2    that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited

3    trial date of November 30, 2021. That Order also provided that the parties could engage in discovery

4    through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive

5    motions. By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop

6    the evidentiary record to be presented upon motions for summary judgment and/or at trial.

7    In the ensuing months, the parties proceeded with discovery. Both Polymer80 and

8    Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2] Pursuant to the

9    parties' Stipulation, this Court directed that they file their oppositions to the other side's summary

10   judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing

11   on November 23, 2021. That hearing was held as scheduled and the Court heard substantial

12   argument from the parties. Notably, both parties agreed at that hearing that this Court could decide

13   this case upon the record before it at that point, and that a trial was unnecessary. At the conclusion

14   of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment. This Order

15   follows and memorializes that ruling.

16   Accordingly,

17   IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is

18   GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set

19   forth herein and on the record at the November 23, 2021, hearing.

20

21

22

23

24   [2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an
     appeal from this Court's *Order Granting Preliminary Injunction*. Thereafter, Defendants filed a
25   Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure
     question of law that would be resolved upon their then-pending appeal. This Court denied
26   Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not
     AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion
27   in granting interim relief. Moreover, a stay would have only delayed a ruling on the constitutionality
     of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.
28

## II

## <u>CONTESTED PROVISIONS OF AB 286</u>

The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by adding, among others, the following provisions, which are the subject of this proceeding.

First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

> 1.    A person shall not possess, purchase, transport or receive an unfinished frame or receiver unless:
>     (a) The person is a firearms importer or manufacturer; or
>     (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.
>
> 2.    A person who violates this section:
>     (a) For the first offense, is guilty of a gross misdemeanor; and
>     (b)  For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130.[3]

Plainly, this provision makes it a crime to "possess, purchase, transport or receive an unfinished frame or receiver" in the State of Nevada.

Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

> 1.    A person shall not sell, offer to sell or transfer an unfinished frame or receiver unless:
>     (a) The person is:
>         (1) A firearms importer or manufacturer; and
>         (2) The recipient of the unfinished frame or receiver is a firearms importer or manufacturer; or
>     (b)  The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.

---

[3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison and a fine of up to $5,000.00.

2.    A person who violates this section:
(a) For the first offense, is guilty of a gross misdemeanor; and
(b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130

This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver" in the State of Nevada.

Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or receiver" to Nevada law and defines that term as follows:

9.    "Unfinished frame or receiver" means a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.[4]

# III

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than simply show that there is some metaphysical doubt as to the operative facts in order to avoid

---

[4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment relating to the efficacy of those provisions.

1   summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2   724, 732 (2005) (quotations omitted).   "The nonmoving party must, by affidavit or otherwise, set

3   forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4   judgment entered against him." *Id.*  And, the party opposing summary judgment cannot build a case

5   on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6   *Nevada Bell*, 108 Nev. 105, 110 (1992)).   Critically, the Nevada Supreme Court, as the parties have

7   acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8   Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9   *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009).  As explained below, there are no

10   "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11   this action on summary judgment upon the record before it.

12                                      **IV**

13                   **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14          Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15   It manufactures, designs, and distributes gun-related products, components, and after-market

16   accessories.  The legislative history reveals that AB 286 has targeted, at least partially, certain of

17   Polymer80's business products.  Defendants have also admitted as much in their Answer and in their

18   moving papers.  As set forth in the testimony of Assemblywoman Sandra Jauregui:

19                   . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
20                   largest manufacturers of ghost guns.

21   Minutes, Assembly Committee on Judiciary, p.6 (March 17, 2021).  Assemblyman Wheeler stated

22   therein:

23                   The kit guns you called ghost guns are used by a lot of hobbyists.
24                   Under federal law, those are quite legal, so outlawing them in Nevada,
                     as this bill tries to do, basically puts a company [Polmer80] in my
25                   district out of business. . . .
                     We are going to drive a company in my district out of business, but
26                   people can still buy them in Kentucky. . .

27

28

1 | <u>Minutes</u>, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

2 | **A.     STANDING OF POLMER80**

3 |         In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of

4 | Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.   The

5 | Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts

6 | in their Motion that they indeed have standing.

7 |         NRS 30.040 provides, in pertinent part:

8 |              **NRS 30.040. Questions of construction or validity of . . . statutes.**

9 |
10 |                   1. Any person . . . whose rights, status or other legal relations
     are affected by a statute . . . may have determined any question of
     construction or validity arising under the . . . statute . . . and obtain a
11 |              declaration of rights, status or other legal relations thereunder.

12 | NRS 30.040(1).  In Nevada, the issue of Standing is a question of law.  *Arguello v. Sunset Station,*

13 | *Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

14 |              The question of standing concerns whether the party seeking relief has
15 |              a sufficient interest in the litigation. The primary purpose of this
                 standing inquiry is to ensure the litigant will vigorously and
16 |              effectively present his or her case against an adverse party. Thus, a
                 requirement of standing is that the litigant personally suffer injury that
17 |              can be fairly traced to the allegedly unconstitutional statute and which
                 would be redressed by invalidating the statute. A general interest in
18 |              the matter is normally insufficient: a party must show a personal
19 |              injury.

20 | *Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct.

21 | 7, 2021), (Citations Omitted).

22 |

23 |

24 |

25 |

26 | ───────────────
     [5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286
27 | all indicating the negative impact of the bill on their ability to conduct business in the State of
     Nevada.
28 |

1    This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the

2    constitutionality of AB 286.  Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125

3    Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its

4    ongoing conduct.  Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as

5    Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of

6    AB 286 takes effect January 1, 2022.  Accordingly, it is ripe for this Court to determine whether or

7    not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of

8    the Nevada Constitution.

9

10    Polymer80 satisfies the requirement to show that they would "personally suffer injury that

11    can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony

12    criminal prosecution each time they produce a product which allegedly falls under the purview of

13    the statute.  Further, Polymer80 would suffer significant economic loss as set forth in the Deposition

14    testimony submitted, and uncontested by the Defendants.  This, combined with the legislative history

15    showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that,

16    unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for

17    facial invalidity of the statute – which is Polymer80's only true redress.

18

19    This Court determines that Polymer80 will suffer irreparable harm in the absence of

20    declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as

21    Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice

22    of the conduct being criminalized.[6]

23

24

25

26

27    [6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would
      mitigate any harm as all Polymer80 would have to do is put a serial number on its products.  The

28

1

**B.      STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

2

3          The question before this Court is essentially whether or not AB 286 is unconstitutionally

4    vague under the Due Process Clause of the Nevada Constitution.  It is undisputed that Section 3 and

5    Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D

6    felonies.

7          Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty,

8    or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination

9    of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129

10   P.3d 682, 684 (2006).

11                        Statutes are presumed to be valid, and the challenger bears the burden
                          of showing that a statute is unconstitutional.  The court must interpret
12                        a statute in a reasonable manner, that is, [t]he words of the statute
                          should be construed in light of the policy and spirit of the law, and the
13                        interpretation made should avoid absurd results.  In reviewing a
                          statute, it should be given [its] plain meaning and must be construed
14                        as a whole and not be read in a way that would render words or phrases
15                        superfluous or make a provision nugatory.

16

*Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009).  In reviewing the statute,
17
"every  reasonable  construction  must  be  resorted  to,  in  order  to  save  a  statute  from
18
unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).
19

20         The Nevada Supreme Court has adopted a two-pronged test for determining whether a

21   criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

22

23

24

25

26   argument was abandoned on summary judgment.  Section 3(1)(b) and Section 3.5(1)(b) by their own
     terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be
27   imprinted with a serial number.  It is undisputed that the products produced by Polymer80 are not
     required by federal law to have a serial number imprinted on them.
28

1    Constitution. *See, e.g., Flamingo Paradise Gaming*, 125 Nev. at 510; *Gallegos v. State*, 123 Nev.

2    289, 294 (2007).

3
        A criminal statute can be invalidated for vagueness (1) if it fails to
4        provide a person of ordinary intelligence fair notice of what is
        prohibited *or* (2) if it is so standardless that it authorizes or encourages
5        seriously discriminatory enforcement.

6    *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).  Although both civil and criminal statutes

7    are judged under the same test, the Nevada Supreme Court has explained:

8
        [T]here are two approaches to a facial vagueness challenge depending
9        on the type of statute at issue. The first approach arises under a facial
        challenge to a civil statute and the plaintiff must show that the statute
10       is impermissibly vague in all of its applications. In making this
        showing, [a] complainant who engages in some conduct that is clearly
11       proscribed cannot complain of the vagueness of the law as applied to
        the conduct of others. **But, when the statute involves criminal**
12       **penalties or constitutionally protected rights, the second**
        **approach involves a higher standard of whether "vagueness**
13       **permeates the text.**

14
15   *Flamingo*, 125 Nev. at 512.[7]  Where a statute imposes criminal penalties, as is the case with AB 286,

16   the more exacting standard for Constitutionality is imposed.

17
        Under the higher standard, the question becomes whether vagueness
18       so permeates the text that the statute cannot meet these requirements
        in most applications; and thus, this standard provides for the
19       possibility that some applications of the law would not be void, but
        the statute would still be invalid if void in most circumstances.
20
21   *Flamingo*, 125 Nev. at 507.

22
23
24
    ─────────────────────────
25   [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed
     conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin*, 99 Nev. 336,
26   340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 495 (1982). This
     Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly
27   proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness
     challenges need to show that the law is "impermissibly vague in all its applications."
28

                                Page 10 of 17

In this Court's view, AB 286, a criminal enactment, fails under both prongs for various reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law. While similar, "the first prong is concerned with guiding those who may be subject to potentially vague statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of statutes." *Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

## C.    SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED

Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with fair notice of the conduct which it proscribes. The underlying purpose of this factor is to give a person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*, 123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport, receipt, transfer and sale of what the statute calls an "unfinished frame or receiver." While AB 286 purports to define the term "unfinished frame or receiver," that definition is as follows:

> [A] blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

This definition does not provide a person of ordinary intelligence with adequate notice of what AB 286 criminalizes.

As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada legislative statutory enactment. The terms used in the definition of "unfinished frame or receiver" are not defined elsewhere in the statute. These terms include - blank, casting, machined body, machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control cavity area.

The definition does not tell anyone when during the manufacturing process a blank, casting, or machined body (whatever those terms mean) has gone through the "major machining operations"

(whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct to comply with the law.  As a result, this Court finds that the text of AB 286 does not provide fair notice of whatever it criminalizes.  To this end, this Court asked on multiple occasions during oral argument on the Motion for Summary Judgment what those terms as used in AB 286 mean. Tellingly, the Defendants could not in any manner explain their meaning(s).

This Court inquired whether or not the common law defined the terms used in AB 286, and the response that this Court received was clearly in the negative.  As such, this Court cannot use the common law to decipher, clarify, or define the inherently vague terms of AB 286.  This fact distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of indecent exposure – a common law crime), where the Nevada Supreme Court found that that the common law can provide a definition as to what conduct a statute prohibits.  This Court inquired as to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and, again, the answer was no.  As a consequence, this case is also distinguishable from *Silverwing Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020), (Commonly accepted definition of "subdivision" contained within the State's planning and zoning statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law elsewhere defined an allegedly ambiguous term.  Thus, neither the common law nor any other Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

While portions of AB 286 incorporate certain terms that are defined in federal legislation, this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal definitions relating to firearms or the Gun Control Act into AB 286.  Here, the Nevada Legislature purposely included some federal definitions into AB 286 but, deliberately did not include others. From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent some legislative declaration to the contrary.  Simply put, had the Nevada Legislature wished to incorporate other federal definitions into AB 286, it knew how to do so and would have done so.  It

did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed to do.[8]

In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive from justice." The legislature failed to define what the term "fugitive from justice" meant in relation to the statute. The District Court upheld the validity of the statute and applied the federal definition of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed stating:

> Unlike Congress, the Nevada Legislature has not defined "fugitive from justice." By failing to adopt the federal definition of "fugitive from justice" or include any definition of that phrase. . ., the Legislature failed to provide the public with statutory notice of what that term means. It could arguably encompass a wide variety of circumstances. . . The fact that the district court, sua sponte, adopted the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that deficiency.

*Gallegos v. State*, 123 Nev. @ 294-95.

Finally, the legislative history of AB 286 does not shed any light on the undefined terms used in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates that the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

---

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

1   and undefined terms used in AB 286.  It is noteworthy that the parties agreed that the legislative

2   history for AB 286 gives this Court no information to determine what the Nevada Legislature meant

3   when adopting and implementing the definition of "unfinished frame or receiver."  Tellingly, not

4   even Webster's Dictionary defines a majority of these terms.

5           Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for

6   vagueness.  This Court finds this contention unpersuasive.  The criminal acts defined in Sections 3

7   and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the

8   possession and sale of "unfinished frames and receivers," whatever those things may actually be.

9   And, the person possessing or selling those "unfinished frames and receivers" need not have any

10  particular specific intent.  In fact, AB 286 only and very generally employs intent in the definition

11  of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or

12  a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm."  The

13  use of the word "intended" in this definition does not create the *scienter* element defendants claim

14  to exist within Section 3 and Section 3.5 of the bill.

15          Here, a literal reading of the definitional statute requires that the blank, casting or machined

16  body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm.

17  Nowhere in the definitional statute does it indicate who would have to have intended the unfinished

18  frame or receiver to be transformed into a firearm.  Is it the manufacturer like Polymer80?  It is

19  undisputed that it is their intent not to make a firearm.  Is it the seller of a gun kit?  They have no

20  intent to make a firearm.  The object itself cannot transfer specific intent to the possessor of the item.

21          Even if this Court were to assume an intent element was specifically meant to apply to any

22  individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally

23  vague.  For example, if Section 3 criminalized the possession of a blank, casting, or machined body

24  only if the person who possessed such an item (whatever it might actually be) specifically intended

25  to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still

26  be unconstitutionally vague.

27          In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined

28  body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

1   machining, and (ii) already be formed or machined to the point at which most of the major machining
2   operations have been completed.  Yet, none of these terms are defined, nor is there any way to know
3   when "most of the major machining operations have been completed," and then what "additional
4   machining" must still occur and when.  Accordingly, any specific intent that can be read into
5   Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB
6   286 still fails to provide adequate notice as to what it specifically criminalizes.

7        Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or
8   common law.  Consequently, the only notice of what AB 286 criminalizes is provided in the statute
9   itself.  However, the law does not provide adequate notice of what it criminalizes, given that the
10  definition of "unfinished frame or receiver" uses a myriad undefined terms.  Moreover, the combined
11  use of these undefined terms results in an overall failure to provide a person of ordinary intelligence
12  with fair notice of what is criminalized.  As there is no well-established or ordinary meaning to the
13  terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process
14  Clause of the Nevada Constitution.

15

16  **D.   SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT**
17  **AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

18       This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages
19  seriously discriminatory enforcement." *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).
20  The Court finds that it is.

21       As explained by the Nevada Supreme Court:

22

23           The concern under this prong is the scope of discretion left to law
             enforcement officials and prosecutors. Our fear is that absent adequate
24           guidelines, a criminal statute may permit a standardless sweep, which
             would allow the police, prosecutors, and juries to 'pursue their
25           personal predilections.'

26  *Gallegos*, 125 Nev. @ 296.  (Citation Omitted)

27       AB 286 fails to establish clear standards that law enforcement can use to determine whether
28  the law is violated.  At its most basic, there is no clear standard for law enforcement to use to

1   determine when an "unfinished frame or receiver" comes into existence. Unlike the federal

2   regulatory process to determine whether a frame or lower receiver is considered a firearm under the

3   Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame

4   or receiver" actually comes into existence. The most any court can glean from the definition is that

5   it is something less than a firearm and more than a block of raw material. Where on the scale in

6   between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the

7   law and left to the sole discretion of law enforcement and prosecutors. When does the machining

8   process start? When does the raw material become machined and through what processes? What

9   constitutes a "major machining operation" versus machining itself? Would the "fire-control cavity"

10   be considered a "major machining operation" or is it excluded? What additional machining needs to

11   be completed? It is unclear and undefined under the statute.

12       Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike

13   as they, in their sole discretion and without guidance, could label almost anything an "unfinished

14   frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.

15   There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing

16   their personal predilections.

17       Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section

18   3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law. Therefore,

19   enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary

20   and discriminatory enforcement.

21       For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are

22   unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23                               **V**

24                         **ORDER AND JUDGMENT**

25       Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are

26   unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence

27   with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and

28   encourages seriously arbitrary and discriminatory enforcement.

1    Good cause appearing,

2    IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3    GRANTED.

4    IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5    DENIED.

6    IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7    Polymer80 and against Defendants; to wit,

8    IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9    Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10   State Constitution.

11   IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12   Polymer80 and against Defendants; to wit,

13   IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14   Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15   Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16   Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17   and their respective successors, officers, agents, servants, and employees and anyone acting in

18   concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19   Section 3 and Section 3.5 of AB 286.

20   IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21   this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22   exonerated and released to Polymer80 forthwith.

23   THIS IS A FINAL JUDGMENT.

24   DATED this 10th day of December, 2021.

25

26                                                    JOHN P. SCHLEGELMILCH,

27                                                    DISTRICT JUDGE

28

1  Case No. 21-CV-00690

2  Dept. No. I

### Certificate of Mailing

3

4      I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5  Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6  mailed at Yerington, Nevada addressed to:

7  Gregory L. Zunino, Esq.
   *Emailed*: gzunino@ag.nv.gov
8

9  Brad M. Johnston, Esq.
   *Emailed: bjohnston@shjnevada.com*
10

11  James J. McGuire, Esq.
    *Emailed: james.mcguire@gmlaw.com*
12

13  Michael Patrick, Esq.
    *Emailed: michael.patrick@gmlaw.com*

14  Mark Doerr
    *Emailed: mark.doerr@gmlaw.com*
15

16  Craig A. Newby, Esq.
    *Emailed: CNewby@ag.nv.gov*
17

18

19      DATED: This _10 th_ day of December, 2021.

20

21                          _al Nelson_
22                          Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28

## IN CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE, INC., et al.,**

*Plaintiffs,*

**vs.**                                        **CASE NO.: 485899V**

**MONTGOMERY COUNTY, MARYLAND,**

*Defendant.*

### PLAINTIFFS' MOTION TO EXCEED PAGE LIMITATION
### ON THEIR OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND
### ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through counsel and pursuant to the Rules of this Court, hereby move for

leave to exceed the page limitation applicable to the accompanying Plaintiffs' Opposition To

Defendant's Motion For Summary Judgment And Motion To Dismiss. For the following reasons,

this motion should be granted:

1. On May 28, 2021, Plaintiffs filed a four-count Verified Complaint in this Court, seeking

declaratory and equitable relief as to County Bill 4-21, which made numerous changes to Chapter

57, Weapons, of the Montgomery County Code. The law went into effect on July 16, 2021. Count

I of the Verified Complaint alleges that Bill 4-21 is not a "local law" within the meaning of Article

XI § 3 of the Maryland Constitution. Count II alleges that Bill 4-21 violates the Express Powers

Act, MD Code, Local Government, §10-206, because Bill 4-21 is preempted by or is inconsistent

with numerous provisions of State law. Count III alleges that Bill 4-21 constitutes an illegal Taking

under the Maryland Takings Clause, Article III, §40 of the Maryland Constitution, and a

deprivation of property without due process in violation of Article 24 of the Maryland Declaration

of Rights. Count IV alleges that Bill 4-21 is unconstitutionally vague under both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

2. On June 16, 2021, prior to the entry of any scheduling order, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. The Motion was two pages long, not counting the supporting declarations and attachment, and the supporting memorandum of law was 51 pages long, not counting the certificate of service. Plaintiffs requested an emergency hearing on their motion.

3. This Court granted plaintiffs' hearing request and scheduled a hearing on plaintiffs' emergency motion for July 15, 2021. However, on July 12, 2021, in lieu of answering or filing a response to plaintiffs' motion, defendant removed the entire case to federal district court pursuant to 28 U.S.C. § 1441. That removal deprived this Court of jurisdiction to hear the case and the July 15, 2021, hearing was accordingly cancelled. Plaintiffs promptly moved in federal district court to sever the State law claims set forth in Counts I, II, III and IV from the sole federal claim stated in Count IV of the Complaint and to remand the State law claims back to this Court.

4. On February 7, 2022, the federal district court granted plaintiffs' remand motion as to Counts I, II and III, but elected to retain jurisdiction over Count IV, which included both a State constitutional claim under Article 24 and a federal due process claim brought under 42 U.S.C. § 1983. Both Count IV claims alleged that Bill 4-21 was unconstitutionally vague. After receiving the remand order, this Court entered a Scheduling Order, dated February 25, 2022.

5. On February 22, 2022, defendant filed a Motion to Dismiss and Alterative Motion for Summary Judgment, and an Opposition to plaintiffs' motion for summary judgment. That motion was two pages long and the supporting memorandum filed with defendant's motion and opposition was 48 pages long, not counting extensive attachments. Defendant's motion sought dismissal or

2

summary judgment on all the State law claims that were remanded from federal district court, including Count III on which plaintiff had not previously sought summary judgment. Defendant also filed a motion for leave to exceed the page limitation set forth in the Scheduling Order. Plaintiffs have no objection to defendant's motion to exceed the page limit.

6.   As is apparent, the issues presented are complex and important as they involve fundamental questions of preemption and the scope of Montgomery County's power to enact legislation that conflicts or is inconsistent with numerous provisions of State law and is otherwise alleged to in violation of multiple provisions of the Maryland Constitution. These issues fully warrant extended briefing and argument. The accompanying Opposition to defendant's motion to dismiss and for summary judgment is as short as feasible given the length of defendant's 48-page supporting memorandum and motion that addresses all Counts of the Complaint, including Count III, as to which plaintiffs had not previously sought relief in their motion. These pending motions will likely be dispositive of all liability issues, as there are no disputed issues of facts. Such briefing ensures that the Court has the benefit of fully developed arguments.

WHEREFORE, plaintiffs respectfully seeks leave to exceed to the Court's page limitation for their Opposition to defendant's motion.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
   *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing Plaintiffs' Motion To Exceed Page Limitation On Opposition To Defendant's Motion To Dismiss And Alternative Motion For Summary Judgment was served on the following counsel for defendant Montgomery County via the MDEC e-filing system:

Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

Respectfully submitted,

/s/ *Mark W. Pennak*

MARK W. PENNAK
*Counsel for Plaintiffs*

4

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.,* | **Case No.: 485899V** |
| *Plaintiffs,* | |
| vs. | **EXPEDITED HEARING REQUESTED** |
| **MONTGOMERY COUNTY, MARYLAND,** | |
| *Defendant.* | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND MOTION TO DISMISS
EXPEDITED HEARING REQUESTED**

**INTRODUCTION**

On May 28, 2021, plaintiffs filed the Complaint in this matter, challenging Montgomery County Bill 4-21. On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment and supporting memorandum ("P. Mem."), seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint.

On June 16, 2021, plaintiffs filed an emergency motion for partial summary judgment, seeking declaratory and equitable relief on Counts I, II and IV of the Complaint. Plaintiffs at that time did not seek relief under Count III of the Complaint. This Court set a hearing date for July 15, 2021, the day before the County ordinance would have become effective. On July 12, 2021, the day defendant's answer or responsive pleading would have been due, defendant removed the entire case to federal district court under 28 U.S.C. § 1441. The July 15, 2021 hearing was cancelled.

- Page 1 -

1        On February 7, 2022, acting on plaintiffs' motion for a remand, the federal district court

2    remanded Counts I, II and III to this Court. *Maryland Shall Issue, Inc. v. Montgomery County*, No.

3    TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022). A copy of the remand order and the district

4    court's slip opinion are attached as Exhibits A and B, respectively. The district court retained

5    jurisdiction and held in abeyance Count IV of the Complaint, which alleged Bill 4-21 was fatally

6    vague under the Due Process Clause of the Fourteenth Amendment and under Article 24 of the

7    Maryland Declaration of Rights. Count IV is thus no longer before this Court.

8        On February 22, 2022, defendant filed a motion to dismiss and alternative motion for

9    summary judgment on all counts of the Complaint before this Court, as well as its opposition to

10   plaintiffs' motion for partial summary judgment. Pursuant to Rule 2-311, and Rule 2-501, plaintiffs

11   respectfully submit this memorandum in opposition to the defendant's motion and in further

12   support of plaintiffs' emergency motion for partial summary judgment on Counts I and II of the

13   Complaint. For the reasons set forth in plaintiffs' June 16, 2021 motion and supporting

14   memorandum and in this Opposition, defendant's motion should be denied and plaintiffs' motion

15   for declaratory and equitable relief on Counts I and II should be granted, enjoining defendant,

16   Montgomery County ("County"), from enforcing Bill 4-21. While plaintiffs did not originally seek

17   summary judgment on Count III, the issues presented are purely questions of law and can be

18   decided on the defendant's motion for summary judgment. Plaintiffs, no less than defendant, are

19   entitled to a declaration of the parties' rights on defendant's motion. See P. Mem. at 48.

20

21

22

23

24

- Page 2 -

1                                      **ARGUMENT**

2 **I.      AT LEAST ONE PLAINTIFF HAS STANDING ON EACH COUNT**

3        Defendant argues first that the Complaint should be dismissed because the plaintiffs lack

4 standing. (Def. Mem. at 11). That assertion is not remotely serious. To have standing to seek

5 declaratory relief under MD Code, Courts and Judicial Proceedings, § 3-409(a), a plaintiff need

6 only allege that he or she has suffered "some kind of special damage from such wrong differing in

7 character and kind from that suffered by the general public." *Voters Organized for the Integrity of*

8 *City Elections v. Baltimore City Elections Bd.*, 451 Md. 377, 396, 152 A.3d 827 (2017). A

9 declaratory judgment is appropriate if even "one plaintiff" has standing. (451 Md. at 398). The

10 County does not dispute that pre-enforcement review is fully available under this test. *Pizza di*

11 *Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases).

12 The authority on which the County relies is not to the contrary. The County simply ignores the test

13 established by this body of recent case law.

14        At least one plaintiff has standing to bring each count of this Verified Complaint. All of

15 the individual and corporate plaintiffs (save Carlos Rabanales and Maryland Shall Issue, Inc.

16 ("MSI")) are residents of Montgomery County, and either do business in Montgomery County

17 (plaintiffs Engage Armament and I.C.E. Firearms & Defensive Training, LLC.), or are employees

18 or owners of these two corporate entities. Plaintiff Engage Armament alleges it possesses, sells

19 and acts a dealer for "ghost guns" and components banned by Bill 4-21, and transfers such items

20 to lawful purchasers "in the presence" of minors when accompanied by a parent. (Complaint ¶ 26).

21 Plaintiffs Andrew Raymond, Brandon Ferrell and Deryck Weaver all specifically allege they

22 possess one or more "ghost guns" regulated by Bill 4-21. Complaint ¶¶ 26, 27, 29, 30. Plaintiff

23 I.C.E. Firearms and its owner, Ronald David, likewise allege they possess parts, including

1   unfinished receivers banned by Bill 4-21. Such allegations easily distinguish these plaintiffs from

2   the "general public," as these individuals and companies are directly regulated by Bill 4-21. Each

3   of the plaintiffs alleges their locations (homes or businesses) are arguably within the scope of those

4   locations newly regulated by Bill 4-21. The County does not contest any of these allegations and

5   each are supported by sworn declarations.

6        Similarly, the supervisory employees of Engage Armament, Brandon Ferrell and Deryck

7   Weaver, are directly impacted by Bill 4-21's regulation of possession of firearms by such

8   employees, as is their employer, Engage Armament. (Complaint, ¶¶ 29, 30). Plaintiff, Andrew

9   Raymond is directly affected as an owner of Engage Armament (Complaint ¶ 27), and thus has

10  standing to challenge Bill 4-21's regulation of firearms possessed by business owners as does

11  plaintiff Ronald David, the owner of I.C.E. Firearms. (Complaint, ¶33). Andrew Raymond also

12  has standing to challenge Bill 4-21's regulation of possession of "ghost guns" with respect to

13  minors, as he has two minor children who reside with him at his residence in Montgomery County.

14  (Complaint ¶ 27). Plaintiff Deryck Weaver likewise has one minor child residing at his residence

15  in Montgomery County. (Complaint ¶ 30).

16       Plaintiff Carlos Rabanales, a co-owner of Engage Armament, is a resident of Frederick

17  County, and he is individually affected by Bill 4-21's criminalization of his activities at Engage

18  Armament and his ability to travel into Montgomery County with parts and materials from

19  Frederick County to make a living in Montgomery County. (Complaint ¶ 28). The County disputes

20  **none** of these allegations. Each of the foregoing verified allegations is specific, supported by sworn

21  declarations and make clear each of the individual plaintiffs could be sent to prison by Bill 4-21.

22  If these persons do not have standing, then no one does. *Lujan v. Defenders of Wildlife*, 504 U.S.

23

24                                 - Page 4 -

1   555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily

2   little question that the action or inaction has caused him injury.").

3          MSI alleges its membership includes persons who likewise own or possess "ghost guns"

4   and components regulated by Bill 4-21 in Montgomery County, that it participated in the

5   regulatory consideration of Bill 4-21 by filing comments and objections, and that the Bill, as

6   enacted, burdens the ability of MSI members to keep and bear arms within Montgomery County,

7   including firearms that are otherwise lawful in Maryland. (Complaint ¶¶ 24, 25). These verified

8   allegations are sufficient to establish MSI's standing. See *Fraternal Order of Police v.*

9   *Montgomery Cty.*, 446 Md. 490, 506-07, 132 A.3d 311 (2016) (holding that a police union had

10  standing to challenge the County's use of public funds to defeat a referendum concerning a statute

11  on collective bargaining because statute affected the scope of bargaining by the union on behalf of

12  its members).

13         But this Court need not address MSI's standing, as at least "one" of the other plaintiffs has

14  standing to seek declaratory relief, and all it takes is "one" plaintiff. *Voters Organized for the*

15  *Integrity of City Elections*, 451 Md. at 398. The rule in the federal courts is the same. For example,

16  in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020), the Fourth Circuit relied on

17  well-established case law to hold that the federal and State licensed firearms dealer plaintiff in that

18  case (Atlantic Guns) had Article III standing to sue on its own behalf **and** had third-party standing

19  to sue on behalf of customers and "other similarly situated persons" in a constitutional challenge

20  to MD Code, Public Safety, § 5-117.1. (971 F.3d at 216). The Fourth Circuit concluded that it was

21  therefore unnecessary to reach the standing of other plaintiffs, including MSI. (971 F.3d at 214 &

22  n.5). Plaintiff Engage Armament is likewise a federal and State licensed firearms dealer

23  (Complaint ¶ 26), and has the same standing here as Atlantic Guns had in *MSI*. See, e.g., *Saint*

- Page 5 -

*Luke Institute, Inc. v. Jones*, 471 Md. 312, 350, 241 A.3d 886 (2020) (relying on federal standing law in holding plaintiff had third party standing). Defendant's motion to dismiss should be denied.

## I.   BILL 4-21 IS CONTRARY TO THE EXPRESS POWERS ACT (COUNT II).

### A.   Bill 4-21 Exceeds the Scope of Regulatory Power Authorized by the General Assembly in Enacting Section 4-209(b).

Under the Express Powers Act, MD Code, Local Government, §10-206, Montgomery County laws must be "not inconsistent with State law," and the County is barred from enacting laws that are "preempted by or in conflict with public general law." The County does not deny it is bound by the Express Powers Act, but asserts that Bill 4-21 is authorized by MD Code, Criminal Law, 4-209(b)(1), and that the County is thus compliant with the Express Powers Act. Section 4-209(b)(1) does not save Bill 4-21.

As the federal district court noted in remanding this case, there is no case law or other binding authority on the scope of Section 4-209(b)(1). Slip op. at 8. Indeed, as that court also noted (id.), the only decision to address the scope of authority bestowed by Section 4-209(b) is *Mora v. City of Gaithersburg,* 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). *Mora* held that "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation," holding further there can be no doubt that "the exceptions [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly construable." (Id.). *Mora* was discussed in plaintiffs' supporting memorandum (at 9, 32) and yet, remarkably, the County ignores *Mora*. This Court should follow *Mora* and strictly construe Section 4-209(b)(1).

In any event, Bill 4-21 goes far beyond what is authorized by Section 4-209(b). The controlling aspect of the Section 4-209(b)(1) exceptions is that the County's authority to regulate

- Page 6 -

1   is restricted to within **100 yards** of places of "public assembly." Bill 4-21 flouts that restriction

2   and effectively amends Section 4-209(b)(1) by broadly defining "place of public assembly" to

3   include every location, public **or private** "where the public may assemble." County Code, § 57-1.

4   Bill 4-21 then amends existing County law to greatly expand the specific locations that are

5   "included" within this definition. See *Tribbitt v. State,* 403 Md. 638 943 A.2d 1260 (2008) ("when

6   the drafters use the term 'includes,' it is generally intended to be used as 'illustration and not ...

7   limitation'") (citation omitted). See P. Mem. at 40-45.

8          As explained in plaintiffs' opening memorandum (P. Mem. at 10-11), the County is not at

9   liberty to expand the exceptions set out in Section 4-209(b)(1), by broadly defining the meaning

10  of these statutory terms. Even the County admits the list of locations in Bill 4-21 is "somewhat

11  larger" (Def. Mem. at 31) than that set forth in Section 4-209(b)(1). That admission is both a gross

12  understatement and fatal to the Bill, as the County has no authority to enlarge the list set out in

13  Section 4-209(b)(1) **at all**. The County is restricted to what the legislature has authorized. Whether

14  a particular location is a place of public assembly requires a case-by-case determination, not an *a*

15  *priori* redefinition by the County.

16         The County argues (Opp. Mem. at 31-32) that the "plain language" of Section 4-209(b)(1)

17  leaves it free to define a "place of public assembly" to include places where people "may assemble."

18  Yet, nothing in the language of Section 4-209(b)(1) speaks in terms of "may assemble," much less

19  purports to authorize the County to define the term so as to expand the regulatory reach of Section

20  4-209(b)(). Rather, it authorizes regulation within 100 yards of specific places and "other places

21  **of** public assembly," a term which denotes, in the present tense, **public** places that **are** typically

22  used to assemble by the public, not places that "may" be used in the future. Plaintiffs' homes and

23  business are not places where the public normally "assembles."

24

- Page 7 -

1         The County endorses (Def. Mem. at 30) plaintiffs' reliance (P.Mem. at 14) on the *ejusdem*

2   *generis* canon of construction, but fails to grasp that this canon **restricts** the scope of the term

3   "place of public assembly" to those **public** places that are **similar** to the **public** places listed in

4   Section 4-209(b)(1), *i.e.,* similar to "a park, church, school, public building." (Id.). Again, plaintiffs'

5   private homes and businesses are not such places. It is facially absurd to argue, as the County does

6   (Def. Mem. at 30), that defining a "place of public assembly" to include all places, "whether the

7   place is publicly or privately owned," where people "may assemble" is "co-extensive" with "a

8   park, church, school or public building." Rather, the County's redefinition of "place of public

9   assembly," was intended to be and is a dramatic expansion far beyond those locations specified in

10  Section 4-209(b)(1). The County's expanded list of specific locations to include "privately owned"

11  places lefts no doubt on that score.

12        Of course, whether a given location is a "place of public assembly" may not be clear in

13  every case. What should be clear, however, is that the County may not redefine terms enacted by

14  the General Assembly to mean whatever the County would like them to mean and thus broaden

15  the scope of the exception and expand its regulatory power. By limiting the geographic scope of

16  Section 4-209(b) to locations within 100 yards of specified places, the General Assembly

17  obviously intended to **limit** the scope of County authority. While the County derides plaintiffs'

18  suggestion that the term "may assemble" could include virtually every sidewalk and street where

19  two or more persons "may" meet (Def. Mem. at 31), the County never even attempts to proffer a

20  different, more limited definition consistent with the language of Bill 4-21. Plaintiff's

21  interpretation is both facially reasonable (P. Mem. at 40) and consistent with the County's avowed

22  purpose of expanding its regulatory reach.

23        **B.**      **Bill 4-21 Is Expressly Preempted By Other Maryland Statutes**

- Page 8 -

1      Defendant does not deny Bill 4-21 conflicts with no fewer than five express firearms

2   preemption statutes, one of which was enacted into law as recently as March of 2021 by the

3   Maryland General Assembly. See MD Code, Public Safety, § 5-207(a) (enacted in 2021 and

4   expressly preempting a County from regulating "the transfer of a rifle or shotgun"); MD Code,

5   Public Safety, § 5-133(a) (amended in 2003 and expressly preempting a County from regulating

6   "the possession of a regulated firearm"); MD Code, Public Safety, § 5-134(a) (amended in 2003

7   and expressly preempting a County from regulating "the transfer of a regulated firearm"); MD

8   Code, Public Safety, § 5-104 (amended in 2003 and expressly preempting a County from

9   regulating the "sale of a regulated firearm"); 1972 Session Laws of Maryland, Ch. 13, § 6

10  (expressly preempting "the right of political subdivisions" to regulate "the wearing, carrying, or

11  transporting of handguns"). See P. Mem. at 14 *et seq.*

12      Rather, the County asserts the Court should reconcile these provisions so as to give effect

13  to all of these provisions. (Def. Mem. at 32-33). We agree. See *Maryland-National Capital Park*

14  *& Planning Comm'n v. Anderson*, 395 Md. 172, 183, 909 A.2d 694 (2006). Such reconciliation is

15  easily achieved here. As outlined above and as *Mora* held, the Section 4-209(b)(1) exceptions are

16  to be narrowly construed precisely to avoid conflicts. The 100-yard limitation imposed by Section

17  4-209(b)(1) should be strictly enforced to prohibit the County from extending that limitation

18  through the artifice of defining statutory terms selected by the General Assembly. Under that

19  approach, Bill 4-21 fails, as the Bill impermissibly reaches into any place where people "may

20  assemble," which is literally everywhere in the County, far beyond the 100-yard distance specified

21  in Section 4-209(b)(1). Such reach effectively nullifies all these other preemption provisions in

22  Montgomery County. Manifestly, that result is contrary to any reasonable construction of

23  legislative intent. See *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186 (2005)

- Page 9 -

1   ("The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the
2   Legislature.").

3         The County also contends Section 4-209(b)(1) trumps all these statutes because four of
4   these five statutes were originally enacted prior to the 1985 enactment of Section 4-209. (Def.
5   Mem. at 34). In particular, the County places heavy reliance on a 1991 Attorney General Opinion
6   that purports to apply the general canon of construction that a later enacted law controls over an
7   earlier enacted law. Yet, the County largely ignores plaintiffs' point (P. Mem. at 18), that all these
8   preemption provisions were repealed and reenacted in 2003 by the General Assembly, **after** the
9   2002 recodification of Section 4-209. See 2003 Maryland Laws Ch. 5. The canon that later enacted
10  statutes control over earlier statutes is based on the notion that such legislative action is an
11  indication of legislative intent. Here, the 2003 legislation expressly **repealed** earlier versions of
12  these preemption provisions and enacted **new** versions with **new** language. (Id.). That legislative
13  action post-dates the 1985 enactment of Section 4-209.

14        In so doing, the General Assembly was obviously fully aware of the provisions of Section
15  4-209, which had been recodified without change a year earlier in 2002. While the Revisor's notes
16  suggest that parts of these 2003 statutes were intended to be enacted without substantive change
17  from earlier versions, that point merely means the preemption provisions were not intended to be
18  substantively limited in their reach by any prior legislation. What controls is that these preemption
19  provisions were repealed and reenacted in 2003 with new language, **after** the 2002 recodification
20  of Section 4-209, and that reality necessarily embodies a legislative intention to give these
21  preemption provisions full effect, notwithstanding the 2002 recodification of Section 4-209.

22        Significantly, each of these newly enacted preemption provisions in 2003 preempt County
23  regulation of "regulated firearms." The term "regulated firearms" did not exist in 1985, when

- Page 10 -

Section 4-209 was enacted. Rather, that term was first used in 1996. See 1996 Session Laws, Ch. 562. The 2003 repeal and enactment of these preemption provisions shows that the General Assembly adopted a comprehensive approach to preemption of local regulation of "regulated firearms." Again, that 2003 legislation is later than the General Assembly's earlier codification of Section 4-209 in 2002.

The weakness of defendant's argument is starkly demonstrated by how defendant attempts, but fails, to deal with the preemption provisions of MD Code, Public Safety, § 5-207(a), a new provision enacted in 2021. Ignoring its now inconvenient argument that the later enactment governs, defendant contends that Section 5-207(a) should not be read to be an "implied repeal" of Section 4-209(b). (Def. Mem. at 35). That contention is makeweight. At the least, Section 5-207 superseded Section 4-209 by virtue of being enacted after Section 4-209. More fundamentally, this 2021 enactment of Section 5-207(a) shows the General Assembly's renewed commitment to preemption in general, as that preemption provision is plainly modeled after the other preemption provisions, discussed above, which were repealed and reenacted in 2003. That suggests, once again, that state-wide preemption provisions should be given preference and the exception provisions of Section 4-209(b) should be narrowly construed, as *Mora* held.

The County also argues (Def. Mem. at 33) in cases of conflict, the more specific statute controls over the more general statute. Again, we agree. See P. Mem. at 14-15. But the County errs in asserting Section 4-209(b) is more specific and thus controlling. Each of the preemption statutes, listed above, addresses a very specific subject matter, and purports to impose an absolute preemption as to that specific subject matter and activity. For example, three of the five provisions address preemption of a particular type of activity (possession or transfer or sale) with respect to a "regulated firearm." The fourth provision preempts local regulation with respect to "the wearing,

- Page 11 -

1    carrying, or transporting of handguns" which are also "regulated firearms" under Section 5-
2    101(r)(1) of the Public Safety Article.

3          The fifth provision, Section 5-207(a), preempts County regulation of the "transfer of a rifle
4    or shotgun," which is also very specific, both as to the subject matter (rifle or shotgun) and the
5    activity (transfer). In contrast, Section 4-209(b)(1) grants limited exceptions from the otherwise
6    broad preemption provisions of Section 4-209(a), which address **all types** of firearms and **all types**
7    of activities, *viz,* "the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession,
8    and transportation" of "a handgun, rifle, or shotgun" and "ammunition" for these types of firearms.
9    By any measure, the specialized preemption provisions are more specific than Section 4-209.

10       **C.**    **Bill 4-21 Is "Inconsistent" With Other Maryland Statutes.**

11           **1.**    **Bill 4-21's reach into private homes and businesses.**

12         As explained in plaintiffs' opening brief (P. Mem. at 22, *et seq.*), Bill 4-21 prohibits
13   activities that are expressly permitted by MD Code, Criminal Law, 4-203(b). See Section 4-
14   203(b)(6) (allowing the wear, carry, and transport of handguns "on real estate that the person owns
15   or leases or where the person resides" without a permit and by an owner of a business without a
16   permit "within the confines of a business establishment that the person owns or leases"); Section
17   4-203(b)(7) (allowing wear and carry and transport of a handgun without a permit by authorized
18   supervisory employees of a business "within the confines" of a business). Bill 4-21 bans the
19   possession of a "ghost gun" and the "major components" of all types of firearms on private
20   property, in the home, and it requires a business owner and "one" supervisory employee of the
21   business to obtain a carry permit for possession of "one" firearm at the business. It also reaches
22   and regulations mere possession of all firearms on private property. All of this is inconsistent with
23   State law.

1    Indeed, Section 4-203(b)(6), exempts wear, carry and transport of a handgun on any "real

2    estate that the person owns or leases or where the person resides," while County Code, § 5-11(b)(3)

3    exempts only the possession of a "firearm" or ammunition "in the person's own home," and thus

4    is far narrower than the possession, wear, carry or transport of a *handgun* authorized by Section 4-

5    203(b)(6). Indeed, in limiting the exemption for possession of all "firearms" to the interior of one's

6    "own home," Section 5-11(b) allows Section 5-11(a) to reach possession of a *long gun* anywhere

7    on any private property, including private property owned or leased by the home owner. As noted,

8    Bill 4-21 amends Section 5-11(a) to reach  such private property as it redefines a "place of public

9    assembly" to include places where the public "may assemble," **regardless** of "whether the place

10   is publicly or privately owned." Yet, as explained *infra* (at 18-20), nothing in the comprehensive

11   regulatory scheme for firearms enacted by the General Assembly regulates (much less bans) the

12   otherwise lawful possession of a long gun on any private property, much less on private property

13   a person "owns or leases" or where the person "resides."

14   Similarly, the exemption in County Code, § 5-11(b)(4), not only requires the business

15   owner and the supervisory employee to obtain a carry permit, it limits the business owner to "one"

16   firearm and ammunition for that "one" firearm, and further limits the exemption to "one"

17   supervisory employee. Yet, nothing in Section 4-203(b)(6) limits the owner to "one" firearm, much

18   less ammunition for that "one" firearm. Nothing in Section 4-203(b)(7) limits the owner to "one"

19   authorized supervisory employee. As noted, State law does not regulate the possession of a loaded

20   or unloaded long gun on private property. Yet, Section 5-11(b)(4) would ban "possession" of any

21   "firearm," including a *long gun*, by a business owner or an authorized supervisory employee unless

22   these persons had a State Police-issued permit to wear, carry or transport *a handgun*. The State

23   Police do not issue handgun carry permits for such purposes under MD Code, Public Safety, §5-

- Page 13 -

1   306. Such regulatory provisions are inconsistent with the foregoing provisions of Section 4-203(b)

2   and State law in general, and thus violate the Express Powers Act. See P. Mem. at 8.

3        The County wrongly argues these conflicts do not exist because they are supposedly based

4   on plaintiffs' "overbroad reading" of the Bill's definition of "place of public assembly" as

5   encompassing most if not all of Montgomery County. In essence, the County is contending its

6   definition of "place of public assembly" does not reach into homes and businesses. (Def. Mem. at

7   39). Yet, the ban on "ghost guns" in the home is **expressly** stated in County Code, Section § 57-

8   11(b)(3), and thus necessarily embodies the County's intent to reach into the home. The ban on

9   possession of "ghost guns" in the mere "presence" of a minor likewise easily reaches into the home.

10  County Code, § 57-7(d). The County does not deny that it amended Section 57-11(a) to reach and

11  regulate possession of all firearms (including long guns) on "privately owned" property. These

12  express bans make clear the County fully intended to reach into the sanctity of the home, including

13  all property owned or leased by a person or where a person resides. The same point is equally true

14  for the Bill's **express** regulation of business owners and supervisory employees in County Code,

15  § 57-11(b)(4). The County has not disputed the Verified Complaint's factual allegations that each

16  of the individual plaintiffs' homes (save that of plaintiff Carlos Rabanales) and business locations

17  are "arguably within 100 yards of a place of public assembly" as defined by Bill 4-21. Each of

18  these plaintiffs is thus regulated by Bill 4-21 in a manner inconsistent with State law.

19        Home possession of firearms is also constitutionally protected by *District of Columbia v.*

20  *Heller*, 554 U.S. 570, 635 (2008), which struck down DC's ban on handguns and held that the

21  Second Amendment "*elevates above all other interests* the right of law-abiding, responsible

22  citizens to use arms in defense of hearth and home." (Emphasis added). Plaintiffs thus argued that

23  this Court should interpret Section 4-209(b) narrowly so as to avoid that constitutional issue. See

- Page 14 -

Case 8:22-cv-01967-TDC   Document 7   Filed 08/08/22   Page 93 of 235

P. Mem. at 33. Section 4-209(b)(1) is thus best read, consistent with its text and purposes, to govern **public** areas within 100 yards of "a place of public assembly," not private homes and businesses or private land not normally open to "public assembly." Such private homes, businesses and land are not akin to a "park, church, school, public building" specified in Section 4-209(b)(1)(iii). The rule is "[c]ommon sense must guide us in our interpretation of statutes, and 'we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Marriott Employees Federal Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 445, 697 A.2d 455 (1997) (quoting *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994). Defendant's response (Def. Mem. at 31) that a "church" is private and thus Section 4-209(b)(1) allows it to reach into all **other** types of private property is utterly untenable under this principle.

The County concedes any reach into the home would raise the constitutional issue, but asserts the right does not obtain because plaintiffs could protect themselves with other types of firearms. (Def. Mem. at 38 n.21). That "use other guns" argument was expressly rejected in *Heller*, 554 U.S. at 629, with respect to handguns, and has yet to be accepted by the Supreme Court or by **any** lower court with respect to "ghost guns" or "major components of all types of firearm banned by Bill 4-21 in the home.[1] Defendant's argument is also not responsive to plaintiffs' point that Section 4-209 should be interpreted narrowly to **avoid** this serious constitutional issue. Maryland

---

[1] The District of Columbia recently settled a federal lawsuit, *Heller v. District of Columbia*, No. 21-02376 (D.D.C., filed Sept. 08, 2021), in which the DC ban on "ghost guns" was challenged under the Second Amendment, by enacting new legislation that protected both the right of possession and the Second Amendment right to build firearms for personal use. See Ghost Gun Clarification Emergency Amendment Act of 2021, subsection (b), amending D.C. Official Code § 7-2502.02 (December 13, 2021).

- Page 15 -

1    law requires no less. See, e.g., *Schochet v. State*, 320 Md. 714, 730, 580 A.2d 176 (1990) ("a statute

2    will be construed so as to avoid a serious constitutional question").

3        Also flawed is the County's contention that Section 4-203(b) is irrelevant because it was

4    enacted in 1972, before the enactment of Section 4-209. First, the Court has a duty to reconcile

5    these statutes, rather hold that one statute or the other is completely ousted. Second, in any event,

6    the General Assembly revisited and revised Section 4-203 with the enactment of the Firearms

7    Safety Act of 2013, 2013 Maryland Laws, Ch. 427, and elected not to change any of the specific

8    provisions on which plaintiffs rely here. The general rule is that "[w]here sections of a statute have

9    been amended but certain provisions have been left unchanged, we must generally assume that the

10    legislature intended to leave the untouched provisions' original meaning intact." *American Case.*

11    *Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994). In cases of conflict, that intent

12    should be controlling over a statute, such as Section 4-209, that was last amended in 2010, in a

13    revision that **further restricted** the County's authority under Section 4-209(b) by adding new

14    subsection (b)(3). See 2010 Session Laws, Ch 712. That 2010 legislation, cited by defendant (Def.

15    Mem. at 35 n.18), thus hardly supports a broad reading of Section 4-209(b)(1).

16          **2.**    **Bill 4-21's provisions with respect to minors**

17        As set out in plaintiffs' opening brief (P. Mem. at 26, *et seq.*), the Bill's provisions with

18    respect to minors are also inconsistent with MD Code, Public Safety, § 5-133(d)(2)(i), and MD

19    Code, Criminal Law, § 4-104(b)(1). Particularly egregious is the Bill's provision that "a person

20    may not even "purchase, sell, transfer, possess, or transfer a ghost gun . . . *in the presence of a*

21    *minor*." That ban on activities of an adult in the mere "presence" of a minor is not authorized by

22    Section 4-209(b). As the Attorney General's Opinion referenced by the County makes clear, the

23    exception for local regulation of minors was intended to allow a County to regulate minor **access**

1   to firearm, not adult activities in the mere "presence" of a minor. See P. Mem. at 28. The County

2   never responds to that point.

3        Indeed, interpreting this minors provision of Section 4-209(b) broadly would raise

4   profound constitutional problems concerning the constitutional rights of parents to raise their

5   children, a right recognized in *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); and

6   *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). The Court of Appeals thus

7   narrowly construes State regulations and statutes to avoid such issues. *Koshko*, 398 Md. at 422-27.

8   The County contends this right is limited to "the custody of children" (Def. Mem. at 41 n.22), but

9   that contention was expressly rejected in *Frase*, 379 Md. at 124, which held parental rights were

10   not limited to "visitation disputes," but applied broadly to "other areas of [State] interference" as

11   well. Plaintiffs relied on these holdings in *Frase* and *Koshko* (P. Mem. at 28), but defendant ignores

12   these decisions completely.

13        **3.   Implied Preemption**

14        As set forth in plaintiffs' opening brief (P. Mem. at 19, *et seq*.), Bill 4-21 is impliedly

15   preempted by a comprehensive scheme of regulation of the sale, possession, transfer and transport

16   by the State law. Specifically, Bill 4-21 "deals with an area in which the General Assembly has

17   acted with such force that an intent to occupy the entire field must be implied." *Howard County v.*

18   *Potomac Electric Power Co.*, 319 Md. 511, 522, 573 A.2d 821 (1990). Here, as stated in *Mora*,

19   "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation."

20   *Mora*, 462 F.Supp.2d at 689.

21        Virtually all the factors that should be considered in making that implied preemption

22   determination are present here. See *Board of County Commissioners v. Perennial Solar, LLC*, 464

23   Md. 610, 619-20, 212 A.3d 868 (2019) (collecting the case law). No municipality or county has

1  ever attempted to enact legislation remotely similar to Bill 4-21. As *Mora* indicates, the State also

2  enacted a comprehensive system regulating firearms. The State Police have exclusive control over

3  the availability of carry permits under MD Code, Public Safety, § 5-306, and the State has

4  established a comprehensive system of regulation of State licensed dealers, such as plaintiff

5  Engage Armament.[2] Regulated firearms, which are handguns under MD Code, Public Safety, § 5-

6  101(r)(1), are extensively regulated by State law, which requires a prospective purchaser to

7  complete an "application," MD Code, Public Safety, §§ 5-117, 5-118, and the application be

8  approved by the Maryland State Police, MD Code, Public Safety, § 5-120, which must conduct its

9  own background investigation of the applicant, MD Code, Public Safety, § 5-121. A purchaser

10  must wait at least 7 days, but not more than 90 days, before completing the purchase of a regulated

11  firearm, MD Code, Public Safety, § 5-123, and may only purchase one regulated firearm every 30

12  days, MD Code, Public Safety, § 5-128. No person (with few exceptions) is permitted to purchase

13  or sell a handgun unless the purchaser has a Handgun Qualification License issued by the State

14

15

16

17

18  [2] See MD Code, Public Safety, § 5-106 (requiring a dealer's license issued by the State Police before a person may engage "in the business of selling, renting, or transferring regulated firearms"); MD Code, Public Safety, § 5-107 (specifying the contents of an application for a

19  dealer's license); MD Code, Public Safety, § 5-108 (requiring a background check for a dealer's license); MD Code, Public Safety, § 5-109 (requiring an investigation to determine the truth or

20  falsity of the information supplied and the statements made in an application for a dealer's license); MD Code, Public Safety, § 5-111 (establishing the terms of a dealer's license). Dealers were

21  further extensively regulated in 2013 with the enactment of the Firearms Safety Act of 2013, 2013 Session Laws Ch. 427 (amending MD Code, Public Safety, §§ 5-110, 5-114, 5-115, 5-146).

22  Dealers are also subject to extensive regulation by the Maryland State Police, including regulations controlling what firearms dealers may sell and where dealers may conduct business. See COMAR

23  §§ 29.03.01.42-.57. This is as comprehensive as it gets.

24

- Page 18 -

1    Police under MD Code, Public Safety, § 5-117.1. Private sales of regulated firearms must go

2    through the same process as dealer sales. MD Code, Public Safety, § 5-124.

3           In contrast, while the State requires that a private sale of a long gun to non-family members

4    be accomplished through a NICS background check as facilitated by a licensed dealer (not the

5    State Police), MD Code, Public Safety, § 5-204.1, the State has otherwise elected to leave the sale

6    of long guns to federal regulation without imposing the complex overlay of State regulation

7    applicable to regulated firearms. Similarly, the State has enacted special rules for the wear, carry

8    and transport of handguns, MD Code, Criminal Law, § 4-203, but not for long guns. Long guns,

9    unlike handguns, may thus be carried and transported outside the home without a carry permit

10   issued by the State Police and may even be possessed and carried fully loaded, except in or on a

11   vehicle. MD Code, Natural Resources, § 10-410(c)(1).

12          Moreover, any otherwise qualified person may purchase as many long guns as he or she

13   likes, without being restricted to one purchase every 30-days, and without any waiting period. A

14   minor may freely possess a long gun under State law, but a person under the age of 21 may not

15   possess a handgun, except under limited circumstances. MD Code, Public Safety, §5-133(d). A

16   new resident of Maryland must register a regulated firearm within 90 days, MD Code, Public

17   Safety, § 5-143, but need not register a long gun. A federally licensed dealer need only become a

18   State licensed dealer to sell regulated firearms, not long guns. See MD Code, Public Safety, § 5-

19   101(e) (defining "dealer's license"). A person who inherits a regulated firearm must complete the

20   entire application process outlined above, MD Code, Public Safety, § 5-102, but no such

21   requirement is imposed for long guns. The State severely punishes knowing non-compliance with

22   laws governing regulated firearms with five years of imprisonment, MD Code, Public Safety, § 5-

23   144, but such punishments are not applicable to long guns.

- Page 19 -

By any measure, the General Assembly has "enacted extensive and comprehensive legislation in the field" of firearms regulation. *Potomac Elec. Power Co. v. Montgomery County*, 80 Md.App. 107, 110, 560 A.2d 50 (1989). Such a system of comprehensive legislation is "the primary indicia" for determining the question of implied preemption. *Perennial Solar*, 464 Md. at 620. As noted, this comprehensive system includes multiple express preemption provisions, including Section 4-209(a), that necessarily embody the legislature's desire to exercise control over this field. This whole system of carefully calibrated regulation is contradicted by Bill 4-21's undifferentiated, County-wide regulation of the sale, transfer, possession or transport of a "handgun, rifle, or shotgun." County Code, 57-11(a). For example, it is apparent that State law sharply distinguishes between "regulated firearms" and long guns. It is equally apparent that Bill 4-21 treats all firearms the same. The resulting dual regulatory system virtually ensures "confusion" among ordinary, law-abiding persons who live in or travel through Montgomery County. *Potomac Electric*, 80 Md. App. at 110.

Defendant does not deny the comprehensive nature of State regulation, but justifies Bill 4-21 by asserting the General Assembly has authorized local regulation in Section 4-209(b). (Def. Mem. at 37). That assertion misses that point. The State has occupied the field and thus preempted regulation of firearm possession, sale, transfer, and transport except in the very narrow areas permitted by Section 4-209(b). As explained above, there can be little doubt that Bill 4-21 reaches far beyond these very limited exceptions to achieve near County-wide, across-the-board regulation of firearms of all types. See P. Mem. at 31. In an Attorney General Opinion not cited by the County, the Attorney General "cautioned" against county regulations like Bill 4-21, stating that Section 4-209(b)'s "authorization for local regulation 'with respect to minors' cannot be a pretext for regulation of adults' access to handguns." 82 Op. Att'y. 84, 86 (1997). As the Attorney General

1   stated, "[t]he Legislature could not have intended to authorize localities to achieve indirectly what

2   they may not achieve directly: across-the-board regulation of firearms." (Id.). Here, Bill 4-21 does

3   precisely that.

4         *State v. Phillips*, 210 Md. App. 239, 63 A.3d 51 (2013), on which defendant also relies

5   (Def. Mem. at 37), is not to the contrary. In *Phillips*, the issue was whether Baltimore City's

6   ordinance requiring gun offenders to register with the Police Commissioner was impliedly

7   preempted. The court cited the preemption provisions of Section 4-209, but noted the complainant

8   in that case "does not contend, nor could he that the Act is expressly preempted by conflict,"

9   because the Act at issue "does not regulate the possession or sale of a firearm." (210 Md.App. at

10  280). Here, of course, Bill 4-21 does "regulate the possession or sale of a firearm." *Phillips*

11  provides no guidance on whether such a county law is preempted.

12  ## II.  BILL 4-21 IS NOT A LOCAL LAW (COUNT I)

13        As detailed in plaintiffs' opening brief (P. Mem. at 31), Bill 4-21 is not a "local law" within

14  the meaning of Article XI, § 3. It should be obvious the regulation of firearms in the manner

15  attempted by Bill 4-21 "deals with the general public welfare, a subject which is of significant

16  interest not just to any one county, but rather to more than one geographical subdivision, or even

17  to the entire state." *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386 (1976). Thus, "some statutes,

18  local in form, have been held to be general laws, since they affect the interest of the whole state."

19  *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). We stress again that Bill 4-21

20  is not limited to "ghost guns," but rather broadly regulates all firearms and "major components"

21  throughout the County. See County Code, § 57-11(a). Such regulations "affect the interest of the

22  whole state."

23

1    The result is the same even if Bill 4-21 is viewed as a "ghost gun" ordinance. As noted in

2    plaintiffs' opening brief (P. Mem. at 34), the General Assembly has considered State-wide

3    regulation of "ghost guns" in the last three legislative Sessions. By the end of this legislative

4    Session, the General Assembly will likely have enacted a "ghost gun" law. See Senate Bill 387,

5    https://bit.ly/3HsrZBj, and the cross-filed House Bill 425. https://bit.ly/3C7rgEE. HB 425 has just

6    received a favorable report from House Judiciary Committee and soon will be voted on in the

7    House of Delegates. https://bit.ly/3C7rgEE. The Attorney General and legislative leaders have

8    called for the enactment of this legislation, and action by the General Assembly on these bills is

9    considered quite likely. See https://bit.ly/3psu2z8. These bills seek to incorporate the approach

10   taken by the ATF in its proposed rule that will be issued, in final form, not later than June of 2022.

11   See 87 Fed. Reg. at 5111 (January 31, 2022), an approach not followed by Bill 4-21. These bills

12   also create a pathway for continued possession of homemade firearms by current owners, a

13   provision in direct conflict with the approach followed by Bill 4-21. Contrary to Bill 4-21, these

14   bills do not regulate "component" parts of firearms. These bills embody a recognition that "ghost

15   guns" are a matter of State-wide concern and enactment of these bills will bring Bill 4-21 into

16   direct conflict with State law in violation of the Express Powers Act.

17           Defendant does not address plaintiffs' reliance on the test articulated in *Steimel* and *Cole*.

18   Defendant ignores *Cole* entirely and cites *Steimel* only for a different proposition, *viz.*, that a local

19   law may not be "drawn" to apply to two more geographical subdivisions of the State. (Def. Mem.

20   at 17). As noted, *Steimel* also states a law is a prohibited "general law" if it "*deals with* the . . . a

21   subject which is of significant interest not just to any one county, but rather to more than one

22   geographical subdivision, or even to the entire state." *Steimel*, 278 Md. 5 (emphasis added). *Cole*

23   referenced this test and expressly endorsed *Norris v. Mayor & City Council of Baltimore*, 172 Md.

1  667, 192 A. 531, 538 (1937); *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66 (1891); *Gaither v.*

2  *Jackson*, 147 Md. 655, 128 A. 769 (1925); and *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 (1936).

3  In each of those cases, the Court struck down an ordinance because it was not a "local law." *Cole*

4  explained that the controlling "rationale" of these cases was "that while the immediate objective

5  sought to be achieved was local in character, the statutes *indirectly affected* matters of significant

6  interest to the entire state." *Cole*, 249 Md. at 434-35 (emphasis added). By ignoring this point,

7  defendant effectively concedes that Bill 4-21 "indirectly affect[s] matters of significant interest to

8  the entire state" under *Cole*.

9         Defendant tries to argue that Bill 4-21 does not sweep broadly, but that effort fails. As

10  noted, Bill 4-21 expressly bans, in County Code, § 57-11(a), the sale, transfer, possession or

11  transport of **all** firearms within 100 yards of the Bill's vastly expanded "places of public assembly,"

12  subject only to a limited list of exceptions set out in County Code, Section 57-11(b). For example,

13  Section 57-11(b)(6) exempts "an unloaded firearm" from the bans imposed by Section 57-11(a).

14  Yet, even as thus limited, that ban is exceedingly broad, as Section 57-11(a) could be applied to

15  ban hunting with a loaded firearm or mere possession of any loaded firearm anywhere in the

16  County, including on "privately owned" land or even at a firing range of which the County has

17  several. See P. Mem. at 25. Under Bill 4-21, "ghost guns" (or a frame or receiver of a "ghost gun")

18  may not be possessed by an adult in the mere "presence" of a minor or by an adult in the home.

19  The County has no response and thus concedes these points.

20         Such regulation of all firearms in Montgomery County "indirectly affect[s] matters of

21  significant interest to the entire State," *Cole*, 249 Md. at 434-35, because Maryland residents

22  throughout the State, as well as non-residents, may travel through Montgomery County and may

23  purchase, possess or transfer firearms and components in the County under State and federal law.

- Page 23 -

1  Bill 4-21 certainly directly and adversely affects plaintiff Carlos Rabanales, who lives in Frederick

2  County, but travels to, and works at, Engage Armament in Montgomery County. (Complaint ¶ 28).

3  State-wide protection for such commerce lies at heart of the rationale for the express preemption

4  provisions discussed above. Uniform state-wide treatment of this subject matter ensures that

5  innocent persons are not criminally ensnared by local firearms regulations that could otherwise

6  differ from county to county, city to city, town to town. For example, a person from Garrett County

7  traveling in Montgomery County cannot be expected to be aware of or comply with the manifestly

8  odd provision of Bill 4-21 that regulates all firearms at all publicly or privately owned locations

9  within 100 yards of where the public "may assemble." Again, no other jurisdiction has such a law.

10  If the County may legally enact legislation such as Bill 4-21, then other jurisdictions will likewise

11  feel free to do so with still different requirements. The potential for massive confusion and

12  discriminatory arrests and prosecutions is apparent.

13          Ignoring these considerations, the County focuses on Bill 4-21's **separate** prohibition on

14  "undetectable" guns, arguing "major components" of an undetectable gun "would be easily

15  identified as part of an "undetectable gun" and thus there is no "genuine possibility" a law

16  enforcement officer could "confuse" "ghost gun" components with the components "of an ordinary

17  firearm." (Def. Mem. at 20). Yet, the Bill, in County Code, § 57-11(a), **also** bans "ghost guns" and

18  major components of **all** firearms, not merely those which are "undetectable." A "ghost gun" is

19  defined in County Code, § 57-1, as any firearm (including an "unfinished" receiver) that lacks a

20  serial number. The term "major component" is defined in County Code, § 57-1 to include a "slide

21  or cylinder or the frame or receiver" and "in the case of a rifle or shotgun, the barrel."

22          Nothing in these definitions is limited to undetectable parts. Slides or cylinders are seldom

23  "undetectable" as they are typically made of or contain metal. The "barrel" of a shotgun or rifle is

- Page 24 -

1  made entirely of metal. A completely metal "ordinary firearm" may be disassembled into these

2  parts and, once disassembled (or sold separately), those parts are indistinguishable from a "ghost

3  gun" major component. Under County Code, § 57-11(a), any transport, transfer or possession of

4  any of these "components" for any "handgun, rifle or shotgun" could subject a person to arrest and

5  prosecution. A shipment or sale of such a component to or by any person, **including a licensed**

6  **dealer,** would be banned as well. None of the exceptions to Section 57-11(a) set out in Section 57-

7  11(b) even mentions "components" so the sweep of Section 57-11(a) is completely unhindered as

8  to components. Thus, contrary to the County's assertion (Def. Mem. at 19), mere possession of a

9  "component" is banned in the home no less than anywhere else by County Code, § 57-11(a), as

10  the Section 57-11(b) exemption for the home is limited to "a firearm" and "ammunition" and the

11  "major components" banned by Bill 4-21 (other than a frame or receiver) are simply not "firearms"

12  under State and federal law. See P. Mem. at 5, 45.

13          These "major components" of an "ordinary firearm" are not serialized, and a slide, barrel,

14  or a cylinder can be used to build a completely legal firearm that is not a "ghost gun." The builder

15  need only use serialized receivers, which are sold at Federal Firearms Licensees in Maryland and

16  throughout the United States. See P. Mem. at 45. Bill 4-21 thus criminalizes a hobbyist whose

17  possession of these components is completely innocent and lawful. See Maryland State Police

18  Advisory LD-FRS-14-003 (May 16, 2014) (available at https://bit.ly/35wbl6M). It also

19  criminalizes the business operations of all Class 07 federally licensed manufacturers in the County,

20  including plaintiff Engage Armament, which are authorized and directed by federal law, 18 U.S.C.

21  § 923(i), to engrave serial numbers on the receivers they manufacture. (Complaint ¶ 26). All such

22  persons and manufacturers possess and use "major components" to legally build firearms. Plainly,

23

24

1  the County lacks the detailed understanding of firearms, the firearms industry and of federal and

2  State firearms law necessary to regulate intelligently.

3      The County likewise ignores that Bill 4-21 never defines what constitutes an "unfinished

4  frame or receiver," which Bill 4-21 includes in its definition of a "ghost gun" and thus bans

5  everywhere in the County, including in the home and in the "presence" of a minor. The lack of a

6  definition makes this ban both hopelessly vague and unknowably broad as it could include a solid

7  block of aluminum or polymer from which an actual receiver could be milled or crafted. See P.

8  Mem. at 44. Bill 4-21 would even ban Class 07 federally licensed manufacturers, like Engage

9  Armament, from making or possessing "unfinished" receivers during the manufacturing business,

10  as Bill 4-21 makes no exception for licensed dealers. See *Polymer80, Inc. v. Sisolak*, No. 21-CV-

11  00690 (3d Jud. District for Co. of Lyon, December 10, 2021), *appeal dismissed sub nom., Sisolak*

12  *v. Polymer80, Inc.*, 502 P.3d 184 (Nev. 2022) (invalidating Nevada's "ghost gun" law because it

13  failed to define "unfinished" frame or receiver) (opinion attached as Exhibit C). While plaintiffs'

14  vagueness claims in Count IV have been retained by the federal district court, the *scope* of Bill 4-

15  21 is before this Court on the other Counts of the Complaint. These matters are all "of State-wide

16  concern" for the reasons set forth above.

17  **III.   BILL 4-21 IS A *PER SE* TAKING UNDER THE MARYLAND**
   **CONSTITUTION (COUNT III)**
18
       Count III of the complaint alleges that the County's ban on the mere possession of a "ghost
19
   gun" and/or of "major components" is a Taking under the Maryland Takings Clause, Article III, §
20
   40 of the Maryland Constitution, and a deprivation of property without due process under the Due
21
   Process Clause of Article 24 of the Maryland Declaration of Rights. According to the County, Bill
22
   4-21 is an exercise of its "police powers" and therefore not a Taking. See Def. Mem. at 4, 42. That
23

                                        - Page 26 -

1   contention is wrong as a matter of law.

2       These provisions of the Maryland Constitution are interpreted in *pari materia* with the Fifth

3   Amendment. The Court of Appeals' decision in *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d

4   1061, 1070-72 (2002), so holds and makes clear that "[n]o matter how 'rational' under particular

5   circumstances, the State is constitutionally precluded from abolishing a vested property right." The

6   County's "rational" reasons for Bill 4-21 are thus irrelevant. If Bill 4-21 abolishes a vested property

7   right, then it is a Taking, *quod erat demonstrandum*. Bill 4-21 does precisely that.

8       In *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 968

9   (2011), the Court of Appeals explained that the "vested right" analysis is controlled by whether

10  the statute in question is retroactive, explaining that "[r]etrospective statutes are those 'acts which

11  operate on transactions which have occurred or rights and obligations which existed before passage

12  of the act.'" (30 A.3d at 969) (citation omitted). Federal law under the Fifth Amendment is in

13  accord. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992) (to escape the

14  Takings Clause, the government must show "that the proscribed use interests were not part of [the

15  owner's] title to begin with"). Here, the County does not dispute that plaintiffs possessed "ghost

16  guns" and components through "transactions" that occurred prior to the enactment of Bill 4-21.

17  The Bill is thus unquestionably "retroactive" under *Muskin* to the extent it operates on this

18  previously acquired property.

19      Likewise, there can be no dispute that the Maryland Takings Clause fully protects personal

20  property, including firearms. A "vested" right is simply a "property right under Maryland property

21  law." *Muskin*, 422 Md. at 560. In *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967

22  (2004), the Court of Appeals held Maryland's Taking Clause and Due Process Clause are violated

23  "[w]henever a property owner is deprived of the beneficial use of his property or restraints are

- Page 27 -

1   imposed that materially affect the property's value, without legal process or compensation." *Serio*

2   applied that rule to hold that the refusal of a county police department to relinquish a firearm so

3   that a convicted felon could exercise his remaining "ownership" interest violated these provisions

4   of the Maryland Constitution. (863 A.2d at 966, 968). See also *Pitsenberger v. Pitsenberger*, 287

5   Md. 20, 410 A.2d 1052, 1057-1060 & n.5 (1980). The Fifth Amendment's Taking Clause likewise

6   fully protects personal property. See *Horne v. Dep't. of Agric.*, 576 U.S. 350, 358 (2015) ("The

7   Government has a categorical duty to pay just compensation when it takes your car, just as when

8   it takes your home.").

9          In Maryland, "property is a term that has broad and comprehensive significance; it

10   embraces '*everything which has exchangeable value* or goes to make up a man's wealth....'"

11   *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995) (citation omitted) (emphasis added).

12   See *Serio*, 863 A.2d at 965 (relying on *Dodds*). The rule is the same under the Fifth Amendment.

13   *United States v. General Motors*, 323 U.S. 373, 378 (1945) ("[t]he constitutional provision is

14   addressed to every sort of interest the citizen may possess"). It is beyond obvious that "ghost guns"

15   are "property" under *Dodds* and *Serio* and that Bill 4-21 completely deprives the plaintiffs of "the

16   beneficial use" of their property. Bill 4-21 not only bans "possession" of "ghost guns" and

17   components, it bans the sale, transfer and transport as well. County Code, § 57-11(a). These

18   property interests abolished by Bill 4-21 far exceed the "ownership" interest that *Serio* held to be

19   protected.

20          Such regulation "goes too far" and is thus a *per se* Taking. A *per se* Taking is present where

21   the regulation is so complete "that its effect is tantamount to a direct appropriation or ouster."

22   *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). The "ouster" referenced in *Lingle* is the

23   ouster of *possession*. Id., at 539; *Lucas*, 505 U.S. at 1014 (noting that the "practical ouster of

- Page 28 -

1  possession" is the "functional equivalent of" a "direct appropriation"); *Murr v. Wisconsin*, 137 S.

2  Ct. 1933, 1942 (2017) (same). *Accord Steel v. Cape Corp.*, 111 Md. App. 1, 23-24, 677 A.2d 634

3  (1996) (following *Lucas*); *Offen v. County Council*, 96 Md.App. 526, 552, 625 A.2d 424 (1993),

4  *rev'd in part on other grounds*, 334 Md. 499, 639 A.2d 1070 (1994) (relying on *Lucas*, noting that

5  "'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a

6  physical appropriation'") (quoting *Lucas* 505 U.S. at 1017). Bill 4-21 "ousts" plaintiffs here of

7  their right of possession and destroys every *other* stick in the proverbial bundle of sticks that

8  comprise property. *Compare Andrus v. Allard*, 444 U.S. 51, 65 (1979) (holding there was no

9  Taking of personal property where the law at issue allowed the owners to retain the rights to

10  possess, donate, and devise their property), *with Horne*, 576 U.S. at 364 (finding a Taking of

11  personal property where there was a loss of possession and distinguishing *Andrus* on that basis).

12  Contrary to the County's contention, these principles are not trumped by the County's

13  "police powers." In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982),

14  the Supreme Court specifically noted that the lower court had determined that the alleged Taking

15  there involved a "legitimate public purpose" and thus was "within the State's police power." The

16  Court stated that it had "no reason to question that determination," but nonetheless expressly held

17  that *"[i]t is a separate question* . . . whether an otherwise valid regulation so frustrates property

18  rights that compensation must be paid." (Id). (Emphasis added). *Lucas* made the same point,

19  holding that "the legislature's recitation of a noxious-use justification cannot be the basis for

20  departing from our categorical rule that total regulatory takings must be compensated. *If it were,*

21  *departure would virtually always be allowed." Lucas*, 505 U.S. at 1027. (Emphasis added).

22  If "police powers" were all that mattered, then "just compensation" under the Takings

23  Clause would hardly **ever** be available as the power to conduct **any** Taking for a "public use" is

1    "coterminous" with a jurisdiction's "police power." *Hawaii Housing Authority v. Midkiff*, 467 U.S.

2    229, 240 (1984). See also *Kelo v. City of New London,* 545 U.S. 469, 480 (2005) (same). The

3    County's "police power" argument thus proves too much, a point that *Loretto* and *Lucas* recognize.

4    As the Fourth Circuit recently concluded in *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir.

5    2021), "[t]hat Government actions taken pursuant to the police power are not per se exempt from

6    the Takings Clause is axiomatic in the Supreme Court's jurisprudence." Maryland case law is in

7    full accord. See *Muskin*, 422 Md. at 565 ("When a statute enacted under the police power,

8    purporting to regulate private property, takes private property completely from an individual for a

9    public purpose, the doctrine of eminent domain is invoked, and the State must provide just

10   compensation for the taking."); *City of Annapolis v. Waterman*, 357 Md. 484, 509, 745 A.2d 1000

11   (2000) (following *Lucas* and holding "even if there is a valid, connected public purpose, i.e., an

12   essential nexus, there still must be compensation for the taking"); *Steel*, 111 Md.App. at 17 (finding

13   the regulation to be "a reasonable application of the police power" and then moving on to the

14   "second step of the takings analysis" under *Lucas*).

15         The foregoing Takings analysis assumes that Bill 4-21 is an authorized and lawful exercise

16   of the County's police power. If, as argued above, Bill 4-21 is not a "local law" under the Maryland

17   Constitution, or is otherwise contrary to the Express Powers Act, then the deprivation of property

18   rights by Bill 4-21 would not be a "reasonable application of the police power" and would thus

19   fail at the first "step" of the Takings analysis. *Steel*, 111 Md.App. at 17. The owner is still entitled

20   to "just compensation" for such any Taking that arose from such unlawful acts. (Id.). See *Lingle*,

21   544 U.S. at 543 ("if a government action is found to be impermissible . . . that is the end of the

22   inquiry"); *Del-Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362-63 (Fed. Cir.

23   1998) (unlawful government action may still be a Taking).

1        The County likewise errs in relying on (Def. Mem. at 46) the Fourth Circuit's split decision

2    in *Maryland Shall Issue v. Hogan,* 963 F.3d 356 (4th Cir. 2020), *cert. denied,* 141 S.Ct. 2595

3    (2021) ("*MSI*"). There, the majority refused to accept the State's argument, likewise presented by

4    the County here, that "police powers" were sufficient. Rather, the majority held that the Takings

5    Clause was not violated where the State law did not require that the property in question be "turned

6    over" to the State or a third party. (963 F.3d at 366). Contrary to the County's belief, nothing in

7    that majority opinion holds that the State's police power obviates a Taking, without more. Indeed,

8    the Fourth Circuit's recent ruling in *Yawn*, noted above, makes clear that is not so. Under *Serio*, a

9    Taking under the Maryland Constitution is presented where the statute deprives the owner of the

10   "beneficial use" of the owner's property right. No change of possession is required.

11       Ignoring *Serio* and *Dodds*, the *MSI* majority also held that the statute there was not a Taking

12   under the Maryland Constitution, because it was not "retroactive" under *Muskin*. According to the

13   court, that was so because the plaintiffs there had "fair notice of the change in the law." (963 F.3d

14   at 367). The *MSI* majority reasoned that Article III, § 40, turned on whether the statute "'would

15   impair rights a party possessed when he acted, increase a party's liability for past conduct, or

16   impose new duties with respect to transactions already completed.'" (Id.), quoting *John Deere

17   Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 957 A.2d 595, 599 (2008).

18       That analysis is misguided. First, the *John Deere* decision, cited by the *MSI* majority, is

19   not a Takings case, it was a due process case. More importantly, "retroactivity" as applied to a

20   Takings· challenge means the same thing it meant in *Lucas, viz.,* that the statute "operates" on

21   "rights . . . which existed before passage of the act." *Muskin*, 422 Md. at 555. While *Muskin* used

22   due process principles set out in *John Deere* to help define the "unique property interest" adversely

23   affected by the statute there at issue (422 Md. at 559), the Court went on to find a Taking of this

- Page 31 -

1    "unique" interest even though the Court *also* found that plaintiffs there had "fair notice." (422 Md.

2    at 558). That holding contradicts the *MSI* majority's holding that "fair notice" is enough. *Muskin*

3    applied traditional Takings principles to hold that there was a Taking, and that analysis did not

4    include the due process test applied by the *MSI* majority. (422 Md. at 563-68).

5         Under *Muskin*, due process principles may help define a "unique" property interest, but

6    nothing in *Muskin* purported to overrule the *Dodds* definition of "property" applied in *Serio* and

7    at issue here. See *McCree v. State*, 441 Md. 4, 16, 105 A.3d 456 (2014) (applying *Dodds* in a

8    decision that post-dates *Muskin* by three years). Under *Dodds*, there is nothing "unique" about

9    plaintiffs' property rights at issue here. Thus, unlike in *Muskin*, there is no need to resort to due

10   process nuances to define "property." It is enough that plaintiffs legally possessed their personal

11   property before Bill 4-21 was enacted. As the Court of Appeals stated in *Pitsenberger*, "possessory

12   interests in property are within the protection of the Fourteenth Amendment" (287 Md. at 29),

13   noting further that "Article III, § 40 and the Fourteenth Amendment have the same meaning in

14   reference to a 'taking' of property." (287 Md. at 33 n.5), citing *Bureau of Mines v. George's Creek*,

15   272 Md. 143, 156, 321 A.2d 748 (1974) ("The constitutional provision is addressed to every sort

16   of interest the citizen may possess.").

17        For the reasons set out in the dissenting opinion, the *MSI* majority's ruling that there is no

18   Taking unless the State (or third party) assumes possession of the property is also dead wrong

19   under the Takings Clause of the Fifth Amendment. See 963 F.3d at 377 (Richardson, J., dissenting).

20   The majority's analysis is incompatible with the Supreme Court's decision in *General Motors*,

21   where the Court held that "the deprivation of the former owner rather than the accretion of a right

22   or interest to the sovereign constitutes the taking." (323 U.S. at 377). The majority in *MSI* did not

23   even cite, much less discuss, *General Motors*. The majority likewise took no notice of the

1    statement in *Lucas* that the effect is to be determined "from the landowner's point of view." (505

2    U.S. at 1017). In short, from the owner's "point of view," a criminal law that bans possession

3    deprives the owner of his or her property regardless of whether there has been an "accretion of the

4    right" of possession to the State. See *MSI*, 963 F.3d at 375-76 (Richardson, J., dissenting). The

5    dissent would have sustained the Maryland Takings claim for the same reasons the dissent would

6    have sustained the Fifth Amendment claim. (963 F.3d at 376 n.12). The dissent was correct.

7         Defendant also relies on *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*,

8    493 F.3d 404 (4th Cir. 2007), as somehow creating a "police power" exception to the Takings

9    Clause. (Def. Mem. at 45). That reliance is misplaced, again for the reasons set forth by the dissent

10   in *MSI*. See 963 F.3d at 377-78 (Richardson, J., dissenting). Any such interpretation of *Holliday*

11   is likewise precluded by the Fourth Circuit's recent and subsequent ruling in *Yawn*, noted above,

12   which dismissed as contrary to Supreme Court jurisprudence the notion that "police power" is a

13   complete defense to a Takings claim. *Yawn*, 1 F.4th at195. This Court should follow the dissent's

14   Takings analysis and the *Yawn* ruling, not the majority's flawed approach.

15        In any event, this Court is not bound by lower federal court decisions and thus must address

16   this question *de novo. Pope v. State*, 284 Md. 309, 320 n.10 396 A.2d 1054 (1979) (holding that

17   unlike the decisions of the Supreme Court of the United States, decisions of federal courts of appeal

18   are not binding on Maryland courts); *Henry v. Gateway, Inc.*, 187 Md. App. 647, 666, 979 A.2d

19   287 (2009) (same); *Whalen v. HPRB*, 2020 WL 2501446 at *5 (Md. App. 2020) (same). In so

20   doing, the Court should look to the recent decision by the Federal Circuit in which the court

21   declined to follow the *MSI* majority's approach to property. *McCutchen v. United States*, 14 F.4th

22   1355, 1366 n.6 (Fed. Cir. 2021). While the Federal Circuit also declined to accept the government's

23   reliance on its "police power," it held that the plaintiffs' challenge to a federal rule that banned

- Page 33 -

1    continued possession of specific personal property failed because plaintiffs did not have a

2    sufficient *pre-existing* property interest that *pre-dated* the regulation in question. *McCutchen*, 14

3    F.4th at 1363-65.

4          That particular result in *McCutchen* is, of course, inapposite, as the plaintiffs here have

5    fully protected, vested property rights under *Dodds* in the property acquired prior to Bill 4-21's

6    enactment, as discussed above. However, the Federal Circuit's analysis of general Takings

7    principles is consistent with the approach taken by the dissent in *MSI* and by *Dua, Muskin, Serio,*

8    *Steel, Waterman* and *Offen*, discussed above. The *McCutchen* court's refusal to accept the

9    government's "police power" argument is likewise persuasive authority on that point as is the

10   Fourth Circuit's recent ruling in *Yawn*, noted above. These decisions and opinions should guide

11   this Court's analysis, not the *MSI* majority's misguided approach. To date, we have found no other

12   appellate court of any jurisdiction that has followed the *MSI* majority's outlier analysis.

13         In sum, this Court should declare that Bill 4-21 is a Taking under Article III, § 40 of the

14   Maryland Constitution, and a deprivation of property without due process in violation of Article

15   24 of the Declaration of Rights. The appropriate relief is an injunction barring enforcement until

16   just compensation is accorded. *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521

17   A.2d 313 (1986). Indeed, such relief is required by the text of Article III, § 40, which provides that

18   "[t]he General Assembly shall enact no Law authorizing private property, to be taken for public

19   use, without just compensation, as agreed upon between the parties, or awarded by a Jury, *being*

20   *first paid or tendered* to the party entitled to such compensation." (Emphasis added). The County

21   has yet to pay or tender payment to plaintiffs.

22         Plaintiffs are entitled to just compensation under Count III for the Takings and deprivation

23   of private property that occurred after Bill 4-21 became effective on July 16, 2021. The controlling

1   rule is set forth in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,

2   482 U.S. 304, 320 (1987), where the Supreme Court held that the government has a "duty to

3   provide compensation for the period during which the taking was effective." See *Steel*, 111

4   Md.App. at 21 (applying *First English*). The Court should apply MD Rule 2-602, find there is no

5   just reason for delay, order the entry of final judgment granting plaintiffs declaratory and injunctive

6   relief on Counts I, II and III, and thereafter schedule further proceedings for the determination of

7   just compensation under *First English*.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

**CONCLUSION**

2      For the foregoing reasons, plaintiffs' motion for partial summary judgment should be

3  granted and defendant's motion to dismiss and for summary judgment should be denied. The Court

4  should issue declaratory and injunctive relief as to Count III in addition to Counts I and II. Plaintiffs

5  respectfully request an expedited hearing and a decision on these motions at the earliest practicable

6  date.

7                                    Respectfully submitted,

8                                    */s/ Mark W. Pennak*

9                                    MARK W. PENNAK
                                      Maryland Shall Issue, Inc.
10                                    9613 Harford Rd, Ste C #1015
                                      Baltimore, MD 21234-21502
11                                    mpennak@marylandshallissue.org
                                      Phone: (301) 873-3671
12                                    MD Atty No. 1905150005
                                      *Counsel for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

1        **CERTIFICATE OF SERVICE**

2        The undersigned counsel hereby certifies that on March 7, 2022, a copy of the foregoing

3    Plaintiffs' Opposition To Defendant's Motion For Summary Judgment And Motion To Dismiss

4    Expedited Hearing Requested was served on the following counsel for defendant Montgomery

5    County via the MDEC e-filing system:

6

7    Edward Barry Lattner          Edward.Lattner@MontgomeryCountyMD.gov

8    Patricia Lisehora Kane        patricia.kane@montgomerycountymd.gov

9    Sean Charles O Hara           sean.ohara@montgomerycountymd.gov

10

11                        Respectfully submitted,

12                        /s/ *Mark W. Pennak*

13                        MARK W. PENNAK
                          *Counsel for Plaintiffs*
14

15

16

17

18

19

20

21

22

23

                              - Page 37 -

E-FILED; Montgomery Circuit Court
Docket: 3/7/2022 6:28 PM; Submission: 3/7/2022 6:28 PM

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANELES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

      Plaintiffs,

      v.

MONTGOMERY COUNTY, MARYLAND,

      Defendant.

Civil Action No. TDC-21-1736

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, ECF No. 18, is GRANTED IN PART and DENIED IN PART.

2. Counts 1, 2, and 3 of Plaintiffs' Complaint are severed and remanded to the Circuit Court for Montgomery County, Maryland.

3. This action is STAYED, and Count 4 is held in abeyance pending the resolution of Counts 1, 2, and 3 in the state court proceeding.

4.  The parties shall file a Joint Status Report every **90 days** to report on the progress of the state court proceeding.

5.  Within **14 days** of the resolution of Counts 1, 2, and 3 in the state court proceeding, the parties shall file a Joint Status Report reporting on that resolution and requesting either that the stay be lifted or that this case be dismissed.

Date: February 7, 2022

THEODORE D. CHUANG
United States District Judge

2

E-FILED; Montgomery Circuit Court
Docket: 3/7/2022 6:28 PM; Submission: 3/7/2022 6:28 PM

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

      Plaintiffs,

      v.

MONTGOMERY COUNTY, MARYLAND,

      Defendant.

Civil Action No. TDC-21-1736

## MEMORANDUM OPINION

Plaintiffs have filed this civil action against Defendant Montgomery County, Maryland ("the County"), alleging that a recently enacted County ordinance regulating ghost guns and other undetectable guns violates Article XI-E of the Maryland Constitution; the Maryland Express Powers Act; the Takings Clause of the Maryland Constitution; the Due Process Clause of Article 24 of the Maryland Declaration of Rights; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Pending before the Court is Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local

**EXHIBIT  B**

R. 105.6.  For the reasons set forth below, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

On April 16, 2021, the County Executive of Montgomery County signed into law Bill No. 4-21, legislation passed by the Montgomery County Council to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns.  Bill No. 4-21 amended the County's existing firearms ordinance by adding such guns and their components to the list of items subject to the County's prohibitions on the transfer of guns to a minor and on the sale, transfer, possession, or transport of firearms within 100 yards of a place of public assembly.  Bill No. 4-21 also expanded the definition of a "place of public assembly" to include "a place where the public may assemble, whether the place is publicly or privately owned."  Bill No. 4-21 at 4, Compl. Ex. A, ECF No. 7.  Finally, the bill added a requirement for the Montgomery County Police Department to report annually on the availability and use of ghost guns and undetectable guns within the County.  The effective date of Bill No. 4-21 was July 16, 2021.

On May 25, 2021, Plaintiffs filed this action in the Circuit Court for Montgomery County, Maryland, alleging four counts numbered as follows:  (1) that by expanding the "place of public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland Constitution to enact local laws; (2) that Bill No. 4-21's amendments are inconsistent with and preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann., Local Gov't § 10-206 (LexisNexis 2013); (3) that Bill No. 4-21 violates the Takings Clause of the Maryland Constitution, Md. Const. art. III, § 40, and the Due Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process Clause") by depriving gun owners of property without legal process or compensation; and (4) that Bill No. 4-21's definitions of "place

2

of public assembly," "ghost gun," "major component," and other terms are unconstitutionally vague, in violation of the Maryland Due Process Clause and the Due Process Clause of the Fourteenth Amendment. Plaintiffs requested a declaratory judgment on all four counts, a preliminary and permanent injunction barring enforcement of Bill No. 4-21, compensatory and punitive damages for the Fourteenth Amendment violation pursuant to 42 U.S.C. § 1983, and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

On June 16, 2021, Plaintiffs filed an Emergency Motion for Partial Summary Judgment, which was scheduled for a hearing in the Circuit Court on July 15, 2021. On July 12, 2021, before the hearing could take place, the County removed the case to this Court pursuant to 28 U.S.C. § 1441 based on federal question jurisdiction.

## DISCUSSION

In their Motion, Plaintiffs argue that the state law claims in this case should be severed and remanded to state court because (1) severance and remand is mandatory under 28 U.S.C. § 1441(c); and (2) remand is warranted under 28 U.S.C. § 1367 because the state law claims predominate and this case raises novel or complex issues of state law. Plaintiffs also request that the remaining federal claim be stayed pending completion of the state court proceedings on the remanded state law claims.

## I.   Section 1441

Plaintiffs first argue that severance and remand is mandatory under 28 U.S.C. § 1441(c), which provides, in relevant part, that:

    (1)    If a civil action includes—

        (A)    a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and

3

      (B)    a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute,

the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B).

    (2)    Upon removal of an action described in paragraph (1), the district court shall sever from the action all claims described in paragraph (1)(B) and shall remand the severed claims to the State court from which the action was removed.

28 U.S.C. § 1441(c).

This provision does not require remand. Although it requires severance and remand of "all claims described in paragraph (1)(B)," which as relevant here consists of any "claim not within the original or supplemental jurisdiction of the district court," such severance is not required because all of the state law claims are within this Court's supplemental jurisdiction. 28 U.S.C. § 1441(c)(2). A federal district court has supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, where the Court has original jurisdiction over Plaintiffs' federal due process claim and the state law claims provide different legal theories by which Plaintiffs challenge the same County ordinance at issue in the federal claim, the Court concludes that it has supplemental jurisdiction over the state law claims. Plaintiffs do not argue otherwise. Because the state law claims here are not subject to the mandatory severance and remand provision of 28 U.S.C. § 1441(c)(2), remand is not warranted on that basis.

## II.    Section 1367

That severance and remand is not mandatory does not the end the inquiry. Historically, pendent or supplemental jurisdiction has been "a doctrine of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (stating that 28 U.S.C. § 1367 codified the doctrine of pendent jurisdiction developed in *Gibbs*).

Under § 1367, a federal district court "may decline to exercise supplemental jurisdiction over a claim" if:

    (1)    the claim raises a novel or complex issue of State law,

    (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3)    the district court has dismissed all claims over which it has original jurisdiction. or

    (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Pursuant to this provision, a court has the "inherent power . . . in cases removed from State court, to remand." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001).  In deciding "the additional question of whether to remand" claims to state court, a court should consider "principles of economy, convenience, fairness, and comity" and "whether the efforts of a party in seeking remand amount to a 'manipulative tactic.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)).  Here, Plaintiffs argue that declining supplemental jurisdiction and remanding the state law claims is warranted because the state law claims substantially predominate over the federal claim. and they raise a novel or complex issue of state law.

## A.  Substantially Predominate

The United States Supreme Court has stated that federal district courts should decline to exercise jurisdiction over state law claims if the state law issues substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs*, 383 U.S. at 726.  "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage," a district court "may fairly" decline to exercise jurisdiction over the state claim. *Id.* at 727.  State law claims may predominate when "the state law claims are more complex or require more judicial resources to adjudicate or are more

5

salient in the case as a whole than the federal law claims." *Diven v. Amalgamated Transit Union Int'l*, 38 F.3d 598, 602 (D.C. Cir. 1994) (citation omitted). Here, while Plaintiffs do not suggest that the proof required differs for the state law claims as compared to the federal claim, the scope of the issues raised and the comprehensiveness of the remedy sought illustrate that the state law claims substantially predominate over the federal due process claim.

Although the County argues that the scope of the issues is "essentially identical across all four counts" because both the federal claim and the collection of state law claims would require analysis of the term "place of public assembly" as defined in Bill No. 4-21, Opp'n Mot. Remand at 8-9, ECF No. 19, the Court does not construe the scope of the state law claims so narrowly. The state law claims collectively constitute a frontal attack on the validity of Bill No. 4-21 based on an array of state constitutional and statutory arguments. Counts 1 and 2 argue that the County's enactment of Bill No. 4-21 violated provisions of the Maryland Constitution and state statutes that limit the authority of the county to legislate on firearms. Count 2 in particular asserts that numerous different provisions of Bill No. 4-21 conflict with or are preempted by state law, in violation of Maryland's Express Powers Act. Count 3 asserts that all of the limitations on gun possession throughout Bill No. 4-21 violate state constitutional provisions barring the taking of private property without due process and compensation. In contrast, the sole federal claim in Count 4 is limited in scope. It challenges the County's definition of specific words and phrases such as "public," "may assemble," "library," "recreational facility," "park," "unfinished receiver," and "major component" as unconstitutionally vague and overly broad as to invite arbitrary enforcement, in violation of the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 58-62, ECF No. 7.

6

Moreover, the state law claims are more complex and would likely require more judicial

resources to resolve. While the federal claim would primarily require the Court to examine specific

phrases in Bill No. 4-21, the state law claims require the Court to look beyond the text and analyze

the interplay between the bill and various Maryland constitutional and state law provisions. For

example, the claim in Count 1 that the County is not authorized to enact this legislation requires

analysis of whether it is the type of "local law[]" permitted by Article XI-E of the Maryland

Constitution. Md. Const. art. XI-E. In response, the County states that its authority to legislate in

this instance arises not from Article XI-E, but instead from Article XI-A, thus requiring the Court

to analyze both provisions to evaluate the scope of the County's authority under the Maryland

Constitution. *See* Md. Const. arts. XI-A, XI-E. Count 2, which alleges that Bill No. 4-21 conflicts

with and is preempted by state law, requires an analysis of the six different Maryland statutes that

Plaintiffs claim to preempt or conflict with Bill No. 4-21. Although the County argues that there

is no preemption because Bill No. 4-21 fits within a statutory exception permitting a county to

regulate certain specific gun activities, *see* Md. Code Ann., Crim. Law § 4-209(b) (LexisNexis

2021), consideration of that argument would require the Court to separately analyze that statute

and Maryland firearm preemption law more generally. Further, the state constitutional claims in

Count 3 add another complex legal analysis relating to two state constitutional provisions to the

range of issues presented by the state law claims.

The comprehensiveness of the remedies sought also illustrates that the state law claims

predominate. Plaintiffs primarily seek declaratory and injunctive relief against enforcement of

Bill No. 4-21. If successful on the state law claims, the scope of that relief would be broader than

what they could obtain by prevailing on the federal claim alone. For example, Plaintiffs' success

on the federal due process claim likely would not bar enforcement of provisions of Bill No. 4-21

unconnected to the terms challenged as unconstitutionally vague, such as the limitations on transferring to a minor ghost guns not containing an unfinished receiver or guns made through a 3-D printing process. Because resolution of the federal claim in Plaintiffs' favor would still require consideration of whether the state law claims invalidate other provisions of Bill No. 4-21, the remedy sought through the federal claim is less comprehensive than the remedy sought through the state law claims.

For these reasons, the Court concludes that the state law claims "substantially predominate" over the federal claim. The state claims "constitute[] the real body of [the] case," and the federal claim here is "only an appendage." *Gibbs*, 383 U.S. at 727.

### B.   Novel or Complex Issue of State Law

As for whether the state law claims present a novel or complex issue of state law, the Court also finds that at least one of Plaintiffs' claims presents such an issue, specifically, Plaintiffs' assertion in Count 2 that Bill No. 4-21 is preempted by state law. In Count 2, Plaintiffs challenge Bill No. 4-21 based on the assertion that six different Maryland state statutes conflict with or preempt it in some way. Although the County argues that the preemption issue is limited to the question of whether Bill No. 4-21 fits within the explicit statutory exception to preemption of firearms regulations which permits a county to regulate the "purchase, sale, transfer, ownership, possession, and transportation" of firearms "with respect to minors" or within 100 yards of a "place of public assembly," Md. Code Ann., Crim. Law § 4-209(b)(1), the existence of this provision does not resolve the question of whether Bill No. 4-21 conflicts with the other allegedly preemptive or conflicting state statutes, or how such conflicts should be reconciled with section 4-209(b). The parties have not cited, and the Court has not identified, any controlling authority applying that statutory exception or meaningfully interpreting its scope.

8

Notably, the existing law relating to whether Maryland has preempted local government laws regulating firearms, including the coverage of section 4-209, is not easily navigated. In *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675 (D. Md. 2006), a judge in this District analyzing section 4-209 and several other state statutory provisions that preempt local authority to regulate firearms concluded that "[s]tate law has so thoroughly and pervasively covered the subject of firearms regulation and the subject so demands uniform state treatment, that any non-specified regulation by local governments is clearly preempted." *Id.* at 687, 690 (holding that the City of Gaithersburg's questionnaire, which requested more information for the return of a firearm than that required under state law to possess a firearm, was preempted by state law), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). The court further concluded that "there can be no doubt that the exceptions to otherwise blanket preemption" in Maryland state law "are narrow and strictly construable." *Id.* Subsequently, in *State v. Phillips*, 63 A.3d 51 (Md. Ct. Spec. App. 2013), the Maryland Court of Special Appeals held that a local ordinance that was not expressly preempted by section 4-209(a) was not impliedly preempted because Maryland "ha[d] not so extensively regulated the field of firearm use, possession, and transfer that all local laws relating to firearms are preempted." *Id.* at 56, 75-76 (holding that a Baltimore City ordinance requiring certain persons convicted of gun offenses to register with the police commissioner was not void based on preemption). Against this landscape, another judge in this District has noted that there is a "lack of clarity regarding the preemption of local law" on firearm use, possession, and transfer. *Blue v. Batth*, No. GJH-15-1024, 2017 WL 4162244, at *5 n.7 (D. Md. Sept. 18, 2017).

Significantly, while the County cites to two opinions from the Maryland Attorney General addressing preemption of local gun laws, no party has cited to authority from the Maryland Court of Appeals interpreting section 4-209. The sole Maryland Court of Appeals case referenced by

9

the County, *Montgomery County v. Atlantic Guns, Inc.*, 489 A.2d 1114 (Md. 1985), interprets a predecessor preemption provision and is thus of limited value. *See id.* at 1115, 1118 (finding a county ordinance regulating loaded handguns to be preempted because the express preemption provision barring regulation of handguns applied to the regulation of ammunition).

Against this backdrop of limited relevant Maryland case law, the preemption issue presented is a matter of first impression. The Maryland courts have yet to consider and resolve a challenge to Bill No. 4-21, on preemption grounds or otherwise, and they have not considered Plaintiffs' specific theory under Count 2 that the County's broadened definition of "place of public assembly" has expanded the regulation of firearms beyond what is permitted by section 4-209(b). Under these circumstances, the Court finds that the state law claims involve a "novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Because the Court finds that the state law claims both substantially predominate over the federal claim and that at least one state law claim involves a novel or complex issue of state law, the Court may decline to exercise supplemental jurisdiction over the state law claims.

## C. Other Considerations

In determining whether to remand, the Court also considers the principles of economy, convenience, fairness, and comity and whether the party seeking remand is engaged in a manipulative tactic. *Hinson*, 239 F.3d at 617. The Court does not find that Plaintiffs have engaged in a manipulative tactic in seeking remand, so the Court will focus on the other factors.

Principles of economy and convenience generally support keeping all claims in one forum. In this instance, however, Plaintiffs request a remand of state law claims and a stay of the sole remaining federal claim until the state claims are resolved. This approach would mitigate concerns about economy and convenience by preventing the County from having to litigate simultaneously

10

in two separate forums and, depending on the proceedings in state court, may obviate the need to litigate the federal claim to completion. Moreover, because this action is in the early stages of litigation and the parties do not anticipate discovery, there is no concern about having wasted judicial resources by remanding at this stage of the action.

The County argues that because the legal theories advanced by Plaintiffs "contain significant overlap," there is a risk that issues of estoppel may complicate adjudication of the federal claim. Opp'n Mot. Remand at 10. The Court finds that Plaintiffs' claims in Counts 1-3 are different enough in nature and scope from the federal claim that this risk is not significant. Although this risk may be greater as to Count 4, in which the federal and state vagueness claims are largely duplicative, the Court will address this risk by exercising supplemental jurisdiction over the state law claim in Count 4 and declining to sever and remand that claim.

Most importantly, the Court finds that any benefits of judicial economy or convenience that could be achieved by keeping all of the claims in one forum are significantly outweighed by the principles of fairness and comity, which favor remand of the state law claims. This litigation is at its core about whether a local government ordinance regulating firearms violates the Maryland Constitution and state law restrictions on such local government provisions. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. Accordingly, the Court concludes that interests of comity outweigh any minimal federal interest in having this Court insert itself into what is primarily a dispute over the scope of a local government's authority to legislate under state law. *See, e.g., Kimberlin v. Nat'l Bloggers Club*, No. GJH–13–3059, 2015 WL 1242763, at *18 (D. Md. Mar. 17, 2015) (declining to exercise supplemental jurisdiction because "no federal policy . . . would be furthered" by the Court

11

presiding over state law claims and one federal claim). The Court will therefore decline to exercise supplemental jurisdiction over Counts 1-3 and will sever those counts and remand them to state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Sever and Remand All State Law Claims will be GRANTED IN PART and DENIED IN PART in that the Court will decline to exercise supplemental jurisdiction over the claims in Counts 1, 2, and 3, which will be severed and remanded to the Circuit Court for Montgomery County, and Count 4 will be stayed and held in abeyance pending the state court's resolution of Counts 1, 2, and 3. A separate order shall issue.

Date:   February 7, 2022

THEODORE D. CHUANG
United States District Judge

12

1    Case No. 21-CV-00690

2    Dept. No. I

3

4    The undersigned affirms that this document
does not contain the social security number
of any individual.

5

**FILED**

2021 DEC 10  AM 9: 54

TANYA SCHIRNE
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT

*Kathy Thomas*

6

7

**IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

8

**IN AND FOR THE COUNTY OF LYON**

9    POLYMER80, INC.,

10             Plaintiff,

11    vs.

12    STEPHEN SISOLAK, Governor of Nevada, AARON
FORD, Attorney General of Nevada, GEORGE

13    TOGLIATTI, Director of the Nevada Department
of Public Safety, MINDY MCKAY, Administrator

14

15    of the Records, Communications, and Compliance
Division of the Nevada Department of Public
Safety,

16

17             Defendants.

                                     /

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER GRANTING SUMMARY
JUDGMENT IN FAVOR OF
PLAINTIFF, POLYMER80, INC.**

18

19        This matter is before the Court upon the parties' competing Motions for Summary Judgment

20    both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter

21    was set for argument on November 23, 2021.  Plaintiff was present and represented by Brad

22    Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

23    of Greenspoon Marder LLP, who was present in Court.  The Defendants were represented by Craig

24    A. Newby, Esq., Deputy Solicitor General, who was present in Court.

25        This Court, having reviewed and considered the parties' respective motions and oppositions

26    for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing

27    upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and

28

**EXHIBIT C**             Page 1 of 17

good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS.

## I

## PROCEDURAL HISTORY

During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB 286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts relating to unfinished frames or receivers under certain circumstances; ... providing penalties; and providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB 286 into law on June 7, 2021.

On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada, George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay, Administrator of the Records, Communications, and Compliance Division of the Nevada Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and a Permanent Injunction barring enforcement of the new law.

On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and Preliminary Injunction*. After briefing and a hearing, this Court, on July 16, 2021, entered its *Order Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That Order is currently pending appeal at the Nevada Supreme Court.

---

[1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286 Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

1      Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021,

2    that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited

3    trial date of November 30, 2021. That Order also provided that the parties could engage in discovery

4    through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive

5    motions. By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop

6    the evidentiary record to be presented upon motions for summary judgment and/or at trial.

7      In the ensuing months, the parties proceeded with discovery. Both Polymer80 and

8    Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2] Pursuant to the

9    parties' Stipulation, this Court directed that they file their oppositions to the other side's summary

10   judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing

11   on November 23, 2021. That hearing was held as scheduled and the Court heard substantial

12   argument from the parties. Notably, both parties agreed at that hearing that this Court could decide

13   this case upon the record before it at that point, and that a trial was unnecessary. At the conclusion

14   of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment. This Order

15   follows and memorializes that ruling.

16     Accordingly,

17     IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is

18   GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set

19   forth herein and on the record at the November 23, 2021, hearing.

20

21

22

23   _____

24   [2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an
     appeal from this Court's *Order Granting Preliminary Injunction*. Thereafter, Defendants filed a

25   Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure
     question of law that would be resolved upon their then-pending appeal. This Court denied

26   Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not
     AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion

27   in granting interim relief. Moreover, a stay would have only delayed a ruling on the constitutionality
     of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.

28

Page 3 of 17

1

## II

2

## <u>CONTESTED PROVISIONS OF AB 286</u>

3        The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by

4    adding, among others, the following provisions, which are the subject of this proceeding.

5        First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

6                1.        A person shall not possess, purchase, transport or receive an
                unfinished frame or receiver unless:
7                        (a) The person is a firearms importer or manufacturer; or
                        (b) The unfinished frame or receiver is required by federal
8        law to be imprinted with a serial number issued by a firearms
        importer or manufacturer and the unfinished frame or receiver has
9        been imprinted with the serial number.

10

11               2.        A person who violates this section:
                        (a) For the first offense, is guilty of a gross misdemeanor;
12       and
                        (b)  For the second or any subsequent offense is guilty of a
13       category  D  felony  and  shall  be  punished  as  provided  in  NRS
        193.130.[3]
14

15       Plainly, this provision makes it a crime to "possess, purchase, transport or receive an

16   unfinished frame or receiver" in the State of Nevada.

17       Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

18               1.        A person shall not sell, offer to sell or transfer an unfinished
                frame or receiver unless:
19                       (a) The person is:
                                (1) A firearms importer or manufacturer; and
20                               (2) The recipient of the unfinished frame or receiver
        is a firearms importer or manufacturer; or
21                       (b)  The unfinished frame or receiver is required by federal
        law to be imprinted with a serial number issued by an importer or
22       manufacturer  and  the  unfinished  frame  or  receiver  has  been
        imprinted with the serial number.
23

24

25

26

27   ───────────────
     [3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison
     and a fine of up to $5,000.00.
28

2.    A person who violates this section:
(a) For the first offense, is guilty of a gross misdemeanor; and
(b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130

This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver" in the State of Nevada.

Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or receiver" to Nevada law and defines that term as follows:

9.    "Unfinished frame or receiver" means a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.[4]

## III

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than simply show that there is some metaphysical doubt as to the operative facts in order to avoid

---

[4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment relating to the efficacy of those provisions.

1    summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2    724, 732 (2005) (quotations omitted). "The nonmoving party must, by affidavit or otherwise, set

3    forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4    judgment entered against him." *Id.* And, the party opposing summary judgment cannot build a case

5    on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6    *Nevada Bell*, 108 Nev. 105, 110 (1992). Critically, the Nevada Supreme Court, as the parties have

7    acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8    Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9    *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009). As explained below, there are no

10   "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11   this action on summary judgment upon the record before it.

12                                     **IV**

13             **<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

14          Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15   It manufactures, designs, and distributes gun-related products, components, and after-market

16   accessories. The legislative history reveals that AB 286 has targeted, at least partially, certain of

17   Polymer80's business products. Defendants have also admitted as much in their Answer and in their

18   moving papers. As set forth in the testimony of Assemblywoman Sandra Jauregui:

19
20                 . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
largest manufacturers of ghost guns.

21   <u>Minutes</u>, Assembly Committee on Judiciary, p.6 (March 17, 2021). Assemblyman Wheeler stated

22   therein:

23
24                 The kit guns you called ghost guns are used by a lot of hobbyists.
Under federal law, those are quite legal, so outlawing them in Nevada,
as this bill tries to do, basically puts a company [Polmer80] in my
25                 district out of business. . . .
We are going to drive a company in my district out of business, but
26                 people can still buy them in Kentucky. . .

27

28

1  Minutes, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

2  **A.    STANDING OF POLMER80**

3        In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of

4  Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.  The

5  Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts

6  in their Motion that they indeed have standing.

7        NRS 30.040 provides, in pertinent part:

8        **NRS 30.040. Questions of construction or validity of . . . statutes.**

9
            1. Any person . . . whose rights, status or other legal relations
10       are affected by a statute . . . may have determined any question of
         construction or validity arising under the . . . statute . . . and obtain a
11       declaration of rights, status or other legal relations thereunder.

12  NRS 30.040(1).  In Nevada, the issue of Standing is a question of law.  *Arguello v. Sunset Station,*

13  *Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

14       The question of standing concerns whether the party seeking relief has
         a sufficient interest in the litigation. The primary purpose of this
15       standing inquiry is to ensure the litigant will vigorously and
         effectively present his or her case against an adverse party. Thus, a
16       requirement of standing is that the litigant personally suffer injury that
         can be fairly traced to the allegedly unconstitutional statute and which
17       would be redressed by invalidating the statute. A general interest in
         the matter is normally insufficient: a party must show a personal
18       injury.
19

20  *Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct.

21  7, 2021), (Citations Omitted).

22

23

24

25

26  _____
    [5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286
27  all indicating the negative impact of the bill on their ability to conduct business in the State of
    Nevada.
28

1

2          This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the

3     constitutionality of AB 286.  Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125

4     Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its

5     ongoing conduct.  Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as

6     Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of

7     AB 286 takes effect January 1, 2022.  Accordingly, it is ripe for this Court to determine whether or

8     not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of

9     the Nevada Constitution.

10         Polymer80 satisfies the requirement to show that they would "personally suffer injury that

11    can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony

12    criminal prosecution each time they produce a product which allegedly falls under the purview of

13    the statute.  Further, Polymer80 would suffer significant economic loss as set forth in the Deposition

14    testimony submitted, and uncontested by the Defendants.  This, combined with the legislative history

15    showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that,

16    unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for

17    facial invalidity of the statute – which is Polymer80's only true redress.

18

19         This Court determines that Polymer80 will suffer irreparable harm in the absence of

20    declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as

21    Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice

22    of the conduct being criminalized.[6]

23

24

25

26

27    _____

[6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would
mitigate any harm as all Polymer80 would have to do is put a serial number on its products.  The

28

Page 8 of 17

**B.      STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

The question before this Court is essentially whether or not AB 286 is unconstitutionally vague under the Due Process Clause of the Nevada Constitution. It is undisputed that Section 3 and Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D felonies.

Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty, or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006).

> Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional. The court must interpret a statute in a reasonable manner, that is, [t]he words of the statute should be construed in light of the policy and spirit of the law, and the interpretation made should avoid absurd results. In reviewing a statute, it should be given [its] plain meaning and must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a provision nugatory.

*Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009). In reviewing the statute, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).

The Nevada Supreme Court has adopted a two-pronged test for determining whether a criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

_____

argument was abandoned on summary judgment. Section 3(1)(b) and Section 3.5(1)(b) by their own terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be imprinted with a serial number. It is undisputed that the products produced by Polymer80 are not required by federal law to have a serial number imprinted on them.

1   Constitution. *See, e.g., Flamingo Paradise Gaming*, 125 Nev. at 510; *Gallegos v. State*, 123 Nev.

2   289, 294 (2007).

3

4   > A criminal statute can be invalidated for vagueness (1) if it fails to
    > provide a person of ordinary intelligence fair notice of what is
    > prohibited *or* (2) if it is so standardless that it authorizes or encourages
5   > seriously discriminatory enforcement.

6   *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).  Although both civil and criminal statutes

7   are judged under the same test, the Nevada Supreme Court has explained:

8

9   > [T]here are two approaches to a facial vagueness challenge depending
    > on the type of statute at issue. The first approach arises under a facial
10  > challenge to a civil statute and the plaintiff must show that the statute
    > is impermissibly vague in all of its applications. In making this
11  > showing, [a] complainant who engages in some conduct that is clearly
    > proscribed cannot complain of the vagueness of the law as applied to
12  > the conduct of others. **But, when the statute involves criminal
    > penalties or constitutionally protected rights, the second**
13  > **approach involves a higher standard of whether "vagueness
    > permeates the text.**
14

15  *Flamingo*, 125 Nev. at 512.[7]  Where a statute imposes criminal penalties, as is the case with AB 286,

16  the more exacting standard for Constitutionality is imposed.

17

18  > Under the higher standard, the question becomes whether vagueness
    > so permeates the text that the statute cannot meet these requirements
    > in most applications; and thus, this standard provides for the
19  > possibility that some applications of the law would not be void, but
    > the statute would still be invalid if void in most circumstances.
20

21  *Flamingo*, 125 Nev. at 507.

22

23

24

25  [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed
    conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin*, 99 Nev. 336,
26  340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 495 (1982). This
    Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly
27  proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness
    challenges need to show that the law is "impermissibly vague in all its applications."
28

1    In this Court's view, AB 286, a criminal enactment, fails under both prongs for various

2    reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law.   While

3    similar, "the first prong is concerned with guiding those who may be subject to potentially vague

4    statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of

5

6    statutes." *Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

7    **C.    SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY**

8    **INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED**

9    Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with

10   fair notice of the conduct which it proscribes.   The underlying purpose of this factor is to give a

11   person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*,

12   123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport,

13   receipt, transfer and sale of what the statute calls an "unfinished frame or receiver."   While AB 286

14   purports to define the term "unfinished frame or receiver," that definition is as follows:

15               [A] blank, a casting or a machined body that is intended to be turned
16               into the frame or lower receiver of a firearm with additional
                 machining and which has been formed or machined to the point at
17               which most of the major machining operations have been completed
                 to turn the blank, casting or machined body into a frame or lower
18               receiver of a firearm even if the fire-control cavity area of the blank,
                 casting or machined body is still completely solid and unmachined.
19

20   This definition does not provide a person of ordinary intelligence with adequate notice of

21   what AB 286 criminalizes.

22   As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada

23   legislative statutory enactment.   The terms used in the definition of "unfinished frame or receiver"

24   are not defined elsewhere in the statute.   These terms include - blank, casting, machined body,

25   machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control

26   cavity area.

27   The definition does not tell anyone when during the manufacturing process a blank, casting,

28   or machined body (whatever those terms mean) has gone through the "major machining operations"

1  (whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of
2  a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct
3  to comply with the law.  As a result, this Court finds that the text of AB 286 does not provide fair
4  notice of whatever it criminalizes.  To this end, this Court asked on multiple occasions during oral
5  argument on the Motion for Summary Judgment what those terms as used in AB 286 mean.
6  Tellingly, the Defendants could not in any manner explain their meaning(s).

7       This Court inquired whether or not the common law defined the terms used in AB 286, and
8  the response that this Court received was clearly in the negative.  As such, this Court cannot use the
9  common law to decipher, clarify, or define the inherently vague terms of AB 286.  This fact
10  distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of
11  indecent exposure – a common law crime), where the Nevada Supreme Court found that that the
12  common law can provide a definition as to what conduct a statute prohibits.  This Court inquired as
13  to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and,
14  again, the answer was no.  As a consequence, this case is also distinguishable from *Silverwing*
15  *Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020),
16  (Commonly accepted definition of "subdivision" contained within the State's planning and zoning
17  statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law
18  elsewhere defined an allegedly ambiguous term.  Thus, neither the common law nor any other
19  Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

20       While portions of AB 286 incorporate certain terms that are defined in federal legislation,
21  this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal
22  definitions relating to firearms or the Gun Control Act into AB 286.  Here, the Nevada Legislature
23  purposely included some federal definitions into AB 286 but, deliberately did not include others.
24  From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent
25  some legislative declaration to the contrary.  Simply put, had the Nevada Legislature wished to
26  incorporate other federal definitions into AB 286, it knew how to do so and would have done so.  It
27
28

did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed to do.[8]

In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive from justice." The legislature failed to define what the term "fugitive from justice" meant in relation to the statute. The District Court upheld the validity of the statute and applied the federal definition of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed stating:

> Unlike Congress, the Nevada Legislature has not defined "fugitive from justice." By failing to adopt the federal definition of "fugitive from justice" or include any definition of that phrase. . ., the Legislature failed to provide the public with statutory notice of what that term means. It could arguably encompass a wide variety of circumstances. . . The fact that the district court, sua sponte, adopted the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that deficiency.

*Gallegos v. State*, 123 Nev. @ 294-95.

Finally, the legislative history of AB 286 does not shed any light on the undefined terms used in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates that the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

---

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

1  and undefined terms used in AB 286.  It is noteworthy that the parties agreed that the legislative

2  history for AB 286 gives this Court no information to determine what the Nevada Legislature meant

3  when adopting and implementing the definition of "unfinished frame or receiver."  Tellingly, not

4  even Webster's Dictionary defines a majority of these terms.

5        Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for

6  vagueness.  This Court finds this contention unpersuasive.  The criminal acts defined in Sections 3

7  and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the

8  possession and sale of "unfinished frames and receivers," whatever those things may actually be.

9  And, the person possessing or selling those "unfinished frames and receivers" need not have any

10  particular specific intent.  In fact, AB 286 only and very generally employs intent in the definition

11  of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or

12  a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm."  The

13  use of the word "intended" in this definition does not create the *scienter* element defendants claim

14  to exist within Section 3 and Section 3.5 of the bill.

15        Here, a literal reading of the definitional statute requires that the blank, casting or machined

16  body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm.

17  Nowhere in the definitional statute does it indicate who would have to have intended the unfinished

18  frame or receiver to be transformed into a firearm.  Is it the manufacturer like Polymer80?  It is

19  undisputed that it is their intent not to make a firearm.  Is it the seller of a gun kit?  They have no

20  intent to make a firearm.  The object itself cannot transfer specific intent to the possessor of the item.

21        Even if this Court were to assume an intent element was specifically meant to apply to any

22  individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally

23  vague.  For example, if Section 3 criminalized the possession of a blank, casting, or machined body

24  only if the person who possessed such an item (whatever it might actually be) specifically intended

25  to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still

26  be unconstitutionally vague.

27        In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined

28  body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

1   machining, and (ii) already be formed or machined to the point at which most of the major machining

2   operations have been completed. Yet, none of these terms are defined, nor is there any way to know

3   when "most of the major machining operations have been completed," and then what "additional

4   machining" must still occur and when. Accordingly, any specific intent that can be read into

5   Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB

6   286 still fails to provide adequate notice as to what it specifically criminalizes.

7         Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or

8   common law. Consequently, the only notice of what AB 286 criminalizes is provided in the statute

9   itself. However, the law does not provide adequate notice of what it criminalizes, given that the

10   definition of "unfinished frame or receiver" uses a myriad undefined terms. Moreover, the combined

11   use of these undefined terms results in an overall failure to provide a person of ordinary intelligence

12   with fair notice of what is criminalized. As there is no well-established or ordinary meaning to the

13   terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process

14   Clause of the Nevada Constitution.

15

16 **D.**     **SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT**

17 **AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

18
        This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages

19
seriously discriminatory enforcement." *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).

20
The Court finds that it is.

21
        As explained by the Nevada Supreme Court:

22

23           The concern under this prong is the scope of discretion left to law
          enforcement officials and prosecutors. Our fear is that absent adequate

24           guidelines, a criminal statute may permit a standardless sweep, which
          would allow the police, prosecutors, and juries to 'pursue their

25           personal predilections.'

26 *Gallegos*, 125 Nev. @ 296. (Citation Omitted)

27         AB 286 fails to establish clear standards that law enforcement can use to determine whether

28   the law is violated. At its most basic, there is no clear standard for law enforcement to use to

1   determine when an "unfinished frame or receiver" comes into existence.   Unlike the federal

2   regulatory process to determine whether a frame or lower receiver is considered a firearm under the

3   Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame

4   or receiver" actually comes into existence.   The most any court can glean from the definition is that

5   it is something less than a firearm and more than a block of raw material.   Where on the scale in

6   between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the

7   law and left to the sole discretion of law enforcement and prosecutors.   When does the machining

8   process start?   When does the raw material become machined and through what processes?   What

9   constitutes a "major machining operation" versus machining itself?   Would the "fire-control cavity"

10   be considered a "major machining operation" or is it excluded? What additional machining needs to

11   be completed?   It is unclear and undefined under the statute.

12   Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike

13   as they, in their sole discretion and without guidance, could label almost anything an "unfinished

14   frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.

15   There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing

16   their personal predilections.

17   Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section

18   3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law.   Therefore,

19   enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary

20   and discriminatory enforcement.

21   For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are

22   unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23   **V**

24   **ORDER AND JUDGMENT**

25   Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are

26   unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence

27   with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and

28   encourages seriously arbitrary and discriminatory enforcement.

1      Good cause appearing, and *illegible*

2          IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3      GRANTED.

4          IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5      DENIED.

6          IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7      Polymer80 and against Defendants; to wit,

8          IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9      Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10     State Constitution.

11         IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12     Polymer80 and against Defendants; to wit,

13         IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14     Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15     Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16     Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17     and their respective successors, officers, agents, servants, and employees and anyone acting in

18     concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19     Section 3 and Section 3.5 of AB 286.

20         IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21     this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22     exonerated and released to Polymer80 forthwith.

23         THIS IS A FINAL JUDGMENT.

24         DATED this 10th day of December, 2021.

25

26

27     JOHN P. SCHLEGELMILCH,
       DISTRICT JUDGE

28

1     Case No. 21-CV-00690

2     Dept. No. I

3                                 **Certificate of Mailing**

4         I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5     Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6     mailed at Yerington, Nevada addressed to:

7     Gregory L. Zunino, Esq.

8     *Emailed*: gzunino@ag.nv.gov

9     Brad M. Johnston, Esq.
        *Emailed: bjohnston@shjnevada.com*

10

11     James J. McGuire, Esq.
        *Emailed: james.mcguire@gmlaw.com*

12

13     Michael Patrick, Esq.
        *Emailed: michael.patrick@gmlaw.com*

14     Mark Doerr
        *Emailed: mark.doerr@gmlaw.com*

15

16     Craig A. Newby, Esq.
        *Emailed: CNewby@ag.nv.gov*

17

18

19         DATED: This _10 th_ day of December, 2021.

20

21

22                                Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28

Case 8:22-cv-01967-TDC   Document 7   Filed 08/08/22   Page 148 of 235
Case 8:21-cv-01736-TDC   Document 22   Filed 03/07/22   Page 1 of 12
E-FILED; Montgomery Circuit Court
Docket: 3/7/2022 6:38 PM; Submission: 3/7/2022 6:38 PM

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID and
NANCY DAVID,

     Plaintiffs,

     v.

MONTGOMERY COUNTY, MARYLAND,

     Defendant.

Civil Action No. TDC-21-1736

## MEMORANDUM OPINION

Plaintiffs have filed this civil action against Defendant Montgomery County, Maryland ("the County"), alleging that a recently enacted County ordinance regulating ghost guns and other undetectable guns violates Article XI-E of the Maryland Constitution; the Maryland Express Powers Act; the Takings Clause of the Maryland Constitution; the Due Process Clause of Article 24 of the Maryland Declaration of Rights; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Pending before the Court is Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local

## EXHIBIT B

R. 105.6.  For the reasons set forth below, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On April 16, 2021, the County Executive of Montgomery County signed into law Bill No. 4-21, legislation passed by the Montgomery County Council to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns.  Bill No. 4-21 amended the County's existing firearms ordinance by adding such guns and their components to the list of items subject to the County's prohibitions on the transfer of guns to a minor and on the sale, transfer, possession, or transport of firearms within 100 yards of a place of public assembly.  Bill No. 4-21 also expanded the definition of a "place of public assembly" to include "a place where the public may assemble, whether the place is publicly or privately owned."  Bill No. 4-21 at 4, Compl. Ex. A, ECF No. 7.  Finally, the bill added a requirement for the Montgomery County Police Department to report annually on the availability and use of ghost guns and undetectable guns within the County.  The effective date of Bill No. 4-21 was July 16, 2021.

On May 25, 2021, Plaintiffs filed this action in the Circuit Court for Montgomery County, Maryland, alleging four counts numbered as follows:  (1) that by expanding the "place of public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland Constitution to enact local laws; (2) that Bill No. 4-21's amendments are inconsistent with and preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann., Local Gov't § 10-206 (LexisNexis 2013); (3) that Bill No. 4-21 violates the Takings Clause of the Maryland Constitution, Md. Const. art. III, § 40, and the Due Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process Clause") by depriving gun owners of property without legal process or compensation; and (4) that Bill No. 4-21's definitions of "place

2

of public assembly," "ghost gun," "major component," and other terms are unconstitutionally

vague, in violation of the Maryland Due Process Clause and the Due Process Clause of the

Fourteenth Amendment.   Plaintiffs requested a declaratory judgment on all four counts, a

preliminary and permanent injunction barring enforcement of Bill No. 4-21, compensatory and

punitive damages for the Fourteenth Amendment violation pursuant to 42 U.S.C. § 1983, and

attorney's fees and costs pursuant to 42 U.S.C. § 1988.

On June 16, 2021, Plaintiffs filed an Emergency Motion for Partial Summary Judgment,

which was scheduled for a hearing in the Circuit Court on July 15, 2021.  On July 12, 2021, before

the hearing could take place, the County removed the case to this Court pursuant to 28 U.S.C. §

1441 based on federal question jurisdiction.

## DISCUSSION

In their Motion, Plaintiffs argue that the state law claims in this case should be severed and

remanded to state court because (1) severance and remand is mandatory under 28 U.S.C. § 1441(c);

and (2) remand is warranted under 28 U.S.C. § 1367 because the state law claims predominate and

this case raises novel or complex issues of state law.  Plaintiffs also request that the remaining

federal claim be stayed pending completion of the state court proceedings on the remanded state

law claims.

**I.     Section 1441**

Plaintiffs first argue that severance and remand is mandatory under 28 U.S.C. § 1441(c),

which provides, in relevant part, that:

> (1)     If a civil action includes—
>
>     (A)     a claim arising under the Constitution, laws, or treaties of the
>             United States (within the meaning of section 1331 of this title), and

3

(B)    a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute,

the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B).

(2)    Upon removal of an action described in paragraph (1), the district court shall sever from the action all claims described in paragraph (1)(B) and shall remand the severed claims to the State court from which the action was removed.

28 U.S.C. § 1441(c).

This provision does not require remand. Although it requires severance and remand of "all claims described in paragraph (1)(B)," which as relevant here consists of any "claim not within the original or supplemental jurisdiction of the district court," such severance is not required because all of the state law claims are within this Court's supplemental jurisdiction. 28 U.S.C. § 1441(c)(2). A federal district court has supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, where the Court has original jurisdiction over Plaintiffs' federal due process claim and the state law claims provide different legal theories by which Plaintiffs challenge the same County ordinance at issue in the federal claim, the Court concludes that it has supplemental jurisdiction over the state law claims. Plaintiffs do not argue otherwise. Because the state law claims here are not subject to the mandatory severance and remand provision of 28 U.S.C. § 1441(c)(2), remand is not warranted on that basis.

## II.    Section 1367

That severance and remand is not mandatory does not the end the inquiry. Historically, pendent or supplemental jurisdiction has been "a doctrine of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (stating that 28 U.S.C. § 1367 codified the doctrine of pendent jurisdiction developed in *Gibbs*).

4

Under § 1367, a federal district court "may decline to exercise supplemental jurisdiction over a claim" if:

    (1)    the claim raises a novel or complex issue of State law,

    (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3)    the district court has dismissed all claims over which it has original jurisdiction, or

    (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Pursuant to this provision, a court has the "inherent power . . . in cases removed from State court, to remand." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001). In deciding "the additional question of whether to remand" claims to state court, a court should consider "principles of economy, convenience, fairness, and comity" and "whether the efforts of a party in seeking remand amount to a 'manipulative tactic.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)). Here, Plaintiffs argue that declining supplemental jurisdiction and remanding the state law claims is warranted because the state law claims substantially predominate over the federal claim, and they raise a novel or complex issue of state law.

### A.    Substantially Predominate

The United States Supreme Court has stated that federal district courts should decline to exercise jurisdiction over state law claims if the state law issues substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs*, 383 U.S. at 726. "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage," a district court "may fairly" decline to exercise jurisdiction over the state claim. *Id.* at 727. State law claims may predominate when "the state law claims are more complex or require more judicial resources to adjudicate or are more

5

salient in the case as a whole than the federal law claims." *Diven v. Amalgamated Transit Union*

*Int'l*, 38 F.3d 598, 602 (D.C. Cir. 1994) (citation omitted). Here, while Plaintiffs do not suggest

that the proof required differs for the state law claims as compared to the federal claim, the scope

of the issues raised and the comprehensiveness of the remedy sought illustrate that the state law

claims substantially predominate over the federal due process claim.

Although the County argues that the scope of the issues is "essentially identical across all

four counts" because both the federal claim and the collection of state law claims would require

analysis of the term "place of public assembly" as defined in Bill No. 4-21, Opp'n Mot. Remand

at 8-9, ECF No. 19, the Court does not construe the scope of the state law claims so narrowly. The

state law claims collectively constitute a frontal attack on the validity of Bill No. 4-21 based on an

array of state constitutional and statutory arguments. Counts 1 and 2 argue that the County's

enactment of Bill No. 4-21 violated provisions of the Maryland Constitution and state statutes that

limit the authority of the county to legislate on firearms. Count 2 in particular asserts that

numerous different provisions of Bill No. 4-21 conflict with or are preempted by state law, in

violation of Maryland's Express Powers Act. Count 3 asserts that all of the limitations on gun

possession throughout Bill No. 4-21 violate state constitutional provisions barring the taking of

private property without due process and compensation. In contrast, the sole federal claim in

Count 4 is limited in scope. It challenges the County's definition of specific words and phrases

such as "public," "may assemble," "library," "recreational facility," "park," "unfinished receiver,"

and "major component" as unconstitutionally vague and overly broad as to invite arbitrary

enforcement, in violation of the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶

58-62, ECF No. 7.

Moreover, the state law claims are more complex and would likely require more judicial resources to resolve. While the federal claim would primarily require the Court to examine specific phrases in Bill No. 4-21, the state law claims require the Court to look beyond the text and analyze the interplay between the bill and various Maryland constitutional and state law provisions. For example, the claim in Count 1 that the County is not authorized to enact this legislation requires analysis of whether it is the type of "local law[]" permitted by Article XI-E of the Maryland Constitution. Md. Const. art. XI-E. In response, the County states that its authority to legislate in this instance arises not from Article XI-E, but instead from Article XI-A, thus requiring the Court to analyze both provisions to evaluate the scope of the County's authority under the Maryland Constitution. *See* Md. Const. arts. XI-A, XI-E. Count 2, which alleges that Bill No. 4-21 conflicts with and is preempted by state law, requires an analysis of the six different Maryland statutes that Plaintiffs claim to preempt or conflict with Bill No. 4-21. Although the County argues that there is no preemption because Bill No. 4-21 fits within a statutory exception permitting a county to regulate certain specific gun activities, *see* Md. Code Ann., Crim. Law § 4-209(b) (LexisNexis 2021), consideration of that argument would require the Court to separately analyze that statute and Maryland firearm preemption law more generally. Further, the state constitutional claims in Count 3 add another complex legal analysis relating to two state constitutional provisions to the range of issues presented by the state law claims.

The comprehensiveness of the remedies sought also illustrates that the state law claims predominate. Plaintiffs primarily seek declaratory and injunctive relief against enforcement of Bill No. 4-21. If successful on the state law claims, the scope of that relief would be broader than what they could obtain by prevailing on the federal claim alone. For example, Plaintiffs' success on the federal due process claim likely would not bar enforcement of provisions of Bill No. 4-21

7

unconnected to the terms challenged as unconstitutionally vague, such as the limitations on transferring to a minor ghost guns not containing an unfinished receiver or guns made through a 3-D printing process. Because resolution of the federal claim in Plaintiffs' favor would still require consideration of whether the state law claims invalidate other provisions of Bill No. 4-21, the remedy sought through the federal claim is less comprehensive than the remedy sought through the state law claims.

For these reasons, the Court concludes that the state law claims "substantially predominate" over the federal claim. The state claims "constitute[] the real body of [the] case," and the federal claim here is "only an appendage." *Gibbs*, 383 U.S. at 727.

### B.    Novel or Complex Issue of State Law

As for whether the state law claims present a novel or complex issue of state law, the Court also finds that at least one of Plaintiffs' claims presents such an issue, specifically, Plaintiffs' assertion in Count 2 that Bill No. 4-21 is preempted by state law. In Count 2, Plaintiffs challenge Bill No. 4-21 based on the assertion that six different Maryland state statutes conflict with or preempt it in some way. Although the County argues that the preemption issue is limited to the question of whether Bill No. 4-21 fits within the explicit statutory exception to preemption of firearms regulations which permits a county to regulate the "purchase, sale, transfer, ownership, possession, and transportation" of firearms "with respect to minors" or within 100 yards of a "place of public assembly," Md. Code Ann., Crim. Law § 4-209(b)(1),  the existence of this provision does not resolve the question of whether Bill No. 4-21 conflicts with the other allegedly preemptive or conflicting state statutes, or how such conflicts should be reconciled with section 4-209(b). The parties have not cited, and the Court has not identified, any controlling authority applying that statutory exception or meaningfully interpreting its scope.

8

Notably, the existing law relating to whether Maryland has preempted local government laws regulating firearms, including the coverage of section 4-209, is not easily navigated. In *Mora v. City of Gaithersburg*, 462 F. Supp. 2d 675 (D. Md. 2006), a judge in this District analyzing section 4-209 and several other state statutory provisions that preempt local authority to regulate firearms concluded that "[s]tate law has so thoroughly and pervasively covered the subject of firearms regulation and the subject so demands uniform state treatment, that any non-specified regulation by local governments is clearly preempted." *Id.* at 687, 690 (holding that the City of Gaithersburg's questionnaire, which requested more information for the return of a firearm than that required under state law to possess a firearm, was preempted by state law), *modified on other grounds*, 519 F.3d 216 (4th Cir. 2008). The court further concluded that "there can be no doubt that the exceptions to otherwise blanket preemption" in Maryland state law "are narrow and strictly construable." *Id.* Subsequently, in *State v. Phillips*, 63 A.3d 51 (Md. Ct. Spec. App. 2013), the Maryland Court of Special Appeals held that a local ordinance that was not expressly preempted by section 4-209(a) was not impliedly preempted because Maryland "ha[d] not so extensively regulated the field of firearm use, possession, and transfer that all local laws relating to firearms are preempted." *Id.* at 56, 75-76 (holding that a Baltimore City ordinance requiring certain persons convicted of gun offenses to register with the police commissioner was not void based on preemption). Against this landscape, another judge in this District has noted that there is a "lack of clarity regarding the preemption of local law" on firearm use, possession, and transfer. *Blue v. Bath*, No. GJH-15-1024, 2017 WL 4162244, at *5 n.7 (D. Md. Sept. 18, 2017).

Significantly, while the County cites to two opinions from the Maryland Attorney General addressing preemption of local gun laws, no party has cited to authority from the Maryland Court of Appeals interpreting section 4-209. The sole Maryland Court of Appeals case referenced by

9

the County, *Montgomery County v. Atlantic Guns, Inc.*, 489 A.2d 1114 (Md. 1985), interprets a predecessor preemption provision and is thus of limited value. *See id.* at 1115, 1118 (finding a county ordinance regulating loaded handguns to be preempted because the express preemption provision barring regulation of handguns applied to the regulation of ammunition).

Against this backdrop of limited relevant Maryland case law, the preemption issue presented is a matter of first impression. The Maryland courts have yet to consider and resolve a challenge to Bill No. 4-21, on preemption grounds or otherwise, and they have not considered Plaintiffs' specific theory under Count 2 that the County's broadened definition of "place of public assembly" has expanded the regulation of firearms beyond what is permitted by section 4-209(b). Under these circumstances, the Court finds that the state law claims involve a "novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Because the Court finds that the state law claims both substantially predominate over the federal claim and that at least one state law claim involves a novel or complex issue of state law, the Court may decline to exercise supplemental jurisdiction over the state law claims.

### C.    Other Considerations

In determining whether to remand, the Court also considers the principles of economy, convenience, fairness, and comity and whether the party seeking remand is engaged in a manipulative tactic. *Hinson*, 239 F.3d at 617. The Court does not find that Plaintiffs have engaged in a manipulative tactic in seeking remand, so the Court will focus on the other factors.

Principles of economy and convenience generally support keeping all claims in one forum. In this instance, however, Plaintiffs request a remand of state law claims and a stay of the sole remaining federal claim until the state claims are resolved. This approach would mitigate concerns about economy and convenience by preventing the County from having to litigate simultaneously

10

in two separate forums and, depending on the proceedings in state court, may obviate the need to litigate the federal claim to completion. Moreover, because this action is in the early stages of litigation and the parties do not anticipate discovery, there is no concern about having wasted judicial resources by remanding at this stage of the action.

The County argues that because the legal theories advanced by Plaintiffs "contain significant overlap," there is a risk that issues of estoppel may complicate adjudication of the federal claim. Opp'n Mot. Remand at 10. The Court finds that Plaintiffs' claims in Counts 1-3 are different enough in nature and scope from the federal claim that this risk is not significant. Although this risk may be greater as to Count 4, in which the federal and state vagueness claims are largely duplicative, the Court will address this risk by exercising supplemental jurisdiction over the state law claim in Count 4 and declining to sever and remand that claim.

Most importantly, the Court finds that any benefits of judicial economy or convenience that could be achieved by keeping all of the claims in one forum are significantly outweighed by the principles of fairness and comity, which favor remand of the state law claims. This litigation is at its core about whether a local government ordinance regulating firearms violates the Maryland Constitution and state law restrictions on such local government provisions. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. Accordingly, the Court concludes that interests of comity outweigh any minimal federal interest in having this Court insert itself into what is primarily a dispute over the scope of a local government's authority to legislate under state law. *See, e.g., Kimberlin v. Nat'l Bloggers Club*, No. GJH–13–3059, 2015 WL 1242763, at \*18 (D. Md. Mar. 17, 2015) (declining to exercise supplemental jurisdiction because "no federal policy . . . would be furthered" by the Court

11

presiding over state law claims and one federal claim). The Court will therefore decline to exercise supplemental jurisdiction over Counts 1-3 and will sever those counts and remand them to state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Sever and Remand All State Law Claims will be GRANTED IN PART and DENIED IN PART in that the Court will decline to exercise supplemental jurisdiction over the claims in Counts 1, 2, and 3, which will be severed and remanded to the Circuit Court for Montgomery County, and Count 4 will be stayed and held in abeyance pending the state court's resolution of Counts 1, 2, and 3. A separate order shall issue.


Date:   February 7, 2022

THEODORE D. CHUANG
United States District Judge

1  Case No.  21-CV-00690

2  Dept. No.  I

3  The undersigned affirms that this document
4  does not contain the social security number
   of any individual.
5

FILED

2021 DEC 10  AM 9: 54

TANYA SCEIRINE
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT

X Kathy Thomas DEPUTY

6

7          IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

8                      IN AND FOR THE COUNTY OF LYON

9  POLYMER80, INC.,

10                Plaintiff,

11         vs.

12  STEPHEN SISOLAK, Governor of Nevada, AARON
    FORD, Attorney General of Nevada, GEORGE
13  TOGLIATTI, Director of the Nevada Department
    of Public Safety, MINDY MCKAY, Administrator
14  of the Records, Communications, and Compliance
    Division of the Nevada Department of Public
15  Safety,
16
                 Defendants.
17  _____/

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER GRANTING SUMMARY
JUDGMENT IN FAVOR OF
PLAINTIFF, POLYMER80, INC.**

18         This matter is before the Court upon the parties' competing Motions for Summary Judgment

19  both filed on November 8, 2021, and duly opposed by each party on November 18, 2021. The matter

20  was set for argument on November 23, 2021.   Plaintiff was present and represented by Brad

21  Johnston, Esq., of Simons Hall Johnston PC (via Zoom) and James J. McGuire, Esq., (pro hac vice)

22  of Greenspoon Marder LLP, who was present in Court.  The Defendants were represented by Craig

23  A. Newby, Esq., Deputy Solicitor General, who was present in Court.

24

25         This Court, having reviewed and considered the parties' respective motions and oppositions

26  for summary judgment, considered the exhibits thereto and arguments therein, conducted a hearing

27  upon those motions, and heard oral argument from counsel for Polymer80 and for Defendants, and

28

**EXHIBIT C**                    Page 1 of 17

1  good cause appearing, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW,

2  AND ORDERS.

3                                        **I**

4                          **PROCEDURAL HISTORY**

5

6          During the 81st legislative session, the Nevada Legislature passed Assembly Bill 286 ("AB

7  286"). AB 286 is -- "AN ACT relating to crimes; prohibiting persons from engaging in certain acts

8  relating to unfinished frames or receivers under certain circumstances; ... providing penalties; and

9  providing other matters properly relating thereto." Nevada Governor, Stephen Sisolak, signed AB

10  286 into law on June 7, 2021.

11          On June 22, 2021, Plaintiff, Polymer80, Inc. ("Polymer80"), filed this lawsuit against

12  Defendants, Stephen Sisolak, Governor of Nevada, Aaron Ford, Attorney General of Nevada,

13  George Togliatti, Director of the Nevada Department of Public Safety, and Mindy McKay,

14  Administrator of the Records, Communications, and Compliance Division of the Nevada

15  Department of Public Safety (collectively referred to as "Defendants"), alleging that Sections 3 and

16  3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Constitution of the

17  State of Nevada ("Nevada Constitution"). In its Verified Complaint, Polymer80 sought a

18  Declaration from this Court that Sections 3 and 3.5 of AB 286 violate the Nevada Constitution and

19  a Permanent Injunction barring enforcement of the new law.

20          On June 25, 2021, Polymer80 filed its *Motion for Temporary Restraining Order and*

21  *Preliminary Injunction*. After briefing and a hearing, this Court, on July 16, 2021, entered its *Order*

22  *Granting Preliminary Injunction*, preliminarily barring enforcement of Section 3.5 of AB 286.[1] That

23  Order is currently pending appeal at the Nevada Supreme Court.

24

25

26

27  ──────────────────────────────

28  [1] At that time, this Court declined to enter a Preliminary Injunction as to the enforcement of AB 286
    Section 3, because that portion of the new statute would not go into effect until January 1, 2022.

1    Thereafter, the Court held a Case Management and Scheduling Conference on July 14, 2021,

2    that resulted in a July 15, 2021, *Case Management and Trial Scheduling Order* setting an expedited

3    trial date of November 30, 2021. That Order also provided that the parties could engage in discovery

4    through November 1, 2021, and fixed November 8, 2021, as the deadline for filing dispositive

5    motions. By so ruling, this Court wanted to, and did, afford the parties the opportunity to develop

6    the evidentiary record to be presented upon motions for summary judgment and/or at trial.

7    In the ensuing months, the parties proceeded with discovery. Both Polymer80 and

8    Defendants timely filed Motions for Summary Judgment on November 8, 2021.[2] Pursuant to the

9    parties' Stipulation, this Court directed that they file their oppositions to the other side's summary

10   judgment motion on November 18, 2021, dispense with reply briefs, and proceed to a full hearing

11   on November 23, 2021. That hearing was held as scheduled and the Court heard substantial

12   argument from the parties. Notably, both parties agreed at that hearing that this Court could decide

13   this case upon the record before it at that point, and that a trial was unnecessary. At the conclusion

14   of the hearing, the Court rendered an oral ruling granting Polymer80 summary judgment. This Order

15   follows and memorializes that ruling.

16   Accordingly,

17   IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc., for Summary Judgment* is

18   GRANTED, and that *Defendants' Motion for Summary Judgment* is DENIED, for the reasons set

19   forth herein and on the record at the November 23, 2021, hearing.

20

21

22

23

---

24   [2] Before the parties filed their competing Motions for Summary Judgment, Defendants filed an appeal from this Court's *Order Granting Preliminary Injunction*. Thereafter, Defendants filed a

25   Motion to Stay this case in this Court, arguing, among other things, that this matter presented a pure question of law that would be resolved upon their then-pending appeal. This Court denied

26   Defendants stay, largely because the issue on appeal was not the ultimate question of whether or not AB 286 was and is unconstitutionally vague but whether or not this Court had abused its discretion

27   in granting interim relief. Moreover, a stay would have only delayed a ruling on the constitutionality of AB 286, which would not have been in the best interests of either Plaintiff or Defendants.

28

## II

## CONTESTED PROVISIONS OF AB 286

The 81st Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes by adding, among others, the following provisions, which are the subject of this proceeding.

First, Section 3 of AB 286, effective as of January 1, 2022, provides as follows:

> 1.    A person shall not possess, purchase, transport or receive an unfinished frame or receiver unless:
> (a) The person is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.
>
> 2.    A person who violates this section:
> (a) For the first offense, is guilty of a gross misdemeanor; and
> (b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130.[3]

Plainly, this provision makes it a crime to "possess, purchase, transport or receive an unfinished frame or receiver" in the State of Nevada.

Second, Section 3.5 of AB 286, which became effective on June 7, 2021, provides as follows:

> 1.    A person shall not sell, offer to sell or transfer an unfinished frame or receiver unless:
> (a) The person is:
> (1) A firearms importer or manufacturer; and
> (2) The recipient of the unfinished frame or receiver is a firearms importer or manufacturer; or
> (b) The unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number.

---

[3] NRS 193.130 provides that a category D felony is punishable by 1-4 years in Nevada State Prison and a fine of up to $5,000.00.

Page 4 of 17

2.      A person who violates this section:
(a) For the first offense, is guilty of a gross misdemeanor; and
(b) For the second or any subsequent offense is guilty of a category D felony and shall be punished as provided in NRS 193.130

This Section makes it a crime to "sell, offer to sell or transfer an unfinished frame or receiver" in the State of Nevada.

Section 6 of AB 286 amended NRS 202.253 by adding the term "[u]nfinished frame or receiver" to Nevada law and defines that term as follows:

9.      "Unfinished frame or receiver" means a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

Polymer80 argues that Sections 3 and 3.5 of AB 286 are unconstitutionally vague under the Due Process Clause of the Nevada Constitution.[4]

### III

### STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." NRCP 56(c). While this Court must construe the evidence in the light most favorable to the nonmoving party upon such a motion, the nonmoving party "bears the burden to do more than simply show that there is some metaphysical doubt as to the operative facts in order to avoid

_____

[4] This decision does not extend to Section 4 or 5 of AB 286 and this Court makes no judgment relating to the efficacy of those provisions.

1   summary judgment being entered in the moving party's favor." *Wood v. Safeway, Inc.*, 121 Nev.

2   724, 732 (2005) (quotations omitted). "The nonmoving party must, by affidavit or otherwise, set

3   forth specific facts demonstrating the existence of a genuine issue for trial or have summary

4   judgment entered against him." *Id.* And, the party opposing summary judgment cannot build a case

5   on the "'gossamer threads of whimsy, speculation, and conjecture.'" *Id.* (quoting *Bulbman, Inc. v.*

6   *Nevada Bell*, 108 Nev. 105, 110 (1992)). Critically, the Nevada Supreme Court, as the parties have

7   acknowledged, has held that summary judgment is appropriate with respect to, as here, a facial Due

8   Process challenge on vagueness grounds to the constitutionality of a criminal statue. *See Flamingo*

9   *Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 508-09 (2009). As explained below, there are no

10   "genuine issues of material fact" precluding summary judgment, and this Court may properly resolve

11   this action on summary judgment upon the record before it.

12 **IV**

13 **<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

14       Polymer80 is a Nevada corporation headquartered in Dayton, Nevada, within Lyon County.

15   It manufactures, designs, and distributes gun-related products, components, and after-market

16   accessories. The legislative history reveals that AB 286 has targeted, at least partially, certain of

17   Polymer80's business products. Defendants have also admitted as much in their Answer and in their

18   moving papers. As set forth in the testimony of Assemblywoman Sandra Jauregui:

19
20         . . . a Nevada based company, Polmer80, Inc., [is] one of the nation's
        largest manufacturers of ghost guns.

21   <u>Minutes</u>, Assembly Committee on Judiciary, p.6 (March 17, 2021). Assemblyman Wheeler stated

22   therein:

23
        The kit guns you called ghost guns are used by a lot of hobbyists.
24         Under federal law, those are quite legal, so outlawing them in Nevada,
        as this bill tries to do, basically puts a company [Polmer80] in my
25         district out of business. . . .
        We are going to drive a company in my district out of business, but
26         people can still buy them in Kentucky. . .

27

28

Page 6 of 17

1  *Minutes*, Assembly Committee on Judiciary, p.13-14 (March 17, 2021).[5]

2  **A.      STANDING OF POLMER80**

3          In Defendants' Answer and at the Motion for Preliminary Injunction hearing, the State of

4  Nevada contested Polymer80's standing to contest the constitutional validity of AB 286.   The

5  Defendants' have not argued a lack of standing on summary judgment. However, Polymer80 asserts

6  in their Motion that they indeed have standing.

7          NRS 30.040 provides, in pertinent part:

8              **NRS 30.040.  Questions of construction or validity of . . . statutes.**

9                  1.  Any person . . . whose rights, status or other legal relations
10            are affected by a statute . . . may have determined any question of
              construction or validity arising under the . . . statute . . . and obtain a
11            declaration of rights, status or other legal relations thereunder.

12  NRS 30.040(1).  In Nevada, the issue of Standing is a question of law.  *Arguello v. Sunset Station,*

13  *Inc.*, 127 Nev. 365, 368 (2011). As explained recently by the Nevada Supreme Court:

14            The question of standing concerns whether the party seeking relief has
15            a sufficient interest in the litigation. The primary purpose of this
              standing inquiry is to ensure the litigant will vigorously and
16            effectively present his or her case against an adverse party. Thus, a
              requirement of standing is that the litigant personally suffer injury that
17            can be fairly traced to the allegedly unconstitutional statute and which
              would be redressed by invalidating the statute. A general interest in
18            the matter is normally insufficient: a party must show a personal
19            injury.

20  *Flor Morency v Nevada Department of Education*, 137 Nev. Adv. Op. 63, p. 7, 496 P.3d 584 (Oct.

21  7, 2021), (Citations Omitted).

22

23

24

25

26  _____
    [5] This Court notes that there are multiple references to Polmer80 in the legislative history of AB 286
27  all indicating the negative impact of the bill on their ability to conduct business in the State of
    Nevada.
28

1       This Court finds that Polymer80 has standing to mount a facial vagueness challenge to the

2 constitutionality of AB 286.  Like the Plaintiffs in *Flamingo Paradise Gaming, LLC v. Chanos*, 125

3 Nev. 502, 508-09 (2009), Polymer80 could be subject to criminal prosecution stemming from its

4 ongoing conduct.  Polymer80's facial challenge to AB 286 is ripe for this Court's adjudication as

5

6 Section 3.5 of AB 286 took effect earlier this year upon approval by the Governor and Section 3 of

7 AB 286 takes effect January 1, 2022.  Accordingly, it is ripe for this Court to determine whether or

8 not both of those Sections of AB 286 are unconstitutionally vague under the Due Process Clause of

9 the Nevada Constitution.

10       Polymer80 satisfies the requirement to show that they would "personally suffer injury that

11 can fairly be traced to the allegedly unconstitutional statute" by facing the prospect of felony

12

13 criminal prosecution each time they produce a product which allegedly falls under the purview of

14 the statute.  Further, Polymer80 would suffer significant economic loss as set forth in the Deposition

15 testimony submitted, and uncontested by the Defendants.  This, combined with the legislative history

16 showing that the thrust of the bill was to put Polymer80 out of business, clearly establishes that,

17 unlike any other potential litigant, Polymer80 will vigorously and effectively present the case for

18 facial invalidity of the statute – which is Polymer80's only true redress.

19

20       This Court determines that Polymer80 will suffer irreparable harm in the absence of

21 declaratory and/or injunctive relief, since, as under *Flamingo*, that harm exists if a Nevadan, such as

22 Polymer80, must conduct its affairs in the wake of criminal jeopardy that fails to provide fair notice

23 of the conduct being criminalized.[6]

24

25

26

27 _____

[6] The Defendants previously argued at the preliminary injunction hearing that Section 3(1)(b) would mitigate any harm as all Polymer80 would have to do is put a serial number on its products.  The

28

1

**B.     STANDARD OF REVIEW FOR A FACIAL VAGUENESS CHALLENGE**

2

3       The question before this Court is essentially whether or not AB 286 is unconstitutionally

4  vague under the Due Process Clause of the Nevada Constitution.  It is undisputed that Section 3 and

5  Section 3.5 of AB286 are criminal statutes with penalties being elevated as high as category D

6  felonies.

7       Nevada's Due Process Clause states simply that "No person shall be deprived of life, liberty,

8  or property, without due process of law." Nev. Const., Art. 1, Sec. 8(2). In Nevada, the determination

9  of whether a statute is constitutional is a question of law. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129

10  P.3d 682, 684 (2006).

11

12              Statutes are presumed to be valid, and the challenger bears the burden
                of showing that a statute is unconstitutional.  The court must interpret
13              a statute in a reasonable manner, that is, [t]he words of the statute
                should be construed in light of the policy and spirit of the law, and the
14              interpretation made should avoid absurd results.  In reviewing a
                statute, it should be given [its] plain meaning and must be construed
15              as a whole and not be read in a way that would render words or phrases
                superfluous or make a provision nugatory.
16

17  *Flamingo Paradise Gaming v. Att'y General*, 125 Nev. 502, 509 (2009).  In reviewing the statute,

18  "every reasonable construction must be resorted to, in order to save a statute from

19  unconstitutionality." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010).

20       The Nevada Supreme Court has adopted a two-pronged test for determining whether a

21  criminal statute is so impermissibly vague as to run afoul of the due process clause of the Nevada

22

23

24

25

26  argument was abandoned on summary judgment.  Section 3(1)(b) and Section 3.5(1)(b) by their own
    terms only provide relief when the "unfinished" frame or receiver is "required" by federal law to be
27  imprinted with a serial number.  It is undisputed that the products produced by Polymer80 are not
    required by federal law to have a serial number imprinted on them.
28

1   Constitution. *See, e.g., Flamingo Paradise Gaming,* 125 Nev. at 510; *Gallegos v. State*, 123 Nev.

2   289, 294 (2007).

3
4               A criminal statute can be invalidated for vagueness (1) if it fails to
                provide a person of ordinary intelligence fair notice of what is
                prohibited *or* (2) if it is so standardless that it authorizes or encourages
5               seriously discriminatory enforcement.

6   *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).  Although both civil and criminal statutes

7   are judged under the same test, the Nevada Supreme Court has explained:

8
                [T]here are two approaches to a facial vagueness challenge depending
9               on the type of statute at issue. The first approach arises under a facial
                challenge to a civil statute and the plaintiff must show that the statute
10              is impermissibly vague in all of its applications. In making this
11              showing, [a] complainant who engages in some conduct that is clearly
                proscribed cannot complain of the vagueness of the law as applied to
12              the conduct of others. **But, when the statute involves criminal
                penalties or constitutionally protected rights, the second
13              approach involves a higher standard of whether "vagueness
                permeates the text.**
14

15  *Flamingo*, 125 Nev. at 512.[7]  Where a statute imposes criminal penalties, as is the case with AB 286,

16  the more exacting standard for Constitutionality is imposed.

17
                Under the higher standard, the question becomes whether vagueness
18              so permeates the text that the statute cannot meet these requirements
                in most applications; and thus, this standard provides for the
19              possibility that some applications of the law would not be void, but
                the statute would still be invalid if void in most circumstances.
20
21  *Flamingo*, 125 Nev. at 507.

22

23

24
    _____
25  [7] The Defendants have urged this Court to roll back *Flamingo* and apply the "clearly proscribed
    conduct" test to this criminal statute as set forth in *Sheriff of Washoe Cty v. Martin*, 99 Nev. 336,
26  340 (1983) (citing *Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 495 (1982)). This
    Court declines to do so as *Flamingo* made clear that under the Nevada Constitution the "clearly
27  proscribed conduct" analysis applies to vagueness challenges of civil statutes where facial vagueness
    challenges need to show that the law is "impermissibly vague in all its applications."
28

                                    Page 10 of 17

In this Court's view, AB 286, a criminal enactment, fails under both prongs for various reasons resulting in an unconstitutionally vague statute under Nevada Constitutional law. While similar, "the first prong is concerned with guiding those who may be subject to potentially vague statutes, while the second -- and more important -- prong is concerned with guiding the enforcers of statutes." *Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

## C.    SECTIONS 3 AND 3.5 OF AB 286 FAIL TO PROVIDE A PERSON OF ORDINARY INTELLIGENCE FAIR NOTICE OF WHAT IS PROHIBITED

Section 3 and Section 3.5 of AB 286 fail to provide a person of ordinary intelligence with fair notice of the conduct which it proscribes. The underlying purpose of this factor is to give a person "notice of the law so they can conform their conduct to its requirements." *Gallegos v. State*, 123 Nev. 289, 295 (2007). Those sections of AB 286 criminalize the possession, purchase, transport, receipt, transfer and sale of what the statute calls an "unfinished frame or receiver." While AB 286 purports to define the term "unfinished frame or receiver," that definition is as follows:

> [A] blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

This definition does not provide a person of ordinary intelligence with adequate notice of what AB 286 criminalizes.

As stated above, the crimes established in Section 3 and 3.5 are purely the result of Nevada legislative statutory enactment. The terms used in the definition of "unfinished frame or receiver" are not defined elsewhere in the statute. These terms include - blank, casting, machined body, machining, major machining operations, frame or lower receiver of a firearm, and/or fire-control cavity area.

The definition does not tell anyone when during the manufacturing process a blank, casting, or machined body (whatever those terms mean) has gone through the "major machining operations"

1   (whatever those are) to turn that blank, casting, or machined body into a frame or lower receiver of
2   a firearm (whatever that may be), a person of ordinary intelligence could not proscribe their conduct
3   to comply with the law.  As a result, this Court finds that the text of AB 286 does not provide fair
4   notice of whatever it criminalizes.  To this end, this Court asked on multiple occasions during oral
5   argument on the Motion for Summary Judgment what those terms as used in AB 286 mean.
6   Tellingly, the Defendants could not in any manner explain their meaning(s).

7        This Court inquired whether or not the common law defined the terms used in AB 286, and
8   the response that this Court received was clearly in the negative.  As such, this Court cannot use the
9   common law to decipher, clarify, or define the inherently vague terms of AB 286.  This fact
10  distinguishes this case from *State v. Castaneda*, 126 Nev. 478 (2010)(Common Law definition of
11  indecent exposure – a common law crime), where the Nevada Supreme Court found that that the
12  common law can provide a definition as to what conduct a statute prohibits.  This Court inquired as
13  to whether any other Nevada statutes or Nevada case law defined the terms found in AB 286 and,
14  again, the answer was no.  As a consequence, this case is also distinguishable from *Silverwing*
15  *Development v. Nevada State Contractors Board*, 136 Nev. Adv. Rep. 74, 476 P.3d 461 (2020),
16  (Commonly accepted definition of "subdivision" contained within the State's planning and zoning
17  statutes) where the Nevada Supreme Court rejected a vagueness challenge, when Nevada law
18  elsewhere defined an allegedly ambiguous term.  Thus, neither the common law nor any other
19  Nevada statutes or authorities define or clarify the vagueness that permeates the text of AB 286.

20       While portions of AB 286 incorporate certain terms that are defined in federal legislation,
21  this Court cannot imply that the Nevada Legislature wanted to incorporate all the existing federal
22  definitions relating to firearms or the Gun Control Act into AB 286.  Here, the Nevada Legislature
23  purposely included some federal definitions into AB 286 but, deliberately did not include others.
24  From that fact, this Court can only conclude that the Nevada Legislature purposely did so absent
25  some legislative declaration to the contrary.  Simply put, had the Nevada Legislature wished to
26  incorporate other federal definitions into AB 286, it knew how to do so and would have done so.  It

27

28

did not. And so, this Court will not do what the Nevada Legislature deliberately declined or failed to do.[8]

In *Gallegos v. State*, 123 Nev. 289 (2007), the Nevada Supreme Court was faced with the same dilemma. In *Gallegos*, the legislature criminalized the possession of firearms by a "fugitive from justice." The legislature failed to define what the term "fugitive from justice" meant in relation to the statute. The District Court upheld the validity of the statute and applied the federal definition of "fugitive from justice" into the statute to provide meaning. The Nevada Supreme Court reversed stating:

> Unlike Congress, the Nevada Legislature has not defined "fugitive from justice." By failing to adopt the federal definition of "fugitive from justice" or include any definition of that phrase. . ., the Legislature failed to provide the public with statutory notice of what that term means. It could arguably encompass a wide variety of circumstances. . . The fact that the district court, sua sponte, adopted the 18 U.S.C. § 921(a)(15) definition in this case does not remedy that deficiency.

*Gallegos v. State*, 123 Nev. @ 294-95.

Finally, the legislative history of AB 286 does not shed any light on the undefined terms used in AB 286 nor the meaning of "unfinished frame or receiver." To the contrary, that history illustrates that the State Legislature received comments during the legislative process that AB 286 was vague, and that the definition of "unfinished frame or receiver" was particularly uncertain. Rather than address the issue through comments or revising the text of AB 286, the Nevada Legislature remained silent. Thus, the legislative history does not aid this Court in unearthing the meaning of the vague

---

[8] The Defendants have proposed two separate definitions for the Court to "imply" into the statute to define what a Frame or Receiver is. Both definitions differed substantially. Federal Law (27 CFR § 478.11) defines "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Defendants' second proposed definition comes from the Glossary of the Association of Firearm and Toolmark Examiners defining "frame or receiver" as "the finished part which is capable of being assembled with other parts to put together a firearm."

1    and undefined terms used in AB 286.  It is noteworthy that the parties agreed that the legislative

2    history for AB 286 gives this Court no information to determine what the Nevada Legislature meant

3    when adopting and implementing the definition of "unfinished frame or receiver." Tellingly, not

4    even Webster's Dictionary defines a majority of these terms.

5        Defendants contend that since AB 286 includes a *scienter* element, the statute is not void for

6    vagueness.  This Court finds this contention unpersuasive.  The criminal acts defined in Sections 3

7    and 3.5 of AB 286 do not contain a *scienter* element, as they criminalize, among other things, the

8    possession and sale of "unfinished frames and receivers," whatever those things may actually be.

9    And, the person possessing or selling those "unfinished frames and receivers" need not have any

10   particular specific intent.  In fact, AB 286 only and very generally employs intent in the definition

11   of "unfinished frame or receiver," stating an "unfinished frame or receiver" is "a blank, a casting or

12   a machined body that is ***intended*** to be turned into the frame or lower receiver of a firearm." The

13   use of the word "intended" in this definition does not create the *scienter* element defendants claim

14   to exist within Section 3 and Section 3.5 of the bill.

15       Here, a literal reading of the definitional statute requires that the blank, casting or machined

16   body (all inanimate objects) be intended to be turned into the frame or lower receiver of a firearm.

17   Nowhere in the definitional statute does it indicate who would have to have intended the unfinished

18   frame or receiver to be transformed into a firearm. Is it the manufacturer like Polymer80?  It is

19   undisputed that it is their intent not to make a firearm.  Is it the seller of a gun kit? They have no

20   intent to make a firearm.  The object itself cannot transfer specific intent to the possessor of the item.

21       Even if this Court were to assume an intent element was specifically meant to apply to any

22   individual purportedly violating Section 3 and 3.5, the statute would still be unconstitutionally

23   vague.  For example, if Section 3 criminalized the possession of a blank, casting, or machined body

24   only if the person who possessed such an item (whatever it might actually be) specifically intended

25   to turn it into the frame or lower receiver of a firearm with additional machining, AB 286 would still

26   be unconstitutionally vague.

27       In this regard, the statute is expressly conjunctive, such that the blank, casting, or machined

28   body must: (i) be intended to be turned into the frame or lower receiver of a firearm with additional

1   machining, and (ii) already be formed or machined to the point at which most of the major machining
2   operations have been completed.  Yet, none of these terms are defined, nor is there any way to know
3   when "most of the major machining operations have been completed," and then what "additional
4   machining" must still occur and when.  Accordingly, any specific intent that can be read into
5   Sections 3 and 3.5 of AB 286 does not salvage the statute, because, even with an intent element, AB
6   286 still fails to provide adequate notice as to what it specifically criminalizes.

7        Sections 3 and 3.5 of AB 286 create a new crimes that do not exist under federal law or
8   common law.  Consequently, the only notice of what AB 286 criminalizes is provided in the statute
9   itself.  However, the law does not provide adequate notice of what it criminalizes, given that the
10  definition of "unfinished frame or receiver" uses a myriad undefined terms.  Moreover, the combined
11  use of these undefined terms results in an overall failure to provide a person of ordinary intelligence
12  with fair notice of what is criminalized.  As there is no well-established or ordinary meaning to the
13  terms used in AB 286, Section 3 and Section 3.5 are unconstitutionally vague under the Due Process
14  Clause of the Nevada Constitution.

15

16  **D.      SECTIONS 3 AND 3.5 OF AB 286 ARE SO STANDARDLESS THAT IT**
17  **AUTHORIZES OR ENCOURAGES SERIOUSLY DISCRIMINATORY ENFORCEMENT**

18
19      This Court now turns to whether AB 286 "is so standardless that it authorizes or encourages
20  seriously discriminatory enforcement."  *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021 (2015).
    The Court finds that it is.
21
22      As explained by the Nevada Supreme Court:

23          The concern under this prong is the scope of discretion left to law
            enforcement officials and prosecutors.  Our fear is that absent adequate
24          guidelines, a criminal statute may permit a standardless sweep, which
            would allow the police, prosecutors, and juries to 'pursue their
25          personal predilections.'

26  *Gallegos*, 125 Nev. @ 296.  (Citation Omitted)

27      AB 286 fails to establish clear standards that law enforcement can use to determine whether
28  the law is violated.  At its most basic, there is no clear standard for law enforcement to use to

Page 15 of 17

1    determine when an "unfinished frame or receiver" comes into existence. Unlike the federal
2    regulatory process to determine whether a frame or lower receiver is considered a firearm under the
3    Gun Control Act, Nevada has established no authority at all to determine when an "unfinished frame
4    or receiver" actually comes into existence. The most any court can glean from the definition is that
5    it is something less than a firearm and more than a block of raw material. Where on the scale in
6    between both extremes the ill-defined "unfinished frame or receiver" lands is unknown under the
7    law and left to the sole discretion of law enforcement and prosecutors. When does the machining
8    process start? When does the raw material become machined and through what processes? What
9    constitutes a "major machining operation" versus machining itself? Would the "fire-control cavity"
10   be considered a "major machining operation" or is it excluded? What additional machining needs to
11   be completed? It is unclear and undefined under the statute.

12       Nevadans would face the risk of discriminatory enforcement by police and prosecutors alike
13   as they, in their sole discretion and without guidance, could label almost anything an "unfinished
14   frame or receiver," if it in any way even resembles a firearm's undefined frame or lower receiver.
15   There is no clear statutory language to bridle that discretion or to prevent state actors from pursuing
16   their personal predilections.

17       Ordinary Nevada citizens are at risk of arbitrary and discriminatory enforcement of Section
18   3 and 3.5 of AB 286 owing to the vagueness that permeates the text of the law. Therefore,
19   enforcement of AB 286 is standardless to such a degree that it authorizes and/or encourages arbitrary
20   and discriminatory enforcement.

21       For this additional reason, the Court finds that Sections 3 and 3.5 of AB 286 are
22   unconstitutionally vague under the Nevada Constitution's Due Process Clause.

23                                      **V**

24                     **ORDER AND JUDGMENT**

25       Based upon all of the foregoing, the Court finds that Section 3 and 3.5 of AB 286 are
26   unconstitutionally vague, insofar as the law: (i) fails to provide a person of ordinary intelligence
27   with fair notice of the conduct that is prohibited, and (ii) is so standardless that it authorizes and
28   encourages seriously arbitrary and discriminatory enforcement.

1    Good cause appearing,

2    IT IS HEREBY ORDERED that the *Motion of Polymer80, Inc, for Summary Judgment* is

3    GRANTED.

4    IT IS HEREBY FURTHER ORDERED that *Defendants' Motion for Summary Judgment* is

5    DENIED.

6    IT IS HEREBY FURTHER ORDERED that a Declaratory Judgment be entered in favor of

7    Polymer80 and against Defendants; to wit,

8    IT IS HEREBY FURTHER ORDERED, DECREED AND DECLARED that Section 3 and

9    Section 3.5 AB 286 are unconstitutionally vague and violate the Due Process Clause of the Nevada

10   State Constitution.

11   IT IS HEREBY FURTHER ORDERED that a Permanent Injunction be entered in favor of

12   Polymer80 and against Defendants; to wit,

13   IT IS HEREBY ORDERED that the State of Nevada and Defendants, STEPHEN SISOLAK,

14   Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

15   Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the

16   Records, Communications, and Compliance Division of the Nevada Department of Public Safety,

17   and their respective successors, officers, agents, servants, and employees and anyone acting in

18   concert with them, individually and/or collectively, are hereby permanently enjoined from enforcing

19   Section 3 and Section 3.5 of AB 286.

20   IT IS HEREBY FURTHER ORDERED that the security Polymer80 previously posted with

21   this Court pursuant to NRCP 65(c) in the amount of $20,000.00 (Twenty Thousand Dollars) be

22   exonerated and released to Polymer80 forthwith.

23   THIS IS A FINAL JUDGMENT.

24   DATED this 10th day of December, 2021.

25

26

27                                               JOHN P. SCHLEGELMILCH,
                                                 DISTRICT JUDGE
28

1    Case No. 21-CV-00690

2    Dept. No. I

3                              **Certificate of Mailing**

4           I hereby certify that I, Andrew C. Nelson, am an employee of the Third Judicial District

5    Court, and that on this date pursuant to NRCP 5(b), a true copy of the foregoing document was

6    mailed at Yerington, Nevada addressed to:

7    Gregory L. Zunino, Esq.
     *Emailed*: gzunino@ag.nv.gov
8

9    Brad M. Johnston, Esq.
     *Emailed: bjohnston@shjnevada.com*
10

11   James J. McGuire, Esq.
     *Emailed: james.mcguire@gmlaw.com*
12

13   Michael Patrick, Esq.
     *Emailed: michael.patrick@gmlaw.com*

14   Mark Doerr
     *Emailed: mark.doerr@gmlaw.com*
15

16   Craig A. Newby, Esq.
     *Emailed: CNewby@ag.nv.gov*
17

18

19          DATED: This 10 $^{th}$ day of December, 2021.

20

21                                              Al Nelson

22                                       Employee of Hon. John P. Schlegelmilch

23

24

25

26

27

28

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**MARYLAND SHALL ISSUE INC ET AL**
                    Plaintiff                                    :
            vs.                                                  :         Case No. Civil # 485899V
                                                                 :
**MONTGOMERY COUNTY MARYLAND**                                   :
                    Defendant                                    :

## ORDER

Upon review of the record herein, and this matter having been remanded from the United States District Court for the District of Maryland, it is this _24th_ day of _February_, 2022, by the Circuit Court for Montgomery County, Maryland,

**ORDERED,** that the Assignment Office shall issue a Track 2 Scheduling Order with a Base Date of ___February 18, 2022___.

JAMES A. BONIFANT
ADMINISTRATIVE JUDGE
Circuit Court for Montgomery County, Maryland

Entered: Clerk, Circuit Court for
Montgomery County, MD
February 28, 2022



**CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**
50 Maryland Avenue
Rockville, Maryland 20850

Main: 240-777-9400

Case Number: **485899V**
Other Reference Number(s):

**MARYLAND SHALL ISSUE INC ET AL VS MONTGOMERY COUNTY MARYLAND**

Date: 2/25/2022

## SCHEDULING ORDER – TRACK 2
## COMPLAINT FILED ON 05/28/2021

THIS ORDER IS YOUR OFFICIAL NOTICE OF CASE DEADLINES AND HEARINGS REQUIRING APPEARANCES.  FAILURE TO APPEAR AT HEARINGS OR COMPLY WITH ALL REQUIREMENTS MAY RESULT IN DISMISSAL, DEFAULT JUDGMENT, EXCLUSION OF WITNESSES AND/OR EXHIBITS, ASSESSMENTS OF COSTS AND EXPENSES, INCLUDING ATTORNEY FEES, OR OTHER SANCTIONS.

| EVENT: [ATTENDANCE REQUIRED AT EVENTS] | DEADLINE: |
|---|---|
| *DEADLINE: MOTION FOR ALTERNATIVE SERVICE FILED* | 06/21/2022 |
| *DEADLINE: DISCOVERY COMPLETED* | 07/11/2022 |
| *DEADLINE: PRETRIAL STATEMENT DUE* | 07/20/2022 |
| *DEADLINE: DISPOSITIVE MOTIONS FILED* | |
| *DEADLINE: ADR DEADLINE* | 07/25/2022 |
| PRETRIAL/STATUS HEARING | 7/28/2022 at |
| ATTENDANCE REQUIRED | 10:30 AM |
| *DEADLINE: PLEADING AMENDMENT TO BE DETERMINED AT PRETRIAL* | |

**TRIAL COUNSEL SHALL APPEAR** AT THE STATUS / PRETRIAL HEARING, ACCOMPANIED BY OR WITH TELEPHONE ACCESS TO THE INDIVIDUAL(S) WITH AUTHORITY TO SETTLE THE CASE.  TRIAL COUNSEL SHALL SUBMIT A WRITTEN PRETRIAL STATEMENT THAT 1) DESCRIBES THE NATURE OF THE CASE; 2) SETS FORTH CLAIMS AND/OR DEFENSES; 3) DETAILS STIPULATIONS; AND 4) IDENTIFIES WITNESSES AND EXHIBITS.  MOTIONS FILED IN TRACK 2 ACTIONS SHALL NOT EXCEED 15 PAGES INCLUDING ANY MEMORANDUM OF LAW AND OPPOSITION / REPLY MOTIONS SHALL NOT EXCEED 10 PAGES WITHOUT LEAVE OF THE COURT.

THE TRIAL DATE SHALL BE SET AT THE STATUS / PRETRIAL HEARING BETWEEN THE DATES NOTED BELOW.  COUNSEL ARE ENCOURAGED TO CLEAR DATES WITH ONE ANOTHER AND THE ASSIGNMENT OFFICE PRIOR TO THE CASE BEING CALLED.

**Trial Date Between:** _____ and _____.

**ANY MODIFICATIONS OF THIS SCHEDULING ORDER MUST BE REQUESTED BY WRITTEN MOTION FILED IN ADVANCE OF THE DEADLINES OR HEARING DATES SOUGHT TO BE MODIFIED, PROVIDING GOOD CAUSE TO JUSTIFY ANY MODIFICATION THEREOF.**

Possession and use of cell phones, computers, other electronic devices, and cameras may be limited or prohibited in designated areas of the court facility.  The use of any camera, cell phone, or any electronic device for taking, recording, or transmitting photographs, videos, or other visual images is prohibited in the court facility at all times, unless the court expressly grants permission in a specific instance.

**MARYLAND SHALL ISSUE INC ET AL VS MONTGOMERY COUNTY MARYLAND   Case Number: 485899V**

**Other Reference Number(s):**

_____2/25/2022_____                    _____

Date                                         Administrative Judge

IF TRACK INFORMATION DOES NOT CORRESPOND TO ASSIGNED TRACK, COUNSEL FOR THE
DEFENDANT SHALL NOTIFY THE DCM COORDINATOR AT (240) 777-9358.  QUESTIONS?  Please see the
Court's GUIDE TO DCM ORDERS and https://montgomerycountymd.gov/cct/departments/dcm.html.

E-FILED; Montgomery Circuit Court
Docket: 2/22/2022 5:37 PM; Submission: 2/22/2022 5:37 PM

### IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Case No. 485899V |
| | * | |
| MONTGOMERY COUNTY, MARYLAND | * | |
| | * | |
| Defendant | * | |

### DEFENDANT'S MOTION TO EXCEED PAGE LIMITATION ON OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Montgomery County, Maryland, by and through counsel and pursuant to the Rules of this Court, hereby moves for leave to exceed the page limitation applicable to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment, and Memorandum of Grounds and Authorities in Support of Defendant's Opposition, and as grounds therefore, state as follows:

1. On May 28, 2021, Plaintiffs filed a four-count Complaint in this Court, seeking declaratory relief and an injunction against enforcing County Bill 4-21, which made changes to Chapter 57, Weapons, of the Montgomery County Code. Complaint ¶ 1. The law went into effect on July 16, 2021. *Id.*

2. The Counts and declarations sought by Plaintiffs are as follows:

- Count I: the Bill is not a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

- Count II: the Bill is preempted by and in conflict with State law;

- Count III: the Bill is an unconstitutional taking under Md. Const. art. III § 40 and Md. Decl. Rights art. 24 (this count also seeks "just compensation" from the County);

- Count IV: the Bill violates due process because it is unconstitutionally vague under Md. Decl. Rights art. 24 and U.S. Const. 14th Amendment (the latter claim also seeks damages

and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively).

3.   Plaintiffs filed a 52-page Motion for Partial Summary Judgment on June 16, 2021.

4.   On July 12, 2021, the County removed the Complaint to the United States District Court for the District of Maryland. On July 19, the federal court denied Plaintiffs' Motion, without prejudice, because the federal court's case management order precluded filing a motion without first seeking a pre-motion conference with the court. Thereafter, Plaintiffs filed a Motion to Remand the Complaint to state court. The County opposed that Motion.

5.   By Order dated February 7, 2022, the federal court granted, in part, Plaintiffs' Motion to Remand. The federal court remanded Counts I, II, and III to this Court while retaining, but holding in abeyance, Count IV pending resolution of the other claims in this Court.

6.   On this date, the Defendant Montgomery County, Maryland files its Motion to Dismiss or, Alternatively for Summary Judgment, and Opposition to Plaintiffs' Motion for Partial Summary Judgment, and Memorandum of Grounds and Authorities in Support of Defendant's Motion in this Court.

7.   This is a Track 2 case and, according to the Court's Scheduling Order, motions and accompanying memoranda are not to exceed 15 pages.

8.   The contemporaneously filed motion and memorandum addresses the three Counts and claims remanded to this Court and responds to Plaintiffs' motion. Together, the motion and memorandum are 48 pages in length.

9.   Given the complexity of the issues contained in Counts I-III, and the necessary response to issues in Plaintiffs' motion, Defendant seeks permission to exceed the standard page limitation for a dispositive motion.

10. This motion is made to avoid any prejudice that would result from imposition of the

ordinary page limitation for dispositive motions.

WHEREFORE, Defendant respectfully seeks leave to exceed to the Court's page limitation

for its opposition.

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 22nd day of February 2022, a copy of the foregoing was electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

                                             */s/ Edward B. Lattner*
                                             Edward B. Lattner, Chief
                                             Division of Government Operations

motion exceed page limit
21-003732

4

E-FILED; Montgomery Circuit Court
Docket: 2/22/2022 5:37 PM; Submission: 2/22/2022 5:37 PM

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,    *
                                         *
    Plaintiffs                       *
                                         *
    v.                               *    Case No. 485899V
                                         *
MONTGOMERY COUNTY, MARYLAND              *
                                         *
    Defendant                        *

### DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Montgomery County, Maryland, by and through its undersigned counsel, respectfully requests that this Court dismiss the Complaint for lack of standing or, alternatively, enter judgment in its favor as to all three counts of the Complaint (pending before this Court on remand from federal court) and further declare that:

Count I: Bill 4-21 is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

Count II: Bill 4-21 is authorized by, and not preempted by or in conflict with, State law; and

Count III: The restrictions of Bill 4-21 are *per se* not a taking and Bill 4-21 was properly enacted pursuant to the County's police powers.

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## REQUEST FOR HEARING

Pursuant to Rule 2-311(f), Defendant requests a hearing on Plaintiff's Motion for Partial

Summary Judgment and Defendant's Motion to Dismiss or, alternatively, for Summary Judgment.

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of February 2022, a copy of the foregoing was
electronically served through MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

E-FILED; Montgomery Circuit Court
Docket: 2/22/2022 5:37 PM; Submission: 2/22/2022 5:37 PM

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,         \*

                             \*

      Plaintiffs                 \*

                             \*

      v.                      \*      Case No.: 485899V

                             \*

MONTGOMERY COUNTY, MARYLAND  \*

                             \*

      Defendant                \*

### MEMORANDUM IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### STATEMENT OF THE CASE

"Ghost guns" are homemade unserialized (and therefore untraceable) firearms, which can be easily assembled from kits or built using 3D printers by individuals without any required background check. When made of plastic, these guns may also be undetectable at security checkpoints that use metal detectors. Police in Montgomery County recovered 73 of these guns in 2020. And their use is increasing, both here and in surrounding jurisdictions.

In response, the County Council enacted, and the County Executive signed, Bill 4-21 ("the Bill"). **Ex. A**. The Bill generally restricts the "possession, use, sale, and transfer" of "ghost guns, undetectable guns, and certain other firearms" "with respect to minors" and "within 100 yards of places of public assembly." The Council's motivation to enact Bill 4-21 is set out in the Council Action Staff Report:[1]

BACKGROUND

"Ghost guns," or "do-it-yourself guns," are unserialized firearms built by unlicensed individuals. These guns evade many firearms regulations. Kits to build

---

[1] Council staff prepares a report at each stage of the legislative process. Those reports are publicly available at https://apps.montgomerycountymd.gov/ccllims/BillDetailsPage?RecordId=2695. For this Court's convenience, the council staff action packet is attached as **Ex. B**.

ghost guns are readily sold on the internet, without the requirement of federal background checks. Other ghost guns are built at home using blueprints and 3D printers.

When ghost guns are used in crimes, they are untraceable due to lack of serial numbers. During 2020, Montgomery County Police Department (MCPD) officers recovered 73 ghost guns.

*         *         *

SPECIFICS OF THE BILL

The purpose of Bill 4-21 is to begin to address the issue of ghost guns at the County level, consistent with limitations placed upon localities by Maryland state preemption of local firearms regulations. Under Maryland law, the County generally is preempted to regulate in the area of firearms. However, state law carves out certain specific areas in which the County may regulate. In particular, the County may regulate the sale, use, or transfer of firearms: (1) with respect to minors; or (2) within 100 yards of a place of public assembly.

In this vein, the bill first would maximize the impact of the County's firearms regulations by expanding the definition of "place of public assembly". The definition of "place of public assembly would be expanded to include any "place where the public may assemble, whether the place is publicly or privately owned, including a [government owned] park [identified by the Maryland-National Capital Park and Planning Commission]; place of worship; [elementary or secondary] school; [public] library; [government-owned or -operated] recreational facility; or multipurpose exhibition facility, such as a fairgrounds or conference center."[2]

With respect to ghost guns or DIY guns, the bill would define ghost guns to include firearms, including unfinished frames or receivers,[3] that are unserialized in accordance with federal regulations. The bill would define undetectable guns to include those that cannot be detected through metal detectors, or that are made with 3D printers. These ghost guns, including unfinished frames or receivers, and undetectable guns would be restricted with regard to minors and places of public assembly.

Specifically, the bill would prohibit a person from transferring a ghost gun

---

[2] Underlined text indicates text added by Bill 4-21 while brackets indicate text deleted by Bill 4-21.

[3] ATF Firearms Technology Branch Technical Bulletin 14-01, "Unfinished '80%' AR-15 Type Receivers," provides a useful explanation and examples of unfinished receivers. https://www.nfatca.org/pubs/FTB_Bulletin_102813.pdf. **Ex. C**. The Court may properly consider this document because Plaintiffs cite it in their Motion for Summary Judgment at p. 44.

2

or undetectable gun to a minor. Further, it would prohibit a person from possessing or manufacturing a gun, including through a 3D printing process, in the presence of a minor. Persons also would be prohibited from storing ghost guns, undetectable guns, or gun components in places that the person should know are accessible to minors.

Concerning places of public assembly, the bill would prohibit the sale, transfer, manufacture, or possession of ghost guns or undetectable guns within 100 yards of a place of public assembly. The bill also would prohibit—within 100 yards of a place of public assembly—the sale, transfer, possession, or use of a computer code to create a firearm through a 3D printing process.

SUMMARY OF PUBLIC HEARING

At the public hearing on February 9, five speakers provided testimony regarding Bill 4-21. Chief Marcus Jones testified that the Montgomery County Police Department (MCPD) and the County Executive "fully support the bill." Chief Jones stated that ghost guns are easy to acquire through 3D printing. Ghost guns also are easy to build from parts that can be bought on the internet. Ghost guns make the investigation of crime more difficult and tracing the origins of the ghost guns is nearly impossible. In 2020, MCPD recovered 73 ghost guns.

The Council enacted the Bill on April 6, 2021, and the County Executive signed it into law on April 16, 2021. It took effect on July 16, 2021. The Bill amended Chapter 57 (Weapons) of the Montgomery Cnty. Code by amending §§ 57-1, 57-7, and 57-11 and adding a new § 57-16.[4]

On May 28, 2021, Plaintiffs filed a four-count Complaint in this Court, seeking the following declarations and an injunction against enforcing the Bill:

- Count I: the Bill is not a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

- Count II: the Bill is preempted by and in conflict with State law;

- Count III: the Bill is an unconstitutional taking under Md. Const. art. III § 40 and Md. Decl. Rights art. 24 (this count also seeks "just compensation" from the County);

- Count IV: the Bill violates due process because it is unconstitutionally vague under Md.

---

[4] A copy of Chapter 57, incorporating the changes made by the Bill, is attached as **Ex. D**.

3

Decl. Rights art. 24 and U.S. Const. 14th Amendment (the latter claim also seeks damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively).

Plaintiffs filed a Motion for Partial Summary Judgment on June 16, 2021.

On July 12, 2021, the County removed the Complaint to the United States District Court for the District of Maryland. On July 19, the federal court denied Plaintiffs' Motion, without prejudice, because the federal court's case management order precluded filing a motion with first seeking a pre-motion conference with the court.[5] Thereafter, Plaintiffs filed a Motion to Remand the Complaint to state court. The County opposed that Motion.

By Order dated February 7, 2022, the federal court granted, in part, Plaintiffs' Motion to Remand. The federal court remanded Counts I, II, and III to this Court while retaining, but holding in abeyance, Count IV pending resolution of the other claims in this Court.

This Court must dismiss the Complaint because all Plaintiffs lack standing as they have not alleged a credible threat of prosecution under Bill 4-21. In addition, Plaintiff Maryland Shall Issue, Inc. lacks organizational standing because it has not alleged any cognizable harm beyond speculative potential future harm to its members.

Alternatively, the County is entitled to summary judgment and a declaration in its favor on each count in the Complaint. As to Count I, the Bill is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment). As to Count II, the Bill is authorized by, and not preempted by or in conflict with, State law. Finally, with respect to Count III, the restrictions of Bill 4-21 are *per se* not a taking and the Bill was properly enacted pursuant to the County's police powers.

---

[5] Given that Plaintiffs' Motion for Partial Summary Judgment was denied on procedural grounds unique to the federal court and anticipating that Plaintiffs would renew their Motion before this Court, Defendant has styled this response, in part, as an Opposition to their Motion. In any event, Plaintiffs already identified in their Complaint all the allegedly preemptive and conflicting State laws (and some of the cases) they rely upon in their Motion.

4

## UNDISPUTED MATERIAL FACTS

The Bill makes several amendments to Montgomery Cnty. Code Chapter 57 ("Weapons").

It expands the definition of the terms "gun or firearm" in Montgomery Cnty. Code § 57-1 to include

a "ghost gun" and an "undetectable gun." A "ghost gun" is defined as follows:

> a firearm, including an unfinished frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer under federal law or markings in accordance with 27 C.F.R. § 479.102. It does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968."

An "undetectable gun" is defined as follows:

(A)   a firearm that, after the removal of all its parts other than a major component, is not detectable by walk-through metal detectors commonly used at airports or other public buildings;

(B)   a major component that, if subjected to inspection by the types of detection devices commonly used at airports or other public buildings for security screening, would not generate an image that accurately depicts the shape of the component; or

(C)   a firearm manufactured wholly of plastic, fiberglass, or through a 3D printing process.

"3D printing process" is defined as "a process of making a three-dimensional, solid object

using a computer code or program, including any process in which material is joined or solidified

under computer control to create a three-dimensional object."[6]

"Major component means, with respect to a firearm: (1) the slide or cylinder or the frame

or receiver; and (2) in the case of a rifle or shotgun, the barrel."

The Bill amended the definition for a "place of public assembly" as follows:

A 'place of public assembly' is a place where the public may assemble, whether the place is publicly or privately owned, including a [government owned] park [identified by the Maryland-National Capital Park and Planning Commission];

---

[6] Additions to existing County law made by the original bill are underlined and deletions to existing law made by the original bill are [bracketed]. Post-introduction (amendments to the bill) additions are double underlined and post-introduction deletions are [[double bracketed.]]

place of worship; [elementary or secondary] school; [public] library; [government-owned or -operated] recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

The Bill added new subsections (c), (d), and (e) to § 57-7 ("Access to guns by minors"):

(c)     A person must not give, sell, rent, lend, or otherwise transfer to a minor:
         (1)     a ghost gun or major component of a ghost gun;
         (2)     an undetectable gun or major component of an undetectable gun; or
         (3)     a computer code or program to make a gun through a 3D printing.

(d)     A person must not [[manufacture or assemble]] purchase, sell, transfer, possess, or transfer[7] a ghost gun, including [[making]] a gun created through a 3D printing process, in the presence of a minor.

(e)     A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

The Bill amended § 57-11 ("Firearms in or near places of public assembly"):

(a)     [A] In or within 100 yards of a place of public assembly, a person must not:
         (1)     sell, transfer, [[manufacture, assemble,]] possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms[, in or within 100 yards of a place of public assembly]; or
         (2)     sell, transfer, possess, or transport[[, or use a computer code to create,]] a firearm created through a 3D printing process.
(b)     This section does not:
         (1)     prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);
         (2)     apply to a law enforcement officer, or a security guard licensed to carry the firearm;
         (3)     apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;
         (4)     apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm;
         (5)     apply to the possession of a handgun by a person who has received a permit to carry the handgun under State law; or
         (6)     apply to separate ammunition or an unloaded firearm:

---

[7] The second reference to "transfer" is likely a typo, meant to say "transport."

    (A)     transported in an enclosed case or in a locked firearms rack on a motor vehicle, <u>unless the firearm is a ghost gun or an undetectable gun</u>; or

    (B)     being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

Finally, the Bill adds § 57-16, which requires the Montgomery County Police Department to annually track and report the availability, use, and recovery of ghost guns and undetectable guns.

The Plaintiffs bringing suit include Maryland Shall Issue, Inc. ("MSI"), a Maryland corporation located in Baltimore, Maryland. Compl. ¶ 24. According to the Complaint, the organization is a Section 501(c)(4), non-profit membership organization with approximately 2,000 members statewide, including ones residing in Montgomery County. *Id.* It is allegedly an "all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland." *Id.*

Plaintiff Engage Armament ("Engage") is a Maryland corporation located in Montgomery County. Compl. ¶ 26. Engage is allegedly a Maryland State licensed arms dealer whose business allegedly includes the stocking and selling of "unserialized items," and may include the "transfer [of] firearms in the presence of a minor who is accompanied by a parent." *Id.* Engage is allegedly a dealer of "machines and computer code for the manufacture of firearms by individuals for personal use." *Id.* Engage is allegedly "within 100 yards of a place of public assembly" as defined by Bill 4-21. *Id.*

Plaintiff Andrew Raymond is allegedly a co-owner of Engage and resident of Montgomery County. Compl. ¶ 27. His residence is allegedly "within 100 yards of a public street." He allegedly assembles firearms in the presence of his minor children. He further allegedly possesses computer code used to manufacture firearms and he possesses ghost guns. *Id.* "As co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms

within the business confines of Engage for their self-protection and for the protection of the business." *Id.*

Plaintiff Carlos Rabanales is allegedly a co-owner of Engage and resident of Frederick County. Compl. ¶ 28. He allegedly "has authorized more than one supervisory employee at Engage to carry firearms within the business confines of Engage for their self-protection and for the protection of the business." *Id.* He allegedly "possesses more than one firearm for the protection of himself and his business" and he "may transport unserialized firearm parts and components to and from Engage as part of the business of Engage." *Id.*

Plaintiff Brandon Ferrell is a resident of Montgomery County and a supervisory employee of Engage. Compl. ¶ 29. His residence is allegedly "within 100 yards of a place of public assembly, as defined by Bill 4-21." *Id.* At work, he "wears and carries a fully loaded handgun in the course of his employment at Engage." *Id.* "He possesses one or more 'ghost guns.'" "He possesses computer code of the type regulated by Bill 4-21." *Id.* He allegedly does not possess a wear and carry permit. *Id.*

Plaintiff Deryck Weaver is a resident of Montgomery County and a supervisory employee of Engage. Compl. ¶ 30. He alleges that his residence is "within 100 yards of a 'place of public assembly.'" *Id.* He is the father of one minor child who lives with him. *Id.* "He possesses within his home one or more 'ghost guns.'" *Id.* He allegedly "wears and carries a fully loaded handgun" at his place of employment." *Id.* He is allegedly a qualified handgun instructor. *Id.* He allegedly does not possess a wear and carry permit. *Id.*

Plaintiff Joshua Edgar is a resident of Montgomery County and works as a contractor at Engage. Compl. ¶ 31. He alleges that his residence is "within 100 yards of a place of public assembly." *Id.* He alleges that he possesses within his home one or more "ghost guns." *Id.*

He further alleges that "[f]rom time to time, he assembles a firearm in the presence of a minor child for purposes of instruction." *Id.* He alleges that he does not possess a wear and carry permit. *Id.*

Plaintiff I.C.E. Firearms & Defensive Training, LLC, ("ICE Firearms") is allegedly a Maryland corporation located in Montgomery County. Compl. ¶ 32. ICE Firearms allegedly provides firearm training and safety instruction. *Id.* ICE Firearms allegedly "possesses computer code of the type regulated by Bill 4-21." *Id.* ICE Firearms further allegedly "possesses parts of firearms that are banned by Bill 4-21." *Id.* ICE Firearms allegedly is located "within 100 yards of a place of public assembly as that term is defined in Bill 4-21."

Plaintiff Ronald David is allegedly a resident of Montgomery County and the owner and operator of ICE Firearms. Compl. ¶ 33. He alleges that his home is "within 100 yards of a place of public assembly as that term is defined by Bill 4-21." *Id.* He allegedly possesses computer code of the type regulated by Bill 4-21. *Id.* He allegedly "possesses one or more receivers as defined and banned by Bill 4-21 as a 'ghost gun.'" *Id.* He is allegedly a qualified handgun instructor. *Id.*

Plaintiff Nancy David is allegedly a resident of Montgomery County. Compl. ¶ 33. She alleges that her home is "within 100 yards of a place of public assembly as that term is defined by Bill 4-21." *Id.* She allegedly possesses computer code of the type regulated by Bill 4-21. *Id.* She is allegedly a qualified handgun instructor. *Id.* She allegedly does not possess a Maryland carry permit. *Id.*

### STANDARDS OF REVIEW

**Dismissal**

Maryland Rule 2-322 provides that a party may make a motion to dismiss for failure to state a claim upon which relief can be granted. When moving to dismiss, the defendant asserts that,

even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law. *Lubore v. RPM Associates*, 109 Md. App. 312, 322 (1996). In reviewing a motion to dismiss, the Court must assume the truth of all relevant and material facts that are well pleaded and all inferences that can reasonably be drawn from those pleadings. *Bennett Heating and Air Conditioning, Inc. v. NationsBank*, 103 Md. App. 749, 757 (1995), *rev'd in part on other grounds*, 342 Md. 169 (1996). On the other hand, "[a]ny ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317 (2009). Moreover, "the well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Parks v. Alpharma, Inc.*, 421 Md. 59, 72 (2011) (internal quotation and citation omitted).

As to declaratory judgment, dismissal is appropriate only in those cases where the plaintiff is not entitled to a declaration. *Hunt v. Montgomery County*, 248 Md. 403 (1968). For example, a complaint for declaratory judgment is properly dismissed where there is no justiciable controversy between the parties, *120 W. Fayette St., LLLP v. Mayor and City Council of Baltimore City*, 413 Md. 309 (2010), or where the plaintiff has failed to exhaust his administrative remedies, *Abington Ctr. Assoc. Ltd. P'ship v. Baltimore County*, 115 Md. App. 580 (1997). *See also* Md. Code Ann., Cts. & Jud. Proc. § 3-409(b) ("If a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed in lieu of a proceeding under this subtitle").

**Summary Judgment**

Summary judgment should be entered where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 2-501; *Syme v. Marks Rentals, Inc.*, 70 Md. App. 235, 248 (1987); *King v. Bankerd*, 303 Md. 98, 111 (1985). A material

fact is one which will somehow affect the outcome of the case. *Friedman & Fuller, P.C. v. Funkhouser*, 107 Md. App. 91, 99 (1995).

**Declaratory Judgment**

Where a declaratory judgment action is properly brought and considered for summary judgment, the trial court must issue a written declaration of the parties' rights, even if it is not the declaration sought by the plaintiff. *Herlson v. RTS Residential Block 5, LLC*, 191 Md. App. 719, 730 (2010); *Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 524 (2006); *East v. Gilchrist*, 293 Md. 453, 461 n.3 (1982) ("where a plaintiff seeks a declaratory judgment . . ., and the court's conclusion . . . is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment"). Where the court's declaration is in line with the defendant's argument, it is also proper for the court to issue that declaration upon a motion for summary judgment by the defendant. *Griffin v. Anne Arundel County*, 25 Md. App. 115, 137 (1975).

The trial court must issue a separate written declaration. Although the judgment may recite that it is based on reasoning set forth in an accompanying memorandum, it cannot simply incorporate by reference an earlier oral ruling. *Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 308 n.7 (2004).

## ARGUMENTS: DISMISSAL

**I.    The Complaint Must Be Dismissed Because the Plaintiffs Lack Standing**

Dismissal is proper "when the party seeking such judgment has no standing and there is no justiciable controversy properly before the court." *Roper v. Camuso*, 376 Md. 240, 246-47 n.3, 829 A.2d 589 (2003).

> That the existence of a justiciable controversy is a prerequisite to the maintenance of a declaratory judgment in Maryland is well settled. *Prince George's Co. v. Bd. of*

11

> *Trustees*, 269 Md. 9, 304 A.2d 228 (1973). A controversy is justiciable 'when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded.' *Patuxent Oil Co. v. County Comm'rs of Anne Arundel County*, 212 Md. 543, 548, 129 A.2d 847, 849 (1957). It is thus clear that the declaratory judgment process is not available to decide purely theoretical questions or questions that may never arise, *Prince George's Co. v. Chillum-Adelphi*, 275 Md. 374, 340 A.2d 265 (1975); *Liss v. Goodman*, 224 Md. 173, 167 A.2d 123 (1961), or questions which have become moot, *Eberts v. Congressional Country Club, Inc.*, 197 Md. 461, 79 A.2d 518 (1951), or merely abstract questions, *Davis v. State*, 183 Md. 385, 37 A.2d 880 (1944). That the declaratory judgment process should not be used where a declaration would not serve a useful purpose or terminate a controversy is equally well settled. *Liss v. Goodman, supra*; *Bachman v. Lembach*, 192 Md. 35, 63 A.2d 641 (1949); *Staley v. Safe Deposit & Trust Co.*, 189 Md. 447, 56 A.2d 144 (1947).

*Hamilton v. McAuliffe*, 277 Md. 336, 339-40, 353 A.2d 634 (1976).

The requirement that there be an existing "live" controversy is intended to avoid the issuance of advisory opinions instead of resolving actual disputes. *See Hatt v. Anderson*, 297 Md. 42, 46, 464 A.2d 1076 (1983) ("Indeed, the addressing of non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.") (citing *Maryland-National Capital Park & Planning Comm'n v. Randall*, 209 Md. 18, 120 A.2d 195 (1956); *Tanner v. McKeldin*, 202 Md. 569, 97 A.2d 449 (1953); *Hammond v. Lancaster*, 194 Md. 462, 71 A.2d 474 (1950).

In *Hatt*, a fireman brought suit against the county fire department and other entities, seeking a declaratory judgment that a departmental regulation was unconstitutional. 297 Md. at 43. Both parties moved for summary judgment, and the trial court denied the fireman's motion and granted the county's motion. *Id.* The fireman appealed, and the Court of Appeals vacated the circuit court's judgment, remanding the case and instructing the circuit court to dismiss the fireman's action for lack of a justiciable controversy. *Id.* at 47. The Court observed that nowhere in his complaint did the fireman allege that the regulation had directly impacted him. *Id.* at 45. It concluded that "nothing appears in the pleadings even remotely suggesting that an actual dispute exists between

the parties beyond that which might be implied by the mere facial existence of the regulation; and this alone is plainly insufficient to present a justiciable controversy." *Id.* at 46-47 (citing *Hitchcock v. Kloman*, 196 Md. 351, 356, 76 A.2d 582 (1950)). Further, the Court noted that the complaint contained "no allegation that the regulation has been, or is threatened to be interpreted or applied by [defendant] in any particular way" nor were their pleadings alleging that plaintiff's rights were "*actually* being disputed, challenged or contested." *Id.* (Emphasis added). In the absence of an actual direct controversy, plaintiff's claim was "simply too theoretical, too abstract and too speculative to form the basis for an action for declaratory relief." *Id.*

Like in *Hatt*, no individual Plaintiff has plead facts to support that enactment of Bill 4-21 created an actual direct controversy. Under Maryland law, declaratory relief is unavailable to prevent hypothetical and abstract consequences in the future. *Cf. State v. G & C Gulf, Inc.,* 442 Md. 716, 734, 114 A.3d 694, 705 (2015) (A hypothetical threat is not enough).

## II.    Plaintiff Maryland Shall Issue, Inc. Lacks Organizational Standing

In Maryland, an organization has standing to bring a judicial action if it has a "property interest of its own—separate and distinct from that of its individual members." *Med. Waste Assocs. v. Md. Waste Coal.*, 327 Md. 596, 612, 612 A.2d 241, 249 (1992). This is shown if that organization "has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public." *Id.* at 613. *See also Sugarloaf v. Dep't of Environment*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996), and cases there cited.

"The mere fact that an individual or group is opposed to a particular public policy does not confer standing to challenge that policy in court." *Evans v. State*, 396 Md. 256, 329, 914 A.2d 25, 68 (2006). "[E]nsuring that State officials operate legally…is no different than the interest of all Maryland citizens." *Id.*

13

Here, Plaintiff MSI has not plead facts to support that its interest in the case is separate and distinct from its members. Neither has MSI plead potential damage differing from the general public. MSI's particular public policy priority—the "preservation and advancement of gun owners' rights in Maryland"- is insufficient to establish standing.

### ARGUMENTS: SUMMARY JUDGMENT (DECLARATORY JUDGMENT IN THE COUNTY'S FAVOR)

It is important to note at the outset that the wisdom of the legislative findings supporting the Bill is not on trial. Plaintiffs cannot challenge whether the County Council "was correct" in its legislative findings. *Md. Aggregates Ass'n, Inc. v. State*, 337 Md. 658, 668 (1995) ("the wisdom or expediency of a law adopted by a legislative body is not subject to judicial review"). Rather, the question is whether the Bill violates the specific constitutional and statutory provisions alleged in the Complaint.

### I.    BILL 4-21 IS A VALID LOCAL LAW

Article XI-A[8] of the Maryland Constitution provides counties electing a charter form of government with a certain measure of independence from the State legislature by providing for the transfer, within well-defined limits, of certain legislative powers formerly reserved to the General Assembly. Ratified by the voters of this State in November 1915, Md. Const. Art. XI-A, also known as the "Home Rule Amendment," was intended to secure to Maryland citizens "the fullest measure of local self-government" with respect to their local affairs. *State v. Stewart*, 152 Md. 419, 422, 137 A. 39, 41 (1927). The Home Rule Amendment "freed[]" counties from the General

---

[8] The Complaint alleges that the Bill is not a local law under Md. Const. Art. **XI-E**, § 3. Compl. ¶ 39. Art. XI-E governs the home rule authority of municipal corporations; the County's authority is governed by Art. XI-A. *See, e.g., FOP v. Montgomery Cnty.*, 446 Md. 490, 518 (2016); *Save Our Sts. v. Mitchell*, 357 Md. 237, 250 n.8 (2000); *Gordon v. Comm'rs of St. Michaels*, 278 Md. 128, 132 (1976).

Assembly's "interference," *City of Balt. v. Sitnick*, 254 Md. 303, 311 (1969), and bridged the gap between the policy decisions of detached state legislators and the actual preferences of local constituents, *Ritchmount P'ship v. Bd. of Supervisors of Elections*, 283 Md. 48, 56 (1978).

Section 2 of the Home Rule Amendment mandates that the General Assembly expressly enumerate and delegate those powers exercisable by counties electing a charter form of government and, in 1918, the legislature enacted the Express Powers Act, Md. Code Ann., presently codified at Md. Code Ann., Local Gov't. (LG) § 10-101 *et seq.*, which endowed charter counties with a wide array of legislative and administrative powers over local affairs. Montgomery County became the first county to adopt a charter form of government by doing so in the November 1948 general election. *McCarthy v. Board of Education*, 280 Md. 634, 638, 374 A.2d 1135, 1137 (1977).

The Express Powers Act is "broadly construed" to enable charter counties such as Montgomery County to "legislate **beyond the powers expressly enumerated**," thereby fostering "peace, good government, health, and welfare of the County." *Snowden v. Ann Arundel Cty.*, 295 Md. 429, 432 (1983) (emphasis added) (citing Express Powers Act). Together, the Home Rule Amendment and the Express Powers Act vest charter counties with significant power on the theory that "the closer those who make and execute the laws are to the citizens they represent, the better … those citizens [are] represented and governed in accordance with democratic ideals." *Ritchmount P'ship v. Bd. of Supervisors of Elections*, 283 Md. 48, 56 (1978).

The broadest authority for local legislation exists in LG § 10-206 of the Express Powers Act, which is often referred to as the "general welfare clause" because it grants charter counties the power to legislate on matters not specifically enumerated elsewhere. *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (referring to the predecessor statute Md. Code

15

Ann., Art. 25A, § 5(S)). LG § 10-206 empowers charter counties to enact local laws "not preempted by or in conflict with public general law" that "may aid in maintaining the peace, good government, health, and welfare of the county."[9] Thus, in *Greenhalgh*, the Maryland Court of Appeals relied upon § 5(S) to uphold Montgomery County's authority to enact a fair housing law even though the Express Powers Act did not specify that power and explained that "[t]he broadest grant of powers customarily is to home rule Counties . . . and cases holding that a delegation was restricted or narrow are concerned almost always with delegations to municipalities that do not enjoy home rule." *Greenhalgh*, 253 Md. at 162, 252 A.2d at 247.[10]

Under § 3 of the Home Rule Amendment, a charter county has full power to enact "local laws" on any subject covered by the Express Powers Act. A charter County also has the power to appeal or amend public local laws enacted by the General Assembly upon all matters covered by the Express Powers Act.[11] Section 4 of the Home Rule Amendment states that "[a]ny law so drawn

---

[9] Section 3 of the Home Rule Amendment also provides that a public general law controls in case of a conflict with a local law.

[10] Maryland court have sustained a wide variety of local legislation under the Home Rule Amendment and LG § 10-206 of the Express Powers Act. *See FOP v. Montgomery Cty.*, 446 Md. 490, 518-19 (2016) (upholding County spending to support a proposed charter amendment on the ballot); *Tyma v. Montgomery Cnty., Md.*, 369 Md. 497 (2002) (sustaining the County's domestic partnership benefits law); *Cade v. Montgomery Cnty.*, 83 Md. App. 419, *cert. denied*, 320 Md. 350 (1990) (sustaining the County's towing law); *Holiday Universal Club of Rockville, Inc. v. Montgomery Cnty.*, 67 Md. App. 568, *cert. denied*, 307 Md. 260 (1986) (sustaining the County's public accommodation law); *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (sustaining the County's fair housing law).

[11] A companion provision in section 4 of the Home Rule Amendment prohibits **the General Assembly** from enacting a public **local** law on any subject covered by the Express Powers Act, although it may enact a public **general** law inconsistent with the express powers of a chartered county. *State's Attorney of Baltimore City v. City of Baltimore*, 274 Md. 597, 606 (1975). A State law (on a subject covered by the Express Powers Act) is not an impermissible public local law "merely because its operation is confined to Baltimore City or to a single county, if it affects the interests of the people of the whole state." *Gaither v. Jackson*, 147 Md. 655, 667 (1925). *Dasch v. Jackson*, 170 Md. 251, 261 (1936) (state statute concerning the licensing of paper hangers in

so as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law within the meaning of this Act." *See Steimel v. Board of Election Supervisors*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976); *State's Attorney v. City of Baltimore*, 274 Md. 597, 607, 337 A.2d 92, 98-99 (1975). The Home Rule Amendment otherwise "attempts no definition of the distinction between a local law and a general law but leaves that question to be determined by the application of settled legal principles to the facts of particular cases in which the distinction may be involved." *McCrory Corp. v. Fowler*, 319 Md. 12, 17 (1990). Thus, for example, the Maryland Court of Appeals struck down the County's "future service contract" law because of its extra territorial application. *Holiday Universal, Inc. v. Montgomery Cnty.*, 377 Md. 305, 316 (2003) ("the ordinance makes clear that it would apply to a contract signed outside of Montgomery County, by parties residing outside of Montgomery County, where as much as forty-nine percent of the performance of the contract takes place outside of Montgomery County").

Where the application of a county law is limited to the enacting county Maryland courts will invalidate that law only it if clearly intruded on some well-defined state interest. *Tyma v. Montgomery Cnty.*, 369 Md. 497, 513 (2002). For example, in *McCrory Corp. v. Fowler*, the Court of Appeals struck down a Montgomery County law creating a private cause of action for violations of the County's employment discrimination law because it was not a "local law" under the Home Rule Amendment. "In Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *McCrory*, 319 Md. at 20, 570 A.2d at 838.

The Bill is a local law. First, its application is limited to Montgomery County. Unlike the

---

Baltimore City was not an impermissible local law because, in part, it imposed taxes or fees designed to produce a surplus payable into the general funds of the state).

local law in *Holiday Universal*, the Bill does not apply outside of the County.

Second, unlike the other local law struck down in *McCrory*, the Bill is specifically authorized by State law. Md. Code Ann., Crim. Law (CL) § 4-209(b) empowers the County to enact this law (and, as discussed below, the Bill is within the confines of that authorization).

Finally, contrary to Plaintiffs' argument, a local enactment does not cease to be a local law under the Home Rule Amendment merely because it regulates a matter that is also of interest to the State. Compl. ¶ 37; Pls.' Mot. for Summ. J. 31-32. If that were the test, few local regulations would pass muster. For example, although abusive employment practices constitute a statewide problem which have been addressed by the General Assembly, the Court of Appeals recognized that the County could still create administrative remedies to address the matter. *McCrory Corp. v. Fowler*, 319 Md. 12, 20. What the County could not do was create a new **private judicial** cause of action. Likewise, discrimination in housing and places of public accommodation may also be a statewide matter of concern (that has also been addressed by the General Assembly), but the County could create administrative remedies to address those evils as well. *Holiday Universal Club of Rockville, Inc. v. Montgomery County*, 67 Md. App. 568, *cert. denied*, 307 Md. 260 (1986) (sustaining the County's public accommodation law); *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 161 (1969) (sustaining the County's fair housing law).

Plaintiffs' remaining objections do not further any local law argument and, instead, are general complaints about the Bill. For example, Plaintiffs' complaint that the County cannot regulate major components of a firearm because certain major components of a ghost gun (e.g., the slide, cylinder, or barrel) are not a firearm and are not required to be serialized under Federal law; only a finished receiver is required to be serialized. Pls.' Mot. for Summ. J. 32.[12] But the

---

[12] Plaintiffs mischaracterize this regulation as a complete ban. It is not. The regulation is

18

County's authority under State law to regulate firearms with respect to minors (and within 100 yards of a place of public assembly) includes "ammunition for **and components of** a handgun, rifle, or shotgun." CL § 4-209(b)(1) ("A county . . . .. may regulate the times listed in subsection (a) of this section.") The County's authority to regulate the components of ghost guns does not depend upon whether those components are themselves firearms or required to be serialized under Federal or State law.

Plaintiffs argue that the Bill "bans the mere possession **in the home** of these otherwise non-regulated components," including the slide, cylinder and barrel. Pls.' Mot. for Summ. J. 33 (emphasis in original). However, this argument ignores the home exclusion of proposed County Code 57-11(b)(3) and the plain definitions of a "ghost gun" and "undetectable gun." After enactment of Bill 4-21, the text of County Code 57-11(b)(3) now states the following:

> This section [prohibiting possession of firearms, ghost guns, and undetectable guns within 100 yards of a place of public assembly] does not apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

According to the plain language of County Code 57-11(b)(3), a resident is permitted to possess firearms (except for ghost and undetectable guns) within their own homes, regardless of proximity to a place of public assembly. To the extent a "major component" is part of an ordinary firearm, whether assembled or disassembled, it does not fall within the ambit of Bill 4-21.

With respect to "major components" of a "ghost gun," Plaintiffs argue that Bill requires that each such "major component" be serialized—a requirement not imposed under Maryland or Federal law. Pls.' Mot. for Summ. J. 32-33. This reading is simply not supported by the text of the Bill, and it is not clear how Plaintiffs arrived at this conclusion. Quite to the contrary, the definition

---

limited to regulating firearms in the presence of children and within 100 yards of a place of public assembly. § 57-11(a).

of a "ghost gun" within Bill 4-21 specifically excludes a "firearm ... that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968." Furthermore, the definition of a "ghost gun" incorporates by reference the regulations of 27 C.F.R. § 479.102 related to serialization on the frame or receiver—but not other components.

While "major components" of an "undetectable gun" are prohibited in the presence of minors and within 100 yards of a place of public assembly, those components would be easily identified as part of an "undetectable gun" because each "major component" of an "undetectable gun," by definition under Bill 4-21, must "not generate an image that accurately depicts the shape of the component" in a metal detector. In plain words, the "major component" would be made of plastic or some other non-metallic substance. Therefore, there is no genuine possibility that a law enforcement officer would confuse the plainly legal "major components" of an ordinary firearm with the prohibited "major components" of an "undetectable gun" and Plaintiffs' fear of arbitrary enforcement is meritless. Pls.' Mot. for Summ. J. 32-33.[13]

The Bill is a valid local law within the Home Rule Amendment and the County requests that this Court enter a declaratory judgment to that effect.

## II.   BILL 4-21 IS NOT PREEMPTED BY, OR IN CONFLICT WITH, STATE LAW

The Bill is not preempted by, or in conflict with, State law because it is specifically authorized by CL § 4-209(b), which empowers the County to regulate the purchase, sale, transfer, ownership, possession, and transportation of firearms (including their ammunition and

---

[13] In any event, the federal Undetectable Firearms Act prohibits a person from manufacturing, importing, selling, shipping, delivering, possessing, transferring, or receiving any firearm that is not detectable by a walk-through metal detection as a security exemplar containing 3.7 ounces of steel, or any firearm with major components that do not generate an accurate image before standard airport imaging technology. The federal prohibition was first enacted in 1988 and was renewed for 10 years in December 2013. 18 U.S.C. § 922(p).

components) with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. The Bill fits within this authority.

The Home Rule Amendment provides that a State public general law controls over a conflicting charter county's local law. Art. XI-A, § 1. *See also* LG § 10-206 (providing that a charter county may enact local laws to the extent that they are not preempted by or in conflict with public general laws).

A state law may preempt local law in one of three ways: express preemption, implied preemption, and conflict preemption. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 685 (2019). Regardless of the mode of preemption analysis, Maryland courts recognize a presumption against preemption, with ambiguities resolved in favor of local regulation. Thus, when a local law is enacted under competent authority, it "should be upheld by every reasonable intendment, and reasonable doubts as to the validity of an ordinance should be resolved in its favor." *Mayor & Alderman of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 391 (1979). *See also Mayor and Council of Forest Heights v. Frank*, 291 Md. 331, 337 ("We have also recognized that a local government unit may be justified in going further than the policy in effect throughout the broader governmental unit.")

### A.   The Scope of Express Preemption and the Exception / Authority Reserved to Local Governments.

Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 686 (2019). While the State has expressly preempted some local regulation of firearms, it has also expressly created an exception in CL § 4-209(b), authorizing local firearm regulation with respect to minors and near places of public assembly. Although Bill 4-21 is ultimately sustained because it falls within that express authorization, it is important to note at the outset that the scope

of the express preemption in LC § 4-209(a) is quite narrow and specific.

### 1.    Scope of the express preemption under CL § 4-209

CL § 4-209 provides:

> *§ 4-209. Regulation of weapons and ammunition*
>
> (a)     *State preemption.* -- Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:
>
> (1)     a handgun, rifle, or shotgun; and
> (2)     ammunition for and components of a handgun, rifle, or shotgun.
>
> (b) *Exceptions.* --
>
> (1)     A county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:
> (i)     with respect to minors;
> (ii)    with respect to law enforcement officials of the subdivision; and
> (iii)   except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.
> (2)     A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.
> (3)     A county, municipal corporation, or special taxing district may not prohibit the transportation of an item listed in subsection (a) of this section by a person who is carrying a court order requiring the surrender of the item, if:
> (i)     the handgun, rifle, or shotgun is unloaded;
> (ii)    the person has notified the law enforcement unit, barracks, or station that the item is being transported in accordance with the court order; and
> (iii)   the person transports the item directly to the law enforcement unit, barracks, or station.
>
> (c)     *Preexisting local laws.* -- To the extent that a local law does not create an inconsistency with this section or expand existing regulatory control, a county, municipal corporation, or special taxing district may exercise its existing authority to amend any local law that existed on or before December 31, 1984.

(d)     *Discharge of firearms.* --

    (1)     Except as provided in paragraph (2) of this subsection, in accordance with law, a county, municipal corporation, or special taxing district may regulate the discharge of handguns, rifles, and shotguns.

    (2)     A county, municipal corporation, or special taxing district may not prohibit the discharge of firearms at established ranges.

As the Attorney General has noted, "while State preemption of local firearms regulation is undeniably broad, the preemption statutes are also specific—they preempt regulation of specific activities such as the transport of handguns, the sale or manufacture of firearms, or the ownership or possession of firearms." 93 Md. op. Att'y Gen. 126, 134 (2008) (contrasting the relatively limited preemption of firearm regulation with Md. Code Ann., Transp. § 25-101, broadly preempting "**any** local law . . . on **any** subject covered by the Maryland Vehicle Law, subject to specific exceptions) (emphasis in original).

For example, in 2008, the Attorney General opined that a proposed Baltimore City law, which would require a gun owner to report the theft or loss of a firearm within two days of discovery that the weapon had been lost or stolen, did not fall within the express preemption of CL § 4-209(a). 93 Md. Op. Att'y Gen. 126 (2008). Apart from the duty to report the loss of the firearm, the local law did not otherwise restrict, control, or affect the ownership, possession, or use of firearms. "Its effect, if any, on gun ownership is too remote to be deemed a regulation of ownership, such that it would be expressly preempted by State statute." *Id*. at 126.

Similarly, in *State v. Phillips*, 210 Md. App. 239 (2013), the court concluded that State law, including CL § 4-209(a), did not preempt a Baltimore City law requiring persons convicted of certain gun offenses in Baltimore City to register with the Police Commissioner. The court concluded that, although the State has heavily regulated the field of use, ownership, and possession, of firearms, it has not so extensively regulated the field that all local laws relating to firearms are preempted. *State v. Phillips*, 210 Md. App. 239, 280-281 (2013) (citing with approval

93 Md. op. Att'y Gen. 126 (2008)).

**2. Bill 4-21 Falls Within the Scope of The State Exception / Authority Reserved to Local Government to Regulate Firearms with respect to minors and near places of public assembly**

The amendments to the County's weapons law made in the Bill fit within the authority granted to counties by CL § 4-209(b) to regulate firearms with respect to minors and within 100 yards of places of public assembly.

**a.      The plain language of CL § 4-209**

Local ordinances, such as the Montgomery County Code, are interpreted "under the same canons of construction that apply to the interpretation of [state] statutes." *Kane v. Bd. of Appeals of Prince George's Cnty.*, 390 Md. 145, 161 (2005) (quoting *O'Connor v. Balt. Cnty.*, 382 Md. 102, 113 (2004)). The Court of Special Appeals recently reiterated the by-now familiar principles of statutory construction. *Sullivan v. Caruso Building Belle Oak, LLC*, 251 Md. App. 304, 318 (2021).

The plain language of CL § 2-409 reveals an express grant of authority to counties, municipal corporations, and special taxing districts to regulate firearms with respect to minors and within 100 yards of a place of public assembly, such as a "park, church, school, or public building." The legislative history of CL § 4-209 confirms this interpretation.

**b.      The legislative history of CL § 4-209**

The legislative history of CL § 4-209 was recounted in detail in 76 Md. Op. Att'y Gen. 240, 243-46 (1991).

In 1982, the State considered legislation that would have allowed local governments to impose additional restrictions on the sale of handgun ammunition. Senate Bill 323 (1982) would have amended Md. Code Ann., Art. 27 §§ 442(a) and 445(a) to permit counties, municipalities,

and special taxing districts to impose restrictions more stringent than those imposed under State law. But the bill died in committee. Despite the failure of the state bill, the County went forward with a local bill (Bill 17-82) to regulate the sale of ammunition. Although both the County Attorney and the Attorney General[14] opined that the bill was preempted, the Council enacted the bill.

The bill was challenged, and the Circuit Court for Montgomery County found that it was preempted by State law. *Atlantic Guns, Inc. v. Montgomery Cnty.*, Equity No. 85854 (Cir. Ct. for Montgomery Cnty., Oct. 27, 1983). The decision was appealed to the Court of Special Appeals, but the Court of Appeals granted a writ of certiorari before the intermediate appellate court took any action on the matter.

While the appeal was pending in the Court of Appeals, legislation was introduced in the 1984 session of the General Assembly that would have removed any local authority to regulate weapons and ammunition (SB 66 and HB 315). The bills expressly preempted local governments from regulating the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of a broad range of firearms, explosives, and ammunition. The only possible remaining local authority would have been over the discharge of firearms.

Both bills passed, but Governor Hughes vetoed them both because they would "invalidate beneficial existing local legislation without any corresponding statewide substitute and, contrary to the sponsor's intent, . . . undermine public safety." 1984 Md. Laws 3866-68. The Governor's veto message gave examples of these **beneficial existing local laws** that would be invalidated by passage of the bill, including laws regulating the **possession of a firearm by a minor** and laws prohibiting the possession of a firearm **within 1,000 feet of a place of public assembly**. *Id.* at 3867. Gov. Hughes concluded, "I am unwilling to sign into law a bill that would invalidate the

---

[14] 67 Md. Op. Att'y Gen. 316 (1982).

judgment of local elected officials when they determine that local legislation of the type described above . . . is required within a particular jurisdiction." *Id.* at 3868. An attempt to override the vetoes at the start of the 1985 session failed by a wide margin.

After the veto, the Governor's Office worked with the sponsors of the vetoed bills on a compromise that would except from preemption local laws with respect to minors and in close proximity to places of public assembly. SB 88 and HB 176 were introduced in the 1985 Session as a result. A bill analysis prepared by the Senate Judicial Proceedings Committee stated that the bill would change current law as follows:

> The General Assembly **partially** preempts the rights of counties, municipalities, and special taxing districts to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, transportation, and discharge of handguns, rifles, shotguns, and their ammunition.
>
> Some exceptions are made in this preemption. **Localities still may regulate some weapons and their ammunition with respect to minors, various places of public assembly,** and law enforcement and security personnel. Also, localities may continue to regulate the discharge of handguns, rifles, and shotguns.

76 Md. Op. Att'y Gen. 240, 246 (1991) (emphasis in original). The Committee report also noted that "[t]he bill's intent is to reserve within the General Assembly the **primary** power to regulate **some forms** of weaponry and ammunition" (*quoted in* 93 Md. op. Att'y Gen 126, 134 n.8 (emphasis in original)). The legislation passed.[15] The Attorney General's May 23, 1985, bill review letter to the Governor noted that the effect of the bill might be in some respects to reduce State preemption of local laws that would otherwise be invalid under older law. *Id.* ("the new authority to regulate in specific ways would control over the older broad preemption"). Governor Hughes signed SB 88 on May 28, 1985, which became 1985 Md. Laws ch. 724 and which added

---

[15] The day after the house of Delegates passed HB 176, the Maryland Court of Appeals concluded that the County's regulation of ammunition sales was preempted by State law. *Montgomery Cnty. v. Atlantic Guns, Inc.*, 302 Md. 540 (1985).

§ 36H to Art. 27.

The Attorney General concluded that Art. 27, § 36H

is a perfect example of a statute reflecting a political compromise. Its predecessor legislation, Senate Bill 66 and House Bill 315 of 1984, would have preempted virtually all local regulation of firearms, ammunition, and explosives. Governor Hughes' veto prompted several compromises from the legislative sponsors of the 1984 legislation. Among those compromises was the creation of a specific exception to the general preemption rule, to allow local governments to regulate weapons and ammunition with respect to minors [and within 100 yards of or in a park, church, school, public building, and other place of public assembly]. Indeed, that exception can be traced to Governor Hughes' veto message itself, in which he asserted the need for "comprehensive" regulatory authority, either at the State or the local level, and identified examples of local legislation that he believed should not be preempted. The effect of the compromise is that local governments may regulate to whatever extent they consider appropriate for the protection of the public, so long as they do so only in the areas identified in § 36H(b)

76 Md. Op. Att'y Gen. 240, 247 (1991). In 2002, Art. 27, § 36H was recodified to the then-newly created Criminal Law Article as CL § 4-209, without substantive change according to the revisor's note. 2002 Md. Laws ch. 26. Subsection (b)(3) was added in 2010, forbidding a county, municipal corporation, or special taxing district from prohibiting, under certain circumstances, the transportation of a firearm by a person who is carrying a court order requiring the surrender of the item. 2010 Md. laws ch. 712.

### c.    Interpretation of the exceptions in CL § 4-209

The Maryland Attorney General has twice construed the scope of the exceptions to preemption under CL § 4-209(b) and each time found them sufficient to sustain local County firearm regulations. In 1991, after examining both the statutory language and confirmatory legislative history of CL § 4-209, the Attorney General concluded that it did not preempt (and specifically authorized) the County's authority to enact a proposed local law that would prohibit leaving a loaded—or an unloaded firearm near ammunition—in the proximity of a child, with an exception for guns secured in a locked gun cabinet or by a trigger lock. 76 Md. Op. Att'y Gen. 240

27

(1991).[16] The Attorney General noted that the State law's grant of local authority to regulate firearms "with respect to" minor was quite broad. "Therefore, any regulation that bears a reasonable relation to minors' access to, or use of, firearms is a firearms regulation 'with respect to minors.'" *Id.* at 242. "[The proposed County bill] unquestionably is one 'with respect to minors.' It seeks to protect them against death and injury caused by improperly stored firearms. . . . To be sure, the bill regulates the behavior of adults, not children. But since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id.*

A few years later, the Attorney General similarly concluded that CL § 4-209(b) authorized proposed Montgomery and Prince George's County laws that would (1) prohibit gun dealers from selling, leasing, or otherwise transferring a handgun without also selling or otherwise providing with each handgun a trigger lock or similar device that is designed to prevent the unintentional discharge of the handgun; and (2) require gun dealers to post a conspicuous notice describing the trigger lock sale requirement and the requirement in State law that gun owners keep their guns out of the reach of children. 82 Md. op. Att'y Gen. 84 (1997). The County enacted the proposed bill (County Bill 11-97) shortly thereafter. 1997 Laws Montgomery Cnty. (LMC) ch. 16 (presently codified at MCC § 57-8).

### d.    The Bill falls within the exceptions in CL § 4-209

Comparison of CL § 4-209 and the Bill reveals the following: CL § 4-209(b) expressly **permits** a county, municipal corporation, or special taxing district to do the following:

- "regulate the purchase, sale, transfer, ownership, possession, and transportation of";
- a handgun, rifle, or shotgun, their ammunition and their components;

---

[16] The Attorney General construed CL § 4-209's predecessor—Art. 27, § 36H.

28

- o "with respect to minors" and

- o "within 100 yards of or in a park, church, school, public building, and other place of public assembly."

Bill 4-21 implements this grant of authority by prohibiting a person from committing the following acts:

- selling, renting, lending, or otherwise transferring **to a minor** an untraceable ghost or undetectable gun (or a major component thereof) or a computer code or program to make a gun through a 3D printing process

- purchasing, selling, transferring, or possessing an untraceable ghost gun, including a gun created through a 3D printing process, **in the presence of a minor**;

- storing a leaving an untraceable ghost undetectable gun (or a major component thereof) in a location that the person knows or should know is **accessible to a minor**;

- selling, transferring, possessing, or transporting an untraceable ghost or undetectable gun or a firearm created through a 3D printing process[17] **in or within 100 yards of a place of public assembly**. This prohibition does not apply to:

  - o the possession of a firearm or ammunition, other than an untraceable ghost or undetectable gun, in the person's own home; or

  - o separate ammunition of an unloaded firearm transported in an enclosed case or a locked firearms rack on a motor vehicle, unless the firearm is an untraceable ghost or undetectable gun.

---

[17] Montgomery Cnty. Code § 57-11(a) already prohibited selling, transferring, possession, or transporting a handgun, rifle, or shotgun or their ammunition, in or within 100 yards of a place of public assembly. That provision was enacted in 1997. 1997 Laws Montgomery Cnty. ch. 14 (Bill 4-97). **Ex. E.**

Plaintiffs argue that the Bill exceeds the authority granted under CL § 4-209(b). Compl. ¶ 42(a); Pls.' Mot. for Summ. J. 9-14. They write that the County has "effectively rewritten" CL § 4-209 with amendments to County law that are "breathtaking and leave no doubt that the County has vastly overreached." Pls.' Mot. for Summ. J. 10. But, in fact, the Bill fits comfortably within the authority granted to counties in CL § 4-209(b).

First, in breathless hyperbole, Plaintiffs argue that the new definition of a place of public assembly "literally regulates the totality ·of Montgomery County, including untold tens of thousands of homes and business throughout the County. Indeed, it is difficult to think of any location within the County that is not within 100 yards of a sidewalk or street, or other or other location where people 'may assemble.'" Pls.' Mot. for Summ. J. 12.

The plain language of the Bill belies Plaintiffs' argument. CL § 4-209(b)(1)(iii) empowers a county to regulate firearms "within 100 yards of or in a park, church, school, public building, and other place of public assembly." Consistent with this authorization, the Bill defines a place of public assembly as follows:

> A 'place of public assembly' is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building.

The Bill's definition of a place of public assembly is co-extensive with the definition in CL § 4-209(b)(1)(iii). As Plaintiffs note, "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned." Pls.' Mot. for Summ. J. 13-14 (quoting *In re Wallace W.*, 333 Md. 186, 190 (1993)). *See also United States v. Andrews*, 441 F3d 220, 224 (4th Cir. 2006). This list of places in the Bill

30

is consistent with the list in CL § 4-209, if somewhat longer. The Bill's examples of places of public assembly ("park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center") are as much places of public assembly as CL § 4-209's examples (a park, church, school, public building). Plaintiffs' suggestion that the Bill's definition of a place of public assembly "literally encompasses every sidewalk, every street, every restaurant, every coffee shop, and every private business in the entire County" is not supported by the plain language of the Bill.

Plaintiffs' argument that the Bill improperly includes places on private property is similarly refuted by the plain language of CL § 4-209. Both § CL § 4-209 and the Bill include private property as an example of a place of public assembly. CL § 4-209 lists a "church" as a place of public assembly, evidencing the General Assembly's intent not to limit "places of public assembly" to places that are located on public property. The Bill does the same.

Finally, Plaintiffs argue that the County has impermissibly expanded CL § 4-209's definition of "place of public assembly" because the Bill defines it as "a place where the public **may** assemble." (Emphasis added.) Under Plaintiffs reading of CL § 4-209, the County's authority to regulate firearms is limited to "100 yards of specific, existing locations where people typically **already** assemble." Pls.' Mot. for Summ. J. 13 (emphasis in original). In other words, in Plaintiffs' view, a location cannot be a place of public assembly until it is "broken in;" that is, until people have actually assembled there at least once. Aside from being a nonsensical interpretation, which is to be avoided, Plaintiffs' interpretation is, again, not supported by the plain language of CL § 4-209, which empowers the County to regulate firearms within 100 yards of or in a park, church, school, public building, and other place of public assembly." It does not limit the County's

authority to places where the public has **previously** assembled for an established period of time. Nor does it limit the County's authority to places where the public is **currently** assembled. The County's authority is not limited to a church when services are being conducted, or a school when it is in session. Contrary to the cannons of statutory interpretation, Plaintiffs are reading words into the statute that are not there.

>   **3.    The specific authority granted in CL § 4-209 governs, not the earlier enacted, more general express preemption provisions.**

Plaintiffs contend that the General Assembly has repealed, *sub silentio*, the authority granted in CL § 4-209(b) through a series of statutes that were either enacted before CL § 4-209 or are more general than CL § 4-209. This strained argument is contrary to well accepted cannons of statutory construction, which Plaintiffs cite, but fail to apply.

As an initial matter, this Court should construe the various statutory provisions regarding firearms so that they do not conflict with one another.

> When the language of a section of a statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the purpose, aim, or policy of the enacting body, and attempt to harmonize provisions dealing with the same subject so that each may be given effect. In addition to harmonizing the provisions within a single statutory scheme, where statutes relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope.

*Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 714-15 (2010) (internal citations and quotations omitted). Therefore, "when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable." *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 183 (2006).

Two other canons are helpful when seeking to reconcile multiple statutes that related to the same subject matter. First, "[i]t is an often repeated principle that a specific statutory provision

governs over a general one. Thus where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable." *Schreyer v. Chaplain*, 416 Md. 94, 118 n.12 (2010) (internal quotations and citations omitted). Second, when the General Assembly enacts a specific provision subsequent to a general provision, the later-enacted provision controls. *Prince George's Cnty. v. Fitzhugh*, 308 Md. 384, 390 n.4 (1987) (citing earlier authority).

Plaintiffs maintain that the authority granted to counties in CL § 4-209(b) to regulate firearms with respect to minors and near a place of public assembly was constrained by four earlier enacted statutes that more generally preempt the authority of a county to regulate the possession, transfer, and sale of a regulated firearm. Compl. ¶¶ 20 & 42; Pls.' Mot. for Summ. J. 14-18. Specifically, Plaintiffs rely upon PS §§ 5-104 (preempting a local jurisdiction from regulating the sale of a regulated firearm); 5-133(a) (preempting a local jurisdiction from regulating the possession of a regulated firearm); 5-134(a) (preempting a local jurisdiction from regulating the transfer of a regulated firearm) and 1972 Md. Laws ch. 13 § 6 (an uncodified provision preempting a political subdivision from regulating the wearing, carrying, or transporting of handguns).

It is readily apparent that these four provisions, generally preempting local regulation of the sale, possession, transfer, and wearing, carrying, or transporting of a firearm, are broader than CL § 4-209(b)'s narrower grant of authority to local jurisdictions to regulate those same aspects of firearms **with respect to minors and within 100 yards of a place of public assembly**. In other words, CL § 4-209(b) can (and should) be read exactly as intended and written: an exception to the otherwise general preemption in these other statutes and, of course, a specific exception to the preemption in CL § 4-209(a). In this way, these firearm statutes can be read in harmony, avoiding

a strained reading that, contrary to accepted cannons of statutory interpretation, would render nugatory the grant of authority in CL 4-209(b).

In addition, CL § 4-209 was enacted in 1985, after these other statutes were enacted in 1966 and 1972. The Attorney General addressed this very issue—the relationship between the authorization afforded local governments in Art. 27, § 36H (now codified in CL § 4-209) and the four general firearm preemption statutes Plaintiffs rely upon—when reviewing the County's authority to enact a proposed local law regulating a minor's access to firearms. 76 Md. Op. Att'y Gen. 240 (1991).

> Other preemption provisions relating to handguns do not affect the issue, in our opinion. Under Article 27, §§ 442(a) [recodified as **PS § 5-104** in 2003 Md. Laws ch. 5] and 445(a) [recodified as PS §§ **5-133, 5-134** in 2003 Md. Laws ch. 5], the State has preempted local regulation of the sale, possession, and transfer of pistols and revolvers. **These provisions were enacted in Chapter 502 of the Laws of Maryland 1966.** Furthermore, Chapter 13 of the Laws of Maryland **1972** contains an uncodified section preempting local laws regulating the wearing, carrying, or transporting of handguns. *See Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 542, 489 A.2d 1114 (1985).
>
> Customary principles of statutory construction, however, lead us to give effect to the specific and later-enacted authorization for local regulation in § 36H(b), notwithstanding these other preemption provisions. First, where the General Assembly has enacted both a specific and a general statute, and the general statute includes the same subject matter as the more specific, the general statute governs only those cases that do not fall within the provisions of the specific statute. *See Lumberman's Mut. Casualty v. Ins. Comm'r*, 302 Md. 248, 268-69, 487 A.2d 271 (1985) (citing earlier authority). Moreover, when the General Assembly enacts a specific provision subsequent to a general provision, the later-enacted provision controls. *Prince George's County v. Fitzhugh*, 308 Md. 384, 390 n.4, 519 A.2d 1285 (1987) (citing earlier authority).
>
> Under either canon of construction, the specific regulatory authority given local governments under § 36H(b) prevails over more general preemption provisions found elsewhere. Hence, we turn to the task of construing § 36H(b)(1).

76 Md. Op. Att'y Gen. 240, 241 (1991) (emphasis added).[18]

---

[18] Plaintiffs sheepishly acknowledge that the three Public Safety Article statutes were

Plaintiffs' reliance upon PS § 5-207(a) fares no better. Compl. ¶¶ 20 & 42; Pls.' Mot. for Summ. J. 17-18. Finally, PS § 5-207(a)'s general preemption of the right of a local jurisdiction to regulate the transfer of a rifle or shotgun can easily be reconciled with CL § 4-209(b)'s more narrow exception permitting local regulation of a handgun, rifle, or shotgun, their ammunition and component parts, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. It is unreasonable to assume, as Plaintiffs do, that the General Assembly intended to repeal, *sub silentio*, the express authority granted to localities in this back handed manner. The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law. For this reason, another cardinal rule of statutory construction is that courts will not find an implied repeal unless demanded by irreconcilability or repugnancy. *Harden v. Mass Transit Admin.*, 277 Md. 399, 406-07 (1976). PS § 5-207(a) and CL § 4-209(b) are hardly irreconcilable.

In addition, the County has prohibited the transfer of a rifle or shotgun to a minor, except where the transferor is the minor's parent or instructor, since 1966. Montgomery Cnty. Code § 103-6 (1966). **Ex. F**.[19] Because "the General Assembly is presumed to be aware of existing local law when it legislates," the legislature's failure to "address the interaction of its statutes with pre-existing local ... laws suggests that it intended no change in the applicability of the local laws."

---

amended and **reenacted** after 1985. Pls.' Mot. for Summ. J. 18. If mere reenactment was determinative, then it should be noted that CL § 4-209 was most recently amended in 2010 (to add subsection (b)(3)), at which time the authority of a county in subsection (b)(1) to regulate firearms with respect to minors and near a place of public assembly was left undisturbed.

[19] The County more generally prohibited the transfer of a gun to a minor, except where the transferor is the minor's parent or instructor, since 1955. Montgomery Cnty. Code § 95-6 (1955). **Ex. G**.

35

*Ad + Soil, Inc. v. Cty. Comm'rs of Queen Anne's Cty.*, 307 Md. 307, 333 (1986); *see also City of Balt. v. Sitnick*, 254 Md. 303, 322 ("There is a presumption of statutory construction that the Legislature acts with the knowledge of existing laws on the subject matter under consideration."). As in *Sitnick*, the state law "included no repealer of the [local] law[s] nor, as a matter of fact, the standard clause repealing all inconsistent laws." 254 Md. at 322. This failure to grapple with preexisting local law "is an important factor indicating that there was no intent by the General Assembly to preempt the field." *Nat'l Asphalt Pavement Ass'n, Inc. v. Prince George's Cty.*, 292 Md. 75, 79 (1981). *See also Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979). This failure to "mention[] preexisting local … ordinances [is] a clear indication that the General Assembly did not intend to preempt these local laws." *Bd. of Child Care of Balt. Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 698 (1989)

## B.    Implied Preemption

State law does not impliedly preempt Bill 4-21. Pls.' Mot. for Summ. J. 19-20.

Preemption may be implied only if there is "unequivocal conduct of the General Assembly" that "manifest[s] a purpose to occupy exclusively a particular field." *Bd. of Child Care of Balt. Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 697 (1989). The General Assembly must "act[] with such force that an intent by the State to occupy the entire field must be implied." *Talbot Cty. v. Skipper*, 329 Md. 481, 488 (1993) (citation omitted); *see also City of Balt. v. Sitnick*, 254 Md. 303, 323 (1969).

The "primary indicia of a legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated the field." *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 299 (1993) (quoting *Skipper*, 329 Md. at 488). In making this assessment, courts may also consider various "secondary factors" in determining whether a local

law is impliedly preempted. *See id.* at 299-300.[20]

      Given that implied preemption is the search for legislative intent to preempt in the absence of express legislative guidance, application of that doctrine is inappropriate where the State law expressly **authorizes** local regulation, as is the case here. In other words, this Court should not seek to divine whether the General Assembly intended to preempt the County from regulating handguns, rifles, or shotguns (or the component parts) with respect to minors and within 100 yards of a place of public assembly when the General Assembly has expressly authorized the County to do just that in CL § 4-209(b).

      In *State v. Phillips*, 210 Md. App. 239 (2013), the court concluded that State law did not expressly or impliedly preempt a Baltimore City law requiring persons convicted of certain gun offenses in Baltimore City to register with the Police Commissioner. With regard to implied preemption, the court concluded that, although the State has heavily regulated the field of use, ownership, and possession, of firearms, it has not so extensively regulated the field that all local laws relating to firearms are preempted. *Id.* at 280-281. The court quoted 93 Md. Op. Att'y Gen. 126 (2008) (opining that the Baltimore City law was not preempted), where the Attorney General noted that although the State has broadly preempted much local regulation, it has also "enacted specific exceptions to that preemption," where local regulation is authorized.

      The legislature is presumed to know of the Attorney General's interpretation of its statutes,

---

[20] These factors include "whether the state laws provide for pervasive administrative regulation"; "whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances"; "whether a state agency … has recognized local authority to act in the field"; "whether the particular aspect of the field sought to be regulated … has been addressed by the state legislation"; "whether a two-tiered regulatory process … would engender chaos and confusion"; whether "some local control has traditionally been allowed"; and "whether local laws existed prior to the enactment of the state laws." *Allied Vending*, 332 Md. at 299-300.

which can place a gloss on subsequent legislation. *Montgomery Cnty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 695 n.29 (2019). As noted above, the Attorney General has twice interpreted the exceptions in CL § 4-209(b) as permitting local regulation of firearms, notwithstanding other broader express preemption provisions in State law. Legislative acquiescence in the Attorney General's interpretation of one of its statutes is a factor in determining legislative will. *Demory Bros. v. Bd. of Public Works of Md.*, 20 Md. Appl. 467, 473 (1974).

This Court cannot conclude that the State has impliedly preempted all local regulation of firearms in light of the express authorization in CL § 4-209(b) and subsequent confirmatory Attorney General opinions.

## C.   Conflict

Plaintiffs also argue that the Bill conflicts with many of the same State laws cited above. Pls.' Mot. for Summ. J. 21-30.[21]

---

[21] Under the heading "Bill 4-21 is 'inconsistent' with other Maryland statutes," Plaintiffs include a passing reference that the Bill County Code "raises profound Second Amendment questions" under *Heller*. Pls.' Mot. for Summ. J. 22-23. Profundity aside, Plaintiffs have chosen not to include a Second Amendment claim in their Complaint. Even under *Heller*, the Supreme Court made clear that certain restrictions on access to guns were allowed, including laws that involved restrictions over public places. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). The Fourth Circuit has further held that limits to certain types of firearms does not "severely burden...the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (affirmed after summary judgment, the Maryland Firearm Safety Act was valid even though it banned possession of assault weapons). Assuming *arguendo* an impact on the possession of "ghost," "untraceable," and "undetectable" guns, Plaintiffs and County residents are nevertheless afforded the right "to protect themselves with a plethora of other firearms and ammunition" under the Bill; the Bill does "not effectively disarm individuals or substantially affect their ability to defend themselves." *Kolbe*, 849 F.3d at 138-139. Plaintiff's reliance on cases involving stun guns and one out of Texas involving the manufacture of guns with 3-D printers are of no moment. See *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 699 (W.D. Tex. 2015) ("While Plaintiffs' logic is appealing [relating the historic gunsmithing to modern-day 3-D printing of guns], Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in

"The crux of conflict preemption is that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not **expressly** permitted. Conflict preemption occurs when a local law prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Montgomery Cty. v. Complete Lawn Care, Inc.*, 240 Md. App. 664, 688 (2019) (emphasis in original) (internal quotations and citations omitted). Maryland courts have thus long followed the concurrent powers doctrine, committed to the principle that "[a]dditional regulation by [a local] ordinance does not render [the local ordinance] void" even though the state may have enacted statutes regulating a field. *Rossberg v. State*, 111 Md. 394 (1909) (citation omitted); *accord E. Tar Prods. Corp. v. State Tax Comm'n of Maryland*, 176 Md. 290, 296-97 (1939) (observing that a local law requiring "more than the [state] statute requires creates no conflict").

The Bill does not conflict with CL § 4-203. Compl. ¶ 42; Pls.' Mot. for Summ. J. 22-24. Subsection (a) of that statute sets out the general prohibition against wearing, carrying, or transporting a handgun (whether open or concealed) on or about the person or in a vehicle. Subsection (b) sets out a variety of exceptions, including § 4-203(b)(6) (on real estate that a person owns or leases), § 4-203(b)(7) (when authorized in the scope of employment), and § 4-203(b)(5) (transporting by a bona fide gun collector).

Plaintiffs' argument here, that the Bill prohibits possessing a handgun in places that fall within one or more of the exceptions in CL § 4-203(b), is again based upon their overbroad reading of the Bill's definition of a "place of public assembly" as encompassing "the totality of

---

the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the International Traffic in Arms Regulations constitute a burden on the core of the Second Amendment").

Montgomery County." Pls.' Mot. for Summ. J. 12. As already discussed above, the Bill's definition of a place of public assembly is coextensive with the definition in CL § 4-209(b). Since 1997, the County has exercised this grant of state authority, prohibiting the selling, transferring, possession, or transporting of a handgun, rifle, or shotgun, their ammunition and component parts, in or within 100 yards of a place of public assembly. 1997 Laws Montgomery Cnty. ch. 14 (Bill 4-97). **Ex. E.**

Second, CL § 4-203, like the other provisions of State law cited by Plaintiffs, was enacted before the authority granted to the County in CL § 4-209. Specifically, the General Assembly enacted CL § 4-203 in 1972, as Art. 27, § 36B. *See* 1972 Md. Laws ch. 13 (which, as noted above, included the uncodified preemption language regarding local regulation of the wearing, carrying, or transporting of handguns). CL § 4-209 was enacted later, in 1985. As the Attorney General noted, that compromise legislation excepted from the scope of preemption local regulation of a handgun, rifle, or shotgun, their ammunition and component parts, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly. The Bill cannot conflict with State law when it is enacted pursuant to an explicit exception allowing for local regulation.

Plaintiffs also argue that the Bill exceeds the scope of regulation permitted under CL § 4-209 because, in regulating minors' access to firearms, it impermissibly regulates the conduct of adults. Pls.' Mot. for Summ. J. 27. But the Attorney General has noted that "any regulation that bears a reasonable relation to minors' access to, or use of, firearms is a firearms regulation 'with respect to minors'" permissible under CL § 4-209(b). 76 Md. Op. Att'y Gen. 240, 242 (1991). Thus, the Attorney General found un-preempted a proposed County bill that would (1) prohibit gun dealers from selling, leasing, or otherwise transferring a handgun without also selling or otherwise providing with each handgun a trigger lock or similar device that is designed to prevent

40

the unintentional discharge of the handgun; and (2) require gun dealers to post a conspicuous notice describing the trigger lock sale requirement and the requirement in State law that gun owners keep their guns out of the reach of children. "To be sure, the bill regulates the behavior of adults, not children. But since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id.* Here, the Bill serves this purpose by prohibiting a person from purchasing, selling, transferring, or possessing a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

The Bill also prohibits a person from giving, selling, renting, lending, or otherwise transferring a ghost gun or its major components to a minor. Plaintiffs assert that this provision is overbroad because certain major components of a ghost gun (e.g., the slide, cylinder, or barrel) are not a firearm and are not required to be serialized under Federal law; only a finished receiver is required to be serialized. Pls.' Mot. for Summ. J. 30. But the County's authority under State law to regulate firearms with respect to minors (and within 100 yards of a place of public assembly) includes "ammunition for **and components of** a handgun, rifle, or shotgun." CL § 4-209(b)(1) ("A county . . .. may regulate the times listed in subsection (a) of this section.") The County's authority to regulate the components of ghost guns does not depend upon whether those components are themselves firearms or required to be serialized under Federal or State law.[22]

---

[22] Plaintiffs allude to a Fourteenth Amendment substantive due process claim within their Express Powers Act argument, concluding that the Bill violates their parent-Plaintiffs' liberty interest in the "care, custody, and control of their children." Pls.' Mot. for Summ. J. 28-29. They cite to *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Again, as is true of their Second Amendment argument, the Complaint contains no claim for violation of substantive due process. In any event, the cases they rely on are wholly inapposite, involving the custody of children. The County is unaware of any legal authority for the proposition that parents have a substantive due process right to instruct their children on the use of a specific type of firearm. Moreover, it is long established that "[t]he fundamental right of a parent to control the upbringing of her child...is 'neither absolute nor unqualified.'" *D.B. v. Cardall*, 826 F.3d 721, 740-41 (4th Cir. 2016). It is "subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that

The Bill is not preempted by, or in conflict with, State law. The County asks that this Court issue a declaration to that effect.

### III.   COUNT III: MARYLAND TAKINGS CLAUSE - BILL 4-21 IS A LAWFUL EXERCISE OF MONTGOMERY COUNTY'S POLICE POWERS

In Count III of the Complaint, the Plaintiffs claims that the Bill is a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

#### A.   The Restrictions of the Bill Do Not Amount to a Taking

The Bill does not amount to a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

Article III, § 40 of the Maryland Constitution states:

> The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation.

Article 24 of the Maryland Declaration of Rights states:

> That no man ought to be … disseized of his freehold, liberties or privileges … or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

The federal analog, contained within the Fifth Amendment,[23] states:

> No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

---

interest." *Id.*

[23] "The decisions of the Supreme Court are practically direct authorities for the Fifth and Fourteenth Amendments to the United States Constitution and Article III, § 40, of the Maryland Constitution . . . ." *Niefert v. Dep't of the Envir.*, 395 Md. 486, 518 (2006) (internal quotations omitted); *see also Dep't of Trans. v. Armacost*, 299 Md. 392, 420 (1984).

Plaintiffs argue that "[u]nder Maryland's Taking Clause and Due Process Clause, "[n]o matter how 'rational' under particular circumstances, the State is constitutionally precluded from abolishing a vested property right or taking one person's property and giving it to someone else." Compl. ¶ 47 (quoting *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 623, 805 A.2d 1061 (2002)). This argument misapprehends the holding of *Dua*[24] and ignores the police powers granted to the State and charter counties like the Defendant.

### B. Montgomery County May Exercise Its Police Powers to Restrict Possession and Use of Guns and Related Equipment

As noted above, Montgomery County is a charter county and as such enjoys broad authority to legislate. *Tyma v. Montgomery Cnty.*, 369 Md. 497, 511 (2002) (Express Powers Act is broadly construed to permit charter counties to legislate beyond the powers expressly enumerated in the Express Powers Act). This grant of powers provides charter counties with a general police power to enact ordinances for the public good as long as the ordinances are not preempted by and do not conflict with other laws of the State. *Snowden v. Anne Arundel County,* 295 Md. 429, 432-33 (1983); *Prince Geo's Co. v. Chillum-Adelphi,* 275 Md. 374, 382 (1975); *Montgomery League v. Greenhalgh,* 253 Md. 151, 160-61 (1969).

In *Montgomery Citizens League v. Greenhalgh,* the Court of Appeals recognized that the purpose of Article XI-A of the Maryland Constitution was to transfer local lawmaking powers

---

[24] The quoted portion of *Dua* is inapposite because Bill 4-21 does not empower the County to confiscate ghost guns *and give them to someone else* and also because Plaintiffs do not have a vested property interest in the continuous ownership and possession of a highly regulated piece of personal property. Furthermore, Bill 4-21 is not retroactive because the proscribed conduct at issue takes place in the future. Only potential future conduct of possessing ghost guns and untraceable guns in the presence of minors and in certain places of public assembly will amount to a violation of the County code. Plaintiffs' prior purchase and possession of the subject ghost guns and untraceable guns remains legal and beyond the scope of Bill 4-21 as does continued possession of those items outside of the presence of minors and outside of places of public assembly.

from the state legislature to county governments thereby giving the county council full legislative power to enact local laws on all matters covered by the express grant of powers granted by the Express Powers Act pursuant to Art. XI-A, § 2. *Greenhalgh*, 253 Md. 159-60. Thus, where the County's regulations passed pursuant to its police powers do not contravene state or federal law, the County has properly exercised the police powers delegated to it by the State.

### C.    The Bill is *Per Se* Not a Taking because the County is Authorized to Impose a Regulatory Burden on Personal Property

The state's interest in "the protection of its citizenry and the public safety is not only substantial, but compelling." *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (*en banc*). The Supreme Court has routinely upheld property regulations, even those that "destroy[]" a recognized property interest, where a state "reasonably concluded that the health, safety, morals, or general welfare" would be advanced. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 125, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); see also *Mugler v. Kansas*, 123 U.S. 623, 668, 8 S. Ct. 273, 31 L. Ed. 205 (1887) ("A prohibition . . . upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking . . . .").

The Supreme Court's takings cases distinguish between two types of takings: (1) physical appropriation of private property and (2) regulatory burdens on private property. See *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (discussing the distinct types of takings cases). Plaintiffs herein allege a regulatory burden on their property, and not a physical appropriation, because the Bill does not confiscate any variety of firearm. Instead, the Bill merely regulates the possession and use of certain defined ghost guns and untraceable guns in the presence of a minor and within 100 yards of a place of public assembly. While the Bill places a regulatory burden on the use of ghost guns and untraceable guns, it does not ban them outright.

Unlike physical takings cases, regulatory takings cases distinguish between real property[25] and personal property when determining whether compensation is owed. With regard to personal property, the Supreme Court has explained that "by reason of the State's traditionally high degree of control over commercial dealings, [the owner of personal property] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027-28 (1992); *see also Horne v. Department of Agric.*, 135 S. Ct. 2419, 2427 (2015) (reiterating the "different treatment of real and personal property in a regulatory case" as articulated in *Lucas*).

The Fourth Circuit has held that even outright bans of personal property, much less the targeted restrictions of the Bill, do not amount to a taking where the state exercises its police power for the benefit of the health, safety, and welfare of its citizens. In *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404 (4th Cir. 2007), the Fourth Circuit held that South Carolina's complete ban on the possession or sale of certain gambling machines, which had previously been legal to possess and sell, was not a taking, even though as a result of the newly-enacted law, the machines "lost all market value" and the owner's "business [selling the machines] became worthless." *Id.* at 406. Relying on *Lucas*, the Fourth Circuit reiterated that "the owner of any form of personal property must anticipate the possibility that new regulation might

---

[25] With regard to real property, "a property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers," but this "'implied limitation'" does not permit the state to "subsequently eliminate all economically valuable use" of land. *Lucas*, 505 U.S. at 1027 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. City of New York*, 438 U.S. at 124. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law . . . ." *Id.*

significantly affect the value of his business," particularly "in the case of a heavily regulated and highly contentious activity . . . ." *Id.* at 411 (citing *Lucas*, 505 U.S. at 1027-28). Critically here, the *Holliday* Court held that regulations for the public good in heavily regulated fields like video gambling and production of alcohol "*per se* do not constitute takings, and thus analysis under existing takings frameworks is unnecessary."[26]

It is incontrovertible that firearms are some of the most highly regulated items of personal property. Much like the owners and sellers of gambling machines in *Holliday*, the owners and sellers of firearms have no reasonable expectation that states or counties will not place restrictions on the possession and other use of those firearms—particularly with respect to minors and places of public assembly. Therefore, according to the holding of *Holliday*, the Bill is *per se* not a taking and no further analysis is required.

Relying extensively on *Holliday*, the Fourth Circuit recently rejected lead Plaintiff Maryland Shall Issue, Inc.'s ("MSI") challenge to Senate Bill 707 (2018), now codified at CL §§ 4-301, 4-305.1, 4-306, prohibiting possession of "rapid fire trigger devices." See *Md. Shall Issue v. Hogan*, 963 F.3d 356 (4th Cir. 2020). MSI argued that SB 707 ran afoul of the Takings Clause because the law was "tantamount to a direct appropriation of . . . personal property." *Id.* at 365. The Fourth Circuit disagreed, finding that although the ban "may make the personal property

---

[26] In the context of regulatory takings, as opposed to physical appropriation, the Court often makes factual inquiries "designed to allow careful examination and weighing of all the relevant circumstances." *Murr*, 137 S. Ct. at 1942 (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)). The Court has articulated "a complex of factors" to guide courts, including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). "A central dynamic of the Court's regulatory takings jurisprudence . . . is its flexibility." *Murr*, 137 S. Ct. at 1943. Because Plaintiffs' allegations here are *per se* not a taking, the analysis described in *Murr* is not necessary.

economically worthless," it did not constitute a direct appropriation because it did "not require owners of rapid fire trigger activators to turn them over to the Government or to a third party." *Id.* at 366.

The Bill is even further removed from a taking because it does not ban possession of ghost guns and undetectable guns, much less require them to be turned over to the government or a third party as required by the Fourth Circuit in *Md. Shall Issue v. Hogan*. Instead, the Bill merely restricts possession and transfer of ghost guns and undetectable guns in certain locations and with respect to minors. The Bill does not amount to a taking without just compensation under Article III, § 40 of the Maryland Constitution and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. The County requests that this Court enter a declaration to that effect.

## CONCLUSION

For all of the foregoing reasons, Defendant Montgomery County respectfully requests that this Court dismiss the Complaint because Plaintiffs lack standing. Alternatively, the County requests that grant its Motion for Summary Judgment, enter judgement in its favor, and declare that:

Count I: Bill 4-21 is a valid local law under Md. Const. Art. XI-A (the Home Rule Amendment);

Count II: Bill 4-21 is authorized by, and not preempted by or in conflict with, State law; and

Count III: The restrictions of Bill 4-21 are *per se* not a taking and Bill 4-21 was properly enacted pursuant to the County's police powers.

Respectfully submitted,

JOHN P. MARKOVS
ACTING COUNTY ATTORNEY

/s/ *Patricia Lisehora Kane*
Patricia Lisehora Kane, Chief
Division of Litigation
patricia.kane@montgomerycountymd.gov
CPF ID No. 8011010189

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations
edward.lattner@montgomerycountymd.gov
CPF ID No. 8612300002

/s/ *Sean C. O'Hara*
Sean C. O'Hara
Associate County Attorney
sean.ohara@montgomerycountymd.gov
CPF ID No. 1212120337

Attorneys for Defendant Montgomery
County, Maryland
101 Monroe Street, Third Floor
Rockville, Maryland 20850-2540
(240) 777-6700
(240) 777-6705 Fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of February 2022, a copy of the foregoing was electronically served through the MDEC to:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste. C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org

/s/ *Edward B. Lattner*
Edward B. Lattner, Chief
Division of Government Operations

21-003732
County MTD Cross MSJ.docx

48

| | |
|---|---|
| Bill No. | 4-21 |
| Concerning: | Weapons - Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns |
| Revised: | 04/06/2021   Draft No. 5 |
| Introduced: | January 19, 2021 |
| Enacted: | April 6, 2021 |
| Executive: | April 16, 2021 |
| Effective: | July 16, 2021 |
| Sunset Date: | None |
| Ch. 7 , Laws of Mont. Co. | 2021 |

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council Vice-President Albornoz
Co-Sponsors: Council President Hucker, Councilmembers Katz, Jawando, Navarro, Friedson, Rice,
Riemer and Glass

**AN ACT** to:
(1) define terms related to firearm laws;
(2) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
(3) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
(4) generally amend the law regarding firearms and other weapons.

By amending
Montgomery County Code
Chapter 57, Weapons
Sections 57-1, 57-7, and 57-11

By adding
Montgomery County Code
Chapter 57, Weapons
Section 57-16



DEFENDANT'S
EXHIBIT

A

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| <u>Double underlining</u> | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*